**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

| | |
|---|---|
| PDVSA US LITIGATION TRUST<br><br>Plaintiff,<br><br>v.<br><br>LUKOIL PAN AMERICAS LLC; LUKOIL PETROLEUM LTD.; COLONIAL OIL INDUSTRIES, INC.; COLONIAL GROUP, INC.; GLENCORE LTD.; GLENCORE INTERNATIONAL, A.G.; GLENCORE ENERGY UK LTD.; MASEFIELD A.G.; TRAFIGURA A.G.; TRAFIGURA TRADING LLC; TRAFIGURA BEHEER B.V.; VITOL ENERGY (BERMUDA) LTD.; VITOL S.A.; VITOL, INC.; FRANCISCO MORILLO; LEONARDO BAQUERO; DANIEL LUTZ; LUIS LIENDO; JOHN RYAN; MARIA FERNANDA RODRIGUEZ; HELSINGE HOLDINGS, LLC; HELSINGE, INC.; HELSINGE LTD., SAINT-HÉLIER; WALTROP CONSULTANTS, C.A.; GODELHEIM, INC.; HORNBERG INC.; SOCIETE DOBERAN, S.A.; SOCIETE HEDISSON, S.A.; SOCIETE HELLIN, S.A.; GLENCORE DE VENEZUELA, C.A.; JEHU HOLDING INC.; ANDREW SUMMERS; MAXIMILIANO POVEDA; JOSE LAROCCA; LUIS ALVAREZ; GUSTAVO GABALDON; SERGIO DE LA VEGA; ANTONIO MAARRAOUI; CAMPO ELIAS PAEZ; PAUL ROSADO; BAC FLORIDA BANK; EFG INTERNATIONAL A.G.; BLUE BANK INTERNATIONAL N.V.<br><br>Defendants. | **JURY TRIAL DEMANDED**<br><br>Case No. _____ |

## COMPLAINT

Plaintiff PDVSA US Litigation Trust ("Plaintiff"), for its Complaint against Defendants

(each, a "Defendant, and, collectively, the "Defendants"):[1] Lukoil Pan Americas LLC; Lukoil

---

[1] Each capitalized term defined in this Complaint shall have the meaning ascribed to it herein when being so defined, unless the context clearly requires otherwise.

Petroleum Ltd.; Colonial Oil Industries, Inc.; Colonial Group, Inc.; Glencore Ltd.; Glencore International A.G.; Glencore Energy UK Ltd.; Masefield A.G.; Trafigura A.G.; Trafigura Trading LLC; Trafigura Beheer B.V.; Vitol Energy (Bermuda) Ltd.; Vitol S.A.; Vitol, Inc.; Francisco Morillo; Leonardo Baquero; Daniel Lutz; Luis Liendo; John Ryan; Maria Fernanda Rodriguez; Helsinge Holdings, LLC; Helsinge, Inc.; Helsinge Ltd., Saint-Hélier (Helsinge Holdings LLC, Helsinge, Inc. and Helsinge Ltd., Saint-Hélier, collectively "Helsinge"); Waltrop Consultants, C.A.; Godelheim, Inc.; Hornberg Inc.; Societe Doberan, S.A.; Societe Hedisson, S.A.; Societe Hellin, S.A.; Glencore de Venezuela, C.A.; Jehu Holding Inc.; Andrew Summers; Maximiliano Poveda; Jose Larocca; Luis Alvarez; Gustavo Gabaldon; Sergio De La Vega; Antonio Maarraoui; Campo Elias Paez; Paul Rosado; BAC Florida Bank; EFG International A.G.; and Blue Bank International N.V. (BAC Florida Bank, EFG International A.G.; and Blue Bank International N.V., collectively the "Bank Defendants"), alleges, upon personal knowledge as to its own actions and states upon information and belief as to all other matters as follows:

## NATURE OF THE ACTION

1.      This action arises from an on-going conspiracy (the "Helsinge Enterprise") among international oil companies and traders, their banks, and co-conspirators, including corrupt agents and officials of the Venezuelan state-owned energy company Petróleos de Venezuela, S.A. ("PDVSA"):

> (a)     to fix prices, rig bids, and eliminate competition in the purchase and sale of crude oil and hydrocarbon products by PDVSA;
>
> (b)     to misappropriate PDVSA proprietary data and intellectual property; and
>
> (c)     to systematically loot PDVSA by causing corrupt PDVSA officials not to collect monies due PDVSA, to pay inflated prices for products and services

2

acquired by PDVSA, to accept artificially low prices for products sold by
PDVSA, to overlook the failure to deliver products and services paid for by
PDVSA, and to fraudulently conceal what was owed to PDVSA.

2.    By fixing prices, rigging bids, and eliminating competition in PDVSA's purchase
and sale of crude oil and hydrocarbon products, the Helsinge Enterprise was able to:

> (a)    prevent companies, including many legitimate American companies, from
> competing for PDVSA's business, and thereby secure that business for the
> Oil Company Conspirators (as defined below) members of the Helsinge
> Enterprise;
>
> (b)    purchase PDVSA products at artificially low prices; and
>
> (c)    sell products and services to PDVSA at artificially high prices.

3.    By bribing and corrupting PDVSA agents and officials, the Helsinge Enterprise
was able to favor the Oil Company Conspirators and disadvantage, or exclude, many legitimate
American and other competitors, including by:

> (a)    structuring tenders for PDVSA contracts to favor the Oil Company
> Conspirators and Helsinge and disadvantage, or exclude, competitors;
>
> (b)    securing inside, proprietary information concerning PDVSA's requirements
> and plans before such information was publicly available, again with the
> purpose and effect of advantaging the Oil Company Conspirators and
> disadvantaging, or excluding, competitors; and
>
> (c)    securing inside, proprietary information concerning competing bids so that
> the Oil Company Conspirators could beat them.

3

4. By bribing and corrupting PDVSA agents and officials, the Helsinge Enterprise also induced such agents and officials not to collect the full amounts due to PDVSA for the sale of PDVSA products to the Oil Company Conspirators and to overlook the failure of the Oil Company Conspirators to deliver the full amount of products bought and paid for by PDVSA.

5. Initially, the Helsinge Enterprise acquired the proprietary inside PDVSA information used to implement its schemes by bribing and corrupting PDVSA agents and officials to provide such information on a case-by-case basis.

6. However, as the conspiracy progressed, the Helsinge Enterprise was able to obtain direct access to PDVSA's proprietary servers, including by installing an interconnected, "clone server," and otherwise obtaining direct access to PDVSA's servers, that enabled the Helsinge Enterprise to misappropriate PDVSA inside and proprietary information on a real-time basis.

7. The losses to PDVSA and the gains to Defendants as a result of the misdeeds by the Helsinge Enterprise amount to many billions of dollars.

## PARTIES

8. Plaintiff PDVSA US Litigation Trust is a trust established pursuant to the laws of New York to investigate and pursue claims against Defendants and others.

9. Through bribes and intimidation, Defendants succeeded in concealing their schemes for many years. However, as a result of an intensive investigation by lawyers and investigators in the United States, Venezuela, and Europe, the nature of Defendants' wrongful conduct was uncovered, and the PDVSA US Litigation Trust was formed on July 27, 2017 for the specific purpose, among other things, of pursuing recovery for Defendants' misconduct.

4

10. Defendant Lukoil Pan Americas, LLC is a limited liability company organized under the laws of Delaware with its principal office located at 1095 Avenue of the Americas, New York, New York 10036.

11. Defendant Lukoil Petroleum Ltd. is a company organized under the laws of Switzerland with its principal place of business located at Rue Du Conseil-General 9, 1204 Geneva, Switzerland.

12. Defendant Colonial Oil Industries, Inc. is a corporation organized under the laws of Georgia with its principal place of business at 101 North Lathrop Avenue, Savannah, Georgia 31415.

13. Defendant Colonial Group, Inc. is a corporation organized under the laws of Georgia with its principal office located at 101 North Lathrop Avenue, Savannah, Georgia 31415.

14. Defendant Glencore Ltd. is a company organized under the laws of England and Wales with its principal office located at 50 Berkeley Street, London, England W1J 8HD.

15. Defendant Glencore International A.G. is a corporation organized under the laws of Switzerland with its principal office located at 301 Tresser Boulevard, Stamford, Connecticut 06901.

16. Defendant Glencore Energy UK Ltd. is a company organized under the laws of England and Wales with its principal office located at 50 Berkeley Street, London, England W1J 8HD.

17. Defendant Masefield A.G. is a corporation organized under the laws of Switzerland with its principal office located at Baarerstrasse 69, Zug 6300, Switzerland.

18. Defendant Trafigura AG is a corporation organized under the laws of Switzerland with its principal office located at 1 rue de Jargonnant, CH1207 Geneva, Switzerland.

5

19. Defendant Trafigura Trading LLC, formerly known as "Trafigura, Inc.," is a limited liability company organized under the laws of Delaware with its principal office located at 1401 McKinney Street, Suite 1500, Houston, Texas 77010.

20. Defendant Trafigura Beheer BV is a corporation organized under the laws of the Netherlands with its principal office located at Evert van de Beekstraat 1-82, The Base, Tower B, 5th floor, 1118 CL Schiphol, The Netherlands.

21. Defendant Vitol Energy (Bermuda) Ltd., is a company organized under the laws of Bermuda with its principal office located at Magnolia Towers, Hamilton HM 12, Bermuda.

22. Defendant Vitol SA, is a corporation organized under the laws of Switzerland with its principal office located at Boulevard du Pont d'Arve 28, CH1205 Geneva, Switzerland.

23. Defendant Vitol, Inc., formerly known as "Vitol SA, Inc.," is a corporation organized under the laws of Delaware with its principal office located at 2925 Richmond Avenue, 11th Floor, Houston, Texas 77098.

24. Defendant Francisco Morillo is a Venezuelan national residing in Boca Raton, Florida, Miami, Florida and Geneva, Switzerland.

25. Defendant Leonardo Baquero is a Venezuelan national residing in Miami, Florida.

26. Defendant Daniel Lutz is a Venezuelan national residing in Miami, Florida.

27. Defendant Luis Liendo is a Venezuelan national residing in Orlando, Florida.

28. Defendant John Ryan is a U.S. national residing in Biscayne Park, Florida.

29. Defendant Maria Fernanda Rodriguez is a Venezuelan national residing in Miami, Florida and a confidante of Ryan, Morillo and Baquero, upon information and belief.

30. Defendant Helsinge Holdings, LLC, is a limited liability company organized under the laws of Florida with its principal office located at 1221 Brickell Avenue, Suite 948, Miami,

6

Florida 33131.

31. Defendant Helsinge, Inc. is a corporation organized under the laws of Panama with its principal place of business at 1221 Brickell Avenue, Suite 948, Miami, Florida 33131.

32. Defendant Helsinge Ltd., Saint-Hélier is a company organized under the laws of Jersey (U.K.) with its principal place of business in Geneva, Switzerland.

33. Defendant Waltrop Consultants, C.A. is a corporation organized under the laws of Venezuela with its principal office located at 1221 Brickell Avenue, Suite 948, Miami, Florida 33131.

34. Defendant Godelheim, Inc. is a corporation organized under the laws of Panama with its principal office located at 1221 Brickell Avenue, Suite 948, Miami, Florida 33131.

35. Defendant Hornberg Inc. is a corporation organized under the laws of Panama with its principal office located at 1221 Brickell Avenue, Suite 948, Miami, Florida 33131.

36. Defendant Societe Doberan, S.A. is a corporation organized under the laws of Panama with its principal office located at 1221 Brickell Avenue, Suite 948, Miami, Florida 33131.

37. Defendant Societe Hedisson, S.A. is a corporation organized under the laws of Panama with its principal office located at 1221 Brickell Avenue, Suite 948, Miami, Florida 33131.

38. Defendant Societe Hellin, S.A. is a corporation organized under the laws of Panama with its principal office located at 1221 Brickell Avenue, Suite 948, Miami, Florida 33131.

39. Defendant Glencore de Venezuela, C.A. is a corporation organized under the laws of Panama with its principal office located at 1221 Brickell Avenue, Suite 948, Miami, Florida 33131.

40. Defendant Jehu Holding Inc. is a corporation organized under the laws of Barbados with its principal place of business in Barbados.

41. Defendant Andrew Summers is an individual residing in Geneva, Switzerland.

8

42.    Defendant Maximiliano Poveda is an individual residing in Houston, Texas.

43.    Defendant Jose Larocca is an individual residing in Geneva, Switzerland.

44.    Defendant Luis Alvarez is an individual residing in London, United Kingdom.

45.    Defendant Gustavo Gabaldon is an individual residing in Cos Cob, Connecticut.

46.    Defendant Sergio De La Vega is an individual residing in Mexico City, Mexico.

47.    Defendant Antonio Maarraoui is an individual residing in Houston, Texas.

48.    Defendant Campo Elias Paez is an individual residing in Caracas, Venezuela.

49.    Defendant Paul Rosado is an individual residing in Savannah, Georgia.

50.    Defendant BAC Florida Bank is a Florida banking corporation with its principal office located at 169 Miracle Mile, R-10, Coral Gables, Florida 33134.

51.    Defendant EFG International A.G., formerly known as "BSI," is a banking company organized under the laws of Switzerland with its principal office located at Bleicherweg 8, CH-9022 Zurich, Switzerland.

52.    Defendant Blue Bank International N.V., formerly known as "Premier Bank International N.V." is a banking company organized under the laws of Curaçao with its principal office located at Abraham de Veerstraat 9, Willemstad, Curaçao.

## JURISDICTION AND VENUE

53.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises out of violations of the federal laws and has supplemental jurisdiction over the related state claims pursuant to 28 U.S.C §1367.

54.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, a substantial

9

portion of the affected interstate trade and commerce was carried out in this district, and several of the Defendants reside and have offices in this district.

## BACKGROUND

### I. The Origin of the Conspiracy and the Relevant Participants.

55.     One of the principal participants in the investigations that uncovered the illegal conduct described herein is John Brennan, Chief Executive Officer of The Brennan Group LLC and a former Senior Detective at New Scotland Yard. His Declaration is attached hereto as Exhibit A, and the statements therein are incorporated by reference herein.

56.     Beginning on March 30, 2001, two Venezuelan nationals, Francisco Morillo ("Morillo") and Leonardo Baquero ("Baquero"), formed an energy consultancy firm called Waltrop Consultants, C.A. ("WTRPC") in Venezuela. WTRPC's ostensible purpose was to provide market intelligence to energy traders doing business in Venezuela and with PDVSA specifically.

57.     On January 30, 2004, Morillo and Baquero formed an energy advisory and trading firm called Helsinge, Inc., which they incorporated in Panama. Helsinge, Inc. was originally located in Caracas, Venezuela, but Helsinge and WTRPC thereafter relocated their principal place of business to Miami, Florida.[2] Helsinge and WTRPC describe themselves as energy advisory firms.

58.     On behalf of the Helsinge Enterprise, Morillo and Baquero also formed many additional entities incorporated in Panama or Barbados (the "Panamanian Companies") to facilitate the various illicit schemes described herein. Among the Panamanian Companies formed by

_____

[2] Helsinge also maintains offices in Geneva, Switzerland and Saint-Hélier, Jersey, in the Channel Islands.

10

Morillo and Baquero are: (1) Societe Doberan, S.A.; (2) Societe Hedisson, S.A.; (3) Societe Hellin, S.A.; (4) Hornberg Inc.; (5) Godelheim, Inc.; (6) Glencore de Venezuela, C.A.; and (7) Jehu Holding, Inc.

59.     As is the case with WTRPC and Helsinge, the Helsinge Enterprise through Morillo and Baquero exerts total control over the Panamanian Companies. However, Morillo and Baquero do not appear as directors for any of the Panamanian Companies. Instead, the Panamanian Companies share the same five directors who reside in Panama and Miami, Florida.

60.     The Panamanian Companies are shell companies that serve as conduit entities for illegal payments and money laundering schemes (a) used to provide Morillo and Baquero and their co-conspirators with inside information on PDVSA's tenders for the sales of its hydrocarbon products as well as PDVSA's tenders for the purchase of its light crude oil products necessary for PDVSA's refinery operations so that it can lighten its domestic heavy crude oil products for export to countries outside of Venezuela, including the United States, and (b) used to distribute a portion of the Helsinge Enterprise's ill-gotten gains to participants.

61.     Beginning in 2004, Helsinge (through Morillo and Baquero) received PDVSA's confidential inside information for itself and its select multi-national energy trading corporation clients by bribing PDVSA business managers in PDVSA's Commercial and Supply Department and its Transport Department.

62.     These PDVSA departments collectively control the PDVSA tenders for contracts concerning PDVSA's purchases and sales of hydrocarbon products. The bribes were facilitated and paid out of the Panamanian Companies at the direction of Morillo and Baquero and with the knowledge and approval of their multi-national energy trading corporation co-conspirators.

11

63. The international energy trading companies that have been provided access to this proprietary PDVSA information and that participated in the bribery payments and bid-rigging and other schemes include: (1) Lukoil Pan Americas LLC; (2) Lukoil Petroleum Ltd.; (3) Colonial Oil Industries, Inc.; (4) Colonial Group, Inc.; (5) Glencore Ltd.; (6) Glencore International, A.G.; (7) Glencore Energy UK Ltd.; (8) Masefield A.G.; (9) Trafigura A.G.; (10) Trafigura Trading LLC; (11) Trafigura Beheer B.V.; (12) Vitol Energy (Bermuda) Ltd.; (13) Vitol S.A.; and (14) Vitol, Inc. (each, an "Oil Company Conspirator" and, collectively, the "Oil Company Conspirators").

64. The Oil Company Conspirators have offices throughout the United States.

65. The Oil Company Conspirators' senior traders participating in this illicit activity include:

    (a)    Trafigura senior traders, including Maximiliano Poveda, Jose Larocca and former Trafigura senior trader, Andrew Summers. Poveda is the Head Trader for Trafigura's LPG business worldwide. Larocca is a Director of Trafigura and the Head of Oil Trading and Member of Management Board of Trafigura Beheer B.V. Summers is the former Head of Fuel Oil & Bitumen for Trafigura;

    (b)    Glencore senior traders, including Luis Alvarez (the former global head of crude-oil trading) and Gustavo Gabaldon (an oil products trader) and former Glencore Business Development Executive, Sergio De La Vega;

    (c)    Vitol's Director of Latin American and Caribbean Trading, Antonio Maarraoui; and

    (d)    Colonial Group's senior trader, Paul Rosado.

12

66.     Poveda, Larocca, Summers, Alvarez, Gabaldon, De La Vega, Maarraoui and Rosado are sometimes collectively referred to herein as "Individual Trader Conspirators".

67.     From 2004 to the present time, the Individual Trader Conspirators have served as among the most senior energy traders for each of the Oil Company Conspirators. In the case of Trafigura and Glencore, Jose Larocca and Luis Alvarez served as his company's director and head of global trading.

68.     Among the banks used to facilitate the bribe payments made by the Helsinge Enterprise, including by Morillo and Baquero, Helsinge, and the Oil Company Conspirators are: (1) BAC Florida Bank; (2) Blue Bank International N.V., (formerly "Premier Bank International N.V."); (3) EFG International A.G. (formerly "BSI"); and (4) Credit Suisse, through accounts located in Florida, Switzerland, and Curacao.

69.     This illegal activity is ongoing and the conspirators continue to use the same Panamanian Companies and banks to launder the payments to the bribed PDVSA agents and officials.

## II.     The Bid-Rigging and Price-Fixing Schemes Concerning PDVSA's Tenders for Its Hydrocarbon Sales and Purchases.

70.     PDVSA's policy is to buy and sell products only from traders whom it has pre-approved for doing business with PDVSA.

71.     From 2004 to 2011, neither Helsinge, WTRPC, nor any of the Panamanian Companies were approved as authorized oil and gas traders with PDVSA.

72.     Notwithstanding this fact, in 2004, Morillo and Baquero leveraged their contacts within PDVSA's Commercial and Supply Department and entered into an illicit agreement with several business managers at PDVSA whereby Morillo and Baquero would pay the PDVSA employees bribes in exchange for advance and confidential information concerning PDVSA's

13

future tenders for its purchases and sales of hydrocarbon products and the bids made by competing oil traders.

73. Among the key business managers coordinating this illicit scheme from within PDVSA were Rene Hecker (the business manager of the Commercial and Supply Department until 2013), Marco Malave (Head of the PDVSA Commercial and Supply Department from 2012 to 2017), Edgar Garcia (a business manager in PDVSA's Freight and Transport Department until 2008), and Ysmel Serrano (the current Head of PDVSA's Commercial and Supply Department) (each, a "Bribed PDVSA Employee" and, collectively, the "Bribed PDVSA Employees").

74. The Oil Company Conspirators were already existing traders approved to do business with PDVSA in 2004. However, Morillo and Baquero promised and delivered to the Oil Company Conspirators full details of competing bids as well as PDVSA's confidential inside information concerning PDVSA's future tenders months before the marketplace received the same information from PDVSA.

75. As explained in greater detail below, the advance receipt of this confidential PDVSA information provided the Oil Company Conspirators with an acute advantage over their marketplace competitors in "winning" the tenders offered by PDVSA. Many of these disadvantaged competitors are oil trading companies in the United States.

76. Morillo and Baquero, acting through Helsinge and the Panamanian Companies, provided inside proprietary PDVSA information as well as access to the Bribed PDVSA Employees to the Oil Company Conspirators. In return, the Oil Company Conspirators paid Helsinge and the Panamanian Companies' fees or "commissions" for the receipt of the inside information and rigged tenders. These payments compensated Morillo and Baquero for serving as

14

the "middle man" for the sale of PDVSA's confidential proprietary information and were also the funds ultimately used in part for the bribe payments to the Bribed PDVSA Employees.

77. As explained below, Morillo and Baquero attempted to disguise the bribes and launder these illicit payments. The payments to the Bribed PDVSA Employees were paid by the Oil Company Conspirators to the Panamanian Companies' bank accounts. Morillo and Baquero would then pay the bribes to the Bribed PDVSA Employees from the Panamanian Companies' bank accounts. Shortly before or after the payment of these bribes, the Oil Company Conspirators would receive the advance PDVSA tender information and their competitors' competing bids so that the Oil Company Conspirators were assured to win their choice of PDVSA contracts.

78. As explained below, the Oil Company Conspirators knowingly participated in this scheme. Indeed, the fraudulent and anti-competitive schemes were so lucrative for the Oil Company Conspirators, that as part of the conspiracy Individual Trader Conspirators personally received payments to reward their involvement in the conspiracy and assure their silence.

79. The conspirators expended substantial time and resources to conceal their illicit conduct, including by fraudulently generating fictitious "agency" or "advisory" agreements between the Panamanian Companies and the Oil Company Conspirators whereby the Oil Company Conspirators purportedly "retained" the Panamanian Companies as "market research" or "business intelligence" firms to assist the Oil Company Conspirators' "liaison" with PDVSA.

80. These fictitious agency and advisory agreements were generated between Morillo and Baquero and the Oil Company Conspirators to provide the facade of legitimacy to the millions of dollars in annual bribe payments being funneled by the Oil Company Conspirators, through the Panamanian Companies, to the corrupt PDVSA agents and officials, and other co-conspirators, in furtherance of their bid-rigging, price-fixing and other schemes. Indeed, each of the Oil Company

15

Conspirators entered into an agency or advisory agreement with one or more Panamanian Companies that served as the conduit for the payments to the Bribed PDVSA Employees and Individual Trader Conspirators.

81.     Given that the Panamanian Companies have never been approved to do business of any kind with PDVSA and that the Oil Company Conspirators were all approved traders with PDVSA, there was not even a colorable business justification for these advisory or agency agreements, which purported to pay the Panamanian Companies excessively high compensation for their "services," including non-refundable monthly retainers between $15,000 and $150,000, plus added compensation of $0.05 to $0.22 per barrel of oil product bought from or sold to PDVSA by the Oil Company Conspirators as a result of the Panamanian Companies' "services."

82.     The manner in which Morillo and Baquero communicated PDVSA's proprietary tender information and the third-parties' competing bids to the Oil Company Conspirators took several forms, as described more fully below.

83.     Morillo and Baquero and the Bribed PDVSA Employees communicated via numerous private email accounts using a litany of aliases to conceal their identities. For example, Rene Hecker (one of the Bribed PDVSA Employees) used a private email account at sclups@gmail.com to communicate with Morillo at either Morillo's WTRPC email account or his many private email accounts, including franciscomorillo@cantv.net, whereby Hecker or one of his complicit subordinates would provide Morillo and Baquero with the details concerning upcoming PDVSA tenders.

84.     Morillo and Baquero would then relay PDVSA's proprietary information concerning future tenders to the Oil Company Conspirators at their corporate email accounts or, at other times, to the Individual Trader Conspirators' private email accounts. As explained in

16

greater detail below, the Oil Company Conspirators would then instruct Morillo and Baquero on how to rig selected future tenders in such a manner so as to either ensure (1) that they would win those tenders by being the only bidders able to fulfill the quantitative and qualitative terms of the rigged tenders or (2) that their bids would beat the bids of competing oil traders.

85.     Morillo and Baquero would then relay the Oil Company Conspirators' directives to the Bribed PDVSA Employees over private email to ensure the targeted future tenders were modified accordingly.

86.     As explained below, separate and apart from the use of private emails to disseminate PDVSA's proprietary and confidential information, Morillo and Baquero, with the assistance of certain Bribed PDVSA Employees, particularly Luis Liendo, set up a "clone server," and related interconnected electronic means to gain immediate access to PDVSA's confidential information.

87.     Thus, Morillo and Baquero had direct "real time" access into PDVSA's computer system in the Commercial and Supply Department. This enabled Morillo and Baquero to access PDVSA's confidential information, including with respect to its future tender contracts and the real time competing bids submitted by the Oil Company Conspirators' market competitors for tenders already released by PDVSA for competitive bidding.

88.     Morillo and Baquero would then either share with the Oil Company Conspirators their real-time access to PDVSA's computer system or communicate the competing bid information to the Oil Company Conspirators via private email or through Instant Message Boards in which Morillo and Baquero and the Individual Trader Conspirators, using aliases to conceal their identities, would discuss the competing third-party bids. Each of the Individual Trader Conspirators have operated, and continue to operate, with aliases of their own and the conspirators

17

continue to use the clone server and other means to obtain PDVSA's confidential information to their economic advantage. *See* the Declaration of John Thackray, dated February 12, 2018, attached hereto as Exhibit B, whose statements are incorporated by reference herein.

89. The conspirators have concealed their actions from the marketplace and from PDVSA (apart from the Bribed PDVSA Employees whose misconduct was unauthorized and outside the scope of their employment). In addition to the actions described above, Morillo and Baquero instructed the Bribed PDVSA Employees to destroy evidence maintained at PDVSA concerning the modification of the tenders targeted by the conspirators so as to avoid detection by PDVSA through its internal controls. The Bribed PDVSA Employees were also instructed to destroy any evidence of their communications with the conspirators.

90. As a result of the improper influence of the Helsinge Enterprise, in 2011 PDVSA's accreditation department approved Helsinge as an authorized PDVSA trader.

91. The aforementioned bid-rigging and price-fixing schemes continued after Helsinge became an approved PDVSA trader and continue to the present day. In addition, Helsinge now trades on its own account as well as continuing to serve as the "advisor" or "agent" for the Oil Company Conspirators, whereby Morillo and Baquero continue being compensated by the Oil Company Conspirators for providing the inside information and rigging the tenders on the Oil Company Conspirators' behalf.

**III.  Control and Rigging of PDVSA's Tender Process for Oil Products That It Sells and Purchases.**

92. Morillo and Baquero have control over the PDVSA tender process through the Bribed PDVSA Employees in the Commercial and Supply Department. Morillo and Baquero control the details of the launch of a tender by PDVSA and the tender's terms.

18

93. This gives Helsinge and the Oil Company Conspirators an illegal and grossly disproportionate advantage because it provides them with the ability to dictate the procedure and substance of the tenders in a manner that makes it logistically impossible for a market competitor to even submit a valid competing bid.

94. For example, PDVSA's Planning Department notifies the Commercial and Supply Department of PDVSA's supply of heavy crude available for sale or conversely its light crude requirements approximately 45 to 60 days in advance of when a tender should be "officially" launched into the marketplace for bids.

95. Instead of promptly issuing the tender for the particular hydrocarbon product to the approved PDVSA traders, however, the Bribed PDVSA Employees only communicate this information to Morillo and Baquero and withhold releasing the tender until such time as the Bribed PDVSA Employees receive feedback from Morillo and Baquero as to whether the tender is of interest to Helsinge or the Oil Company Conspirators.

96. Morillo and Baquero use the "first look" and advance lead time to coordinate with the Oil Company Conspirators (including through the Individual Trader Conspirators) and determine if any of the conspirators have an interest in closing on the specific tender.

97. If so, Morillo and Baquero directed the Bribed PDVSA Employees as to how to change the quantitative and qualitative terms of the tender to ensure that one of the Oil Company Conspirators is the winning bidder (per the instructions received by Morillo and Baquero from the Oil Company Conspirators). The adjustments made by the Bribed PDVSA Employees in the Commercial and Supply Department include: (a) lowering the minimum pricing formula for a particular tender; (b) requiring the use of a particular shipping company as the oil tanker transport;

19

(c) altering the loading dates and times; (d) amending the terms of payment for the tender; and (e) demanding that a particular inspection company be available as the quality control agent.

98.     The Bribed PDVSA Employees hold back the tender issuance date to the marketplace in order to compress the bid window and the time period from "best and final" tender offers to the closing date when the buyer must take delivery of the product on its tanker and leave the loading port.

99.     By compressing the time period on those tenders of interest to the Oil Company Conspirators, the market competitors are placed at a further severe disadvantage in submitting competing bids because they cannot arrange for financing, transport vessels or inspection teams in such a short period of time.

100.    By contrast, Helsinge and the Oil Company Conspirators have ample time to establish the lines of credit and transport services required to close on a contract because they receive the tender information at least thirty (30) days before the competitors do. As a result, Helsinge and the Oil Company Conspirators are able to acquire PDVSA's crude oil at a price artificially lower than the price that would result from competitive bidding.

101.    Helsinge and the Oil Company Conspirators are engaging in the same fraudulent scheme for supplying PDVSA with light crude products that PDVSA needs for blending with its heavy crude oil in order to sell its oil products into the marketplace, including the United States.

102.    Just as with PDVSA's oil products that it sells through tenders designed to facilitate competitive bidding, Morillo and Baquero and the Oil Company Conspirators pay bribes to the Bribed PDVSA Employees in exchange for receipt of confidential PDVSA information and control over the tender process for PDVSA's light-crude oil purchases.

20

103. Among the light crude products that PDVSA needs to purchase with regularity are naphtha, MTBE, and Blend Stock. Without these light crude products, PDVSA cannot refine its heavy crude and export its own hydrocarbon products.

104. Helsinge and the Oil Company Conspirators use their advance knowledge of PDVSA's demand requirements for the light crude products (*e.g.*, naphtha) to buy as much of these light crude products and petrochemical solvents from energy suppliers in advance of PDVSA's official issuance of the tenders so as to prevent competitors from being able to source these products during the compressed timeframes demanded in the rigged tenders. In addition, Helsinge and the Oil Company Conspirators can dictate the price of these light crude products sold to PDVSA because of their total control over the tender process.

105. Morillo and Baquero's provision of inside proprietary PDVSA tender information to the Oil Company Conspirators has occurred from 2004 until the present date.

106. The Helsinge Enterprise's illicit schemes and control over the Bribed PDVSA Employees, as orchestrated by Morillo and Baquero, have enabled Helsinge and the Oil Company Conspirators to earn billions in unlawful profits at the expense of PDVSA.

107. Helsinge and the Oil Company Conspirators are now the dominant suppliers of light crude products to PDVSA. Between 2004 and 2017, Helsinge, Glencore, Lukoil, Trafigura, and Vitol constituted five out of the top ten suppliers of light crude products to PDVSA as measured by volume and total contract price.

108. This is remarkable for Helsinge given its small size (under 10 employees, temporary office space, and no significant infrastructure) and the fact that it was not an approved bidder or seller to PDVSA until 2011.

21

109. Indeed, on December 7, 2016, Helsinge was awarded one of the largest contracts for the supply of naphtha in PDVSA's history – the supply of 18 million barrels of heavy naphtha which was scheduled for delivery in the first six months of 2017.

## IV. Bid-Rigging and Price-Fixing Through Direct Real-Time Access to PDVSA's Computer System.

110. Morillo and Baquero and their co-conspirators have implemented a second layer of competitive advantage (also illicit) to ensure that competitors that try to bid on rigged PDVSA tenders are edged out on the "best and final" offers because they have real time access to competing third-party bids through Morillo and Baquero's use of a "clone server," and other electronic interconnections, which provides them direct, real-time access to the confidential information of the PDVSA Commercial and Supply Department.

111. A clone server was originally installed at Morillo and Baquero's Miami offices by a former PDVSA IT Administrator named Luis Liendo. Liendo was an associate of Bribed PDVSA Employee Rene Hecker. Liendo is himself a Bribed PDVSA Employee who received direct payments from Morillo and Baquero (through the Panamanian Companies) in exchange for his services.

112. Morillo and Baquero have referred to Liendo by his alias, "The Nerd," and his bribe payments have been recorded in the Panamanian Companies' books and records.

113. Liendo successfully set up a clone server to operate automatically and provide Morillo and Baquero and their co-conspirators with instantaneous real time "live access" to the PDVSA Commercial and Supply server.

114. Morillo and Baquero and the co-conspirators continue to utilize the clone server, including to provide Morillo and Baquero and, through them, the Helsinge Enterprise, with direct

access to PDVSA internal communications at their Miami office, which serves as the principal place of business for Helsinge, WTRPC, and the Panamanian Companies.

115. Initially, Morillo and Baquero utilized the clone server and conveyed the data so obtained to the Oil Company Conspirators. However, since at least as early as 2013, and up to the present, Morillo and Baquero have been able to provide the Oil Company Conspirators with direct access to the clone server and the PDVSA Commercial and Supply Department. This access is controlled by Morillo and Baquero who are paid by the Oil Company Conspirators for this illicit advantage.

116. In order to prolong the illicit scheme, Morillo and Baquero took active measures to fraudulently conceal the scheme from PDVSA's management. The scheme continued for over a decade because Morillo and Baquero and their co-conspirators intentionally and knowingly concealed material facts, including that the PDVSA tenders were rigged and that Morillo and Baquero and their co-conspirators had access to PDVSA's confidential, inside information.

117. To conceal their scheme, the co-conspirators bribed corrupt high-level PDVSA managers to monitor and sabotage any potential discovery of the scheme and to rig the tenders and bid awards to create a false appearance of regular market transactions. In addition, Morillo and Baquero ensured that their scheme was not discovered by monitoring PDVSA's internal computer system using the clone server that was created for them by the Bribed PDVSA Employees.

118. Absent the co-conspirators' active measures to covertly prevent any discovery of the illicit scheme, PDVSA would have ceased doing business with the Oil Company Conspirators and Helsinge.

V.    **The Payments Flowing from the Oil Company Conspirators to the Bribed PDVSA Employees via the Panamanian Companies.**

119.    Payments from the Oil Company Conspirators to the Bribed PDVSA Employees flowed and continue to flow, among other means, through the Panamanian Companies.

120.    The Oil Company Conspirators wire payments into the Panamanian Companies' bank accounts (many of which are located in Florida and elsewhere in the United States). Typically, within one week of receiving these payments from the Oil Company Conspirators, Morillo and Baquero wire transfer the payments to the Bribed PDVSA Employees from the same Panamanian Companies' bank accounts.

121.    Morillo and Baquero and their co-conspirators have undertaken elaborate efforts to facilitate the bribe payments to the Bribed PDVSA Employees. For example, payments to these employees have been made to "straw men" recipients ranging from shell companies to relatives. Moreover, in an effort to conceal these payments, the records of these payments routinely refer to the recipients through aliases.

122.    Morillo and Baquero have coordinated the payments running to the Bribed PDVSA Employees and the Individual Trader Conspirators from 2004 until the present time by using the Panamanian Companies as the conduit entities to facilitate and launder the payments.

123.    The Oil Company Conspirators were fully apprised of all bribe payments made by Morillo and Baquero which were disguised as "representation fees" or "*honorarios*" in the books and records of the Oil Company Conspirators.

124.    The Oil Company Conspirators have also reconciled the bribes against the contracts steered toward each Oil Company Conspirator. These schedules include payments made to the Oil Company Conspirators' own traders (and sometimes their spouses).

24

125.   Morillo and Baquero have maintained similar records with the Oil Company
Conspirators and the scheme remains in place today.

**VI.   Banks Facilitated the Fraudulent Scheme.**

126.   Morillo and Baquero could not have perpetuated the multibillion-dollar fraudulent
scheme without the active facilitation of the Bank Defendants.

127.   The Bank Defendants failed to follow the due diligence requirements commonly
referred to as "know your customer" rules imposed by banking regulations, industry standards and
internal rules. The "know your customer" rules are designed to detect and prevent the type of
money laundering scheme Morillo and Baquero executed. These rules require a reasonable inquiry
to determine the intended purpose of a customer's transactions and whether a customer's business
operations, and the proceeds of those operations, constitute an illegal scheme. To the contrary, the
Bank Defendants had actual and/or constructive knowledge of the fraud run by Morillo, Baquero,
and the Helsinge Enterprise. The evidence of the Bank Defendants' actual and/or constructive
knowledge include:

   (a)   Morillo and Baquero frequently opened and closed accounts on their own
         behalf, and on behalf of the Panamanian Companies, including closing and
         opening accounts within the same day;

   (b)   Morillo and Baquero and the Panamanian Companies made frequent
         intercompany wire transfers that were obviously not related to the operation
         of any regular business;

   (c)   Morillo and Baquero provided identical pretextual and suspicious reasons
         for closing and opening accounts;

(d) Morillo and Baquero provided evasive and obscure answers to questions regarding the Panamanian Companies' business operations and the identity of their owners; and

(e) Morillo and Baquero and the Bribed PDVSA Employees shared the same private bankers at the Bank Defendants and opened and closed accounts in tandem and wired substantial sums of monies between their accounts at the Bank Defendants.

128. For example, Morillo and Baquero paid Rene Hecker hundreds of thousands of dollars in bribes in four transactions over a three-month period. Those payments were paid out of a Premier Bank International N.V. (now Blue Bank International N.V.) account held in the name of one of the Panamanian Companies and into a Premier Bank International N.V. account held in the name of Rene Hecker's shell entity. All of these transactions were facilitated by a single banker at Premier Bank International N.V., Randolph Arvelo. Two weeks after the last payment, Morillo and Baquero urgently requested Arvelo to close the bank accounts on the same day as they requested to open new accounts. Morillo and Baquero provided Arvelo with identical pretextual reasons for the request to close the accounts and open new accounts.

129. Similarly, Premier Bank International N.V. failed to perform the requisite "know your customer" due diligence when Morillo and Baquero attempted to open new accounts under the names of different Panamanian Companies. Even when Premier Bank International N.V. made rudimentary requests for background information regarding the Panamanian Companies, including the identity of directors, Morillo and Baquero refused to provide responsive information. Notwithstanding the evasiveness, Premier Bank International N.V. permitted Morillo and Baquero to open the accounts without any further investigation.

130.     Industry standards, bank regulations, and the Bank Defendants' own policies required that suspicious activities be reported to the appropriate authorities. Morillo and Baquero's activities clearly raised red flags that were, at best, willfully ignored by the Bank Defendants and were never reported to the authorities. Thus, as a result of the Bank Defendants' failure to comply with their own legal and regulatory obligations, the fraudulent activity continued unabated for over a decade and provided substantial aid to Morillo and Baquero's scheme, realizing millions of dollars in fees for the Bank Defendants as a result.

## VII.   Helsinge and the Oil Company Conspirators Have Failed to Remit Full Payment on the Contracts in Which PDVSA Has Sold to Them and They Have Failed to Deliver the Quantities of Light Crude Oil Products for Which PDVSA Has Already Pre-Paid.

131.     As a result of the conspirators' control over the Bribed PDVSA Employees, the Bribed PDVSA Employees caused PDVSA to overlook the fact that Helsinge and the Oil Company Conspirators have failed to remit full payment to PDVSA on sales contracts for hydrocarbon products on which Helsinge or the Oil Company Conspirators closed.

132.     In addition, Helsinge and the Oil Company Conspirators require PDVSA to pre-pay 100% of the contract price for the light crude products that Helsinge and the Oil Company Conspirators sell to PDVSA. However, the Oil Company Conspirators and Helsinge have consistently failed to deliver the full amount of the light crude oil products for which PDVSA has fully paid.

133.     The total amounts of monies owed by Helsinge and the Oil Company Conspirators, for their respective underpayments on PDVSA's sales contracts and PDVSA's overpayment with recent products purchased by PDVSA that have already been identified alone total in the billions of dollars.

27

**VIII. Payments Were Made by PDVSA and Payments Were Received by PDVSA From and to PDVSA's Accounts in Banks in the United States.**

134. PDVSA received payments for the sale of crude oil and made payments for the purchase of light hydrocarbon products through its accounts in American banks or in foreign banks with branches in the United States.

135. Thus, to the extent that the misdeeds perpetrated by the Helsinge Enterprise resulted in underpayments to PDVSA for the sale of crude oil products and overpayments by PDVSA for the purchase of light hydrocarbon products, PDVSA suffered injury in the United States.

## CLAIMS FOR RELIEF

### COUNT I
### (PDVSA Sales of Hydrocarbon Products – Violations of Section I of the Sherman Act) (Against All Defendants)

136. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

137. PDVSA sells hydrocarbon products for foreign export. The United States is the largest market for PDVSA's products.

138. The Oil Company Conspirators, Helsinge, and their co-conspirators contracted, combined, and conspired to unreasonably restrain trade by fixing the prices of, rigging the bids for, and excluding competition (including the competition of legitimate American oil companies) in, the purchase of hydrocarbon products from PDVSA, as described in more detail above.

139. As a result of the suppressed competition described above, PDVSA was injured because it was forced to sell oil products to the Oil Company Conspirators and Helsinge, and to do so at artificially depressed, below-market prices.

140. The Oil Company Conspirators and Helsinge acted with the specific intent and effect of preventing their competitors, including U.S. importers, from competing with them in the

28

purchase and sale of products to and from PDVSA. That direct domestic effect of limiting competition with U.S. importers caused the injury suffered by PDVSA. That injury is quantifiable and not speculative.

141. As a result of this unlawful conduct, PDVSA suffered billions of dollars in losses by selling its products to the Oil Company Conspirators and Helsinge at artificially depressed prices.

142. The actions of the Oil Company Conspirators, Helsinge, and their co-conspirators constitute a continuing, horizontal agreement and conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition.

143. The Oil Company Conspirators and Helsinge (a) directly entered into the illegal conspiracy and agreement with each other; and (b) entered into individual agreements with their common agents, Morillo and Baquero and their co-conspirators, for the express purpose of illegally restraining competition, which themselves constitute illegal horizontal agreements to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act.

144. The Oil Company Conspirators and Helsinge, by direct agreement and through their common agents, conspired to rig the bidding on the purchase of PDVSA's products. The Oil Company Conspirators and Helsinge's agreement to submit collusive, non-competitive, rigged bids constitutes a *per se* violation of the Section 1 of the Sherman Act (15 U.S.C. § 1).

145. The Oil Company Conspirators and Helsinge, by direct agreement and through their common agents, conspired to artificially depress the price of PDVSA's products. The Oil Company Conspirators and Helsinge's agreement to artificially depress the price of PDVSA's products constitutes a *per se* violation of the Section 1 of the Sherman Act (15 U.S.C. § 1).

29

146. The Oil Company Conspirators and Helsinge, by direct agreement and through their common agents, conspired to obtain and exchange material, non-public information to reduce competition for the purchase of PDVSA's products in order to artificially depress the price of those products and to eliminate competitors. The information exchange among the Oil Company Conspirators and Helsinge facilitated their price-fixing agreement, a *per se* violation of the Section 1 of the Sherman Act (15 U.S.C. § 1).

147. The Oil Company Conspirators and Helsinge engaged in the above-described conduct with the participation of Morillo and Baquero and their co-conspirators.

148. As a result of this unlawful conduct and suppressed competition, PDVSA has suffered billions of dollars in losses. Pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), Defendants are liable for treble damages and the costs of suit, including reasonable attorney's fees, as a consequence of Defendants' violations of Section 1 of the Sherman Act.

149. In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from continuing to engage in the anticompetitive conduct described herein.

## COUNT II
### (PDVSA Purchases of Light Crude Products – Violations of Section I of the Sherman Act) (Against All Defendants)

150. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

151. PDVSA exports oil products including heavy crude oil to the United States and other countries. In order to transport the heavy crude oil, PDVSA refines the heavy crude oil to lighten the load. In order to refine the oil, PDVSA uses imported petroleum solvents and light crude oil products, including naphtha.

152. PDVSA issues tenders to market participants to provide them with an opportunity to bid on spot contracts for the sale of light crude products to PDVSA.

30

153. The Oil Company Conspirators and Helsinge have also sold light crude products to PDVSA, many of these products come from the United States.

154. The Oil Company Conspirators and Helsinge, through Morillo and Baquero, reached an agreement on how they would rig PDVSA tenders for the purchase of its petroleum solvents and light crude oil products, including naphtha, in their favor and at the exclusion of competitors (including legitimate American companies) that are not members of the scheme.

155. In addition their direct agreement to limit competition, the Oil Company Conspirators and Helsinge also used Morillo and Baquero and their co-conspirators as their common agents to participate in the scheme to rig PDVSA's tenders and artificially raise the price of the hydrocarbon products acquired by PDVSA, all as described herein, including, for example, bribing the Bribed PDVSA Employees to customize PDVSA tenders such that only the Oil Company Conspirators and Helsinge could meet the demands of the tenders and otherwise suppressing competition.

156. In addition to customizing the tenders such that only the Oil Company Conspirators and Helsinge could succeed, Morillo and Baquero also bribed the Bribed PDVSA Employees to provide access to material non-public inside information regarding PDVSA's prospective tender pricing and specifications, to further facilitate the bid-rigging scheme, which Morillo and Baquero and their co-conspirators provided to the Individual Trader Conspirators, the Oil Company Conspirators, and Helsinge.

157. The Oil Company Conspirators and Helsinge's advance access to PDVSA's tenders allowed them to acquire a substantial amount of the supply of the light crude products required by PDVSA and store them in warehouses in the United States until the public release of PDVSA's tenders. With regard to the tenders that the co-conspirators manipulated, the scheme prevented

31

other competitors from acquiring the light crude products to sell to PDVSA within the compressed timeframes demanded by the rigged tenders.

158.    As a result of the suppressed competition, PDVSA was injured because it was forced to purchase light crude products at artificially raised, above-market, prices from the Oil Company Conspirators and Helsinge. The Oil Company Conspirators' and Helsinge's competitors would have bid to sell the light crude products to PDVSA at lower, competitive, prices if they were privy to the same PDVSA inside information. The Oil Company Conspirators and Helsinge were able to suppress competition because they conspired with corrupt PDVSA employees to customize and manipulate bids in their favor.

159.    The Oil Company Conspirators and Helsinge acted with the specific intent and effect of eliminating their competitors, including U.S. light crude product exporters, from competing with them by rigging the tenders to exclude these competitors.

160.    As a result of the co-conspirators' unlawful conduct, PDVSA unknowingly entered into thousands of rigged purchase contracts with the Oil Company Conspirators and Helsinge.

161.    The Oil Company Conspirators and Helsinge entered into a continuing, horizontal agreement to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition, including competition from legitimate American companies. That direct domestic effect caused the injury suffered by PDVSA and such injury is in quantifiable and not speculative.

162.    The Oil Company Conspirators and Helsinge directly entered into the illegal agreement with each other.

163.    The Oil Company Conspirators and Helsinge also entered into separate, individual agreements with their common agents, Morillo and Baquero and their co-conspirators, for the

32

express purpose of illegally restraining competition. The use of Morillo and Baquero and their co-conspirators as the Oil Company Conspirators' and Helsinge's common agents constitutes an illegal horizontal agreement to unreasonably restrain trade and commerce.

164. The Oil Company Conspirators and Helsinge, by direct agreement and through their common agents, conspired to rig the bidding on the tenders for the sale of light crude products to PDVSA. The Oil Company Conspirators and Helsinge's agreement to submit collusive, non-competitive, rigged bids constitutes a *per se* violation of the Section 1 of the Sherman Act (15 U.S.C. § 1).

165. The Oil Company Conspirators and Helsinge, by direct agreement and through their common agents, conspired to artificially raise the price of the light crude products PDVSA was seeking to acquire. The Oil Company Conspirators and Helsinge's agreement to artificially raise the price of these products constitutes a *per se* violation of the Section 1 of the Sherman Act (15 U.S.C. § 1).

166. The Oil Company Conspirators and Helsinge, by direct agreement and through their common agents, conspired to obtain and exchange material, non-public information to reduce competition for the sale of light crude products to PDVSA in order to artificially raise the price of those products. The information exchange among the Oil Company Conspirators and Helsinge facilitated their price-fixing agreement, a *per se* violation of the Section 1 of the Sherman Act (15 U.S.C. § 1).

167. Because of this price-fixing, PDVSA paid inflated, anti-competitive prices for light crude products which directly affected the price and the amount of such products that were exported from the United States.

168. The Oil Company Conspirators engaged in the above-described conduct with the participation of their co-conspirators, including Morillo, Baquero, Helsinge, and WTRPC.

169. As a result of this unlawful conduct and suppressed competition, PDVSA has suffered billions of dollars in losses. Pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), Defendants are liable for treble damages, the costs of suit, including reasonable attorney's fees, as a consequence of Defendants' violations of Section 1 of the Sherman Act.

170. In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from engaging in the anticompetitive conduct set forth herein.

## COUNT III
### (PDVSA Sales of Hydrocarbon Products - Violations of Section 2(c) of the Robinson-Patman Act) (Against All Defendants)

171. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

172. In concert with Morillo and Baquero and the Panamanian Companies, the Oil Company Conspirators, Helsinge and the Individual Trader Conspirators paid bribes to the Bribed PDVSA Employees in order to: (a) rig tenders for the sale of PDVSA's oil products; and (b) gain inside information, which allowed the Oil Company Conspirators and Helsinge to eliminate and unreasonably restrain their competition and purchase oil products from PDVSA at artificially depressed prices. For example, as described below:

> (a) The Oil Company Conspirators and Helsinge, as the potential purchasers of PDVSA's products, made illicit payments to the Bribed PDVSA Employees in order to obtain a competitive advantage over other potential purchasers;

34

(b) In exchange for payments, the Bribed PDVSA Employees modified PDVSA tenders such that only the Oil Company Conspirators and Helsinge could meet the tenders' requirements;

(c) In exchange for payments, the Bribed PDVSA Employees rejected competitive bids from market competitors for pretextual reasons in order to award those tenders to the Oil Company Conspirators and Helsinge;

(d) In exchange for payments, the Bribed PDVSA Employees provided the Oil Company Conspirators, Helsinge, the Individual Trader Conspirators and Morillo and Baquero with access to non-public inside information that was unavailable to other potential purchasers of PDVSA products; and

(e) The inside information provided by the bribed PDVSA employees allowed the Oil Company Conspirators, Helsinge and the Individual Trader Conspirators to rig bids for PDVSA products and to fix the pricing for those products.

173. The Oil Company Conspirators and Helsinge colluded in the bribery scheme to gain an advantage over other competitors for the purchase of PDVSA products. The bribery scheme suppressed competition and artificially depressed the price the Oil Company Conspirators and Helsinge paid PDVSA for the oil products. Absent the Oil Company Conspirators and Helsinge's bribery scheme, more competitors would have bid for PDVSA tenders and increased the price that PDVSA would have received for its products.

174. As a result of the anti-competitive conduct, PDVSA was directly injured because it was forced to sell its products for artificially depressed, below-market prices. PDVSA is the party most directly affected by the anti-competitive conduct.

35

175. The Oil Company Conspirators and Helsinge, through Morillo and Baquero, continue to bribe the Bribed PDVSA Employees to conceal their illegal scheme from PDVSA management and to sabotage any attempts at discovering the scheme.

176. The bribery scheme has adversely affected the flow of commerce between the United States and Venezuela, including by excluding legitimate American companies from fairly competing to do business with PDVSA.

177. The Oil Company Conspirators and Helsinge have made the illicit payments in order to induce the Bribed PDVSA Employees to rig tenders in their favor and to allow the Oil Company Conspirators and Helsinge to acquire PDVSA products at artificially depressed, below-market prices. The Oil Company Conspirators and Helsinge have purchased PDVSA products in Venezuela and most of the products were ultimately delivered to the United States market.

178. The Individual Trader Conspirators have used the U.S. bank accounts of the Oil Company Conspirators and Helsinge to transfer payments to Morillo and Baquero, with the intent and effect that the payments would be sent on to the Venezuela-based Bribed PDVSA Employees as bribes.

179. The Helsinge Enterprise through Morillo and Baquero, has managed the bribery scheme from their U.S. offices.

180. In addition, the Individual Trader Conspirators and Morillo and Baquero directly accessed PDVSA's inside information, which was gained by paying bribes to the Bribed PDVSA Employees, at the Individual Trader Conspirators' and Morillo and Baquero's respective U.S. offices.

36

181. In furtherance of the Oil Company Conspirators' and Helsinge's scheme to corrupt the Bribed PDVSA Employees, the Individual Trader Conspirators met with Morillo and Baquero in the United States.

182. The payments of bribes by the Oil Company Conspirators and Helsinge, as purchasers, to the Bribed PDVSA Employees, as agents of the seller, violated Section 2(c) of the Robinson-Patman Act (15 U.S.C. § 13).

183. As a result of Defendants' unlawful conduct and suppressed competition, PDVSA has suffered billions of dollars in losses. Pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), the Defendants are liable for treble damages and the costs of suit, including reasonable attorney's fees.

184. In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from engaging in the anticompetitive conduct described above.

## COUNT IV
### (PDVSA Purchases of Light Crude Products - Violations of Section 2(c) of the Robinson-Patman Act) (Against All Defendants)

185. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

186. In concert with Morillo and Baquero and the Panamanian Companies, the Oil Company Conspirators, Helsinge and the Individual Trader Conspirators paid bribes to the Bribed PDVSA Employees in order to (a) rig tenders for the sale of light crude products to PDVSA and (b) gain advance inside information about the timing and specifications of these tenders, which allowed the Oil Company Conspirators and Helsinge to squeeze out their competition by acquiring a significant supply of petroleum solvent products, stockpiling them and ultimately manipulating the pricing of these products.

37

187. The Oil Company Conspirators and Helsinge, as sellers of products to PDVSA, made illicit payments to the Bribed PDVSA Employees, as agents of the purchaser, in order to obtain a competitive advantage over other potential sellers.

188. In exchange for payments, the Bribed PDVSA Employees modified PDVSA tenders such that only the Oil Company Conspirators and Helsinge could meet the tenders' requirements.

189. In exchange for payments, the Bribed PDVSA Employees rejected competitive bids from market competitors for pretextual reasons in order to award those tenders to the Oil Company Conspirators and Helsinge.

190. In exchange for payments, the Bribed PDVSA Employees provided the Oil Company Conspirators, Helsinge, the Individual Trader Conspirators and Morillo and Baquero with access to non-public inside information that was unavailable to other potential sellers of light crude products to PDVSA.

191. The inside information provided by the bribed PDVSA employees allowed the Oil Company Conspirators, Helsinge and the Individual Trader Conspirators to rig bids for products sold to PDVSA and to fix the pricing for those products.

192. The payments of bribes by the Oil Company Conspirators and Helsinge, as sellers, to the Bribed PDVSA Employees, as agents of the purchaser, violated Section 2(c) of the Robinson-Patman Act (15 U.S.C. § 13).

193. The Oil Company Conspirators and Helsinge colluded in the bribery scheme to gain an advantage over other competitors for the sale of products to PDVSA. The bribery scheme provided the Oil Company Conspirators, Helsinge and the Individual Trader Conspirators with access to advance notice of upcoming PDVSA tenders to purchase light crude products. The Oil

38

Company Conspirators, Helsinge and the Individual Trader Conspirators used the advance knowledge to acquire substantial amounts of the market supply of the light crude products. The resulting lack of supply of the products impeded other competitors from bidding for PDVSA tenders and artificially raised the prices for these products. Absent the Oil Company Conspirators and Helsinge's bribery scheme, more competitors would have bid for PDVSA tenders and decreased the price that PDVSA would have paid for the products PDVSA was seeking to acquire.

194.     As a result of the anti-competitive conduct, PDVSA was directly injured because it was forced to buy light crude products for artificially increased, above-market prices. PDVSA is the party most directly affected by the anti-competitive conduct.

195.     The Oil Company Conspirators and Helsinge, through Morillo and Baquero, continue to bribe the Bribed PDVSA Employees to conceal their illegal scheme from PDVSA management and to sabotage any attempts at discovering the scheme.

196.     The bribery scheme has adversely affected the flow of commerce between the United States and Venezuela.

197.     PDVSA required the light crude products to lighten the heavy crude oil sold to purchasers in order to transport the crude oil from Venezuelan ports to purchasers primarily located in the United States, including the Oil Company Conspirators and Helsinge's customers.

198.     Once the Oil Company Conspirators, Helsinge and the Individual Trader Conspirators obtained advance knowledge of PDVSA's tenders for the purchase of petroleum solvents, the Individual Trader Conspirators acquired those solvents and stockpiled them in the United States until PDVSA published its tenders.

199.     Once PDVSA awarded the tenders for light crude products to the Oil Company Conspirators and Helsinge, the solvents were shipped from the United States to Venezuela.

200.    The Individual Trader Conspirators have used the U.S. bank accounts of the Oil Company Conspirators and Helsinge to transfer payments to Morillo and Baquero, which were destined to the Venezuela-based Bribed PDVSA Employees as bribes.

201.    Morillo and Baquero managed the bribery scheme from their U.S. offices.

202.    In addition, the Individual Trader Conspirators and Morillo and Baquero directly accessed PDVSA's inside information, at the Individual Trader Conspirators' offices, many of which are in the United States, and at Morillo and Baquero's offices in the United States.

203.    In furtherance of the Oil Company Conspirators and Helsinge's scheme to corrupt the Bribed PDVSA Employees, many of the Individual Trader Conspirators met with Morillo and Baquero in the United States.

204.    As a result of Defendants' unlawful conduct and suppressed competition, PDVSA has suffered billions of dollars in losses. Pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), Defendants are liable for treble damages and the costs of suit, including reasonable attorney's fees.

205.    In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from engaging in the unlawful conduct described above.

## COUNT V
### (Violations of the Florida Deceptive and Unfair Trade Practices Act)
### (Against All Defendants)

206.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

207.    Morillo and Baquero were the principal coordinators and facilitators of the illegal anti-competitive schemes. Morillo's and Baquero's companies, Helsinge and WTRPC, have their principal place of business in Florida. They hold their board of directors meetings in Florida, maintained their books and records in Florida and primarily used Florida bank accounts to pursue

their illegal scheme. Morillo and Baquero coordinated their illegal schemes out of their Florida office, including with their co-conspirators, the Oil Company Conspirators and the Bribed PDVSA Employees. Morillo and Baquero transferred illicit payments to the Bribed PDVSA Employees through Florida bank accounts. Morillo and Baquero and their agents, Lutz and Ryan, also accessed PDVSA's confidential information in Florida in furtherance of rigging the PDVSA tenders.

208.    The Oil Company Conspirators and Helsinge have conspired in a bid-rigging and price-fixing scheme, both constituting *per se* violations of the Sherman Act. By violating the Sherman Act, a statute that proscribes unfair methods of competition, the Defendants have violated the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201).

209.    The Oil Company Conspirators and Helsinge have engaged in a scheme to corrupt PDVSA's employees through commercial bribery in violation of the Robinson-Patman Act. By violating the Robinson-Patman Act, a statute that proscribes unfair methods of competition, Defendants have violated the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201).

210.    Defendants engaged in a conspiracy to bribe the Bribed PDVSA Employees, defraud PDVSA and misappropriate PDVSA's confidential information, which independently constitute violations of the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201).

211.    The Oil Company Conspirators and Helsinge, through Morillo and Baquero, continue to bribe the Bribed PDVSA Employees to conceal their illegal scheme from PDVSA management and to sabotage any attempts at discovering the scheme.

212.    As a result of Defendants' fraudulent scheme, PDVSA has suffered billions of dollars in losses. Pursuant to Section 501.211 of the Florida Deceptive and Unfair Trade Practices

Act, the Defendants are liable for actual damages and the costs of suit, including reasonable attorney's fees.

213. In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from engaging in the unlawful conduct described above.

## COUNT VI
### (Violations of the U.S. Racketeer Influenced and Corrupt Organizations Act under 18 U.S.C. § 1962(c)) (Against All Defendants)

214. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

215. Morillo and Baquero and their co-conspirators formed the Helsinge Enterprise, an association-in-fact "enterprise," as that term is defined in 18 US.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. Morillo and Baquero, their named co-conspirators and the Bribed PDVSA Employees are members of the Helsinge Enterprise.

216. The members of the Helsinge Enterprise are and have been joined in a common purpose, have relationships with and among each other, and have associated through time sufficient to permit those associated to pursue the Helsinge Enterprise's purpose. The members forged symbiotic relationships and each member needed and depended on the participation of the other members to accomplish their common purpose of defrauding PDVSA through fraudulent bids submitted to PDVSA tenders, including (a) Morillo and Baquero entered into an illicit agreement with several business managers at PDVSA, whereby Morillo and Baquero would pay the PDVSA employees bribes in exchange for advance and confidential information concerning PDVSA's future tenders, and other assistance to rig the tenders; (b) Morillo and Baquero formed Helsinge and the Panamanian Companies to facilitate and conceal the bribery scheme; (c) Morillo and Baquero recruited the Individual Trader Conspirators to participate in the bid-rigging bribery

42

scheme; (d) the Oil Company Conspirators knowingly and actively participated in the fraudulent scheme; (e) Morillo and Baquero coordinated and controlled the activities and relationships between the members to defraud PDVSA; and (f) the Bank Defendants facilitated the illegal payments from the Oil Company Conspirators to the Panamanian Companies and then the Panamanian Companies to the Bribed PDVSA Employees.

217. Each Defendant has been employed by and/or associated with the Helsinge Enterprise.

218. Each Defendant has knowingly and directly participated in the conduct of the Helsinge Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of predicate acts, defined as "racketeering activity" under 18 U.S.C. § 1961(1). These include acts involving bribery which are chargeable under the laws of the State of Florida (Fla. Stat. § 838.16), the federal mail fraud statute (18 U.S.C. § 1341), the federal wire fraud statute (18 U.S.C. § 1343), the federal money laundering statute (18 U.S.C. § 1956) and the Computer Fraud and Abuse Act (18 U.S.C. § 1030).

219. Pursuant to 18 U.S.C. § 1961(1)(A), any act involving bribery chargeable under State law as a felony constitutes a racketeering activity. Under Fla. Stat. § 838.16, the Helsinge Enterprise has committed the crime of commercial bribery by paying the Bribed PDVSA Employees with the intent to influence those employees to violate their duties to PDVSA.

220. The Helsinge Enterprise has committed mail and wire fraud involving the use of the United States mails and telephone and electronic communication systems to submit fraudulent bids and contracts from the respective United States offices of Morillo and Baquero, the Individual Trader Conspirators, the Oil Company Conspirators and Helsinge, to PDVSA. The bids are submitted in response to PDVSA's tenders without disclosure of material information to PDVSA,

43

including the fact that the tenders were rigged by the Oil Company Conspirators and Helsinge to suppress competition and artificially set the price of the products that were the subject of the bids. The Individual Trader Conspirators, the Oil Company Conspirators and Helsinge knew that they materially misrepresented the true nature of their bids.

221.    The Helsinge Enterprise and its members have committed money laundering by intentionally disguising the nature and source of their illegal proceeds by transferring the ill-gotten gains and bribes to bank accounts in the United States, Switzerland and Curacao, in violation of 18 U.S.C. §§ 1956 and 1957. The Helsinge Enterprise opened and closed bank accounts for the purpose of laundering the illegal proceeds. Each of the laundering transactions exceeded $10,000 and were never disclosed to the applicable reporting authorities and were made with the specific intent to avoid reporting income and gains to the applicable authorities. The laundering transactions were made by the members with the intent of concealing the scheme, and of placing the stolen proceeds beyond the jurisdictional reach of courts in the United States and Venezuela. The laundering transactions affected interstate and foreign commerce as they involved the transfer of money between accounts in the United States or between accounts located in the United States, Switzerland and Curacao.

222.    The Helsinge Enterprise and its members violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 by intentionally accessing PDVSA's protected computer system and stealing PDVSA's confidential information concerning PDVSA's upcoming tenders for the sale of crude oil products; PDVSA's upcoming need for the purchase of various additives to add to its crude oil products; and the competing bids of other oil companies. The Helsinge Enterprise and its members accessed this information to further their conspiracy to fix prices, rig bids and eliminate competition in the purchase and sale of crude oil and hydrocarbon products and to

44

structure tenders for PDVSA contracts to favor the Oil Company Conspirators and Helsinge and disadvantage or exclude competitors, including many American oil trading companies.

223. Defendants' fraudulent scheme took place over an extended period of time, commencing in 2004 and continuing today, and involves distinct and independent criminal acts of mail fraud, wire fraud, bribery, computer tampering, theft of trade secrets, and money laundering. These acts were neither isolated nor sporadic events, but, rather, involved regular and repeated violations of law to accomplish the Helsinge Enterprise's desired objective of defrauding PDVSA. These acts were related to each other by virtue of the common participants, a common victim, common methods of commission, and the common purpose of stealing PDVSA's funds.

224. In addition, the Oil Company Conspirators and Helsinge, through Morillo and Baquero, continue to bribe the Bribed PDVSA Employees to conceal their illegal scheme from PDVSA management and to sabotage any attempts at discovering the scheme.

225. Defendants' violations of 18 U.S.C. §§ 1962(c) proximately caused PDVSA to suffer direct damages and losses from PDVSA's U.S. bank accounts. The Helsinge Enterprise targeted PDVSA's assets located in the United States and misappropriated those assets. The violators have caused U.S. oil-trading competitors to lose contracts for the purchase and sale of oil products from and to PDVSA by means of Defendants' rigging of the bidding process.

226. As a result of Defendants' unlawful conduct, PDVSA has suffered billions of dollars in losses. Pursuant to 18 U.S.C. § 1964(c), Defendants are liable for treble damages and the costs of suit, including reasonable attorney's fees.

227. In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from engaging in the illegal conduct described above.

## COUNT VII
### (Violations of the U.S. Racketeer Influenced and Corrupt Practices
### Act Under 18 U.S.C. § 1962(d))
### (Against All Defendants)

228.    Plaintiff incorporates by reference and realleges each and every allegation contained above as thoughtfully set forth herein.

229.    Each of the Defendants conspired with each other to violate 18 U.S.C § 1962(c), in violation of 18 U.S.C § 1962(d).

230.    As a result of Defendants' unlawful conduct, PDVSA has suffered billions of dollars in losses. Pursuant to 18 U.S.C. § 1964(c), Defendants are liable for treble damages and the costs of suit including reasonable attorney's fees.

231.    In addition to damages, Plaintiff is entitled to injunctive relief enjoining Defendants from engaging in the illegal conduct described above.

## COUNT VIII
### (Violations of the Civil Remedies for Criminal Practices Act)
### (Against All Defendants)

232.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

233.    Morillo and Baquero and their co-conspirators formed the Helsinge Enterprise, an association-in-fact "enterprise" as that term is defined in Fla. Stat. § 772.102(3), that engages in, and the activities of which affect, Florida commerce.

234.    The members of the Helsinge Enterprise are and have been joined in a common purpose, have relationships with and among each other, and have associated through time sufficient to permit those associated to pursue the Helsinge Enterprise's purpose. The conspirators forged symbiotic relationships and each member needed and depended on the participation of the other members to accomplish their common purpose of defrauding PDVSA through fraudulent

46

bids submitted to PDVSA tenders, including (a) Morillo and Baquero entered into an illicit agreement with several business managers at PDVSA, whereby Morillo and Baquero would pay the PDVSA employees bribes in exchange for advance and confidential information concerning PDVSA's future tenders, and other assistance to rig the tenders; (b) Morillo and Baquero formed Helsinge and various the Panamanian Companies to facilitate and conceal the bribery scheme; (c) Morillo and Baquero recruited the Individual Trader Conspirators to participate in the bid-rigging bribery scheme; (d) the Individual Trader Conspirators caused their employers, the Oil Company Conspirators, to knowingly and actively participate in the fraudulent scheme; (e) Morillo and Baquero coordinated and controlled the activities and relationships between all of the members to defraud PDVSA; and (f) the Bank Defendants facilitated the illegal payments from the Oil Company Conspirators to the Panamanian Companies and then from the Panamanian Companies to the Bribed PDVSA Employees.

235. Each Defendant has been employed by and/or associated with the Helsinge Enterprise.

236. Each Defendant has knowingly and directly participated in the conduct of the Helsinge Enterprise's affairs through a pattern of criminal activity consisting of repeated violations of predicate acts, defined as "criminal activity" under Fla. Stat. § 772.102(1), including violations of the Florida commercial bribery statute (Fla. Stat. § 838.16); the Florida Communications Fraud Act (Fla. Stat. § 817.034); and conduct that constitutes "racketeering activity" under 18 U.S.C. § 1961(1), including violations of the federal mail fraud statute (18 U.S.C. § 1341), the wire fraud statute (18 U.S.C. § 1343), the federal money laundering statute (18 U.S.C. § 1956) and the Computer Fraud and Abuse Act (18 U.S.C. § 1030).

47

237. Pursuant to Fla. Stat. § 838.16, the Helsinge Enterprise has committed the crime of commercial bribery by paying the Bribed PDVSA Employees with the intent to influence those employees to violate their duties to PDVSA.

238. The Helsinge Enterprise has committed communications fraud under Fla. Stat. § 817.034 involving the use of the mails and telephone and electronic communication systems to submit fraudulent bids and contracts from the respective United States offices of Morillo and Baquero, the Individual Trader Conspirators, the Oil Company Conspirators and Helsinge, to PDVSA. The bids are submitted in response to PDVSA's tenders without disclosure of material information to PDVSA, including the fact that the tenders were rigged by the Oil Company Conspirators and Helsinge to suppress competition and artificially set the price of the products that were the subject of the bids. The Individual Trader Conspirators, the Oil Company Conspirators and Helsinge knew that they materially misrepresented the true nature of their bids.

239. Defendants' fraudulent scheme took place over an extended period of time, commencing in 2004 and continuing today, and involves distinct and independent criminal acts of mail fraud, wire fraud, bribery, computer tampering, theft of trade secrets and money laundering. These acts were neither isolated nor sporadic events, but, rather, involved regular and repeated violations of law to accomplish the Helsinge Enterprise's desired objective of defrauding PDVSA. These acts were related to each other by virtue of the common participants, a common victim, common methods of commission, and the common purpose of stealing PDVSA's funds.

240. Defendants' fraudulent scheme was orchestrated and coordinated by Morillo and Baquero in their Florida offices and utilizing Florida bank accounts.

241. Defendants unlawfully, knowingly and willfully conspired with each other to violate Fla. Stat. § 772.103(3), in violation of Fla. Stat. § 772.103(4).

242. The Oil Company Conspirators and Helsinge, through Morillo and Baquero, continue to bribe the Bribed PDVSA Employees to conceal their illegal scheme from PDVSA management and to sabotage any attempts at discovering the scheme.

243. Defendants' violations of Fla. Stat. §§ 772.103 (3) and (4) proximately caused PDVSA to suffer direct damages and billions of dollars in losses from PDVSA's U.S. bank accounts. The Helsinge Enterprise targeted PDVSA's assets held in the United States banks and misappropriated those assets.

244. As a result of Defendants' unlawful conduct, PDVSA has suffered billions of dollars in losses. Pursuant to Fla. Stat. § 772.104(1), Defendants are liable for treble damages and the costs of suit, including reasonable attorney's fees.

245. In addition to damages, Plaintiff is entitled to injunctive relief pursuant Fla. Stat. § 895.05(6), enjoining Defendants from engaging in the conduct described above.

## COUNT IX
## (Fraud)
## (Against All Defendants)

246. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

247. Defendants represented their sale and purchase bids to PDVSA as arm's length transactions in an open and free market that was unaffected by bribery or theft of secret business information. Defendants made those representations in order to induce PDVSA to accept Defendants' bids.

248. Defendants knew that such representations were false and that they had, in fact, secretly rigged the market in their favor. Defendants knew that PDVSA was ignorant of Defendants' rigging of the market and that their bids were based upon secret information that they had stolen by bribing PDVSA employees.

49

249. PDVSA was, in fact, ignorant of Defendants' rigging of the market, their bribery and theft of PDVSA's secret business information.

250. PDVSA materially relied upon the existence of an open and free market when it awarded the bids to Defendants.

251. As a result of PDVSA's reliance upon an open and free market for its sale and purchase bids, and its ignorance of Defendants' secret rigging of that market, PDVSA awarded contracts to Defendants that injured PDVSA by fraudulently increasing its costs and diminishing its profits.

252. Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty which entitles Plaintiff to recover punitive damages.

253. Accordingly, by virtue of the foregoing, Plaintiff is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

254. In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from the unlawful acts described above, along with an accounting, restitution and the imposition of a constructive trust against Defendants.

### COUNT X
### (Civil Conspiracy)
### (Against All Defendants)

255. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

256. Defendants knowingly and willfully entered into an agreement for the purpose of defrauding PDVSA and violating U.S. antitrust and money laundering laws.

257. Defendants' fraudulent scheme took place over an extended period of time, commencing in 2004 and continuing to the present, and involved distinct and independent

unlawful acts of fraud, bribery and money laundering. These acts were neither isolated nor sporadic events, but, rather, involved regular and repeated violations of law to accomplish the Helsinge Enterprise's desired objective of defrauding PDVSA. These acts were related to each other by virtue of the common participants, a common victim, common methods of commission, and the common purpose of stealing PDVSA's funds and to disguise and conceal the source of the funds.

258. Absent Defendants' agreement to act jointly against PDVSA, the fraudulent scheme may not have taken place.

259. Accordingly, PDVSA was damaged by the Defendants' conspiracy to defraud it. By virtue of the foregoing, Plaintiff is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

260. In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from engaging in the unlawful conduct described above.

## COUNT XI
## (Aiding and Abetting Breach of Fiduciary Duty)
## (Against All Defendants)

261. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

262. PDVSA's employees owed a fiduciary duty to PDVSA barring them from self-dealing and assisting the Defendants in a scheme to defraud PDVSA.

263. The Bribed PDVSA Employees violated their fiduciary duty by accepting bribes from Defendants to participate in a bid-rigging and price-fixing scheme thereby intentionally causing PDVSA to lose billions of dollars.

264. Defendants knew that PDVSA employees owed a fiduciary duty to PDVSA and that the Defendants' payments would influence PDVSA's employees to breach such duty.

51

265. By bribing PDVSA employees, Defendants rendered knowing and substantial assistance to the Bribed PDVSA Employees in breaching their fiduciary duty.

266. As a result of the Defendants aiding and abetting the breach of PDVSA's employees' fiduciary duties, PDVSA suffered damages in the billions of dollars, and Plaintiff is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

267. In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from engaging in the unlawful conduct described above.

## COUNT XII
### (Aiding and Abetting Fraud)
### (Against the Bank Defendants)

268. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

269. In order to prolong the illicit scheme, Morillo and Baquero took active measures to fraudulently conceal the scheme from PDVSA's management. The scheme continued for over a decade because Morillo and Baquero intentionally and knowingly concealed material facts, including that they were paying bribes to the Bribed PDVSA Employees.

270. To conceal their scheme, Morillo and Baquero bribed corrupt high-level PDVSA managers to monitor and sabotage any potential discovery of the scheme and to rig the tenders and bid awards to create a false appearance of a regular market transaction. In addition, Morillo and Baquero ensured that their scheme was not discovered by monitoring PDVSA's internal system through the clone server that was created for them by the Bribed PDVSA Employees.

271. Morillo and Baquero concealed the scheme by intentionally disguising the nature and source of their illegal transactions by transferring the ill-gotten gains and bribes between various bank accounts in the United States, Switzerland and Curacao held at the Bank Defendants.

272. Absent Morillo's and Baquero's active measures to covertly sabotage any discovery of the illicit scheme, PDVSA would have terminated the Bribed PDVSA Employees and ceased doing business with the Oil Company Conspirators and Helsinge.

273. The Bank Defendants knew that Morillo and Baquero were seeking to disguise and conceal illicit transactions by using the accounts at the Bank Defendants.

274. By failing to comply with their "know your customer" due diligence obligations, the Bank Defendants provided substantial aid and assistance to the conspirators' fraudulent concealment of the bribery scheme.

275. As a result of the Bank Defendants' aiding and abetting the fraud, PDVSA suffered damages in the billions of dollars. Accordingly, by virtue of the foregoing, Plaintiff is entitled to compensatory and punitive damages, together with interest and costs.

276. In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from engaging in the unlawful conduct described above.

## COUNT XIII
### (PDVSA Purchases of Light Crude Products - Breach of Contract)
### (Against the Oil Company Conspirators and Helsinge)

277. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

278. The Oil Company Conspirators and Helsinge entered into agreements with PDVSA which required PDVSA to pre-pay 100% of the supply contract price for petroleum solvents and other light crude products.

279. Despite PDVSA pre-paying in full for the products, the Oil Company Conspirators and Helsinge failed to deliver the contractually agreed amounts of the products. Indeed, PDVSA overpaid on approximately 80% of the contracts because the quantity received by PDVSA was less than the contract's volume specifications.

280. As part of the Oil Company Conspirators and Helsinge's scheme, they bribed the Bribed PDVSA Employees to fraudulently conceal short deliveries.

281. By failing to deliver the contracted volume, Helsinge breached these contracts causing PDVSA damages.

282. By virtue of the foregoing, Plaintiff is entitled to compensatory and punitive damages, together with interest and costs.

283. In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from the behavior described above, together with an accounting, restitution and the imposition of a constructive trust.

## COUNT XIV
### (PDVSA Sales of Hydrocarbon Products - Breach of Contract)
### (Against the Oil Company Conspirators and Helsinge)

284. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

285. The Oil Company Conspirators and Helsinge entered into agreements with PDVSA which required the Oil Company Conspirators and Helsinge to make full payment to PDVSA based on the contract price for hydrocarbon products sold by PDVSA.

286. Despite PDVSA supplying the full amount of the products that it sold, the Oil Company Conspirators and Helsinge failed to remit the entire contract price for thousands of contracts, comprising billions of dollars in underpayments.

287. As part of the Oil Company Conspirators and Helsinge's scheme, they bribed the Bribed PDVSA Employees to fraudulently conceal the underpayment.

288. By failing to remit the entire contract price, Helsinge and the Oil Company Conspirators breached these contracts causing PDVSA damages.

54

289. Accordingly, by virtue of the foregoing, Plaintiff is entitled to compensatory and punitive damages, together with interest and costs.

290. In addition to damages, Plaintiff is also entitled to injunctive relief, enjoining Defendants from the behavior described above, together with an accounting, restitution and the imposition of a constructive trust.

## COUNT XV
### (Unjust Enrichment)
### (Against All Defendants)

291. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

292. Defendants unjustly enriched themselves at PDVSA's expense by engaging in fraudulent bid-rigging and price-fixing reaping billions of dollars of gains.

293. It is against equity and good conscience to permit Defendants to retain the benefits of their fraudulent scheme to misappropriate billions of dollars from PDVSA.

294. Therefore, equity requires that the benefit of Defendants' fraud be returned to Plaintiff.

295. By virtue of the foregoing, Plaintiff is entitled to recover the amount by which Defendants were unjustly enriched and punitive damages, together with interest and costs.

296. In addition to damages, Plaintiff is entitled to an accounting, restitution and the imposition of a constructive trust for the billions of dollars unjustly siphoned from PDVSA.

## COUNT XVI
### (Violation of the Computer Fraud and Abuse Act 18 U.S.C. § 1030)
### (Against All Defendants)

297. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

55

298. Defendants intentionally accessed PDVSA's protected computer system by setting up an unauthorized clone server at WTRPC's offices in Miami, Florida or elsewhere and by otherwise accessing PDVSA's computer system in order to obtain direct "real time" access to PDVSA's confidential information in excess of any authorization otherwise granted to them.

299. Defendants either actively participated in intentionally accessing PDVSA's protected computer system or rendered knowing and substantial assistance in committing the unauthorized access to PDVSA's protected computer system.

300. Defendants obtained PDVSA's confidential information from the protected PDVSA computer system in excess of their authorization.

301. As a result, there was a loss to PDVSA in excess of $5,000 in value each year Defendants accessed PDVSA's computer system.

302. Accordingly, Plaintiff is entitled to compensatory and punitive damages and a preliminary and permanent injunction enjoining access to and use of the internal confidential information described above, restitution and disgorgement of profits, together with interest, costs and attorney's fees.

## COUNT XVII
### (Violation of the Stored Communications Act, 18 U.S.C. § 2701)
### (Against All Defendants)

303. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

304. Defendants intentionally accessed PDVSA's protected computer system and the stored communications therein and set up an unauthorized clone server at WTRPC's offices in Miami, Florida or elsewhere in order to obtain "real time" access to PDVSA's information in excess of any authorization otherwise granted to them.

305. Defendants either actively participated in intentionally accessing PDVSA's protected computer system and stored communications or rendered knowing and substantial assistance in committing the unauthorized access to PDVSA's protected computer system.

306. Defendants willfully, intentionally and in excess of their authorization obtained PDVSA's electronic communications and confidential information stored on the PDVSA computer system.

307. As a result of these violations, PDVSA suffered actual damages, including lost profits, and Plaintiff is entitled to recover such damages and attorney's fees, interest and costs.

308. Because Defendants' actions were willful and intentional, Plaintiff is entitled to punitive damages.

309. In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from their unlawful behavior described above.

## COUNT XVIII
### (Violation of the Wire and Electronic Communications Interception and Interception of Oral Communications Act (Federal Wiretap Act), 18 U.S.C. § 2510) (Against All Defendants)

310. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

311. Defendants intentionally accessed PDVSA's protected computer system and set up an unauthorized clone server at Waltrop's offices in Miami, Florida or elsewhere in order to obtain direct "real time" access to PDVSA's information in excess of any authorization otherwise granted to them.

312. Defendants either actively participated in intentionally intercepting and procuring PDVSA's protected electronic communications, or intentionally disclosed or endeavored to disclose to others the contents of those electronic communications, or intentionally used or

57

endeavored to use the contents of those electronic communications, knowing the information had been obtained through the interception of electronic communications, all in violation of the Federal Wiretap Act.

313. As a result of these violations, PDVSA suffered actual damages, including lost profits, and Plaintiff is entitled to recover actual damages and the disgorgement of all profits made by Defendants as a result of their violations of the Federal Wiretap Act.

314. Plaintiff is also entitled to recover interest and costs.

315. In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from their unlawful behavior described above.

## COUNT XIX
### (Violation of the Florida Uniform Trade Secrets Act, CH. 688)
### (Against All Defendants)

316. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

317. Defendants used unauthorized means, including bribing PDVSA employees and setting up unauthorized electronic access systems, in order to gain access to PDVSA's confidential trade secrets.

318. These trade secrets include PDVSA's confidential information about upcoming tenders for the sale of crude oil and expected amounts of crude oil available for sale; PDVSA's requirements for the purchase of light crude oil products; and the terms of bids received from competing oil companies for the purchase and sale of products.

319. At the time Defendants gained access to PDVSA's trade secrets, they knew that these trade secrets were acquired by unauthorized means and were obtained from individuals who owed a fiduciary duty to PDVSA to maintain the secrecy of these trade secrets.

320. Defendants' actions were willful and malicious.

58

321.    As a result of these actions, Plaintiff is entitled to single and double damages, injunctive relief, attorney's fees, interest and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

I.     As to Count I, compensatory damages, treble damages, injunctive relief, interest and the costs of suit, including reasonable attorney's fees, pursuant to 15 U.S.C. § 15;

II.    As to Count II, compensatory damages, treble damages, injunctive relief, interest and the costs of suit, including reasonable attorney's fees, pursuant to 15 U.S.C. § 15;

III.   As to Count III, compensatory damages, treble damages, injunctive relief, interest and the costs of suit, including reasonable attorney's fees, pursuant to 15 U.S.C. § 15;

IV.    As to Count IV, compensatory damages, treble damages, injunctive relief, interest and the costs of suit, including reasonable attorney's fees, pursuant to 15 U.S.C. § 15;

V.     As to Count V, actual damages, injunctive relief, interest and the costs of suit, including reasonable attorney's fees pursuant to Fla. Stat. § 501.211.

VI.    As to Count VI, compensatory damages, treble damages, interest and the costs of suit, including reasonable attorney's fees, pursuant to 18 U.S.C. § 1964(c);

VII.   As to Count VII, compensatory damages, treble damages, interest and the costs of suit, including reasonable attorney's fees, pursuant to 18 U.S.C § 1964(c);

VIII.  As to Count VIII, compensatory damages, treble damages, interest and the costs of suit, including reasonable attorney's fees, pursuant to Fla. Stat. § 772.104(1);

IX.    As to Count IX, compensatory and punitive damages, injunctive relief together with interest and cost, an accounting, restitution and the imposition of a constructive trust;

X.     As to Count X, compensatory and punitive damages, injunctive relief, together with interest and costs;

XI.    As to Count XI, compensatory and punitive damages, injunctive relief, restitution, disgorgement of profits, and an accounting together with interest and costs;

XII.     As to Count XII, compensatory and punitive damages, restitution, injunctive relief, disgorgement of profits, and an accounting together with interest and costs;

XIII.    As to Count XIII, compensatory and punitive damages, injunctive relief, together with an accounting, restitution, the imposition of a constructive trust, interest and costs;

XIV.    As to Count XIV, compensatory and punitive damages, injunctive relief, together with an accounting, restitution, the imposition of a constructive trust, interest and costs;

XV.     As to Count XV, compensatory and punitive damages, together with an accounting, restitution, the imposition of a constructive trust, interest and costs;

XVI.    As to Count XVI, a preliminary and permanent injunction enjoining access and use of the internal confidential information, described in such Count XVI, compensatory and punitive damages, restitution and disgorgement of profits, interest, costs and attorney's fees;

XVII.   As to Count XVII, actual damages, including lost profits, punitive damages, injunctive relief, attorney's fees, interest and costs;

XVIII.  As to Count XVIII, actual damages, disgorgement of profits made by Defendants, injunctive relief, with interest and costs;

XIX.    As to Count XIX, single and double damages, injunctive relief, interest, costs and attorney's fees.

and, granting Plaintiff such other and further relief as the Court deems just, equitable and appropriate, relating to this litigation.

Dated: March 3, 2018

**BOIES SCHILLER FLEXNER LLP**

By: _____

Steven W. Davis
(Bar No.:347442_)

Stephen N. Zack
(Bar No.:145215)
100 SE Second Street, Suite 2800
Miami, Florida 33131
Tel: (305) 539-8400

60

Fax: (305) 539-1307

David Boies
Nicholas A. Gravante, Jr.
575 Lexington Avenue, 7th Floor
New York, New York 10022
Tel: (212) 446-2300
Fax: (212) 446-2350

George F. Carpinello
30 S. Pearl Street, 11th Floor
Albany, New York 12207
Tel: (518) 434-0600
Fax: (518) 434-0665

# Exhibit A

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division**

PDVSA US LITIGATION TRUST

Plaintiff,

v.

LUKOIL PAN AMERICAS LLC; LUKOIL PETROLEUM LTD.; COLONIAL OIL INDUSTRIES, INC.; COLONIAL GROUP, INC.; GLENCORE LTD.; GLENCORE INTERNATIONAL A.G.; GLENCORE ENERGY UK LTD.; MASEFIELD A.G.; TRAFIGURA A.G.; TRAFIGURA TRADING LLC; TRAFIGURA BEHEER B.V.; VITOL ENERGY (BERMUDA) LTD.; VITOL S.A.; VITOL, INC.; FRANCISCO MORILLO; LEONARDO BAQUERO; DANIEL LUTZ; LUIS LIENDO; JOHN RYAN; HELSINGE HOLDINGS, LLC; HELSINGE, INC.; HELSINGE LTD., SAINT-HÉLIER; WALTROP CONSULTANTS, C.A.; GODELHEIM, INC.; HORNBERG INC.; SOCIETE DOBERAN, S.A.; SOCIETE HEDISSON, S.A.; SOCIETE HELLIN, S.A.; GLENCORE DE VENEZUELA, C.A.; JEHU HOLDING INC.; ANDREW SUMMERS; MAXIMILIANO POVEDA; JOSE LAROCCA; LUIS ALVAREZ; GUSTAVO GABALDON; SERGIO DE LA VEGA; ANTONIO MAARRAOUI; CAMPO ELIAS PAEZ; PAUL ROSADO; BAC FLORIDA BANK; EFG INTERNATIONAL A.G.; BLUE BANK INTERNATIONAL N.V.

Defendants.

Case No. _____

## DECLARATION OF JOHN BRENNAN

**John Brennan**, being first duly sworn, deposes and states as follows:

1.     I am the founder and Chief Executive Officer of The Brennan Group LLC ("TBG"), a Washington DC-based company which provides professional investigation services to law firms and major corporations in multiple jurisdictions around the world, in particular South America, North America and Europe.



2.     I make this declaration in support of Plaintiff's motion for a temporary restraining order and an order temporarily sealing the file pending execution of the temporary restraining order.

## MY BACKGROUND AND QUALIFICATIONS

3.     I am a graduate of the University of Exeter, in the United Kingdom. I served in the police service of the United Kingdom from 1981 to 1996, where I rose to the position of Senior Detective at New Scotland Yard. During that time, I served within the International and Organized Crime Branch and South East Regional Crime Squad. I contributed to numerous successful and complex investigations working in the UK and abroad.

4.     Subsequently, I held senior positions at several international consulting firms, including Charles River Associates, Guidepost Solutions and Alvarez & Marsal, working at the forefront of the use of innovative undercover operations in complex corporate investigations around the world. I founded TBG in 2015.

5.     Recently, I led a major internal inquiry into fraud, corruption and malfeasance at a listed U.S. multinational company. As a result of my on-the-ground inquiries in multiple jurisdictions, I was asked to personally brief the U.S. Department of Justice and the Securities and Exchange Commission.

6.     In 1989-1990, I was awarded a Bramshill Fellowship (United Kingdom National Police Staff College) for my efforts in investigating organized crime and have lectured extensively in Europe and the USA on white collar crime.

## SUMMARY OF FINDINGS

7.     I have been asked by counsel for Plaintiff herein to undertake an investigation of an ongoing criminal conspiracy among several multinational oil and gas trading companies to engage in bid rigging, commercial bribery, computer fraud and theft of trade secrets,

2



involving purchases and sales of crude oil and hydrocarbon products by Petróleos de Venezuela, S.A. ("PDVSA").

8.       In summary, my investigation has revealed that two Venezuelan-born individuals, Francisco Morillo and Leonardo Baquero, and a number of co-conspirators have bribed PDVSA employees to gain direct electronic access to highly-confidential, internal information at PDVSA.  These conspirators have used this access to (1) conspire among themselves to defraud PDVSA and to rig bids; (2) gain knowledge of competing bids so they can beat those bids; (3) obtain information about PDVSA's commodity requirements before they are released to the market; (4) conspire with corrupt PDVSA employees to structure future contract bids to favor clients of Morillo and Baquero; and (5) cheat PDVSA of full payment for oil purchased by the conspirators and short PDVSA of full shipments of products paid for by PDVSA.

9.       As part of my extensive investigation, I have interviewed numerous individuals in the United States, Venezuela and other countries, reviewed numerous documents that we have obtained, and reviewed a forensic computer analysis recently conducted by John Thackray whose Declaration dated February 12, 2018, is attached as Exhibit B to the Complaint.

## INFORMATION GAINED FROM MORILLO'S ESTRANGED WIFE

10.      One source of the information that we have obtained is Ms. Vanessa Friedman, the estranged wife of Morillo.

11.      Ms. Friedman and Morillo have known each other since the mid-90s when they were youthful sweethearts.  They remained in a relationship for the next 15 years and married in 2005.  Ms. Friedman was able to provide extensive details concerning the formation of the entities created by Morillo and Baquero to facilitate their fraud and the conspiracy they are engaged in with other individuals and companies.

3



12.    Ms. Friedman also provided me with a hard drive from the laptop computer that both she and Morillo used when they lived together. The hard drive from the computer contains literally thousands of instant messages, e-mail communications, bank records, and other documents evidencing details of the conspiracy.

13.    Ms. Friedman explained to me that Morillo and the people he associates with are extremely violent people. Her relationship with Morillo began to break down in 2007 and he began to act violently towards her. His behavior became erratic. At the same time, Morillo began associating with individuals whom she believes were involved in drug trafficking, such as Aniasi Turchio, an alleged drug kingpin, Majed Khalil an alleged funder of terrorism, and people associated with Nicaraguan drug cartels.

14.    Ultimately, in 2010, while Morillo was out of Venezuela, Ms. Friedman obtained from a Venezuelan court a temporary restraining order against Morillo and locked him out of the marital home to prevent his entry going forward. Morillo was angered by this action since, among other things, it deprived him of access to their computer. He thereafter made multiple demands that he gain access to the home so that he could obtain the computer and other documents he had left there. Ms. Friedman refused to allow him access.

15.    Morillo then began a campaign of terror against his estranged wife. Ms. Friedman received a number of threats from individuals whom she believes were connected to Morillo, since they specifically referenced demands that she give up the laptop computer. Ms. Friedman has also been confronted on multiple occasions in Caracas by individuals making demands on behalf of Morillo for return of the laptop and other documents, and was the subject of an attempted kidnapping.

16.    In my interviews with Ms. Friedman, she provided me with numerous details of the formation of this criminal enterprise and how it operates.

4



17.     Many of the details provided by Ms. Friedman have been corroborated by the documents she produced to me; interviews by TBG personnel with other informants; and forensic computer analysis of PDVSA computers.

## DETAILS OF THE CRIMINAL ENTERPRISE

18.     In late 2002 or early 2003, Morillo joined PDVSA as a trader of oil-related commodities.  Baquero also was employed at PDVSA in a similar capacity.  Morillo and Baquero worked together at PDVSA for approximately a year, during which time they associated with another PDVSA employee named Rene Hecker.  We understand from our informants that Hecker held the position of business manager of the Commercial and Supply Department of PDVSA until 2013.  Morillo and Baquero also became associated with Marco Malave, a product trader whom I know to be currently in custody in Venezuela on an apparently unrelated criminal matter.  Hecker remains to this day one of the prime contacts for Morillo within PDVSA, his current role being Head of the PDVSA Joint Venture with Chevron known as Petropiar, S.A.

19.     In 2003, Morillo left PDVSA after setting up his own company, Hornberg Inc., a Panamanian company, in 2002, and Baquero partnered with him.  Morillo and Baquero had no office at this time and the whole day-to-day business of the company was controlled and executed by Morillo from his laptop at home.

20.     In March 2004, Morillo and Baquero established a consulting firm for oil and gas trading called Helsinge Inc., which they incorporated in Panama and which purported to provide advisory services to clients in the energy sector.  At about the same time, Morillo and Baquero also set up a number of Panamanian shell entities which they used to receive and transfer funds from clients of Helsinge to, amongst other things, bribe corrupt PDVSA employees.  In 2015, Morillo and Baquero set up a new Florida entity, Helsinge Holdings, LLC to perform essentially the same functions as Helsinge, Inc.  They also formed an entity

5



known as Helsinge Ltd. Saint-Hélier in Jersey in the Channel Islands, with its principal office in Geneva, Switzerland.

21.     In or around 2005, Morillo and Baquero, through corrupt PDVSA employees, were able to obtain unauthorized access to PDVSA's computer system and to set up what can be described for purposes of reference as a "clone server." In essence this was a technical method that allowed Morillo and Baquero to obtain direct and real-time access to PDVSA's confidential information from within the Commercial and Supply Department. This included information concerning PDVSA's intended sales of crude oil and its purchases of hydrocarbon products such as light crude oil additives, like naphtha that are necessary for blending with the heavy crude oil that PDVSA produces. Informants and Mr. Thackray's analysis confirm that such real-time access continues to this day.

22.     An informant, who has extensive knowledge of oil and hydrocarbon trading globally, witnessed Morillo access a computer system from his laptop at a location in the United States in the fall of 2015. Morillo showed the laptop screen to the informant, who could see that Morillo was accessing the live PDVSA system in real time with the ability to alter the official bidding process.

23.     By obtaining real-time access to PDVSA's highly confidential information, Morillo and Baquero have been able, among other things, to do the following: (1) gain early access to proposed tenders for the purchase and sale of products and to manipulate the conditions of the tender so as to favor particular clients of Morillo and Baquero; (2) gain access to competing bids both for the sale of PDVSA's oil and for PDVSA's purchase of light crude products so that Morillo and Baquero's clients could place winning bids just high enough (or low enough) to win contracts; (3) facilitate collusive bidding among Morillo and Baquero's clients so that they could agree on bids and allocate bids among themselves; and (4) give their clients advance notice of tenders so that they could obtain necessary credit,

6



procure the necessary tankers and arrange for shipments to particular ports well in advance of competitors.

24.     The companies that have received this inside information through Morillo and Baquero include: Lukoil; Colonial; Glencore; Masefield; Trafigura; and Vitol (sometimes referred to herein as the "Oil Company Conspirators"). The Oil Company Conspirators are among the largest buyers of PDVSA's crude oil and sellers of light crude oil products to PDVSA. Their transactions with PDVSA during the past 15 years have totaled tens of billions of dollars.

25.     The Oil Company Conspirators have paid Morillo and Baquero and their companies handsomely for this inside information. Morillo and Baquero live lavish life styles in Florida, Geneva, Switzerland and Madrid, Spain where they own property, and travel frequently around the world.

26.     The Oil Company Conspirators have also provided funds to Morillo and Baquero for the payment of bribes to corrupt PDVSA employees. Morillo and Baquero use the Panamanian shell companies to funnel funds from the Oil Company Conspirators to the bribed PDVSA employees who receive such funds through the complicit banks.

27.     Despite knowing and/or being on notice of the irregular nature of Defendants' payments, numerous banks facilitated Defendants' scheme. These banks include EFG International A.G., Blue Bank International N.V. and BAC Florida Bank. Defendants have also utilized accounts at Credit Suisse.

28.     Individuals at the Oil Company Conspirators that participated in the alleged conspiracy include: Maximiliano Poveda; Jose Larocca and Andrew Summers of Trafigura; Luis Alvarez; Gustavo Gabaldon and Sergio De La Vega of Glencore; Antonio Maarraoui of Vitol; and Paul Rosado of Colonial. We have identified the bank accounts used to make the payments.

7



29. In order to conceal their scheme, Morillo and Baquero frequently created multiple public email addresses using aliases or fictitious names in order to avoid detection.

30. We have been able to confirm the use of these fictitious names from emails and informants. Thus, Morillo has multiple fictitious names such as "Skito," "George White," "Piccolo" and "Junior"; Maximiliano Poveda, a senior trader for Trafigura, is identified in the documents as "Che"; Gustavo Gabaldon, a senior trader for Glencore is identified in the documents as s "Tobo"; Rene Hecker a senior PDVSA manager is identified as "Tombo"; Luis Liendo, a corrupt former PDVSA employee who set up the "clone-live server" and facilitated direct access for Morillo and Baquero is referred to as "the Nerd"; and Hecker's father-in-law, Antonio Veleiro Fernandez, a Spanish national who may be identified as "Gigante."

31. Morillo and Baquero have implemented the Defendants' conspiracy primarily through three offices: one located at Room 948, 1221 Brickell Avenue, Miami, Florida; another office on the 11th floor of 1111 Brickell Avenue in Miami; and one located in Geneva, Switzerland. The Miami office at 1221 Brickell Avenue is administered by a U.S. citizen by the name of John Robert ("Jack") Ryan and a Venezuelan citizen and U.S. resident, Daniel Lutz, who is also a childhood friend of Morillo's.

32. Ryan works for of an entity called Waltrop Consultants, C.A., a Venezuelan corporation organized by Morillo and Baquero in March 2001 for the purpose of carrying on clandestine communications with the other conspirators. We have confirmed that Waltrop is still in operation at its Miami office. Waltrop's internet domain name, WTRPC.com, and specific communications by Jack Ryan and another Waltrop employee, Yanir Marcano, appear in recent months on metadata fragments in computers at PDVSA, indicating that Ryan and Marcano are continuing to access confidential business information of PDVSA without authorization. Earlier in my investigation I was provided by an informant a photograph of a

8



Waltrop Consultants business card in the name of Francisco H. Morillo V. with an email address thereon of fm@wrtpc.com. Furthermore, TBG has obtained a Waltrop Consulting business card for Ryan that is identical in format and bears an email address of jr@wrtpc.com which he is currently using.

33.     TBG's investigation has determined that Ryan carries out accounting functions and maintains electronic and hard-copy business records for Morillo, Baquero and their companies at the Helsinge office location in Miami.

34.     As Mr. Thackray describes in his declaration, the evidence indicates that the internal PDVSA computer system used by the Commerce and Supply Department to formulate, tenders, accept bids and award contracts for the purchase and sale of hydrocarbon products by PDVSA has been compromised to allow direct real-time access by individuals outside of PDVSA. That evidence indicates that corrupt PDVSA employees set up this access for Morillo and Baquero by means of a "clone server" or other methods. When Mr. Thackray inspected the PDVSA server room in Caracas, he found a number of unusual and suspicious features, and was prevented, under suspicious circumstances, from fully examining the so-called Core 9 server, which contains highly confidential communications concerning bidding and tenders. He was able to ascertain that Core 9 has a "gateway server" called Metcam85 that provides complete and unrestricted access to Core 9. This unusual setup allows external access to the Core 9 information. Thackray further determined that the Core 9 was set up, again in an unusual and suspicious manner, so that certain communications, from the domains cantv.net and cantv.com and addressed to the domain "pdva.com" (a look-alike variation of pdvsa.com that is a typical ploy of fraudsters) would go directly to individuals at PDVSA who are associated with the freight and operations functions of the Commerce and Supply Department without being tracked by the PDVSA system. This

9



supports the fact that rogue PDVSA employees are still conspiring with Morillo and Baquero to manipulate tenders to the advantage of Morillo and Baquero's clients.

### DOCUMENTARY EVIDENCE OF THE ENTERPRISE

35.     The conspiracy is confirmed by emails among the conspirators that have been obtained from the Friedman/Morillo laptop hard drive and from informants.

36.     For example, attached as Exhibit C to the Complaint, is an email exchange[1] dated April 27, 2005 between a [former] bribed PDVSA employee Luis Liendo ("the Nerd") and Morillo and Helsinge's then bookkeeper, Alejandro Vizcarrondo Morillo, the cousin of Francisco Morillo, discussing the initial steps in creating and installing the "clone server."

37.     Attached as Exhibit D to the Complaint, is a May 30, 2005 email from Liendo to Morillo and his bookkeeper, Vizcarrondo, stating that Liendo is testing the new clone system along with links to Morillo's company along with "built-in aliases."

38.     Attached as Exhibit E to the Complaint, is a general ledger statement of payments out of the account at Premier Bank International N.V. (now Blue Bank International N.V.), of Hornberg Inc., an entity set up by Morillo, which shows payments to "Gigante," believed to be the alias for the father-in-law of a corrupt PDVSA employee Rene Hecker.

39.     Attached as Exhibit F to the Complaint, is a communication between the bookkeeper, Vizcarrondo, and Trafigura's senior trader, Maximiliano Poveda, under his alias "Che," sending him a list of corrupt payments paid to Trafigura traders during the period from March 2005 to February 2006.  These payments exceed $1.75 million.

---

[1] Each email or instant messaging attached as an exhibit is in Spanish with an English translation.



40.     Attached as Exhibit G to the Complaint, is an email reflecting a payment made by one of the Panamanian shell companies, Hornberg, to the wife of one of the Trafigura senior traders, Maximiliano Poveda, on March 17, 2006.

41.     Attached as Exhibit H to the Complaint, is an email dated April 29, 2005 from Morillo, to a trader at Colonial Group, Paul Rosado, showing the Oil Company Conspirators' access to the competing bids of other Oil Company Conspirators for fuel oil, gasoline, low-sulfur diesel fuel, and heating oil.

42.     Attached as Exhibit I to the Complaint, is an email exchange from February 2005 between Morillo and Maximiliano Poveda, Trafigura's senior trader, complaining about the fact that Lukoil was getting inside information about PDVSA tenders.

43.     Attached as Exhibit J to the Complaint, are December 6, 2005 instant messages between Morillo, using the alias "George White" and a Colonial trader discussing their receipt in real time of competing bids of other Oil Company Conspirators for the purchase of crude oil and their strategy to win the tender using this inside information.

44.     Attached as Exhibit K to the Complaint, are instant messages on March 27, 2006 and March 30, 2006 between Morillo (alias "George White"), Maximiliano Poveda, the Trafigura trader, and another Trafigura trader, discussing competing bidding information hacked from PDVSA's computers and discussing a strategy to win the bid using such knowledge.

45.     Attached as Exhibit L to the Complaint, is an April 25, 2006 email from Morillo to traders at Trafigura disclosing a competing oil company's bid.

46.     Attached as Exhibit M to the Complaint, is an email dated August 16, 2005 from one of the bribed PDVSA employees, Antonio Vicentelli (using the alias "Pedro Sanchez"), acting on behalf of bribed PDVSA employee Edgar Garcia (alias "El Hermano Mayor "), to Morillo and Baquero in which Sanchez provides an update on the upcoming

11



tenders concerning chartered vessels used to transport the PDVSA crude products and instructs Morillo using his alias "Junior" to delete the instant message communications between them. In addition, Vicentelli provides his bank account for Morillo and Baquero to pay a bribe in the amount of $100,000 for the award of these upcoming tenders.

47.     Attached as Exhibit N to the Complaint, is a series of email communications dated August 29, 2005 between Morillo and senior Glencore traders discussing how to manipulate PDVSA's tender offer for the purchase of Russian crude oil so as to advantage a bid by Glencore. These communications also discuss how Glencore could provide the bribed PDVSA officials with pre-textual reasons for changing the terms of the tender if any changes were questioned by others at PDVSA. Glencore's comments were forwarded to the private email of Rene Hecker so that he could change the tender before PDVSA officially released the tender to the general market.

48.     Attached as Exhibit O to the Complaint, is a series of messages in August 2005 between Morillo and the Trafigura traders discussing the fact that, because of their illicit access to PDVSA confidential information, Trafigura and Morillo have the opportunity "to write the terms of the [light crude] tenders," and to "get rid of a lot of people that will like to get in the way."

49.     These are but a few examples of the numerous communications and other documents in Plaintiff's counsel's possession establishing the nature and breadth of this criminal conspiracy.

50.     The fact that Morillo and Baquero are still accessing PDVSA's internal computers is confirmed by forensic analysis conducted by Mr. Thackray.

51.     Given the nature of the conspiracy and the brazen criminal acts already committed, I have no doubt that the key players in this conspiracy will attempt to destroy their records and secrete assets as soon as they learn of this proceeding. Attached as Exhibit

12



P to the Complaint, are several email exchanges between Morillo and various co-conspirators in which they reference deleting the email messages.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 1st day of March, 2018

John Brennan

13

# Exhibit B

## DECLARATION OF JOHN THACKRAY

JOHN THACKRAY, being duly sworn, deposes and says:

1. The following information, unless otherwise indicated, is based on my personal knowledge and review of documents. If called upon to do so, I could and would testify competently to the matters set forth herein.

2. **Current Positions.** I am the Vice President and head of global training and operations of GetData Forensics USA ("GetData USA"), based in Manhattan Beach, California. GetData USA uses a forensic software product called Forensic Explorer ("FEX") that is manufactured by GetData Forensics, based in Australia. FEX collects, preserves, and presents digital media for use in civil and criminal investigations and legal proceedings, and it conforms to global standards and best practices for these purposes. I personally authored the protocols and standards for use of the FEX software and developed the training materials for it. FEX software is used by over five thousand commercial organizations and military and law enforcement agencies worldwide. I am also the principal digital forensic consultant for The Brennan Group, which was retained by counsel to conduct investigative activities in this matter. In addition, I serve as a volunteer with the Police Department in Torrance, California, and am a member of a joint task force, overseen by the United States Secret Service, in the Los Angeles area, all of which entails work on active criminal cases that involve the use and abuse of digital technology.

3. **Training and Experience.** In 1972, I enlisted in the British Army and served for nearly 18 years, attaining the rank of Sergeant. During my Army service, I studied and obtained an educational promotion certificate and an advanced educational promotion certificate. I served tours of active duty in Northern Ireland, Cyprus (United Nations), Rhodesia (Zimbabwe), Belize and other classified locations around the world. Beginning in 1978, I was assigned for duty in

various positions that involved the operation and administration of computers and electronic data processing equipment. Following my discharge from the Army, I became professionally involved with information technology as a digital forensic investigator. I joined the South Yorkshire Police in 1989 as a scientific support officer responsible for the investigation of high technology crime, and attained the rank of detective. In 1994, I was assigned as the principal case detective responsible for investigating national and international computer crime with the Regional Crime Squad, based in Wakefield, West Yorkshire. I became familiar with global standards and best practices for electronic forensics, and I assisted in development and implementation of those standards and practices. Beginning in the late 1990s, I developed one of the first training programs for mobile phone forensics using a computer-based process. In 1997, I was employed by the National Police Service of New Zealand to establish and head its first Electronic Crime Unit based in Auckland. I left the Police Service in 2001 to join Ernst & Young, for which I established and headed the Computer Forensic Services team for the Oceanic Region (Australia, New Zealand, Oceanic nations). I left E&Y in 2002 and formed my own company, Thackray Forensics Ltd, based in New Zealand. In 2002-03, I was contracted to IBM's Incident Response Global Services, in Sydney, Australia to implement a computer forensic capability to complement IBM's Information and Communication Technology incident response team. In recent years, in addition to establishing GetData USA in 2015, I have served in an advisory capacity to various governments in Europe, Asia, the Middle East, and Latin America, including their law enforcement and military operations, regarding digital forensics and electronic investigations, in addition to working as a private digital forensics expert.

4.    **Professional Certifications.** I have received the internationally recognized Forensic Science Diploma in Crime Scene Examination. I was one of the first certified lead

2

instructors for several electronic forensic processes that are used to extract, preserve and present digital evidence. All are used by the police, military and major corporations worldwide and include the following digital forensic products: Guidance Software-EnCase; Access Data Forensic Tool Kit; FEX; XRY; CelleBrite; and Fernico-ZRT. To become an instructor, I had to become certified and have an in-depth knowledge with practical experience using each of these tools. I also wrote operational procedures and protocols for the investigation of digital crime for dozens of police departments and corporations worldwide.

5.    **Awards and Recognition.** In 1996, I was the first South Yorkshire police officer to be awarded a Winston Churchill Fellowship, which I used to research and work alongside computer crime, law enforcement agencies, and computer technology research and development specialists worldwide. Upon the successful completion of my research, I was honored as a Churchill Fellow by the patron Her Majesty Queen Elizabeth II. In 2010, I received commendations from the Criminal Division of the U.S. Department of Justice for outstanding performance in instruction of computer and electronic forensics. In 2017, I was recognized by the California State Assembly, Los Angeles County, the City of Torrance and several elected representatives for my computer forensic work in connection with investigations of sex crimes involving children.

6.    **Testimonial Experience.** During my career, I have examined, investigated, and analyzed thousands of cell phones, computers, and servers in connection with civil and criminal matters and internal corporate investigations. I have prepared hundreds of affidavits and expert reports in various criminal, civil and investigative matters worldwide related to digital forensics. This information has been used, among other things, to obtain search warrants and seizure

3

orders. I regularly provide expert opinions for matters involving computer forensics for the Torrance and Gardena Police Departments.

7.    **PDVSA Investigation.** In 2017, I was asked to assist The Brennan Group in conducting an investigation into possible fraudulent access to and use of the computer systems operated by Petróleos de Venezuela, S.A. ("PDVSA") in its business. As part of this investigation, in September and October 2017, I traveled to Caracas, Venezuela, the location of PDVSA's headquarters. Prior to my first trip, I was informed that investigators believe that Francisco Morillo and Leonardo Baquero had formed two energy advisory firms, Helsinge Holdings LLC ("Helsinge", formerly known as Helsinge, Inc.), and Waltrop Consultants, C.A. ("WTRPC"), along with several additional Panamanian companies, to facilitate elaborate alleged price-fixing, kickback and money laundering schemes by accessing and using PDVSA's confidential inside information. I was informed that Helsinge, through Morillo and Baquero, has gained access to highly confidential internal information at PDVSA by bribing PDVSA employees. As relevant here, most such information is created and used in the day-to-day operations of PDVSA's Commerce and Supply ("CyS") department. The CyS Department is responsible on a worldwide basis for purchase by PDVSA of petroleum products that are needed for its operations, and for sale of petroleum products that PDVSA produces. I was informed that certain PDVSA employees are believed to have facilitated the installation of a "clone live server" (either onsite or remotely) or otherwise provided remote real-time access to and replication of the PDVSA server that contains the bulk of the highly confidential PDVSA data. That server is referred to as the "Core 9" server, and its contents include highly sensitive data, including information concerning PDVSA's tenders and bids to purchase and sell petroleum products.

4

Individuals having real-time access to the confidential information are able to manipulate and use that data in furtherance of their alleged schemes.

8. During the investigation, I performed an analysis of the computer network at PDVSA's headquarters and obtained and preserved certain data stored in the network in accordance with best practices for forensic use of electronic evidence. Based on my investigation and on information provided by The Brennan Group, together with my digital forensic analysis and findings described below, it is my opinion that Morillo and/or person(s) working with him, has the ability to remotely access and use confidential PDVSA information on the Core 9 server from outside of PDVSA in real time.

9. In a normal forensic investigation on behalf of a corporation, the investigators are given unrestricted access to all IT personnel, hardware, software and data. However, when I traveled to Caracas in September 2017 with John Brennan to conduct such an investigation, I was not able to gain such access. The reasons included the unstable political and economic environment in Venezuela and the fact that access and information is controlled by certain PDVSA employees who are believed to be collaborating in the conspiracy. These concerns prevented us on this visit from entering the PDVSA premises.

10. In October 2017, I made a second visit to Caracas with Mr. Brennan. At that time, with the approval of senior PDVSA officials, I went incognito to physically investigate the PDVSA premises. I was informed that PDVSA's policy is to retain emails on its network for only three months. I have never seen an e-mail retention policy limited to three months in any company globally, and it is particularly suspicious at a company that trades in high value commodities such as PDVSA. Also highly unusual and suspicious is that, as I was told, there are

5

no disaster recovery plans and backup functions within the PDVSA network. Further, the architecture of the PDVSA network is such that there is limited ability to track information in it.

11.     I also learned that the PDVSA network has fundamental security vulnerabilities and irregularities. I learned that the PDVSA Security department is the access and security gatekeeper of the PDVSA network, and they can provide an employee or third party with credentials to obtain unrestricted remote access to the network, including assistance in installing and configuring a VPN for that purpose. In my experience, it is highly unusual for an IT security department to provide access to a third party not employed by the company, and especially not unrestricted access. I personally observed a demonstration of how an individual could log-in from a remote location to the Core 9 server which contains highly confidential CyS tender and bidding data. From that demonstration, I was able to confirm the availability of unrestricted access to the platform used for bidding on the purchase and sale of petroleum products, and to observe real-time activity associated with those bids. I have been informed by The Brennan Group that there is a witness who was present when Morillo accessed the Core 9 server from a remote location and was able to amend and/or manipulate data, apparently in the same manner as I observed directly.

12.     During the October visit, I also was able to physically inspect the room in PDVSA's main headquarters in which the server systems are located. I was informed that the computer network in PDVSA's headquarters is constructed of ten servers (which are referred to as "Cores"), and that Cores 9 and 10 are dedicated to storing the highly-confidential CyS data. For all cores other than Cores 9 and 10, each core is a replica server (referred to as a "clone") of the adjacent core. For example, Core 1 replicates Core 2, and vice versa. This architecture is typical of the design of corporate IT systems, as it provides redundancy and backup in the event

6

one of the servers does not operate properly. However, Cores 9 and 10 do not similarly replicate and back up each other. I was told that this is because of the low number of users who access Cores 9 and 10 (102 users at the time). The stated rationale does not make logical sense because Cores 7 and 8 had only 72 users, and in any event, such a structure is highly unusual in a corporate environment and raises suspicions that the Core 9 server could be replicating to "rogue computer server," either onsite or remotely. Further, when I examined the Core 10 server, I determined that it was switched on, even though it was not then being used to back up Core 9 or for any other purpose. I then tried to access the Core 9 server to see if it was replicating to some other server and to copy the contents of its hard drive, but I was blocked from having any access to the Core 9 server. I was informed that this was done by Roland Rojas of PDVSA's internal security unit. No such issue arose when I performed the same type of functions on the other Core servers, to which I had full access. Further, security personnel refused to back up the Core 9 server, even though senior PDVSA officers had ordered the back-up. Upon further investigation in the server room, I located an additional server, titled Metcam85, which functions as a gateway server that provides complete unrestricted access to the Core 9 server. Again, this is a highly unusual and suspicious arrangement.

13. As part of my investigation, The Brennan Group asked me to search the PDVSA network to see if it contained two specific domain names – WTRPC.com and CANTV.net. With respect to WTRPC.com, the search uncovered metadata fragments ("hits") on the Core 9 and Metcam85 servers, but not on Core 10, which is further evidence that Core 9 was not replicating to Core 10. These hits indicate that there has been interaction with the servers from two individuals using the WTRPC.com domain in 2017. As previously mentioned, WTRPC is one of the entities believed to be used by Morillo and Baquero to defraud PDVSA. I identified the two

7

individuals whose WTRPC domain metadata fragments were contained on the Core 9 and Metcam85 servers as Jack Ryan and Yanira Marcano, both of whom I am informed are current Helsinge employees. I performed further analysis using the metadata fragments to identify that the WTRPC IP address and domain name was registered to a John Ryan in Florida. I was informed that WTRPC is not a company that is registered to do business with the CyS Department (i.e., a bidder, supplier or customer of PDVSA), and therefore there is no reason that the Core 9 and Metcam85 servers should contain the WTRPC.com domain. Based on my interviews, observations and the information provided to me to date, I believe there is no logical reason for the domain name WTRPC.com to be found on any of the PDVSA servers.

14. With respect to the CANTV.net domain name, my search showed that it appeared on the Core 9, Core 10 and Metcam85 servers. This is suspicious because I was informed the PDVSA network and the servers are generally set to restrict any emails with the CANTV.net domain name. CANTV.net is an e-mail hosting service like gmail.com or aol.com, and it is typical for corporate networks to block emails from such public domains because they can be used to breach security systems. I found that the CANTV.net domain appeared on the Core 9 and Core 10 servers as part of a "rule" that had been programmed into them. This is the only rule that I located in any of the PDVSA Core servers, which is suspicious in itself. In addition, the rule is highly suspicious because it causes any e-mail that both contains the domain names cantv.com and cantv.net and is addressed to ariascu@pdva.com and carmonado@pdva.com to go directly to the two PDVSA employees (Ariascu and Carmonado) in a manner that prevents PDVSA from knowing that the communication ever occurred. Based on information on the PDVSA network, these two individuals are associated, respectively, with the freight and operations functions of the CyS Department. Moreover, the domain name "pdva.com" in these

8

email addresses is not a legitimate PDVSA e-mail domain. Rather, it is often an indicator of fraudulent or criminal purposes for parties to use a domain name that upon a quick glance appears to be a well-known name (such as PDVSA), but in reality, is different (PDVA) and directs the e-mail to an unintended end-point. This technique is typically used globally in connection with identity theft and criminal financial activity. I also have reviewed e-mail correspondence provided by The Brennan Group which shows that Morillo uses CANTV.com e-mail addresses.

15. In September 2017, The Brennan Group provided me with hardcopy versions of two emails and their corresponding English translations and asked me to explain their significance. The emails appear to indicate that Morillo commissioned Luis Liendo to build a network using the wtrpc.com domain. The e-mail dated 27 April 2005 at 4:44pm (attached as Exhibit 1) was sent by Liendo to Alejandro Vizcarrondo, who forwarded it to Morillo later that evening. Based on translations this e-mail appears to be an outline of a proposal to perform services for a domain registration and either updating or creating a computer network. The e-mail dated 25 May 2005 (attached as Exhibit 2), also from Liendo to Vizcarrondo, appears based on translations to be an invoice from Liendo for completing the work that is outlined in the Exhibit 1 proposal, including specifically the registration and configuration of the WTRPC.com domain. Exhibit 2 also requests that Vizcarrondo arrange a meeting that day with "Leo o Francisco" (apparently referring to Leonardo Baquero or Francisco Morillo) to discuss use of a new totally automated tracking methodology. This supports the existence of a rogue clone server

9

that would allow real-time monitoring of data in PDVSA's CyS commodity trading operations. These e-mails further show Morillo's connection to the domain name WTRPC.com, which, as noted, appears on the Core 9 and Metcam85 servers for no apparent logical reason.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 12 February 2018

John Thackray

10

# **Exhibit 1**

**To:** 'Francisco Morillo'[franciscomorillo@cantv.net]
**From:** Alejandro Vizcarrondo M.
**Sent:** Wed 4/27/2005 10:50:35 PM
**Importance:** Normal
**Subject:** FW: DIRRECION PARA ENVIAR PROJECT
**Received:** Wed 4/27/2005 10:50:37 PM


QUE TAL???????????

-----Original Message-----
**From:** Luis Liendo [mailto:liendoluis@hotmail.com]
**Sent:** Wednesday, April 27, 2005 4:44 PM
**To:** alejandro_vizcarrondo@hotmail.com
**Cc:** liendoluis@hotmail.com
**Subject:** RE: DIRRECION PARA ENVIAR PROJECT


Que tal alejandro como estas..?

Propongo el siguiente plan para las proximas actividades:
Servicios a Ser Implantados:
·       Registro del Dominio (Contacto, registros NS, etc) (tiempo previsto 2 horas)
·       Instalación del SO en Ambos servidores (aproximadamente 4 horas para ambos servidores)
·       Implantación de servicio de DNS (MX y demas registros) (8 horas para configurar el servicio de BIND, sobre linux software libre)
·       Implantación del Servicio SMTP, POP3 e IMAP. (aproximadamente 20 horas para el servicio básico y luego unas 20 horas mas para implantar mejoras, que se pueden hacer posteriormente)
·       Configuración Estratificada a nivel de Red para asegurar la seguridad en el sistema (2 horas)
·       Implantación de Servicios de Seguridad Perimetral y puntos de fuerza (Shorewall, Firewall de SUSE Linux(iptables) y Servidor de Proxy (squid) Tiempo Aproximado 20 horas , luego posiblemente se deba tomar mas tiempo en mejoras y adecuación)
·       Posterior implantación de servicios Internos de administración de direcciones privadas y File & Print (DHCP, SAMBA) (tiempo previsto 25 horas, luego posiblemente se deban tomar mas tiempo en mejoras y adecuación)
·       Implantación de Esquema de Backup y Respaldo además de posible balanceo dinámico y FailOver (contingencia en caso de falla) (tiempo Estimado 15 horas)
·       Actualización de Documentación en Paralelo aproximadamente 2 horas al culminar la implantación de cada servicio.
·       Implantación de servicios WEB (se haría con el apoyo de terceros especialistas en el diseño web y la estructuración de sitios y servicios WEB)

Para el dia de mañana estare en Caracas y me estare desocupando como a las 4:00pm, por lo que apartir de esa hora podemos atacar los primeros dos puntos (registro del dominio e instalación del SO en ambos servidores), la configuración del servicio de DNS seria para el dia Sabado y domingo, cuando desarrollariamos tambien la instalación de los servicios de SMTP y POP3 ó IMAP. Por favor avisame que te parece, compartelo con Francisco.
Saludos.
Luis Liendo.

# **Exhibit 2**

## Alejandro Vizcarrondo M.

**From:** Luis Liendo [liendoluiv@hotmail.com]
**Sent:** Wednesday, May 25, 2005 5:45 PM
**To:** alejandro_vizcarrondo@hotmail.com
**Subject:** Relación de Horas Trabajadas y Proximas Actividades

Buenas Tardes Alejandro.

Te anexo la relación de Horas Trabajadas y Proximas Labores a Realizar (tarifa de 120.000Bs / hora)

### Relación de Horas Trabajadas
### Actividades Realizadas

| | |
|---|---|
| Registro y Configuración de Dominio (wtrpc.com y UniqueJet.com) | 4 |
| Configuracion del servidor (Server01) | 5 |
| Configuración del Mail Server (mail.wtrpc.com) | 9 |
| Instalación e inducción del cliente de correo | 2 |
| Configuración de consola administrativa web de auto-gestion | 4 |
| Instrucción sobre la facilidad de Auto-Gestion (cambio de passwrd de cada cuenta y otros datos) | 1 |
| Revision General de Servidor Alterno (actualización de BIOS, Reconstrucción de Arreglo de Discos e Instalación del Sistema Operativo) | 6 |
| **Total** | 31 3.720.000 |

### Proximas Actividades

| | |
|---|---|
| Configuración del Dominio Internet y Servicio de correo para el dominio UniqueJet.com | 6 |
| Configuración de servidor Alterno (Salida SMTP Foranea, para enviar correos desde fuera de las oficinas) | 3 |
| Configuración de Servidor de Archivos File & Print con Samba (Servidor de archivos internos y externos) | 5 |
| Configuración de Servidor Proxy para incrementar la velocidad de conexión a internet | 4 |
| **Total** | 18 2.160.000 |

Necesito que nos reunamos con los muchachos para probar una nueva forma de hacer los seguimientos que nos mejorara notablemente la gestion y seria sin intervension humana, totalmente automatica. Por favor cuadra con Leo ó con Francisco para que la discutamos hoy en la tarde. Estare por las oficinas como a las 6:30pm.
Saludos.

Luis Liendo.

MSN Amor Busca tu ½ naranja

5/31/2005

# Exhibit C

April 27, 2005

How are you. Alejandro? How are you?

I propose the following plan for the next activities. Services to be Implemented

Domain Registration (Contact NS records etc) (estimated time 2 hours)

OS installation on both servers (approximately 4 hours for both servers)

Implementation of DNS service (MX and other registries) (8 hours to configure the service of BIND, on linux libre software)

Implementation of the SMTP Service. POP3 and IMAP. (Approximately 20 hours for the basic service and then about 20 more hours to implement improvements, which can be done later) Layered configuration at the network level to ensure security in the system (2 hours)

Implantation of Perimeter Security Services and strength points (Shorewall, SUSE Linux Firewall (iptables) and Proxy Server (squid) Approximate Time 20 hours, then possibly need to take more time in improvements and adequacy)

After implementation of internal services of management of private addresses and File & Print (DHCP SAMBA) (time planned 25 hours. then possibly need to take more time in improvements and adequacy)

Implementation of Backup and Backup Scheme in addition to possible dynamic balancing and FailOver (contingency in case of failure) (Estimated time 15 hours)

Parallel Documentation Update approximately 2 hours after completing the implementation of each service

Implementation of WEB services (it would be done with the support of third specialists in the web design and structuring of WEB sites and services)

For tomorrow I will be in Caracas and I will be vacating as at 4.00 pm. so from that time we can attack the first two points (registration of the domain and installation of the OS on both servers). the configuration of the service DNS would be for Saturday and Sunday. when we would also install the services of SMTP and POP3 or IMAP. Please let me know what you think share it with Francisco Greetings. Luis Liendo.

**To:**      'Francisco Morillo'[franciscomorillo@cantv.net]
**From:**    Alejandro Vizcarrondo M.
**Sent:**     Wed 4/27/2005 10:50:35 PM
**Importance:**    Normal
**Subject:**  FW. DIRRECION PARA ENVIAR PROJECT
**Received:**     Wed 4/27/2005 10:50:37 PM

QUE TAL ???????????

-----Original Message-----
**From:** Luis Liendo [mailto:liendoluis@hotmail.com]
**Sent:** Wednesday, April 27, 2005 4:44 PM
**To:** alejandro_vizcarrondo@hotmail.com
**Cc:** liendoluis@hotmail.com
**Subject:** RE: DIRRECION PARA ENVIAR PROJECT

Que tal alejandro como estas. ?

Propongo el siguiente plan para las proximas actividades:
Servicios a Ser Implantados:

    Registro del Dominio (Contacto, registros NS, etc) (tiempo previsto 2 horas)

    Instalación del SO en Ambos servidores (aproximadamente 4 horas para ambos servidores)

    Implantación de servicio de DNS (MX y demas registros ) (8 horas para configurar el servicio de BIND, sobre linux software libre)

    Implantación del Servicio SMTP, POP3 e IMAP. (aproximadamente 20 horas para el servicio básico y luego unas 20 horas mas para implantar mejoras, que se pueden hacer posteriormente)

    Configuración Estratificada a nivel de Red para asegurar la seguridad en el sistema (2 horas)

    Implantación de Servicios de Seguridad Perimetral y puntos de fuerza (Shorewall, Firewall de SUSE Linux(iptables) y Servidor de Proxy (squid) Tiempo Aproximado 20 horas , luego posiblemente se deba tomar mas tiempo en mejoras y adecuación)

    Posterior implantación de servicios Internos de administración de direcciones privadas y  File & Print (DHCP SAMBA) (tiempo previsto 25 horas, luego posiblemente se deban tomar mas tiempo en mejoras y adecuación)

    Implantación de Esquema de Backup y  Respaldo ademas de posible balanceo dinámico y FailOver (contingencia en caso de falla) (tiempo Estimado 15 horas)

    Actualización de Documentacion en Paralelo aproximadamente 2 horas al culminar la implantación de cada servicio.

    Implantación de servicios WEB (se haria con el apoyo de terceros especialistas en el diseño web y la estructuración de sitios y servicios WEB)

Para el dia de mañana estare en Caracas y me estare desocupando como a las 4:00pm. por lo que apartir de esa hora podemos atacar los primeros dos puntos (registro del dominio e instalación del SO en ambos servidores), la configuración del servicio de DNS seria para el dia Sabado y domingo, cuando desarrollariamos tambien la instalacion de los servicios de SMTP y POP3 ó IMAP. Por favor avisame que te parece, compartelo con Francisco
Saludos,
Luis Liendo

# Exhibit D

**TOSHIBA0007966**

| ORIGINAL | TRANSLATION |
|---|---|
| From:Luis Liendo<br>Sent:Mon 5/30/2005 6:47:40 PM<br>To:alejandro_vizcarrondo@hotmail.com[alejandro_vizcarr ondo@hotmail.com]; av@wtrpc.com[av@wtrpc.com]; fm@wtrpc.com[fm@wtrpc.com]; lb@wtrpc.com[lb@wtrpc.com]<br>Subject: Prueba de Alias de Correo<br>**Buenas Tardes.**<br>La presente es con el  objeto de probar los alias incorporados el fin de semana<br>**Saludos.**<br>Luis Liendo.<br>P.D.: Por favor recuerdenle a heinrich enviarme el correo con la información del dominio y la clave de administración asi como una lista de las cuentas a albergar en él<br>Las mejores tiendas, los precios mas bajos, entregas en todo el mundo, YupiMSN Compras:<br>http://g.msn.com/BHMAES/2746??PS=47575Haz clic aqui... | From: Luis Liende<br>Sent: Mon 5/30/2005 6:47:40 PM<br>To:<br>alejandro_vizcarrondo@hotmail.com<br>[alejandro_vizcarrondo@hotmail.com]; av@wtrpc.com [av@wtrpc.com]; fm@wtrpc.com [fm@wtrpc.com]; lb@wtrpc.com [lb@wtrpc.com]<br>Subject: Mail Alias Test<br>Good afternoon.<br>The present is for the purpose of testing the built-in aliases on the weekend.<br>Greetings.<br>Luis Liendo.<br>P.D.: Please remind heinrich to send me the mail with the information of the domain and the administration key as well as a list of the accounts to be housed in it<br>The best stores, the lowest prices, worldwide deliveries. YupiMSN Shopping.<br>http://g.msn.com/8HMAES/2746??P S=47575Click here. |

**To:**      alejandro_vizcarrondo@hotmail com[alejandro_vizcarrondo_vizcarrondo@hotmail com]  av@wtrpc com[av@wtrpc.com]  fm@wtrpc.com[fm@wtrpc com].  lb@wtrpc.com[lb@wtrpc.com]
**From:**    Luis Liendo
**Sent:**    Mon 5/30/2005 6:47:40 PM
Imp ~tance:    Normal
    ct:  Prueba de Alias de Correo
    .eived:    Mon 5/30/2005 6:51:49 PM

Buenas Tardes

La presente es con el objeto de probar los alias incorporados el fin de semana
Saludos

Luis Liendo.

P.D.: Por favor recuerdenle a heinrich enviarme el correo con la información del dominio y la clave de administración asi
como una lista de las cuentas a albergar en él.

---

Las mejores tiendas, los precios mas bajos, entregas en todo el mundo, YupiMSN Compras  Haz clic aqui. .

Toshiba(p)0 7960

# Exhibit E

Register: Premier Bank Hornberg - Acct #1
From 08/01/2004 through 12/31/2004

| Date | Number | Payee | Account | Payment |
|---|---|---|---|---|
| 8/10/2004 | PDTE INFO | FRANCISCO MORILLO | Accounts Payable | 37,040.37 |
| 8/13/2004 | PDTE INFO | FRANCISCO MORILLO | Accounts Payable | 85,028.00 |
| 8/13/2004 | PDTE INFO | FRANCISCO MORILLO | Accounts Payable | 120,003.00 |
| 8/20/2004 | PDTE INFO | FRANCISCO MORILLO | Accounts Payable | 80,025.00 |
| 8/24/2004 | PDTE INFO | GIGANTE | Accounts Payable | 30,003.00 |
| 9/9/2004 | PDTE INFO | FRANCISCO MORILLO | Accounts Payable | 84,915.00 |
| 9/9/2004 | PDTE INFO | GIGANTE | Accounts Payable | 117,000.00 |
| 9/20/2004 | PDTE INFO | FRANCISCO MORILLO | Accounts Payable | 45,025.00 |
| 9/20/2004 | PDTE INFO | FRANCISCO MORILLO | Accounts Payable | 8,725.00 |
| 9/24/2004 | PDTE INFO | FRANCISCO MORILLO | Accounts Payable | 69,325.00 |
| 9/24/2004 | PDTE INFO | FRANCISCO MORILLO | Accounts Payable | 4,929.80 |
| 9/27/2004 | PDTE INFO | GEPETO | Accounts Payable | 100,025.00 |
| 10/4/2004 | PDTE INFO | GIGANTE | Accounts Payable | 18,455.46 |
| 10/4/2004 | PDTE INFO | | BSI Ginebra | 300,025.00 |
| 10/6/2004 | PDTE INFO | COMMAND AIR | Accounts Payable | 3,015.00 |
| 10/13/2004 | PDTE INFO | FRANCISCO MORILLO | Accounts Payable | 7,003.00 |
| 10/13/2004 | PDTE INFO | FRANCISCO MORILLO | Accounts Payable | 7,003.00 |
| 10/18/2004 | PDTE INFO | GIGANTE | Accounts Payable | 60,035.00 |
| 10/19/2004 | PDTE INFO | FRANCISCO MORILLO | Accounts Payable | 68,003.00 |
| 10/26/2004 | PDTE INFO | FRANCISCO MORILLO | Accounts Payable | 45,025.00 |
| 10/29/2004 | PDTE INFO | GIGANTE | Accounts Payable | 104,522.00 |
| 11/2/2004 | PDTE INFO | FRANCISCO MORILLO | Accounts Payable | 50,025.00 |
| 11/3/2004 | DN:03110424 | FRANCISCO MORILLO | Accounts Payable | 35,025.00 |
| 11/11/2004 | DN:11110408 | FRANCISCO MORILLO | Accounts Payable | 60,025.00 |
| 11/11/2004 | DN:11110409 | GIGANTE | Accounts Payable | 41,025.00 |
| 11/11/2004 | DN:11110410 | GIGANTE | Accounts Payable | 18,091.30 |
| 11/15/2004 | DN:11110407 | GIGANTE | Accounts Payable | 41,003.00 |
| 11/15/2004 | DN:15110416 | COMMAND AIR | Accounts Payable | 17,801.60 |
| 11/15/2004 | DN:15220416 | FRANCISCO MORILLO | Accounts Payable | 5,025.00 |
| 11/23/2004 | DN:23110418 | FRANCISCO MORILLO | Accounts Payable | 250,025.00 |

☐ TRANSFERENCIAS SIN COMPROBANTE

# Exhibit F

Google Translate

Page 1 of 1

## Translate

Turn off instant translation

Hola Che a continuación te anexo el
detalle de los pagos recibidos por
Trafigura hasta el momento.

Saludos cordiales,

Alejandro Vizcarrondo Morillo

151/5000

Hi Che, below you will find the detail of the
payments received by Trafigura so far.

Best regards,

Alejandro Vizcarrondo Morillo

**To:** 'MAXIMILIANO POVEDA'[maxpoveda@yahoo.co.uk]; Francisco Morillo[fm@wtrpc.com]
**From:** Alejandro Vizcarrondo M.
**Sent:** Wed 3/15/2006 10:26:25 AM
**Subject:** Detalle de Pagos solicitado!!!
Detalle Bancos Trafigura.xls

Hola Che a continuación te anexo el detalle de los pagos recibidos por Trafigura hasta el momento.

Saludos cordiales,

Alejandro Vizcarrondo Morillo

9:17 AM
08/2006
Accrual Basis

**Hornberg Inc**
**Profit & Loss Detail**
January 1, 1999 through September 20, 2006

| | | |
|---|---|---|
| 50,000.00 | 3/9/2005 | PREMIER - HORBERG |
| 20,000.00 | 4/11/2005 | PREMIER - HORBERG |
| 15,000.00 | 4/20/2005 | PREMIER - HORBERG |
| 80,000.00 | 4/21/2005 | PREMIER - HORBERG |
| 302,400.00 | 5/9/2005 | PREMIER - HORBERG |
| 44,800.00 | 7/6/2005 | PREMIER - HORBERG |
| 117,550.00 | 7/7/2005 | PREMIER - HORBERG |
| 15,000.00 | 7/26/2005 | PREMIER - HORBERG |
| 446,100.00 | 8/26/2005 | PREMIER - HORBERG |
| 80,000.00 | 8/29/2005 | PREMIER - HORBERG |
| 27,830.00 | 9/5/2005 | PREMIER - HORBERG |
| 30,000.00 | 9/7/2005 | PREMIER - HORBERG |
| 29,991.00 | 9/16/2005 | PREMIER - HORBERG |
| 37,744.60 | 9/21/2005 | PREMIER - HORBERG |
| 15,000.00 | 11/1/2005 | PREMIER - HORBERG |
| 116,383.00 | 11/1/2005 | PREMIER - HORBERG |
| 140,310.00 | 12/15/2005 | PREMIER - HORBERG |
| 30,000.00 | 12/20/2005 | PREMIER - HORBERG |
| 47,355.00 | 2/22/2006 | PREMIER - HORBERG |
| 79,764.90 | 2/28/2006 | PREMIER - HORBERG |
| 30,000.00 | 2/28/2006 | PREMIER - HORBERG |

# Exhibit G

**To:** 'Morel Jean Francois (BSI-Geneva) [JeanFrancois.Morel@BSI.ch]

**Cc:** Carmen Kunz[Carmen.Kunz@BSI.CH]; Francisco Morillo[fm@wtrpc.com]

**From:** Alejandro Vizcarrondo M.

**Sent:** Fri 3/17/2006 5:39:05 PM

**Subject:** OUTGOING TRANSFERS

Tranferencia.pdf

Good afternoon Carmen, attached here is the pdf with three transfers that should be made as soon as possible. Once the transfers are made I need to send me the FED Number of each of them.

Best regards,


Alejandro Vizcarrondo Morillo

## HORNBERG, INC.

Caracas 17 March 2006

Sirs:

BSI Lugano

Attention: Carmen Kunz

### URGENT

Through this correspondence I wish to request that the funds be transferred to me, according to the following details:

**Amount:**                    $35,000.00 (Thirty-five thousand and 00/100)

**Purpose:**                   Debt payment

**Account to debit:**          Number 91265

**Account to Credit:**

Natwest Offshore Ltd.

Swift Code: RBOSJESH

Beneficiary: Ana Carmen Poveda

Account: 9541-30438966

US dollar correspondent bank:

Wachovia bank na, new York (fed routing no. 026005092) for the account of

Natwest offshore account 200193009233


I appreciate your prompt collaboration

Sincerely;



Francisco Morillo

**Francisco Morillo**

**C.I. 14.203.271**

**Certified**

**To:** 'Morel Jean François (BSI-Genève)'[JeanFrancois.Morel@BSI.ch]
**Cc:** Carmen Kunz[Carmen.Kunz@BSI.CH]; Francisco Morillo[fm@wtrpc.com]
**From:** Alejandro Vizcarrondo M.
**Sent:** Fri 3/17/2006 5:39:05 PM
**Subject:** TRANSFERENCIAS SALIENTES.
 anferencia.pdf

Buenas tardes Carmen, a continuacion anexo el pdf con tres tranferencias que deben ser realizadas a la brevedad posible. Una vez que las transferencias sean realizadas necesito me envied el FED Number de cada una de ellas.

Saludos cordiales,

Alejandro Vizcarrondo Morillo

---

This message (including any attachments) is confidential and may be privileged. If you have received it by mistake please notify the sender by return e-mail and delete this message from your system. Any unauthorized use or dissemination of this message in whole or in part is strictly prohibited. Please note that e-mails are susceptible to change. BSI SA (including its group companies) shall not be liable for the improper or incomplete transmission of the information contained in this communication nor for any delay in its receipt or damage to your system. BSI SA (or its group companies) does not guarantee that the integrity of this communication has been maintained nor that this communication is free of viruses, interceptions or interference.

# HORNBERG

Caracas, 17 de Marzo de 2006.

Señores:
BSI Lugano

Atención: Carmen Kunz

## URGENTE

A través de esta correspondencia deseo solicitar sean transferidos fondos de mi
cuenta de acuerdo a los siguientes detalles:

**Cantidad:**             $35.000,00 (Treinta y cinco mil con 00/100)

**Propósito:**            Pago deuda

**Cuenta a debitar:**     Numero 91265

## Cuenta a Acreditar:

Natwest Offshore Ltd.
Swift Code: RBOSJESH
Beneficiaro: Ana Carmen Poveda
account: 9541-30438966
US dollar correspondant bank:
Wachovia bank na, new york (fed routing no. 026005092) for the account of
Natwest offshore account 2000193009233

Agradezco su pronta colaboración
Atentamente

Francisco Morillo

**To:**      'MAXIMILIANO POVEDA' [maspoveda@yahoo.co.uk]

**From:**   Alejandro Vizcarrondo M.

**Sent:**    Fri 3/17/2006 5:06:32 PM

**Subject:**  RE: TRANSFERS
Hi Che, I want to inform you that the transfer is in the hands of the bank, so at any time you will receive the funds.

Alejandro Vizcarrondo Morillo

**From:**     MAXIMOLIANO POVEDA [mailto:maxpoveda@yahoo.co.uk]

**Sent:**     Tuesday, March 14, 2006 5:58PM

**To:**       Alejandro Vizcarrondo M.

**Subject:**   TRANSFERS

a) please transfer here: EUROS 30,000.00

**ANDBANC**

Address:

Ctra General Caso Nova

Joanet

Baixos

ORDINO

PRINCIPAT D'ANDORRA

Tel:00-376-881-920

b) please transfer here; DOLLARS 35,000.00

Natwest Offshore Ltd.

Swift Cod: RBOSJESH

Beneficiary: Ana Carmen Poveda

Account: 9541-30438966

US dollar correspondent bank:

Wachovia bank na, new York (fed routing no. 026005092) for the account of Natwest offshore account 2000193009233

Thank you

maxi

**To:** 'MAXIMILIANO POVEDA'[maxpoveda@yahoo.co.uk]
**From:** Alejandro Vizcarrondo M.
**Sent:** Fri 3/17/2006 5:06:32 PM
**Subject:** RE: TRANSFERS

Hola Che, quiero informarte que la tranfer esta en manos del banco, asi que en cualquier momento recibiras los fondos.

Alejandro Vizcarrondo Morillo

-----Original Message-----
**From:** MAXIMILIANO POVEDA [mailto:maxpoveda@yahoo.co.uk]
**Sent:** Tuesday, March 14, 2006 5:58 PM
**To:** Alejandro Vizcarrondo M.
**Subject:** TRANSFERS

a) favor transferir aca: EUROS 30,000.00

ANDBANC

Address:
Ctra General Casa Nova

Joanet

Baixos
ORDINO
PRINCIPAT D'ANDORRA
Tel:00-376-881-920

Swift: BACA AD AD
Beneficiario: OR_80241
Account number 4002598.001.000.001

b) favor transferir aca: DOLARES 35,000.00

Natwest Offshore Ltd.
Swift Code: RBOSJESH
Beneficiaro: Ana Carmen Poveda
account: 9541-30438966
US dollar correspondant bank:
Wachovia bank na, new york (fed routing no. 026005092) for the account of Natwest offshore account 2000193009233

gracias
maxi

**Yahoo! Photos** – NEW, now offering a quality print service from just 8p a photo.

# Exhibit H

**To:** paul rosado[paul rosado]; jaime vargas[jaime vargas]
**From:** Francisco Morillo
**Importance:** Normal
**Subject:** FW: TENDERS FRIDAYS APRIL 29TH, 2005

GENTS,

THIS ARE THE NUMBERS.

Fuel oil

| | |
|---|---|
| Itochu | N6 3% nyh -1.85 usd/bbls |
| Petrobras | no bid |
| Vitol | n6 3% usgc -1.86 |
| | Spore 380-36.60 |
| Citizens | SPORE 380 - 35.99 |
| WESTPORT | SPORE 380 -34.95 |
| BP | NYH 3% -4.00 |
| SEMPRA | NYH 3% -1.67 (ATLANTIC BASIN / BLENDING IN CARIBEAN) |
| SEMPRA | USGC -1.89  DESTINATION AS ABOVE |
| PETRODIMON | NO BID |
| WESTPORT | SPORE 380 -34.95 |

GASOLINA 8-10 /MAY

| | |
|---|---|
| CITIZENS | 87 ULD -12.45  CARIBS/USA/SA |
| LUKOIL | 87 UNLD USGC - 27.10 (USA) |
| PMI | 87 ULD 9.0 RVP -6.75 CPG MEXICO |
| CITIZENS | NO BID |

LOW SULFUR DISEL        7-9

| | |
|---|---|
| COLONIAL | USGCWB LSD -2.48 CPG |
| PMI | FOB MED N2 -24 USD/MT |
| VITOL | CIF MED 50 PPM -37.85 USD/MT |
| | CIF MED 50 PPM -25.69 USD/MT |
| KOCH | USGCWB 54GRADE -4.25 |
| DNP | USGCWB LSD - 8.25 CENTRAL AMERICA |
| GLOBAL | NYH LSD - 7.55        USEC |
| PRMECORE | CIF NEW ARA ULSD -35.00 USD/MT |
| CITIZENS | CIF MED LSD -35.00 USD/MT |
| ATALNTIC | NO BID |
| PMI | USGCWB LSD +0.50 CPG (USGC) |
| LUKOIL | NEW 50 PPM - 31.80 (EUROPA) |

HEATING OIL  28-30

| | |
|---|---|
| CITIZENS | NYH N2 -4 CPG (WCSA / CENTRAL AMERICA) |
| KOCH | NO BID |
| VITOL | USGCWB N2 +1.27 (PERU) CI 45 MIN |
| DNP | USGCWB N2 +0.05 (CETRAL AMERICA) |
| PMI | MED N2 -34.0 USD/MT (MED) |
| LUKOIL | NYMEX FORNT -5.43 CPG (USA) |
| VITOL | NYH N2 -3.80 (USEC/P.R/PERU) |
| GLOBAL | NYH N2 - 4.86 USEC |

SALUDOS

# Exhibit I

2/23/2005 – Maximiliano Poveda to Francisco Morillo:

Subject: Lukoil

So he doesn't have anything – but why is he going so aggressive?

2/23/2005 – Francisco Morillo to Maximiliano Poveda:

What do you need, he doesn't have a cargo confirmed for that date but it is viable to have bbls come out during that time that match with the unloading window!!!

2/23/2005 – Maximiliano Poveda to Francisco Morillo:

Can you find something out?

Regards and thanks

Maxi

2/23/2005 – James McNicol to Jorge Troop, Jose Larocca, Leon Christophilopoulos, and Farzad Askari:

Lukoil just spent a week in Caracas !!

2/23/2005 – Jorge Troop to Jose Larocca, Leon Christophilopoulos, Farzad Askari and James McNicol:

Lukoil (Dimitri Feo) is getting some kind of direct look at PDVSA cargoes, PMI told me the Lukoil offering them a Unl 87 cargo ex-pdvsa arriving March 20-25 at USGC minus 1.00, very aggresive offer.

| | |
|---|---|
| **From:** | Maximiliano Poveda (London) <Maximiliano.Poveda@trafigura.com> |
| **Sent:** | Wednesday, February 23, 2005 11:16 AM |
| **To:** | Francisco Morillo |
| **Subject:** | RE: Lukoil |

entonces el no tiene un carajo - pero porque esta llendo tan agresivo ?

-----Original Message-----
**From:** Francisco Morillo [mailto:franciscomorillo@cantv.net]
**Sent:** 23 February 2005 16:10
**To:** Maximiliano Poveda (London)
**Subject:** RE: Lukoil

Que necesitas, un cargo el no tiene confirmado para esa fecha pero es factible que salgan bbls en esa epoca que cuadren con la ventana de descarga!!!

-----Original Message-----
**From:** Maximiliano Poveda (London) [mailto:Maximiliano.Poveda@trafigura.com]
**Sent:** Wednesday, February 23, 2005 10:10 AM
**To:** franciscomorillo@cantv.net
**Subject:** Lukoil
**Importance:** High

Podes averiguar algo ?

saludos y gracias
maxi

-----Original Message-----
**From:** James McNicol
**Sent:** 23 February 2005 13:58
**To:** Jorge Troop; Jose Larocca; Leon Christophilopoulos; Farzad Askari
**Cc:** Venezuela Business
**Subject:** RE: Lukoil

Lukoil just spent a week in Caracas !!

-----Original Message-----
**From:** Jorge Troop
**Sent:** 23 February 2005 13:55
**To:** Jose Larocca; Leon Christophilopoulos; Farzad Askari; James McNicol
**Subject: Lukoil**

Lukoil (Dimitri Feo) is getting some kind of direct look at PDVSA cargoes, PMI told me the Lukoil offering them a Unl 87 cargo ex-pdvsa arriving March 20-25 at USGC minus 1.00, very aggresive offer.

Trafigura Disclaimer:

This email and any attachments are confidential and access to this email or attachment by anyone other than the addressee is unauthorised. If you are not the intended recipient please notify the sender and delete the email including any attachments.

1

You must not disclose or distribute any of the contents to any other person. Personal views or opinions are solely those of the author and not of Trafigura. Trafigura does not guarantee that the integrity of this communication has been maintained nor that the communication is free of viruses, interceptions or interference. By communicating with anyone at Trafigura by email, you consent to the monitoring or interception of such email by Trafigura in accordance with its internal policies. Unless otherwise stated, any pricing information given in this message is indicative only, is subject to change and does not constitute an offer to deal at any price quoted.

# Exhibit J

## bill fredericks

| | |
|---|---|
| n: | Francisco Morillo <franci sco.morillo@wtrpc.com> on behalf of Francisco Morillo |
| To: | jaime_vargas_2001@yahoo.com |
| Subject: | lee please |

george_white2006 (12/6/2005 11:12:27 AM): chamo esta fucking maquina

**george_white2006 (12/6/2005 11:12:27 AM): man, this fucking machine**

paul_rosado_2000 (12/6/2005 11:12:27 AM): [ Zone Labs Security alert: Session not encrypted because

paul_rosado_2000 is not protected by IM Security]

george_white2006 (12/6/2005 11:12:32 AM ): me hecho un vainon

**george_white2006 (12/6/2005 11:12:32 AM ): it made a mess**

george_white2006 (12/6/2005 11:12:40 AM ): el mejor es -2,10

**george_white2006 (12/6/2005 11:12:40 AM ): the best is -2,10**

george_white2006 (12/6/2005 11:12:58 AM ): etonces cuando venga el squizee jodemos a masefield

**george_white2006 (12/6/2005 11:12:58 AM ): so when squizee comes by we will fuck around with masefield**

paul_rosado_2000 (12/6/2005 11:18:04 AM ): [unencrypted] espero q' venga el squeeze, nosotros pusimos -2.20., fuimos ciegos

**paul_rosado_2000 (12/6/2005 11:18:04 AM ): [unencrypted] I hope squeeze comes by, we put in -2.20., we were blind**

george_white2006 (12/6/2005 11:20:22 AM): silo se

**george_white2006 (12/6/2005 11:20:22 AM): yes I know**

george_white2006 (12/6/2005 11:20:30 AM): no me prendio la maquina

**george_white2006 (12/6/2005 11:20:30 AM): the machine did not turn**

    'or me

g..urge_white2006 (12/6/2005 11:20:34 AM): pero ahor amejoramos

**george_white2006 (12/6/2005 11:20:34 AM): but now we improved**

george_white2006 (12/6/2005 11:48:50 AM): no le han dado los resultados del tender?

**george_white2006 (12/6/2005 11:48:50 AM): he has not received the result of the tender?**

paul_rosado_2000 (12/6/2005 11:49:27 AM): [unencrypted] si hable con el, no sabe todavia las numeros

**paul_rosado_2000 (12/6/2005 11:49:27 AM): [unencrypted] yes I spoke with him, he does not know the numbers yet**

george_white2006 (12/6/2005 11:49:56 AM): ok

**george_white2006 (12/6/2005 11:49:56 AM): ok**

george_white2006 (12/6/2005 11:49:58 AM ):  esperemos

**george_white2006 (12/6/2005 11:49:58 AM ):  let's wait**

paul_rosado_2000 (12/6/2005 11:50:26 AM): [unencrypted] seguro, hay q' poner presion para un best and final

**paul_rosado_2000 (12/6/2005 11:50:26 AM): [unencrypted] of course, we have to put pressure for a best and final**

george_white2006 (12/6/2005 11:50:41 AM): eso esta

**george_white2006 (12/6/2005 11:50:41 AM): that is**

g george_white2006 (12/6/2005 11:50:44 AM): tranquilo

**eorge_white2006 (12/6/2005 11:50:44 AM): still**

paul_rosado_2000 (12/6/2005 11:51:13 AM): [unencrypted] good

**paul_rosado_2000 (12/6/2005 11:51:13 AM): [unencrypted] good**

george_white2006 (12/6/2005 2:42:19 PM): EPA

**neorge_white2006 (12/6/2005 2:42:19 PM): EPA**

    _rosado_2000 (12/6/2005 2:42:19 PM): [ Zone Labs Security alert: Session not encrypted because

paul_rosado_2000 is not protected by IM Security]

**paul_rosado_2000 (12/6/2005 2:42:19 PM): [ Zone Labs Security alert: Session not encrypted because**

**paul_rosado_2000 is not protected by IM Security]**

george_white2006 (12/6/2005 2:42:21 PM): estas?

**george_white2006 (12/6/2005 2:42:21 PM): are you?**

aul_rosado_2000 (12/6/2005 3:02:54 PM): [unencrypted] yes

neorge_white2006 (12/6/2005 3:04:29 PM): llamastes?

    ·ge_white2006 (12/6/2005 3:04:29 PM): Did you call?

paul_rosado_2000 (12/6/2005 3:04:58 PM): [unencrypted] no, estoy esperando q' me llamen

paul_rosado_2000 (12/6/2005 3:04:58 PM): [unencrypted] no, I am waiting for them to call me

george_white2006 (12/6/2005 3:05:08 PM): llama tu

george_white2006 (12/6/2005 3:05:08 PM): you call

george_white2006 (12/6/2005 3:05 :11 PM): aver como va eso

george_white2006 (12/6/2005 3:05 :11 PM): see how that goes

paul_rosado_2000 (12/6/2005 3:05:30 PM): [unencrypted] ok

paul_rosado_2000 (12/6/2005 3:05:30 PM): [unencrypted] ok

paul_rosado_2000 (12/6/2005 3:08:20 PM): [unencrypted] cha mo , el tender lo esta manejando jose, me lo acaba de decir caramelo, no tengo ninguna relacion de pinga con este carajito , lo voy a llamar de todas formas

paul_rosado_2000 (12/6/2005 3:08:20 PM): [unencrypted] man , jose, the tender is not working, caramelo just told me, I dont have a damn relationship with this kid , I am going to call him regardless

george_white2006 (12/6/2005 3:08:30 PM): ok

george_white2006 (12/6/2005 3:08:30 PM): ok

george_white2006 (12/6/2005 3:08:37 PM): es bueno que hagas la relacion

george_white2006 (12/6/2005 3:08:37 PM): it's good that you créate a relationship

george_white2006 (12/6/2005 3:08:44 PM): el tipo es bien correcto

george_white2006 (12/6/2005 3:08:44 PM): the guy is very proper

paul_rosado_2000 (12/6/2005 3:09:08 PM): [unencrypted] pero tampoco es mala la relacion, lo q' tequiero decir es q' casi nunca hablo con el

~aul_rosado_2000 (12/6/2005 3:09:08 PM): [unencrypted] but it's not a bad relationship either, what I mean to tell you is ·I hardly ever speak to him

george_white2006 (12/6/2005 3:09 :30 PM): ok

eorge_white2006 (12/6/2005 3:09 :30 PM): ok

paul_rosado_2000 (12/6/2005 3:09:54 PM): [unencrypted] si es bien correcto, entonces nova a llamar a un best and final y nos jodimos

paul_rosado_2000 (12/6/2005 3:09:54 PM): [unencrypted] yes he's very proper, so then he won't call a best and final and we are fucked

paul_rosado_2000 (12/6/2005 3:09:58 PM): [unencrypted]

g!=orge_white2006 (12/6/2005 3:10:29 PM): no tampoco asi

g!=orge_white2006 (12/6/2005 3:10:29 PM): no not like that either

paul_rosado_2000 (12/6/2005 3:11:20 PM): [unencrypted] sabes cual es su tlf, no lo tengo

paul_rosado_2000 (12/6/2005 3:11:20 PM): [unencrypted] do you his telephone, I don't have it

george_white2006 (12/6/2005 3:11:31 PM): lo puedo buscar

george_white2006 (12/6/2005 3:11:31 PM): I can look for it

george_white2006 (12/6/2005 3:11:34 PM): pero no lo llames

george_white2006 (12/6/2005 3:11:34 PM): but don't call him

george_white2006 (12/6/2005 3:11 :39 PM ): yahoseale
george_white2006 (12/6/2005 3:11 :39 PM ): yahoseale

paul _rosado_2000 (12/6/2005 3:12:04 PM): [unencrypted] no tengo su yahoo tampoco

paul _rosado_2000 (12/6/2005 3:12:04 PM): [unencrypted] I don't have his yahoo either

george_white2006 (12/6/2005 3:12:20 PM): no chamo

george_white2006 (12/6/2005 3:12:20 PM): no man

george_white2006 (12/6/2005 3:12:22 PM): sorry
george_white2006 (12/6/2005 3:12:22 PM): sorry

george_white2006 (12/6/2005 3:12:36 PM): eso era conversacion con otra persona

george_white2006 (12/6/2005 3:12:36 PM): that was a conversation with another person

george_white2006 (12/6/2005 3:12:39 PM): sorry no lo tengo

george_white2006 (12/6/2005 3:12:39 PM): sorry I don't have it

george_white2006 (12/6/2005 3:12:44 PM ): pero debe estar en el tender
george_white2006 (12/6/2005 3:12:44 PM ): but it must be in the tender

george_white2006 (12/6/2005 3:12 :52 PM): o en algun tender que el haya mandado

george_white2006 (12/6/2005 3:12 :52 PM): or in any tender that he may have sent

paul_rosado_2000 (12/6/2005 3:15 :57 PM ): [unencrypted] chamo parame un minuto, pis,

paul_rosado_2000 (12/6/2005 3:15 :57 PM ): [unencrypted] man stop me for a minute, please,

george_white2006 (12/6/2005 3:16:35 PM): si dime

george_white2006 (12/6/2005 3:16:35 PM): yes tell me

paul_rosado_2000 (12/6/2005 3:16:49 PM): [unencrypted] ya consegu i el tlf y hable con jose

paul_rosado_2000 (12/6/2005 3:16:49 PM): [unencrypted] I already got the telephone [number] and I spoke with Jose

george_white2006 (12/6/2005 3:16:58 PM): ok

george_white2006 (12/6/2005 3:16:58 PM): ok

george_white2006 (12/6/2005 3:17 :03 PM): y que te dijo?
george_white2006 (12/6/2005 3:17 :03 PM): and what did he say?

paul_rosado_2000 (12/6/2005 3:17:06 PM): [unencrypted] le tengo q' mandar mi best and final

paul_rosado_2000 (12/6/2005 3:17:06 PM): [unencrypted] I have to send him my best and final

george_white2006 (12/6/2005 3:17:25 PM): ok

george_white2006 (12/6/2005 3:17:25 PM): ok

george_white2006 (12/6/2005 3:17 :27 PM): dame un sec
george_white2006 (12/6/2005 3:17 :27 PM): give me a sec

paul _ro sado_2000 (12/6/2005 3:17:35 PM): [unencrypted] pero necesito saber si la otra gente mejoro

paul _ro sado_2000 (12/6/2005 3:17:35 PM): [unencrypted] but I need to know if the other people improved

george_w hit e2006 (12/6/2005 3:17 :50 PM): par eso dejame averiguar

george_w hit e2006 (12/6/2005 3:17 :50 PM): for that let me check


paul_rosado_2000 (12/6/2005 3:18:00 PM): [unencrypted] tengo q' saber el nivel, para poder matar

paul_rosado_2000 (12/6/2005 3:18:00 PM): [unencrypted] I need to know the level to be able to kill

paul_rosado_2000 (12/6/2005 3:18:14 PM): [unencrypted] ok, no problema

paul_rosado_2000 (12/6/2005 3:18:14 PM): [unencrypted] ok, no problem

george_white2006 (12/6/2005 3:19:16 PM ): ok
george_white2006 (12/6/2005 3:19:16 PM ): ok

george_white2006 (12/6/2005 3:24:10 PM): bueno hay una ofera de -1,70 si la viscosidad es 300 ssf

george_white2006 (12/6/2005 3:24:10 PM): well there is an offer of -1,70 if the viscosity is 300

2

george_white2006 (12/6/2005 3:24:22 PM): hay que esperar par chemoil

george_white2006 (12/6/2005 3:24:22 PM): we have to wait for the chemoil

george_white2006 (12/6/2005 3:24:31 PM): pero vamos a darles un rato aver que hacen
george_white2006 (12/6/2005 3:24:31 PM): but lets give them some time to see what it does?

paul_rosado_2000 (12/6/2005 3:24 :57 PM): [unencrypted] la viscosidad no llega a esa vaina, me preocupa che moil

paul_rosado_2000 (12/6/2005 3:24 :57 PM): [unencrypted] the viscosity does not reach this shit, I worry che moil

george_white2006   (12/6/2005 3:25:08 PM): ok

george_white2006   (12/6/2005 3:25:08 PM): ok

george_w hit e2006 (12/6/2005 3:25:19 PM): vamos a esperarlos un pelo que mejoren

george_w hit e2006 (12/6/2005 3:25:19 PM): lets give it a moment to improve

george_white2006 (12/6/2005 3:25:32 PM ): te dieron un limite de tiempo para mejorar?

george_white2006 (12/6/2005 3:25:32 PM ): did they give you a time limit to improve?

paul_ro sado_2000 (12/6/2005 3:26:29 PM): [unencrypted] ok, pero tampoco puedo esperar mucho tiempo, el chamo
se puede arrechar, no me dio limite de tiempo , pero no puedo echar 2hrs

paul_ro sado_2000 (12/6/2005 3:26:29 PM): [unencrypted] ok, but I can't wait too long, the guy can get upset, he did not
give me a time limit, but I can't wait 2 hrs

paul_rosado_2000 (12/6/2005 3:26:52 PM): [unencrypted] seria muy evidente

paul_rosado_2000 (12/6/2005 3:26:52 PM): [unencrypted] it would be very
obvious

george_white2006 (12/6/2005 3:27:16 PM): no chamo

george_white2006 (12/6/2005 3:27:16 PM): no man

george_white2006 (12/6/2005 3:27:24 PM): pero par lo menos 40 min
george_white2006 (12/6/2005 3:27:24 PM): but at least 40 min

george_white2006 (12/6/2005 3:27:50 PM): o en un rato lo llamas y dile que quisas site confirman un barco puedes
tirar un mejor oferta

george_white2006 (12/6/2005 3:27:50 PM): Or you can call him in a bit and tell him that if they can possibly confirm
ship you can throw at them a better offer

george_white2006 (12/6/2005 3:27:57 PM): que te vaz a tomar un ratico

george_white2006 (12/6/2005 3:27:57 PM): that you are going to take a Little while

paul _ro sa do_2000 (12/6/2005 3:28:41 PM): [unencrypted] pero no puedo seguir con ese cuento , los carajos no son tan
estupidos tampoco

paul _ro sa do_2000 (12/6/2005 3:28:41 PM): [unencrypted] I can't continue with that story, the suckers are not that stupid
either

paul _ro sado_2000 (12/6/2005 3:29 :33 PM): [unencrypted] esperemos 30-40 min y la man do, me pregunto si mi8
numero iba a estar par debajo de 2.0$/ bbl de descuento

paul _ro sado_2000 (12/6/2005 3:29 :33 PM): [unencrypted] lets wait 30-40 min and I'll send it, he asked me is my number
was going to be under 2.0$/ bbl of the discount

george_white2006 (12/6/2005 3:29:56 PM): o dile que si retrasa la carga en trinidad puedes pagar un pelo mejor par
que no tendria que esperar el barco para descargar en el terminal

george_white2006 (12/6/2005 3:29:56 PM): or tell him that if he delays the cargo in Trinidad you can pay a bit
better so that he would not have to wait for the ship to unload in the terminal

george_whit e2006 (12/6/2005 3:30 :06 PM): nose chamo

george_whit e2006 (12/6/2005 3:30 :06 PM): I don't know man

george_white2006 (12/6/2005 3:30:07 PM): esperemos

george_white2006 (12/6/2005 3:30:07 PM): let's wait

george_white2006 (12/6/2005 3:30:10 PM ): dame un rato

george_white2006 (12/6/2005 3:30:10 PM ): give me some time

george_white2006 (12/6/2005 3:30:18 PM): para ver que hace chemoil
george_white2006 (12/6/2005 3:30:18 PM): to see what chemoil does

george_white2006 (12/6/2005 3:30:30 PM): que te de un rato
george_white2006 (12/6/2005 3:30:30 PM): to give you some time

n paul_rosado_2000 (12/6/2005 3:30:53 PM): [unencrypted ] ok
    _rosado_2000 (12/6/2005 3:30:53 PM): [unencrypted ] ok
george_white2006 (12/6/2005  3:44:58  PM ): chamo
george_white2006  (12/6/2005   3:44:58  PM ): man
paul_ro sado_2000 (12/6/2005 3:45:06 PM): [unencrypted] si
paul_ro sado_2000 (12/6/2005 3:45:06 PM): [unencrypted] si
george_white2006 (12/6/2005 3:45:08 PM): desesperado chemoil par el cargo
george_white2006 (12/6/2005 3:45:08 PM): chemoil desperate for the cargo
paul_ro sado_2000 (12/6/2005 3:45:19 PM): [unencrypted] y
paul_ro sado_2000 (12/6/2005 3:45:19 PM): [unencrypted] and

george_white2006 (12/6/2005 3:45:38 PM): me dicen que mejoran hasta 1.5

**george_white2006 (12/6/2005 3:45:38 PM): they say that it improves up to 1.5**

·il_rosado_2000 (12/6/2005 3:46:21 PM): [unencrypted] lo mejoraron? o piensan llegar ahi

**ρaul_rosado_2000 (12/6/2005 3:46:21 PM): [unencrypted] did they improve it? Or are thinking of getting there**

george_white2006 (12/6/2005 3:46:37 PM): todavia no lo han  hecho

**george_white2006 (12/6/2005 3:46:37 PM): they still have not done it**

paul_rosado_2000 (12/6/2005 3:47:05 PM): [unencrypted] estan esperando q' metamos el nuestro

**paul_rosado_2000 (12/6/2005 3:47:05 PM): [unencrypted] they are waiting fo rus to put ours in**

george_white2006 (12/6/2005 3:47:15 PM):  no

**george_white2006 (12/6/2005 3:47:15 PM):  no**

george_white2006 (12/6/2005 3:47:22 PM): no saben de ustedes

**george_white2006 (12/6/2005 3:47:22 PM): you guys don't know**

paul_rosado_2000 (12/6/2005 3:48:21 PM): [unencrypted] ese nivel es demasiado caro, no creo q' nos bajemos tanto, habaire aqui y veremos q' vamos a meter

**paul_rosado_2000 (12/6/2005 3:48:21 PM): [unencrypted] that level is too expensive, I don't think we would lower it so much, I will say something here and see what we are going to add**

george_white2006 (12/6/2005 3:48 :44 PM): bueno le van a pedir el best and final a chemoil para ya

**george_white2006 (12/6/2005 3:48 :44 PM): well they are going to ask for the best and final a chemoil for now**

george_white2006 (12/6/2005 3:48:53 PM): asi sabemos su numero  final

**george_white2006 (12/6/2005 3:48:53 PM): like that we know the final number**

paul_rosado_2000 (12/6/2005 3:49 :05 PM): [unencrypted] chemoil no esta suspendido?

**paul_rosado_2000 (12/6/2005 3:49 :05 PM): [unencrypted] chemoil is not suspended?**

george_white2006 (12/6/2005 3:49:14 PM): masefiled

**·irge_white2006 (12/6/2005 3:49:14 PM): masefiled**

ρ·υrge_white2006 (12/6/2005 3:49:16 PM): chamoil

**george_white2006 (12/6/2005 3:49:16 PM): chamoil**

george_white2006 (12/6/2005 3:49:18 PM): es lo mismo

**george_white2006 (12/6/2005 3:49:18 PM): it's the same**

paul_rosado_2000 (12/6/2005 3:49:18 PM): [unencrypted] me parece de pinga

**paul_rosado_2000 (12/6/2005 3:49:18 PM): [unencrypted] it's insane to me**

paul_rosado_2000 (12/6/2005 3:49:34 PM): [unencrypted] esperaremos

**paul_rosado_2000 (12/6/2005 3:49:34 PM): [unencrypted] lets wait**

paul_rosado_2000 (12/6/2005 3:49:51 PM): [unencrypted] y asi vemos si podemos matar

**paul_rosado_2000 (12/6/2005 3:49:51 PM): [unencrypted] and this way we can see if we can kill**

george_white2006 (12/6/2005 3:50:03 PM): ok

**george_white2006 (12/6/2005 3:50:03 PM): ok**

george_white2006 (12/6/2005 3:52:36 PM): chamo le dijeron a chemoil que mantuviera su oferta hasta manana

**george_white2006 (12/6/2005 3:52:36 PM): man they told chemoil to keep his offer until tomorrow**

george_white2006 (12/6/2005 3:52:46 PM): coma para darles idea que estan contentos con ese numero

**george_white2006 (12/6/2005 3:52:46 PM): like to give them an idea that they are happy with that number**

paul_rosado_2000 (12/6/2005 3:52:52 PM): [unencrypted] cual

**l_rosado_2000 (12/6/2005 3:52:52 PM): [unencrypted] which**

george_white2006 (12/6/2005 3:53:05 PM): al menos que las obliguen nova a joder para que mejoren

**george_white2006 (12/6/2005 3:53:05 PM): unless you force it they will fuck with us to improve them**

paul_rosado_2000 (12/6/2005 3:53:11 PM): [unencrypted] la misma q' metieron

**paul_rosado_2000 (12/6/2005 3:53:11 PM): [unencrypted] the same they brought in**

george_white2006 (12/6/2005 3:53:17 PM): si

**george_white2006 (12/6/2005 3:53:17 PM): yes**

george_white2006 (12/6/2005 3:53:45 PM): es decir manda una oferta pero pan una posibilidad de mejora

**george_white2006 (12/6/2005 3:53:45 PM): it is to say send an offer but set a possibility of improvement**

george_white2006 (12/6/2005 3:54:08 PM): tipo que tienes unos ███ operacionales pendientes que no puedes tener respuesta hata mañana

**george_white2006 (12/6/2005 3:54:08 PM): types that you have outstanding pemding peas for which you can't have the answer until tomorrow**

paul_rosado_2000 (12/6/2005 3:54 :28 PM): [unencrypted] ok, entonces metere un mejor numero llama

**paul_rosado_2000 (12/6/2005 3:54 :28 PM): [unencrypted] ok, well then I will enter a better number call**

george_white2006 (12/6/2005 3:54:39 PM): y que par lo tanto tu mejor numero por ahora es -2.00

**george_white2006 (12/6/2005 3:54:39 PM): and that therefore your best number for now is -2.00**

george_white2006 (12/6/2005 3:54:54 PM): y site dan chance hasta manana quisas puedas mejorar un pelo mas

**george_white2006 (12/6/2005 3:54:54 PM): and that if they give you a chance possibly you may be able to improve a bit more**

paul_rosado_2000 (12/6/2005 3:55:18 PM): [unencrypted] ese es chemoil -2.0

**paul_rosado_2000 (12/6/2005 3:55:18 PM): [unencrypted] that is chemoil -2.0**


rge_white2006 (12/6/2005 3:55: 22 PM): -2,10

**george_white2006 (12/6/2005 3:55: 22 PM): -2,10**

george_white2006 (12/6/2005 3:55:27 P ): chamoil -2,10

**george_white2006 (12/6/2005 3:55:27 PM): chamoil -2,10**

paul_rosado_2000 (12/6/2005 3:55:31 PM): [unencrypted] ok

**paul_rosado_2000 (12/6/2005 3:55:31 PM): [unencrypted] ok**

george_white2006 (12/6/2005 3:57 :05 PM): 1,99

**george_white2006 (12/6/2005 3:57 :05 PM): 1,99**

paul_rosado_2000 (12/6/2005 3:57:27 PM): [unencrypted] ok, voy meter alga asi y te aviso

**paul_rosado_2000 (12/6/2005 3:57:27 PM): [unencrypted] ok, I am going to enter something and I will advise you**

george_white2006 (12/6/2005 3:58:00 PM): ok

**george_white2006 (12/6/2005 3:58:00 PM): ok**

george_white2006 (12/6/2005 3:59:50 PM): chamo ya mandastes

**george_white2006 (12/6/2005 3:59:50 PM): man did you send it yet**

george_white2006 (12/6/2005 3:59:54 PM): esperam un sec

**george_white2006 (12/6/2005 3:59:54 PM): wait a sec**

paul_rosado_2000 (12/6/2005 4:13:40 PM): [unencrypted] no

**paul_rosado_2000 (12/6/2005 4:13:40 PM): [unencrypted] no**

paul_rosado_2000 (12/6/2005 4:14:09 PM): [unencrypted] <ding>

**paul_rosado_2000 (12/6/2005 4:14:09 PM): [unencrypted] <ding>**

george_white2006 (12/6/2005 4:14:11 PM): que paso

**rge_white2006 (12/6/2005 4:14:11 PM): what happened**

george_white2006 (12/6/2005 4:14:15 PM): lo mandastes???

**george_white2006 (12/6/2005 4:14:15 PM): did you send it???**

paul_rosado_2000 (12/6/2005 4:14:59 PM): [unencrypted] no

paul_rosado_2000 (12/6/2005 4:14:59 PM): [unencrypted] no

paul_rosado_2000 (12/6/2005 4:15:04 PM): [unencrypted] dime

paul_rosado_2000 (12/6/2005 4:15:04 PM): [unencrypted] tell me

'_rosado_2000 (12/6/2005 4:15:23 PM): [unencrypted] estoy a punto de mandarlo

paul_rosado_2000 (12/6/2005 4:15:23 PM): [unencrypted] I am about to send it

paul_rosado_2000 (12/6/2005 4:15:48 PM): [unencrypted] mejoro chemoil?, q' pasa?

paul_rosado_2000 (12/6/2005 4:15:48 PM): [unencrypted] did chemoil improve?, what's going on?

george_white2006 (12/6/2005 4:15:48 PM): espera

george_white2006 (12/6/2005 4:15:48 PM): wait

george_white2006 (12/6/2005 4:16:02 PM): lo del catire

george_white2006 (12/6/2005 4:16:02 PM): about the catire

paul_rosado_2000 (12/6/2005 4:16:12 PM): [unencrypted] q'?

paul_rosado_2000 (12/6/2005 4:16:12 PM): [unencrypted] what?

george_white2006 (12/6/2005 4:16:25 PM): cuadra con el catire lo que te esta diciendo

george_white2006 (12/6/2005 4:16:25 PM): square of with the catire what's telling you

george_white2006 (12/6/2005 4:16:43 PM): para que lo hagamos asi

george_whi): so that we can do it that way

paul_rosado_2000 {12/6/2005 4:17:40 PM): [unencrypted] ya estoy hablando con el catire

paul_rosado_2000 {12/6/2005 4:17:40 PM): [unencrypted] I am already speaking with the `ntire

paul_rosado_2000 {12/6/2005 4:24:58 PM): [unencrypted] chamo estas ahi

paul_rosado_2000 {12/6/2005 4:24:58 PM): [unencrypted] man are you here

paul_rosado_2000 {12/6/2005 4:25:00 PM):  [unencrypted] <ding>

paul_rosado_2000 {12/6/2005 4:25:00 PM):  [unencrypted] <ding>
paul_rosado_2000 {12/6/2005 4:25:15 PM): [unencrypted] <ding>
paul_rosado_2000 {12/6/2005 4:25:15 PM): [unencrypted] <ding>
george_white2006 {12/6/2005 4:26:37 PM): ok
george_white2006 {12/6/2005 4:26:37 PM): ok
george_white2006 {12/6/2005 4:26:43 PM): si estamos uno al lado de otro
george_white2006 {12/6/2005 4:26:43 PM): yes we are side by side
paul_rosado_2000 {12/6/2005 4:26:47 PM): [unencrypted] voy a mejorar a -1.89
paul_rosado_2000 {12/6/2005 4:26:47 PM): [unencrypted] I am going to improve to -1.89
george_white2006 {12/6/2005 4:27:23 PM): cuandra par yahoo con catire
george_white2006 {12/6/2005 4:27:23 PM): square off by yahoo with catire
george_white2006 {12/6/2005 4:27:30 PM): poe que tenemos gente en la ofi
george_white2006 {12/6/2005 4:27:30 PM): becuase we have the poeple in the office
paul_rosado_2000 {12/6/2005 4:27:40 PM): [unencrypted] OK _vargas_2001@yahoo.com
paul_rosado_2000 (12/6/2005 4:27:40 PM): [unencrypted] OK _vargas_2001@yahoo.com

# Exhibit K

**From:** Francisco Morillo
**To:** Maximiliano Poveda
**Subject:** Mateo
**Date:** Thursday, March 30, 2006 12:40:06 AM

Chamo ahi esta ..... Le mande todos los numero y las mejoras subsiguientes de esos numeros ..... No se que cono mas quiere..... Pero ahi lo tiene
Man, there it is...I sent you all the numbers and subsequent of those numbers...I don't know what else you want...But there you have it.

Mateo Lvoff (27/03/2006 16:28:15): [unencrypted] chamo eres un pelo cmplicado
Man, you are complicated

Mateo Lvoff (27/03/2006 16:28:19): [unencrypted] namas dime
Just tell me

Mateo Lvoff (27/03/2006 16:28:24): [unencrypted] soy guapo si o no
Am I good looking yes or no

george_white2006 (27/03/2006 16:28:27): koch Platts USGC Unl 87 Waterborne - US$ 17.25/ bbl
Mateo Lvoff (27/03/2006 16:28:46): [unencrypted] eso es -4
That's it

george_white2006 (27/03/2006 16:29:01): shell UNLEADED 87 WATERBORNE -31.00 USC/ GALLON
george_white2006 (27/03/2006 16:29:21): tu menos 35,93
You less

george_white2006 (27/03/2006 16:29:43): lukoil OPIS NAPHTHA (OFFSHORE 40 N+A) minus (-) 10.68 cpg
george_white2006 (27/03/2006 16:30:05): vitol PLATT'S USGC WB MEAN MINUS 48.00 CPG
Mateo Lvoff (27/03/2006 16:30:08): [unencrypted] gaon shell
Mateo Lvoff (27/03/2006 16:30:13): [unencrypted] gano shell

george_white2006 (27/03/2006 16:30:20): Bueno
Good

george_white2006 (27/03/2006 16:30:22): puedes mejorar
You could do better

george_white2006 (27/03/2006 16:30:24): eso es todo
That's all

Mateo Lvoff (27/03/2006 16:30:45): [unencrypted] bueno espero el llamado entonces
Well I'll wait for the call then

Mateo Lvoff (27/03/2006 16:34:19): [unencrypted] chamo me puedes hablar de lo que esta pasando en amuay?
Man can you talk to me about what's happening in amuay?

george_white2006 (27/03/2006 16:34:42): ok
ok

george_white2006 (27/03/2006 16:34:51): lo de amuay le vamos a escribir una nota
About amuay we are writing a notice

george_white2006 (27/03/2006 16:34:56): llama tu para mejorar
You should call to improve

Mateo Lvoff (27/03/2006 16:35:13): [unencrypted] a quien?
Who?

george_white2006 (27/03/2006 16:35:24): a la persona que mando el tender
the person that sent the tender

george_white2006 (27/03/2006 16:39:23): mejora de dimitry nafta mop minus 9.91 cpg or unl 87 mop minus 33.71 cpg or 1/3 mop nafta 1/3 mop unl 87 1/3 opis minus 17.98
george_white2006 (27/03/2006 16:40:25): creo que tienes que llamar a luis pena
I think you have to call Luis Pena

Mateo Lvoff (27/03/2006 16:41:01): [unencrypted] no encuentro el numero lo tienes a mano?
I can't find the number do you have it handy?

george_white2006 (27/03/2006 16:41:12): en el tender
In the tender

george_white2006 (27/03/2006 16:41:15): esta en el tender
it's in the tender

Mateo Lvoff (27/03/2006 16:41:37): [unencrypted] claro
Right

Mateo Lvoff (27/03/2006 16:41:41): [unencrypted] perdon
Sorry

george_white2006 (27/03/2006 16:42:06): TEL: +58 212 7083197 FAX: +58 212 7083562 MOB. +58 412 2383322
george_white2006 (27/03/2006 16:42:19): ese es de luis Vazquez
That is Luis Vazquez

george_white2006 (27/03/2006 16:42:46): luis pena TEL: +58 212 7083235 FAX: +58 212 7083186
george_white2006 (27/03/2006 16:55:39): mejora de dimitry
better for Dimitry

george_white2006 (27/03/2006 16:55:40): second offer mop minus 7.98 cpg
Mateo Lvoff (27/03/2006 17:00:39): [unencrypted] mop naphtha ?

george_white2006 (27/03/2006 17:00:53): sip
yes

Mateo Lvoff (27/03/2006 17:09:04): [unencrypted] se me acaba de ocurir algo puedo mejorar bastante
I just thought of something I can improve

Mateo Lvoff (27/03/2006 17:09:07): [unencrypted] <ding>
Mateo Lvoff (27/03/2006 17:10:20): [unencrypted] no me responde
Not responding

george_white2006 (27/03/2006 17:10:39): ok
ok

george_white2006 (27/03/2006 17:10:43): suena bien
sounds good

george_white2006 (27/03/2006 17:10:52): llama a luis vazques al cellular
Call luis Vazquez on his cell

Mateo Lvoff (27/03/2006 17:12:37): [unencrypted] seguro ?
Are you sure?

Mateo Lvoff (27/03/2006 17:12:56): [unencrypted] o espero un pelito a ver si luispeña responde
Or should I wait a little and see if luis pena responds.

george_white2006 (27/03/2006 17:13:18): mandale un e-mail
send him an email

george_white2006 (27/03/2006 17:13:21): que quieres mejorar
what do you want to improve?

george_white2006 (27/03/2006 17:13:27): para que quede un record
so that there is a record

Mateo Lvoff (27/03/2006 17:13:27): [unencrypted] a quien?
To whom?

Mateo Lvoff (27/03/2006 17:13:36): [unencrypted] a luis pea
To Luis pena

Mateo Lvoff (27/03/2006 17:13:44): [unencrypted] peña?
Pena?

Mateo Lvoff (27/03/2006 17:14:01): [unencrypted] <ding>
Mateo Lvoff (27/03/2006 17:14:39): [unencrypted] <ding>
george_white2006 (27/03/2006 17:14:49): si
Yes

george_white2006 (27/03/2006 17:14:52): a luis pena
to Luis Pena

george_white2006 (27/03/2006 17:14:55): y a Vasquez
And Vazquez

george_white2006 (27/03/2006 17:14:57): a los dos
for both

george_white2006 (27/03/2006 17:18:42): lukoil mejoro a 7.73 debajos de la nafta mop
Lukoil improved to 7.73 under the nafta mop

Mateo Lvoff (27/03/2006 17:20:09): [unencrypted] yo los mato a todos
I'll kill them all

george_white2006 (27/03/2006 17:20:17): dale
do it

george_white2006 (27/03/2006 17:20:22): mandale un e-mail
send them an email

george_white2006 (27/03/2006 17:20:27): y deja algo para mejorar luego
and leave something to improve for later

Mateo Lvoff (27/03/2006 17:20:34): [unencrypted] gasolina -29.29
Gasoline -29.29

george_white2006 (27/03/2006 17:20:37): pero ponlo por escrito
Have it in writing

Mateo Lvoff (27/03/2006 17:21:06): [unencrypted] Dear Luis: I am sending you this E mail as I realised that I made an error in my bid to you for this tender. As per my telephone recording to you, I now realise that I am able to considerably improve on my original bid. I am available to talk about an improvement of my original bid either at work 1 203 355 72 15 or on my cell phone 1 646 258 0765 Hoping to hear from you at your earliest convinience. I remain Mateo Lvoff

Mateo Lvoff (27/03/2006 17:21:17): [unencrypted] lo made a los 2 luises
I sent it to both Luis's

Mateo Lvoff (27/03/2006 17:21:23): [unencrypted] lo mande
I sent it

george_white2006 (27/03/2006 17:22:29): ok
ok

Mateo Lvoff (27/03/2006 17:22:33): [unencrypted] que te parece ahora tengo que p[oner especificamente my numero?
What do you think of now that I have to specifically put my number

george_white2006 (27/03/2006 17:22:51): si
yes

george_white2006 (27/03/2006 17:22:58): pero pon un numero mejor que todo el mundo
but put a number better than everyone's

Mateo Lvoff (27/03/2006 17:23:01): [unencrypted] por telefono o por E mail
Through telephone or email

george_white2006 (27/03/2006 17:23:02): pero no el major
but not the better

george_white2006 (27/03/2006 17:23:06): para que puedas mejorar
so you can improve

Mateo Lvoff (27/03/2006 17:23:07): [unencrypted] ???

george_white2006 (27/03/2006 17:23:10): por e-mail
through email

Mateo Lvoff (27/03/2006 17:23:57): [unencrypted] entonces mando 29.92 por e mail?
Well then should I send 29.92 through email?

george_white2006 (27/03/2006 17:24:11): ese es tu mejor numero?
Is that your best number?

Mateo Lvoff (27/03/2006 17:24:16): [unencrypted] pero llamo antes?
Call him before

Mateo Lvoff (27/03/2006 17:24:33): [unencrypted] no me dijistes tu de no arrancar con el major
Did you tell me to take off with the major one

george_white2006 (27/03/2006 17:24:39): correcto
correct

Mateo Lvoff (27/03/2006 17:24:49): [unencrypted] llamo primero?
Call first?

george_white2006 (27/03/2006 17:24:57): lo ideal es que mandes un numero que sea mejor que el de todo el mundo... pero no tu mejor numero....
The ideal thing is to send a number that's better than everyone else's... but not your best number

george_white2006 (27/03/2006 17:25:07): llama primero y luego lo pones por escrito
call first and then have it in writing

Mateo Lvoff (27/03/2006 17:25:12): [unencrypted] ok
Ok

george_white2006 (27/03/2006 17:25:19): mandalo incluso si no te contestan
send it even if they don't respond

Mateo Lvoff (27/03/2006 17:26:06): [unencrypted] llamo primero a peña
I'll call Pena first

george_white2006 (27/03/2006 17:26:19): si
yes

Mateo Lvoff (27/03/2006 17:34:14): [unencrypted] estas
Are you

Mateo Lvoff (27/03/2006 17:34:16): [unencrypted] ??

Mateo Lvoff (27/03/2006 17:34:31): [unencrypted] lo llame me [idio de mandar por e mail
I called, he said to send it through email

Mateo Lvoff (27/03/2006 17:34:38): [unencrypted] le puse -29.74
I put -29.74

Mateo Lvoff (27/03/2006 17:34:56): [unencrypted] creo que gano pero analysis esta buscando -25 ....
I think I win but the analysis is looking for -25

Mateo Lvoff (27/03/2006 17:35:04): [unencrypted] para me bolas chamo !!
I could care less Man

Mateo Lvoff (27/03/2006 17:35:09): [unencrypted] <ding>
george_white2006 (27/03/2006 17:35:13): estoy
I am

george_white2006 (27/03/2006 17:35:20): ok
ok

Mateo Lvoff (27/03/2006 17:35:22): [unencrypted] lee
Read

george_white2006 (27/03/2006 17:35:26): y cual es tu mejor numero
What is your best number?

george_white2006 (27/03/2006 17:35:28): ?

Mateo Lvoff (27/03/2006 17:35:47): [unencrypted] 29.00
29.00

george_white2006 (27/03/2006 17:35:50): creo que lo que tenemos que hacer es ser el mejor numero
I think what we have to do is be the best number.

george_white2006 (27/03/2006 17:35:57): que nadia nos gane y ya
No one beats us that's it

george_white2006 (27/03/2006 17:36:05): ellos tendran que vender
they are going to have to sell

Mateo Lvoff (27/03/2006 17:36:22): [unencrypted] bueno que hago ?
Well what should I do?

Mateo Lvoff (27/03/2006 17:36:29): [unencrypted] me quedo tranquiito?
Stay calm?

george_white2006 (27/03/2006 17:36:42): mandale y vemos que pasa
send it and we'll see what happens

george_white2006 (27/03/2006 17:36:48): si dimitry mejora o que
if dimitry improves or what

Mateo Lvoff (27/03/2006 17:36:51): [unencrypted] ya te dije que lo mande
I told you to send it

george_white2006 (27/03/2006 17:36:53): estoy pendiente
I'm waiting

george_white2006 (27/03/2006 17:36:56): y dejame llamar

and let me call

# Exhibit L

CI_Emails_00008273

**04.25.2006 – Francisco Morillo:**

Hi,

This is BP's offer... they want to take it under the terms of their natural gas term contract with PDVSA.

**PRICING:**

A + B (FOB Curacao)

A= Platt's Mean USGC Natural Gasoline (MT. Velviue, Non-Warren)

B= Discount -4.09 (US Cents per Gallon)

Regards,

Francisco

| From: | Francisco Morillo |
| To: | Mateo Lvoff |
| Cc: | Maximiliano Poveda |
| Subject: | Nafta primera oferta para el tender de manana |
| Date: | Tuesday, April 25, 2006 4:33:00 PM |

Hola,

Esta es la oferta de bp... se lo quieren llevar bajo los terminos de su contrato a termino con PDVSA de gasolina natural.

PRICING    : A + B  (FOB Curacao)
                 A = Platt's Mean USGC Natural Gasoline (Mt. Belvieu, Non-Warren)
                 B = Discount -4.09(US Cents per Gallon)

Saludosm

Francisco

# Exhibit M

**TOSHIBA0016697**

| ORIGINAL | TRANSLATION |
|---|---|
| From:PEDRO SANCHEZ<br>Sent:Tue 8/16/2005 2:38:58 PM<br>To:Francisco Morillo[fm@wtrpc.com]; Francisco Morillo[francisco.morillo@wtrpc.com];<br>Carpio5[leonardo.baquero@wtrpc.com];<br>Carpio6[lb@wtrpc.com]<br>Subject: REUNION CON EL HERMANO MAYOR<br>SEÑORES:<br>LOS PUNTOS QUE SE TRATARON FUERON LOS SIGUIENTES:<br>STATUS DE LOS VLCC (CINCO (5) OFERTAS):<br>• FRONT VANGUARD ( NO SE ACUERDA LOS NIVELES)<br>• GEMINIS GLORY ( PUEDE SER EL SELECCIONADO PERO ESTA BAJO DISCUSION TODAVIA. NIVELES: SINGAPUR 2.9, COREA 3.8 (PALOS). DICE QUE ESTE 3ª CARGAMENTO DE SANSUNG SI VA YA QUE TIENEN BIEN ARMADA LA L/C. NO CREE QUE VAYA UN 4ª, NO ME DICE PORQUE???.<br>• MILLENIUM (NO SE ACUERDA LOS NIVELES)<br>• LA MADRINA (ESTA EN EL GOLFO ARABICO Y LO PROMETIO PARA EL 23/08/05, POR LO TANTO DICE QUE NO VA PA EL BAILE)<br>• NO SABE EL NOMBRE DEL ULTIMO<br>PREGUNTO:<br>1. DE QUIEN ES EL ISABELA (AFRAMAX Ó PANAMAX???)<br>2. QUE HACE LA VACA EN ITALIA???<br>3. PORQUE SIGUE EL CAP. SANCHEZ INSTALADO EN LA OFICINA DE EL EN C&S. EL PEO ES DE QUE A PESAR DE QUE NO MANDA ESCUCHA TODO E INFORMA A LA VACA. QUE SI PUEDEN BUSCAR LA MANERA DE SACARLO DEL PISO.<br>4. DICE QUE EL CAP. SANCHEZ SE METIO EN UN PEO YA QUE EXTENDIO EL CONTRATO DE BAHIA POZUELOS HASTA DICIEMBRE.<br>5. LE MANDA A DECIR AL JUNIOR QUE POR FAVOR LE ELIMINE LOS MENSAJES DE GLOBOVISION (ESCUALIDOS???). TAMBIEN PREGUNTA QUE SIGNIFICA QUE TODOS LOS MENSAJES QUE QUEDAN GRABADOS EN GATEAWAY?????. | From: PEDRO SANCHEZ<br>Sent: Tue 8/16/2005 2:38:58 PM<br>To: Francisco Morillo [fm@wtrpc.com]; Francisco Morillo [francisco.morillo@wtrpc.com]; Carpio5 [leonardo.baquero@wtrpc.com]; Carpio6 [lb@wtrpc.com]<br>Subject: REUNION WITH THE BIG BROTHER<br>SIRS:<br>THE POINTS TO BE TREATED WERE THE FOLLOWING:<br>STATUS OF THE VLCC (FIVE (5) OFFERS):<br>• FRONT VANGUARD (LEVELS DO NOT AGREE)<br>• GEMINIS GLORY (MAY BE SELECTED BUT IT IS LOW DISCUSSION YET LEVELS: SINGAPORE 2.9, KOREA 3.8 (STICKS) SAYS THAT THIS 3rd SANSUNG LOADING IF YOU ARE ALREADY ALMOST ARMED THE L / C DO NOT BELIEVE THAT A 4TH , DO NOT TELL ME BECAUSE ???.<br>• MILLENNIUM (LEVELS DO NOT AGREE)<br>• MADRINA (THIS IN THE ARABIC GULF AND PROMISED FOR 23/08/05, THEREFORE SAYS NOT GO TO THE DANCE)<br>• DO NOT KNOW THE LAST NAME<br>I ASK:<br>1. WHO IS THE ISABELA (AFRAMAX OR PANAMAX ???)<br>2. WHAT DOES THE COW IN ITALY DO?<br>3. WHY FOLLOW THE CAP. SANCHEZ INSTALLED IN THE OFFICE OF EL EN C & S. THE PEO IS THAT WHILE NOT SENDING LISTENING EVERYTHING AND INFORMES THE COW. THAT IF YOU CAN LOOK FOR THE WAY TO REMOVE IT FROM THE FLOOR.<br>4. SAYS THAT CAP. SANCHEZ WAS METIO IN A PEO AND EXTENDED THE CONTRACT OF BAHIA POZUELOS UNTIL DECEMBER.<br>5. Tell the JUNIOR to PLEASE DELETE GLOBOVISION MESSAGES (SLOWLY ???). ALSO QUESTION WHICH MEANS THAT ALL MESSAGES THAT ARE ENGRAVED IN GATEAWAY ?????.<br>6. AND LAST TO BE CHARGED 100,000.00 TO THE NUMBER 0412-598-5826 OR YOU BUY TWO CARDS OF 50,000.00.<br>FOR THE MOMENTS THERE ARE NO MORE REQUIREMENTS. WE WILL KEEP IT INFORMED AS EARLY AS POSSIBLE.<br>REGARDS,<br>TONY |

6. Y POR ULTIMO QUE LE CARGUEN 100.000,00 AL
NUMERO 0412-598-5826 Ó LE COMPREN DOS
TARJETAS DE 50.000,00.
POR LOS MOMENTOS NO HAY MAS
REQUERIMIENTOS. NOS MANTENDRA
INFORMADO LO MAS TEMPRANO POSIBLE.
SALUDOS,
TONY

To:        Francisco Morillo[fm@wtrpc.com]; Francisco Morillo[francisco.morillo@wtrpc.com]; Carpio5[leonardo.baquero@wtrpc.com]; Carpio5[lb@wtrpc.com]
From:      PEDRO SANCHEZ
Sent:      Tue 8/16/2005 2:36:58 PM
Importance:  Normal
Subject:   REUNION CON EL HERMANO MAYOR
Received:  Tue 8/16/2005 2:34:46 PM

SEÑORES:
LOS PUNTOS QUE SE TRATARON FUERON LOS SIGUIENTES:

STATUS DE LOS VLCC (CINCO (5) OFERTAS):

- FRONT VANGUARD ( NO SE ACUERDA LOS NIVELES)
- GEMINIS GLORY ( PUEDE SER EL SELECCIONADO PERO ESTA BAJO DISCUSION TODAVIA. NIVELES: SINGAPUR 2.9, COREA 3.8 (PALOS). DICE QUE ESTE 3ª CARGAMENTO DE SANSUNG SI VA YA QUE TIENEN BIEN ARMADA LA L/C. NO CREE QUE VAYA UN 4ª, NO ME DICE PORQUE???.
- MILLENIUM (NO SE ACUERDA LOS NIVELES)
- LA MADRINA (ESTA EN EL GOLFO ARABICO Y LO PROMETIO PARA EL 23/08/05, POR LO TANTO DICE QUE NO VA PA EL BAILE)
- NO SABE EL NOMBRE DEL ULTIMO


PREGUNTO:

1. DE QUIEN ES EL ISABELA (AFRAMAX Ó PANAMAX???)
2. QUE HACE LA VACA EN ITALIA???
3. PORQUE SIGUE EL CAP. SANCHEZ INSTALADO EN LA OFICINA DE EL EN C&S. EL PEO ES DE QUE A PESAR DE QUE NO MANDA ESCUCHA TODO E INFORMA A LA VACA. QUE SI PUEDEN BUSCAR LA MANERA DE SACARLO DEL PISO.
4. DICE QUE EL CAP. SANCHEZ SE METIO EN UN PEO YA QUE EXTENDIO EL CONTRATO DE BAHIA POZUELOS HASTA DICIEMBRE.
5. LE MANDA A DECIR AL JUNIOR QUE POR FAVOR LE ELIMINE LOS MENSAJES DE GLOBOVISION (ESCUALIDOS???). TAMBIEN PREGUNTA QUE SIGNIFICA QUE TODOS LOS MENSAJES QUE QUEDAN GRABADOS EN **GATEAWAY?????**.
6. **Y POR ULTIMO QUE LE CARGUEN 100.000,00 AL NUMERO 0412-598-5826 Ó LE COMPREN DOS TARJETAS DE 50.000,00.**

POR LOS MOMENTOS NO HAY MAS REQUERIMIENTOS. NOS MANTENDRA INFORMADO LO MAS TEMPRANO POSIBLE.

SALUDOS,
TONY

Toshiba0016697

# Exhibit N

**BIRMINGHAM00111822**

| ORIGINAL | TRANSLATION |
|---|---|
| From: Francisco Morillo <franciscomorillo@cantv.net><br>Sent: Monday, August 29, 2005 4:01 PM<br>To: 'Calnex' <sclups@gmail.com><br>Subject: FW: PDVSA REBCO TENDER OCT 05 TO OCT 06 | From: Francisco Morillo <franciscomorillo@cantv.net><br>Sent: Monday, August 29, 2005 4:01 PM<br>To: 'Calnex' <sclups@gmail.com><br>Subject: FW: PDVSA REBCO TENDER OCT 05 TO OCT 06 |
| -----Original Message-----<br>From: Luis.Alvarez@glencore.co.uk<br>[mailto:Luis.Alvarez@glencore.co.uk]<br>Sent: Friday, August 26, 2005 8:42 AM<br>To: Francisco Morillo; Gustavo.Gabaldon@glencore-us.com; leonardo.baquero@wtrpc.com;<br>Sergio.Delavega@glencore-us.com<br>Subject: PDVSA REBCO TENDER OCT 05 TO OCT 06<br>Importance: High | ----- Original Message -----<br>From: Luis.Alvarez@glencore.co.uk [mailto: Luis.Alvarez@glencore.co.uk]<br>Sent: Friday, August 26, 2005 8:42 AM<br>To: Francisco Morillo;<br>Gustavo.Gabaldon@glencore-us.com;<br>Leonardo.baquero@wtrpc.com;<br>Sergio.Delavega@glencore-us.com<br>Subject: PDVSA REBCO TENDER OCT 05 TO OCT 06<br>Importance: High |
| Este seria el formato que queremos que usen para el tender para entrega en<br>Rotterdam. Como acordamos nos hemos centrado solo en el volumen por barco y<br>para entrega en el Norte para intentar conseguirlo todo.<br>En cuanto al periodo de pricing lo hemos dejado bastante vago esperando que<br>las ofertas sean solo con 5 despues de BL y la nuestra con pricing<br>alternativos salga mejor en la matriz.<br>Es muy importante que la restriccion del puerto de carga se mantenga y solo<br>acepten Primorsk.<br>En cuanto a la puntuacion en el tender, tanto Incomed como Citizens han<br>tenido contratos a plazo para el sumistro en el Norte y asi se dice en la<br>presentacion, asi que seria bueno que se le diera un 10-15% a las cias que<br>han tenido contrato directo con PDVSA para el suminstro Roterdam/Wileshaven.<br>Con Incomed y teniendo en cuenta que no es favorita, ofreceriamos en bases<br>FOB y con flete ligado a Platt's. | This would be the format we want them to use for tending for delivery in Rotterdam. As we have agreed, we have focused only on volume per ship and For delivery in the North to try to get everything.<br>As for the pricing period, we have left it quite vague,<br>The offers are only with 5 after BL and ours with pricing<br>Alternatives come out better in the matrix.<br>It is very important that the cargo port restriction is maintained and only Accept Primorsk.<br>As for the punctuation in the tender, both Incomed and Citizens have<br>Term contracts for the supply in the North and so it is said in the<br>Presentation, so it would be good to give 10-15% to the<br>Have had a direct contract with PDVSA for the supply<br>Rotterdam / Wileshaven.<br>With Incomed and considering that it is not favorite, we would offer on<br>FOB and freight bonded to Platt's. |

Otro punto importante es que como veis pedimos que las cias oferten solo

por la totalidad del volumen en el Norte, asi cias pequenas no pueden venir

con ofertas muy agresivas para solo una pequena parte del volumen.

Por ultimo tambien hemos puesto una restriccion que impide que las cias que

ofrecen en el Sur o en el tubo puedan ofrecer aqui. Si hacen falta razones

para explicar porque PDVSA deberia hacer esto, las tenemos.

Si necesitais algo mas, dejarmelo saber.

Suerte!

?

Another important point is that as you see we ask that the companies offer only
By the whole volume in the North, so small ones can not come
With very aggressive offers for only a small part of the volume.
Finally, we have also introduced a restriction that prevents
Offer in the South or in the tube can offer here. If reasons are necessary
To explain why PDVSA should do this, we have them.
If you need anything else, let me know.
Luck!

**To:** 'Calnex'[sclups@gmail.com]
**From:** Francisco Morillo
**Sent:** Mon 8/29/2005 8:00:55 PM
**Importance:** High
**Subject:** FW: PDVSA REBCO TENDER OCT·05 TO OCT 06
**Received:** Mon 8/29/2005 8:00:00 PM

-----Original Message-----
From: Luis.Alvarez@glencore.co.uk [mailto:Luis.Alvarez@glencore.co.uk]
Sent: Friday, August 26, 2005 8:42 AM
To: Francisco Morillo; Gustavo.Gabaldon@glencore-us.com; leonardo.baquero@wtrpc.com; Sergio.Delavega@glencore-us.com
Subject: PDVSA REBCO TENDER OCT 05 TO OCT 06
Importance: High

Este seria el formato que queremos que usen para el tender para entrega en
Rotterdam. Como acordamos nos hemos centrado solo en el volumen por barco y
para entrega en el Norte para intentar conseguirlo todo.
En cuanto al periodo de pricing lo hemos dejado bastante vago esperando que
las ofertas sean solo con 5 despues de BL y la nuestra con pricing
alternativos salga mejor en la matriz.
Es muy importante que.la restriccion del puerto de carga se mantenga y solo
acepten Primorsk.
En cuanto a la puntuacion en el tender, tanto Incomed como Citizens han
tenido contratos a plazo para el sumistro en el Norte y asi se dice en la
presentacion, asi que seria bueno que se le diera un 10-15% a las cias que
han tenido contrato directo con PDVSA para el suminstro
Roterdam/Wileshaven.
Con Incomed y teniendo en cuenta que no es favorita, ofreceriamos en bases
FOB y con flete ligado a Platt's.
Otro punto importante es que como veis pedimos que las cias oferten solo
por la totalidad del volumen en el Norte, asi cias pequenas no pueden venir
con ofertas muy agresivas para solo una pequena parte del volumen.
Por ultimo tambien hemos puesto una restriccion que impide que las cias que
ofrecen en el Sur o en el tubo puedan ofrecer aqui. Si hacen falta razones
para explicar porque PDVSA deberia hacer esto, las tenemos.
Si necesitais algo mas, dejarmelo saber.
Suerte!

-------------------------------------------------------------------------------

Re: Crude – Russian Export  Crude Oil Sale tender to PDVSA for delivery
Rotterdam/Wileshaven commencing October 2005 to October 2006.

Please find below details of our tender:

1/ Seller:
----------
Revert with full style.

2/ Buyer:
----------
PDVSA Petroleo S.A.
Caracas 1060 A
Venezuela

3/ Product:
----------
Russian Export Blend crude oil of normal export quality, as made
available by the loading terminal Primorsk, Russia at the time of loading.
Other loading ports will not be accepted.

Birmingham-00111822

#### 4/ Validity:

Contract to be valid for a period of 12 months starting October 2005 and to be
extended for similar periods by mutual agreement.

#### 5/ Quantity:

To be basis aprox. 140,000 barrels per day, with delivery mutually agreed
between the parties on cargo lots of 100,000 MT +/-10%.
Only offers for the whole volume will be considered.
Companies offering volumes for PDVSA tender in the South and/or via
pipeline will not be considered to offer into this tender.

#### 6/ Nomination:

By the 15th of the month preceding the month of delivery, buyer will
nominate
preferred five day delivery windows and number of cargoes and within the
following three working days both parties should have confirmed the
following two points :
i. The number of cargoes to be delivered during the month of delivery
ii. The five day delivery window associated for each cargo

#### 7/ Delivery:

In one lot Delivered CIF Rotterdam/Wilhelmshaven with arrival window(s)
agreed as per above.
Seller shall narrow the arrival window(s) to a 3 day delivery window(s) 10
days before
the 1st day of the above window(s).

Seller's vessel(s) to be acceptable to buyer, such acceptance not to be
unreasonably witheld. In the case of substitution, such substitution to be
acceptable to buyer such acceptance not to be unreasonably witheld.

#### 8/ Price:

Price of each cargo in U.S.Dollars per net Bill of lading barrel basis one
safe port/berth Rotterdam/Wilhelmshaven to be equal to the arithmetic
average of the mean of the high and low quotations as published in Platt's
crude oil marketwire for Urals (Rotterdam) spread vs fwd Dated Brent.

The standard pricing period for these cargoes is five quotations
immediately following the bill of lading date (b/l date = day 0).

Future Platts corrections (if any) to apply.

The price for Russian Export Blend crude oil is understood to be based on a
density of 32.00-32.09 api. If the api as ascertained at loadport is below
32.09 price to de-escalate with usd 0.003/bbl for each full tenth degree of
api below 32.09 api. If the api as ascertained at loadport is above 32.00
price to escalate with USD 0.003/bbl for each full tenth degree of api
above 32.00 api.

Final price will be rounded to three (3) decimal places.

#### 9/ Terms of payment applicable:

Net B/L barrels shall be invoicing quantity as converted according to
clause 11 hereunder.

By telegraphic transfer in immediately availiable funds 30 days from B/L
date (B/L date to count as day one) without offset, deduction or
counterclaim against presentation of Seller's commercial invoice,
independent inspector's load report evidencing net US barrels loaded

Birmingham-00111822

(telex acceptable), independent inspector's loading report evidencing API
(telex acceptable), copy of the charter party recap (telex acceptable) and
Seller's letter of indemnity statement countersigned by a first class
western bank in the following format:
Quote
To: PDVSA                                    Date ........................

We refer to a cargo of ................ net barrels of ........................... crude oil sold by us
to you pursuant to our contract dated ................. and shipped on board the
vessel '...................................' which loaded at port of ................... pursuant to bills of
lading dated ................................

Although we have sold the cargo and have transferred the title to you, we
are unable to provide you with the documents required for payment under our
contract including the full set of 3/3 original bills of lading covering
the cargo ('shipping documents').

In consideration of your paying the full purchase price of U.S.Dollars
....................... prior to our tender of the shipping documents, we hereby
expressly warrant that we had, have, or will have as of the time prescribed
for the transfer of title to you under our contract:

(i)   good title to such cargo and the bills of lading free and clear of
      any charge, lien, encumbrance or other security interest, and
(ii)  the full right and authority to transfer such title and effect
      delivery of such cargo and the bills of lading to you.


In further consideration we agree to indemnify, hold you harmless from,
protect and defend you against, and pay and satisfy, any and all damages,
costs and expenses (including reasonable attorney fees) which you may incur
or be adjudged owing or for which you may otherwise be liable by reason of
the shipping documents remaining outstanding and/or the breach of the
warranties given above, including but not limited to, those which arise out
of any claims and demands which may be made by a holder or transferee of
the original bills of lading or by any other third party claiming an
interest in or liens on the cargo, bills of lading, or on the proceeds
thereof.

This letter of indemnity shall be construed, interpreted and governed by
the laws of england excluding choice of law rules and the u.n. convention
on contracts for the international sale of goods.

This letter of indemnity shall expire upon our tender of the shipping
documents to you. we agree we will make all reasonable efforts to obtain
and surrender the shipping documents as soon as possible.

Signed
(Authorised signatory)
(Seller's full style)

We hereby irrevocably and unconditionally agree to be jointly and severally
obligated by the above indemnity.
Bank's name
Authorized signature(s)
Unquote

Seller expressly warrants that he is hereunder transfering his marketable
title of the crude oil (as defined on clause 3 of this contract), free and
clear of any
lien or encumbrace, under the basis that seller has full right and
authority to transfer to buyer and effect delivery of such crude oil.
Furthermore, seller hereunder irrevocally and unconditionally undertakes to
hold buyer harmless against any claim damage, loss, cost, and/or expenses
which may suffer, incur or be put to, as a result of a breach of our

Birmingham-001 | 1822

warranties or any of them as set out above.

Buyer to issue a payment undertaking to seller's designated bank prior to discharge.
Seller to inform (formal request) of banking details at least two working days prior to issuing of payment undertaking to the person in charge at PDVSA being ................ On Tel No.............................. or, in the event the person in charge is not available, buyers nominated replacement.

Quote
From PDVSA
To (bank)
Attn (name)

Ref: Payment undertaking
Your ref: agreement of (date)
Our ref: (tbn)

Only for banking purposes
=====================

We, PDVSA (buyer), confirm having entered into a contract with .................
(seller), for the purchase of (volume) plus minus (pct) pct of (crude), of the quality made available at the loadport at the time of loading the vessel. The price will be fixed as per contractual terms between PDVSA , and seller to be delivered CIF on dates (date) to (date), with payment at (xx) days (from/after) bill of lading date (b/l date=day (zero or one)).

We will irrevocably and unconditionally undertake to pay on due date without any setoff deduction or counterclaim whatsoever, and free of all charges, the full amount of the sellers invoice covering the above mentioned purchase by telegraphic transfer to the client's account at (bank), against presentation of seller's commercial invoice (telex/telecopy acceptable), independent inspector's quality report at loading port (telex acceptable), independent inspector's quantity report at the load port (telex acceptable ), full set 3/3 original bills of lading issued to or endorsed to the order of buyer and original certificate of origin, if any of the above documents are not available at payment due date, then seller shall present all other required documents, including seller's commercial invoice (telex acceptable) and seller's letter of indemnity covering the missing document(s) (telex acceptable).

This undertaking is subject to our having received good and unencumbered title of goods and subject further to our not being prevented from carrying out this undertaking by order of court or other authority.

We further represent that this undertaking is a legally binding payment obligation and is in full accordance with our by-laws and regulations applicable to us.

We have obtained all approvals and/or licenses from the relevant authorities to enable us to enter into the underlying commercial contract and to effect the above mentioned payment when due.

Buyer confirms that seller have the right upon giving written notice to buyer, to assign to its designated financing bank its right to the proceeds of the sales price payable under the above mentioned sale contract.

This payment undertaking is subject to english law.

Best regards,
...........................................................................
Authorised Signatory
PDVSA
Unquote

Payment shall be made against presentation of seller's commercial invoice full set of 3/3 original bills of lading and other usual shipping

Birmingham-00111822

documents.

If due date occurs on a saturday or on a non Monday bank holiday in
New York, payment to be effected on the preceeding New York banking
day. If due date occurs on a Sunday or on a Monday bank holiday in
New York, payment to be effected on the following New York banking
day.

In the event the final price to be used for invoicing purposes is unknown
when payment is due, then provisional payment shall be effected on the
due date based on 95 pct of the net amount calculated based on net B/L
volume and estimated price based on all pricing quotation using in the
agreed
formula available until 7 working days before the due date.
Any imbalance to be settled five working days after final price is
calculated.

10/ Title and risk:
---------------------
Shall pass from seller to buyer as the oil passes the vessels
permanent hose connection at loading port.

11/ Quality / Quantity determination:
-------------------------------------------------
Quality and quantity as per mutually agreed independent inspectors
load report which shall be final and binding save fraud or
manifest error and shall be used for invoicing purposes.

At loadport, mutually agreed independent inspector to be appointed
for control purposes only. costs to be split 50/50 seller/buyer.

At disport, an independent inspector to be appointed and costs to be for
the buyer.

Seller shall have the right to have his representative present to witness
all ullages and tests at the discharge port.

12/ Laytime/Demurrage/Claims:
------------------------------------------
- NOR to be tendered upon ship's arrival at disport.
- Allowed laytime 36 hours + up to 6 hours nor, shinc, prorata for part
  cargo.
- Any demurrage claim by seller shall be calculated in accordance
  with the actual charter party and notified to the buyer in writing
  and be supported by the following documents:
- Seller's invoice for demurrage
.- Details of the seller's calculations of the amount claimed.
- Copy of statements of facts or timesheet at loading and discharge
  port by independent inspector or vessel's agents.
- Letters of protest issued at loadport or disport
- Copy owner's invoice for demurrage or demurrage invoice received by
seller
  from previous cargo owner (in case that seller does not charter the
vessel)
- Copy of the charter party or telex recap of the vessel.
Any claim shall be submitted to the other party with supporting
documentation within ninety (90) days from the bill of lading date
and the party receiving the claim shall not be liable for any claim
received after date.all payments to the designated account of the
relevant party within thirty (30) days after receipt thereof.

13/ Law:
-----------
This contract shall be governed and construed in accordance with the Laws
of England with exclusive jurisdiction in the High Courts of London without
recourse to any arbitration.

14/ Force Majeure:

Birmingham-00111822

Neither Seller nor Buyer shall be liable in damages or otherwise for any
failure or delay in performance of any obligation hereunder other than
obligation to make payment, where such failure or delay is caused by force
majeure, being any event, occurrence or circumstances reasonably beyond the
control of that party, including without prejudice to the generality of the
foregoing: failure or delay caused by or resulting from acts of God,
strikes, fires, floods, wars (whether declared or undeclared), riots,
destruction of the oil, delays of carriers due to breakdown or adverse
weather, perils of the sea, embargoes, accidents disruptions or breakdowns
of production or refinery facilities and equipments, or prevention of delay
in loading or discharging of vessels or barges due to such disruptions or
breakdowns, restrictions imposed by any governmental authority (including
allocations priorities, requisitions, quotas and price controls). The time
of Seller to make, or Buyer to receive, deliver, hereunder shall be
extended during any period in which delivery shall be delayed or prevented
by reason of any of the foregoing causes, up to a total of thirty (30)
days. If any delivery hereunder shall be so delayed or prevented by reason
for more than 30 days, either party may terminate this contract with
respect to such delivery upon written notice to the other party.

## 15/ ISPS:

a.   Sellers' obligations:
(i)   from the date of coming into force of the international code for the
security of ships and of port facilities and the relevant amendments to
chapter xi of solas (the "isps code") the sellers warrant that in respect
of any vessel upon which any of the goods sold under this contract are
intended to be shipped or are in fact shipped (the "vessel") both the
vessel and the company, as defined by the isps code (the "company") shall
comply with the requirements of the isps code relating to the vessel and
the company.  where the discharge port is within the usa and us territories
or waters, the sellers shall, further, procure that the vessel and the
company shall comply with the requirements of the us maritime
transportation security act 2002 ("MTSA").
(ii)  upon request the sellers shall provide the buyers with a copy of the
relevant international ship security certificate (or the interim
international ship security certificate).
(iii) the sellers shall procure that the vessel shall, when required to do
so by the appropriate authorities, take all necessary steps to complete a
declaration of security ("dos").  any delay arising from a failure on the
part of the vessel to complete a dos in timely fashion shall be for the
sellers' account and shall not count as laytime or time on demurrage.
(iv)  the sellers shall procure that they and/or any charterers and/or
sub-charterers of the vessel provide the company security officer ("CSO")
and the ship security officer ("sso")/master with their full style contact
details and any other information the owners and/or the company may require
to comply with the isps code and/or mtsa (if applicable).
(v)   save where either (1) the company and/or the vessel has failed to
comply with the requirements of the isps code and/or, within the usa and us
territories or waters, with mtsa, or (2) the sellers have failed to comply
with any provision of this clause, the sellers shall be entitled to tender
notice of readiness under this contract even if the vessel is not cleared
due to applicable security regulations or measures imposed by the discharge
port/terminal/installation or any relevant authority under the isps code
and/or mtsa (if applicable).
(vi)  any delay, loss, damage or expense, whatsoever caused by failure on
the part of the company and/or the vessel and/or the sellers to comply with
the requirements of the isps code or of mtsa (if applicable) or of this
clause shall be for the sellers' account and shall not count as laytime or
time on demurrage.
Notwithstanding any prior acceptance of the vessel by the buyers, if the
vessel does not comply with the requirements of the isps code or mtsa (if
applicable) either prior to arrival or at the discharge port (s) and is
consequently prohibited by the relevant authorities from discharging:
the sellers shall be obliged to procure that the vessel owners promptly and
urgently take all necessary remedies to ensure that the vessel complies
with the requirements of the isps code or mtsa (if applicable): or

Birmingham-00111822

the sellers shall be obliged to substitute the vessel with a vessel
complying with the requirements of the isps code or mtsa (if applicable).
any time lost shall be for the account of sellers and sellers to be liable
for any and all losses, costs and expenses which the buyers may incur as a
direct result of a failure of the vessel to comply with the requirements of
the isps code or mtsa (if applicable) as described in this sub-clause
(vii).
   (viii)   where the discharge port/terminal/installation is in the united
states or any us territories or waters, the sellers shall procure that the
vessel or its agents shall report and send all notices as required to
obtain entry and exit clearances from the relevant us authorities. any
delay caused by the failure to so report shall be for the sellers' account
unless such failure to report is caused by or attributable to the buyers or
their representatives or agents including but not limited to the receiver
of the cargo. time which, pursuant to this clause, is for sellers'
account, shall not count as used laytime or time on demurrage.

   b.   Buyer's obligations:
   (i)   the buyers warrant that the discharge port/terminal/installation
shall comply with the requirements of the isps code and/or, if located
within the usa and us territories, with the mtsa.
   (ii)   any costs or expenses in respect of the vessel and/or the cargo
including any additional charge, fee or duty levied on the vessel at the
discharge port and actually incurred by the sellers resulting directly from
the failure of the discharge port/terminal/installation to comply with the
isps code and/or, if located within the usa and/or us territories or
waters, with the mtsa, shall be for the account of the buyers, including
but not limited to the time required or costs incurred by the vessel in
taking any action or any special or additional security measures required
by the isps code or mtsa.  all time so required shall count as used laytime
or time on demurrage.
   (iii) save insofar as paragraph b(ii) above applies, where the discharge
port is located within the usa and/or us territories or waters, unless
caused by the negligence of the vessel owners and/or the sellers, any
delays suffered or time lost in obtaining the entry and exit clearances
from the relevant us authorities shall be for the buyers' account and time
so lost shall count as used laytime or time on demurrage.
   (iv)  save where the vessel and/or the company has failed to comply with
the requirements of the isps code or, within the usa and us territories or
waters, with the mtsa, any delays, costs or expenses arising out of or
related to security regulations or measures required by the discharge port
or port facility or any relevant authority in accordance with the isps code
including, but not limited to, security guards, launch services, tug
escorts, port security fees or taxes and inspections, shall be for the
buyers' account.  time so spent shall count as used laytime or time on
demurrage.
   (v)  save where the vessel and/or the company has failed to comply with
the requirements of the isps code and/or, within the usa and us territories
or waters, with mtsa, the buyers shall be responsible for any delays at the
discharge port or port facility resulting directly from the vessel being
required by the port facility or any relevant authority to take any action
or any special or additional security measures or undergo additional
inspections by virtue of the vessel's previous ports of call. time so
spent shall count as used laytime or time on demurrage.
   (vi)  the buyers' liability to the sellers for any costs, losses or
expenses incurred by the vessel, the charterers or sub-charterers or the
vessel owners resulting from the failure of the discharge
port/terminal/installation to comply with the isps code or mtsa shall be
limited to the payment of demurrage in accordance with the terms of this
contract and costs actually incurred by the sellers in accordance with the
provisions of this clause.

16/ Other terms:
--------------------
Where not in conflict with the above, Incoterms 2000 terms and
conditions for CIF deliveries shall apply.
LEGAL DISCLAIMER. The contents of this e-mail and any attachments are strictly confidential and they may not be used or disclosed
by someone who is not a named recipient.

Birmingham-00111822

If you have received this email in error please notify the sender by replying to this email inserting the word "misdirected" as the message and delete this e-mail from your system.

Birmingham-00111822

# Exhibit O

To:      'Andy Summers'[Andy.Summers@trafigura.com]
Cc:      'Jose Larocca'[Jose.Larocca@trafigura.com]; 'Maximiliano Poveda (London)'[Maximiliano.Poveda@Trafigura.com];
'lb@wtrpc.com'[lb@wtrpc.com]; 'Wendy Moss'[Wendy.Moss@trafigura.com]; 'Ingrid MacKay'[Ingrid.Mackay@trafigura.com]
From:    Francisco Morillo
Sent:    Wed 8/24/2005 5:41:29 PM
Importance:    Normal
Subject:    RE: Crude to Europe
Received:    Wed 8/24/2005 5:41:00 PM
UNTITLED.PPT

Here is the presentation in digital form, Andy I have been trying to call you since yesterday and have not been able to reach you.

-----Original Message-----
From: Andy Summers [mailto:Andy.Summers@trafigura.com]
Sent: Wednesday, August 24, 2005 10:44 AM
To: francisco.morillo@wtrpc.com
Cc: Jose Larocca; Maximiliano Poveda (London); lb@wtrpc.com; Wendy Moss; Ingrid MacKay
Subject: Re: Crude to Europe

Franciso pls call me 447775607833
Andy

-----Original Message-----
From: Andy Summers <Andy.Summers@trafigura.com>
To: 'francisco.morillo@wtrpc.com' <francisco.morillo@wtrpc.com>
CC: Jose Larocca <Jose.Larocca@trafigura.com>; Maximiliano Poveda (London) <Maximiliano.Poveda@Trafigura.com>;
'lb@wtrpc.com' <lb@wtrpc.com>; Wendy Moss <Wendy.Moss@trafigura.com>; Ingrid MacKay <Ingrid.Mackay@trafigura.com>
Sent: Tue Aug 23 15:39:34 2005
Subject: Re: Crude to Europe

Ok but I will only be able took at it thursday
Andy

-----Original Message-----
From: Francisco Morillo <francisco.morillo@wtrpc.com>
To: Andy Summers <Andy.Summers@trafigura.com>
CC: Jose Larocca <Jose.Larocca@trafigura.com>; Maximiliano Poveda (London) <Maximiliano.Poveda@Trafigura.com>;
lb@wtrpc.com <lb@wtrpc.com>; Wendy Moss <Wendy.Moss@trafigura.com>; Ingrid MacKay <Ingrid.Mackay@trafigura.com>
Sent: Tue Aug 23 15:37:43 2005
Subject: RE: Crude to Europe

Will send it from my yahoo.... is the file is too big. There is no
English version.

-----Original Message-----
From: Andy Summers [mailto:Andy.Summers@trafigura.com]
Sent: Tuesday, August 23, 2005 10:35 AM
To: francisco.morillo@wtrpc.com
Cc: Jose Larocca; Maximiliano Poveda (London); lb@wtrpc.com; Wendy Moss;
Ingrid MacKay
Subject: Re: Crude to Europe

Can u get me an english version?

And pls copy ingrid - ingrid can u fax to my hotel pls
Andy

-----Original Message-----
From: Francisco Morillo <francisco.morillo@wtrpc.com>
To: Andy Summers <Andy.Summers@trafigura.com>
CC: Jose Larocca <Jose.Larocca@trafigura.com>; Maximiliano Poveda
(London) <Maximiliano.Poveda@Trafigura.com>; 'Leonardo Baquero'
<lb@wtrpc.com>; Wendy Moss <Wendy.Moss@trafigura.com>
Sent: Tue Aug 23 15:08:56 2005
Subject: RE: Crude to Europe

Good Day Andy,

Here is the presentation I talk to you about. Please treat this as
Highly P&C, remember it is very sensible that you have this document.
The presentation is in Spanish. How is you Spanish?.

We need to make a basic draft of the contract including operational
procedure, pricing mechanism to the different discharch ports, in which
you can use freight differentials, or different quotes for the different
port.

Also I'm attaching the PDVSA general terms and conditions for CIF sales,
which has to be the base for the contract.

Also you have to include handling of laycan, cancellations and early
arrivals.

Another important part of the deal is that we have to establish a
typical cargo of maybe (80.000 to 100.000 mt), and a way to establish a
differential if PDVSA nominates cargos of less than 80.000 MT. And a
benefit to them if they receive cargos of more than 100.000 mt.

Also we should include some kind of performance bond, so the terms of it
we can also play around with. This will help us to get rid of a lot of
people that will like to get in the way. Probably the bigger the bond
the better.

At the end of the day, you got a lot more knowledge to add to this.

Regards,

Francisco

-----Original Message-----
From: Andy Summers [mailto:Andy.Summers@trafigura.com]
Sent: Tuesday, August 23, 2005 3:51 AM
To: Francisco Morillo
Cc: Jose Larocca; Maximiliano Poveda (London); Leonardo Baquero; Wendy
Moss
Subject: RE: Crude to Europe

excellent

I need to elave for the sirport this afternoon at about 2:15 London time
(what time UK is 9:30 Caracas?)

Just a quick point - if we get to draft the tender we shud make sure
NONE of the options we suggest are mentioned. We want people to think
it's straightforward and bid with straightforward pricing.

If we publish the options then we give away the advantage

a

-----Original Message-----
From: Francisco Morillo [mailto:francisco.morillo@wtrpc.com]
Sent: 23 August 2005 01:08
To: Andy Summers
Cc: Jose Larocca; Maximiliano Poveda (London); 'Leonardo Baquero'
Subject: Crude to Europe

Good Day guys,

Please note that the meting came out today just like we wanted. So the
volume is going to go to tender probably on the 6th of September.

Need your help in something that I'm sure you will like.

We have the opportunity to write the terms of the tender for the crude
oil at our convenience as long as everything is justifiable with in
reason. Maxi/Andy and Jose (if you are available) lets have a conference
call tomorrow at 9:30 am Caracas time about it. I will have for you the
actual presentation with all the explanation of all operational issues
and supply need for veba. As well as a detailed explanation in how the
refinery is been supplied at the moment. That presentation will include
numbers at which Bp has been buying, customers volumes among other
things.

Regards,

Francisco.

***************************************************************

This email and any attachments are confidential and access
to this email or attachment by anyone other than the addressee
is unauthorised. If you are not the intended recipient please
notify the sender and delete the email including any attachments.

You must not disclose or distribute any of the contents to any
other person. Personal views or opinions are solely those of the
author and not of Trafigura. Trafigura does not guarantee that
the integrity of this communication has been maintained nor
that the communication is free of viruses, interceptions or
interference. By communicating with anyone at Trafigura by
email, you consent to the monitoring or interception of such
email by Trafigura in accordance with its internal policies.
Unless otherwise stated, any pricing information given in this
message is indicative only, is subject to change and does not
constitute an offer to deal at any price quoted.

**From:**   Calnex <sclups@gmail.com>
**To:**      fm@wtrpc.com
**Received:**            Wed Jul 13 06:08:41 2005
**Subject:**   Re: chamo al aire? te mande el recado, please elimina toda la info.........

Chamo confirma que recibiste la info y eliminaste datos de origen
please. Tambien te mande la info de la ferreteria para poder cancelar
el fee anual.

The EYE me comento que mandaron a enfriar al pana nerd por unos dias
para esperar que pase el ventarron.

On 7/12/05, Francisco Morillo <francisco.morillo@wtrpc.com> wrote:
> Manana en la manana eliminada!!! Que tal el feling de paternidad??? Por que le tengo mucha caga a esa vaina
> -----Original Message-----
> From: Calnex <sclups@gmail.com>
> Date: Tue, 12 Jul 2005 20:25:18
> To:francisco.morillo@wtrpc.com, fm@wtrpc.com
> Subject: chamo al aire? te mande el recado, please elimina toda la info.........
>
>
>
> Sent wirelessly via BlackBerry from T-Mobile.
>

**CI Emails 00026044**

01.14.2005 – Rene Hecker:

Subject: account (dude delete these files after please)

Bank: DEUTSCHE BANK TRUST CO AMERICA

ADDRESS: 16 WALL STREET NEW YORK- USA

ACCOUNT NO. 04043534

ABA: 021001033

CREDIT IN FAVOR: GALICIA SAVINGS ACCOUNT

BENEFICIARY: ANTONIO VELEIRO FERNANDEZ

NO. DE CTA: 2091-0535-66-3910000169

**To:**      FHM[fhm@tmotion.net]
**From:**    Rene Hecker
**Sent:**    Fri 1/14/2005 1:38:16 AM
**Importance:**        Normal
**Subject:**  cuenta (chamo elimina estos archivos despues please)
**Received:**          Fri 1/14/2005 1:38:26 AM

BANCO: DEUTSCHE BANK TRUST CO AMERICA

DIRECCION: 16 WALL STREET NEW YORK-USA

ACCOUNT NO. 04043534

ABA: 021001033

ABONO A FAVOR: CAJA DE AHORROS DE GALICIA

BENEFICIARIO: ANTONIO VELEIRO FERNANDEZ

NO DE CTA:    2091-0535-66-3910000169

**CI_Emails_00004151**

Francisco Morillo to Rene Hecker:

Subject: insurance certificates

Dude delete the file and/or transfer it so that there is no evidence.

Let me know if you got it.

**To:** fhm[fhm]
**From:** Rene Hecker
**Importance:** Normal
**Subject:** certificados de seguro
foreman.xls

chamo borra el archivo y/o transfierelo para que no quede rastro.
avisame si te llego

CI_Emails_00004151 (English text).txt

*From:   Rene *Hecker
*Sent:   *Tue *Dec 07 22:01:41 2004
*To:     *fhm[*fhm]
*Subject: certificates of safe

*chamo Erases the archive and/or *transfierelo so that it do not remain trace.
*avisame If I arrive you


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
END OF ENGLISH TRANSLATION
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


From:   Rene Hecker
Sent:   Tue Dec 07 22:01:41 2004
To:     fhm[fhm]
Subject: certificados de seguro

chamo borra el archivo y/o transfierelo para que no quede rastro.
avisame si te llego