# Exhibit B

### DECLARATION OF JOHN THACKRAY

JOHN THACKRAY, being duly sworn, deposes and says:

1.      The following information, unless otherwise indicated, is based on my personal knowledge and review of documents. If called upon to do so, I could and would testify competently to the matters set forth herein.

2.      **Current Positions.** I am the Vice President and head of global training and operations of GetData Forensics USA ("GetData USA"), based in Manhattan Beach, California. GetData USA uses a forensic software product called Forensic Explorer ("FEX") that is manufactured by GetData Forensics, based in Australia. FEX collects, preserves, and presents digital media for use in civil and criminal investigations and legal proceedings, and it conforms to global standards and best practices for these purposes. I personally authored the protocols and standards for use of the FEX software and developed the training materials for it. FEX software is used by over five thousand commercial organizations and military and law enforcement agencies worldwide. I am also the principal digital forensic consultant for The Brennan Group, which was retained by counsel to conduct investigative activities in this matter. In addition, I serve as a volunteer with the Police Department in Torrance, California, and am a member of a joint task force, overseen by the United States Secret Service, in the Los Angeles area, all of which entails work on active criminal cases that involve the use and abuse of digital technology.

3.      **Training and Experience.** In 1972, I enlisted in the British Army and served for nearly 18 years, attaining the rank of Sergeant. During my Army service, I studied and obtained an educational promotion certificate and an advanced educational promotion certificate. I served tours of active duty in Northern Ireland, Cyprus (United Nations), Rhodesia (Zimbabwe), Belize and other classified locations around the world. Beginning in 1978, I was assigned for duty in

various positions that involved the operation and administration of computers and electronic data processing equipment. Following my discharge from the Army, I became professionally involved with information technology as a digital forensic investigator. I joined the South Yorkshire Police in 1989 as a scientific support officer responsible for the investigation of high technology crime, and attained the rank of detective. In 1994, I was assigned as the principal case detective responsible for investigating national and international computer crime with the Regional Crime Squad, based in Wakefield, West Yorkshire. I became familiar with global standards and best practices for electronic forensics, and I assisted in development and implementation of those standards and practices. Beginning in the late 1990s, I developed one of the first training programs for mobile phone forensics using a computer-based process. In 1997, I was employed by the National Police Service of New Zealand to establish and head its first Electronic Crime Unit based in Auckland. I left the Police Service in 2001 to join Ernst & Young, for which I established and headed the Computer Forensic Services team for the Oceanic Region (Australia, New Zealand, Oceanic nations). I left E&Y in 2002 and formed my own company, Thackray Forensics Ltd, based in New Zealand. In 2002-03, I was contracted to IBM's Incident Response Global Services, in Sydney, Australia to implement a computer forensic capability to complement IBM's Information and Communication Technology incident response team. In recent years, in addition to establishing GetData USA in 2015, I have served in an advisory capacity to various governments in Europe, Asia, the Middle East, and Latin America, including their law enforcement and military operations, regarding digital forensics and electronic investigations, in addition to working as a private digital forensics expert.

4.    **Professional Certifications.** I have received the internationally recognized Forensic Science Diploma in Crime Scene Examination. I was one of the first certified lead

2

instructors for several electronic forensic processes that are used to extract, preserve and present digital evidence. All are used by the police, military and major corporations worldwide and include the following digital forensic products: Guidance Software-EnCase; Access Data Forensic Tool Kit; FEX; XRY; CelleBrite; and Fernico-ZRT. To become an instructor, I had to become certified and have an in-depth knowledge with practical experience using each of these tools. I also wrote operational procedures and protocols for the investigation of digital crime for dozens of police departments and corporations worldwide.

5.     **Awards and Recognition.** In 1996, I was the first South Yorkshire police officer to be awarded a Winston Churchill Fellowship, which I used to research and work alongside computer crime, law enforcement agencies, and computer technology research and development specialists worldwide. Upon the successful completion of my research, I was honored as a Churchill Fellow by the patron Her Majesty Queen Elizabeth II. In 2010, I received commendations from the Criminal Division of the U.S. Department of Justice for outstanding performance in instruction of computer and electronic forensics. In 2017, I was recognized by the California State Assembly, Los Angeles County, the City of Torrance and several elected representatives for my computer forensic work in connection with investigations of sex crimes involving children.

6.     **Testimonial Experience.** During my career, I have examined, investigated, and analyzed thousands of cell phones, computers, and servers in connection with civil and criminal matters and internal corporate investigations. I have prepared hundreds of affidavits and expert reports in various criminal, civil and investigative matters worldwide related to digital forensics. This information has been used, among other things, to obtain search warrants and seizure

3

orders.  I regularly provide expert opinions for matters involving computer forensics for the Torrance and Gardena Police Departments.

7.     **PDVSA Investigation.**  In 2017, I was asked to assist The Brennan Group in conducting an investigation into possible fraudulent access to and use of the computer systems operated by Petróleos de Venezuela, S.A. ("PDVSA") in its business.  As part of this investigation, in September and October 2017, I traveled to Caracas, Venezuela, the location of PDVSA's headquarters.  Prior to my first trip, I was informed that investigators believe that Francisco Morillo and Leonardo Baquero had formed two energy advisory firms, Helsinge Holdings LLC ("Helsinge", formerly known as Helsinge, Inc.), and Waltrop Consultants, C.A. ("WTRPC"), along with several additional Panamanian companies, to facilitate elaborate alleged price-fixing, kickback and money laundering schemes by accessing and using PDVSA's confidential inside information.  I was informed that Helsinge, through Morillo and Baquero, has gained access to highly confidential internal information at PDVSA by bribing PDVSA employees.  As relevant here, most such information is created and used in the day-to-day operations of PDVSA's Commerce and Supply ("CyS") department.  The CyS Department is responsible on a worldwide basis for purchase by PDVSA of petroleum products that are needed for its operations, and for sale of petroleum products that PDVSA produces.  I was informed that certain PDVSA employees are believed to have facilitated the installation of a "clone live server" (either onsite or remotely) or otherwise provided remote real-time access to and replication of the PDVSA server that contains the bulk of the highly confidential PDVSA data.  That server is referred to as the "Core 9" server, and its contents include highly sensitive data, including information concerning PDVSA's tenders and bids to purchase and sell petroleum products.

4

Individuals having real-time access to the confidential information are able to manipulate and use that data in furtherance of their alleged schemes.

8.      During the investigation, I performed an analysis of the computer network at PDVSA's headquarters and obtained and preserved certain data stored in the network in accordance with best practices for forensic use of electronic evidence.  Based on my investigation and on information provided by The Brennan Group, together with my digital forensic analysis and findings described below, it is my opinion that Morillo and/or person(s) working with him, has the ability to remotely access and use confidential PDVSA information on the Core 9 server from outside of PDVSA in real time.

9.      In a normal forensic investigation on behalf of a corporation, the investigators are given unrestricted access to all IT personnel, hardware, software and data.  However, when I traveled to Caracas in September 2017 with John Brennan to conduct such an investigation, I was not able to gain such access.  The reasons included the unstable political and economic environment in Venezuela and the fact that access and information is controlled by certain PDVSA employees who are believed to be collaborating in the conspiracy.  These concerns prevented us on this visit from entering the PDVSA premises.

10.     In October 2017, I made a second visit to Caracas with Mr. Brennan.  At that time, with the approval of senior PDVSA officials, I went incognito to physically investigate the PDVSA premises.  I was informed that PDVSA's policy is to retain emails on its network for only three months.  I have never seen an e-mail retention policy limited to three months in any company globally, and it is particularly suspicious at a company that trades in high value commodities such as PDVSA.  Also highly unusual and suspicious is that, as I was told, there are

5

no disaster recovery plans and backup functions within the PDVSA network. Further, the architecture of the PDVSA network is such that there is limited ability to track information in it.

11.     I also learned that the PDVSA network has fundamental security vulnerabilities and irregularities. I learned that the PDVSA Security department is the access and security gatekeeper of the PDVSA network, and they can provide an employee or third party with credentials to obtain unrestricted remote access to the network, including assistance in installing and configuring a VPN for that purpose. In my experience, it is highly unusual for an IT security department to provide access to a third party not employed by the company, and especially not unrestricted access. I personally observed a demonstration of how an individual could log-in from a remote location to the Core 9 server which contains highly confidential CyS tender and bidding data. From that demonstration, I was able to confirm the availability of unrestricted access to the platform used for bidding on the purchase and sale of petroleum products, and to observe real-time activity associated with those bids. I have been informed by The Brennan Group that there is a witness who was present when Morillo accessed the Core 9 server from a remote location and was able to amend and/or manipulate data, apparently in the same manner as I observed directly.

12.     During the October visit, I also was able to physically inspect the room in PDVSA's main headquarters in which the server systems are located. I was informed that the computer network in PDVSA's headquarters is constructed of ten servers (which are referred to as "Cores"), and that Cores 9 and 10 are dedicated to storing the highly-confidential CyS data. For all cores other than Cores 9 and 10, each core is a replica server (referred to as a "clone") of the adjacent core. For example, Core 1 replicates Core 2, and vice versa. This architecture is typical of the design of corporate IT systems, as it provides redundancy and backup in the event

6

one of the servers does not operate properly. However, Cores 9 and 10 do not similarly replicate and back up each other. I was told that this is because of the low number of users who access Cores 9 and 10 (102 users at the time). The stated rationale does not make logical sense because Cores 7 and 8 had only 72 users, and in any event, such a structure is highly unusual in a corporate environment and raises suspicions that the Core 9 server could be replicating to "rogue computer server," either onsite or remotely. Further, when I examined the Core 10 server, I determined that it was switched on, even though it was not then being used to back up Core 9 or for any other purpose. I then tried to access the Core 9 server to see if it was replicating to some other server and to copy the contents of its hard drive, but I was blocked from having any access to the Core 9 server. I was informed that this was done by Roland Rojas of PDVSA's internal security unit. No such issue arose when I performed the same type of functions on the other Core servers, to which I had full access. Further, security personnel refused to back up the Core 9 server, even though senior PDVSA officers had ordered the back-up. Upon further investigation in the server room, I located an additional server, titled Metcam85, which functions as a gateway server that provides complete unrestricted access to the Core 9 server. Again, this is a highly unusual and suspicious arrangement.

13.    As part of my investigation, The Brennan Group asked me to search the PDVSA network to see if it contained two specific domain names – WTRPC.com and CANTV.net. With respect to WTRPC.com, the search uncovered metadata fragments ("hits") on the Core 9 and Metcam85 servers, but not on Core 10, which is further evidence that Core 9 was not replicating to Core 10. These hits indicate that there has been interaction with the servers from two individuals using the WTRPC.com domain in 2017. As previously mentioned, WTRPC is one of the entities believed to be used by Morillo and Baquero to defraud PDVSA. I identified the two

individuals whose WTRPC domain metadata fragments were contained on the Core 9 and Metcam85 servers as Jack Ryan and Yanira Marcano, both of whom I am informed are current Helsinge employees. I performed further analysis using the metadata fragments to identify that the WTRPC IP address and domain name was registered to a John Ryan in Florida. I was informed that WTRPC is not a company that is registered to do business with the CyS Department (i.e., a bidder, supplier or customer of PDVSA), and therefore there is no reason that the Core 9 and Metcam85 servers should contain the WTRPC.com domain. Based on my interviews, observations and the information provided to me to date, I believe there is no logical reason for the domain name WTRPC.com to be found on any of the PDVSA servers.

14.     With respect to the CANTV.net domain name, my search showed that it appeared on the Core 9, Core 10 and Metcam85 servers. This is suspicious because I was informed the PDVSA network and the servers are generally set to restrict any emails with the CANTV.net domain name. CANTV.net is an e-mail hosting service like gmail.com or aol.com, and it is typical for corporate networks to block emails from such public domains because they can be used to breach security systems. I found that the CANTV.net domain appeared on the Core 9 and Core 10 servers as part of a "rule" that had been programmed into them. This is the only rule that I located in any of the PDVSA Core servers, which is suspicious in itself. In addition, the rule is highly suspicious because it causes any e-mail that both contains the domain names cantv.com and cantv.net and is addressed to ariascu@pdva.com and carmonado@pdva.com to go directly to the two PDVSA employees (Ariascu and Carmonado) in a manner that prevents PDVSA from knowing that the communication ever occurred. Based on information on the PDVSA network, these two individuals are associated, respectively, with the freight and operations functions of the CyS Department. Moreover, the domain name "pdva.com" in these

8

email addresses is not a legitimate PDVSA e-mail domain. Rather, it is often an indicator of fraudulent or criminal purposes for parties to use a domain name that upon a quick glance appears to be a well-known name (such as PDVSA), but in reality, is different (PDVA) and directs the e-mail to an unintended end-point. This technique is typically used globally in connection with identity theft and criminal financial activity. I also have reviewed e-mail correspondence provided by The Brennan Group which shows that Morillo uses CANTV.com e-mail addresses.

15. In September 2017, The Brennan Group provided me with hardcopy versions of two emails and their corresponding English translations and asked me to explain their significance. The emails appear to indicate that Morillo commissioned Luis Liendo to build a network using the wtrpc.com domain. The e-mail dated 27 April 2005 at 4:44pm (attached as Exhibit 1) was sent by Liendo to Alejandro Vizcarrondo, who forwarded it to Morillo later that evening. Based on translations this e-mail appears to be an outline of a proposal to perform services for a domain registration and either updating or creating a computer network. The e-mail dated 25 May 2005 (attached as Exhibit 2), also from Liendo to Vizcarrondo, appears based on translations to be an invoice from Liendo for completing the work that is outlined in the Exhibit 1 proposal, including specifically the registration and configuration of the WTRPC.com domain. Exhibit 2 also requests that Vizcarrondo arrange a meeting that day with "Leo o Francisco" (apparently referring to Leonardo Baquero or Francisco Morillo) to discuss use of a new totally automated tracking methodology. This supports the existence of a rogue clone server

that would allow real-time monitoring of data in PDVSA's CyS commodity trading operations. These e-mails further show Morillo's connection to the domain name WTRPC.com, which, as noted, appears on the Core 9 and Metcam85 servers for no apparent logical reason.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 12 February 2018

John Thackray

10

# <u>Exhibit 1</u>

**To:**    'Francisco Morillo'[franciscomorillo@cantv.net]
**From:**   Alejandro Vizcarrondo M.
**Sent:**   Wed 4/27/2005 10:50:35 PM
**Importance:**    Normal
**Subject:**  FW: DIRRECION PARA ENVIAR PROJECT
**Received:**     Wed 4/27/2005 10:50:37 PM


QUE TAL???????????


-----Original Message-----
**From:** Luis Liendo [mailto:liendoluis@hotmail.com]
**Sent:** Wednesday, April 27, 2005 4:44 PM
**To:** alejandro_vizcarrondo@hotmail.com
**Cc:** liendoluis@hotmail.com
**Subject:** RE: DIRRECION PARA ENVIAR PROJECT


Que tal alejandro como estas..?

Propongo el siguiente plan para las proximas actividades:
Servicios a Ser Implantados:
·    Registro del Dominio (Contacto, registros NS, etc) (tiempo previsto 2 horas)
·    Instalación del SO en Ambos servidores (aproximadamente 4 horas para ambos servidores)
·    Implantación de servicio de DNS (MX y demas registros) (8 horas para configurar el servicio de BIND, sobre linux software libre)
·    Implantación del Servicio SMTP, POP3 e IMAP. (aproximadamente 20 horas para el servicio básico y luego unas 20 horas mas para implantar mejoras, que se pueden hacer posteriormente)
·    Configuración Estratificada a nivel de Red para asegurar la seguridad en el sistema (2 horas)
·    Implantación de Servicios de Seguridad Perimetral y puntos de fuerza (Shorewall, Firewall de SUSE Linux(iptables) y Servidor de Proxy (squid) Tiempo Aproximado 20 horas , luego posiblemente se deba tomar mas tiempo en mejoras y adecuación)
·    Posterior implantación de servicios Internos de administración de direcciones privadas y  File & Print (DHCP, SAMBA) (tiempo previsto 25 horas, luego posiblemente se deban tomar mas tiempo en mejoras y adecuación)
·    Implantación de Esquema de Backup y Respaldo además de posible balanceo dinámico y FailOver (contingencia en caso de falla) (tiempo Estimado 15 horas)
·    Actualización de Documentación en Paralelo aproximadamente 2 horas al culminar la implantación de cada servicio.
·    Implantación de servicios WEB (se haría con el apoyo de terceros especialistas en el diseño web y la estructuración de sitios y servicios WEB)

    Para el dia de mañana estare en Caracas y me estare desocupando como a las 4:00pm, por lo que apartir de esa hora podemos atacar los primeros dos puntos (registro del dominio e instalación del SO en ambos servidores), la configuración del servicio de DNS seria para el dia Sabado y domingo, cuando desarrollariamos tambien la instalación de los servicios de SMTP y POP3 ó IMAP. Por favor avisame que te parece, compartelo con Francisco.
Saludos.
Luis Liendo.

# **Exhibit 2**

## Alejandro Vizcarrondo M.

**From:** Luis Liendo [liendoluiv@hotmail.com]
**Sent:** Wednesday, May 25, 2005 5:45 PM
**To:** alejandro_vizcarrondo@hotmail.com
**Subject:** Relación de Horas Trabajadas y Proximas Actividades

Buenas Tardes Alejandro.

Te anexo la relación de Horas Trabajadas y Proximas Labores a Realizar (tarifa de 120.000Bs / hora)

**Relación de Horas Trabajadas**
**Actividades Realizadas**

| Actividad | Horas |
|---|---|
| Registro y Configuración de Dominio (wtrpc.com y UniqueJet.com) | 4 |
| Configuracion del servidor (Server01) | 5 |
| Configuración del Mail Server (mail.wtrpc.com) | 9 |
| Instalación e inducción del cliente de correo | 2 |
| Configuración de consola administrativa web de auto-gestion | 4 |
| Instrucción sobre la facilidad de Auto-Gestion (cambio de passwrd de cada cuenta y otros datos) | 1 |
| Revision General de Servidor Alterno (actualización de BIOS, Reconstrucción de Arreglo de Discos e Instalación del Sistema Operativo) | 6 |
| **Total** | **31 3.720.000** |

**Proximas Actividades**

| Actividad | Horas |
|---|---|
| Configuración del Dominio Internet y Servicio de correo para el dominio UniqueJet.com | 6 |
| Configuración de servidor Alterno (Salida SMTP Foranea, para enviar correos desde fuera de las oficinas) | 3 |
| Configuración de Servidor de Archivos File & Print con Samba (Servidor de archivos internos y externos) | 5 |
| Configuración de Servidor Proxy para incrementar la velocidad de conexión a internet | 4 |
| **Total** | **18 2.160.000** |

Necesito que nos reunamos con los muchachos para probar una nueva forma de hacer los seguimientos que nos mejorara notablemente la gestion y seria sin intervension humana, totalmente automatica. Por favor cuadra con Leo ó con Francisco para que la discutamos hoy en la tarde. Estare por las oficinas como a las 6:30pm.
Saludos.

Luis Liendo.

MSN Amor Busca tu ½ naranja

5/31/2005