## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 18-20818-CIV-GAYLES

PDVSA US LITIGATION TRUST,

        Plaintiff,

v.

LUKOIL PAN AMERICAS LLC, *et al.*,

        Defendants.

_____/

### DEFENDANTS' JOINT RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION[1]

Defendants, Helsinge Inc., Helsinge Ltd., Helsinge Holdings, LLC, Daniel Lutz, Luis Liendo, Francisco Morillo, Leonardo Baquero, and John Ryan (collectively, "Defendants"),[2] through this limited appearance, submit this joint opposition to Plaintiff PDVSA US Litigation Trust's ("Plaintiff['s]") *Ex Parte* Motion for a . . . Preliminary Injunction [Dkt. 5] ("Motion"), filed March 3, 2018.

### Introduction

As a threshold matter, Plaintiff lacks standing to assert the pleaded claims both as a matter of Venezuelan and New York law. As explained in detail below, Venezuelan law provides that a state-owned company such as Petróleos de Venezuela, S.A. ("PDVSA") must obtain approval

---

[1]  In filing this Response, Defendants do not waive any objections, defenses or rights available to them, including as to the sufficiency of service of process or lack of personal jurisdiction and to arbitrate any of the claims asserted by the Plaintiff.

[2]  Due to this Court's order requiring the filing of joint motions and responses, all the named Defendants are joining in this Response, notwithstanding that Messrs. Morillo, Baquero, and Ryan are represented by different counsel.

from the Venezuelan legislature before entering into any international contract, such as the trust agreement identified in the complaint whereby PDVSA allegedly assigned all of its rights to any claims relating to the alleged conduct. The trust also violates New York law on various grounds, including with respect to its formation and the trust's violation of the Rule Against Perpetuities.

Because Plaintiff is an invalid trust with no standing, the Court lacks jurisdiction and, before permitting or considering further action or argument in this case, should first determine whether the Plaintiff can meet its burden to establish standing at the Preliminary Injunction phase. *See Lee v. Resor*, 348 F. Supp. 389, 391–92 (M.D. Fla. 1972) ("The threshold question which must be resolved by the Court is whether plaintiffs have . . . standing to bring the action for a preliminary injunction.").[3]  If the Court determines that Plaintiff cannot, then the Court should not permit argument or the submission of evidence on any other issues raised by the Motion and proceed to fully determine the issue of standing at the Motion to Dismiss stage.  *See Warth v. Seldin*, 422 U.S. 490, 498 (1975) ("[Standing] is the threshold question in every federal case, determining the power of the court to entertain the suit."); *Fla. Ass'n of Med. Equip. Dealers, Med-Health Care v. Apfel*, 194 F.3d 1227, 1231 (11th Cir. 1999) (affirming denial of plaintiff's motion for a preliminary injunction and dismissal of case because the plaintiff lacked standing).

Putting aside its lack of standing, Plaintiff fails to meet its burden of establishing the elements necessary for the imposition of the extraordinary and drastic remedy of a preliminary injunction. In the first place, Plaintiff's request to freeze defendants' assets and seize and copy all of the defendants' documents is improper under applicable law and that relief does not even match the claims asserted (*e.g.*, it does not even seek to enjoin the alleged ongoing theft of trade secrets).

---

[3] *See also Bill Salter Advert., Inc. v. City of Brewton, Ala.*, 486 F. Supp. 2d 1314, 1334–36 (S.D. Ala. 2007) ( denying preliminary injunctive relief upon finding that plaintiff lacked standing).

As this Court already noted in its TRO, there is no legal support for Plaintiff's request for such broad relief.  The Motion is a thinly-veiled attempt to circumvent the normal discovery process and procedures for obtaining pre-judgment writs of garnishment.  Besides the lack of legal support for the relief Plaintiff seeks, there is no factual basis for the imposition of a preliminary injunction freezing assets and seizing all electronic and hard-copy documents.  Absent from this extensive, nineteen-count complaint is any indication or support concerning the alleged role of the individual Defendants Daniel Lutz and John Ryan. Each name is mentioned one time beyond the identification of the parties. Yet now, Plaintiff seeks to invade the homes of Ryan and Lutz without any explanation as to why they should be subject to an extraordinary measure of relief that this Court correctly observed is generally unavailable to even criminal prosecutors.

Plaintiff's allegations consist primarily of conclusory statements and assumptions spread over three documents: the Amended Complaint, the declaration of Plaintiff's investigator (John Brennan), and the declaration of Plaintiff's computer forensics service provider (John Thackray). But these three documents primarily point to each other for support in order to create the illusion of a supporting factual record, despite what is a lack of evidence and specific factual allegations. For example, the complaint often cites to the declaration of Mr. Brennan, who in turn often cites to the declaration of Mr. Thackray, who in turn makes various unfounded and unsupported assumptions. Alan Brill, Managing Director in Kroll's Cyber Security and Investigations practice, was retained by certain Defendants to review and analyze fundamental allegations that serve as a basis for much of Plaintiff's allegations. In particular, Mr. Brill, who is a renowned expert in his own right, analyzed the Thackray declaration, which attempts to assert allegations against Defendants through a Declaration attached to, and incorporated into, the Amended Complaint.  As set forth in Mr. Brill's Declaration, attached hereto as **Exhibit C**, he opines that Mr. Thackray did

not conduct an independent forensic analysis of PDVSA's data or systems and that Mr. Thackray does not establish, opine on, or conclude that any of the defendants accessed, had access to, or exceeded authorized access to any PDVSA server or computer. As such, Mr. Brill, through his detailed Declaration, supports Defendants request to deny Plaintiff's Motion at least as to the CFAA, SCA, and trade secret claims. And, with the failing of those three claims, Plaintiffs Motion shall fail in its entirety as any theory of Plaintiff's claims is reliant on these.

Furthermore, Mr. Brennan, Plaintiff's investigator, makes several conclusory statements and/or assumptions citing merely to unspecified "informants" or vague references in only a handful of documents despite claiming that the computer he obtained the documents from "contains literally thousands of instant messages, e-mail communications, bank records, and other documents evidencing details of the conspiracy." Dkt. 12-1 ¶ 12. In the end, however, neither of the declarations of Mr. Thackray or Mr. Brennan or the Amended Complaint refer to anything of substance and, in fact, are silent as to a majority of the entity defendants and say almost nothing as to many of the individuals that Plaintiff seeks to enjoin. For all of these reasons stated above, and explained in greater detail below, Plaintiff's Motion should be denied.

## Background

Plaintiff filed an *ex parte* Motion, seeking a TRO and a preliminary injunction against the Defendants to seize and copy all electronic and hard-copy documents of the "Morillo Group Defendants"[4] and freeze all of their assets both in the U.S. and abroad and enjoin all Defendants from removing, destroying, altering, or concealing any documents related in any way to PDVSA.

---

[4] Plaintiff defines the "Morillo Group Defendants" as Defendants Morillo, Baquero, Lutz, Liendo, Ryan, Helsinge Holdings, LLC, Helsinge, Inc., Helsinge Ltd. Saint-Hélier, Waltrop Consultants, C.A., Godelheim, Inc., Hornberg Inc., Societe Doberan, S.A., Societe Hedisson, S.A., Societe Hellin, S.A., Glencore de Venezuela, C.A., and Jehu Holding Inc. Dkt. 5 at 3-4.

Dkt. 5 at 3, 5.   After an *ex parte* hearing on the Motion, this Court entered an order denying

Plaintiff's request to seize and copy all electronic and hard-copy documents of the Morillo Group

Defendants and refusing to freeze assets but entering a TRO preventing all defendants from

removing, alienating or transferring their electronic and hard copy documents.  Dkt. 9.

### Argument

**I.      Plaintiff does not have standing to file suit or request a preliminary injunction.**

This Court does not have subject-matter jurisdiction over this case, including Plaintiff's

motion for a preliminary injunction, because Plaintiff does not have standing.   "[S]tanding is a

jurisdictional threshold question," *DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1301 (11th

Cir. 2008), and, thus, "a dismissal for lack of standing is essentially the same as a dismissal for

want of subject matter jurisdiction . . . ." *In re: Takata Airbag Prods. Liab. Litig.*, No. 15-md-2599,

2016 WL 1266609, at *2 (S.D. Fla. March 11, 2016). The party invoking federal jurisdiction has

the burden of proving standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Spokeo,*

*Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Plaintiff has not established that it has standing to pursue its claims.   Plaintiff alleges that

it is a New York-based trust that was created for the purpose of investigating and pursuing potential

claims by PDVSA against third parties and that PDVSA assigned to the trust any claims that

PDVSA might have.  Dkt. 12 at ¶¶ 8-9.  But, Plaintiff does not allege any details of PDVSA's

purported transfer of rights to the New York trust, who at PDVSA purportedly authorized such a

transfer, or whether the transfer was valid under Venezuelan law.  Plaintiff does not even explain

why PDVSA cannot pursue its claims against Defendants directly. In short, Plaintiff has failed to

show that it is a valid trust with standing, because, in fact, it is not. Indeed, Plaintiff does not even

attach a copy of the relevant trust agreement to its Motion or its Amended Complaint. Defendants

have, however, obtained a copy of what is understood to be the relevant trust agreement, the PDVSA U.S. Litigation Trust Agreement (the "Trust Agreement"), attached hereto as **Exhibit A**.

### A.   The Trust Agreement is Null and Void Under Venezuelan Law.

Under Venezuelan law, the Trust Agreement is null and void for a number of reasons. First, PDVSA is a "public company" (*i.e.*, a state-owned company),[5] and Venezuelan law requires that the National Assembly (the legislative branch of the Venezuelan government) approve "public-interest contracts"—such as the Trust—entered by public companies.  *See* Declaration of Rafael Badell Madrid dated March 26, 2018, attached hereto as **Exhibit B**, at ¶¶ 22-24, 45, 151.[6] Specifically, Articles 150 and 187(9) of the Venezuelan Constitution require that "public-interest contracts" entered into by "public companies" must be approved by the National Assembly.  *Id*. at ¶¶ 22-23.  This has not occurred, and thus the Trust Agreement is null and void.  *Id*. at ¶ 130-31.

Second, the Trust Agreement appears to be null and void because the two individuals who executed the agreement on behalf of PDVSA—the Minister of the Ministry of People's Petroleum Power and the Attorney General of Venezuela—do not have the legal authority to enter into or execute contracts on behalf of PDVSA.  *Id*. at ¶¶ 64-66, 87.  Specifically, PDVSA's Bylaws

---

[5] Under Venezuelan law, a "public company" is a company incorporated as a private company, but in which the Republic of Venezuela owns more than 50% of the shares.  *Id*. at ¶ 26.  The Republic of Venezuela is PDVSA's sole shareholder, so PDVSA is a "public company." *Id*. at ¶¶ 36, 45.

[6] The Trust Agreement is a "public-interest contract" because, *inter alia*: i) through the Trust Agreement, PDVSA (a public company) attempts to irrevocably transfer, assign and deliver all the interests, assets, actions, and resources that derive from certain litigation claims to the Litigation Trustees; ii) PDVSA is wholly-owned by the Republic of Venezuela and controls Venezuela's key economic resource (petroleum); iii) the Trust Agreement affects both Venezuela's economic and social interests and concerns national interests and the activities of the Venezuelan government; iv) the Trust Agreement involves foreign parties (*e.g.*, two of the three Litigation Trustees are U.S. parties), is governed under foreign law (New York law), and provides for any related disputes to be heard outside Venezuela (in New York); and v) the Trust Agreement is of significant importance to the Republic, given that, as Plaintiff alleges, the damages suffered by Venezuela are in the "many billions of dollars" (Dkt. 12 ¶¶ 7, 106, 126, 133, 144, 148); Ex. B at ¶¶ 120-30, 150.

establish the power to authorize contracts to PDVSA's Board of Directors, and the power to execute contracts to the President of the Board of Directors. *Id*. at ¶¶ 57-59. Here, there is nothing to indicate that the Board of Directors of PDVSA approved the Trust Agreement, that the President of the Board of Directors signed the agreement, or that the Board of Directors delegated authority to the actual signatories to sign the Trust Agreement on behalf of PDVSA. *Id*. at ¶¶ 77-80, 87. Absent this, the Trust Agreement should be considered null and void under Article 19(4) of the Venezuelan Organic Law on Administrative Procedures. *Id*.[7]

**B.      The Trust Agreement is Null and Void Under New York Law.**

Beyond this, the Trust Agreement does not comply with the requirements of New York's Estates, Powers and Trusts Law ("EPTL"), which governs New York trusts, as Plaintiff purports to be. The trust does not comply with EPTL § 7-1.17, which requires that all signatures of the parties to the trust agreement be witnessed or acknowledged by a notary. EPTL § 7-1.17(a). This renders the Trust Agreement (and any purported transfers of claims or assigned actions to the trust) null and void. *See Matter of McQuade (Graffeo)*, 2017 N.Y. Misc. LEXIS 3154 at *6 (citing *Gaines v. City of New York et al.*, 137 A.D.3d 673, 674 [1st Dept 2016] and *Fasano v. DiGiaacomo,* 49 A.D. 3d 683, 685 [2d Dept 2008]).

The Trust Agreement also violates the Rule against Perpetuities, codified in EPTL § 9-1.1, which requires that a trust vest within a period no longer than the lives in being at the creation of the estate, plus 21 years. The Trust Agreement does not contain language that requires the trust to

---

[7] Beyond this, Articles 11, 12 and 13 of the Venezuelan Law of the Attorney General's Office Act require that the Attorney General issue opinions regarding contracts involving government entities such as PDVSA, where, as here, the contract is a "public-interest contract," directly or indirectly affects the patrimonial interest of the Republic, or contains an arbitration provision or requires litigation outside Venezuela. *Id*. at ¶¶ 30-34. Here, there is no evidence any such opinions were rendering prior to execution of the Trust Agreement, rendering the agreement null and void if no such opinions were timely rendered. *Id* at ¶ 87-88.

terminate within the perpetuities period. EPTL § 9-1.1(b).  Under New York law, the inclusion of the terms "successors," "heirs" and/or "assigns" as beneficiaries of a contract indicates an intent that such contract will last indefinitely, violating the rule against perpetuities.  *Dimon v. Starr*, 299 A.D.2d 313, 313 (N.Y. App. Div. 2002).  Such a violation renders the trust "void and of no force and effect." *Estate of Aslanoff,* 2014 NYLJ LEXIS 2952 (NY Surr. Ct, Bronx Cty., Dec. 9, 2015). PDVSA is identified in the Trust Agreement by reference to its "affiliates, subsidiaries, successors and assigns," (Ex. A at 1), and the inclusion of these terms without language prohibiting the vesting of such parties' rights beyond the perpetuities period voids the Trust Agreement.

The Trust Agreement is also void under New York law because the trust corpus is not sufficiently identified to enable title of the property to pass to the trustee. Under New York law, "[a] valid express trust requires (1) a designated beneficiary, (2) a designated trustee, (3) a fund or other property sufficiently designated or identified to enable title of the property to pass to the trustee, and (4) actual delivery of the fund or property, with the intention of vesting legal title in the trustee." *Matter of Doman*, 890 N.Y.S.2d 632, 634 (2d Dep't 2009) (citing *Brown v. Spohr*, 180 N.Y. 201, 209 (N.Y. 1904)).  Per the Trust Agreement, PDVSA funds the Trust with "all of its respective rights, title, and interests in and to the Contributed Claims and the Assigned Actions." *See* Ex. A at § 2.2. "Contributed Claims" is defined as various claims against multiple individuals and entities (defined as "Conspirators"), arising out of certain actions of such Conspirators, without defining the term "Conspirators." *Id*. at 1.  "Assigned Actions" is defined as the civil actions that PDVSA is authorizing in order to obtain compensation for PDVSA and the people of Venezuela. *Id*. at 1.  Put simply, the property used to fund the trust is too broad and speculative to be accurately identified.  In other lawsuits brought by litigation trusts, the settlor of the trust first files the lawsuit and then assigns its rights thereunder to the trust. *See, e.g.*, *Catskill Dev., L.L.C. v. Park Place*

*Entm't Corp.*, 547 F.3d 115, 122 (2d Cir. 2008).  By contrast, because PDVSA did not originally

file suit, the Conspirators (and therefore all the potential assets of the Trust) are not clearly defined,

and the Trust Agreement fails for lack of a properly identified corpus. [8]

Because the Trust lacks standing, the Court lacks jurisdiction and the Motion should be

denied *ab initio* and the Court should decline to consider any other issues raised therein.

## II.    Plaintiff fails to meet its burden for the imposition of a preliminary injunction.

The grant of a preliminary injunction is the "exception rather than the rule."  *Siegel v.*

*LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).  To obtain a preliminary injunction, Plaintiff has

the burden of establishing the following:

> (1) a substantial likelihood of success on the merits of the underlying case; (2) the
> movant will suffer irreparable harm in the absence of an injunction; (3) the harm
> suffered by the movant in the absence of an injunction would exceed the harm suffered
> by the opposing party if the injunction issued, and (4) an injunction would not disserve
> the public interest.

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246-47 (11th Cir.

2002).  "A preliminary injunction is an extraordinary and drastic remedy that should not be granted

unless the movant clearly carries its burden of persuasion on each of these prerequisites."

---

[8] The Trust Agreement also appears to suffer from another fatal defect; specifically, the same entity
(PDVSA) appears to be the sole trustee and sole beneficiary of the trust.  Indeed, while the Trust
Agreement mandates the appointment of three Litigation Trustees (one appointed by PDVSA and
the other two by the U.S. law firms), the agreement also provides that the Litigation Trustees are
to hold the trust assets "in trust for PDVSA subject to the terms of this Litigation Trust Agreement
and the engagement letters entered into between *PDVSA* and the law firms . . . engaged to
investigate and prosecute the Assigned Actions."  *Id*. at § 2.1(b) (emphasis added).  According to
the Trust Agreement, Plaintiff's counsel in this case have a client-relationship with PDVSA, which
would make them agents of PDVSA.  If this is the case, PDVSA or its agents have appointed all
three Litigation Trustees, and because PDVSA is also the beneficiary under the trust, the trustees
and beneficiaries are one and the same, rendering the Trust Agreement null and void.  *See, e.g.,*
*U.S. v. Sun Myung Moon*, 718 F.2d 120, 1226 (2d Cir. 1983) ("the same person may not at one
and the same time be the sole trustee and sole beneficiary of a trust").

*GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1322 (11th Cir. 2015) (quotations omitted).  In this case, Plaintiff has not and cannot meet its burden of persuasion as to any of the prerequisites for a preliminary injunction.

### A.  Plaintiff is not Likely to Succeed on the Merits of its Claims.

Plaintiff claims that it is entitled to a preliminary injunction pursuant to the following counts alleged in the Amended Complaint: the Federal Computer Fraud and Abuse Act ("CFAA") and Stored Communication Act ("SCA"), its federal and Florida RICO claims, and its claim under the Florida Trade Secrets Act.[9]  But Plaintiff fails to allege a prima facie case for violation of any of these statutes and thus does not meet its burden of showing a likelihood of success on the merits.

### 1.  Plaintiff is not likely to succeed on the merits of its CFAA claim.

Plaintiff's CFAA claim fails.  As a threshold matter, the Complaint names forty separate defendants who allegedly engaged in distinct conduct.[10]  Even a cursory evaluation of the parties against whom the CFAA claim is levied shows Plaintiff does not—and cannot—assert a CFAA claim *indiscriminately* against all defendants.  And, Plaintiff does not—and cannot—satisfy its pleading burden by asserting innuendo and supposition, spread broadly and vaguely across forty

---

[9]  Although the Amended Complaint also alleges, in its first four counts, federal antitrust claims, as well as, common law claims, Plaintiff completely ignores these claims in its Motion, simply stating in passing that it "is also likely to prevail at trial on its federal antitrust and common law claims." Dkt. 5 at 6.  Plaintiff evidently recognizes that those claims are fatally flawed and will not survive a motion to dismiss for numerous reasons.

[10]  Plaintiff categorizes the defendants into one of three groups: (1) The "Bribed" PDVSA Employees, who allegedly cloned the server; (2) Morillo and Baquero, who allegedly accessed the "clone server" in some unknown way; and (3) the "Oil Company Conspirators," who allegedly received information from the clone server.  Notably, Helsinge, Lutz, and Ryan do not fall into any of these three categories, further undermining Plaintiff's claim that it can succeed on the merits of a CFAA claim against *all* Defendants.

defendants.[11]   Further, the Complaint is silent as to how and when Helsinge Inc., Helsinge Ltd., Saint-Hélier, and Helsinge Holdings LLC (collectively, "Helsinge"), Lutz, Liendo, and Ryan, violated the CFAA.  For these reasons alone, Plaintiff's Motion should be denied.

Plaintiff's claim also fails for the following reasons.  **First**, Plaintiff does not allege that defendants accessed PDVSA's computer system without authorization or by exceeding authorized access, as required by the CFAA.  **Second**, Plaintiff does not allege that any defendants engaged in a conspiracy to access PDVSA's computer system, as required under Section 1030(b).  **Third**, Plaintiff fails to allege requisite damage or loss necessary to sustain a civil action under the CFAA. Thus, Plaintiff has not established a likelihood of success on the merits of its CFAA claim.

> ### a.   Plaintiff Does Not Allege Defendants Accessed Without Authorization Or Exceeded Authorized Access To The "Clone Server."

Plaintiff asserts a conclusory violation of the CFAA, 18 U.S.C. § 1030.  Dkt. 12 at ¶¶ 297– 302.  While the CFAA identifies seven prohibited types of conduct, Plaintiff addresses only two in its Motion.[12]  Dkt. 5 at pp. 7–8 (citing violations of §§ 1030(a)(4) and 1030(a)(5)).[13]  Sections

---

[11] To satisfy the pleading requirements of the Federal Rules of Civil procedure, Plaintiff must "state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Plausibility "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 555.

[12] While Defendants reject any future argument that section 1030(a)(2) of the CFAA, is applicable here, to the extent Section 1030(a)(2) becomes at issue, the same reasons for rejecting Sections (a)(4) and (a)(5) apply to rejecting Section 1030(a)(2).  Plaintiff does not directly address section 1030(a)(2) in its Motion, and therefore it is not addressed herein.

[13] Plaintiff alleges that defendants violated Sections 1030(a)(5)(A)(i) and (ii).  These are invalid sections of the statute, as they do not appear in the statute in its current form.  Furthermore, the current version of Section 1030(a)(5) adds the requirement that a plaintiff plead loss, which does not appear in the version of the section cited by Plaintiff in its Motion.  *See* Dkt. 5, pp. 7–8; Section II.A.1.c, *infra*.

1030(a)(4) and (a)(5) prohibit knowingly or intentionally accessing a protected computer without authorization or in a manner that exceeds authorized access. *See* 18 U.S.C. § 1030(a).[14]

Here, Plaintiff fails to allege that some undefined and purported access to a "clone server" either was unauthorized or exceeded authorized access.[15]  Unauthorized access is not defined by statute, but by its plain meaning requires access without permission. *See Lockheed Martin Corp. v. Speed*, No. 6:05-CV-1580-ORL-31, 2006 WL 2683058, at *5 (M.D. Fla. Aug. 1, 2006).  Plaintiff alleges Helsinge had access to information from the "clone server" but articulates no facts in support of its conclusion that Helsinge actually accessed the server. *See* Brill Declaration, attached hereto as **<u>Exhibit C</u>**, at ¶¶ 27, 44, 46.  Thackray declared he "was informed" that Helsinge, through Morillo and Baquero, "has gained access to" highly confidential information, but alleged access to *information* is not sufficient, for purposes of the CFAA, to allege that Helsinge physically accessed the "clone server." *See* § 1030(a); Dkt. 12-2 at ¶ 7; Ex. C at ¶¶ 27, 41.  Similarly, Plaintiff

---

[14]  Section 1030(a)(5)(A) prohibits "knowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caus[ing] damage without authorization, to a protected computer."  Plaintiffs have not alleged a violation of section 1030(a)(5)(A) in its Complaint and for the first time attempts to assert a 1030(a)(5)(A) violation in its Motion. By its plain terms, section 1030(a)(5)(A) prohibits the transmission of a program or code ***<u>to</u>*** a computer; whereas, Plaintiff's Motion alleges a transfer of files ***<u>from</u>*** PDVSA's servers. Dkt. 5, at p. 7.  Therefore, only sections 1030(a)(5)(B) and 1030(a)(5)(C) are discussed herein. To the extent Plaintiff bases its CFAA claim on section 1030(a)(5)(A), Defendants reserve their rights as to whether Plaintiff adequately has plead such claim.

[15] Exceeding authorized access necessarily requires that access be authorized in the first instance. *See* 18 U.S.C. § 1030(e); *Trademotion, LLC v. Marketcliq, Inc.*, 857 F. Supp. 2d 1285, 1290–91 (M.D. Fla. 2012).  Plaintiff never alleges that Helsinge, Lutz, Ryan or any of the other defendants (other than the "Bribed" PDVSA Employees) ever were granted authorized access by PDVSA such that they could allegedly exceed such authorization.  As such, Plaintiff is left to allege unauthorized access as to those defendants.

does not allege that Lutz accessed any PDVSA computer or server at all, much less that he accessed it without authorization.[16]

Even the allegations as to whether Morillo and Baquero ever accessed the server are speculative, based on information received (at best) second-hand, and apparently are supported by some unidentified informant. *See* Ex. C at ¶¶ 33, 39, 44; Dkt. 12-1 at ¶ 22. This fails to satisfy the CFAA's requirements that access be "knowing[ ] and with the intent to defraud," *see* § 1030(a)(4), or "intentional[ ] and resulting in damage." *See* § 1030(a)(5)(B), (C); Ex. C at ¶ 27. And, Plaintiff fails to allege that the alleged *ability* to "provide … direct access" to some "clone server" resulted in the "Oil Company Conspirators" ever physically accessing the server, as required by the CFAA.[17] *See* Ex. C at ¶¶ 27, 28; § 1030(g); *Trademotion*, 857 F. Supp. 2d at 1293. Further, this bare allegation does not establish that Morillo or Baquero accessed the server. *Id.*

Plaintiff at best infers that the "Bribed PDVSA Employees," including Liendo, who allegedly installed a "clone server," accessed whatever PDVSA server(s) is at issue. Dkt. 12 at ¶¶ 86, 111; Dkt. 12-1 at ¶ 21. But, as yet another critical failure, Plaintiff fails to allege that such access was unauthorized or exceeded authorized access. *Id.*; Section 1030(a). Under the CFAA, if an employer grants an employee unrestricted access to a protected computer, the employee's access of that computer *cannot* exceed authorized access. *See Trademotion*, 857 F. Supp. 2d at 1291–92 (finding that where an individual with full administrative rights accessed plaintiff's computer, deleted files, and entered code that diverted emails from plaintiff's customers to its

---

[16] Lutz is referenced only twice in the Amended Complaint and once in the Brennan Declaration. Dkt. 12 at ¶¶ 26, 207; Dkt. 12-1 at ¶ 31.

[17] Plaintiff alleges that "since at least …2013 … Morillo and Baquero *have been able to* provide the Oil Company Conspirators with direct access to the clone server." Dkt. 12 at ¶ 115 (emphasis added).

competitor, such access was not "without authorization"). In the District of Florida, exceeding authorized access means that, "while an employee's initial access was permitted, the employee accessed information for which the employer had not provided permission." *Enhanced Recovery Co., LLC v. Frady*, No. 3:13-CV-1262-J-34JBT, 2015 WL 1470852, at *6 (M.D. Fla. Mar. 31, 2015) (internal quotations omitted). It does not mean the employee utilized information or data that he or she could permissibly access in a way the employer did not like. *Id.* at *7–8 ("[A]pplying the CFAA to an employee … who divulges trade secrets that she was actually permitted to access, or who violates computer usage policies, takes the CFAA far beyond its original purpose.").

Here, Plaintiff makes no factual allegation that Liendo or other PDVSA employees who allegedly installed the "clone server" were not authorized to access the servers. Instead, Plaintiff alleges that, generally, PDVSA employees were authorized to access a server that allegedly was cloned (*though how it was allegedly cloned and by whom remains a mystery*). *See* Dkt. 12-2 at ¶ 11 ("I personally observed a demonstration of how an individual could log-in from a remote location to Core 9 server."). PDVSA's Security Department, possibly including Liendo since allegedly he was a PDVSA IT Administrator, allegedly was authorized to provide "unrestricted remote access to the network." Dkt. 12-2 at ¶ 11.

Plaintiff fails to establish that the defendants were not authorized to access the servers, and furthermore fails to allege that any PDVSA employees accessed information they were not authorized to access. *See* Ex. C at ¶ 37, 38. Because the PDVSA employees were authorized to access the server, based on Plaintiff's allegations, *see id.*, even if they did "clone" a server -- and there is no allegation that they actually did -- the Complaint is silent as to how that conduct would violate the CFAA. *See* § 1030(e)(6); *Allied Portables, LLC v. Youmans*, No. 2:15-cv-294-FtM-

38CM, 2015 WL 3720107, at *4 (holding that employees do not "exceed authorized access" by obtaining information they are permitted to access, "but in a manner that is not authorized").[18]

### b. Plaintiff Fails To Adequately Plead Conspiracy Under The CFAA.

Absent an allegation of direct access, a claim under the CFAA provisions at issue here can only be sustained if Plaintiff can establish conspiracy or attempt to access a protected computer. *See* 18 U.S.C. § 1030(b); *see also Trademotion,* 857 F. Supp. 2d at 1293.  Plaintiff apparently attempts to plead conspiracy by claiming defendants either actively accessed PDVSA's computer system, "*or rendered knowing and substantial assistance*" in accessing such system.  Dkt. 12 at ¶ 199 (emphasis added).

A civil CFAA claim must be asserted against the "violator" who actually accessed the computer or exceeded authorized access.  *See Trademotion,* 857 F.Supp.2d at 1293 (denying claim under CFAA where defendants had not personally committed any violative acts and failed to sufficiently allege conspiracy).  Assuming a conspiracy claim can stand in a civil action, which Defendants deny,[19]  Plaintiff fails to plead conspiracy with sufficient specificity to satisfy the CFAA's requirements.  *See* § 1030(b).  The Middle District of Florida has stated, "[w]here … there are various, separate theories of § 1030(a) stated as substantive violations" -- as Plaintiff has

---

[18] In a holding subsequently limited in the District of Florida to very specific situations, the Eleventh Circuit found that an employee who had been informed explicitly by his employer that he "was not authorized to obtain personal information for nonbusiness reasons" exceeded his authorized access when he accessed a government database for an improper purpose.  *U.S. v. Rodriquez*, 628 F.3d 1258, 1263 (11th Cir. 2010).  *Rodriquez* is entirely distinguishable from the allegations here, as Plaintiff has not pointed to a single PDVSA policy or directive that in any way restricted employee access to the PDVSA computer network.

[19] For purposes of this Opposition only, Defendants acknowledge that the CFAA may authorize a claim against conspirators, *see* 18 U.S.C. § 1030(b).  However, Defendants reserve their rights as to whether a conspiracy claim can be brought in the civil context under the CFAA.  *See Trademotion,* 857 F. Supp. 2d at 1293 (questioning but not resolving whether § 1030(b) permits a private cause of action against co-conspirators).

tried, but fails, to accomplish here -- "a single, general" allegation of conspiracy under § 1030(b), "without a reference to the objects of that conspiracy (by relevant factual allegations or [ ] through citation), fails to put Defendants on notice of what it is that Plaintiff alleges they conspired to do." *Coll Builders Supply, Inc. v. Velez*, No. 617-CV-933-ORL40DCI, 2017 WL 4158661, at *11 (M.D. Fla. Aug. 31, 2017), *report and recommendation adopted*, No. 617-CV-933-ORL40DCI, 2017 WL 4125641 (M.D. Fla. Sept. 18, 2017).

Here, Plaintiff fails to make even a "single, general" conspiracy allegation under § 1030(b) and instead alleges only that defendants "rendered knowing and substantial assistance." Dkt. 12 at ¶ 199. As to Helsinge and Lutz, Plaintiff fails to make *a single* allegation that either provided assistance of any nature for the cloning of, or in accessing any, server.[20] Plaintiff fails to allege any conspiracy claim under the CFAA, and therefore, it cannot serve as a basis for its Motion.

### c.    Plaintiff Fails to Allege Any Damage or Loss Under the CFAA.

Finally, to sustain a civil claim under *any* provision of the CFAA, one must allege that he or she suffered "damage or loss by reason of a violation" of the CFAA.[21] *See* 18 U.S.C. § 1030(g).

---

[20] Plaintiff apparently attempts to establish a conspiracy as to other defendants by alleging that bribes to PDVSA employees who allegedly assisted in providing access were "facilitated and paid out… with the knowledge and approval of the multi-national energy trading corporation co-conspirators." Dkt. 12 at ¶ 62. This allegation is entirely unsupported by factual allegations that associate any alleged bribes to the requirements of pleading a CFAA claim. Furthermore, in no way does this allegation implicate Helsinge and Lutz, and it fails to even demonstrate the existence of a conspiracy specifically to violate the CFAA. *Velez*, 2017 WL 4158661, at *11 ("The crux of a conspiracy is an agreement to violate the law.").

[21] "Damage" under the CFAA means "any impairment to the integrity or the availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). "Loss" is defined under the CFAA as either the costs associated with "responding to the offense, conducting a damage assessment, [or] restoring the data," and/or "revenue lost, costs incurred, or other consequential damages incurred *because of* interruption of service." 18 U.S.C. § 1030(e)(11) (emphasis added). Loss does *not* mean loss of revenue or business from the "use of proprietary information, or the value of alleged trade secrets." *Gibraltar Metals, LLC v. Next Generation Metals, Inc.*, No. 08-80051-

Even if Plaintiff could demonstrate that any of the defendants accessed, or conspired to access, the server without authorization, or that defendants exceeded their authorized access, Plaintiff's CFAA claim still fails because Plaintiff has not alleged any damage or loss resulting from any purported violation, which is a prerequisite for any civil action under the CFAA. *See id.* To adequately allege damage or loss, Plaintiff must allege that information on the alleged computer in question became unusable or unobtainable, or that it suffered an interruption of service. 18 U.S.C. § 1030(e)(11); *Trademotion,* 857 F. Supp. 2d at 1292. Plaintiff fails to allege it suffered damage or loss as a result of Defendants' alleged violation. In particular, Plaintiff does not allege that Defendants lost or made unusable any data on any PDVSA computer and does not allege it suffered any interruption of service at any time. Instead, Plaintiff concludes, without any supporting factual allegations, that as a result of defendants' alleged violation, "there was a loss to PDVSA in excess of $5,000 in value each year Defendants accessed PDVSA's computer system." Dkt. 12 at ¶ 301. Plaintiff fails to plead loss or damage as required to maintain a CFAA civil action; therefore, Plaintiff is not likely to succeed on the merits of its CFAA claim (and furthermore cannot even maintain a CFAA claim).

### 2.    Plaintiff Is Not Likely To Succeed On The Merits Of Its SCA Claim.

Due to the same deficiencies that plague its CFAA claim, Plaintiff fails to demonstrate a likelihood of success on the merits of its claim under the Stored Communications Act (hereinafter "SCA"), 18 U.S.C. § 2700, et seq. The SCA provides, in relevant part:

> "whoever (1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished …."

CIV, 2008 WL 11331994, at *3 (S.D. Fla. Feb. 13, 2008), *report and recommendation adopted in part*, No. 08-80051-CIV, 2008 WL 11333489 (S.D. Fla. Mar. 10, 2008).

18 U.S.C. § 2701(a).  **First**, as with its CFAA claim, Plaintiff fails to allege Defendants accessed a facility without authorization or by exceeding authorized access, as required.  *See id*.  **Second**, Plaintiff fails to allege the server at issue provides an electronic communication service, as defined by the SCA.  *See* § 2501(15).  **Third**, Plaintiff has not alleged that Defendants obtained access to a wire or electronic communication while in electronic storage, as required.  *See* § 2501(17).

> ### a.   Plaintiff Fails To Allege Defendants Accessed Without Authorization, Or Exceeded Authorized Access To, A Facility.

To sustain an SCA claim, Plaintiff must establish that each defendant against whom this count is alleged -- which is all defendants -- actually accessed the facility[22] in question.[23]  Nowhere in the Complaint does Plaintiff allege that Helsinge, Lutz, or Ryan accessed the "clone server" without authorization or by exceeding their authorization.[24]  In fact, Plaintiff does not allege that Defendants accessed the server ***at all***.  *See* Ex. C at ¶ 27, 39, 44.

The sum total of the allegations against Lutz is that he "administer[s]" Morillo's and Baquero's Miami office.  Dkt. 12-1 at ¶ 31.  The Complaint is devoid of even a suggestion that

---

[22] "Facility" is not defined in the SCA, but at least one court has referred to a "facility" as something that provides a "server-like function."  *Vaquero Energy, Inc. v. Herda*, No. 1:15-CV-0967-JLT, 2015 WL 5173535, at *11 (E.D. Cal. Sept. 3, 2015).  Thus, for the purposes of this Opposition only, the alleged "clone server" is presumed to be a facility even though there are no allegations supporting such a conclusion.  However, Defendants reserve their rights as to whether a the server is a facility under the SCA.

[23] Unlike the CFAA, the SCA does not provide for liability against co-conspirators.  *See* 18 U.S.C. § 2701, *et seq.*; *Vista Mktg., LLC v. Burkett*, 812 F.3d 954, 960 (11th Cir. 2016) (citing approvingly to the district court's holding that the SCA does not include "language evidencing an intent to cover secondary liability, such as conspiracy claims").

[24] At least one court in the District of Florida has treated the meaning of access without authorization and access that exceeds authorization identically under the SCA and the CFAA.  *Enhanced Recovery Co., LLC v. Frady*, No. 3:13-CV-1262-J-34JBT, 2015 WL 1470852, at *11 (M.D. Fla. Mar. 31, 2015).

Lutz ever accessed the "clone server." Thus, Plaintiff has not alleged that Lutz "engaged in a violation" of the SCA. *See* § 2707. As to Helsinge, the Complaint makes conclusory allegations that Helsinge may have utilized information obtained from a server, but nowhere does Plaintiff allege that Helsinge obtained such information by "intentionally access[ing]" the server (and, as such, there is likewise no allegation that Helsinge exceeded any authorized access). *See e.g.* Dkt. 12 at ¶¶ 76, 95, 104. The closest the Complaint gets -- which still fails to allege access -- is its reference to Thackray's conclusory supposition that he "*was informed* that Helsinge, through Morillo and Baquero, *has gained access* to *highly confidential internal information* at PDVSA by bribing PDVSA employees." Dkt. 12-2 at ¶ 7 (emphasis added); Ex. C at ¶ 27, 39, 44. Even still, Plaintiff does not allege that Helsinge accessed any "facility" or server itself.[25] Because Plaintiff does not allege that Defendants accessed a server or "facility" as required to plead an SCA violation, Plaintiff has no likelihood of success on the merits.[26]

### b.     Plaintiff Fails To Establish That The Server Provides An Electronic Communication Service.

Even if Plaintiff alleged that Helsinge or Lutz accessed the server -- which it fails to do -- Plaintiff has not established that the server at issue is a facility "through which an electronic communication service is provided." 18 U.S.C. § 2701(a). The SCA defines an "electronic communication service" as "any service which provides to users thereof the ability to send or

---

[25] While Liendo may have accessed a "facility," based on Plaintiff's assertions, Plaintiff has not alleged that such access was without authorization or exceed Liendo's authorized access. *See* Section II.A.1.b, *supra*.

[26] With respect to claims of access by all other defendants, the same pleading failures that undermine Plaintiff's claims of access under the CFAA are equally applicable to Plaintiff's SCA claim here.

receive wire or electronic communications."[27]  18 U.S.C. § 2510(15).  Plaintiff fails to articulate whether or how the "clone server" meets this definition; it is entirely unclear what communications, if any, the server facilitates.  *See* Ex. C at ¶¶ 40, 41, 43.  Plaintiff makes a single reference to "PDVSA internal communications" but gives no further explanation regarding the nature or type of the communications.  Dkt. 12, ¶ 114.[28]  Otherwise, Plaintiff alleges that the server enabled users to access "confidential information" and data, and the examples alleged, such as PDVSA's intended purchases and sales, and competitors' bids, (*see* Dkt. 12 at ¶¶ 110, 115, 117; Dkt. 12-1 at ¶¶ 21, 23; Dkt. 12-2 at ¶ 11), are not "electronic communications" as defined by the SCA.  *See* § 2510(12) (defining electronic communications as any "*transfer* of signs, signals… data, or intelligence… transmitted in whole or in part") (emphasis added).

If the server(s) at issue provides an electronic communication service, Plaintiff must articulate with some specificity what that service is.  *See Enhanced Recovery Co., LLC v. Frady*, No. 3:13-CV-1262-J-34JBT, 2015 WL 1470839, at *7–8 (M.D. Fla. Jan. 20, 2015) (finding plaintiff's allegation that its "electronic systems were routinely involved in sending and receiving electronic communications in interstate commerce" insufficient to demonstrate it was an electronic

---

[27] Common examples of electronic communication service providers include phone companies, Internet service providers, electronic bulletin board systems, and proprietary email providers.  *See, e.g.*, *U.S. v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003) ("The SCA clearly applies, for example, to information stored with a phone company, Internet Service Provider (ISP), or electronic bulletin board system (BBS).");  *Vista Marketing, LLC v. Burkett*, Case No. 8:12–cv–1640–T–30TBM, 2014 WL 3887729, at *3 (M.D. Fla. Aug. 7, 2014), *aff'd in part, vacated in part*, 812 F.3d 954 (11th Cir. 2016) (finding plaintiff's email system qualified as an electronic communication service rather than a remote computing service).

[28] In his Declaration, Brennan alleges that, *per Thackray's Declaration*, the Core 9 server -- the server that was purportedly cloned -- contained "highly confidential communications." Dkt. 12-1 at ¶ 34.  While Thackray repeatedly refers to "information" and "data," and also references "real-time activity associated with [ ] bids," (*see* Dkt. 12-2 at ¶¶ 7, 8, 11, 12), he never uses the term "communications."

communication service under the SCA), *report and recommendation adopted in part, rejected in part*, No. 3:13-CV-1262-J-34JBT, 2015 WL 1470852 (M.D. Fla. Mar. 31, 2015) (adopting the recommendation as to the SCA).  Because Plaintiff's Complaint fails to establish the server was a facility through which an electronic communication service is provided, it is not likely to succeed on the merits of this claim.

**c.    Plaintiff Fails To Allege Defendants Obtained, Altered, Or Prevented Access To A Wire Or Electronic Communication While In Electronic Storage.**

Even assuming, *arguendo*, that Plaintiff could establish Defendants accessed without authorization, or exceeded authorized access to, a facility through which an electronic communication service is provided, that is insufficient to establish an SCA violation.  Plaintiff must also establish that Defendants obtained, altered, or prevented access to a wire or electronic communication while in electronic storage.  *See* § 2701(a).  Plaintiff makes no such allegation.  As discussed above, Plaintiff does not articulate whether the server stores "communications" within the meaning of the statute **_at all_**.  § 2510(15) (defining "electronic communication").  Moreover, Plaintiff fails to allege that any such information on the server(s), to the extent the server or information existed, was allegedly obtained "while in electronic storage."  § 2701(a).

The SCA defines "electronic storage" as "any temporary or immediate storage of a *wire or electronic communication* incidental to the electronic transmission thereof; and any storage of such communication for purposes of backup protection." § 2510(17) (emphasis added).  While temporary storage may be, for example, when an Internet service provider temporarily holds an

email until it is delivered, any alleged backup storage must be intentional.  *See Theofel v. Farey-Jones*, 359 F.3d 1066, 1075, 1076 (9th Cir. 2004).[29]

The Complaint is silent as to whether the server either temporarily stored an electronic communication incidental to the transmission of some communication or specifically for the purposes of backup protection in the process of delivery of the communication.[30]  At best, Plaintiff has alleged that certain information can be accessed through some server, but such allegation is not sufficient to demonstrate that the information was in electronic storage as defined by the SCA. Dkt. 12 at ¶ 86 (alleging Liendo "set up a 'clone server' and related interconnected electronic means to gain immediate access to PDVSA's confidential information").  As Plaintiff fails to allege that Defendants obtained, altered, or prevented access to a wire or electronic communication while in electronic storage, as required by the SCA, Plaintiff cannot demonstrate a likelihood of success on the merits.  Plaintiff's request for a preliminary injunction must, therefore, be denied.

> **3.    Plaintiff is not likely to succeed on the merits of its claims for violation of the federal RICO Act, under 18 U.S.C. § 1962(c) or (d).**

Counts VI and VII of the Complaint raise claims under the U.S. Racketeer Influences and Corrupt Organizations Act ("RICO").  These claims, however, fail for multiple reasons.

> **a.    The RICO statute does not apply extraterritorially.**

---

[29]  The *Theofel* court explained, "[T]he mere fact that a copy could serve as a backup does not mean it is stored for that purpose."  *Id.*; *see also Vista Mktg., LLC v. Burkett*, 812 F.3d 954, 964 (11th Cir. 2016) (finding that prior to being opened by an individual, emails stored by a company's email service provider were in electronic storage because the emails were stored for "the purposes of providing backup protection of [the] emails, at least until such time as [the individual] received and opened them on his computer.").

[30]  *See* Dkt. 12-1 at ¶ 34 (alleging that defendants obtained access to PDVSA's confidential information through the server but not articulating whether or how information was stored on the server); Dkt. 12-2 at ¶ 12 (stating that Thackray "was informed" that the servers were "dedicated to storing" highly confidential information, without any additional detail regarding the storage).

First, the RICO statute does not apply extraterritorially to cover the alleged conduct upon which Plaintiff's RICO claims are based.  The Supreme Court recently held that Section 1964(c) of the RICO statute, which gives a private right of action to "[a]ny person injured in his business or property by reason of a violation of [RICO's substantive provisions, codified in Section 1962]," does not apply extraterritorially.  *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2106 (2016).  To maintain a RICO claim based on foreign racketeering activity, "[a] private RICO plaintiff [] must allege and prove a *domestic* injury to its business or property."  *Id.* (emphasis in original).  This is because "[a]llowing recovery for foreign injuries in a civil RICO action, including treble damages, presents the [] danger of international friction."  *Id.* at 2107.  Although the Supreme Court did not explain how to determine whether an injury is domestic or foreign, several courts have since analyzed the issue.

For example, as noted by one Florida district court, "the focus of the matter is the geographic location of the injury to plaintiffs, not the location of a defendant's wrongful act." *Absolute Activist Value Master Fund Ltd. v. Devine*, 233 F. Supp. 3d 1297, 1326 (M.D. Fla. 2017) (finding the economic injuries alleged were suffered by the plaintiffs "where the plaintiffs were located—in the Cayman Islands").  Similarly, in *Bascunan v. Elsaca*, 874 F.3d 806 (2d Cir. 2017), the Second Circuit held that "an injury to tangible property is generally a domestic injury only if the property was physically located in the United States."  *Id.* Importantly, the "defendant's use of the U.S. financial system to conceal or effectuate his tort does not, on its own, turn an otherwise foreign injury into a domestic one."  *Id.* at 819.  As the *Bascunan* court explained:

> To hold otherwise would subvert the intended effect of the "domestic injury" requirement articulated by the *RJR Nabisco* Court. Because of the primacy of American banking and financial institutions, particularly those in New York, a transnational RICO case is often likely to involve in *some* way, however insignificant, financial transactions with American institutions. Holding that a *defendant's* mere use of a domestic bank account could transform an otherwise

foreign injury into a domestic one might well effectively eliminate the effect of the domestic injury requirement in a large number of cases.

*Id.* (emphases in original).

Here, Plaintiff alleges "the case involves a criminal conspiracy secretly engaging in the electronic theft of PDVSA's confidential commercial information and the bribery of PDVSA's employees in order to facilitate an elaborate bid-rigging and price-fixing scheme." Dkt. 5 at 3; *see, e.g.*, Dkt. 12 ¶¶ 1, 4, 56. In other words, Plaintiff alleges a theft of information *from Venezuela* and the bribery of officials *in Venezuela* in a scheme orchestrated by "two *Venezuelan* nationals." Dkt. 12 ¶¶ 24–25, 56 (emphasis added). This is the quintessential case of an alleged "scheme perpetrated by foreigners against other foreigners." *Sinaltrainal v. Coca-Cola Co.*, 256 F. Supp. 2d 1345, 1359 (S.D. Fla. 2003).

Plaintiff makes a transparent attempt to allege a domestic injury by stating that Defendants' conduct "caused PDVSA to suffer direct damages and losses *from PDVSA'S U.S. bank accounts*." Dkt. 12 at ¶¶ 225, 243 (emphasis added). But this is insufficient to satisfy the domestic injury requirement. As the Court noted in its previous order, the assets that Plaintiff seeks to freeze are "alleged to be payments made by third parties to the Morillo Group Defendants," not "the plaintiff's money either fraudulently obtained or withheld." Dkt. 9 at 3. Moreover, notwithstanding Plaintiff's vague allegations regarding "PDVSA's U.S. bank accounts," the Complaint does not contain any allegations that PDVSA's had "property [] located in the United States [] [that] was stolen or harmed." *Bascunan*, 874 F.3d at 820–21. Allowing Plaintiff's unsupported allegation to circumvent the domestic injury requirement would render *RJR Nabisco* meaningless, permitting any foreign entity with at least one U.S. bank account to claim that the monies it should have received would have gone into that account. For this reason alone, the RICO claims are meritless.

**b.   Plaintiff does not state a claim under section 1962(c).**

Section 1962(c) makes it unlawful "to conduct or participate, directly or indirectly, in the conduct of [an] enterprise [that affects interstate commerce] through a pattern of racketeering activity." *Rep. of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 948-949 (11th Cir. 1997). Under section 1962(c), a plaintiff must allege: "(1) the existence of an enterprise; (2) that the enterprise affected interstate commerce; (3) that the defendants were employed by or associated with the enterprise; (4) that the defendants participated . . . in the conduct of the affairs of the enterprise; and (5) that the defendants participated through a pattern of racketeering activity." *U.S. v. Starrett*, 55 F.3d 1525, 1541 (11th Cir. 1995). Here, Plaintiff fails to adequately allege the first, third, fourth and fifth elements.

### i.   Plaintiff fails to allege an enterprise or which Defendants were associated with the alleged enterprise.

RICO defines an "enterprise" to include "any individual, partnership, corporation association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "An association-in-fact enterprise requires that the plaintiff identify a group of persons who are associated together for a common purpose of engaging in a course of conduct." *In re Managed Care Litig.*, 150 F. Supp. 2d 1330, 1342 (S.D. Fla. 2001). An association-in-fact enterprise has three "structural features": (1) a "purpose," (2) "relationships among those associated with the enterprise," and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 944-946 (2009). For the second requirement, a plaintiff must show that defendants "acted as a continuing unit, and not merely independently." *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1068 (11th Cir. 2017). To do so, the plaintiff cannot merely recite the legal conclusion of "the existence of an agreement" between the alleged members of the enterprise; it must "allege facts showing that

[the] alleged agreement actually exists." *Id.*  Importantly, "parallel conduct alone cannot support a plausible inference of an agreement." *Id.* (noting that parallel conduct "can just as easily indicate 'independent action' as it can collusion").  Plaintiffs have "to assert allegations explaining how exactly the defendants went about entering into an agreement with each other. It [is not] enough that the defendants all ended up doing the same fraudulent thing." *Id.* at 1068–69.[31]

Here, Plaintiff alleges that there was an "association-in-fact" enterprise, *see* Dkt. 5 at 10; Dkt. 12 ¶ 215, but never alleges who the members of that enterprise were, much less that the Defendants *agreed* to be members of that enterprise.  Plaintiff defines the "Helsinge Enterprise" as "an on-going conspiracy" among international oil companies, their banks, and co-conspirators, including corrupt agents and officials of [PDVSA]."  Dkt. 12 ¶ 1.  Not only is it entirely unclear from this allegation which Defendants are included in the general "co-conspirators" category, there are no facts supporting that the various members—including the oil companies (who compete against one another) and "their banks"—reached any agreement to participate in such an enterprise.[32]  Nor are there any facts establishing that the members acted for the purpose of the alleged enterprise and not for their own individual gain.  *Managed Care Litig.*, 298 F. Supp. 2d at 1274 (because "diverse parties . . . customarily act for their own gain or benefit in commercial relationships," a complaint founded on commercial relationships must plead facts "dispel[ling] the notion that the different parties entered into [the] agreements . . . for their own gain or benefit.").

> ii.     **Plaintiff fails to allege that Helsinge, Lutz, Liendo, or Ryan participated in the alleged enterprise.**

---

[31]   Notably, "[i]t's not just unknowingly parallel conduct that fails to pass the plausibility threshold." *Id.* at 1069.  The "rule extends to consciously parallel conduct as well," which "occurs when competitors engage in similar behavior and are aware of each other's behavior."  *Id.*

[32] In fact, the only paragraph of the Complaint that purports to allege any sort of vague agreement between certain individuals or entities allegedly involved in the enterprise, does not contain *any* allegations regarding the Helsinge Defendants, Lutz, or Ryan.  Dkt. 12 ¶ 216.

Plaintiff also fails to allege that Defendants directed the affairs of the enterprise, as required by the fourth element of a RICO claim. "In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179, (1993).  Specifically, defendant must "participate[] in the operation or management of the enterprise itself."  *Id.* at 185.

With regard to Lutz and Ryan, the Amended Complaint contains only one conclusory allegation, stating that they were agents of Defendants Morillo and Baquero, devoid of any facts about either whatsoever, much less those required to support such an agency relationship.  *See PYCSA Panama, S.A. v. Tensar Earth Tech*., Inc., 625 F. Supp. 2d 1198, 1252 (S.D. Fla. 2008) (to establish an agency relationship, Plaintiff must plead (1) acknowledgment by the principal that the agent will act on its behalf; (2) the agent's acceptance of the undertaking; and (3) control by the principal over the agent's actions and day-to-day activities).  It does not state the nature of any specific knowledge, agreement, or participation by Lutz or Ryan in the alleged misconduct, the nature of their purported agency to Morillo and Baquero in the alleged misconduct, or any facts that could support an inference regarding the existence or nature of such agency.

Likewise, it is entirely unclear what alleged conduct is attributed to each of the Helsinge entities because the Complaint lumps them together and refers to them collectively throughout. *See* St*erling Nat. Mortg., Co. v. Infinite Title Sols., LLC*, No. 10-22147, 2011 WL 1303225, at *4 (S.D. Fla. Mar. 4, 2011) (plaintiff "cannot state a claim simply by naming [defendants] and lumping them together . . . in general RICO allegations); *Maale v. Kirchgessner*, No. 08-80131-CIV, 2010 WL 11506030, at *3 (S.D. Fla. Apr. 12, 2010) ("each count improperly refers to and lumps the Defendants together collectively such that it is impossible to know what conduct is alleged to have been committed by each individual Defendant").

With regard to Liendo, although there are allegations concerning his alleged involvement in setting up a "clone server," it is unclear whether such conduct would fall within the operation or management of the enterprise. And, as discussed above, Plaintiff does not allege he accessed the "clone server" without Authorization. *See* Section II.A.1.a., *supra*.

**ii.      Plaintiff fails to allege a pattern of racketeering activity.**

Plaintiff also fails to allege racketeering activity. To establish a "pattern of racketeering activity," a plaintiff must allege "at least two acts of racketeering activity" within a ten-year period, 18 U.S.C. § 1961(5), and must allege facts sufficient to support each of the statutory elements for those two predicate acts. *Rep. of Panama,* 119 F.3d at 949. Here, Plaintiff purports to allege the predicate acts of bribery, mail and wire fraud, money laundering, and violation of the CFAA.

Mail and wire fraud require that a person "(1) intentionally participate[] in a scheme or artifice to defraud another of money or property, and (2) use[] or 'cause[]' the use of the mails or wires for the purpose of executing the scheme or artifice." *United States v. Ward*, 486 F.3d 1212, 1221 (11th Cir. 2007). Where a RICO claim relies on mail and wire fraud, a plaintiff must meet Rule 9(b)'s heightened standard by alleging, as to each defendant, '(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the [p]laintiffs; and (4) what the defendants gained by the alleged fraud. *See Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316-17 (11th Cir. 2007); *Band v. Ginn Companies, LLC*, No. 3:09-CV-792-J-25TEM, 2010 WL 11515174, at *5 (M.D. Fla. Sept. 30, 2010) (plaintiff must "describe, with particularity, each Defendant's (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity"). The Complaint fails to allege these facts for any of the Defendants.

Plaintiff also purports to allege a violation of section 838.16 of the Florida Statutes, for

28

commercial bribery.  But this statute's reach does not extend extraterritorially—*i.e.*, bribery that takes place in Venezuela.  Indeed, "Florida law cannot be applied extraterritorially unless the statute contains an express intention that its provisions are to be given extraterritorial effect." *Howard v. Kerzner Int'l Ltd.,* No. 12-22184-CIV, 2014 WL 714787, at *5 (S.D. Fla. Feb. 24, 2014).  Thus, the alleged bribery cannot serve as a predicate act to support Plaintiff's RICO claim.

Although Plaintiff includes money laundering as a predicate offense to support its RICO claim, there are no allegations implicating Helsinge, Liendo, Lutz, or Ryan in any way in any alleged money laundering activity.  Finally, as discussed above, Plaintiff fails to allege any facts supporting a violation of the Computer Fraud and Abuse Act.  *See* Section II.A.1., *supra*.

### c.     Plaintiff does not state a claim under section 1962(d).

Plaintiff also fails to state a claim for RICO conspiracy, which requires that Plaintiff allege either (1) "an agreement of an overall objective" or (2) "that a defendant agreed personally to commit two predicate acts."  *Managed Care Litig*., 150 F. Supp. 2d at 1350.  In addition, the defendant must have "joined knowingly in the scheme and been involved himself, directly or indirectly, in the commission of at least two predicate offenses."  *Cox v. Admin'r. U.S. Steel & Carnegie*, 17 F.3d 1386, 1410.  First, because the substantive RICO claim fails, the RICO conspiracy claim fails as well. *Jackson v. BellSouth Telecom.*, 372 F.3d 1250, 1269 (11th Cir. 2004) (to be guilty of a conspiracy to commit a RICO violation, the parties must first have violated a provision of the RICO statute).  Second, as discussed above, Plaintiff has not alleged any facts to support an agreement involving Lutz, Ryan, or the Helsinge Defendants or anything other than vague allegations regarding an agreement with Liendo.  *See O'Malley v. O'Neill*, 887 F.2d 1557, 1560 (11th Cir. 1989) (affirming dismissal of RICO conspiracy claim because "allegations of a conspiracy were merely conclusory and unsupported by any factual allegations").  Indeed, "both

*Twombly* and the requirements for pleading a RICO case" warrant dismissal when a complaint does not allege "who made the agreement [to conspire], when the agreement was made, or how the Defendants made the agreement." *Solomon v. Blue Cross & Blue Shield Ass'n*, 574 F. Supp. 2d 1288, 1292 (S.D. Fla. 2008). Finally, Plaintiff fails to identify specific conduct taken by any of the Defendants amounting to involvement in the commission of predicate acts.

### 4.    Plaintiff is not likely to succeed on the merits of its Florida RICO claim.

Plaintiff also fails to state a claim under the Civil Remedies for Criminal Practices Act ("Florida RICO Act"). First, "Florida civil RICO does not apply extraterritorially." *Absolute Activist Value Master Fund Ltd. v. Devine*, 233 F. Supp. 3d 1297, 1327 (M.D. Fla. 2017) (citing *Equitable Life Assurance Soc'y of the U.S. v. McRee*, 75 Fla. 257, 265, 78 So. 22 (1918) ("It is manifest that the statute can have no force beyond the limits of this State.")). Second, where a plaintiff fails to state a claim under the federal RICO statute, his claim under the Florida RICO Act fails as well. "The federal RICO civil remedy provision and the Florida RICO civil remedy provision are nearly identical, and it is clear that the Florida RICO Act is patterned after the federal RICO Act." *Id.*; *see also Jackson*, 372 F.3d at 1263. As such, federal cases interpreting the federal RICO statute have been found to be persuasive when interpreting the Florida RICO Act. *Absolute*, 233 F. Supp. 3d at 1328; *Jackson*, 372 F.3d at 1263–64 ("[T]he analysis we apply to the plaintiffs' federal RICO claims is equally applicable to their state RICO claims."). Because Plaintiff fails to state a claim in Count VI under federal RICO, Count VIII fails as well.

### 5.    Plaintiff is not likely to succeed on its Florida Trade Secrets Act claim.

In its Motion, Plaintiff briefly discusses the Florida Trade Secrets Act, but does not address at all how Plaintiff is likely to succeed on the merits of this claim; thus, failing to meet its burden of establishing likelihood of success. (*See* Mot. 14–15). Instead, Plaintiff appears to assume it

will succeed on its claim—without any explanation—and proceeds with its extraordinary injunctive request that is wholly unwarranted under the Trade Secrets Act.

Under the Trade Secrets Act, "[a]ctual or threatened misappropriation may be enjoined" and the injunction may be continued to "eliminate commercial advantage."  Fla. Stat. § 688.003.  Based on this statute, meant to enjoin a competitor from misappropriating trade secrets, Plaintiff seeks to seize all of the Morillo Group Defendants' electronic information and freeze their assets before all of the defendants have been served.  In support of this request, Plaintiff cites cases that are inapposite.  For example, in *Four Seasons Hotels & Resorts B.V. v. Consorcio Barr, S.A.*, 267 F. Supp. 2d 1268 (S.D. Fla. 2003)—which was reversed in part[33]—the court found (after a bench trial) that the defendant had hacked into the plaintiff's central reservation system and misappropriated secrets and thus a permanent injunction was warranted to allow the plaintiff's forensic expert to inspect the defendant's computers to ensure that the defendant had not retained customer information it could use to compete with the plaintiff. *Id.* at 1326–27.  Plaintiff's reliance on *Four Seasons* is erroneous because there, the court issued a permanent injunction after finding that the defendant had violated the Trade Secrets Act.  *See id.*  Furthermore, as the Court already pointed out in its TRO, Plaintiff's reliance on *Dell Inc. v. BelgiumDomains, LLC*, No. CIV. 07-22674, 2007 WL 6862341 (S.D. Fla. Nov. 21, 2007) is misplaced because *Dell* involved trademark counterfeiting, and the seizure scheme was authorized by Congress. Dkt. 9 at 2.[34]  In sum, Plaintiff

---

[33] The Eleventh Circuit's reasoning and holding—reversing in part the district court—was not published; thus, one cannot ascertain whether the district court's permanent injunction decision was reversed.  *See Four Seasons*, 138 F. App'x 297 (11th Cir. 2005)

[34] And even if *Dell* were applicable, there, the plaintiff's seizure request was limited to the defendant's business records relating to counterfeited domain names of the plaintiff's trademark, *Dell*, 007 WL 6862341, at * 1; whereas here, Plaintiff's request for all of the Morillo Group Defendant's computers and electronic information is overbroad, intrusive, and unwarranted.

fails to cite even a single case supporting its unusual request that under the Trade Secrets Act the Court may issue a preliminary injunction to freeze all of a defendant's assets and seize all of a defendant's computers and electronic records.

In addition, Plaintiff fails to explain how it is likely to succeed on its claim. Plaintiff bears the burden of: (1) establishing the information allegedly taken by Defendants is a trade secret; (2) describing the trade secret with particularity; (3) establishing the information is not readily ascertainable by others; (4) showing that Plaintiff took reasonable steps to protect the secret information; (5) demonstrating the secret was misappropriated by Defendants; and (6) that the information has a competitive economic advantage. *See, e.g.*, *Del Monte Fresh Produce Co. v. Dole Food Co.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001); *VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1358 (S.D. Fla. 2012). In this case, however, Plaintiff does not allege in its Amended Complaint, let alone demonstrate in its Motion, that the information allegedly accessed by Defendants is a trade secret not available to the public, and that it took reasonable steps to protect the trade secret. Notably, Defendants are not competitors of Plaintiff, and thus Plaintiff's claim fails because there is no "competitive advantage" Defendants gained relative to Plaintiff from allegedly obtaining this information. *See Fortline, Inc. v. Moody*, No. 12-CV-81271, 2013 WL 12101142, at *6 (S.D. Fla. Jan. 7, 2013) (noting that the Trade Secrets Act regulates "participant conduct in the marketplace" to ensure "fair competition"). In short, Plaintiff cannot establish a likelihood of success on its Trade Secrets Act claim, and its attempt to use the Act's injunctive relief (meant to deter unfair competition) to freeze the Morillo Group Defendants' assets and seize all of the Morillo Group Defendants' electronic devices should be rejected by the Court.

### B.    Plaintiff fails to demonstrate irreparable harm.

Plaintiff also fails to establish that it will suffer irreparable injury in the absence of the

broad preliminary injunction that it seeks.  Plaintiff claims that, absent injunctive relief, the Defendants "will destroy or transfer the computer records they illegally possess and will continue to conceal proceeds that they control."  But this general allegation of purported harm is misleading and insufficient to warrant the drastic remedy of a preliminary injunction for several reasons.

First, Plaintiff has not been diligent in seeking an injunction.  Plaintiff waited months after allegedly discovering the evidence upon which the complaint and Motion are based.  *See* Dkt. 12 at ¶ 9 (noting that the Plaintiff trust was formed in July 2017, after "an intensive investigation by lawyers and investigators").  And, as explained in Section II(A)(1) and (2), the declarations filed by Plaintiff lack a reasonable foundation upon which a finding can be based that any of the Defendants accessed PDVSA's computer server without authorization.

Second, Plaintiff will not suffer irreparable harm absent the blanket freeze of "any assets" of the Morillo Group Defendants in the U.S. and abroad because it is not Plaintiff's money that is alleged to have been fraudulently obtained or withheld.  Rather, as this Court noted, the assets in question in the Amended Complaint are alleged payments made by third parties in furtherance of an alleged scheme to defraud the Plaintiff.  Put simply, Plaintiff is seeking a preliminary injunction to freeze assets to satisfy a potential money judgment, which the law does not allow.  *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1530 (11th Cir. 1994) ("We repeat: preliminary injunctive relief freezing a defendant's assets in order to establish a fund with which to satisfy a potential judgment for money damages is simply not an appropriate exercise of a federal district court's authority.").  Moreover, where, as here, the legal remedy of a money judgment, including statutory damages provided by state and federal RICO laws, provide sufficient redress to make a plaintiff whole, it is improper to freeze a defendant's assets to prevent asset dissipation.  *Storehouse Credit Union, EK. For. v. Cusumano*, 610CV850ORL35GJK, 2010 WL 11508264, at *7 (M.D. Fla. July 26, 2010).

Third, the Defendants as parties are already under an obligation to preserve documents and electronically stored information related to the issues raised in this proceeding.  *See Keim v. ADF Midatlantic, LLC*, 12-CV-80577, 2016 WL 7048835, at *4 (S.D. Fla. Dec. 5, 2016).  Thus, a preliminary injunction motion is, frankly, redundant as a  failure to preserve evidence can lead to sanctions under the Federal Rules of Civil Procedure and this Court's inherent authority.

**C.    Plaintiff cannot establish that the harm that it will suffer in the absence of an injunction would exceed the harm suffered by Defendants.**

Plaintiff also fails to establish that the harm that it will suffer if an injunction is not entered will be greater than the harm suffered by the Defendants if the injunction is entered.  Plaintiff's request to seize all of the Morillo Group Defendants' electronic files and equipment and physical documents and to freeze all of their assets in the U.S. and abroad would of course be incredibly harmful to the defendants in a number of ways and would far outweigh any harm to Plaintiff, which would have an adequate remedy at law for legal damages.

**D.    A preliminary injunction is not in the public interest.**

A preliminary injunction in this case is against the public interest. Plaintiff's seizure request is incredibly broad and would require the use of law enforcement to assist in preserving evidence— which may contain information that is unrelated, confidential, and privileged—for the Plaintiff. This is not the purpose of a preliminary injunction.  Plaintiff's request to freeze all of Defendants assets is also against the public interest because its request is solely to freeze assets in the event of possible damages, which is an improper use of a preliminary injunction.  *Rosen*, 21 F.3d at 530.

**III.    The Motion should also be denied for lack of personal jurisdiction.**

PDVSA's motion for a preliminary injunction should be denied as to Defendants, including Morillo, Baquero, Lutz, Liendo, and the Helsinge entities on the additional ground that the Court lacks personal jurisdiction over them.  *See, e.g., It's a 10, Inc. v. Beauty Elite Grp., Inc.*, 932 F.

Supp. 2d 1325, 1330 (S.D. Fla. 2013) (denying motion for preliminary injunction when court lacked personal jurisdiction over defendant).   The court lacks personal jurisdiction because these Defendants have not been served with process.   *Padrazi v. Cullman Med. Ctr.*, 896 F.2d 1313, 1317 (11th Cir. 1990) ("Service of process is a jurisdictional requirement: a court lacks jurisdiction over the person of a defendant when that defendant has not be served.").   Moreover, PDVSA has not alleged facts sufficient to establish that these Defendants, including Morillo, Baquero, or Lutz—who are both located outside the United States—have contacts with this forum sufficient to establish personal jurisdiction even if PDVSA had effectuated proper service of process.[35]

## IV.     Security Bond Request

Pursuant to Rule 65(c), Fed. R. Civ. P., in the event the relief requested in the Motion is granted by the Court, the Defendants request a bond in the amount of no less than double the amount of the value of the assets frozen, given the loss of opportunity and business costs that would result from an asset freeze.

<u>Conclusion</u>

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiff's Motion for Preliminary Injunction.

---

[35] While counsel for Morillo, Baquero, Lutz, Liendo, and the Helsinge entities have appeared in this matter, that appearance is solely for the limited purpose of opposing PDVSA's motion for a preliminary injunction and does not establish personal jurisdiction over Defendants.   *See Hudson Nat'l Bank v. Shapiro*, 695 F. Supp. 544, 546 (S.D. Fla. 1988) (finding that "personal jurisdiction over the Defendants that have not yet been personally served extends only to the issue of this preliminary injunction" and does not prejudice a general challenge to personal jurisdiction).

Dated:  March 26, 2018              Respectfully submitted,

**HOLLAND & KNIGHT LLP**
*Attorneys for Defendants Daniel Lutz, Helsinge*
*Inc., Helsinge Ltd., Saint-Hélier, Helsinge*
*Holdings, LLC, and Luis Liendo*
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Tel: (305) 374-8500
Fax: (305) 789-7799

By**:** *s/Alex M. Gonzalez*
    Alex M. Gonzalez
    Florida Bar No. 991200
    alex.gonzalez@hklaw.com
    Israel J. Encinosa
    Florida Bar No. 0046083
    israel.encinosa@hklaw.com
    David Kully (admitted *pro hac vice*)
    David.kully@hklaw.com

and

*s/ Kimberly Ann Pathman*
Kimberly A. Pathman
Florida Bar No. 118844
kpathman@akingump.com
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue NW
Washington, DC 20036
Tel: (202) 887-4000
Fax: (202) 887-4288

and

Mark J. MacDougall (admitted *pro hac vice*)
mmacdougall@akingump.com
Thomas P. McLish (admitted *pro hac vice*)
tmclish@akingump.com
Stacey H. Mitchell (admitted *pro hac vice*)
shmitchell@akingump.com
Connor Mullin (admitted *pro hac vice*)
cmullin@akingump.com

*Attorneys for Defendants*
*Francisco Morillo and Leonardo Baquero*

and

MARK MIGDAL & HAYDEN
*Attorneys for Defendant John Ryan*
80 SW 8th Street
Suite 1999
Miami, FL 33130
Telephone: 305-374-0440

By: *s/ Etan Mark*_____
Etan Mark, Esq.
Florida Bar No. 720852
etan@markmigdal.com
Donald J. Hayden, Esq.
Florida Bar No. 097136
don@markmigdal.com
Lara O'Donnell Grillo, Esq.
Florida Bar No. 37735
lara@markmigdal.com
eservice@markmigdal.com

## CERTIFICATE OF SERVICE

I certify that on March 26, 2018, I filed this document with the Clerk of Court using

CM/ECF, which will serve this document on all counsel of record.

*s/Alex M. Gonzalez*