**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

Case No. 1:18-cv-20818 DPG

PDVSA US LITIGATION TRUST
        Plaintiff,

vs.

LUKOIL PAN AMERICAS LLC; LUKOIL
PETROLEUM LTD.; COLONIAL OIL INDUSTRIES,
INC.; COLONIAL GROUP, INC.; GLENCORE LTD.;
GLENCORE INTERNATIONAL A.G.; GLENCORE
ENERGY UK LTD.; MASEFIELD A.G.;
TRAFIGURA A.G.; TRAFIGURA TRADING LLC;
TRAFIGURA BEHEER B.V.; VITOL ENERGY
(BERMUDA) LTD.; VITOL S.A.; VITOL, INC.;
FRANCISCO MORILLO; LEONARDO BAQUERO;
DANIEL LUTZ; LUIS LIENDO; JOHN RYAN;
MARIA FERNANDA RODRIGUEZ;HELSINGE
HOLDINGS, LLC; HELSINGE, INC.; HELSINGE
LTD., SAINT-HEUER; WALTROP
CONSULTANTS, C.A.; GODELHEIM, INC.;
HORNBERG INC.; SOCIETE DOBERAN, S.A.;
SOCIETE HEDISSON, S.A.; SOCIETE HELLIN,
S.A.; GLENCORE DE VENEZUELA, C.A.; JEHU
HOLDING INC.; ANDREW SUMMERS;
MAXIMILIANO POVEDA; JOSE LAROCCA; LUIS
ALVAREZ; GUSTAVO GABALDON; SERGIO DE
LA VEGA; ANTONIO MAARRAOUI; CAMPO
ELIAS PAEZ; PAUL ROSADO; BAC FLORIDA
BANK; EFG INTERNATIONAL A.G.; BLUE BANK
INTERNATIONAL N.V.

Defendants
_____

1

## AFFIDAVIT OF RAFAEL BADELL MADRID

My name is Rafael Badell Madrid, I am of legal age, bearer of Venezuelan Identity document No. 5.530.274, attorney-at-law, admitted to the practice of law in Venezuela under the license number 22.749, and admitted to practice as a foreign legal consultant by the Florida Bar No. 285154.  I hereby proceed to issue the following declaration:[1]

## I. QUALIFICATIONS

1.      I am a Venezuelan lawyer who obtained a J.D. at Universidad Catolica Andres Bello (1982) with a Master (LL.M) in Administrative Law at Universidad Central de Venezuela (1986), Doctor of Laws (PhD) at the Universidad Catolica Andres Bello (2008) and the Management Development Program from the IE-Business School of Madrid (2013).

2.      My professional background includes 35 years of experience as a lawyer and a Professor.  I joined the Attorney General's Office in 1979, where I held several positions to become Director of State Counsel and, later, Director of Administrative Litigation. Furthermore, I was Associate Judge of the First Contentious Administrative Court, Former Judge Rapporteur of the Political-Administrative Chamber of the Supreme Court of Justice, Former Associate Judge of the Electoral Chamber of the Supreme Court of Justice and Former Associate Judge of the Constitutional Chamber of the Supreme Court of Justice from January 2001 until April 2005.

---

[1] My native language is Spanish, however I speak and write in English, so I have made this statement in English for the convenience of the Court.

3.      I have been involved in private practice as a founder (1985) and senior partner of Law Firm BADELL & GRAU, which specializes in Government and Public Sector Law and Administrative Litigation. At BADELL & GRAU, I have represented and provided legal advisory and counseling services to both private parties and government departments and agencies, in matters related to constitutional law, public law, such as administrative contracts, public bidding procedures, administrative organizations and agencies, class actions, administrative litigation, privatizations, project finance, regulatory law, public debt, expropriations, and banking and capital markets, among other matters.

4.      I am a Professor of Administrative and Constitutional Law at the Universidad Catolica Andres Bello since 1982 to date in the pre graduate level and in the Master and PhD programs; lecturer at various related public law forums in Venezuela, Spain, United Kingdom, Colombia, Argentina, Uruguay and Mexico. In the 1998-1999 academic year, I took the Andres Bello Chair at St. Anthony's College, Oxford University and later I was appointed as a Senior Associate Member of said University in 2006 and 2007. I was also a Visiting Fellow of the External University of Colombia (1995) and a Extraordinary Visiting Professor at the Catholic University of Salta, Argentina (2001).

5.      I  have published numerous books and articles related to Constitutional and Administrative Law. A current copy of my *curriculum vitae*, including my publications and speaking engagements in the last thirty-five years is attached to this Report as Exhibit "A".

6.      I am a Lifetime Member of the Political and Social Sciences Academy of Venezuela (chair no. 17).

7.     I have been retained by Holland & Knight LLP, attorneys for defendant, Helsinge Inc., in order to express my expert opinion on certain principles of Venezuelan Law as they apply to the claim filed by PDVSA US LITIGATION TRUST, regarding the body of laws that governs the activity of Petróleos de Venezuela, S.A. (PDVSA) to sign valid and enforceable agreements and the validity of the PDVSA U.S. Litigation Trust Agreement executed by PDVSA represented by the Minister of the People's Petroleum Power.  A copy of the PDVSA U.S. Litigation Trust Agreement is attached as Exhibit "B".

8.     I render the following statement based on my experience and knowledge of Venezuelan Law and applicable statutes and principles, as well as my daily studies and analysis of scholars and court decisions, and my academic activity throughout the years.

9.     For the purposes of this statement, I have reviewed and analyzed the following documents:

a) AMENDED COMPLAINT filed by PDVSA US LITIGATION TRUST against LUKOIL PAN AMERICAS, LLC *et al*, before the United States District Court Southern District of Florida, Miami Division, Case No. 1:18-cv-20818 DPG (the "Complaint").

b) PLAINTIFF'S EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUCTION AND DELAYED SERVICE. Case 1:18-cv-20878-DPG.

c) PDVSA U.S. LITIGATION TRUST AGREEMENT executed on July 12, 2017 by and between PDVSA and the Litigation Trustees (as defined in the Agreement).

d) Minutes of Shareholder's Meeting of PDVSA with the up-to-date bylaws modifications, which was duly filed before the Office of the First Commerce Registrar of the District Capital (Venezuela) on March 9, 2017, under number 59, book 30-A.

## II. THE ISSUE

10.     The issue submitted for my consideration consists in examining whether, in accordance with the Venezuelan legal system, the PDVSA U.S. Litigation Trust Agreement (the "Litigation Trust Agreement"), executed by Petróleos de Venezuela, S.A. (PDVSA), represented by the Minister of the People's Petroleum Power: (i) is a valid contract; (ii) if the representations and authority alleged by the Minister of the People´s Petroleum Power has legal effects; and, (iii) if the mandatory formalities and requirements established by the Constitution of the Bolivarian Republic of Venezuela of 1999[2] (the "Constitution") and the laws and the statutes of Venezuela that regulate the matter were complied and fulfilled at the time of the execution of the Litigation Trust Agreement. Specifically, I have been asked to examine whether, according to the legal regime that governs the activity of PDVSA, and by virtue of the terms of the Litigation Trust Agreement, the Minister of the People's Petroleum Power had the authority, capacity and power to represent a public company such as PDVSA and sign a binding agreement, enforceable against PDVSA as a public company, and if the validity of the Litigation Trust Agreement required mandatory previous authorization by the National

---

[2] Oficial Gazzette Nº 36.860  of December 30, 1999 and Oficial Gazzette N º 5.908 of February 19 2009.

Assembly of Venezuela, in accordance with Article 150 of the Constitution or by any other authority.

11.     The foregoing has been raised in the context of the Complaint filed by PDVSA US LITIGATION TRUST against LUKOIL PAN AMERICAS, LLC *et al*, before the United States District Court Southern District of Florida, Miami Division, Case No. 1:18-cv-20818 DPG, in which the plaintiff acts as the purported assignee of PDVSA's actions, rights, title and interests in and to the claims asserted, enforcing claims that were allegedly irrevocably assigned to the plaintiff through the Litigation Trust Agreement.

### III. LEGAL REGIME OF PUBLIC COMPANIES IN VENEZUELA

12.     General Concepts: In Venezuela, the Government and Public Sector directly participate in a variety of economic activities and in strategic sectors, often as monopoly or with exclusive rights, through "public companies." These "public companies" are "Governmental Decentralized Entities" (Government´s instrumentalities) that carry out commercial, industrial, financial, or any other activities, and are regulated under a mixed regime of laws (Public Laws or Private Laws[3]) according to the nature of the acts they perform.   Indeed, when a "public company" acts in its regular and customary course of business (as any other business association), Private Law applies; but when it comes to acts involving the transfer of rights or titles, or when the importance

---

[3] According to the legal system in Venezuela, there is a distinction between "Private Law" and "Public Law".  Private Law involves the body of laws (statutes) that regulates the relationships between individuals and business associations, such as the law of contracts, torts, and the law of obligations. It is to be distinguished from Public Law, which deals with relationships between both individuals and business associations and the Government, including regulatory statutes, and other bodies of laws (statutes) that affect the public order and public policy. In general terms, private law involves interactions between private citizens, whereas public law involves interrelations between the government itself and or with the general population.  Also, it is important to clarify that –usually- when something is qualified as "public", this means Government involvement or property.

6

or transcendence of the operation involves public funds, the rules of control of Public Law apply. The latter is a logical consequence, because in some cases the National Treasury may be comprised. Therefore the "public company" and the national interests are linked concepts.

13.    That is the reason why scholar -BREWER-CARÍAS- defines "public companies" as *"business associations incorporated with public capital contributions, which are incorporated and operated according to the procedure and the legal regime established in the Código de Comercio (Commercial Code), and whose activity is under the control of the Congress[4]."*[5]  Among these "public companies" scholars distinguish the business associations in which the Government or Public Sector owns the totality (100%) of the outstanding shares; those of mixed capital contributions, that is, those in which the Government or Public Sector owns 50% or more of the outstanding shares; and mixed companies, in which the Government or Public Sector owns between 30% and 49% of the outstanding shares.[6]

14.    For the scholar VILORIA, "public companies" are "*those functionally decentralized entities of the Government with legal personality of public or private law in which the State exercises control of its address, directly or through other public entities, through possession of the majority of the capital contribution or through other instruments that assure said control and whose object is the production of goods and/or*

---

[4]  BREWER-CARÍAS, Allan, The Public Administration, Treatise of Administrative Law, Volume II, Publisher Thomson Reuters, 013. page 357.
[5]  With the exception of the Litigation Trust Agreement, which is in English, the authorities cited herein are all written in Spanish.  The quotes provided herein are my translations of the original, Spanish authorities.
[6]  Id. Brewer.

*services of an industrial, commercial or financial nature or the coordination and control of the activity of other public companies .*"[7]

15.     For the academic GARRIDO ROVIRA "public companies" encompass a "*business association (corporation or limited liability company) in which ownership, jointly or separately, belongs to the following entities with real or personal substratum : 1. The Republic; 2. The smallest territorial entities, that is, the States and Municipalities; 3. Autonomous Institutes and other public foundational institutions such as the State Universities; 4. State legal persons of associative basis governed by Public Law; 5. The foundations incorporated and directed by a State public entity; 6. Companies whose purpose is the control of other (holding), State Companies of first, second or more grades, as well as companies born by the participation of any of the aforementioned entities .*"[8]

16.     The definition of "public company" encompasses a business association incorporated by the Government or any other public entity, which has an associative nature and a majority –or totality- of government's or public entity participation in the share holding. This structure is part of the decentralized public administration organization, as it entails the incorporation of a separate legal personality from the Republic and Government, with separate assets and liabilities.

17.     As part of the French legal heritage and integrated into the legal system of Venezuela -as many other *Civil Law* concepts- "public companies" in Venezuela are subject to a mixed legal regime, which involve rules and regulations of Public Law and

---

[7] VILORIA, ENRIQUE, T*he Concept of Public Enterprise: The four elements of a definition, Journal of Public Law, Journal of Public Law, No. 16, October-December, 1983, p. 92*
[8] Garrido Rovira, Juan, Topics on Descentralized Administration in Venezuela, Editorial Jurídico Venezolana, Caracas, 1984, PP. 121-127.

Private Law.  Therefore, these mixed principles and body of laws applicable to the "public companies" differ from the body of laws applicable to other business associations of the "private sector" and from the system under the *Common Law*. In particular, those rules and regulations of Public Law mean a special set of regulations on the relationship of "public companies" with the Government and its branches and, very specifically, on the management of their assets and resources that are directly linked to the national interest.

18.     In short, the "public company" involves a specific activity developed by the Government through a business association.  However, its operation is subject to an essential "*check and balance*" control under the regulations and statutes of Public Law.

19.     <u>Legal regime of "public companies"</u>: The legal regime of "public companies" in Venezuela embraces, in its first level, the Constitution, which establishes the role of the "public company" as an instrument of the Government for the fulfillment of the purposes of the "social State under the rule law", in terms of the satisfaction of general interests. Article 299 of the Constitution establishes that the Government, together with the private initiative, will promote the harmonious development of the national economy, allowing its direct participation in the economy, which is concretized by virtue of the channel of the "public company".

20.     This is recognized by article 300 of the Constitution, which establishes that *"the national regulations and statutes shall establish the conditions for the creation of functionally decentralized entities to undertake social or business activities in order to ensure the reasonable economic and social productivity of the public resources that are invested in it."*

21.     Article 302 of the Constitution provides that "*The Government reserves, through the respective organic statute, and for reasons of national convenience, oil activity and other industries, operations, services and goods of public interest and strategic nature. The Government will promote the national manufacture of raw materials from the exploitation of non-renewable natural resources, in order to assimilate, create and innovate technologies, generate employment and economic growth, and create wealth and welfare for the people.*"

22.     Article 187(3) of the Constitution establishes the power of the National Assembly (the Legislative branch of Venezuela) to exercise the functions of "checks and balances" over the Government and the national public administration, in the terms established in the Constitution and in the body of laws (statutes and Acts, since Venezuela is a Civil Law tradition country). Likewise, article 187(9) of the Constitution grants the power to the National Assembly to approve "public-interest contracts" entered into by the Government. This control regime is complemented by the provisions of Article 142 of the Constitution, which states "*public interests in corporations or any other entities, shall be under the control of the Government, in the manner established by law.*" With this rule, the Constitution delegated to the Legislative Branch of the Government the establishment of concrete control mechanisms over decentralized entities, such as "public companies."

23.     Another provision of special importance in the constitutional is Article 150, which establishes that "*The execution of the public-interest contracts shall require the approval of the National Assembly in the cases determined by law. No municipal, state, or national public-interest contract shall be executed with foreign nations or*

*official entities, nor with foreign associations not domiciled in Venezuela, nor transferred to them without the approval of the National Assembly. The law may require in the public-interests contracts, certain conditions of nationality, domicile or of another order, or require special guarantees.*"  Likewise, in this matter the provisions of article 151 of the Constitution are applicable.

24.     Finally, since "public companies" are part of the organization of the Government, their actions are also subject to the principle of legality as established in Article 137 of the Constitution which says that all Public Power bodies must be submitted in all its actions to the provisions of Constitution and in what the laws foresee.

25.     All these constitutional regulations on "public companies" are intended to constraint the performance of those entities to a special-control regime, so that the use of the business association is not intended as a mechanism to act in an unlimited manner, rather, their actions are submitted by the Constitution and, especially, to the parliamentary check and balance control exercised by the National Assembly.

26.     The Constitution is not the only body of law with rules governing "public companies".  Indeed there are many statutes and Acts in Venezuela regulating "public companies". *The Organic Law of Public Administration Act* (LOAP)[9], establishes the general principles governing "public companies". First, it defines public companies in article 103 of the LOAP as "***public law juridical entities incorporated in accordance to the rules of private law***, *in which the Republic, the states, the metropolitan districts or the Municipalities, or any of the functionally decentralized entities, alone or jointly, have a participation greater than fifty percent of the share capital* ".

---

[9] Oficial Gazzette  N° 6.147 of  November 17th, 2014.

27.     Then, Article 108 of the LOAP establishes that "*Public Companies shall be governed by the ordinary legislation, except as provided in this Statute. State companies, created by a national statute, shall also be governed by ordinary legislation, except as provided in the law.*"

28.     <u>Organic Law of the Financial Administration of the Public Sector Act</u>: The *Decree with Rank, Value and Force of the Organic Law of Financial Administration of the Public Sector Act (LOAFSP)*[10] applies to "public companies" and establishes the budget regime, public credit, public accounting, and internal audit, and also establishes the legal regime of public finances.

29.     <u>*Organic Law of the Office of the General Comptroller of the Republic and the National System of Fiscal Control* (LOCGR) Act</u>[11]: "Public companies" are subject to the control regime established in the LOCGR. In fact, as per article 9(10) of this Statute: "*[These entities] shall be Submitted to the provisions of this Act and to the control, oversight and supervision of the Office of the General Comptroller of the Republic: .... 10. The business associations of any nature in which the persons referred to in the foregoing numerals [Government and Public entities] have a share in their capital stock, as well as those that are incorporated with the participation of the latter.*"

30.     "Public companies" are also subject to the provisions of the *Decree with Rank, Value and Force of Organic <u>Law of the  Attorney General's Office Act</u> (LOPGR)*[12], which regulates the operation of the  Attorney General's Office as representative of the Republic and Advisor to the entities and bodies of the Central National Public Administration and Functionally Decentralized.

---

[10] Extraordinary Oficial Gazzete  N° 6.210  of December 30th, 2015.
[11] Extraordinary Oficial Gazette  N° 6.013 of December 23th, 2010.
[12] Extraordinary Oficial Gazette  N° 6.210  of December 30th, 2015.

31.   Specifically with regards to the exercise of the counseling power in the matter of contracting, Article 11 of the LOPGR establishes that:

*"It is the responsibility of the Republic Attorney General's Office to issue its opinion on national-public-interest contracts **and on any agreement or convention that directly or indirectly affects the patrimonial interests of the Republic**."* (Emphasis added).

32.   The LOPGR broadly establishes those agreements that are submitted to the opinion of the Republic Attorney General's Office, which should be noted, is not limited to the public-interest contracts that will be analyzed later, but also extends the exercise of this advisory power to any agreement or convention that directly or indirectly affects the assets or interests of the Republic.

33.   As regards the adoption of arbitration as a mechanism for resolving conflicts of public contracts, implying a waiver of the jurisdiction of Venezuelan courts, a stricter provision is established as indicated in articles 12 and 13 of the LOPGR:

*Article 12: "The contracts to be executed by the Republic that establish clauses of arbitration, both national and international, must be submitted to the prior and express opinion of the Attorney General of the Republic."*

*Article 13: "For the purposes set forth in the previous article, the highest authorities of the organs of the National Public Power, must submit to the Attorney General's Office the draft contracts to be executed, with their respective supports and the opinion of the Legal Consultancy, which must make express pronouncement, on the origin of the clauses of national or international arbitration."*

34.   Article 8 of the LOPGR establishes that all the provisions of the LOPGR are considered of public order and are applied with preference to other Laws.

35.   Of all these legal provisions and statutes, the special legal regime of "public companies" is clear, to which the entire regime of constitutional and legally established control is applied first, and secondly, ordinary legislation.

13

## IV. LEGAL REGIME APPLICABLE TO PDVSA

36.     <u>Constitutional legal regime applicable to PDVSA</u>: Article 303 of the Constitution granted constitutional status to Venezuelan oil activity and, in particular, establishes the involvement of the Government directly in that sector through the use of the public company, "Petróleos de Venezuela, S.A", by indicating that constitutional provision that "*For economic sovereignty, politics and national strategy reasons, the Government will keep all the shares of Petróleos de Venezuela, S.A, or the entity created for the management of the oil industry, except those of the subsidiaries, strategic associations, companies, and any other that has been constituted or constituted as a consequence of the business development of Petróleos de Venezuela, S.A.*"

37.     Therefore, the existence of a "public company" with a single shareholder was imposed: the Republic, for the management of the oil industry, in a monopoly condition, which although it was incorporated and operates as a business association, due to its importance, strategic character and the importance of the field in which it operates, is also regulated by Public Law regulations and statutes, which makes its business turn subject to important regulations, constitutional and legal, which would be inapplicable to private business associations in the exercise of its economic activity. In particular, PDVSA is subject to the parliamentary control referred to in the aforementioned constitutional provisions, article 142 and article 187(3) of the Constitution and all the controls established in laws, statutes and resolutions due to the importance for the entire country of the activities developed by PDVSA.

38.     <u>Public Law system applicable to PDVSA as a "public company"</u>: In addition to the constitutional regulations contained in articles 137, 142, 187(3), 187(9),

299, 300, 302, 150 and 151, previously mentioned that are applicable to PDVSA, below we will analyze the set of Public Law regulations that control and regulate the activity of PDVSA, related to its management, administration and, especially, the execution of contracts that may comprise its assets.

39.     Organic Law of Public Administration Act: The *Organic Law of Public Administration Act* (LOAP) has the purpose of establishing the principles and bases that govern the organization and functioning of public administration, both centrally and functionally decentralized (Article 1), within which is understood including PDVSA as a "public company".

40.     In particular, the regulations of the "public companies" referred to in Section Two of Chapter II of the functional decentralization that forms part of Title IV of the deconcentration and functional decentralization regulated by the LOAP are applicable to PDVSA. Especially the aforementioned article 103 that highlight the special mixed legal regime to which "public companies" are subject to.

41.     Likewise, the operation of PDVSA, as a public company, is subject to the control mechanisms inherent to inter-administrative relations exercised by central public administration bodies (eg. ministries) with respect to decentralized entities (eg public companies).  Article 120 of the LOAP provides as follows:

> *"The Vice-President of the Republic, the vice-presidents or vice-presidents of the sector, the ministers or other bodies or control bodies, national, state, of the metropolitan or municipal districts, with respect to the functionally decentralized entities that are assigned to him, have the following attributions:*
> 1. *Define the policy to be developed by such entities, for which purpose they will formulate the general directives that are necessary.*
> 2. *Permanently perform coordination, supervision and control functions in accordance with the guidelines of the centralized planning.*

3. *Appoint the presidents of public institutes, autonomous institutes and other decentralized entities.*

4. *Continuously evaluate the performance and results of its management and promptly inform the President or President of the Republic, governor or governor, mayor or mayor, as appropriate.*

5. *To be permanently informed about the execution of the plans, and to require such information when it deems appropriate.*

6. *Propose to the President or President of the Republic, governor or governor, mayor or mayor, as appropriate, the necessary reforms for the purpose of modifying or eliminating functionally decentralized entities that were assigned to him, in accordance with the applicable regulations.*

7. *Ensure the conformity of the actions of its functionally decentralized entities that are assigned to it, to the guidelines, policies and plans dictated according to the centralized planning.*

8. *The others determined by national laws, state laws, ordinances and regulations.*
   *When the assignment of a functionally decentralized entity is performed to another entity of the same type, the highest authority of the guardianship entity by ascription shall render accounts to the holder of the superior body to which it is ascribed, on the exercise of the attributions contained in this article, in order to guarantee unity in the exercise of corresponding control by the higher bodies of the Public Administration. "*

42.     Thus, PDVSA, being a decentralized administration body, is subject to the controls derived from its attachment to the national public administration, in this case to the Ministry of Popular Power for Petroleum.

43.     This inter-administrative relationship is regulated in the *Decree-Law on the Affiliation of Autonomous Institutes, Public Companies, Foundations, Associations and Civil Associations of the State to the organs of public administration Act*[13], which states that the public administration will exercise over the entities assigned to it, the following control mechanisms: (i) *shareholding control* (control accionarial), (ii) *guardianship control* (control de tutela), and (iii) *bylaws control* (control estatutario).

---

[13] Extraordinary Oficial Gazette  N° 5.556 of November 13th, 2001.

44.     Within these control mechanisms, PDVSA applies the shareholding control established in article 78(14) of the LOAP, which provides for the following:

> "Article 78.14 of the Organic Law of the Public Administration
> Chapter VI
> Of the Common Competencies of the Ministers and Vice-Ministers
> Common competences of the ministers with office
> Article 78
> Common competences of the ministers or ministers with office are:
> (...)
> 14. Exercise the representation of the Republic's shares in the state-owned companies assigned to them, as well as the corresponding shareholding control ".

45.     Shareholding control is implemented through the participation of the public entities that act as shareholders in its capital stock. In the case of PDVSA, the Republic owns all the shares of PDVSA with exclusivity. The control of PDVSA, is exercised in the same way as the individual shareholder of a corporation[14] that is, through the shareholders' meeting, a body regulated in the Bylaws of PDVSA, to which I will refer later.

46.     It is a control that grants powers to the Minister of limited character because it is regulated by the Public Law legal system. That is to say: *First of all, the control is limited by the law, which implies that the guardian entity cannot freely dictate an order to the public company since it is submitted to a specific body of laws; Secondly, the control is not presumed, but must be expressly attributed in the law.* Thus, BREWER-CARÍAS explains that "*the guardianship control is not presumed, it must be expressly established in the Law, determining what the guardian controller can do on the*

---

[14]   BREWER-CARIAS, Allan, Principles of the legal regime of the organization Venezuelan Administrative, Venezuelan Legal Editorial, Caracas, 1994, p. 85

*decentralized entity. It is not an unlimited control, but, on the contrary, the ways as it must be done and the acts submitted to it, must be expressly established in the Law."[15]*

47.   <u>Organic Law of the Financial Administration of the Public Sector Act</u>: The *Decree with Rank, Value and Force of the Organic Law of Financial Administration of the Public Sector Act* (LOAFSP) establishes the budget regime, public credit, public accounting, and internal audit, and also establishes the legal regime of public finances, as well as the multiannual framework of the budget and the macroeconomic coordination between the Executive Branch and the Central Bank of Venezuela.

48.   In accordance with article 5 of the LOAFSP, the regulations of said legal instrument are applicable to "public companies" and, therefore, to PDVSA, which have an impact on two specific aspects: (i) budgetary regime; and (ii) internal control regime.

49.   *<u>Organic Law of the Office of the General Comptroller of the Republic and the National System of Fiscal Control Act (</u>*LOCGR): PDVSA, as a "public company", is submitted to the fiscal control regime established in the LOCGR. In fact, in accordance with article 9(10): "*[These entities] shall be Submitted to the provisions of this Statute and to the control, oversight and supervision of the Office of the General Comptroller of the Republic: .... 10. The business associations of any nature in which the persons referred to in the foregoing numerals [Government and Public entities] have a share in their capital stock, as well as those that are incorporated with the participation of the latter.*"[16]

50.   According to the regime established in the LOCGR, the activity carried out by PDVSA as a public company is submitted to the powers of that oversight and

---

[15] Id. p. 83
[16] The Regulation referred to in numeral 10, encompasses the National, State and Municipal Public Power, as well as the Autonomous Institutes.

control comptroller, so that any action taken by PDVSA, especially those activities related to the disposition of the property that is owned by the Republic.

51.   <u>Organic Hydrocarbons Law Act</u>: Everything related to the exploration, exploitation, refining, industrialization, transportation, storage, commercialization, conservation of hydrocarbons, as well as the refined products and the works required for these activities, is governed by the *Organic Law of Hydrocarbons Act* (LOH)[17].

52.   Article 3 of the LOH reaffirms the provisions of the Constitution with regard to the ownership of the Republic over hydrocarbon deposits that are considered public property, and therefore inalienable and never acquirable through adverse possession or prescription of any kind. Also this Law declares as public utility and of national interest the activities that this law regulates, which highlights the importance of the economic activity that PDVSA represents in Venezuela.

53.   <u>Private Law regime applicable to PDVSA as a public company</u>: Based on the consideration previously made regarding the mixed legal regime that governs the operation of PDVSA, in accordance with the provisions of article 108 of the LOAP, we must make reference to the ordinary legislation and the Company's Bylaws that regulate its internal organization and representation regime.

54.   <u>Bylaws of PDVSA as a source of law applicable to its actions</u>: The PDVSA's bylaws define in its Third Clause that the activity of that company is submitted to the *Organic Law of Hydrocarbons Act* (LOH), the *Decree with Rank and Force of Organic Law of Gaseous Hydrocarbons Act* (LOHG)[18], by its regulations, by these

---

[17] Oficial Gazette N° 38.493 of August 4th, 2006.
[18] Oficial Gazette N° 36.793 of September 23, 1999.

Statutes, by the provisions issued by the Executive Branch by the body of the Ministry of Popular Power of Petroleum and by the rules of law applicable to it.

55.     In particular, the Eleventh Clause of the Bylaws of PDVSA, which is included within the Title II of the Shareholder's Meetings, expressly provides for the shareholding control exercised by the Ministry over that company by stating that:

> *"**Eleventh Clause**. The Ministry of People's Power of Petroleum and the other Ministers that may designate the President of the Republic, shall exercise the representation of the Republic in the Shareholder's Meeting, which shall be presided over by the Minister of Popular Power of Petroleum. "*

56.     This participation of the Minister in the shareholders' meeting is totally different from the decision-making of the Board of Directors of PDVSA, as the management and administration body of the company that executes the decisions taken by the majority in the shareholders' meeting.

57.     The Bylaws of PDVSA provide for a special title with the regulation of the Board of Directors as the body empowered to authorize the execution of contracts by PDVSA. In this regard, the aforementioned clause indicates the following:

> *"**Twenty-Seventh Clause**. The Board of Directors will exercise the supreme administration of the business of the company and, especially, its attributions will be the following: (...)*
> *5. Authorize the execution of contracts, being able to delegate this power in accordance with the special internal regulations that will be dictated for that purpose."*

58.     Moreover, the Board of Directors itself will have a President who exercises legal representation of the company and is the person empowered to execute the acts on behalf of PDVSA. In that sense, the thirty-second and thirty-third clauses clearly establish the following:

> *"Thirty-Second Clause. The immediate management and daily management of the company's business will be under the responsibility of the President, who will also be his legal representative.*
> *Thirty-third Clause. The President will have the following duties and powers: (...)*
> *3. Execute or cause the decisions of the Shareholders' Meetings and the Board of Directors to be executed.*
> *4. Execute all the documents related to the company's operations, being able to delegate this faculty according to the regulations of internal organization*
> *8. Perform the representation of the company in accordance with the provisions of this instrument, it being understood that it will not have the judicial representation of it."*

59.     As can be seen from the previous lines, the power to sign contracts and bind the company in accordance with the provisions of the PDVSA's Bylaws **belongs to the President of the Board of Directors, who could legally bind the company, with the prior authorization of the Board of Directors**.

60.     Although from the commercial law perspective the corporate rules that should be primarily applied to all internal matters of the company are the Bylaws, the Venezuelan Commercial Code[19] rules are additionally applicable, which is recognized by the Bylaws of PDVSA as rules of regulations of law. In this regard, it is worth mentioning the provisions of article 270 of the Commercial Code, according to which:

> *"The management of the business of the company, as well as the representation thereof, as regards this management, may be entrusted to directors, managers or other agents, associates or not, whose appointment, revocation and powers shall be regulated by the bylaws"*

61.     As we have said before, within the legal regime applicable to PDVSA, not only the rules of Public Law are applicable, but it is also subject to the Bylaws as a fundamental corporate norm and supplemented by the rules of the Commercial Code that governs business associations.

---

[19] Extraordinary Oficial Gazette N° 475 of December 21th, 1995.

## V. INCOMPETENCE OF THE MINISTRY OF PEOPLE'S OWN POWER TO EXECUTE THE "U.S. PDVSA LITIGATION TRUST AGREEMENT"

62.     Having explained the above considerations regarding the special legal regime to which PDVSA is submitted, as a "public company", it must be analyzed whether, in accordance with the legal regime that regulates its operation, the Minister of the People's Petroleum Power had competence to, in the name and on behalf of that public company, execute the Litigation Trust Agreement.

63.     When signing the Litigation Trust Agreement, the Minister invoked as its legal grounds to execute it article 78 (14) of the LOAP, which establishes the following:

> *"Article 78.14 of the Organic Law of the Public Administration*
> *Chapter VI*
> *Of the Common Competencies of the Ministers and Vice-Ministers*
> *Common competences of the ministers with office*
> *Article 78*
> *Common competences of the ministers or ministers with office are:*
> *(...)*
> *14. Carry-on the representation of the Republic's shares in the state-owned companies assigned to them, as well as the corresponding shareholding control ".*

64.     The aforementioned regulation establishes the power of the Minister to perform the representation of the Republic in the shareholders' meeting of PDVSA with the right to voice and vote, that is, as explained above, to exercise the shareholding control derived from the participation that, in its social capital, the Republic owns (which, in this case, are all the outstanding shares of PDVSA). Such representation in the shareholders' meeting empowers the Minister to approve or disapprove the specific matters submitted to the shareholders' meeting, such as approving or disapproving the annual report of the Board of Directors, knowing the Commissioner's report, arranging

22

the distribution of profits or even reforming the society bylaws, among other matters to be considered within the frame of a shareholder's meeting.

65.     However, according to the regime contained in the bylaws of PDVSA, the aforementioned legal provision does not empower the Ministry to represent PDVSA in the execution of contracts, let alone to execute the Litigation Trust Agreement that implies the disposition of the litigious rights of PDVSA.

66.     That is to say that the Minister does not have the legal competence to represent PDVSA *vis-à-vis* third parties or to execute contracts on behalf of PDVSA, because who has that power to execute contracts is the President of the Board of Directors after approval of the Shareholders' Meeting and the Board of Directors.  In this regard, the provisions of the twenty-seventh clause cited above of the bylaws of PDVSA that expressly states:

> *"Twenty-Seventh Clause. The Board of Directors will exercise the supreme administration of the business of the company and, especially, its attributions will be the following: (...)*
> *5. Authorize the execution of contracts, being able to delegate this power in accordance with the special internal regulations that will be dictated for that purpose."*

67.     Moreover clauses Thirty-Two and Thirty-Three of the Bylaws clearly states:

> *"Thirty-Second Clause. The immediate management and daily management of the company's business will be under the responsibility of the President, who will also be his legal representative.*
> *Thirty-third Clause. The President will have the following duties and powers: (...)*
> *3. Execute or cause the decisions of the Shareholders' Meetings and the Board of Directors to be executed.*
> *4. Execute all the documents related to the company's operations, being able to delegate this faculty according to the regulations of internal organization*

*8. Perform the representation of the company in accordance with the provisions of this instrument, it being understood that it will not have the judicial representation of it."*

68.     Consequently, in accordance with the provisions of Clause Thirty-Second and Thirty-Third the Bylaws of PDVSA, it is the President of the Board of Directors who can represent PDVSA *vis-à-vis* third parties with the prior approval of the Board of Directors issued by a majority of its members.

69.     In this way, the execution of acts or contracts on behalf of PDVSA must be approved by the Board of Directors and they will be executed by the President of the Board, but in no way could the power of shareholder control exercised by the Minister of Finance as per Article 78(14) of the LOAP be interpreted or extended to exercise the execution of disposition of assets agreement that comprise PDVSA's assets.

70.     <u>Limits on shareholder's control</u>: The Minister of Petroleum, acting as representative of the Republic's shares, does not have PDVSA's management and/or administration powers; it represents the shares or stocks of the Republic in the shareholders' meeting, but cannot by itself make decisions or execute agreements to bind PDVSA. The shareholder control exercised in PDVSA's shareholders' meeting does not enable it to act as its legal representative and, even less, to execute contracts that comprise the PDVSA's assets.

71.     The Minister performs his shareholder control in the shareholders' meeting, which is a body of the company, which makes decisions in the field of powers established by the bylaws of PDVSA and, additionally, in what has not been regulated, as what the rules of the Commercial Code provides. No rule of the Bylaws confers powers

on the Minister, as a member of the shareholders' meeting, to legally represent PDVSA or to execute contracts on behalf of PDVSA.

72.     Both the shareholders' meeting and its individual members must comply with the provisions of the PDVSA's Bylaws. It is true that they have the power to appoint administrators and commissioners, but they cannot invade their field of action while they are in operation. As stated by the most authoritative mercantile scholar in Venezuela - MORLES- the administrators have the exclusive competence to manage the company, only the shareholders' meeting having the power to appoint or revoke them and, if necessary, decide on their responsibility. Thus, the shareholder's meeting cannot interfere in the management and powers of the administrators, since they (the administrators) are responsible for the execution of the acts necessary for the fulfillment of the corporate purpose.[20]

73.     The powers of shareholding control, as well as all the powers granted to the administrators, are of restrictive interpretation and, therefore, the limits preset by the laws, regulations and bylaws must be respected.  If not, any act performed beyond powers or out the specific power granted by the laws will result invalid as an undue extension of the powers assigned by the legal system. Consequently, the power of shareholding control established in Article 78 of the LOAP does not constitute a mechanism for granting powers to the Minister of Petroleum to execute contracts with third parties on behalf of PDVSA and much less to comprise its assets.

74.     The Litigation Trust Agreement also invoked, as legal authority, Article 8 of the *Organic Law on Hydrocarbons Act*, which expressly establishes the following:

> "*Article 8. Competence*.

---

[20] MORLES, Alfredo, Course on Commercial Law, Volume II, UCAB, Caracas, 1989, pp.940 and 9 41.

*The Ministry of Energy and Petroleum is responsible for the formulation, regulation and monitoring of policies and the planning, execution and supervision of activities related to hydrocarbons, which includes the development, conservation, use and control of said resources; as well as the study of markets, the analysis and pricing of hydrocarbons and their products. In this regard, the Ministry of Energy and Petroleum is the competent national body in everything related to the administration of hydrocarbons and consequently has the power to inspect the work and activities inherent to them, as well as to supervise the operations that cause the taxes, fees or contributions established in this Act and review the respective accounts.*

*The Ministry of Energy and Petroleum will perform the planning function referred to in this article, in accordance with the National Development Plan. For the fulfillment of these functions, the National Executive will provide the necessary resources in accordance with the pertinent legal norms.*

*Officials and individuals will provide national employees who perform the above functions, the most comprehensive facilities for the full performance of them.*

75.     The aforementioned regulation refers to the powers of the Minister of Petroleum within the framework of the activities carried out by PDVSA, especially the Minister is given the power to evaluate the programs and actions of public companies, to establish guidelines and plans in relation to the future of the company, as well as to establish guidelines for the distribution of resources and control their budget, which attends to specific controls and performance control.

76.     This competence expressly attributed by the law is also referred to control powers exercised by the central public administration through the Ministry of Petroleum on PDVSA, which finds its limit in the regulation itself, not being possible to make an extensive interpretation of those powers to pretend to exercise other powers not expressly regulated neither in the Law nor in the Company's Bylaws. The aforementioned Article 8 of the *Hydrocarbons Law Act* (LOH) does not grant any competence to the Minister of

Petroleum to legally represent PDVSA or to execute contracts with third parties that comprise PDVSA's assets.

77.     Competence is one of the principles on which the administrative organization in Venezuela is based, which requires that the bodies and entities of the administration act strictly within the framework of the functions as specifically determined by the legal system, without being possible to act outside of what is expressly allowed by law. The foregoing is also based on the principle of administrative legality expressly established in Article 137 of the Constitution.

78.     Competence is a fundamental principle whose compliance is decisive to guarantee the legality of government's actions. Consequently, when a government body acts in a certain area without having due legal competence, its actions are considered null and void and do not produce any legal effects. This is expressly stated in Article 19(4) of the Organic Law on Administrative Procedures (LOPA)[21], declaring null and void acts "*dictated by manifestly incompetent authorities*".

79.     Having reviewed the documentation towards the preparation of this affidavit, we have not observed any document that demonstrates that the PDVSA's Board of Directors authorized the Minister of Petroleum - acting in that capacity - to sign the Litigation Trust Agreement on behalf of PDVSA. As indicated above, the LOAP does not recognize competence for the Ministry to represent and bind PDVSA before third parties, so it can be concluded that the Minister of Petroleum has no competence by law nor was it attributed by the PDVSA's Board of Directors to represent PDVSA in the execution of the Litigation Trust Agreement.

---

[21] Extraordinary Oficial Gazette  N° 2.818 .July, 1ˢᵗ 1981.

80.     **As a result of the foregoing, based on Article 137 of the Constitution in accordance with Article 19(4) of the Organic Law on Administrative Procedures, our conclusion is that the Litigation Trust Agreement executed by the Minister of Popular Power of Petroleum could be considered null and void under the laws of the Venezuelan legal system, insofar as there is no evidence that the Minister had express competence to represent by itself PDVSA and/or to execute contracts on behalf of PDVSA, especially to bind PDVSA in any way, since in accordance with the PDVSA's bylaws and the Code of Commerce, the body that has the power to bind PDVSA and execute contracts is the Board of Directors and performed through its President.**

## VI. FORMALITIES PROVIDED FOR THE ORGANIC LAW OF THE REPUBLIC   ATTORNEY GENERAL APPLICABLE TO THE EXECUTION OF THE LITIGATION AGREEMENT

81.     Pursuant to the legal regime applicable to "public companies", PDVSA is also submitted to the application of the LOPGR, which regulates the operation of the Attorney General's Office as a representative of the Republic and adviser to the bodies of the Central National Public Administration and Functionally Decentralized.

82.     Especially with regard to the exercise of the consultative power in matters of contracting, Article 11 of the LOPGR establishes that:

> *"It is the responsibility of the Office of the Republic Attorney General's Office to issue its opinion on national-public-interest contracts **and on any agreement or convention that directly or indirectly affects the patrimonial interests of the Republic.**" (Emphasis added).*

83.    The LOPGR broadly establishes those acts for which its opinion will be necessary, which should be noted, is not limited to public-interest contracts that will be analyzed later, but also extends the exercise of this advisory power to any agreement or convention that directly or indirectly affects the assets or interests of the Republic.

84.    To emphasize the importance of all the provisions contains in LOPGR article 8 statues that all the provisions of the LOPGR are considered of public order and are applicable with preference over any other Laws.

85.    As regards the adoption of arbitration as a mechanism for resolving conflicts of public contracts, implying a waiver of the jurisdiction of Venezuelan courts, a stricter provision is established as indicated in articles 12 and 13 of the LOPGR:

> *Article 12*: *"The contracts to be executed by the Republic that establish clauses of arbitration, both national and international, must be submitted to the prior and express opinion of the Attorney General of the Republic."*

> *Article 13*: *"For the purposes set forth in the previous article, the highest authorities of the organs of the National Public Power, must submit to the Attorney General's Office the draft contracts to be executed, with their respective supports and the opinion of the Legal Consultancy, which must make express pronouncement, on the origin of the clauses of national or international arbitration."*

86.    The documentation provided and analyzed for the preparation of this affidavit does not indicate the existence of any previous and express opinion of the Attorney General that supports the execution of this Agreement, which is a requirement that must be met in accordance with Articles 11, 12 and 13 of the aforementioned LOPGR, because: (i) the Litigation Trust Agreement is a contract that encumbers the disposition of rights, title, and interests of claims and litigious rights of PDVSA which indirectly affects the assets and interests of the Republic, in as much as this is the

29

Republic is the single and sole shareholder PDVSA; and (ii) Article IX, paragraph 9(4) of the Litigation Trust Agreement contains an arbitration clause that submits any dispute arising from that contract to an arbitration before an international entity such as the International Chamber of Commerce's arbitration center (ICC) in city of New York and that shall be governed by the Comprehensive Arbitration Rules and Procedures, which falls within the cases regulated in articles 12 and 13 of the LOPGR, cited above.

87.     The Litigation Trust Agreement is executed, in addition to the Minister of People's Power for Petroleum, by the Attorney General of the Republic.  However, this Office (Attorney General of the Republic) does not have the power to set up a trust on behalf of PDVSA or to transfer or assign PDVSA's litigious rights and titles. The Attorney General only signed the Agreement, which cannot be considered as a substitution of the formalities required by articles 11, 12 and 13 of the LOPGR, all of which refer to the previous study of the situation to draft a legal opinion that analyzes the case and decides on the possibility -or not- of signing a contract that directly or indirectly affects the interests of the Republic and contains arbitration clauses.  Moreover, having in mind that the Litigation Trust Agreement includes a section by which PDVSA waived its rights of jurisdiction and venue (Section 9(5) of the Agreement) by consenting the exclusive jurisdiction of the state of New York state and federal courts, The Attorney General of the Republic needed to draft a previous opinion, let alone the content of article 151 of the Constitution.

88.     By the preceding, and in harmony with the documents reviewed, there is no evidence that the Attorney General issued its prior opinion regarding the legality and validity of the Litigation Trust Agreement or regarding the analysis of the arbitration

clause. This omission will affect the validity of the Litigation Trust Agreement making it null and void according to Article 137 of the Constitution in accordance with Article 19(4) of the Organic Law on Administrative Procedures.

89.     Moreover we should take into consideration that article 8 of the aforementioned LOPGR establishes that all the provisions of the LOPGR are considered of public order and are applied with preference to other Laws.

90.     This claim about the validity of the Litigation Trust Agreement based on lack of the previous opinion by the Attorney General can give raise to claims at any court, not only in the courts of Venezuela, but also abroad.

## VII.     LEGAL     REGIME     OF     NATIONAL-PUBLIC-INTEREST     IN VENEZUELA

91.     In addition to the aforementioned considerations, the legal nature of the Litigation Trust Agreement must also be examined in order to determine whether that contract contains elements that would make it possible to classify them as a national-public-interest contract and, consequently, if for its execution it was necessary to have the authorization of the National Assembly of Venezuela, as established in article 150 of the Constitution, which we have already mentioned.

92.     Constitutional regime of public-interest contracts: The Constitution provides for the regime of public interest contracts in articles 150, 151, and 187(9), in the following terms:

> Article 150: "The execution of national-public-interest contracts will require the approval of the National Assembly in the cases determined by law.

> *No contract of municipal, state or national public interest may be entered into with foreign official States or entities or with companies not domiciled in Venezuela, nor may they be transferred to them without the approval of the National Assembly.*
> *The law may require in the contracts of public interest, certain conditions of nationality, domicile or of another order, or require special guarantees"*
>
> *Article 151: "In public-interest contracts, if it is not inadmissible according to the nature of the same, it shall be considered incorporated, even if not expressly stated, a clause according to which the doubts and controversies that may arise about said contracts and that will not be resolved amicably by the contracting parties, will be decided by the competent courts of the Republic, in accordance with its laws, without for any reason or cause may give rise to foreign claims ".*
> *Article 187: "[Attributions] of the National Assembly [are]:*
> *(...)*
> 9. *To authorize the National Executive to celebrate national-interest, in the cases established in the law. Authorize municipal, state or national public interest contracts with foreign official states or entities or companies not domiciled in Venezuela"*

93.     The constitutional regulations are clear when establishing the formalities that the Government –at any level- must fulfill when executing public-interest contracts; however, they do not define or contain clarifying elements about the notion of such contracts and, particularly, about the concept of "public interest", so it is necessary to analyze what is stated by the specialized scholars in the matter and the Court's jurisprudence from the Supreme Court of Venezuela, in order to explain the criteria that allow qualifying a public-interest contract, and, therefore, subject to the aforementioned constitutional regime.

94.     <u>Concept and elements of definition of a contract as of national-public interest-contract in Venezuela</u>: There are various trends about this interpretation.  A first trend established that a national-public-interest contract (NPIC) is one involving a

*Nation's Interest* according to the body who executes the agreement (i.e. National Public Power).

95.     That was the position of the scholar LARES MARTÍNEZ, for whom the NPIC is the gender, which will be qualified as of national interest in accordance with the entity that subscribes it to national, state or municipal power.[22] Likewise, for BREWER-CARÍAS, the national public interest contract is the one that "*is of interest to the national sphere (as opposed to the state or municipal sphere) because it has been executed by a national-level legal entity of public law (the Republic or an Autonomous Institute) or private law (public companies).[23] "* The same is the position of former Supreme Court Justice FARÍAS MATA, who points out that within the contracts of public interest, those that have "*relevance to national life*" in contrast to those of interest in the state or municipal area will be of national public interest[24].

96.     Another group of scholars add to the explanation based on quantitative or qualitative aspects related to the importance or economic-financial magnitude of the contract. In that sense, the scholar PÉREZ LUCIANI affirms that the criterion of determination must be that the contracts of national public interest are "*of great importance or of a very high cost that could seriously comprise the national assets and liabilities ...*" (emphasis added)[25]. Similar is the position assumed by the scholar MELICH-ORSINI, who has indicated that the notion of contracts of national public

---

[22] LARES MARTÍNEZ, Eloy, Manual of Administrative Law, 12th Edition, Central University of Venezuela, Caracas, 2001. p. 284.
[23] BREWER-CARÍAS, Allan, The Constitution of 1999, Venezuelan Constitutional Law, Volume I, Editorial Jurídica Venezolana, Caracas, 2004. p. 293.
[24] FARIAS MATA, Luis Henrique, The Theory of Administrative Contract in Venezuelan Doctrine, Legislation and Jurisprudence in Book Homage to Professor Antonio Moles Caubet, Volume II,  Central University of Venezuela, Caracas, pp. 935-971.
[25] PÉREZ LUCIANI, Gonzalo, "Contracts of National Interest, Contracts of Public Interest and Public Loan Contracts" in Book Homage to Doctor Eloy Lares Martínez, Volume I, Caracas, 1984, p. 103

interest is linked to the idea of "*large agreements that could seriously comprise the economic assets and liabilities of the Republic, expose it to serious losses or international claims that could go so far as to threaten the sovereignty or the integrity of the country*" and that therefore justify the check and balance control of the National Assembly.[26]

97.     This observation was indicated by CASAL MONTBRUN in an opinion prepared for the National Congress in 1973, in which he argued that although in Venezuela NPIC were defined in that way *"because of the way of State that the country assumes"*, it was necessary to take into account that in many of the previous constitutions -from which the current regulation comes- when reference was made to contracts of national interest, they were referred to "*because of the importance of the same and not by the quality of the contracting party* "(emphasis added).[27]

98.     Likewise, CABALLERO ORTÍZ affirms that *"... the importance of the contract, its economic-financial magnitude and the importance that implies for the development of the country in qualitative and quantitative terms should be the indices to be taken into account in order to determine in which cases it should be left a certain type of contract qualified as a national public interest, submitted to the National Assembly, regardless of whether the execution of a public service may be comprised[28] "*.

99.     <u>In the jurisprudence of the Supreme Court of Justice</u>: In the absence of a statutory definition, the Constitutional Chamber of the Supreme Court of Justice (in the opinion held of September 24, 2002. Case: Andrés Velásquez, Elías Mata *et al*), in

---

[26]  MELICH-ORSINI, José, The Notion of Public Interest Contract" in Public Law Magazine number 7, July-September, Caracas, 1981, p. 32 and ss.

[27] CASAL MONTBRUN, Jesús María, Opinion for the National Congress on Parliamentary Procedure for the approval of Contracts of National Interest, Printing Office of the Congress of the Republic, Caracas, 1973, p. 46

[28] CABALLERO ORTIZ, Jesús, The Administrative Contracts, the Public INterest Contracts and the Nacional Public Interest Contracts in the Constitution of 1999 in Book Homage to Central University of Venezuela, Supreme Court of Justice, Caracas, 2001. pp. 142-143.

exercise of its condition of maximum interpreter of the Constitution, previous the reference to the doctrinal positions in the matter, and after an analysis of the normative precedents, issued a decision from which the characteristic notes are extracted that allow establishing criteria defining this category of NPIC, which he has estimated are a type of administrative contracting. In effect, the aforementioned judgment established that:

> "... the current Constitution does not indicate what meaning should be attributed to the notion of contract of public interest, which is why this Chamber, considering the interpretations previously examined, as the maximum and last interpreter of the Constitutional Text, considers that they are subsumable in said genre all those contracts celebrated by the Republic, the States or the Municipalities in which the national, state or municipal public interest is involved, understood this one, in agreement with the author Héctor J. Escola, as "the result of a set of shared and coincident individual interests of a majority group of individuals, which is assigned to the entire community as a consequence of that majority, and which finds its origin in the axiological work of these individuals, appearing with a concrete and determinable content, current, eventual or potential, personal and direct with respect to them, who can recognize in him their own will and his own valuation, prevailing over the individual interests that oppose or affect him, which he displaces or replaces, without annihilating them "(The Public Interest as the Basis of Administrative Law, Buenos Aires, Depalma, 1989, pp. 249 and 250). In this regard, all contracts entered into by the Republic, through the competent bodies of the National Executive whose purpose is decisive or essential for the realization of the purposes and tasks, will be included in the form of contracts of national public interest. of the Venezuelan State in order to satisfy the individual and coinciding interests of the national community and not only of a particular sector of the same, as in the case of public or state municipal contracts, where the purpose of such legal acts would be decisive or essential for the inhabitants of the contracting state or municipal entity, which imply the assumption of obligations whose total or partial payment is stipulated to be made in the course of several fiscal years subsequent to that in which the object of the contract has been caused , in view of the implications that the adoption of such commitments may imply to the economic and social life of the Nation. "(added emphasis).

100.      Taking into account the above considerations, it can be affirmed that the test under which classify a contract as of NPIC are the following:

35

101.    A) That they are contracts or agreement executed by the Republic, the states or municipalities (counties). In the particular case of NPIC must be executed by the Republic, through the competent bodies for it.

102.    Regarding this first element, it has also been understood that this category of contracts also applies to those that have been subscribed by functionally decentralized national public administration bodies (i.e. autonomous institutes and public companies). In this regard, the scholar BREWER-CARÍAS states that *"... contracts signed, for example, by autonomous institutes or national government companies, must be considered as"* national public interest contracts *"in accordance with Article 150 of the Constitution. The opposite does not make sense, and would lead to consider in accordance with the doctrine of the Supreme Court that, for example, a contract signed by Petróleos de Venezuela (PDVSA) could not be considered a contract of national public interest, which, we insist, not it makes sense in spite of that erroneous doctrine, however, and without a doubt, that contract is a contract of public interest, that is, it is a national public contract subscribed by a state public entity, in particular, a public company or legal entity of right state private.*[29] *"*

103.    The previous consideration was also held by the Constitutional Chamber in a ruling of April 29, 2003 (Exp. 00-0836), when it heard a nullity action against a contract signed by the public company C.V.G Electrificación del Caroní, C.A. (EDELCA) with Brazilian electricity company, in execution of a previous international commitment that had been signed by the Republic, through the Executive Branch, and stated that "*With regard to the legal concept, which is based on international*

---

[29] BREWER-CARÍAS, Allan, About Public Contracts in Venezuela, in Mexican Magazine Statum Rei Romanae of Administrative Law, No. 6, in Book Homage to Dr. José Luis Meilán Gil, School of Law and Criminology of the Autonomous Univesity of Nuevo León, Monterrey, January-June 2011. pp. 207-252.

*commitments signed by The National Executive, it is noteworthy that although it is a product of the aforementioned government acts, it turns out to be a contractual agreement, which* **constitutes a contract of public interest***, since it has been comprised by a high interest of the Republic in the margin of its international relations with the Federative Republic of Brazil for the supply of electric power* "(emphasis added).

104.    It is thus legally reasonable to extend the qualification of NPIC to agreements entered into by a company of the Government, since these contracts also jeopardize the interests of the Republic as the political-territorial entity holding the shares of that business association.

105.    B) That its purpose is decisive or essential for the achievement of the aims and tasks of the Venezuelan Government: Second, the purpose of the NPIC must be *decisive or essential* for the achievement of the aims and tasks of the Government of Venezuela and, therefore, must satisfy directly the interests of the national community, as opposed to state and municipal interests.

106.    C) That imply the submission of obligations or commitments that involve the economic and social life of the Nation: In accordance with the criterion stated by the Constitutional Chamber and the aforementioned experts, to qualify a contract as a national public interest, it is It is necessary that such agreement leads to undertake **obligations and liabilities** whose total or partial payment is agreed to be made in the course of several fiscal years subsequent to that in which the contract was executed, *"in view of the implications that the adoption of such commitments can imply for the economic and social life of the Nation "*.

37

107.    D) <u>That transcends the powers of disposition of the body that executes it and that therefore requires the approval of the National Assembly</u>, as the magnitude and transcendence in the powers of disposition of the signor requires that the parliament exercises its functions of control in order to ensure that the signing of the contract does not affect the interests of the State.

108.    <u>Regime of control of the NPIC:</u> Precisely the special characteristics of this type of contracts, incorporates them into the Constitution within a special regime of compulsory parliamentary control exercised through the National Assembly according to articles 150, 187(9) of the Constitution.

109.    In particular, Article 150 of the Constitution submits for the approval of the National Assembly: (i) contracts of national public interest when so determined by law, and (ii) municipal, state or national public interest contracts that are executed with States or foreign official entities or with companies not domiciled in Venezuela. The foregoing is ratified in Article 187(9) which grants the National Assembly the authority to *"authorize municipal, state or national public interest contracts with foreign official States or entities or companies not domiciled in Venezuela."*

110.    The parliamentary check and balance control provided for in the second paragraph of Article 150 of the Constitution for NPIC signed with foreign subjects is not only a manifestation of the traditional parliamentary control over the performance of the administration; but it is also linked to the notion of sovereignty, since the Constitution provides for such control as prior provided that the contract is signed with a State or entity or society not domiciled in Venezuela.

111.        In this regard, the scholar TORO JIMÉNEZ explains that the expression of NPIC is equivalent to contracts entered into with foreigners because *they have the potential to give rise to foreign claims[30]*, excluding from that notion those contracts that the Republic executed with individuals or any form of associations. Thus, the prior authorization of the National Assembly of NPIC signed with foreign entities serves, in addition to the special characteristics that such contracts have, to the nature of the subject that executes it.

## VIII. LEGAL NATURE OF THE LITIGATION TRUST AGREEMENT

112.        Having explained the above considerations regarding what should be understood as a NPIC as well as the application of articles 150, 187(9) of the Constitution, it must be examined whether the Litigation Trust Agreement founded with all the litigious rights, titles, and interests of PDVSA is certain claims (as defined in the Agreement) framed within that notion and, if consequently, is submitted to control by the National Assembly.

113.        The Litigation Trust Agreement is a trust subscribed by the Ministry of Popular Power of Petroleum purportedly acting in representation of PDVSA, for the purpose of transferring to irrevocably transfer, assign, and delivers to the Litigation Trust and the trustees, all the interests, assets, actions and resources that derive from PDVSA´s litigious rights as a public company.

114.        In accordance with the provisions of the Venezuelan Trust Law (LDF)[31], the trust constitutes a legal relationship by which a person named trustor

---

[30]  TORO JIMÉNEZ, Fermín, Manual of Public International Law, Caracas, 1982, pp. 481 et seq.

[31]  Extraordinary Oficial Gazette N° 496 August 17, 1956.

transfers one or more assets to a person called a trustee, who undertakes to use it in favor of that person or from a third party called a beneficiary. In this sense, the trust agreement constitutes an act of total or partial disposition of property of the settlor or other party.

115.    According to the aforementioned definition, the essential element of existence of the trust agreement is the contribution of some assets by the trustor or settlor, in this sense, the trust can be constituted on all kinds of assets, except those that according to the law are strictly personal to the owner.

116.    In the case of the Litigation Trust Agreement it is noted that the rights assigned by PDVSA for the constitution of the trust, in accordance with the provisions of clause 2.2, were *"all of their respective rights, titles, interests, claims and actions in litigation"*, that is, the totality of their litigious rights.

117.    This generic and *irrevocable* transfer of the litigious rights and title of PDVSA was specified in the following clause of the contract that is quoted below:

> *Transfer of Litigation Trust Assets*
> *(a) PDVSA hereby irrevocably transfers, assigns, and delivers to the Litigation Trust, without recourse, all of its respective rights, title, and interests in and to the Contributed Claims and the Assigned Actions; and*
> *(b) PDVSA hereby irrevocably transfers, assigns, and delivers to the Litigation Trust and the Litigation Trustees, without wavers, all of the all their respective rights, titles and interests in any privilege of immunity that is attached to any document or communication (written or oral) associated with the Contributed Claims (collectively "Privileges"), which will be deposited in the trustees and the litigation trust, in trust, for the benefit of PDVSA. "*

118.    The Agreement specifically deals with "litigious rights" when the plaintiff claims in the Complaint to be the holder of a certain right, but such ownership will not have legal certainty until the respective trial is fully completed, which will culminate in a judgment that will delimit and quantify that right.

119.        Note that in the Litigation Trust Agreement, PDVSA assigned to a Trust all of its litigious rights that are part of its assets, even though its actual value is uncertain and depends on the outcome of a judicial contest it is an act of disposition of rights that make up PDVSA's assets.

120.        Taking into account the above considerations, the Litigation Trust Agreement should be analyzed according to each of the elements of the test that determines the existence of a contract of public interest, namely:

121.        A) <u>That are contracts entered into by the Republic, the states or municipalities, or a decentralized entity</u>: The Litigation Trust Agreement was signed by the public company Petróleos de Venezuela, S.A. (PDVSA) and the trustees are Miguel Bolívar, Vincent Andrews and Edward P. Sawyer. Although the contract was not signed directly by the Republic as a territorial political entity, in accordance with the scholars and jurisprudence of the aforementioned Constitutional Chamber, it is clear that contracts signed by public companies can also be considered NPIC, when the national interests that correspond to the Republic are directly affected.

122.        PDVSA is the main Venezuelan Government's holding, with constitutional rank (article 303 of the Constitution), it exercises the petroleum activity that is a strategic sector reserved to the Venezuelan Government (article 302 of the Constitution) for reasons of national convenience; and all of its shares are owned by the Republic. Having that condition, the execution of a contract by PDVSA in which irrevocably disposes of all the litigious rights of which that public company owns, it can be affirmed that evidently the execution of the Litigation Trust Agrees directly affects in the national interests that encumbers the Republic.

123.        B). <u>That its purpose is decisive or essential for the achievement of the aims and tasks of the Venezuelan State</u>: The purpose of the Litigation Trust Agreement is clearly related to the achievement of the aims and tasks of the Venezuelan Government and, therefore, the execution of the Litigation Trust Agreement directly affects the interests of the Nation, since the irrevocable transfer of all of PDVSA's litigious rights and titles undoubtedly affects the fulfillment of the State's tasks. Thus, it deals with activities that the Government assumed as its own through PDVSA, which is the defense of the actions, rights and interests of which the state company may be entitled and which both the constituent and the legislator have expressly established as a essential activity for the benefit of the community. The filing of legal actions by that company, which is contained in its litigious rights assigned in the Trust, is intended to claim the collection of debts, damages, damages and any other kind of compensation against third parties which has an evident economic connotation for the Republic, which is its main shareholder of PDVSA.

124.        PDVSA is a public company of great national and international significance in Venezuela, which by virtue of its economic activities in the hydrocarbons market, which is the main source of income for the Venezuelan Government, maintains multiple legal relationships both nationally and internationally, from which may arise judicial or extrajudicial claims for or against that company, which by virtue of the Litigation Trust Agreement the ownership of the litigious rights that would represent said actions were transferred to a subject other than PDVSA.

125.        <u>C) That imply the assumption of obligations or commitments that involve the economic and social life of the Nation</u>: The Litigation Trust Agreement

through which PDVSA transferred all the actions, rights and litigious interests, implied the assumption of obligations and liabilities that involve the economic and social life of the Nation. Under the study of this criterion, the quantitative element is determinant, since evidently the irrevocable assignment of all the litigious rights of PDVSA, comprises amounts of money and monetary resources to be claimed in this and in future fiscal years, especially in the case of litigious rights that may be received in the future by virtue of a possible favorable ruling of the Trust, so there is no doubt that the trust constituted is very important in view of its high cost to the economic assets of the Republic. Note that the Complaint, in several paragraphs, asserts damages for billions of dollars by the defendants.

126.          Notwithstanding the Litigation Trust Agreement does not reveal any specific economic quantification, it involves elements of economic importance, since the generic assignment of litigious rights have already being materialized in a Complaint containing claims and counts of the highest economic significance for the Nation. Indeed, it is observed, within the universe of indeterminate litigious rights that were assigned for the constitution of the trust, that this contract is currently being used in the lawsuit filed before the Southern District Court of the Florida Division, Miami of the States. United States of America, under file number 1: 18-cv-20818-DPG, in which the application expressly claims "many billions of dollars" (See count number 7, 106, 126, 133, 144, 148) , of the Litigation Trust Agreement, for alleged actions taken against PDVSA.

127.          Therefore, there are elements to consider that it is a contract that contains an operation that is not part of the regular management of PDVSA, but that includes an extraordinary act of irrevocable disposition of assets (litigious rights) of

PDVSA for the settlement of a trust, which are part of the assets of that state owned-company with a high economic significance.

128.        D) <u>The Litigation Trust Agreement was signed with persons not domiciled in Venezuela, such as Trustees Vincent Andrews and Edward P. Sawyer.</u> Likewise, the text of that document shows that in order to carry out the Assigned Actions referred to in the Litigation Trust Agreement, two foreign law firms, Boies Schiller Flexner LLP and Meister Seelig & Fin, LLP, were appointed in the same agreement through an engagement letter. Likewise, it was removed from the Venezuelan legislation and established as applicable law the one that governs in the State of New York of the United States of America in accordance with what is established in clause 9.3 of the Litigation Trust Agreeing and; PDVSA expressly waived the jurisdiction of the Venezuelan courts by subscribing clause 9.4 in which they submit to arbitration administered by the International Chamber of Commerce (ICC) arbitration center to be held in New York City. More important, PDVSA submitted any controversy to the exclusive jurisdiction of the State of New York, violating article 151 of the Constitution.

129.        It is definitely a contract in which all the actions, interests, litigious and collective rights and titles of PDVSA regarding a very sensitive matter (manipulation of oil prices and interference with PDVSA's systems, among other counts), are irrevocably transferred to the Litigation Trust.  Moreover, the Litigation Trust Agreement was executed by and between PDVSA and foreign entities and individuals not domiciled in Venezuela which can raise international claims in foreign jurisdictions against PDVSA, moreover if we consider that according to Section 9.5 of the Agreement parties submitted themselves exclusively to the jurisdiction of the State of New York

130.      That said, I consider that there are sufficient elements to consider that the Litigation Trust Agreement should be classified as a national public interest contract executed with individuals and business associations domiciled abroad, which requires the application of the check and balance control power of the Assembly National as established in articles 150, 187(9) of the Constitution. According to the article 137 of the Constitution, it is a constitutional regulation of obligatory compliance that the bodies and entities of the public administration shall adjust its action to the Constitution, and that it is equally applicable, as it was explained to the "public companies" that also deals with assets and interests of the State.

131.      From the documentation reviewed for the preparation of this opinion and in accordance with the wording of the Litigation Trust Agreement, there is no evidence that this national-public-interest contract was authorized by the National Assembly, which entails its nullity for having been issued without complying with the formalities required in articles 150 and 187(9) of the Constitution.

## IX. CONCLUSIONS

132.      In Venezuela, the Government and Public Sector have undertaken through the "public companies" many and a variety of economic activities in strategic sectors, even in a condition of monopoly or exclusivity. These "public companies" are Governmental Decentralized *Entities* (Government´s instrumentalities) that carry out commercial, industrial, financial, or any other activities, and are regulated under a mixed body of laws (Public Laws or Private Law) according to the nature of the acts they perform.  Indeed, when a "public company" acts in its regular and customary operations

(as any other business association), Private Law applies; but when it comes to acts involving transfer of rights or titles, or when due to the importance or transcendence of the operation involves public funds, the rules of control of Public Law apply.

133.    The legal regime of public companies in Venezuela is regulated in various provisions of the Venezuelan Constitution of 1999, which, besides recognizing the possibility that the State has for its creation (Article 300 of the Constitution), submit their activity to the respect of the Constitution and laws (Article 137 of the Constitution) and, in particular, the check and balance control system exercised by the National Assembly (Article 142, 150, 151, 187(3), 187(9)).

134.    Public companies are also subject to various laws that contain public law provisions such as LOAP, LOAFSP, LOPGR, LOCGR. Especially the LOAP defines these entities as persons of public law constituted according to the rules of private law (article 103 of the LOAP).

135.    PDVSA is a public company whose existence is expressly recognized in the Constitution (article 303 of the Constitution), which although it was incorporated and functions as a corporation of a business nature, due to its strategic nature and the nature of the field in which it operates, it is regulated by public law rules, which make its business turn subject to important public regulations, constitutional and legal, that would be inapplicable to private legal entities in the exercise of their economic activity. PDVSA is subject to the parliamentary control referred to in the aforementioned constitutional provisions, article 142 and article 187 (3) of the Constitution and all the controls established in laws and resolutions due to the importance for the entire country of the actions of PDVSA.

136.        Internally, the operation of PDVSA is governed by the provisions of its Bylaws, and supplemented by the Venezuelan Commercial Code.

137.        Specifically, the power to execute contracts and bind the company in accordance with the provisions of the Bylaws of PDVSA is the responsibility of the President of the Board of Directors, who could legally bind the company with prior authorization from the Shareholders' Meeting and the Board Directive.

138.        When signing the Litigation Trust Agreement, the Minister invoked as basis of his action the article 78(14) of the LOAP, which establishes the power of the Minister to exercise the representation of the Republic in the shareholders' meeting of PDVSA with the right to voice and vote, that is, to exercise the shareholder control that corresponds to it on behalf of the sole shareholder that is the Republic. This representation in the shareholders' meeting empowers him to approve or deny the shareholders' own affairs, such as increasing or decreasing capital, approving the management of the company, appointing or removing members of the Board of Directors.

139.        However, according to the regime contained in the bylaws of PDVSA, the aforementioned legal provision does not empower the Ministry to represent PDVSA in the execution of contracts, and even less, to sign the Litigation Trust Agreement that implies the assignment of the litigious rights of PDVSA.

140.        The Minister performs his shareholding control in the shareholder's meeting, which is a body of the company, which makes decisions in the field of powers established by the bylaws of PDVSA and, additionally, in what has not been regulated, as provided by the rules of the Commercial Code. No rule of the bylaws confers powers on

the Minister, as a member of the shareholder meeting to legally represent PDVSA or to sign contracts on behalf of PDVSA.

141.     The powers of shareholder control, as well as all the powers granted to the administration, are of restrictive interpretation and, therefore, the limits preset by the law must be respected. Although the Minister has powers as a shareholder, this does not constitute an attribution mechanism of powers to execute contracts with third parties on behalf of PDVSA, let alone comprise its assets.

142.     Competence is a fundamental principle whose fulfillment is decisive to guarantee the legality of the administration's action, since, according to article 19(4) of the LOPA when an organ acts without due competence, its acts are null and void.

143.     From the documentation that we have reviewed for the preparation of this opinion, we have not observed any document that demonstrates that the PDVSA's Board of Directors authorized the Minister of Petroleum to sign the Litigation Trust Agreement on behalf of PDVSA. Consequently, based on Article 137 of the Constitution in accordance with Article 19(4) of the *Organic Law on Administrative Procedures Act*, the execution of the Litigation Trust Agreement by the Minister of the Popular Power of Petroleum is likely to be considered null and void under the Venezuelan legal system while there is no evidence that the Minister has the express competence to represent alone and to sign contracts on behalf of PDVSA, especially to bind PDVSA with third parties, since in accordance with the company's bylaws and the Commercial Code, the power to bind PDVSA and sign contracts belongs to the Board of Directors as exercised through the President.

144.      Pursuant to the legal regime applicable to public companies, PDVSA is also subject to the LOPGR, and as such, all contracts that it executes in which the interests of the Republic may be directly or indirectly involved are subject to the rules regarding the Republic Attorney General´s Office powers and duties. In accordance with the LOPGR, the Attorney General is required to render legal opinions for all such contracts that incorporate arbitration as a dispute resolution mechanism (Articles 12 and 13 of the LOPGR) or that exclude the Republic of Venezuela as the locale where any claim from the Litigation Trust shall be filed.

145.      There is no evidence that the Attorney General issued its prior opinion regarding the legality and validity of the Litigation Trust Agreement or regarding the analysis of the arbitration clause. This omission will affect the validity of the Litigation Trust Agreement making it null and void based on Article 137 of the Constitution in accordance with Article 19(4) of the *Organic Law on Administrative Procedures Act*, and can give raise to claims at any court, not only in the courts of Venezuela, but also abroad.

146.      Article 8 of the LOPGR establishes that all the provisions of the LOPGR are considered of public order and are applied with preference to other Laws.

147.      The Litigation Trust Agreement was executed by, in addition to the Minister of People's Power for Petroleum, the Attorney General of the Republic. However, this Office (Attorney General of the Republic) does not have the power to set up a trust on behalf of PDVSA or to transfer or assign PDVSA's litigious rights and titles. The Attorney General only signed the Agreement, which cannot be considered as a substitution of the formalities required by articles 11, 12 and 13 of the LOPGR, all of

which require the previous study of the situation to draft a legal opinion that analyzes the case and decides on the possibility -or not- of signing a contract that directly or indirectly affects the interests of the Republic and contains arbitration clauses and excludes the Republic of Venezuela as the proper venue for any claim.

148.        In accordance with the foregoing and in accordance with the documents reviewed, there is no evidence that the Attorney Generals Office issued its prior opinion regarding the legality of the Litigation Trust Agreement or regarding the possibility of concluding that contract with an arbitration clause that can give rise to claims before an organ, different from the courts of the Republic of Venezuela, located abroad.

149.        The Venezuelan Constitution provides for a check and balance control when contracts signed by the organs and entities of the State are susceptible of being classified as public interest contracts. The special characteristics of this type of contracts are incorporated into the Constitution within a special regime of mandatory parliamentary control exercised by the National Assembly in accordance with articles 150 and 187(9) of the Constitution.

150.        According to the criteria set forth by the national doctrine and the jurisprudence of the Supreme Court of Justice, it can be affirmed that there are sufficient elements to classify the Litigation Trust Agreement as a public interest contract, because: (i) It was executed by PDVSA as an entity of the national public administration functionally decentralized and significantly comprises the Republic's interest in disposing irrevocably of the litigious rights of PDVSA; (ii) The purpose of the agreement is decisive for the achievement of the purposes and tasks of the Venezuelan State and

affects the interests of the nation, since the irrevocable transfers all of the litigious rights of PDVSA, undoubtedly affect the fulfillment of the duties of the State to activities that both the constituent and the legislator have expressly established as an essential activity for the benefit of the community; (iii) It involves amounts of money and monetary resources to be claimed in this and in future fiscal years, all the more so if it deals with litigious rights that may be perceived in the future by virtue of a possible sentence favorable to PDVSA; (iv) It was signed with persons not domiciled in Venezuela, such as Trustees Vincent Andrews and Edward P. Sawyer; two foreign law firms, Boies Schiller Flexner LLP and Meister Seeling & Fein LLP, were appointed in that same act and through an engagement letter; its execution was submitted to foreign legislation, in the State of New York of the United States of America and; PDVSA expressly waived the jurisdiction of the Venezuelan courts by subscribing clause 9.4 in which they submit to arbitration administered by the International Chamber of Commerce (ICC) arbitration center to be held in New York City and excluding any other venue than the State of New York (Section 9(5)).

151.        In accordance with the foregoing, I conclude that there are sufficient elements to affirm and assert that the Litigation Trust Agreement should be classified as a national public interest contract executed with subjects domiciled abroad, which makes it necessary to apply the power of control of the National Assembly established in articles 150 and 187(9), of the Constitution. According to article 137 of the Constitution, it is a constitutional regulation of obligatory fulfillment on the part of all the organs and entities of the public administration that they must adjust its action to this

fundamental text, and that it is equally applicable, as explained above, to public companies that also represent patrimonial interests of the State.

152.       From the documentation reviewed for the preparation of this opinion and according to the wording of the Litigation Trust Agreement, we have no evidence that this contract of public interest has been submitted to the authorization of the National Assembly, which entails its nullity for having been issued without complying with the formalities required by articles 150 and 187.9 of the Constitution.

153.       The conclusions contained herein conform to my sincere opinion.

--oo00oo--


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 26, 2018.

Rafael Badell Madrid

# EXHIBIT "A"

# J O S É   R A F A E L   B A D E L L   M A D R I D

---

## PERSONAL INFORMATION

**Date and place of birth**: December 19, 1958. Caracas, Venezuela.

**Marital Status**:          Married

**Passport Number**:      ███8486

---

## EDUCATION

> \* **Universidad Católica Andrés Bello** (1982) Caracas, Venezuela
> Faculty of Law. Degree: *Abogado* (Lawyer)

> \* **Universidad Central de Venezuela** (1985). Caracas, Venezuela
> Faculty of Law. Degree: *Especialista en derecho administrativo* (Master's degree in Administrative Law).

> \* **Universidad Católica Andrés Bello** (2008). Caracas, Venezuela
> Faculty of Law. Degree: *Doctor en derecho* (PhD in Law).

> \***Executive Program IE Business School** (2013). Madrid, Spain.

---

## PROFESSIONAL PROFILE

### CURRENT POSITIONS

- Lifetime Member of the Political and Socials Sciences Academy (chair no. 17).
- Attorney – Founder and senior partner of **BADELL & GRAU** Law Firm (since 1985).

> I provide legal advisory and counseling services to government agencies and entities, as well as private corporations in the area of public law, especially administrative contracts, public bidding, project finance, administrative litigation and regulatory law, among others. I have rendered services to the Attorney General's Office, and public agencies such as the Ministry of

Transportation and Communications (currently known as the Ministry of Infrastructure), the Central Bank of Venezuela, and the Corporación Venezolana de Guayana (C.V.G.). I have also rendered services to public companies such as SIDOR, C.V.G. Electrificación del Caroní (EDELCA), C.V.G. International, Petróleos de Venezuela (PDVSA), PDV United Kingdom (PDVUK), and Ferrominera del Orinoco, among others, as well as private companies in the telecommunications (attorney for the one of the largest telecommunications company in Venezuela, Movilnet from 2000-2002), major local Banks (e.g. Mercantil Banco, Banco Venezolano de Crédito, Banco Exterior, Banco Provincial and Banco Activo); oil sector: Royal Dutch Shell; international airlines such as: IBERIA Líneas Aéreas de España, Aerolíneas Argetinas, AVIANCA and Líneas Aéreas Costarricences (LACSA); BAT: British American Tabacco; health care companies: Sanitas de Venezuela, Plansanitas and Rescarven Medicina Prepagada; insure companies: Mercantil Seguros and Corretaje de Seguros Alfa; construction sector: Grupo Fernández, and Desarrollos Inmobiliarios Yohans; real estate companies: Administradora Loyola, Estacionamiento Parque Central, Fondo de Valores Inmobiliarios and Operadora Estacionamiento C.C Tolón; commerce, industry and retail companies: Consorcio Barr, Consorcio Absorven, Fosforera Suramericana, Hotel Alferca, Hotel Aladín, Caracas Palace Hotel and Corporación FBK.

- Member of the Arbitration Tribunal of the Chamber of Commerce of Caracas.
- Member of the Arbitration Tribunal of the Venezuelan-American Chamber of Commerce and Industry (Venamcham).
- Member of the Arbitration Committee of the Venezuelan-American Chamber of Commerce and Industry (Venamcham).
- Member of the Venezuelan Association of Arbitration (AVA).
- Member of the Editorial Council of the *Revista de Derecho Administrativo* (Administrative Law Review).
- Member of the Venezuelan Association of Administrative Law.
- Foreign Legal Consultant admitted by the Florida State Bar, USA.

## PAST POSITIONS
### ATTORNEY GENERAL'S OFFICE - (1979-1985)

- Director of Advisory Services (1987).
- Director of Administrative Litigation (1987).
- Attorney III (1983).
- Attorney II (1983).
- Attorney I (1982).
- Paralegal (1981).

## JUDICIARY POSITIONS
### PAST POSITIONS

- Associate Judge of the Electoral Chamber of the Supreme Court of Justice (2000).
- Associate Judge of the Constitutional Chamber of the Supreme Court of Justice (2002-2005).
- Judge Rapporteur of the Political-Administrative Chamber of the Supreme Court of Justice (1989-1996.)
- Associate Judge of the First Contentious Administrative Court (1990-1993).
- Judge Reporter (Decision Drafter). First Contentious Administrative Court (1985-1989).

## ACADEMIC POSITIONS

**\* UNIVERSIDAD CATÓLICA ANDRÉS BELLO – SCHOOL OF LAW**. Caracas, Venezuela **(since 1982)**

**Undergraduate level**: Professor of:

- Administrative law I.
- Administrative law II.
- Administrative law practice.
- Constitutional and administrative procedure.
- Public international law.
- Property and expropriation.

**\*** Head of the administrative law professorship (2007-2008).

**Graduate level**:   Professor of:

- Administrative Organization.
- Liability of the Administration.
- Administrative Contracts.
- Constitutional and Administrative Procedure.
- Constitutional Law.

**PhD program:** Professor of:

- Constitutional Law
- Administrative organization. Public and private law.

\* UNIVERSIDAD CENTRAL DE VENEZUELA – FACULTY OF POLITICAL AND JURIDICAL SCIENCE. Caracas, Venezuela **(1989 - 2004)**

**Undergraduate level**: Professor of administrative law I.

**Graduate level**:   Administrative law.

**PhD program:**  Professor of constitutional law.

\* UNIVERSIDAD MONTEÁVILA. Caracas, Venezuela.

**Graduate level**:   Professor of constitutional Law (2002).

**Graduate level**:   Professor of introduction to constitutional Law (2015).

\* UNIVERSIDAD SAN PABLO CEU. Madrid, Spain
- Invited professor for public law course (2001, 2002, 2003, 2004, and 2005).

**FELLOWSHIPS AND RESEARCH POSITIONS**:

\* ST. ANTONY'S COLLEGE – UNIVERSITY OF OXFORD. United Kingdom.

- Andres Bello Fellowship (1998-1999)

\* ST. ANTONY'S COLLEGE – UNIVERSITY OF OXFORD. England, UK

- Senior Academic Member (2006-2007)

\* **Andrés Bello Catholic University - School of Law.** Caracas, Venezuela.

- Researcher of the Legal Research Center. - (1980-1982).

**LECTURES, CONFERENCES AND PUBLICATIONS:**

Lecturer and guest speaker in conferences held in several local and foreign universities. Topics presented in areas of Constitutional and Administrative Law, including administrative contracts and administrative litigation.  Among most notable lectures:

- *"The interest of the Republic in actions to declare null and void decisions issued by the Commission created in Decree No. 61".*  (El interés de la República en las demandas de nulidad por ilegalidad intentadas contra las decisiones emanadas de la Comisión creada por el Decreto Nro. 61), in "Revista de Derecho Público" (Public Law Review), No. 29. January-March, 1987. Page. 161-179.

- *"Exhaustion of administrative channels in the case of Decisions issued by the Commission created in Decree No. 61".*  (Agotamiento de la vía administrativa en el caso de las decisiones emanadas de la Comisión creada por el Decreto Nro. 61), in "Revista de la Fundación Procuraduría General de la República" (Attorney General's Office Foundation Review), Year 3, No. 3. 1988. Page.143- 162.

- *"Public Bidding Procedures in Municipalities".*  (El Régimen de Licitaciones en el ámbito municipal), in "La Contratación Municipal" (Municipal Contracts), Prohombre – P.H. Publisher C.A., Caracas. 1988. Page.55-81.

- *"Doctrine of Unforeseeability in Administrative Contracts".*  (Teoría de la Imprevisión en los Contratos Administrativos), in "Régimen Jurídico de los Contratos Administrativos" (Legal Regime of Administrative Contracts), Attorney General's Office Foundatión,  Caracas. 1991. Page. 63-85.

- *"Comments on the causes of action in the Constitutional and Administrative Procedure".* (Comentarios acerca de los motivos de impugnación en el contencioso administrativo), in "Avances Jurisprudenciales del Contencioso Administrativo en Venezuela" (Advances of Court Decisions in the Constitutional and Administrative Procedure), Legal Studies Institute of Lara State. 1993. Page. 167.169.

- *"Administrative Contracts".*  (La Contratación Administrativa), in "Jornadas Colombo Venezolanas de Derecho Público" (Colombian-Venezuelan Conferences on Public Law), Externado University of Colombia, Bogotá. 1996. Page. 693-727.

- *"The parties to administrative litigation procedures, third parties, third party plaintiffs".*  (Las partes en el proceso administrativo, terceros intervinientes, coadyuvantes), in "Primeras Jornadas Internacionales de Derecho Administrativo 'Allan Randolph Brewer-Carías' Contencioso Administrativo" (First International Seminar of Administrative Law "Allan Randolph Brewer-Carías" – Administrative Litigation), Funeda Publisher,  Caracas. 1996. Page.411-423.

- ***"The Administrative Execution of the administrative acts and the guarantee of the Constitutionals Rights".***   (La ejecución administrativa de los actos administrativos y la garantía de los derechos constitucionales), in "Terceras Jornadas Internacionales de Derecho Público 'Allan Brewer-Carías' (Third International Seminar of Public Law "Allan Brewer-Carías"), Funeda Publisher, Caracas. 1997. Page. 261-282.

- ***"The recourse for abstention or in absence".***   (El Recurso por Abstención o Carencia), in "El Contencioso Administrativo en Venezuela" (Constitutional and Administrative Procedure in Venezuela), Carabobo State BAR.  Venezuela, 1997.

- ***"The Regime of Public Works and Public Services Concessions ".*** (El Régimen jurídico de las Concesiones de Obra Pública y Servicios Públicos), in "Segundas Jornadas Internacionales de Derecho Administrativo 'Allan Randolph Brewer-Carías' – Las Formas de la Actividad Administrativa" (Second International Seminar of Administrative Law "Allan Randolph Brewer-Carías" – The Forms of Administrative Activities), Funeda Publisher, Caracas. 1997. Page. 395-434.

-    **University of Oxford**. Oxford, United Kingdom.
**Seminar:** Lectures related to *Public Law in Venezuela*. "Derecho Público en Venezuela". 1998-1999.

-    **Catholic University of Uruguay.** Montevideo, Uruguay.
**Seminar:** *Legal regime of administrative concessions.* "Régimen legal de las concesiones administrativas". October, 1999.

- **"Considerations on the regime of central banks in comparative law".**   (Consideraciones sobre el régimen jurídico del Banco Central en el Derecho Comparado), in  "Venezuela en Oxford,  25 años de la Cátedra Andrés Bello en el St. Antony´s College de la Universidad de Oxford" (Venezuela in Oxford, 25 years of the Andrés Bello Fellowship in St Antony's College of the University of Oxford),  Central Bank of Venezuela, Caracas. 1999. Page. 643-584.

- **"The Economic Framework of the Venezuelan Constitution".**   (La Constitución Económica de Venezuela), in "Revista BCV, XIV, 1, 2000" (Review of the Central Bank of Venezuela), Central Bank of Venezuela, Caracas. 2000. Page. 152-194.

-**"Perspective on the Oil and Gas industry in Venezuela".**   (Perspectivas de la industria de Petróleo y Gas en Venezuela), in "Revista Internacional de Petróleo y Gas Financiera" (International Oil & Gas, Finance  Review), United States (USA). 2000. Page. 122-124.

- **"Administrative Concessions".** (La Concesión Administrativa),  in "Boletín de la Academia de Ciencias Políticas y Sociales" (Bulletin of the Political and Socials Sciences Academy), Enero – Diciembre, Caracas. 2000.  Page. 219-404.

- **Monteávila University**. Caracas, Venezuela.
**Seminar:** *Current tendencies in the field of Administrative Contracts in Venezuela.* "Tendencias actuales en materia de contratación administrativa". May, 2001.


- **University of Salta**. Salta, Argentine.
**Seminar:** *The Patrimonial Responsibility of the Venezuelan State.* "La Responsabilidad Patrimonial del Estado en Venezuela". August, 2001.


- **"Studies on the Constitutions of the 20ᵗʰ Century".** (Estudios sobre las Constituciones del Siglo XX), in "Venezuela en el Siglo XX. Foundation Polar" (Venezuela on the 20ᵗʰ Century. Polar Foundation), Caracas. 2001. Page. 36-71.

> * This is a study on the Constitutions enacted in Venezuela during the 20th century, prepared specially for the Polar Foundation. It is part of a three volume collection, with essays and studies by recognized Venezuelan authors, professors and academics on the economic, political, legal, sociological, literary, artistic and scientific achievements of Venezuela during the 20ᵗʰ century.


- **Complutense University of Madrid**. Madrid, Spain.
**Seminar:** *Tendencies of Constitutional and Administrative procedure in Venezuela under the Constitution of 1999.* "Tendencias del Contencioso Administrativo en Venezuela bajo la vigencia de la Constitución de 1999". January, 2002.


- **"Legal Limitations to Property Rights"**. (Limitaciones Legales al Derecho de Propiedad), in "Libro Homenaje a Gonzalo Pérez Luciani" (Book in Honor to Gonzalo Pérez Luciani), Supreme Tribunal of Justice, Caracas. 2002. Page. 89-231.


- "**The Action for Constitutional Protection in the Jurisprudence of the Supreme Tribunal of Justice".** (El Amparo Constitucional en la Jurisprudencia del Tribunal Supremo de Justicia), in "Revista de Derecho" (Law Review), N° 4. Supreme Tribunal of Justice, Caracas. 2002. Page. 87-129.


- **"Competencies of the Constitutional Chamber of the Supreme Court of Justice".** (Competencias de la Sala Constitucional), in "Libro Homenaje a José Andrés Fuenmayor" (Book in Honor to José Andrés Fuenmayor), Supreme Tribunal of Justice, Caracas, Venezuela. 2002.


- "**The Liberalization of Public Services in Venezuela".** (La Liberalización de los Servicios Públicos en Venezuela), in "VI Jornadas Internacionales de Derecho Administrativo 'Allan Randolph Brewer-Carías' – El Nuevo Servicio Público" (Sixth International Seminar of Administrative Law "Allan Randolph Brewer-Carías" – The New Public Service), Funeda Publisher, Caracas. 2002. Page. 115-145.

- *"**Jurisprudence of the Political Administrative Chamber of the Supreme Court of Justice**"*. (Jurisprudencia de la Sala Político Administrativa del Tribunal Supremo de Justicia), in "Comentarios Jurisprudenciales del Tribunal Supremo de Justicia" (Commentaries on the Jurisprudence of the Supreme Court of Justice),  Barquisimeto, 2002.

- **San Pablo CEU University**. Madrid, Spain.
**Seminar:** *Crisis of the Beginning of the Separation of the Powers in Venezuela*. "Crisis del Principio de la Separación de los Poderes en Venezuela". January, 2003.

- *"**The Recourse for Nullity**"*.  (El Recurso de Nulidad), in "Avances Jurisprudenciales del Contencioso Administrativo en Venezuela" (Advances of Court Decisions in Administrative Litigation),  Institute of Legal Studies of Lara State, Barquisimeto. 2003. Page. 67-150.

- *"**Class Actions**"*.  (Tutela Judicial de los Intereses Difusos y Colectivos), in "Separata de la Revista de Derecho del Tribunal Supremo de Justicia" (Law Review of Supreme Court of Justice),  Número 14. Supreme Tribunal of Justice, Caracas. 2004. Page.14-47.

- *"**The Patrimonial Responsibility of the Venezuelan State**"*.  (La Responsabilidad Patrimonial del Estado Venezolano), in "Estudios de Derecho Público" (Public Law Estudies),  Volume II, UCAB, Caracas. 2004. Page. 480-575.

- *"**Contracts of Nacional Public Interest**"*.  (Contratos de Interés Público Nacional), in "Revista de Derecho Administrativo" (Administrative Law Review), Nº 19 July – December 2004,  Sherwood Publisher, Caracas. 2005. Page. 41-67.

- *"**Judicial Procedures contained in the Organic Tax Code. Special reference to the Litigation Tax Recourse**"*. (Procedimientos judiciales previstos en el Código Orgánico Tributario. Especial referencia al Recurso Contencioso Tributario), in "Revista de Derecho" (Law Review),  Nº 19 of  Supreme Tribunal of Justice, Caracas. 2005. Page.238-286.

- **Administrative Contentious Tribunal of Sinaloa State.** Sinaloa**,** México.
**Seminar:** *Class Actions in the Venezuelan Administrative Contentious*. "Protección de los Intereses Colectivos y Difusos en el Contencioso Administrativo Venezolano". May, 2006.

- *"**Alternative Procedures for solution of conflicts in Venezuelan Law. Arbitration in Administrative Contracts**"*. (Medios Alternativos de Resolución de Conflictos en el Derecho Venezolano. El Arbitraje en los Contratos Administrativos),   in "Congreso Internacional de Derecho Administrativo en Homenaje al Prof. Luís H. Farías Mata" (International Seminar of Administrative Law in Honor to Professor Luís H. Farías Mata), Margarita University, Caracas. 2006. Page. 105-186.

- *"**Matter of the Contentious Annulment Recourse**"*. (Materia del Recurso Contencioso de anulación), in "El Contencioso Administrativo en el Ordenamiento Jurídico Venezolano y la Jurisprudencia del Tribunal Supremo der Justicia. III Jornadas sobre Derecho

Administrativo en Homenaje a la Dra. Hildegard Rondón de Sansó" (The Administrative Contentious   in the Venezuelan Legal Legislation and Jurisprudential of the Supreme Tribunal of Justice. 3[th] Seminar of Administrative Law in Honor to Hildegard Rondón de Sansó), Carabobo. 2006. Page. 27-61.

- *"The Recourse for Nullity".*   (El Recurso de Nulidad), in "Derecho Contencioso Administrativo, Libro Homenaje al Profesor Luís Henrique Farías Mata" (Constitutional and Administrative Procedure, Book in Honor to Professor Luís H. Farías Mata), Lara State BAR, Venezuela, Library J. Rincón. Barquisimeto. 2006. Page. 1-66.

- *"Administrative Concessions. Administrative Law in thresholds of the XXI Century".* (La Concesión Administrativa en El Derecho Administrativo Venezolano en los umbrales del siglo XXI), in "Libro homenaje al Manual de Derecho Administrativo de Eloy Lares Martínez" (Book in Honor to Administrative Law book of Eloy Lares Martínez),   Jurídica Venezolana Publisher, Universidad Monteávila, Caracas. 2006.

- *"The liability of the State in the 1999 Constitution and its perception in the jurisprudence of the Supreme Court of Justice".*   (La responsabilidad patrimonial del Estado en la Constitución de 1999 y su percepción en la jurisprudencia del Tribunal Supremo de Justicia), in "El Derecho Público a los 100 números de la Revista de Derecho Público 1980 – 2005" (The Public Law to the 100 numbers of the Public Law Review 1980-2005),  Jurídica Venezolana Publisher, Caracas. 2006.  Page. 109-163.

-   *"Jurisprudential Evolution of the Public Service".* (Desarrollo Jurisprudencial del Servicio Público), in "XIII Jornadas Centenarias del Colegio de Abogados del Estado Carabobo" (13th Century Seminar of Carabobo State BAR, Venezuela), Valencia, Carabobo State. November, 2006.

-   *"The Immunity of Jurisdiction and de Arbitration in the State Contracts ".* (La Inmunidad de Jurisdicción y el Arbitraje en los Contratos del Estado), in "VIII Jornadas Internacionales de Derecho Administrativo 'Allan Randolph Brewer-Carías' – Los contratos administrativos" (Eihth International Seminar of Administrative Law "Allan Randolph Brewer-Carías" – The Administrative Contracts), Caracas, Venezuela. 2006. Page. 261-290.

-   **National Academy of Law and Socials Sciences.** Buenos Aires, Argentina.
**Seminar:** *Administrative law in Venezuela. In studies about the Constitution of 1961 and 1999.* "El derecho administrativo en Venezuela. De la Constitución de 1961 a la de 1999.". September, 2008.

-   **Austral University of Buenos Aires.** Buenos Aires, Argentina.
**Seminar:** *Injuctions in the administrative procedure in Venezuela.* "Medidas cautelares en el procedimiento administrativo en Venezuela". September, 2008.

-   **National University of the Comahue.** Neuquén, Argentina.

**Seminar:** *Legal regime of the Administrative Contracts in Venezuela.* "Régimen Jurídico de los Contratos Administrativos en Venezuela". September, 2008.

- **Political and Socials Sciences Academy.** Caracas, Venezuela**.**
**Seminar:** *Lights and shadows of Administrative Law in Venezuela.* "Luces y sombras del Derecho Administrativo en Venezuela". June, 2009.

- **Carabobo University and  Arturo Michelena University.** Valencia, Venezuela.
**Seminar:** *Class Actions as instrument of Constitutional Protection* "La Tutela Judicial de los Intereses Colectivos y Difusos como medio de protección constitucional.". June, 2010.


- **Central University of Venezuela.** Caracas, Venezuela.
**Seminar:** *Class actions in Venezuela as an instrument of constitutional protection.* "La tutela de los intereses colectivos y difusos en Venezuela como medio de protección constitucional". October, 2010.

- **Zulia State BAR**. Maracaibo, Venezuela.
**Seminar:** *Contentious Administrative Jurisdiction in Venezuela.* "Jurisdicción Contencioso Administrativa en Venezuela". May, 2012.

- **Monteávila University**. Caracas, Venezuela.
**Seminar:** *Class actions and it's judicial protection in Venezuela.* "Los intereses colectivos y difusos y su protección judicial en Venezuela" .October, 2013.

- ***"The Demand of Nullity".***    in  "Avances Jurisprudenciales del Contencioso Administrativo, en XXVII Jornadas J.M Domínguez Escovar" (Jurisprudencial Advances of the Constitutional and Administrative Procedure, 27th Domínguez Escovar Seminar), Barquisimeto, Lara State, Venezuela. 2013.

- **Monteávila University.** Caracas, Venezuela.
**Seminar:** *Class actions and  Constitutional Rights*  "La Protección de los Intereses Colectivos o Difusos en el Proyecto de Ley Orgánica de Amparo sobre Derechos y Garantías Constitucionales". October, 2014.

- **Political and Socials Sciences Academy.** Caracas, Venezuela.
**Seminar:** *The legal regulation of leasing.* "La regulación legal del arrendamiento de los inmuebles comerciales". November, 2014.

- **Yacambú University.** Barquisimeto, Venezuela.
**Seminar:** *The most important cases in matter of property and expropiation* "Pronunciamientos judiciales trascendentales en materia de propiedad y expropiación". November, 2014.

- ***"The Demand of Nullity".*** (La Demanda de Nulidad), in  "XVII Jornadas Centenarias Internacionales: Constitución, derecho administrativo y proceso: vigencia, reforma e

innovación" (27th International Century Seminar: Constitution, Administrative Law and Procedure: Validity, Reform and Inovation), Carabobo State BAR, Valencia, Venezuela. Legal Studies Institute "Dr. José Ángel Castillo Moreno". Valencia. 2014. Page 373 - 423.

- **"Considerations on the Law of Institutions of the Bank Sector"**. (Consideraciones sobre la Ley de Instituciones del Sector Bancario), in "Revista de Derecho Público" (Public Law Review),  No. 140, octubre – diciembre. 2014. Page. 282 -291.

-     **Carabobo State BAR.** Valencia, Venezuela.
**Seminar:** *General Considerations of public Contracts.*   "Consideraciones Generales sobre Contratación Pública". June, 2015.

-     **Political and Socials Sciences Academy.** Caracas, Venezuela**.**
**Seminar:** *Arbitration in Administrative Law.*  "El Arbitraje en Derecho Administrativo". November, 2015.

- **"Class Action in the Constitution of Venezuela".** (Class Action en la Constitución de Venezuela),  in  "XVIII Jornadas Centenarias Internacionales: Derecho Procesal, Carabobo State BAR, Valencia, Venezuela. Legal Studies Institute "Dr. José Ángel Castillo Moreno". November 2015.

- **Carabobo State BAR.** Valencia, Venezuela.
**Seminar:** *General Considerations about public procurement*. "Consideraciones generales sobre la Contratación Pública". June, 2015.

- **Carabobo State BAR.** Valencia, Venezuela.
**Seminar:   The Constitutional procedure Law.** "El derecho procesal constitucional". November, 2015.

- **"Lights and shadows of Public Law in Venezuela".** (Luces y sombras del Derecho Administrativo en Venezuela). Published in the Political and Social Science Academy, "Homage Book to the Political and Social Science Academy in the centenarian of its foundation 1915-2015", II Tome, Centenarian Collection, Caracas, 2015. Pages from 1007–1083.

- **Andres Bello Catholic University,** Caracas, Venezuela.
**Seminar:** *General considerations about the administrative act*. "Consideraciones generales sobre el acto administrativo". April, 2016.

- **Carabobo State BAR.** Valencia, Venezuela.
**Seminar:** *General Considerations about public procurement*. "Consideraciones generales sobre la Contratación Pública". June, 2016.

- **Political and Socials Sciences Academy.** Caracas, Venezuela.
**Seminar:** *The arbitral activity of the Public Administration*. "Actividad arbitral de la administración". November, 2016.

- ***"Powers of the Supreme Court".*** (Poderes del juez constitucional). Conference dictated in the IV International Congress of procedural and Constitucional Law and IV Congress of Administrative Law in tribute to Dr. Carlos Ayala Corao. November, 2016. Published in the Academy of Political and Social Science Bulletin Nro. 155, Year 2016. Vid: http://www.acienpol.org.ve/

- ***"The state intervention in the economy".*** Conference dictated at the XIX International Seminar of the State Bar of Carabobo, on december 9, 2016.Published in the Academy of Political and Social Science Bulletin Nro. 154, Year 2015. Vid: http://www.acienpol.org.ve/

- ***"Constitutional Right to Privacy and its Conflict with the Intellectual Rights".*** Intellectual Property Journal, electronic version. Nro. 19. Year 2017. Universidad de los Andes SABER-ULA, 2017.

- ***"Electoral bases decreed by the President of the Republic through Decree No. 2.878".*** Article published in BREWER-CARÍAS, Allan / GARCÍA SOTO, Carlos (Collectors), "Estudios sobre la Asamblea Nacional Constituyente y su inconstitucional convocatoria en 2017", Editorial Temis, Editorial Jurídica Venezolana, Bogotá/Caracas, 2017, pp.413-418. Also published in the web page of the Politics and Social Science Academy: http://www.acienpol.org.ve/

- ***"Regimen of the constituent process in the Constitution of Venezuela".*** Article published in BREWER-CARÍAS, Allan / GARCÍA SOTO, Carlos (Collectors), "Estudios sobre la Asamblea Nacional Constituyente y su inconstitucional convocatoria en 2017", Editorial Temis, Editorial Jurídica Venezolana, Bogotá/Caracas, 2017, pp.137-204. Also published in the web page of the Politics and Social Science Academy: http://www.acienpol.org.ve/

- **Political and Socials Sciences Academy.** Caracas, Venezuela.
***"Unconstitutionality of the call for presidential elections by the National Constituent Assembly".*** (Inconstitucionalidad del llamado a elecciones presidenciales por parte de la Asamblea Nacional Constituyente). February, 2018.

- **Association of Executives of the state of Carabobo.** Valencia, Venezuela.
**Seminar:** ***"Unconstitutionality of the call for elections by the National Constituent Assembly".*** (Inconstitucionalidad del llamado a elecciones por parte de la Asamblea Nacional Constituyente). March, 2018.

- ***"Comments on the "Constitutional Law against hate, for the peaceful coexistence and tolerance".*** (Comentarios sobre la "Ley Constitucional Contra el Odio, por la Convivencia Pacífica y la Tolerancia). Published in the XLIII Conference "J.M. Domínguez Escovar": "The absence of legality in the Venezuelan legal system", Institute of Legal Studies Ricardo Hernández Alvarez, Academic Unit of the State Bar of Lara, Barquisimeto, 2018. pp. 43-64.

- **Andres Bello Catholic University.** Caracas, Venezuela.

Seminar: ***"Unconstitutionality of the call for elections by the National Constituent Assembly".*** (Inconstitucionalidad del llamado a elecciones por parte de la Asamblea Nacional Consituyente). March, 2018.

---

## BOOKS

**Author of the following Books:**

- ***"Legal Regime of the Administrative Contracts".*** (Régimen Legal del Contrato Administrativo). Caracas. 2001. 191 pages.

- ***"The Liability of the State in Venezuela".*** (La Responsabilidad del Estado en Venezuela). Caracas. 2001. 125 pages.

- ***"Legal Regime of Concessions in Venezuela".*** (Régimen Jurídico de las Concesiones en Venezuela). Caracas. 2002. 489 pages.

- ***"Class Actions in Venezuela".*** (La Protección de los Intereses Colectivos o Difusos en Venezuela), Andrés Bello Catholic University, Caracas.  2014. 146 pages.

- ***"The Liability of the State in Venezuela".*** (La Responsabilidad del Estado en Venezuela),  Trabajo de incorporación a la Academia de Ciencias Políticas y Sociales (Addition Work to political and socials sciences Academy),  Torino Publisher. Caracas.  2014. 257 pages.

- ***"Legal Regimen of the Expropiations in Venezuela".*** (Régimen Jurídico de la Expropiación en Venezuela), Paredes Publisher, Caracas. 2014. 584 pages.

**Co- author of the "Legal Books BADELL & GRAU" collection** ("BADELL & GRAU Legal Notes"):

* The "BADELL & GRAU Legal Notes" Collection is a series of publications prepared and sponsored by the firm BADELL & GRAU on various legal topics.

- *"Commentaries to the Commercial Arbitration Law "*. (Comentarios a la Ley de Arbitraje Comercial), Caracas. 1998. 113 pages.

- *"Regime of Casinos and Bingo Halls"*. (Régimen de los Casinos y Salas de Bingos), Caracas. 1998. 170 pages.

- *"Legal Regime of Privatization"*. (Régimen Legal de la Privatización), Caracas. 1999. 215 pages.

- *"Regime of Fiscal Control"*. (Régimen de Control Fiscal), Caracas. 1999. 347 pages.

- *"Administrative Contracts"*. (Contratos Administrativos), Caracas. 1999. 188 pages.

- *"Commentaries to the Organic Tourism Law "*. (Comentarios a la Ley Orgánica de Turismo), Caracas. 1999. 175 pages.

- *"Commentaries to the Value Added Tax Law"*. (Comentarios a la Ley del Impuesto al Valor Agregado), Caracas. 1999. 196 pages.

- *"Legal Regime of Urban Planning"*. (Régimen Jurídico sobre Urbanismo), Caracas. 2000. 430 pages.

- *"Commentaries to the new Law for the Protection of Consumers and Users"*. (Comentarios a la nueva Ley de Protección al Consumidor y al Usuario), Caracas. 2004. 173 pages.

- *"Commentaries to the Value Added Tax Law "*. (Comentarios a la Ley del Impuesto al Valor Agregado), Caracas. 2005   219  pages.

- *"Commentaries to the Anti-Corruption Law"*. *(Comentarios* a la Ley Anti-Corrupción), Caracas. 2005    145 pages.

- *"Juridical Regimen of the Monetary Conversion"*. (Régimen Jurídico de la Reconversión Monetaria), Caracas. 2007.   79 pages.

- *"Commentaries to the Law of Credit, Debit, Prepaid and Other Financing Cards or Electronic Payment"*. *(*Comentarios a la Ley de Tarjetas de Crédito, Débito, Prepago y demás Tarjetas de Financiamiento o Pago Electrónico). Caracas. 2009. 89 pages.

- *"Comments on the Law for the Defense of the People's Access to Goods and Services"*. *(*Comentarios a la Ley para la Defensa de las Personas en el Acceso a los Bienes y Servicios), Caracas. 2010.  257 pages.

**Co-author with David Quiroz and José I. Hernández**:

- ***"Legal Regime of the Electric Sector in Venezuela".*** (Régimen Legal del Sector Eléctrico en Venezuela), Paredes Pubisher, Caracas. 2002. 609 pages.

**Co-author with José I. Hernández**:

- ***"Legal Regime of Telecommunications in Venezuela".*** (Régimen Legal de las Telecomunicaciones en Venezuela), Paredes Publisher, Caracas. 2002. 590 pages.

- ***"Legal Regime of the Liability of the State in Venezuela".*** (Régimen Jurídico de la Responsabilidad en Venezuela), in "Tratado de Responsabilidad Civil" (Traty of Civil Liability), La Ley Publisher, Argentina. 2004.

---

# HONORS AND AWARDS

- **Award** for more than 30 years of Practice of Law. Caracas BAR, Venezuela. 2014.

- **Award** for more than 20 years of Practice of Law. Caracas BAR, Venezuela. 2004.

- **Award**. Council of City of Caracas. 2002 and again in 2003.

- **Order in its First Class**. Council of City of Caracas. 2003.

- **Medal of Honor to the Municipal Merit.** Council of Estado Miranda. 2002.

- **Award Arminio Borjas Order** in its First Class. BAR Federation. of Venezuela, 2000.

- **Three Awards** granted by the Andrés Bello Catholic University for a longtime Academic work and Professor Career (1992, 1998 y 2006).

- **Award** granted by the Andrés Bello Catholic University for more than 30 years of Academic work and the election as Individual of number of the Political and Social Sciences Academy. Caracas, 2013.

- **Honor to the Merit in Constitutional** Fundación de Estudios Constitucionales. Venezuela, 1995.

- **Award** as person being honored in the eleventh Administratives Seminar celebrated in the frame of the 25 anniversary of the Yacambú University. Venezuela, 2014.

# EXHIBIT "B"

## PDVSA U.S. LITIGATION TRUST AGREEMENT

This PDVSA U.S. Litigation Trust Agreement (the **"Litigation Trust Agreement"** or **"Agreement"),** made this 27th day of July, 2017, by and between (a) Petróleos de Venezuela S.A. (with all affiliates, subsidiaries, successors and assigns, **"PDVSA"),** acting in this matter through the Minister of the People's Petroleum Power, as a representative duly authorized to take action on behalf of PDVSA, by virtue of Number 14 of Article 78 of the *Decreto con Rango, Valor y Fuerza de Ley Orgánica de la Administración Pública,* as most recently published and promulgated in the *Gaceta Oficial de la República Bolivariana de Venezuela* N° 6.147 *Extraordinaria,* dated November 17, 2014, and Article 8 of the *Ley Orgánica de Hidrocarburos,* as most recently published and promulgated in the *Gaceta Oficial de la República Bolivariana de Venezuela* N° 38.493, dated August 4, 2006, and (b) the individuals designated as trustees for the liquidating trust established pursuant to this Litigation Trust Agreement (each such person and each successor trustee, the **"Litigation Trustees"),** is executed to facilitate the prosecution of claims PDVSA has against various entities and individuals and the distribution of the Proceeds thereof. Each of PDVSA and the Litigation Trustees are sometimes referred to individually as a **"Party"** and collectively as the **"Parties."**

## RECITALS

WHEREAS, PDVSA is an oil and gas company owned by the Bolivarian Republic of Venezuela **("Venezuela");** and

WHEREAS, PDVSA is the owner of claims against multiple individuals and entities (the **"Conspirators")** arising out of (1) the Conspirators' depression of prices for PDVSA's futures contracts; (2) the Conspirators' systematic failure to pay the ten percent (10%) balance for the futures contracts; (3) the Conspirators' inflation of the prices PDVSA pays for Naphtha; and (4) the Conspirators' systematic failure to deliver the full amount of Naphtha purchased by PDVSA (the **"Contributed Claims");** and

WHEREAS, the Conspirators' misconduct has caused and continues to cause vast damages to PDVSA and the people of Venezuela; and

WHEREAS, in order to obtain compensation for PDVSA and the people of Venezuela, PDVSA is authorizing the engagement of United States law firms and investigators to further investigate, commence one or more civil actions (the **"Assigned Actions"),** and prosecute the Assigned Actions to conclusion; and

WHEREAS, PDVSA is also authorizing the engagement of counsel in other jurisdictions where ancillary litigation and legal services may be required in connection with the Contributed Claims and the Assigned Actions; and

WHEREAS, PDVSA is entering into this Litigation Trust Agreement in order to ensure the engagement of legal counsel and the investigators who have already expended substantial time, effort, and money investigating, analyzing and preparing the forthcoming litigation, and to provide for the orderly and consensual distribution of the Proceeds of the Assigned Actions, whether by pre-suit settlement, post-suit settlement, or judgment, to PDVSA; and

WHEREAS, PDVSA and Boies Schiller Flexner LLP and Meister Seelig & Fein LLP (the **"US Law Firm Appointers")** are appointing the Litigation Trustees to hold and pursue the Assigned Actions; and

1

NOW, THEREFORE, in consideration of the promises, the mutual agreements of the Parties contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

For all purposes of this Litigation Trust Agreement, capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms: (i) in Annex A attached hereto and made part hereof; or (ii) that certain engagement letter agreement, dated as of July 12, 2017 (the "**Engagement Letter**"), between PDVSA and the Firm.  Unless otherwise specified, Article, Section and Paragraph references herein are to Articles, Sections and Paragraphs of this Litigation Trust Agreement.

## ARTICLE II
## ESTABLISHMENT OF THE LITIGATION TRUST

2.1     Establishment of Litigation Trust and Appointment of Litigation Trustees.

(a)     The Parties hereby establish a trust which shall be known as the "PDVSA US Litigation Trust" (defined herein as the **"Litigation Trust"**) on behalf of PDVSA.

(b)     The Litigation Trustees are hereby appointed as trustees of the Litigation Trust effective as of the full execution and delivery of this Litigation Trust Agreement and agree to accept and hold the assets of the Litigation Trust in trust for PDVSA subject to the terms of this Litigation Trust Agreement and the engagement letters entered into between PDVSA and the law firms and investigators engaged to investigate and prosecute the Assigned Actions.  The Litigation Trustees and each successor trustee serving from time to time hereunder shall have all the rights, powers and duties set forth herein.

(c)     The Litigation Trustees may serve without bond.

2.2     Transfer of Litigation Trust Assets.

(a)     PDVSA hereby irrevocably transfers, assigns, and delivers to the Litigation Trust, without recourse, all of its respective rights, title, and interests in and to the Contributed Claims and the Assigned Actions; and

(b)     PDVSA hereby irrevocably transfers, assigns, and delivers to the Litigation Trust and the Litigation Trustees, without waiver, all of their respective rights, title and interests in and to any privilege or immunity attaching to any documents or communications (whether written or oral) associated with the Contributed Claims (collectively, **"Privileges"** and, together with Contributed Claims, **"Assigned Actions"),** which shall vest in the Litigation Trustees and the Litigation Trust, in trust, for the benefit of PDVSA.  For purposes of the transfer of documents, the Litigation Trust is an assignee and successor to PDVSA in respect of the Contributed Claims and shall be treated as such in any review of confidentiality restrictions in requested documents. For purposes of this Section 2.2(b), "privileged" means attorney-client privilege or work product protection (or both as the case may be) as those terms are defined in Federal Rule of Evidence 502(g).




2.3     Funding of the Litigation Trust.

(a)     From time to time, Algamex may provide funding to fund the fees, expenses, and costs of the Litigation Trust. To the extent that a portion of any funding provided to the Litigation Trust by Algamex is not needed or reasonably likely to be used to defray the costs and expenses of the Litigation Trust, such funds shall be returned to Algamex.

(b)     Any failure or inability of the Litigation Trust to obtain funding will not affect the enforceability of the Litigation Trust.

2.4     Title to the Litigation Trust Assets. The transfer of the Litigation Trust Assets to the Litigation Trust pursuant to Section 2.2 hereof is being made by PDVSA for the sole benefit, and on behalf of, PDVSA. Upon the transfer of the initial Litigation Trust Assets to the Litigation Trust, the Litigation Trust shall succeed to all of PDVSA's rights, title and interests in the Litigation Trust Assets and no other entity shall have any interest, legal, beneficial, or otherwise, in the Litigation Trust or the Litigation Trust Assets upon their assignment and transfer to the Litigation Trust, other than as provided herein.

2.5     Nature and Purpose of the Litigation Trust.

(a)     Purpose. The Litigation Trust is organized and established as a trust pursuant to which the Litigation Trustees, subject to the terms and conditions contained herein, is to (i) hold the Litigation Trust Assets and dispose of the same in accordance with this Litigation Trust Agreement, and (ii) oversee and direct the expeditious but orderly liquidation of the Litigation Trust Assets.   The primary purpose of the Litigation Trust is to facilitate the prosecution and resolution of the Assigned Actions and to liquidate the Litigation Trust Assets with no objective to continue or engage in the conduct of a trade or business.

(b)     Relationship. This Litigation Trust Agreement is intended to create a trust and a trust relationship and is to be governed and construed in all respects as a trust.   The Litigation Trust is not intended to be, and shall not be deemed to be, or be treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Litigation Trustees or PDVSA, for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers. The relationship of PDVSA to the Litigation Trustees shall be solely that of beneficiary of a trust and shall not be deemed a principal and agency relationship, and its rights shall be limited to those conferred upon it by this Litigation Trust Agreement.

## ARTICLE III
## RIGHTS, POWERS AND DUTIES OF LITIGATION TRUSTEES

3.1     Role of the Litigation Trustees. In furtherance of and consistent with the purpose of the Litigation Trust, subject to the terms and conditions contained herein, the Litigation Trustees shall (i) hold the Litigation Trust Assets for the benefit of PDVSA , and (ii) make distributions of Proceeds and other Litigation Trust Assets. The Litigation Trustees shall be responsible for all decisions and duties with respect to the Litigation Trust and the Litigation Trust Assets.  In all circumstances, the Litigation Trustees shall act in the best interests of all PDVSA and in furtherance of the purpose of the Litigation Trust, and shall use commercially

3

reasonable efforts to dispose of the Litigation Trust Assets and to make timely distributions and not unduly prolong the duration of the Litigation Trust.

3.2     Prosecution of Assigned Actions.     Subject to the provisions of this Litigation Trust Agreement, the Litigation Trustees shall hold, pursue, prosecute, release, settle or abandon, as the case may be, any and all Assigned Actions (including any counterclaims to the extent such counterclaims are set off against the Proceeds of any such causes of action).

3.3     Authority to Settle Assigned Actions.

(a)     The Litigation Trustees, by unanimous consent, after consultation with the *Procurador General de la República Bolivariana de Venezuela* (the **"General Attorney"**) shall be empowered and authorized to settle, dispose of or abandon any Assigned Actions (including any counterclaims to the extent such counterclaims are set off against the Proceeds of any such Assigned Actions).

(b)     Any determinations by the Litigation Trustees with regard to the amount or timing of settlement or other disposition of any Assigned Action shall be conclusive and binding on PDVSA and all other parties in interest.

3.4     Retention of Litigation Counsel and Other Professionals.     Subject to the Engagement Letter, the Litigation Trustees may (a) retain such independent experts and advisors (including, but not limited to, counsel, tax advisors, consultants, or other professionals) as the Litigation Trustees deem necessary to aid them in the performance of their duties and responsibilities hereunder and to perform such other functions as may be appropriate in furtherance of the intent and purpose of this Litigation Trust Agreement, and (b) commit the Litigation Trust to provide such professional persons or entities compensation and reimbursement in accordance with the Engagement Letter for services rendered and expenses incurred, *provided, however,* that all litigation counsel shall be approved in advance by the General Attorney.   Subject to the foregoing, the Litigation Trustees may select any of the foregoing professionals in their sole discretion, and such professionals' affiliation with the Litigation Trustees shall not preclude the Litigation Trust's retention of such professionals. Without limiting the foregoing, the Litigation Trustees may engage such professionals on a contingency fee basis, such that the professionals will be paid based upon recoveries from the Assigned Actions, in accordance with the Engagement Letter.

3.5     Trust Expenses. The Litigation Trustees may incur any reasonable and necessary expenses in liquidating the Litigation Trust Assets.

(a)     The Litigation Trustee may maintain an expense fund (the **"Expense Fund"**) and expend the assets of the Expense Fund (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Litigation Trust during liquidation, (ii) to pay administrative expenses (including but not limited to, the costs and expenses of the Litigation Trustees (including reasonable fees, costs, and expenses of professionals incurred in the administration of the Litigation Trust) any taxes imposed on the Litigation Trust or in respect of the Litigation Trust Assets or fees and expenses in connection



with, arising out of or related to the Litigation Trust Assets, and (iii) to satisfy other liabilities incurred or assumed by the Litigation Trust (or to which the assets are otherwise subject).

(b)     The Litigation Trustees may retain from the Proceeds and add to the Expense Fund, at any time and from time to time, such amounts as the Litigation Trustee deems reasonable and appropriate to ensure that the Expense Fund will be adequate to meet the expenses and liabilities described in Section 3.5(a) above.

(c)     Notwithstanding any other provision of this Litigation Trust Agreement to the contrary, the Litigation Trustees shall not be required to take any action or enter into or maintain any claim, demand, action or proceeding relating to the Litigation Trust unless it shall have sufficient funds in the Expense Fund for that purpose.

(d)     In accordance with the Engagement Letter, all expenses of prosecuting the Assigned Actions, including payments to all professionals, shall be borne by parties receiving 66% of the Proceeds of the Assigned Actions.

3.6     Distributions.

(a)     In the reasonable discretion of the Litigation Trustees by unanimous consent, the Litigation Trustees shall distribute all Proceeds on hand to PDVSA subject to approval of the General Attorney pursuant to the *Ley Orgánica de la Procuraduría General de la República*, as most recently published and promulgated in the *Gaceta Oficial de la República Bolivariana de Venezuela* N° 6.220 *Extraordinaria*, dated March 15, 2016, as the same may be amended from time to time ("**Ley Orgánica de la Procuraduría General de la República**").

(b)     The Litigation Trust may withhold from amounts distributable to any Person any and all amounts, determined in the Litigation Trustees' reasonable sole discretion, required by any law, regulation, rule, ruling, directive, or other governmental requirement (including, without limitation, tax withholding relating to wage claims).

(c)     The Litigation Trustees may retain a distribution agent for the effective administration and distribution of amounts payable to PDVSA and all costs and expenses of such distribution agent shall be paid from the Expense Fund.

3.7     Management of Litigation Trust Assets.

(a)     Except as otherwise provided in this Litigation Trust Agreement, and subject to Treasury Regulations governing liquidating trusts, but without prior or further authorization, the Litigation Trustees may, control and exercise authority over the Litigation Trust Assets, over the acquisition, management and disposition thereof and over the management and conduct of the Litigation Trust, in each case, to the extent necessary to enable the Litigation Trustees to fulfill the intents and purposes of this Litigation Trust Agreement. No person dealing with the Litigation Trust will be obligated to inquire into the authority of the Litigation Trustees in connection with the acquisition, management or disposition of the Litigation Trust Assets.

(b)     In connection with the management and use of the Litigation Trust Assets and, except as otherwise expressly limited in this Litigation Trust Agreement, the Litigation

Trustees will have, in addition to any powers conferred upon the Litigation Trustee by any other provision of this Litigation Trust Agreement, the power to take any and all actions as, in the Litigation Trustees' discretion, are necessary or advisable to effectuate the primary purposes of the Litigation Trust, including, without limitation, the power and authority (i) to distribute the Litigation Trust Assets to PDVSA in accordance with the terms of this Litigation Trust Agreement, (ii) to pay all expenses of the Litigation Trust, (iii) to sell, convey, transfer, assign, liquidate or abandon the Litigation Trust Assets, or any part thereof or any interest therein, upon such terms and for such consideration as may be commercially reasonable, (iv) to endorse the payment of notes or other obligations of any Person or to make contracts with respect thereto, and (v) to borrow such sums of money, at any time and from time to time, for such periods of time, upon such terms and conditions, from such Persons, for such purposes as may be commercially reasonable. The Litigation Trustees will not at any time, on behalf of the Litigation Trust or PDVSA, enter into or engage in any trade or business, and no part of the Litigation Trust Assets will be used or disposed of by the Litigation Trustees in furtherance of any trade or business.

(c)     All decisions and actions by the Litigation Trustees under the authority of this Litigation Trust Agreement will be binding upon PDVSA and the Litigation Trust.

3.8     <u>Additional Powers of the Litigation Trustees.</u> In addition to any and all of the powers enumerated above, and except as otherwise provided in this Litigation Trust Agreement, and subject to the Treasury Regulations governing liquidating trusts, the Litigation Trustees, shall be empowered to:

(a)     hold legal title to any and all rights of PDVSA in or arising from the Litigation Trust Assets, including, but not limited to, the right to collect any and all money and other property belonging to the Litigation Trust;

(b)     protect and enforce the rights of the Litigation Trust to the Litigation Trust Assets by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity;

(c)     determine and satisfy any and all liabilities created, incurred or assumed by the Litigation Trust;

(d)     assert or waive any privilege or defense on behalf of the Litigation Trust;

(e)     make all payments relating to the Litigation Trust Assets;

(f)     obtain insurance coverage with respect to the potential liabilities and obligations of the Litigation Trust, the Litigation Trustees (in the form of a directors and officers policy, an errors and omissions policy or otherwise);

(g)     file, if necessary, any and all tax and information returns with respect to the Litigation Trust and pay taxes properly payable by the Litigation Trust, if any;



6

(h)     request any appropriate tax determination with respect to the Litigation Trust;

(i)     retain and reasonably compensate for services rendered and expenses incurred an accounting firm or financial consulting firm to perform such reviews and/or audits of the financial books and records of the Litigation Trust as may be appropriate in the Litigation Trustee's discretion and to prepare and file any tax returns or informational returns for the Litigation Trust as may be required;

(j)     take or refrain from taking any and all actions the Litigation Trustee reasonably deems necessary for the continuation, protection, and maximization of the Litigation Trust Assets consistent with the purposes hereof;

(k)     take all steps and execute all instruments and documents the Litigation Trustee reasonably deems necessary to effectuate the Litigation Trust; and

(m)     take all actions the Litigation Trustee reasonably deems necessary to comply with this Litigation Trust Agreement and the obligations hereunder.

3.9     <u>Limitations on Power and Authority of the Litigation Trustees.</u> Notwithstanding anything in this Trust Agreement to the contrary, the Litigation Trustees will not have the authority to do any of the following:

(a)     take any action in contravention of this Litigation Trust Agreement;

(b)     take any action which would make it impossible to carry on the activities of the Litigation Trust;

(c)     possess property of the Litigation Trust or assign the Litigation Trust's rights in specific property for other than Litigation Trust purposes and as provided herein;

(d)     permit the Litigation Trust to receive or retain cash or cash equivalents in excess of a reasonable amount necessary to meet claims and contingent liabilities (including without limitation expected expenses) or to maintain the value of its assets during liquidation;

(e)     exercise any investment power other than the power to invest in demand; and time deposits in banks or savings institutions, or temporary investments such as short term certificates of deposit or Treasury bills or other investments that may be held by a "liquidating trust" for federal income tax purposes under Treasury Regulation section 301.7701-4(d), or any successor provision thereof;

(f)     take any other action that would jeopardize treatment of the Litigation Trust as a liquidating trust for federal income tax purposes under Treasury Regulation section 301.7701-4(d), or any successor provision thereof.

3.10     <u>Books and Records.</u> The Litigation Trustees shall maintain in respect of the Litigation Trust, the books and records relating to the Litigation Trust Assets and income of the Litigation Trust and the payment of expenses, liabilities and claims against or assumed

by, the Litigation Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Litigation Trust. Nothing in this Litigation Trust Agreement requires the Litigation Trustees to file any accounting or seek approval of any court with respect to the administration of the Litigation Trust, or as a condition for managing any payment or distribution out of the Litigation Trust Assets.

3.11    Reports

(a)    Financial and Status Reports. Within 90 days after the calendar year-end following the Effective Date and for each calendar year end thereafter, and as soon as practicable upon termination of the Litigation Trust, the Litigation Trustees shall make available upon request to PDVSA a written report including: (i) financial statements of the Litigation Trust for such period, and, if the end of a calendar year, a report (which may be prepared by an independent certified public accountant employed by the Litigation Trustee) reflecting the result of such agreed upon procedures relating to the financial accounting administration of the Litigation Trust as proposed by the Litigation Trustee; (ii) a description of any action taken by the Litigation Trust which materially affects the Litigation Trust and of which notice has not previously been given to the holders of Litigation Trust Interests; and (iii) a description of the progress of liquidating Litigation Trust Assets and making distributions to PDVSA and any other material information relating to the Litigation Trust Assets and the administration of the Litigation Trust.

(b)    Annual Plan and Budget. The Litigation Trustees may, but shall not be required to, prepare and submit to PDVSA an annual plan and budget in such detail as is reasonably requested.

3.12    Compliance with Laws. Any and all distributions of Litigation Trust Assets and Proceeds of borrowings, if any, shall be in compliance with applicable laws, including, but not limited to, applicable federal and state laws.

## ARTICLE IV
## THE LITIGATION TRUSTEES

4.1    Number and Appointment of Litigation Trustees.

(a)    There shall at all times be three (3) Litigation Trustees.

(b)    The initial three (3) Litigation Trustees hereby appointed are Miguel Bolivar, Vincent Andrews, and Edward P. Swyer.

(c)    Miguel Bolivar (the **"PDVSA Appointee"**) has been appointed by PDVSA (the **"PDVSA Appointer"**), and Vincent Andrews and Edward P. Swyer (together, the **"US Law Firm Appointees"**) have been jointly appointed by the US Law Firm Appointers. The PDVSA Appointer has the sole authority to select the successor(s) of the original PDVSA Appointee and the US Law Firm Appointers have the sole authority to appoint the successor(s) of the original US Law Firm Appointees. For the avoidance of doubt, and notwithstanding

anything contained to the contrary herein, at all times the Litigation Trustees shall be comprised of one person appointed by the PDVSA Appointer and two persons appointed by the US Law Firm Appointers.

4.2 <u>Independent Trustees.</u> The Litigation Trustees may not be a beneficiary hereunder.

4.3 <u>Decisions and Actions of the Litigation Trustees</u>. Except as specified otherwise herein, all decisions and actions of the Litigation Trustees shall be by majority vote and shall require approval of at least two (2) of the three (3) Litigation Trustees.

4.4 <u>Trustees' Compensation and Reimbursement.</u> The Litigation Trustees shall receive compensation from the Litigation Trust as follows:

(a) <u>Compensation.</u> The Litigation Trustees shall receive reasonable compensation <u>as agreed to by PDVSA and the US Law Firm Appointers</u>. The Litigation Trustees' compensation may only be modified by unanimous consent of the Litigation Trustees and PDVSA.

(b) <u>Expenses.</u> In addition, the Litigation Trust will reimburse the Litigation Trustees (out of the Litigation Trust Assets) for all reasonable, out-of-pocket expenses incurred by the Litigation Trustees in connection with the performance of their duties hereunder.

4.5 <u>Resignation.</u> The Litigation Trustees may resign by giving not less than ninety (90) days' prior written notice. Such resignation shall become effective on the later to occur of: (a) the day specified in such notice, and (b) the appointment of a successor by the applicable appointer pursuant to Section 4.1 of this Litigation Trust Agreement for the Litigation Trustee position being vacated and the acceptance by such successor of such appointment. If a successor Litigation Trustee is not appointed or does not accept its appointment within ninety (90) days following delivery of notice of resignation, the resigning Litigation Trustee may petition any court of competent jurisdiction for the appointment of a successor Litigation Trustee.

4.6 <u>Removal.</u> The Litigation Trustees may be removed for Cause.

4.7 <u>Appointment of Successor Litigation Trustee.</u> In the event of the death (in the case of a Litigation Trustee that is a natural person), dissolution (in the case of a Litigation Trustee that is not a natural person), resignation, incompetency, or removal of the Litigation Trustee, the applicable appointer under Section 4.1 shall designate a successor Litigation Trustee. Such appointment shall specify the date on which such appointment shall be effective. Every successor Litigation Trustee appointed hereunder shall execute, acknowledge, and deliver to the Litigation Trust an instrument accepting the appointment under this Litigation Trust Agreement and agreeing to be bound thereto, and thereupon the successor Litigation Trustee, without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of the retiring Litigation Trustee; *provided, however,* that a removed or resigning Litigation Trustee shall, nevertheless, when requested in writing by the successor Litigation Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Litigation

9

Trustee under the Litigation Trust all the estates, properties, rights, powers, and trusts of such predecessor Litigation Trustee.

      4.8    <u>Confidentiality.</u> The Litigation Trustee shall, during the period that the Litigation Trustee serves as Litigation Trustee under this Litigation Trust Agreement and following the termination of this Litigation Trust Agreement or following its removal or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the Litigation Trust Assets relates or of which the Litigation Trustee has become aware in the Litigation Trustee's capacity as Litigation Trustee, except as otherwise required by law.

**ARTICLE V**
**LIABILITY AND INDEMNIFICATION**

      5.1    <u>No Further Liability</u>.  Each of the Litigation Trustees shall have no liability for any actions or omissions in accordance with this Litigation Trust Agreement unless arising out of their gross negligence or willful misconduct. In performing their duties under this Litigation Trust Agreement, the Litigation Trustees shall have no liability for any action taken by the Litigation Trustee in accordance with the advice of counsel, accountants, appraisers and other professionals retained by the Litigation Trust. Without limiting the generality of the foregoing, the Litigation Trustees may rely without independent investigation on copies of documents reasonably believed by the Litigation Trustee to be genuine, and shall have no liability for actions taken in reliance thereon. None of the provisions of this Litigation Trust Agreement shall require the Litigation Trustees to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers. Notwithstanding the foregoing, nothing in this Section 5.1 shall relieve the Litigation Trustees from any liability for any actions or omissions arising out of their gross negligence or willful misconduct.

      5.2    <u>Indemnification of the Litigation Trustees.</u>

          (a)    To the fullest extent permitted by law, the Litigation Trust, to the extent of its assets legally available for that purpose, will indemnify and hold harmless the Litigation Trustees and each of their respective directors, members, shareholders, partners, officers, agents, professionals or employees (collectively, the **"Indemnified Persons"**) from and against any and all loss, cost, damage, expense (including, without limitation, fees and expenses of attorneys and other advisors and any court costs incurred by any Indemnified Person) or liability by reason of anything any Indemnified Person did, does or refrains from doing for the business or affairs of the Litigation Trust, except to the extent that it is finally judicially determined by a court of competent jurisdiction that the loss, cost, damage, expense or liability resulted from the Indemnified Person's gross negligence or willful misconduct.  This indemnification shall apply only to the Litigation Trustees in the exercise of their duties hereunder and shall not apply to the actions of other persons involved in the prosecution of the Assigned Actions.

          (b)    Notwithstanding any provision herein to the contrary, the Indemnified Persons shall be entitled to obtain advances from the Litigation Trust to cover their reasonable

expenses of defending themselves in any action brought against them as a result of the acts and omissions, actual or alleged, of an Indemnified Person in its capacity as such, *provided, however,* that the Indemnified Persons receiving such advances shall repay the amounts so advanced to the Litigation Trust immediately upon the entry of a final, non-appealable judgment or order finding that such Indemnified Persons were not entitled to any indemnity under the provisions of this Section 5.2. The foregoing indemnity in respect of any Indemnified Person shall survive the termination of such Indemnified Person from the capacity for which they are indemnified. Termination or modification of this Litigation Trust Agreement shall not affect any indemnification rights or obligations then existing.

(c)     The Litigation Trust, with the unanimous approval of the Litigation Trustees, may indemnify any of the Indemnified Persons for any loss, cost, damage, expense or liability for which the Indemnified Persons would not be entitled to mandatory indemnification under this Section 5.2.

(d)     Any Indemnified Person may waive the benefits of indemnification under this Section 5.2, but only by an instrument in writing executed by such Indemnified Person.

(e)     The rights to indemnification under this Section 5.2 are not exclusive of other rights which any Indemnified Person may otherwise have at law or in equity, including without limitation common law rights to indemnification or contribution. Nothing in this Section 5.2 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under any other agreement or instrument to which that Person is a party.

5.3     Litigation Trust Liabilities. All liabilities of the Litigation Trust, including without limitation indemnity obligations under Section 5.2 of this Litigation Trust Agreement, will be liabilities of the Litigation Trust as an entity, and will be paid or satisfied from Litigation Trust Assets. No liability of the Litigation Trust will be owed in whole or in part by PDVSA individually or in PDVSA's capacity as a Beneficiary, by the Litigation Trustees individually or in the Litigation Trustees' capacity as Litigation Trustees, or by any member, partner, shareholder, director, officer, professional, employees, agent, affiliate or advisor of PDVSA or Litigation Trustee.

5.4     Limitation of Liability. Neither the Litigation Trustee nor their agents, employees and professionals will be liable for punitive, exemplary, consequential, special or other damages for a breach of this Trust Agreement under any circumstances.

5.5     Burden of Proof. In making a determination with respect to entitlement to exculpation or indemnification hereunder, the person, persons or entity making such determination shall presume that the Indemnified Person is entitled to exculpation and indemnification under this Litigation Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome that presumption.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES

PDVSA hereby represent and warrant that (i) the signatories hereto have full authority to execute this Agreement on its behalf; (ii) this Agreement has been duly authorized, executed and

delivered by it or on its behalf and is its valid and binding agreement, enforceable against it in accordance with the Agreement's terms; (iii) its execution, delivery, and performance under this Agreement will not contravene or constitute a default under any provision of applicable law or regulation or its charter documents (if any), any agreement or other instrument binding upon it or any of its subsidiaries or assets, or any judgment, order or decree of any governmental body, agency, official, or court having jurisdiction over it; and (iv) it has received all necessary approvals and authorizations from any governmental bodies, agencies, officials, self-regulatory organizations, or courts or other tribunals, whether foreign or domestic.

## ARTICLE VII
## TERMINATION OF LITIGATION TRUST

The Litigation Trustees and the Litigation Trust shall be discharged or dissolved, as the case may be, at such time as (a) the Litigation Trustees determine that the pursuit of additional Assigned Actions is not likely to yield sufficient additional Proceeds to justify further pursuit of such Claims and (b) all distributions of Proceeds and other Litigation Trust Assets required to be made by the Litigation Trustees under this Litigation Trust Agreement have been made and all expenses of the Litigation Trust have been paid. Upon dissolution of the Litigation Trust, any remaining Cash on hand and other Litigation Trust Assets shall be distributed to PDVSA. Article V of this Litigation Trust Agreement shall survive any termination of the Litigation Trust Agreement.

## ARTICLE VIII
## AMENDMENT AND WAIVER

Any provision of this Litigation Trust Agreement may be amended or waived only in writing by unanimous consent of the Litigation Trustees; *provided, however,* that all amendments of this Litigation Trust Agreement shall be consistent with the purpose and intention of the Litigation Trust to facilitate the commencement and the prosecution of the Assigned Actions and to provide for the distribution of the Proceeds.

## ARTICLE IX
## MISCELLANEOUS PROVISIONS

9.1     Effectiveness. This Litigation Trust Agreement shall become effective as of the date that it is fully executed and delivered (the "**Effective Date**").

9.2     Counterparts. This Litigation Trust Agreement may be executed in two or more counterparts, all of which shall be taken together to constitute one and the same instrument.

9.3     Governing Law. This Litigation Trust Agreement shall be governed by, and construed and enforced in accordance the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

9.4     Dispute Resolution.  The Parties hereby agree that any dispute, claim or controversy arising out of or relating to this Litigation Trust Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in

New York City before three arbitrators. The arbitration shall be administered by the ICC pursuant to its Comprehensive Arbitration Rules and Procedures. The arbitrators shall award to the prevailing party its costs, including reasonable attorneys' fees, arbitrator fees, filing fees, and other costs of the arbitration. Judgment on the Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. The arbitrator's decision and award shall be final and binding and may be entered in any court of competent jurisdiction.

       9.5    <u>Venue and Jurisdiction</u>. Subject to Section 9.4, the Parties irrevocably consent to the exclusive jurisdiction of the state and federal courts located within the State of New York, County of New York for any action or proceeding relating to the Litigation Trust or this Litigation Trust Agreement, provided, however, to the extent necessary or advisable, court approval of the Litigation Trust or this Litigation Trust Agreement may be sought in any court of competent jurisdiction that is presiding over an Assigned Action.

       9.6    <u>Headings.</u> Sections, subheadings and other headings used in this Litigation Trust Agreement are for convenience only and shall not affect the construction or interpretation of this Litigation Trust Agreement or any provision thereof.

       9.7    <u>Severability</u>. If any provision of this Litigation Trust Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Litigation Trust Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provisions of this Litigation Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

       9.8    <u>Due Authorization by the General Attorney</u>. This Litigation Trust Agreement has been duly authorized by the General Attorney, Citizen Reinaldo Muñoz Pedroza, by virtue of, and in accordance with, Articles 107, 76, 21, 5 and 9 (1) of the Ley Orgánica de la Procuraduría General de la República.

       9.9    <u>Notices</u>. All notices, requests or other communications, required or permitted to be made in accordance with this Litigation Trust Agreement including any change of address of PDVSA for the purposes of receiving distributions from the Litigation Trust shall be in writing and shall be delivered personally or by first class or express mail, return receipt requested or fax with confirmation of receipt or email with receipt acknowledgement. Notices should be directed to:

      (a)    If to the Litigation Trust or the Litigation Trustees:

          Vincent Andrews
          Private Capital Adv
          150 East 52nd St. Suite 21002
          NY, NY 10022
          <u>vandrews@privatecapitaladv.com</u>





Edward P. Swyer
The Swyer Companies
10 Executive Park Drive
Stuyvesant Plaza
Albany, New York 12203
eswyer@stuyvesantplaza.com

Miguel Bolívar
Gerente Corporativo de Tesoreria
Petroleos de Venezuela S.A.
Avenida Libertador, cruce con calle El Empalme
Complejo MinPetróleo - PDVSA
La Campiña, Caracas
VENEZUELA

(b)   If to PDVSA:

Vicky Zarate
Consultora Jurídica
Avenida Libertador, cruce con calle El Empalme
Complejo MinPetróleo - PDVSA
La Campiña, Caracas
VENEZUELA

(c)   If to Procuraduría General de la República:

Despacho del Procurador General
Av. Los Ilustres, cruce con Calle Francisco Lazo Martí
Urb. Santa Mónica Caracas.
La Campiña, Caracas
VENEZUELA
rmunoz@pgr.gob.ve
rmunoz.pgr@gmail.com





IN WITNESS WHEREOF, the Parties hereto have either executed and acknowledged this Litigation Trust Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.


**Dated: July 27, 2017**


_____

**Miguel Bolívar**


_____

**Edward P. Swyer**


_____

**Vincent Andrews**


_____

**Nelson Martínez**
**Minister of the People's Petroleum Power**
**Bolivarian Republic of Venezuela**

_____

**Reinaldo Muñoz Pedroza**
**Procurador General de la República**
**Bolivarian Republic of Venezuela**




15

## ANNEX A

## DEFINITIONS

"**Cause**" shall be defined as: (i) a person's willful failure to perform his material duties hereunder, which is not remedied within thirty (30) days of notice; (ii) a person's commission of an act of fraud, theft or embezzlement during the duties of his employment hereunder; or (iii) the Person's conviction for the commission of a felony with all appeals having been exhausted or appeal periods lapsed; *provided,* that no Cause shall exist involving subsection (i) above until the person first has failed to cure such failure within thirty (30) days of having been given written notice of such failure. For purposes of the foregoing, no act or failure to act on the part of a person shall be considered "willful" unless it is done, or permitted to be done, by the Person without reasonable belief that such person's action or omission was in the best interests of the Trust.

"**Interests**" means beneficial interests in the Litigation Trust.

"**Litigation Trust Assets**" includes the Assigned Actions and any Proceeds, or other results, from the Assigned Actions, directly or indirectly.

"**Proceeds**" means the actual consideration, if any, received as a result of any judgment, settlement, or compromise of any of the Assigned Actions, *provided, however,* that, as contemplated in the Engagement Letter, the Litigation Trust shall not receive more than 34% of the final amount of Proceeds.

"**Treasury Regulation**" means any regulation promulgated under the Internal Revenue Code of 1986, as amended.


