**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

---

PDVSA US LITIGATION TRUST

    Plaintiff,

  v.

LUKOIL PAN AMERICAS LLC; LUKOIL PETROLEUM
LTD.; COLONIAL OIL INDUSTRIES, INC.; COLONIAL
GROUP, INC.; GLENCORE LTD.; GLENCORE
INTERNATIONAL, A.G.; GLENCORE ENERGY UK
LTD.; MASEFIELD A.G.; TRAFIGURA A.G.;
TRAFIGURA TRADING LLC; TRAFIGURA BEHEER
B.V.; VITOL ENERGY (BERMUDA) LTD.; VITOL S.A.;
VITOL, INC.; FRANCISCO MORILLO; LEONARDO
BAQUERO; DANIEL LUTZ; LUIS LIENDO; JOHN
RYAN; MARIA FERNANDA RODRIGUEZ; HELSINGE
HOLDINGS, LLC; HELSINGE, INC.; HELSINGE LTD.,
SAINT-HELIER; WALTROP CONSULTANTS, C.A.;
GODELHEIM, INC.; HORNBERG INC.; SOCIETE
DOBERAN, S.A.; SOCIETE HEDISSON, S.A.; SOCIETE
HELLIN, S.A.; GLENCORE DE VENEZUELA, C.A.;
JEHU HOLDING INC.; ANDREW SUMMERS;
MAXIMILIANO POVEDA; JOSE LAROCCA; LUIS
ALVAREZ; GUSTAVO GABALDON; SERGIO DE LA
VEGA; ANTONIO MAARRAOUI; CAMPO ELIAS
PAEZ; PAUL ROSADO; BAC FLORIDA BANK; EFG
INTERNATIONAL A.G.; BLUE BANK
INTERNATIONAL N.V.

    Defendants.

**Case No. 1:18-cv-20818-DPG**

---

**DECLARATION OF ALAN BRILL**
**IN SUPPORT OF DEFENDANTS' OPPOSITION**
**TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**Table of Contents**

Introduction/Assignment ........................................................................................................... 3

Qualifications .............................................................................................................................. 3

Disclosures .................................................................................................................................. 8

Compensation .............................................................................................................................. 9

Scope of Analysis ...................................................................................................................... 10

Summary of Opinions ................................................................................................................ 10

Analytic Findings ...................................................................................................................... 12

Conclusions ............................................................................................................................... 28

Reservation of Right to Revise .................................................................................................. 29

APPENDIX A ............................................................................................................................ 30

APPENDIX B ............................................................................................................................. 66

I, Alan Brill, hereby declare as follows:

**Introduction/Assignment**

1.   Holland & Knight LLP, as counsel for Defendants, has engaged Kroll Cyber Security LLC, which has assigned me to independently review and analyze "Exhibit B" to a document entitled "Amended Complaint" dated March 1, 2018 in a matter captioned as PDVSA US Litigation Trust v. Lukoil Pan Americas L.L.C et al. (Civ. No. 1:18-cv-20818-DPG), before Hon. Darrin P. Gayles, USDJ, in the United States District Court for the Southern District of Florida, Miami Division.

2. Exhibit B to the Amended Complaint is a document entitled "Declaration of John Thackray," and it consists of 10 numbered pages (15 numbered paragraphs) plus two Exhibits numbered "1" and "2." I otherwise have not reviewed the Amended Complaint.

**Qualifications**

3. I am employed by Kroll Cyber Security, Inc. as a Senior Managing Director in Kroll's Cyber Security and Investigations practice, a practice that I founded in 1988. I have been employed by Kroll Cyber Security LLC or its parent company's constituent companies from 1988 through the present date.

4. My current *Curriculum Vitae* is provided as Appendix A to this report, and I incorporate it herein by reference.

5. Over my career, including work at prior employers and in connection with my military service, I have evaluated and provided consulting support and recommendations for the information security operations of approximately 300 companies and public-sector agencies around the world. The following represent examples of this work.

3

a.  During the 2008 United States presidential election, federal law enforcement notified the campaigns of both then-Senator Barack Obama and Senator John McCain that both campaigns – along with the Democratic and Republican National Committees – had been hacked by operatives of the People's Republic of China (PRC). I managed the defense of the Obama campaign ("Obama for America") and the Democratic National Committee – to remove PRC intrusions into their systems and to prevent new intrusions. I did this from mid-August of 2008 through a month after the election. This intrusion was made public by the White House just prior to then-President Obama's publicly raising the issue during a 2013 meeting with PRC President Xi Jipeng.

b.  When a defense contractor manufacturer's employee took a manufacturing specification trade secret (which was also defense classified information) without authorization by copying it to an external storage device, I investigated the action, provided guidance, and assisted in the repatriation of the information and reporting the incident to Department of Defense investigators.

c.  I served in 2014–2015 as the designated expert witness in the field of information security on behalf of the U.S. Federal Trade Commission for the litigation entitled *U.S. Federal Trade Commission v. Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, Wyndham Hotels and Resorts, LLC and Wyndham Hotel Management Incorporated*, filed in the United States District Court for the District of New Jersey before Hon. Esther Salas, USDJ. This project required performing an analysis of the information security standards and actual

information security operations of defendants as they existed and were operated over a multi-year retrospective period.

d. I served on the Security Committee of the Center for Innovation in Advanced Development & Manufacturing (CIADM) at the Texas A&M University Health Science Center. CIADM, as "one of three centers established as public-private partnerships with the U.S. Department of Health and Human Services to develop and manufacture countermeasures, the Texas A&M Center for Innovation will respond to the need for rapid and flexible manufacturing to bolster the nation's ability to respond to any attack or threat, including novel, previously unrecognized, naturally occurring emerging infectious diseases, as well as various chemical, biological, radiological and nuclear threats."[1] Because of the importance of the Center and its mission of developing vaccines for naturally occurring pandemics and in response to the deployment by enemies of biological/chemical war weapons, security was a key requirement for the Center. As a member of the Security Committee, I reviewed vendor plans, standards, and other policies for this research facility.

e. When the U.S. National Archives lost a hard drive containing former President William Clinton's White House meeting schedule, I was requested by the Chairman and Ranking Member of an investigating subcommittee of the U.S. House of Representatives to testify before the subcommittee as a neutral expert on information security. This testimony was taken under oath.

---

[1] See https://ciadm.tamhsc.edu/about/ accessed October 17, 2017.

f.  I served for two years (2015–2016) on the Cyber Leadership Council of the United States Chamber of Commerce in Washington, D.C., a group led by the first Secretary of Homeland Security and former Pennsylvania governor Tom Ridge.

6.  I hold the following certifications:

g.  Certified Information Systems Security Professional (CISSP)

h.  Certified Fraud Examiner (CFE)

i.  Certified Information Privacy Professional (CIPP/US)

j.  I am also a Fellow of the American Academy of Forensic Sciences (AAFS) in the Digital and Multimedia Sciences Section, of which I am a founding member.

k.  As a military officer, I held a Top Secret clearance from the Department of Defense.

7.  Prior to joining Kroll in 1988, I served as Director of the Information Systems and Information Security Bureau of the New York City Department of Investigation. In that role, I served as the senior information security professional in the New York City government and advised New York City government agencies on information security. I also managed investigations of crime, misuse, and abuse of systems used by City agencies. I served in this position, and in the prior assignment as Deputy Inspector General for Computer Security in the Office of the Inspector General, Human Resources Administration for the City of New York from 1983 to 1988.

8.  From 1980–1983, I was a consultant for Yourdon, Inc. and provided consulting services in the area of information security. I developed the portions of the methodology designed to build security and internal controls into systems built using the Yourdon

6

methodologies. In addition to providing consulting services, I regularly taught a 5-day seminar entitled "Building Controls Into Structured Systems" as well as another 5-day seminar entitled "Structured Analysis and Design Workshop." I wrote the book "Building Controls Into Structured Systems" for the Yourdon Press imprint of Simon & Schuster during this time period.

9. From 1974–1980, I was a consultant and later Manager in The Management Consulting Services unit of Ernst & Ernst (now called "EY"), which is an international audit, tax, and consulting company. I worked on the development and implementation of that firm's "Data Systems Security Review" practice. I conducted both reviews using the Data Systems Security Review methodology and internal control reviews in connection with the Ernst & Ernst audit practice.

10. From 1970–1974, I was a systems developer for Chase Manhattan Bank (now J.P. Morgan Chase). While there, I was assigned to the development of systems in support of the bank's Trust Department.

11. From 1968–1970, I served on active duty as an officer in the United States Army, assigned to the Military Occupational Research Branch of the Office of Personnel Operations, part of the Office of the Deputy Chief of Staff of the U.S. Army. Subsequently, as part of the United States Army Reserve, I held Mobilization Designee positions as a commissioned Army officer (Captain and Major) in both the Office of the Secretary of Defense, where I provided services related to information and computer security, and when assigned by the Army to the U.S. Federal Emergency Management Agency (FEMA), as a military liaison officer to the New York City Police Department (NYPD) for coordination in emergency situations involving joint police-military

operations. My total service as a commissioned officer on active duty and in the reserves was 38 years.

**Disclosures**

12. As disclosed in Appendix A, I hold BA and MBA degrees from New York University. I am also a graduate of both the United States Army Command and General Staff College, and the National Security Management Program of the Industrial College of the Armed Forces (now the Dwight D. Eisenhower School for National Security and Resource Strategy) a unit of the U.S. National Defense University.

13. I am the author, co-author, chapter author or editor of the books listed in Appendix A that were published in the past 10 years.

14. During the 10-year time period required by this Court and ending as of the date of this report, I have authored or co-authored the articles, and made the presentations listed in Appendix A.

15. In publications relating to my work in security, I wrote a chapter of the Practicing Law Institute ("PLI") 1992 book, *Trade Secret Protection and Litigation: Protecting Confidential Business & Technical Information.* This was based on a presentation that I did at the PLI conference held at the courthouse of the Ninth Circuit Court of Appeals in San Francisco, California.

16. During the four-year period ending on the date of this report, I have testified in one deposition but at no trials in any litigation, as disclosed in Appendix A. I did appear and offer unsworn testimony on June 7, 2016, at a hearing before the United States Department of Labor's Advisory Council on Employee Welfare and Pension Plans. The hearing was entitled "Cybersecurity Considerations for Benefit Plans." My sworn

testimony before a committee of the U.S. House of Representatives was disclosed above and in Appendix A to this report.

17. In addition to my work at Kroll, I hold a faculty appointment as an Adjunct Professor at the Texas A&M University School of Law located in Fort Worth, Texas, as part of the school's LL.M. and M.Jur. Program in risk management. I teach the online course "Cybersecurity."

18. I also provide *pro bono* instruction at training programs of the North Atlantic Treaty Organization (NATO) *Center of Excellence - Defense Against Terrorism* (CoE-DAT) located in Ankara, Turkey, and at programs sponsored by the NATO Science for Peace and Security (SPS) Program. The primary course is the semi-annual training program entitled "Terrorist Use of Cyber Space" presented at CoE-DAT. The presentations in connection with my pro bono work for NATO are disclosed in my presentations list at Appendix A. The NATO publications I authored or co-authored in the NATO refereed journal *Defense Against Terrorism Review* and in connection with NATO SPS presentations are disclosed in Appendix A. I have also co-authored an article on Information security (*"Will Hackers Be Competing in the Olympics?"*) that appeared in *Freedom From Fear*, a journal published jointly by the United Nations Interregional Crime and Justice Research Institute (UNICRI) and the Max Planck Institute.

## Compensation

19. I am employed by Kroll Cyber Security LLC. Kroll bills for my time at the rate of $650 per hour. Employees of Kroll have assisted me in this assignment.

20. My compensation is not contingent upon either my testimony or on the outcome of this litigation.

**Scope of Analysis**

21. As noted above, I was asked to review Exhibit B to the Amended Complaint. All information that I reviewed is disclosed in Appendix B to this report.

22. The documents I relied on in performing my analysis and formulating my opinions are disclosed at Appendix B to this report.

**Summary of Opinions**

23. It is my opinion that based on the information presented in Appendix B, that Mr. Thackray did not conduct an independent forensic analysis of either data or systems that he states that he examined in his report. There is no analytic plan, no recitation of evidence collected, no indication of the analysis of forensic evidence, or any of the other documentary evidence that I would expect in a forensic report. He reaches conclusions that, while they appear to mimic the information provided to him by Mr. Brennan, there is no documentation that I or anyone else could use to determine exactly what, if anything, he did or what data he relied on in reaching his conclusions. I do not know who he spoke to, as he does not disclose it. I do not know what constituted Mr. Thackray's analysis of the computer network as no methodology is described or listed. I do not know what documentation (if any) he may have reviewed, as it is not disclosed in his report. There is no listing of documents on which Mr. Thackray relied in formulating his opinions. There is no architecture documentation, no description of or listing of what system or systems were accessed, what forensic information was obtained, reviewed, and relied upon, or how such information was obtained. Thus, my analysis of his report had to be limited to the information provided in his report.

24. I understand that Mr. Thackray was provided with information from one of his disclosed employers, The Brennan Group,[2] concerning the allegations in this action, and that he relied on those in performing his work. What I did not find in his report, is independent forensic (or other) investigation that is documented in a way to provide even basic information against which his opinions could be evaluated. Thus, it is my opinion that this report as written, does not provide the reader with the objective information on which to support Mr. Thackray's opinions.

25. Mr. Thackray, in his Paragraph 2, says that he "personally authored the protocols and standards for the use of the FEX software and developed the training materials for it." I note, however, that he neither includes a reference to these standards as being a basis for his opinions (as I understand to be required in an opinion-witness report) nor provides any reference to any standards that he actually used in carrying out the forensic work referred to in his report. In fact, it is my opinion that Mr. Thackray's report does not disclose any evidence of his having carried out a forensic analysis of any competency as he does not disclose a methodology, what data was analyzed, the source of such data, how it was protected and authenticated, the tools used to analyze the data or the results of his forensic analysis or the results of that analysis. He merely seems to provide a very general outline of activities, and then confirms the conclusions provided to him by The Brennan Group without the factual basis, beyond what The Brennan Group told him. While he alludes to what others told him in Venezuela, he fails to even tell us who he spoke to, their positions, and whether he received any documentation. Again, there is no

---

[2] I am informed by counsel that there are other versions of his background that do not include his employment by the Brennan Group.

11

listing of documents on which he relied, so I have to assume that there were none, other than the two email messages that he reproduces in his report.

26. With regard to those emails, he states that he relied on an English translation of the two email messages, which were written in the Spanish language. But he does not provide those translations – which were the actual documents he said he used – so it is impossible for me to know for sure what the translations stated or their degree of translation accuracy.

27. My preliminary analysis shows that Mr. Thackray does not actually establish, opine on, or conclude that any of the defendants accessed, had access, or exceeded authorized access to any PDVSA server or computer.  In addition, he fails to offer any objective support or documentation as to the contents of any server or computer he merely references from time-to-time.  It is entirely unclear to me as to his basis for offering his opinions other than unsupported supposition presented in a fashion that appears compatible with the narrative provided to him by The Brennan Group or unidentified persons and the basis of his information as to PDVSA's IT infrastructure and security remains unknown.

**Analytic Findings**

28. Mr. Thackray states in his Paragraph 1 that the information in his report is based on personal knowledge and review of documents.  Mr. Thackray does not articulate the scope of the documents he reviewed and upon which he relies, other than the two Exhibits (in Spanish, although he states that he relied on English translations which he did not provide) to his Declaration.  For example, Mr. Thackray later in his report makes

reference to some analysis or review of systems, but he does not identify what he analyzed or reviewed.

29. In my view, Mr. Thackray's Declaration is based on:

    a.   What The Brennan Group and various undisclosed persons may have told him;

    b.   Undocumented access gained under some "incognito" scheme;

    c.   What he characterizes as "an analysis of the computer network at PDVSA's headquarters and obtained and preserved certain data stored in the network in accordance with best practices for forensic use of electronic device";

    d.   Undocumented searches of some undefined network attempts to obtain data or access to systems to forensically analyze, critical information about which he was "informed," most often by unknown individuals;

    e.   Critical information about which he was "informed" by John Brennan, but the source of which is not identified (and possibly not known by Mr. Thackray); and

    f.   Mr. Thackray did not report or base his supposition on any actual, documented analysis of the server(s) or computer(s) that are allegedly in question.

30. In his second paragraph, Thackray states that he developed standards for use of FEX forensic software. But someone who developed standards for the use of any software that purports to "collect, preserve[ ] and present[ ] digital media for use in civil and criminal investigations and legal proceedings" and who states that it "conforms to global standards and best practices" would know that there is no global standard or global best practices document that is universally recognized. Whatever global standard or best practices that

FEX purports to follow have to be defined. As it stands, there is no objective basis for evaluating his statements. It may or may not be used by thousands of organizations, but there is no indication that anyone is required either to follow the standards that Thackray developed or his training material. I believe that the closest to global standards currently recognized in the forensic community are the documents published by the Scientific Working Group on Digital Evidence (SWGDE),[3] But in any case, he does not provide either any standards he supports, or any standards that were actually followed in connection with any work he may have done at PDVSA.

31. While Mr. Thackray states that he is a "volunteer with the Torrance (California) Police Department and a "member" of a joint task force managed by the Secret Service, and that his work "entails work on active criminal cases" he discloses no cases in which he has testified, although his Paragraph 6 is entitled "Testimonial Experience" He states that he has examined "thousands" of devices in civil or criminal cases. But in this case, he merely makes assertions about servers that he states he looked at, but we do not know how or under what circumstances or have any documentation – even screenshots – that would constitute evidence of what he did.

32. His entire Paragraph 7 is nothing more than a recitation of the information provided to him by "investigators" employed by the Plaintiff. What he says in this paragraph, including things like where information is created and used, and the facilitation of "installation of a 'clone live server'" represent information given to him on which he is relying and not on any work he did.

---

[3] See, for SWGDE, the website at URL https://www.swgde.org/.

33. His statements in Paragraph 8 are unsupported.

    a.   He fails to document how he did the analysis of the PDVSA headquarters computer network.

    b.   He fails to document what data he obtained and preserved, how or from whom he got it, how he authenticated it, how he analyzed it, or any other objective information against which his words can be vetted.

    c.   He fails to document how he could objectively and conclusively identify "person(s) working with" Morillo, or who was accessing data using the purported (but not actually documented) external access to the so-called "Core 9" server.

34. In regard to his Paragraph 9, as a purported forensic expert, Thackray would be expected to know that in a normal forensic investigation, investigators are almost universally not given "unrestricted access to all IT personnel, hardware, software and data." They are provided with access to that information that they, in consultation with the parties and their counsel, have determined is relevant to the case. For example, if I were investigating the theft of credit card data from a hospital, I would not expect – in fact would not want – full access to patient data that would be covered by the HIPAA and HITECH laws, as those would likely be irrelevant to my investigation. As an expert in forensics, I can tell the Court that normal forensic investigations are not fishing expeditions where the parties say "do whatever you want with whatever data you want." That is why there are forensic protocols, and forensic project plans. I have seen no forensic analysis plan that Thackray used or even purported to use.

35. Additionally, in Paragraph 9, in reporting that he could not gain unrestricted access (which I have stated is not usual in a "normal forensic investigation on behalf of a corporation") he cites three reasons. The first two are the "unstable political and economic environments in Venezuela." How those are the proximate cause of his inability to gain the access he desired is unclear. I am informed by counsel, and accept for the purpose of this report, that PDVSA is a large functional petroleum company which was nationalized by the Venezuelan government. It continues to operate in the current Venezuelan environment, so why Thackray blames the political and economic environments was not explained -- it was just asserted. The third reason he states was that "access and information is controlled by certain PDVSA employees who are believed to be collaborating in the conspiracy." But he offers no evidence of this, nor does he name the employees of who he is reporting. This is just an assertion without any stated basis upon which to rely..

36. In Paragraph 10, he states that he made an incognito visit to PDVSA premises. He then goes on to make several assertions, none of which are backed up with any evidence or documentation.

   a. He was informed that the email retention policy is three months. We do not know who informed him, and he discloses no steps that he took to verify this. The fact that he has never seen a 90-day retention policy does not in and of itself make that a problem. Organizations set their retention policies based on many criteria. Those criteria change over time. As an example, in 2015, New York State changed its retention policy. It had been 90 days, and Governor Cuomo decided to

change it.[4] In another example, as part of the Reinvent Albany project, the NY Department of Health was reported to have moved to a 90-day email retention program in conjunction with their move to Microsoft's Office 365 system.[5] Thus, his assertion that a 90-day retention program is suspicious is simply untrue.

b.  He further says that "as I was told, there are no disaster recovery plans and backup functions within the PDVSA network." We have no idea of who told him this, their position within the organization, or whether, in fact it is true, or whether there is anything unusual or suspicious about this at PVDSA as is implied by Mr. Thackray.. He simply assets that he was told and thus that we should accept that as the true state of PDVSA. But in doing a simple search using the Google system, I found the following statement attributed to Kela Barrios, Storage Administrator, PDVSA, published on September 12, 2017. It appears that PDVSA uses MicroFocus Data Protector, and that Kelia Barrios said that "PDVSA reduced time to restore by 75% after using MicroFocus Data Protector.[6] Micro Focus[7] states that it provides comprehensive enterprise data protection across heterogeneous environments, applications and media, and built-in disaster recovery. While I have not independently investigated this, it certainly appears to be contradictory to the mere assertion that there are neither data recovery nor backups at PDVSA.

---

[4] See for example, the contemporaneous New York Times article at
https://www.nytimes.com/2015/05/23/nyregion/cuomo-administration-ends-90-day-rule-on-deleting-state-workers-email.html.
[5] https://reinventalbany.org/wp-content/uploads/2015/02/2013.07.30-DOH-Memo.pdf
[6] https://www.techvalidate.com/product-research/microfocus-data-protector/facts/692-B7F-42C
[7] https://www.techvalidate.com/product-research/microfocus-data-protector/facts/692-B7F-42C

17

c.  He asserts in Paragraph 10 that "the architecture of the PDVSA network is such that there is limited ability to track information in it." This is a broad assertion, with no particular meaning, from an unknown party, and appears, like the others, to simply be accepted as true by Thackray without any investigation that is disclosed in his report.

37. In Paragraph 11, he asserts "fundamental security vulnerabilities and irregularities." He says that he "learned" that the PDVSA Security Department controls access to the company network, and they can provide "an employee or third party" with credentials to obtain unrestricted access to the network, including assistance in installing and configuring a VPN for that purpose. This should not be troubling to Thackray or anyone else. Someone has to control access, and a security department is a logical candidate to do this, and in my experience, the security department is most often charged with this responsibility. Further, I applaud that they help install and configure VPNs, which are a vital part of a remote access data security program. I run into a problem when he says that "it is highly unusual for an IT security department to provide access to a third party not employed by the company and especially not unrestricted access." There are two points that I have to make.

a.  That is factually untrue. In the current technology environment, third parties are granted access frequently. Outsourcing means that you hire a company to perform a function. Depending on that function, they receive necessary access. As a common example, a company may outsource its help desk and tech staff that supports the help desk. They are not company employees – they are vendors – but they have a valid need for significant access, so they get it. As we move toward

more collaborative computing environments, it is expected that third parties will play an increasing role in providing IT services to enterprises.

b. If we go back to his paragraph 9, he says that "in a normal forensic investigation on behalf of a corporation, the investigators are given unrestricted access to all IT personnel, hardware, software and data." Mr. Thackray cannot have it both ways. On the one hand, he characterizes complete access as "normal" and literally on the next page of his report, he characterizes a third party (like Thackray) gaining access as highly unusual.

38. In this same paragraph, he says he saw a demonstration of remote access. But we do not know the circumstances of the demonstration, or the parameters on which it was based. His characterization of "the availability of unrestricted access to the platform…" ignores the fact that the Security Department makes the decisions on who can access what. I cannot imagine that he expects this court to believe that anyone can access that system at any time. I think what he is describing, but I cannot be sure based on Mr. Thackray's declaration is a controlled remote access with permission provided by the department assigned by PDVSA to do so – which again, could be entirely appropriate. He references VPN – a virtual private network. This is a control feature to regulate remote access to authorized persons, and to provide end-to-end encryption of transmissions to protect the data in-transit. As described above, there is nothing remotely unusual or suspicious about such a control feature.

39. The final piece of this paragraph concerns a witness that The Brennan Group told him about, but of which he does not have any direct knowledge. Without direct knowledge concerning what the witness accessed and how, he is simply relying on and interpreting

19

the word of The Brennan Group and somehow inferring that it is the same access that he observed directly during whatever demonstration he says he attended.

40. In paragraph 12, he says he "was able to physically inspect the room in PDVSA's main headquarters in which the server systems are located." He then jumps to information that he was "informed" about, including that the network consisted of 10 servers. Given the size and complexity of PDVSA's operations, as a systems professional, it would seem unlikely that their entire network runs on 10 servers. Thackray's knowledge of the network appears to be what someone told him or potentially, what he observed, but it is not clear. He provides neither the identity of the person who told him or their duty position. We are not provided with any documentation – even a simple network diagram – of the structure or architecture and have no basis to determine the thoroughness of any review conducted. Again, without any evidence, we are left only with Mr. Thackray's unsupported assertions. When he describes replica or clone servers, I would expect even just a simple explanation of the architecture. Are they set up as a redundant array? How does the replication occur? Is it software driven? How frequently are the two servers synchronized? Again, there are unsupported assertions, but no evidence or documentation or even a description of such evidence or documentation.

41. He finds that the information he was given, that Cores 9 and 10 have 102 users, while Cores 7 and 8 have 72 users to be troubling. Depending on the use of each server (or server pair) it would not necessarily be unusual to have servers with different number of users. He says that he was informed that cores 9 and 10 support highly confidential data. Assuming this to be true, even without evidence to confirm, different user communities among the servers would not be surprising, much less troubling. It is not clear why the

number of users (and we do not know how that is defined – e.g., people; accounts; service accounts, etc.) raises any particular issue. He states, "such a structure is highly unusual in a corporate environment and raises suspicion' that the Core 9 server could be replicating to 'rogue computer server,' either onsite or remotely." First, we do not know what he means by "such a structure," and further there is no clear indication that anything Mr. Thackray identifies as "suspicious" in his declaration is in fact suspicious or indicative of any wrong doing. He jumps to a conclusion, without any evidence to support, that there could be a rogue server replicating it. There is simply  an unsupported accusation.

42. According to Mr. Thackray, when he examined the Core 10 server, it was on, although he did not know of anything it was being used for. In my experience, and I think in that of most IT professionals, servers running in server rooms are routinely left on. Powering down a server is usually done when there is a need to do so.

43. He is troubled that he was not given access to the Core 9 server, but it is not clear why this would be difficult to understand.  He says that the Core 9 and 10 servers are used for highly confidential information. And he said that on this visit to Caracas, he was "incognito," but we are not sure what that means (e.g., was he disguised, using false credentials, or using other subterfuge or false pretense). Mr. Thackray indicates that Mr. Rojas, part of PDVSA Internal Security, refused to give him access.  But he does not tell us whether his incognito persona should have had access to that highly confidential data. He says he could access other servers but Mr. Thackray does not provide information on how he tried to obtain access or, for that matter, why he should have access to the highly confidential server. Also worth noting again is that Mr. Thackray indicated that giving

such unrestricted access to a third party (presumably like him) would be highly unusual. As to Mr. Thackray's statements pertaining to the additional server, titled Metcam85, which he claims functions as a gateway server, there is no documentation or evidence at all to support his assertion that the presence of a gateway server, if true, would be "highly unusual and suspicious," given that we have no evidence of the official systems architecture.

44. In paragraph 13, Mr. Thackray reports on his search of the PDVSA network, looking for two domains supplied to him by The Brennan Group. WTRPC.com and CANTV.net. We do not know how his search of the PDVSA network was conducted, what tools were used, or what the scope of the search entailed. He says he found "metadata fragments" on the core 9 and Metcam85 machines, but offers no evidence. We do not know what he means by "metadata fragments," which has no uniform meaning to forensic professionals. He then says that those hits indicated interactions from two people using the WTRPC domain. If that is what he found, he should provide evidence, which he does not. But then he asserts that "[a]s previously mentioned, WTRPC is one of the entities believed to be used by Morillo and Baquero to defraud PDVSA." But this is information simply given to him by The Brennan Group, of which he offers no proof. His "belief" is based on his employer telling him that. The names he associates with these "metadata fragments" and identifies as Helsinge employees, is based on what his employer told him and apparently not on his own knowledge.  He says he performed further analysis, but does not explain what he did, or how, which is considered a universal requirement for a forensic investigation. Information concerning how an analysis was conducted is typically added as an appendix, but this was not done. All that can be determined from

Mr. Thackray's discussion about finding the WTRPC.com domain is that he thinks there is logical reason for the domain to be found on any of the PDVSA servers. I cannot make this leap without more information and can certainly identify other reasons outside of the Brennan Group narrative. For example, the fragments could have been deliberately placed on the machine for him to find. This authentication is completely ignored. If I do a good job of copying a file that I prepared onto computer X and erase it, there could be exactly the kind of data that he apparently found. Since Mr. Thackray does not provide any reasonable forensic report, we cannot know what he found, how, or what it means).

45. With respect to CANTV.net, he is suspicious because he "was informed the PDVSA network and the servers are generally set to restrict any emails with the CANTV.net domain name." First, he does not provide who informed him and we have no reason to know whether it is true. Second, we are not provided any documentation of the restriction, and when it may or may not have been in effect. Third, we do not know what "generally" means. Something is restricted or not restricted, based on a rule-set. "Generally" is not a word I associate with a domain restriction, and I don't understand it or why he would say it without explanation. He characterizes CANTV as a "mail hosting service like gmail.com.and aol.com. CANTV is a very large and complex organization. According to BNA, it provides fixed and mobile telephony services and internet services to 2.5 million subscribed households. It is owned by the Government of Venezuela. I would strongly disagree that it is typical for a company to block huge internet providers like Gmail across the board. They could certainly block them in appropriate circumstances, but he is not accurate in saying that it is "typical" that such domains be blocked. It makes no sense to assert that such actions are typical "because they can be

used to breach security systems." So can every domain. Hackers are far smarter than he seems to credit. If they found a place that blocked AOL or Gmail, they would simply use a different domain – perhaps one that they were unauthorized to use.

46. Although Mr. Thackray indicated that he was blocked from the Core 9 server, he also reports that it had a rule (not further defined) that had something to do with CANTV on that server. It is not clear how these statements can be reconciled, how access was obtained, or what level of access was obtained.  The rule (which he could have provided so that it could be independently reviewed), seems to parse emails addressed to two people from CANTV networks to those people at an address with a "PDVA.com" domain, For a further discussion regarding the PDVA domain and the impossibility of that domain reaching PDVSA's email server, see Paragraph 47, below.   He does not explain how the forwarding prevents PDVSA from knowing the communication occurred (or anything else about network monitoring by PDVSA's security group)

47. He goes on to say that PDVA is not an address used in PDVSA's email system. But the similarity is enough to say that it is indicative of a scheme "typically used globally in connection with identity theft and criminal financial activity." Certainly that is conceivable, but it is not a strong indicator of any nefarious activity in and of itself. Again, more information is needed and not provided. For example, the web address cnn.com is site of the Cable News Network. The very similar ncnn.com is the site of the North Carolina News Network. Neither CNN nor NCNN believe the other is out to get them. I would expect a professional report to point out both possibilities. In fact, a quick look-up on the Internet's Whois system shows that PDVA.com is a parked address not

currently in use which is apparently owned by an individual in California who appears to

be a part of "Domain Name 4 Sale.

WHOIS search results

Domain Name: PDVA.COM
Registry Domain ID: 120843719_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.enom.com
Registrar URL: www.enom.com
Updated Date: 2017-04-17T18:25:38.00Z
Creation Date: 2004-05-23T17:10:39.00Z
Registrar Registration Expiration Date: 2018-05-23T17:10:00.00Z
Registrar: ENOM, INC.
Registrar IANA ID: 48
Domain Status: clientTransferProhibited
https://www.icann.org/epp#clientTransferProhibited
Registry Registrant ID:
Registrant Name: HOWARD HOFFMAN
Registrant Organization: DOMAIN NAME 4 SALE
Registrant Street: 3301 ALMA ST
Registrant City: PALO ALTO
Registrant State/Province: CA
Registrant Postal Code: 94306
Registrant Country: US
Registrant Phone: 1.6504937874
Registrant Phone Ext:
Registrant Fax: 1.
Registrant Fax Ext:
Registrant Email: DOMAIN@HIOSILVER.COM
Registry Admin ID:
Admin Name: HOWARD HOFFMAN
Admin Organization: DOMAIN NAME 4 SALE
Admin Street: 3301 ALMA ST
Admin City: PALO ALTO
Admin State/Province: CA
Admin Postal Code: 94306
Admin Country: US
Admin Phone: 1.6504937874
Admin Phone Ext:
Admin Fax: 1.
Admin Fax Ext:
Admin Email: DOMAIN@HIOSILVER.COM
Registry Tech ID:
Tech Name: HOWARD HOFFMAN
Tech Organization: DOMAIN NAME 4 SALE
Tech Street: 3301 ALMA ST
Tech City: PALO ALTO

25

Tech State/Province: CA
Tech Postal Code: 94306
Tech Country: US
Tech Phone: 1.6504937874
Tech Phone Ext:
Tech Fax: 1.
Tech Fax Ext:
Tech Email: DOMAIN@HIOSILVER.COM
Name Server: NS1.SEDOPARKING.COM
Name Server: NS2.SEDOPARKING.COM
DNSSEC: unSigned
Registrar Abuse Contact Email: abuse@enom.com
Registrar Abuse Contact Phone: +1.4252982646

A quick lookup would show that the domain PDVA which Mr. Thackray finds so suspicious is registered but not in use at all. This is the kind of innuendo which a minimally competent investigation would show is false. Moreover, there is another issue that is extremely troubling. In Paragraph 14, Thackray introduces the notion of PDVA - which I have shown is a parked site, not in operation, but currently registered with an ISP - by reporting on what he says was a rule on the Core 9 and 10 servers (and I still don't understand how he accessed them, given his earlier statements) that could be logically characterized as follows:

(i) IF an email contains EITHER CANTV.com ¬OR CANTV.net as the originating domain

(ii) AND The same email is addressed to EITHER ariscu@pdva.com OR carmonado@pdva.com

(iii) THEN Send it to those employees.

It is clear that Mr. Thackray is talking about an email message. ("it causes any email.) but for his rule to make sense, it would have to be possible for an email addressed to anyone at PDVA.com to get to the PDVSA server. I have shown through evidence presented above that the PDVA.com address is registered to a domain parking site. That is known to the Internet's

26

Domain Naming System (DNS) which routes messages. It is the DNS which makes it possible to address an email, for example, to the President of Venezuela, Mr. Maduro, by using the email address correo@presidencia.gob.ve even though I don't know the actual numeric Internet Protocol (IP) address of the server running the presidencia.gob.ve email system. The DNS handles the translation of a user-friendly address to a routable IP address. Because PDVA is a registered domain, any mail addressed to anyone at PDVA.com would not - in fact could not - go to the mail server for PDVSA.COM, because PDVA mail is routed to the registered server for the PDVA.com account. So the rule that he posits is meaningless, as it appears impossible that an email addressed to a PDVA account would pop up as an inbound email at the PDVSA mail server. This is what I would consider the most basic knowledge of the workings of the Internet, and I cannot explain why the report does not point out this glaring problem.

48. He concludes paragraph 14 with a sentence on his review of correspondence provided by his employer that shows that Morillo has a CANTV address (as apparently do several million Venezuelan subscribers). But we are not provided with copies of these documents, even though they seem to inform his opinions.

49. Finally, in Paragraph 15 he speaks of 2 emails. He provides them as his exhibits 1 and 2. They are in Spanish. But Thackray says he looked at English translations, which he does not supply. So we do not actually know what he read and we have no information on the authenticity of these hard copy documents, any pedigree of the documents, or anything that authenticates them. They appear on their face to be 13 year old emails, and provided to him by his employer. There did not seem to be anything that was conclusive proof of his contention about a rogue clone server.

**Conclusions**

50. It should be clear that there is no documented forensic analysis of any kind. There is a great deal of assertion backed up by no facts.

51. In fact, I do not have personal knowledge of the situation at PDVSA, but a fair reading of the Thackray report shows that:

    a. There is a total lack of demonstrated evidence. Nothing is attached that would permit a forensic specialist to understand what – if anything – he did. For someone who boasts of developing forensic standards and helping police departments in criminal matters, this is highly disturbing. Forensic science does not exist to facilitate the narrative of one's employer. It is based on objective truth and the ability to recreate forensic analysis. He says he copies servers. How? Where is the data?

    b. He fails to do even simple testing as I have pointed out with the truth about the PDVA domain.

    c. He mischaracterizes what is or is not common, as in the example of third party access to corporate systems (common no matter what he would have the court believe) or that PDVSA has no backup systems (disputed by one of their own employees only a few months ago).

    d. He does not let us know where information that he uses in reaching his conclusions comes from (other than from his employer.) We do not know who he spoke to.

52. In summary, I cannot in good conscience recommend that this Court accept that the Thackray report has probative value. Absent the kinds of documentation and support we should expect in a report by a self-described forensic expert, it fails the test of forensic appropriateness.

28

**Reservation of Right to Revise**

Should additional information be provided to me after the data of this document, I reserve the right to modify or supplement this report.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Signed this 26th day of March, 2018.

_____
Alan Brill

On this 26 day of __March__, 2018, before me, the undersigned Notary Public, personally appeared Alan Brill, proved to me through satisfactory evidence of identification to be the person who signed the preceding subpoena.

_____
Notary Public
My Commission Expires: 09|04|2020

IRINA EGAY
Notary Public - State of New York
NO. 01EG6268361
Qualified in Queens County
My Commission Expires 09|04|2020

# APPENDIX A
(Curriculum Vitae)

**Curriculum Vitae of Alan Brill**

**Employment History**

| FROM | TO | ORGANIZATION |
|---|---|---|
| 1967 | 1967 | National Aeronautics and Space Administration (NASA) Manned Spacecraft Center, Houston. Technical Specialist (management internship during graduate school.) |
| 1968 | 1970 | United States Army. Commissioned Officer. Assigned to the Office of the Chief of Staff as an Operations Research Systems Analysis Officer, The Pentagon, Washington, DC. Later assigned to Office of the Secretary of Defense to perform computer security investigations. Final assignment was as Military Liaison Officer to the New York City Police Department. Rank: Second Lieutenant to Major. Remained in reserves for 36 years. |
| 1970 | 1974 | Chase Manhattan Bank, N.A. New York NY. Supervising Systems Analyst, Trust Systems Division. |
| 1974 | 1980 | Ernst & Ernst (later Ernst & Whinney, now Ernst & Young. New York. Senior Manager, Management Consulting Services. Information technology consulting. Co-Developer, Data Systems Security Review methodology. |
| 1980 | 1984 | Yourdon, Inc. Instructor and Director of Professional Services. Developed methodology for security, auditability and control in structured development methodologies. |
| 1984 | 1988 | City of New York. Initially, Deputy Inspector General for Information Security, NYC Human Resources Administration. Later Director, Information Systems and Information Security Bureau, New York Department of Investigation. Senior official responsible for computer security of all mayoral agencies in the city government. |
| 1988 | NOW | Kroll – Senior Managing Director and Founder of the firm's technology practice. Cybersecurity-related consulting. Testifying and Consulting Expert. |

**Education and Professional Certifications**

**Education**

**BA in Psychology**
New York University
University College of Arts & Sciences
Bronx NY
1966

**MBA in Systems Management**
New York University
Graduate School of Business Administration
(Now *The Stern School of Business Administration*)
New York NY
1968

**Certificate in National Security Management**
The Industrial College of the Armed Forces
(Now The *Dwight D. Eisenhower School for National Security and Resource Strategy*)
The National Defense University
Fort Leslie J. McNair
Washington DC
1970

**Diploma, Command and General Staff Officers Course**
United States Army Command and General Staff College
U.S. Army Combined Arms Center
Fort Leavenworth KS
1979

## Professional Certifications

**CISSP (Certified Information Systems Security Professional)**
International Information Systems Security Certification Consortium

**CFE (Certified Fraud Examiner)**
Association of Certified Fraud Examiners

**CIPP/US (Certified Information Privacy Professional/United States)**
International Association of Privacy Professionals

**CBA (Certified Board Advisor)**
Center for Strategic Business Integrity

**CICA (Certified Internal Controls Auditor)**
The Institute for Internal Controls

**FAAFS (Fellow of the American Academy of Forensic Sciences)**
Digital and Multimedia Sciences Section
American Academy of Forensic Sciences

## Licenses and Appointments

Notary Public for the State of New York

Notary Public for the State of New Jersey

Private Investigator Licenses in the multiple states:

FCC General Mobile Radio Service (GMRS) License WQAI798

FAA Unmanned Aircraft System Certificate FA3CNXP7TH

## Faculty Appointments

Adjunct Professor, Texas A&M University School of Law (current)

Adjunct Professor of Forensic Science, National University (former)

## Testimony

### Deposition/Trial Testimony

**Superior Court, Commonwealth of Massachusetts**
*Alnylam Pharmaceuticals, Inc. v. Dicerna Pharmaceuticals, Inc.*
Civil Action 15-4126H
Deposition provided on January 31, 2018

### Congressional and Federal Executive Agency Testimony

**United States Department of Labor**
*Advisory Council on Employee Welfare & Pension Plans*
"Cybersecurity Considerations for Benefit Plans"
Unsworn Testimony provided on June 7, 2016

## Books

*This section lists books authored, co-authored, edited or chapter-authored in the past 10 years.*

**Terrorist Use of Cyberspace and Cyber Terrorism: New Challenges and Responses**
*(Volume 42 of the NATO Science for Peace and Security Series)*
IOS Press *(published in cooperation with the NATO Emerging Security Challenges Division)*
ISBN 978-1-61499-527-2
2015
(Chapter Author)

**Science for Lawyers**
American Bar Association Press
ISBN 1590319265
2008
(Chapter Author)

# Authored Publications in the past 10 years

**Defense Against Terrorism Review**
Alan Brill & Jason Smolanoff
*Hacking Back Against Cyberterrorists. Could you? Should you?*
January 3, 2018

*Published in Volume 9 of DATR, the journal of the NATO Center of Excellence – Defense Against Terrorism.*

**Kroll Global Fraud & Risk Report 10th Edition (2017-2018)**
Alan Brill, Jonathan Fairtlough, Kenya Nann Faulkner and John Friedlander
*When it Comes to Information Security, Employees Can Be Your Most Important Asset and Your Greatest Threat*
January 22, 2018

**Kroll Global Fraud & Risk Report**

**10th Edition (2017-2018)**

Alan Brill, Jonathan Fairtlough, Kenya Nann Faulkner and John Friedlander

*When it Comes to Information Security, Employees Can Be Your Most Important Asset and Your Greatest Threat*

January 22, 2018

**2017**

**Kroll Data Security Insights**

Alan Brill

*The Internet of Things: Immediate challenges, immediate dangers*

January 5, 2017

**Asian-mena Counsel**

Alan Brill & Thien Tam Huynh

*Smart Doesn't Mean Secure*

January, 2017 (Vol. 14 No. 8)

**International Law Quarterly**

Alan Brill & Jason Smolanoff

*When You Have Suffered a Data Breach, Attribution May Be Useful, But Hacking Back? Not So Much!*

Spring 2017

June 13, 2017

**Security Week**

Alan Brill

*Industry Reactions to "CrashOverride" Malware*

June 16, 2017

*Alan was a contributor to this column by Eduard Kovacs. The column was picked up by other media outlets*


**Kroll Intelligence Center**

Alan Brill

*Internet of Things Hacking is Real: Are You Already at Risk but Don't Know it? Part 1:Understanding the IoT Risk*

*June 23, 2017*

and

*Internet of Things Hacking is Real: Are You Already at Risk but Don't Know it? Part 2: An IoT Game Plan*

July 27, 2017


**Middle East Economic Digest**

Andrew Beckett & Alan Brill

*Building Strong Cyber-Defenses*

June 27, 2017


**The Security Ledger (Podcast)**

Interview with Alan Brill

*Capitol Hill Takes a Swing at IoT Security*

August 25, 2017

**The Economist**

Alan Brill (contributor)

*The Safe Cities Index 2017*

October 11, 2017


*I was one of the subject matter experts involved in this report. There were significant media pick-ups under multiple titles.*


**Kroll Intelligence Center Blog**

Alan Brill

*It's Time to Know Your Company's Internet of Things Risks.*

October 16, 2017


**Massachusetts Lawyer Weekly**

Alan Brill

*It's Time to Know Your Company's Internet of Things Risks.*

October 16, 2017


*This document previously appeared in Kroll's Intelligence Center Blog, October 16, 2017*


**SecurityLedger Podcast**

Alan Brill (Interviewed)

*Will Uber's Florida Man Problem Chill Bug Bounties?*

December 12, 2017

37

*"And we invite Alan Brill of the firm Kroll back to discuss recent House of Representatives hearings on the future of authentication in an age of rampant data sharing and data theft."*

2016

**My Credit Union Newsletter**

Alan Brill

*Information Security – Protection Begins at Home*

January, 2016

**United States Department of Labor**

*Testimony Before the ERISA Advisory Council to the U.S. Department of Labor*

Testimony of Alan E. Brill

June 7, 2016

**Corporate Counsel**

Alan Brill

*Is Pokémon Go A No-Go For Your Company Smartphones?*

June 26, 2016

*This article was selected as an "Editor's Pick" by the Executive Editor of Corporate Counsel.*

*It was also listed as one of Corporate Counsel's "Most Shared Articles of the Week" and as the first article in the Editor's "Cream of the Crop" listing.*

**The Boston Globe**

Daniel Linsky and Alan Brill

*Understanding the benefits and risks of police body cameras*

August 4, 2016

**Kroll Intelligence Center**

Alan Brill

*Response to The New Yorker's The Big Hack*

*November 17, 2016*

**Corporate Counsel**

Alan Brill

*When Worlds Collide: Can Cybersecurity and Cyberprivacy Peacefully Coexist?*

November 21, 2016

*This article also appeared in full in LegaltechNews on November 23, 2016, and was listed as one of the most viewed articles on Legaltech News.It was also listed as one of Corporate Counsel's most popular stories fo the week. It appeared in LawJournalNewsletters on December 2, 2016.*

**Data Breach Today**

Alan Brill, Audio Interview by Matthew J. Schwartz

*Breach Attribution and 'Hack Back': Don't Waste Time*

December 14, 2016

*Links to this audio interview also appeared in:*

    *DataBreachToday Europe*

    *GovInfoSecurity*

    *CareersInfoSecurity*

    *Hackbusters*

    *Bank Infosecurity*

**Kroll Intelligence Center Blog**

Alan Brill

*The fight against ransomware: Getting the Upper Hand*

December 16, 2016

**Law360**

Sonja Carlson and Alan Brill

*Addressing IoT Security: Collaboration is Key*

December 20, 2016

**2015**

**Freedom From Fear, Issue No. 10**
A publication of the United Nations
Interregional Crime & Justice Research Institute
(UNICRI) and the Max Planck Gesellschaft
(Institute)
Alan Brill & Snezana Petreska
*Are Cyber Criminals Competing at the*
*Olympics?*
January 14, 2015

**Defense Against Terrorism Review V. 6 No. 1.**
A publication of the NATO Centre of
Excellence-Defense Against Terrorism
Alan Brill & Lonnie Keene
*Cryptocurrencies: The Next Generation of*
*Terrorist Financing?*
February 15, 2015

**URMIA Journal**
A publication of the University Risk
Management and Insurance Association
Alan Brill & Jennifer Rothstein
*Are you Prepared to Respond to Your Next*
*Cyber-Incident?*
September 22, 2015


**Kroll 2015 Global Fraud Report**
Alan Brill
*Will Cryptocurrencies become tools for fraud?*
November 23, 2015


**2014**

Podcast Interview
**Bank Infosecurity**
*2014 Cybersecurity Forecast: Kroll's*
*Alan Brill on emerging Threats, Security*
*Strategies*
January 3, 2014

*This was also covered in govinfosecurity*
*and inforisktoday.*

**Helpnet Security**
Alan Brill
*Does IP convergence open you up to hackers?*
April 7, 2014

**Corporate Compliance Insights**
Alan Brill
*Are Service Providers Prepared for Cybersecurity Risks Post-Heartbleed?*
June 6, 2014

**Kroll Call**
Alan Brill
*Celebrities aren't the only ones using the cloud for sensitive data.*
September 3, 2014

**Nightly Business Report Produced by CNBC for PBS**
Alan Brill (Interviewed)
*Cybersecurity*
September 9, 2014

**IT Sitio Empresas (Argentina)**
Alan Brill
*Almancenar Datos Sensibles En La Nube: ¿Sí O No?*
November 5, 2014

**2013**

Interviewed in
**Wall Street Journal**
Corruption Currents
*Q&A: Kroll's Alan Brill on Cybersecurity*
Christopher M. Matthews
January 4, 2013

**Data Breach Today**
Alan Brill
*Just Because You Have A Service Doesn't Mean I Want It*
May 14, 2013

42

**SC Magazine**
Alan Brill
*Is Your IT Department "Donating" Your*
*Attorney-Client Privilege Without Your*
*Knowledge?*
June 6, 2013

**Data Breach Today**
Alan Brill
*Social Media: Corporate Do's and Don'ts*
June 19, 2013

**Kroll Special Report: Cyber Security**
**and Investigations – Looking Beyond**
**the Headlines to Effectively Safeguard**
**Data**
Alan Brill
*A common sense approach to limiting*
*cyber liability*
July 31, 2013

**GovConExec**
Alan Brill
*FedTech Soundoff: Identity Ecosystem*

**Kroll Special Report: Cyber Security**
**and Investigations – Looking Beyond**
**the Headlines to Effectively Safeguard**
**Data**
Alan Brill
*Corporate Social Networking Sites:*
*Controlling Access and Ownership*
July 31, 2013

**University Risk Management &**
**Insurance Association (URMIA)**
**Journal 2013**
Alan Brill & Jason Straight
*Looking at Information Threats Beyond*
*the Network: Managing Risks in*
*University Voicemail and Conference*
*Calling Systems*
August 9, 2013

**Risk Management Magazine**
Alan Brill & Jason Straight
*Guidance for Investors on Cyber Due-*
*Diligence*
October 1, 2013

**CIO**
Alan Brill and Jonathan Fairtlough
*Don't say no to BYOD and personal
clouds, but understand the legal risks
when you say yes*
December 5, 2013
(This also appeared in other publications
including Techworld)


## 2012

**NATO Defense Against Terrorism
Review Vol. 3 No. 2**
*From Hit and Run to Invade and Stay:
How Cyber Terrorists Could be Living
Inside Your System*
January 10, 2012

Video Interview
**Financial Management Network**
Alan Brill
*Cyber Terror and Cyber Risk: What You
Need to Know*
January 12, 2012

Podcast Interview
**HIT Consultant Online**
Fred Pennic and Alan Brill
*Healthcare Cyber Security Issues in 2012
With Alan Brill, Volume 1*
January 20, 2012

Podcast Interview
**HIT Consultant Online**
Fred Pennic and Alan Brill
*Healthcare Cyber Security Issues in 2012
With Alan Brill, Volume 2*
January 27, 2012

**Help Net Security**
Alan Brill
*Log management deserves a company's
respect*
February 27, 2012

Podcast Interview
**HIT Consultant**
Fred Pennic and Alan Brill
*Security Log Management and Analysis
With Alan Brill, Volume 1*
March 11, 2012

Podcast Interview
**HIT Consultant**
Fred Pennic and Alan Brill
*Security Log Management and Analysis
With Alan Brill, Volume 2*
March 26, 2012

**Corporate Compliance Insights**
Alan Brill
*Hiding in Plain Sight: Physical Security's
Role in Corporate Compliance*
April 16, 2012

**TabTimes**
Alan Brill
*Three important issues to address when
devising BYOD policy for tablets and
smartphones*
April 17, 2012

**Corporate Compliance Highlights**
Alan Brill
*Putting your PII and PHI in the cloud: Is it
secure enough?*
May 17, 2012

**Corp! Magazine**
Alan Brill
*How to mitigate insider threats*
July 19, 2012

**Advisen Cyber Liability Journal**
Alan Brill
*Beyond BYOD: Watch out for BYOC
(Bring Your Own Cloud)*
August 31, 2012

45

**Government Security News**
Alan Brill & Timothy P. Ryan
*2013 cyber security forecast*
Alan Brill & Timothy P. Ryan
December 27, 2012


## 2011

**Business Insurance Magazine**
Alan Brill
*Twitter Virus Attack Highlights Key Risk
of Social Media*
September 26, 2011

**SC Magazine**
Alan Brill
*Who's Listening to your conference calls?*
October 5, 2011

**Chain Store Age**
Alan Brill
*Cybersecurity Trends Impacting Retailers
This Holiday Season*
November 22, 2011

**Kroll Data Security Insight (V4, Issue
10)**
Alan Brill
*Advanced Persistent Threats and the
Evolution of Cybercrime*
October 1, 2011


## 2010

**New York Enterprise Report**
Alan Brill
*Information Technology Security for Small
Businesses: A Report From the Front*
August 19, 2010


**Business Insurance Magazine**
Alan Brill
*Twitter Virus Attack Highlights Key Risk
of Social Media*
September 26, 2010

**2009**

> **The In-House Advocate (Kroll Ontrack Newsletter)**
> Adam Smith & Alan Brill
> *Overcoming the Challenges of Electronic Discovery, Remote Storage & Digital Land Mines*
> January, 2009

> **American Bar Association-The Young Lawyer**
> Alan Brill
> *Keep it? Delete it? Forward it?*
> April 1, 2009

> **MMC Viewpoint Magazine**
> Richard Abbey, Alan Brill & Brian Lapidus
> *Confronting Fraud in a Downturn: Old Scams and Evolving Risks*
> August 1, 2009

**2008**

> **MMC Viewpoint Magazine**
> Alan Brill and Brian Lapidus
> *The Science and Art of Effective Data Security*
> January 1, 2008

> **Kroll Ontrack Cyber Crime & Computer Forensic Newsletter**
> Alan Brill
> *The Brill Files: The Case of the Phantom Photograph*
> January, 2008

> **Kroll Ontrack Cyber Crime & Computer Forensic Newsletter**
> Alan Brill
> *The Brill Files: We All Play a Part in Safeguarding the Environment*
> February, 2008

**Kroll Ontrack Cyber Crime &
Computer Forensic Newsletter**
Alan Brill
*The Brill Files: Considerations When
Recycling Your Old GPS*
March, 2008

**Kroll Ontrack Cyber Crime &
Computer Forensic Newsletter**
Alan Brill
*The Brill Files: April Fool's Hoax Viruses*
April, 2008

**Kroll Ontrack Cyber Crime &
Computer Forensic Newsletter**
Alan Brill
*The Brill Files: How Quickly Can You
Detect an Incident?*
May, 2008

**Kroll Ontrack Cyber Crime &
Computer Forensic Newsletter**
Alan Brill
*The Brill Files: Just Because You Install
the Software Does Not Mean You Are
Secure*
June, 2008

**Kroll Ontrack Cyber Crime &
Computer Forensic Newsletter**
Alan Brill
*The Brill Files: Can a Social Network Site
Leak Confidential Corporate Data?*
July, 2008

**Kroll Ontrack Cyber Crime &
Computer Forensic Newsletter**
Alan Brill
*The Brill Files: Think You've Had a
Breach of Sensitive Data? Don't Jump to
Conclusions*
August, 2008

**Kroll Ontrack Cyber Crime &
Computer Forensic Newsletter**
Alan Brill
*The Brill Files: If You Are Going to do
Forensics, Don't Shoot Yourself in the
Foot*
September, 2008

**Kroll Ontrack Cyber Crime &
Computer Forensic Newsletter**
Alan Brill
*The Brill Files: Be Aware of Third Party
Storage Facilities*
October, 2008

**Kroll Ontrack Cyber Crime &
Computer Forensic Newsletter**
Alan Brill
*The Brill Files: Hot Job Alert – Forensic
Accounting*
November, 2008

## Presentations

**2018**

**Cyber Liabilities Insurance ExecuSummit
Keynote speech
Uncasville, CT USA
March 26, 2018
2017**

**Columbia University School of Law**

*Digital Forensics for Lawyers: An Introduction*

New York NY

January 21, 2017

**Jones Walker/Midsize Bank Coalition of America**

*Dynamic Administration – Financial Services in an Unconventional Environment*

Washington DC

February 15, 2017

**Claims & Litigation Management Alliance 2017 Annual Conference (CLM)**

*The Post-Spokeo World of Article III Standing – Where Are the Courts Headed and What Are the Implications for Insurers*

Nashville, Tennessee

May 30, 2017

**NATO Science for Peace and Security Program**

**Countering ISIS Radicalization Activities Through Cyberspace in the Region of South-East Europe**

*Keynote Address* and

*Virtual Currencies as a Vehicle for Terrorist Financing*

Ohrid, Macedonia

April 3 and 4, 2017

**Professional Liability Underwriting Society (PLUS) 2017 Cyber Symposium**

*Security as an Afterthought: The Internet of Things*

Chicago IL

April 6, 2017

**NATO Center of Excellence – Defense Against Terrorism**

**Terrorist Use of Cyberspace Program**

*Keynote address* and

*Future Uses of Cyberspace by Terrorist Organizations*

Ankara, Turkey

April 24-28, 2017

**Strafford CLE Webinar: Managing Data Privacy and Cybersecurity Risks in M&A Deals: Pre-Planning, Due Diligence and Risk Allocation Strategies**

*Panelist*

Online Event

May 4, 2017

**2nd Annual Industrial Control Cyber Security Nuclear Summit: Gaining C-Level Buy In**

*Panelist*

Warrington, United Kingdom

May 23, 2017

**Stevens Institute of Technology 2017 Financial Cyber Security Summit**

*Emerging Threats*

Hoboken New Jersey

May 31, 2017

**Nelson Mullins Law Firm**

Blockchain Nation: Today's Bubble or Transformational Technology

Washington DC

June 23, 2017

**Association of Certified Anti Money Laundering Specialists, Colorado Chapter**

*Cyber Security: It Takes a Team*

Denver CO

September 14, 2017

**Kroll Webinars**

*Blockchain and the future of Data Breaches*

Webinar

September 19, 2017

**The NATO Science for Peace and Security Program (SPS) and the United States National Defense University (NDU)**

*Senior Leadership Roundtable on Military and Defense Aspects of Border Security in South East Europe*

Berovo, Macedonia

September 24, 2017

**The George Washington University School of Law**

*2017 Privacy + Security Conference*

Washington DC, USA

October 5, 2017


**International Association of Privacy Professionals (IPP)**

*Knowledge Net Conference*

Jacksonville, Florida, USA

November 2, 2017


**NATO Center of Excellence – Defense Against Terrorism**

*Terrorist Use of Cyberspace Course:*

*Cryptocurrencies and Terrorist Financing*

Ankara, Turkey (via Skype link)

November 7, 2017



**2016**


**RSA Conference – Special Session for Board Members**

*Cybersecurity Risk Update*

San Francisco CA

January 29, 2016

**NATO Center of Excellence – Defense Against Terrorism**

*Terrorist Use of Cyberspace Conference*

Ankara, Turkey

(Keynote speaker + 2 sessions)

March 14-18 2016


**UJA-Federation: Conference for Senior Staff and Agency Executives**

*Cybersecurity for Nonprofit Organizations*

Tarrytown NY

May 10, 2016


**Pennsylvania Bar Institute**

*Cyberterrorism*

Philadelphia PA

May 24, 2016


**Stevens Institute of Technology Financial Cybersecurity Conference (FINCYBERSEC 2016)**

*Lessons From the Field: Working With Law Enforcement But Protecting Yourself*

Hoboken NJ

June 1, 2016

**U.S. Department of Labor**

**Advisory Council on Employee Welfare and Pension Benefit Plans**

*Cybersecurity Considerations for Employee Benefit Plans*

Washington DC

June 7, 2016


**Thunderbird Independent Alumni Association**

*Cyber Security and Cyber Insurance: A Briefing.*

New York, NY

June 11, 2016


**Brandeis Women**

*Cyber Security For You, Your Families, Your Businesses*

Staten Island NY

June 15, 2016


**International Association of Privacy Professionals**

*The Perfect Storm: How Mobile and Cloud Computing Affect Risk & Privacy*

San Jose, CA

September 15, 2016

**Globex International Partner Broker Conference**

*Cyber Update: Data Breach, Data Security, Cyber-Terrorism*

Coral Gables FL

October 18, 2016


**Advisen Cyber Risk Conference**

*Navigating Service Offerings*

New York, NY

October 27, 2016


**NATO Center of Excellence – Defense Against Terrorism**

**Terrorist Use of Cyberspace Course**

*The State of Cybersecurity 2016*

*Emerging Threats: Terrorist financing and virtual currencies*

*Emerging Threats: Terrorist use of the Internet of Things*

*Cyber Security Triage*

Ankara, Turkey

November 7-11, 2016


**2015**


**NATO Center of Excellence – Defense Against Terrorism**
*Terrorist Use of Cyberspace Conference*

Ankara Turkey
(Keynote speaker + 2 sessions)
February 9-13, 2015

**Center for the Advancement of Public Integrity**
Columbia University School of Law
*Global Cities: Joining Forces Against Corruption
Conference*
New York NY
April 25, 2015

**The National Football League**
*Security Representatives Seminar*
Fort Lauderdale FL
June 2, 2015

**Center for National Security and
Counterterrorism at Syracuse University
and
NATO Collective Cyberdefense Center of
Excellence**
*Controlling Economic Cyber Espionage*
Syracuse NY
June 19, 2015

**Strafford Publications**
*Data Privacy and Cybersecurity Due Diligence in
M&A Deals*
Online Webinar
October 22, 2015

**2014**

**RSA**
*The 2014 RSA Security Conference*
San Francisco, California
February 25, 2014

**Securities Industry & Financial Markets
Association (SIFMA)**
*Meeting of the Audit Committee*
Washington DC
March 4, 2014

**IT-SA Brasil**
*2014 IT-SA Cyber Security Conference*
Sao Paulo, Brazil
April 15, 2014

**NATO Center of Excellence – Defense
Against Terrorism**
*Terrorist Use of Cyberspace Conference*
Ankara Turkey
(Keynote speaker + 2 sessions)
May 5-9 2014

**Cyprium**
*CEOs Conference*
Cleveland, OH
May 14, 2014

**Compliance Week**
*The 2014 Compliance Week Conference*
Washington, DC
May 19, 2014

**Law Forms & Big Data: Business of Law
or Business of Security?**
*Kroll Ontrack Google+ Hangout*
Online
July 30, 2014
(Also known as "James Bond, Data
Security and Law Firms: They Have More
In Common Than You May Think")

**Travelers Insurance**
*2014 Conference on Torts*
St. Paul MN
September 10, 2014

**New York External Fraud Committee**
*Cyber Attacks and Phishing*
New York NY
September 16, 2014

**British-American Chamber of
Commerce**
*The State of Cyber Security*
Mexico City DF (via webinar)
September 19, 2014

**Federation of Latin American Banks
Feleban XXIX Bank Security
Conference (CELAES 2014)**
*How not to become the next victim of a
data breach story*
Miami FL
September 22, 2014

**Strafford Publications**
*Data Privacy and Cybersecurity Due
Diligence in M&A Deals*
Online Webinar
October 9, 2014

**Foley Hoag**
*Data Breach Prevention and Response:
Avoiding Potential Pitfalls and
Implementing Best Practices to Protect
Your Company. A presentation by Foley
Hoag and Kroll*
Boston MA
October 17, 2014


**Advisen Cyber Risk Insights Conference**
*Hack and Response*
New York NY
October 20, 2015


**Advisen Cyber-Risk Conference**
*The Internet of Things (panelist &
moderator)*
*Data Breach Table Top Exercise
(participant)*
New York NY
October 28, 2014

**NATO Center of Excellence – Defense
Against Terrorism & Macedonia
Military Academy**
*Advanced Course on Terrorist Use of
Cyberspace*
Ohrid, Republic of Macedonia
December 10-11, 2014

**2013**

**The National Catholic Risk Retention
Group, Inc.**
*Annual Winter Meeting*
Clearwater Florida, USA
January 4, 2013

**NATO Center of Excellence – Defense
Against Terrorism**
*Cyber Terrorism Awareness – Policy and
Management Level Course*
Ankara Turkey
(Keynote speaker + 2 sessions)
January 11-15, 2013

**American Academy of Forensic Sciences**
*Annual Scientific Meeting*
Washington DC USA
February 19, 2013

**Family Office Exchange**
Webinar
March 17, 2013

**Bernard Baruch College, City
University of NY**
*Future@Risk 2013+*
New York NY
April 9, 2013

**Banking Information Security Podcast**
*Who Owns Your Social Media*
Podcast
July 18, 2013

**Legaltalk Network: The ESI Report**
*What Honeybaked Ham Can Teach Us
About the Future of E-Discovery*
Webinar
July 20, 2013

**Data Breach Today**
*Anatomy of a Data Breach*
Webinar
July 31, 2013

**Carlton Fields**
*Client Conference: Compliance,*
*Governance and Risk Management*
Miami, FL
September 6, 2013

**American Institute of CPAs**
*National Audit Committee Forum*
New York, NY
September 13, 2013

**The New York External Fraud**
**Committee**
*September Meeting Presentation*
New York, NY
September 17, 2013

**VoiceAmerica Business Channel**
*Breaking Banks Internet Radio Show*
*Mobile Banking Security*
September 19, 2013

**Advisen**
*Cyber Risks Liability Conference*
*(Advisory Board, Track Moderator and*
*Speaker)*
New York NY
October 24, 2013


**2012**


**NATO Center of Excellence – Defense**
**Against Terrorism**
*Cyberterrorism Course*
Ankara, Turkey

**Business Insurance Magazine**
*Risk Management Summit*
New York, NY

**Association of Corporate Counsel**
*Delaware Valley Chapter Litigation*
*Seminar*
Philadelphia PA

**Business Insurance Magazine**
*Cyber Security Webinar*
Online
August, 2012

**XII Congreso y Exposición
Latinoamericana de Automatización
Bancaria (CLAB XII)**
Panama City, Panama
September, 2012

## 2011

**American Academy of Forensic Sciences**
*2011 Annual Scientific Meeting*
Chicago, IL

**American Society for Industrial
Security International**
*2011 Annual Conference*
Orlando, FL

**Compliance Week**
*2011 Annual Conference*
Washington, DC

**e-Discovery & e-Investigations Forum**
London, England

**Georgetown University Law Center**
*Advanced eDiscovery Institute*
Arlington, VA

**Infragard**
*New York State Annual Conference*
Syracuse, NY

**International Association of Privacy
Professionals**
*2011 Canadian Privacy Symposium*
Toronto, Canada

**Legal Tech**
*2011 Conference*
New York, NY

**NATO Center of Excellence – Defense Against Terrorism**
*Cyberterrorism Course*
Ankara, Turkey

**Pennsylvania Association of Criminal Defense Lawyers (PACDL)**
*What Lawyers Need to Know About Data Breaches*
Philadelphia, PA

**NetDiligence CyberRisk Forum**
Philadelphia, PA
June 7, 2011

**International Association of Privacy Professionals**
*2011 Privacy Academy*
Dallas, TX
September 14, 2011


**2010**


**Boston Bar Association**
*Boston, MA*

**Infragard**
*Pennsylvania Chapter Seminar*
Hershey, PA

**International Association of Privacy Professionals**
*Seminar*
Santa Clara, CA

**International Association of Privacy Professionals**
*Privacy Academy*
Baltimore, MD

**Marsh**
*Academy of Risk*
Minneapolis, MN

**NetDiligence Cyber Risk & Privacy Liability Forum**
Philadelphia, PA

**The Masters Conference for Legal Professionals**
*Security, Privacy & Compliance Within Corporate Litigation*
Washington, DC

**University Risk Management & Insurance Association**
*Annual Conference*
Pittsburgh, PA

**American Academy of Forensic Sciences**
*Annual Scientific Conference*
Seattle, WA
February 24, 2010

**X Congreso y Exposición Latinoamericana de Automatización Bancaria (CLAB X)**
Panama City, Panama
September 3, 2010

**2009**

**Legal Talk Network**
*The ESI Report*
Webinar/Podcast

**LegalTech**
*Annual Conference*
New York, NY

**New York State Society of Certified Public Accountants**
*Anti-Fraud/Anti-Money Laundering Conference*
New York, NY

**Mercy College**
*Public & Private Sector Security
Conference*
Dobbs Ferry, NY
January 14, 2009

**American Academy of Forensic Sciences**
*Annual Scientific Conference*
Denver, CO
February 16, 2009

**2008**

**ALM Events**
*20th Annual General Counsel Conference*
Skokie, IL

**American Academy of Forensic Sciences**
*Annual Scientific Conference*

**IBM Corporation**
*Data Security Summit*
New York, NY
October 30, 2008

# APPENDIX B

(Documents relied on in developing my opinions)

All documents that I used in forming my opinions have been disclosed either in the body or notes to my report.

# Exhibit B

### DECLARATION OF JOHN THACKRAY

JOHN THACKRAY, being duly sworn, deposes and says:

1.     The following information, unless otherwise indicated, is based on my personal knowledge and review of documents.  If called upon to do so, I could and would testify competently to the matters set forth herein.

2.     **Current Positions.**  I am the Vice President and head of global training and operations of GetData Forensics USA ("GetData USA"), based in Manhattan Beach, California. GetData USA uses a forensic software product called Forensic Explorer ("FEX") that is manufactured by GetData Forensics, based in Australia.  FEX collects, preserves, and presents digital media for use in civil and criminal investigations and legal proceedings, and it conforms to global standards and best practices for these purposes.  I personally authored the protocols and standards for use of the FEX software and developed the training materials for it.  FEX software is used by over five thousand commercial organizations and military and law enforcement agencies worldwide.  I am also the principal digital forensic consultant for The Brennan Group, which was retained by counsel to conduct investigative activities in this matter.  In addition, I serve as a volunteer with the Police Department in Torrance, California, and am a member of a joint task force, overseen by the United States Secret Service, in the Los Angeles area, all of which entails work on active criminal cases that involve the use and abuse of digital technology.

3.     **Training and Experience.**  In 1972, I enlisted in the British Army and served for nearly 18 years, attaining the rank of Sergeant.  During my Army service, I studied and obtained an educational promotion certificate and an advanced educational promotion certificate.  I served tours of active duty in Northern Ireland, Cyprus (United Nations), Rhodesia (Zimbabwe), Belize and other classified locations around the world.  Beginning in 1978, I was assigned for duty in

various positions that involved the operation and administration of computers and electronic data processing equipment. Following my discharge from the Army, I became professionally involved with information technology as a digital forensic investigator. I joined the South Yorkshire Police in 1989 as a scientific support officer responsible for the investigation of high technology crime, and attained the rank of detective. In 1994, I was assigned as the principal case detective responsible for investigating national and international computer crime with the Regional Crime Squad, based in Wakefield, West Yorkshire. I became familiar with global standards and best practices for electronic forensics, and I assisted in development and implementation of those standards and practices. Beginning in the late 1990s, I developed one of the first training programs for mobile phone forensics using a computer-based process. In 1997, I was employed by the National Police Service of New Zealand to establish and head its first Electronic Crime Unit based in Auckland. I left the Police Service in 2001 to join Ernst & Young, for which I established and headed the Computer Forensic Services team for the Oceanic Region (Australia, New Zealand, Oceanic nations). I left E&Y in 2002 and formed my own company, Thackray Forensics Ltd, based in New Zealand. In 2002-03, I was contracted to IBM's Incident Response Global Services, in Sydney, Australia to implement a computer forensic capability to complement IBM's Information and Communication Technology incident response team. In recent years, in addition to establishing GetData USA in 2015, I have served in an advisory capacity to various governments in Europe, Asia, the Middle East, and Latin America, including their law enforcement and military operations, regarding digital forensics and electronic investigations, in addition to working as a private digital forensics expert.

4.      **Professional Certifications.** I have received the internationally recognized Forensic Science Diploma in Crime Scene Examination. I was one of the first certified lead

2

instructors for several electronic forensic processes that are used to extract, preserve and present digital evidence. All are used by the police, military and major corporations worldwide and include the following digital forensic products: Guidance Software-EnCase; Access Data Forensic Tool Kit; FEX; XRY; CelleBrite; and Fernico-ZRT. To become an instructor, I had to become certified and have an in-depth knowledge with practical experience using each of these tools. I also wrote operational procedures and protocols for the investigation of digital crime for dozens of police departments and corporations worldwide.

     5.    **Awards and Recognition.** In 1996, I was the first South Yorkshire police officer to be awarded a Winston Churchill Fellowship, which I used to research and work alongside computer crime, law enforcement agencies, and computer technology research and development specialists worldwide. Upon the successful completion of my research, I was honored as a Churchill Fellow by the patron Her Majesty Queen Elizabeth II. In 2010, I received commendations from the Criminal Division of the U.S. Department of Justice for outstanding performance in instruction of computer and electronic forensics. In 2017, I was recognized by the California State Assembly, Los Angeles County, the City of Torrance and several elected representatives for my computer forensic work in connection with investigations of sex crimes involving children.

     6.    **Testimonial Experience.** During my career, I have examined, investigated, and analyzed thousands of cell phones, computers, and servers in connection with civil and criminal matters and internal corporate investigations. I have prepared hundreds of affidavits and expert reports in various criminal, civil and investigative matters worldwide related to digital forensics. This information has been used, among other things, to obtain search warrants and seizure

3

orders. I regularly provide expert opinions for matters involving computer forensics for the Torrance and Gardena Police Departments.

7.    **PDVSA Investigation.**  In 2017, I was asked to assist The Brennan Group in conducting an investigation into possible fraudulent access to and use of the computer systems operated by Petróleos de Venezuela, S.A. ("PDVSA") in its business.  As part of this investigation, in September and October 2017, I traveled to Caracas, Venezuela, the location of PDVSA's headquarters.  Prior to my first trip, I was informed that investigators believe that Francisco Morillo and Leonardo Baquero had formed two energy advisory firms, Helsinge Holdings LLC ("Helsinge", formerly known as Helsinge, Inc.), and Waltrop Consultants, C.A. ("WTRPC"), along with several additional Panamanian companies, to facilitate elaborate alleged price-fixing, kickback and money laundering schemes by accessing and using PDVSA's confidential inside information.  I was informed that Helsinge, through Morillo and Baquero, has gained access to highly confidential internal information at PDVSA by bribing PDVSA employees.  As relevant here, most such information is created and used in the day-to-day operations of PDVSA's Commerce and Supply ("CyS") department.  The CyS Department is responsible on a worldwide basis for purchase by PDVSA of petroleum products that are needed for its operations, and for sale of petroleum products that PDVSA produces.  I was informed that certain PDVSA employees are believed to have facilitated the installation of a "clone live server" (either onsite or remotely) or otherwise provided remote real-time access to and replication of the PDVSA server that contains the bulk of the highly confidential PDVSA data.  That server is referred to as the "Core 9" server, and its contents include highly sensitive data, including information concerning PDVSA's tenders and bids to purchase and sell petroleum products.

4

Individuals having real-time access to the confidential information are able to manipulate and use that data in furtherance of their alleged schemes.

8. During the investigation, I performed an analysis of the computer network at PDVSA's headquarters and obtained and preserved certain data stored in the network in accordance with best practices for forensic use of electronic evidence. Based on my investigation and on information provided by The Brennan Group, together with my digital forensic analysis and findings described below, it is my opinion that Morillo and/or person(s) working with him, has the ability to remotely access and use confidential PDVSA information on the Core 9 server from outside of PDVSA in real time.

9. In a normal forensic investigation on behalf of a corporation, the investigators are given unrestricted access to all IT personnel, hardware, software and data. However, when I traveled to Caracas in September 2017 with John Brennan to conduct such an investigation, I was not able to gain such access. The reasons included the unstable political and economic environment in Venezuela and the fact that access and information is controlled by certain PDVSA employees who are believed to be collaborating in the conspiracy. These concerns prevented us on this visit from entering the PDVSA premises.

10. In October 2017, I made a second visit to Caracas with Mr. Brennan. At that time, with the approval of senior PDVSA officials, I went incognito to physically investigate the PDVSA premises. I was informed that PDVSA's policy is to retain emails on its network for only three months. I have never seen an e-mail retention policy limited to three months in any company globally, and it is particularly suspicious at a company that trades in high value commodities such as PDVSA. Also highly unusual and suspicious is that, as I was told, there are

5

no disaster recovery plans and backup functions within the PDVSA network.  Further, the architecture of the PDVSA network is such that there is limited ability to track information in it.

11.    I also learned that the PDVSA network has fundamental security vulnerabilities and irregularities.  I learned that the PDVSA Security department is the access and security gatekeeper of the PDVSA network, and they can provide an employee or third party with credentials to obtain unrestricted remote access to the network, including assistance in installing and configuring a VPN for that purpose.  In my experience, it is highly unusual for an IT security department to provide access to a third party not employed by the company, and especially not unrestricted access.  I personally observed a demonstration of how an individual could log-in from a remote location to the Core 9 server which contains highly confidential CyS tender and bidding data.  From that demonstration, I was able to confirm the availability of unrestricted access to the platform used for bidding on the purchase and sale of petroleum products, and to observe real-time activity associated with those bids.  I have been informed by The Brennan Group that there is a witness who was present when Morillo accessed the Core 9 server from a remote location and was able to amend and/or manipulate data, apparently in the same manner as I observed directly.

12.    During the October visit, I also was able to physically inspect the room in PDVSA's main headquarters in which the server systems are located.  I was informed that the computer network in PDVSA's headquarters is constructed of ten servers (which are referred to as "Cores"), and that Cores 9 and 10 are dedicated to storing the highly-confidential CyS data. For all cores other than Cores 9 and 10, each core is a replica server (referred to as a "clone") of the adjacent core.  For example, Core 1 replicates Core 2, and vice versa.  This architecture is typical of the design of corporate IT systems, as it provides redundancy and backup in the event

6

one of the servers does not operate properly. However, Cores 9 and 10 do not similarly replicate and back up each other. I was told that this is because of the low number of users who access Cores 9 and 10 (102 users at the time). The stated rationale does not make logical sense because Cores 7 and 8 had only 72 users, and in any event, such a structure is highly unusual in a corporate environment and raises suspicions that the Core 9 server could be replicating to "rogue computer server," either onsite or remotely. Further, when I examined the Core 10 server, I determined that it was switched on, even though it was not then being used to back up Core 9 or for any other purpose. I then tried to access the Core 9 server to see if it was replicating to some other server and to copy the contents of its hard drive, but I was blocked from having any access to the Core 9 server. I was informed that this was done by Roland Rojas of PDVSA's internal security unit. No such issue arose when I performed the same type of functions on the other Core servers, to which I had full access. Further, security personnel refused to back up the Core 9 server, even though senior PDVSA officers had ordered the back-up. Upon further investigation in the server room, I located an additional server, titled Metcam85, which functions as a gateway server that provides complete unrestricted access to the Core 9 server. Again, this is a highly unusual and suspicious arrangement.

13.    As part of my investigation, The Brennan Group asked me to search the PDVSA network to see if it contained two specific domain names – WTRPC.com and CANTV.net. With respect to WTRPC.com, the search uncovered metadata fragments ("hits") on the Core 9 and Metcam85 servers, but not on Core 10, which is further evidence that Core 9 was not replicating to Core 10. These hits indicate that there has been interaction with the servers from two individuals using the WTRPC.com domain in 2017. As previously mentioned, WTRPC is one of the entities believed to be used by Morillo and Baquero to defraud PDVSA. I identified the two

7

individuals whose WTRPC domain metadata fragments were contained on the Core 9 and
Metcam85 servers as Jack Ryan and Yanira Marcano, both of whom I am informed are current
Helsinge employees. I performed further analysis using the metadata fragments to identify that
the WTRPC IP address and domain name was registered to a John Ryan in Florida. I was
informed that WTRPC is not a company that is registered to do business with the CyS
Department (i.e., a bidder, supplier or customer of PDVSA), and therefore there is no reason that
the Core 9 and Metcam85 servers should contain the WTRPC.com domain. Based on my
interviews, observations and the information provided to me to date, I believe there is no logical
reason for the domain name WTRPC.com to be found on any of the PDVSA servers.

14.     With respect to the CANTV.net domain name, my search showed that it appeared
on the Core 9, Core 10 and Metcam85 servers. This is suspicious because I was informed the
PDVSA network and the servers are generally set to restrict any emails with the CANTV.net
domain name. CANTV.net is an e-mail hosting service like gmail.com or aol.com, and it is
typical for corporate networks to block emails from such public domains because they can be
used to breach security systems. I found that the CANTV.net domain appeared on the Core 9
and Core 10 servers as part of a "rule" that had been programmed into them. This is the only
rule that I located in any of the PDVSA Core servers, which is suspicious in itself. In addition,
the rule is highly suspicious because it causes any e-mail that both contains the domain names
cantv.com and cantv.net and is addressed to ariascu@pdva.com and carmonado@pdva.com to go
directly to the two PDVSA employees (Ariascu and Carmonado) in a manner that prevents
PDVSA from knowing that the communication ever occurred. Based on information on the
PDVSA network, these two individuals are associated, respectively, with the freight and
operations functions of the CyS Department. Moreover, the domain name "pdva.com" in these

8

email addresses is not a legitimate PDVSA e-mail domain. Rather, it is often an indicator of fraudulent or criminal purposes for parties to use a domain name that upon a quick glance appears to be a well-known name (such as PDVSA), but in reality, is different (PDVA) and directs the e-mail to an unintended end-point. This technique is typically used globally in connection with identity theft and criminal financial activity. I also have reviewed e-mail correspondence provided by The Brennan Group which shows that Morillo uses CANTV.com e-mail addresses.

15.     In September 2017, The Brennan Group provided me with hardcopy versions of two emails and their corresponding English translations and asked me to explain their significance. The emails appear to indicate that Morillo commissioned Luis Liendo to build a network using the wtrpc.com domain. The e-mail dated 27 April 2005 at 4:44pm (attached as Exhibit 1) was sent by Liendo to Alejandro Vizcarrondo, who forwarded it to Morillo later that evening. Based on translations this e-mail appears to be an outline of a proposal to perform services for a domain registration and either updating or creating a computer network. The e-mail dated 25 May 2005 (attached as Exhibit 2), also from Liendo to Vizcarrondo, appears based on translations to be an invoice from Liendo for completing the work that is outlined in the Exhibit 1 proposal, including specifically the registration and configuration of the WTRPC.com domain. Exhibit 2 also requests that Vizcarrondo arrange a meeting that day with "Leo o Francisco" (apparently referring to Leonardo Baquero or Francisco Morillo) to discuss use of a new totally automated tracking methodology. This supports the existence of a rogue clone server

that would allow real-time monitoring of data in PDVSA's CyS commodity trading operations. These e-mails further show Morillo's connection to the domain name WTRPC.com, which, as noted, appears on the Core 9 and Metcam85 servers for no apparent logical reason.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 12 February 2018

John Thackray

10

# Exhibit 1

| To: | 'Francisco Morillo'[franciscomorillo@cantv.net] |
|---|---|
| From: | Alejandro Vizcarrondo M. |
| Sent: | Wed 4/27/2005 10:50:35 PM |
| Importance: | Normal |
| Subject: | FW: DIRRECION PARA ENVIAR PROJECT |
| Received: | Wed 4/27/2005 10:50:37 PM |

QUE TAL???????????

----Original Message----
From: Luis Liendo [mailto:liendoluis@hotmail.com]
Sent: Wednesday, April 27, 2005 4:44 PM
To: alejandro_vizcarrondo@hotmail.com
Cc: liendoluis@hotmail.com
Subject: RE: DIRRECION PARA ENVIAR PROJECT

Que tal alejandro como estas..?

Propongo el siguiente plan para las proximas actividades:
Servicios a Ser Implantados:
· 	Registro del Dominio (Contacto, registros NS, etc) (tiempo previsto 2 horas)
· 	Instalación del SO en Ambos servidores (aproximadamente 4 horas para ambos servidores)
· 	Implantación de servicio de DNS (MX y demas registros) (8 horas para configurar el servicio de BIND, sobre linux software libre)
· 	Implantación del Servicio SMTP, POP3 e IMAP. (aproximadamente 20 horas para el servicio básico y luego unas 20 horas mas para implantar mejoras, que se pueden hacer posteriormente)
· 	Configuración Estratificada a nivel de Red para asegurar la seguridad en el sistema (2 horas)
· 	Implantación de Servicios de Seguridad Perimetral y puntos de fuerza (Shorewall, Firewall de SUSE Linux(iptables) y Servidor de Proxy (squid) Tiempo Aproximado 20 horas , luego posiblemente se deba tomar mas tiempo en mejoras y adecuación)
· 	Posterior implantación de servicios Internos de administración de direcciones privadas y  File & Print (DHCP, SAMBA) (tiempo previsto 25 horas, luego posiblemente se deban tomar mas tiempo en mejoras y adecuación)
· 	Implantación de Esquema de Backup y Respaldo además de posible balanceo dinámico y FailOver (contingencia en caso de falla) (tiempo Estimado 15 horas)
· 	Actualización de Documentación en Paralelo aproximadamente 2 horas al culminar la implantación de cada servicio.
· 	Implantación de servicios WEB (se haría con el apoyo de terceros especialistas en el diseño web y la estructuración de sitios y servicios WEB)

Para el dia de mañana estare en Caracas y me estare desocupando como a las 4:00pm, por lo que apartir de esa hora podemos atacar los primeros dos puntos (registro del dominio e instalación del SO en ambos servidores), la configuración del servicio de DNS seria para el dia Sabado y domingo, cuando desarrollariamos tambien la instalación de los servicios de SMTP y POP3 ó IMAP. Por favor avisame que te parece, compartelo con Francisco.
Saludos.
Luis Liendo.

# **<u>Exhibit 2</u>**

**Alejandro Vizcarrondo M.**

**From:** Luis Liendo [liendoluiv@hotmail.com]
**Sent:** Wednesday, May 25, 2005 5:45 PM
**To:** alejandro_vizcarrondo@hotmail.com
**Subject:** Relación de Horas Trabajadas y Proximas Actividades

Buenas Tardes Alejandro.

Te anexo la relación de Horas Trabajadas y Proximas Labores a Realizar (tarifa de 120.000Bs / hora)

**Relación de Horas Trabajadas**
**Actividades Realizadas**

| | |
|---|---|
| Registro y Configuración de Dominio (wtrpc.com y UniqueJet.com) | 4 |
| Configuración del servidor (Server01) | 5 |
| Configuración del Mail Server (mail.wtrpc.com) | 9 |
| Instalación e inducción del cliente de correo | 2 |
| Configuración de consola administrativa web de auto-gestion | 4 |
| Instrucción sobre la facilidad de Auto-Gestion (cambio de passwrd de cada cuenta y otros datos) | 1 |
| Revision General de Servidor Alterno (actualización de BIOS, Reconstrucción de Arreglo de Discos e Instalación del Sistema Operativo) | 6 |
| **Total** | 31 3.720.000 |

**Proximas Actividades**

| | |
|---|---|
| Configuración del Dominio Internet y Servicio de correo para el dominio UniqueJet.com | 6 |
| Configuración de servidor Alterno (Salida SMTP Foranea, para enviar correos desde fuera de las oficinas) | 3 |
| Configuración de Servidor de Archivos File & Print con Samba (Servidor de archivos internos y externos) | 5 |
| Configuración de Servidor Proxy para incrementar la velocidad de conexión a Internet | 4 |
| **Total** | 18 2.160.000 |

Necesito que nos reunamos con los muchachos para probar una nueva forma de hacer los seguimientos que nos mejorara notablemente la gestion y seria sin intervension humana, totalmente automatica. Por favor cuadra con Leo ó con Francisco para que la discutamos hoy en la tarde. Estare por las oficinas como a las 6:30pm.
Saludos.

Luis Liendo.

MSN Amor Busca tu ½ naranja

5/31/2005