**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 18-20818-CIV-GAYLES**

PDVSA US LITIGATION TRUST,

        Plaintiff,

v.

LUKOIL PAN AMERICAS LLC, *et al.*,

        Defendants.

_____/

**DEFENDANTS' MOTION FOR AN ORDER**
**TO SHOW CAUSE AND OTHER RELIEF**

Defendants Helsinge Inc. and John Ryan (together, "Defendants"), through this limited appearance,[1] move for an Order to Show Cause, and other relief explained herein, directing Plaintiff to appear before the Court, or in the alternative file a response, explaining why it should not be held in contempt for the reasons stated herein.

## I.   INTRODUCTION

Based on additional information obtained, and further analysis performed, after the March 14, 2018 hearing on Plaintiff's Emergency Motion for Enforcement of Court's Temporary Restraining Order (the "Emergency Motion") [ECF No. 60], Defendants have uncovered substantial evidence that strongly suggests:

- Plaintiff (i) orchestrated a scheme to circumvent the portion of the TRO which denied Plaintiff's request to seize and copy defendants' servers and (ii) caused, that portion of the TRO directing that documents not be removed or alienated, to be violated, by causing the server that was the subject of Plaintiff's Emergency Motion (the "Server") to be sent to the Swiss Prosecutor and (iii) caused Defendant Helsinge, Inc. to be deprived of its rightful possession and use of the Server;

- Plaintiff filed its sham Emergency Motion in which it both omitted material facts and made affirmative statements in what appears to have been a calculated effort to: (i) hide from the Court the fact that Plaintiff caused the Server to be shipped to Switzerland in violation of the TRO; (ii) hide from the Court the fact that that Plaintiff took several affirmative steps to try to circumvent the Court's TRO and obtain a copy of the Server; and (iii) mislead the Court into believing that defendants had caused the TRO to be

---

[1]     In filing this Motion, Defendants do not waive any objections, defenses or rights available to them, including as to the sufficiency of service of process or lack of personal jurisdiction and to arbitrate any of the claims asserted by the Plaintiff.

violated, for the purpose of convincing the Court to reconsider its denial of Plaintiff's request to seize and copy all of defendants' documents;

- Plaintiff's Certification of Emergency [ECF No. 60-2], filed together with its Emergency Motion, contains false and/or misleading statements that appear to have been calculated to (i) lead the Court to believe an emergency existed; and (ii) hide from the Court the fact that Plaintiff delayed the filing of its motion because it was attempting to obtain a copy of the Server, in circumvention of the Court's TRO; and

- Plaintiff made false and/or misleading statements at the March 14, 2018 hearing, including in response to questions posed by the Court.

Aside from the fact that it appears Plaintiff has intentionally attempted to circumvent the Court's TRO and in the process appears to have violated other Court rules and orders as well as its duty of candor to the Court; importantly, Plaintiff's actions have also resulted in Defendant Helsinge, Inc. being deprived of its rightful possession and use of its Server. Specifically, Plaintiff caused the Server to be sent outside of the jurisdiction, to Switzerland, in coordination with a Swiss prosecutor (though it appears Plaintiff may have misled the Swiss prosecutor as well, as explained below), caused Mr. Ryan to be detained in Switzerland and then caused the Swiss prosecutor to demand that Mr. Ryan turn the Server over to him without resort to the applicable treaties and conventions in place between the United States and Switzerland regarding obtaining evidence, including the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Convention") and the Swiss-American Treaty on Mutual Assistance in Criminal Matters of 25 May 1973 (the "Mutual Legal Assistance Treaty").

Plaintiff's improper conduct is even more concerning given Plaintiff lacks standing, as explained in Defendants' Joint Response to Plaintiff's Motion for Preliminary Injunction [ECF

No. 161].  In addition to the improper conduct described above, Defendant recently learned (as explained in Defendants' forthcoming Motion to Quash) that Plaintiff has recently issued 60 subpoenas.  Indeed, in light of Plaintiff's improper conduct, it appears that it is attempting not only to circumvent normal discovery process, but is engaging in these tactics for some ulterior purpose, such as to further other legal proceedings, like the criminal action it initiated in Switzerland.

For all of these reasons, as explained below, the Court should issue an Order to Show Cause requiring Plaintiff to explain why it should not be held in contempt and grant other relief explained below.

## II.    PROCEDURAL HISTORY

PDVSA initiated a criminal investigation in Switzerland.  (*See* Translation of Johan Droz Letter ("Swiss Prosecutor Letter"), attached as **Exhibit A** (original letter was filed as ECF No. 84-1)).  As part of that criminal investigation, Mr. Ryan was detained by Swiss authorities on March 4, 2018.  (Eve Dolon[2] Declaration ("First Dolon Decl.") [ECF No. 84-1] ¶ 4).  On March 3, 2018, Plaintiff filed its Complaint [ECF No. 1] and *ex parte* emergency Motion for a Temporary Restraining Order ("TRO Motion") [ECF No. 5].  These documents were filed under seal and two days later, on March 5, 2018, an *ex parte* hearing on the TRO Motion was held.  (*See* Minute Entry [ECF No. 8]).  The same day, the Court entered the TRO which, among other things, denied Plaintiff's request to seize and copy all of Defendants' hard copy and electronic records, granted Plaintiff's request to order the preservation of materials, and directed that the TRO be served on all Defendants within 7 days.  (*See* TRO 2–3).  Three days later, on March 8, 2018, the Court unsealed the record.  (*See* Order [ECF No. 48]).

---

[2] Even Dolon is Mr. Ryan's Swiss counsel.

3

The following day, on March 9, 2018, Plaintiff filed its Emergency Motion at 8:07 p.m., claiming that (a) Plaintiff had "been conducting surveillance of Mr. Ryan's" house and saw the Server being removed from the house at approximately 10:05 a.m. that same day; (b) the Server was going to be delivered to "legal authorities in Switzerland"; and (c) "[r]egardless of the motive[,] these actions violate the Court's TRO as to preserving the evidence in this case." (Emergency Mot. ¶¶ 2–6).  In its Emergency Motion, Plaintiff asked that the Court order that Plaintiff be allowed to copy the Server before it was sent to the Swiss prosecutor and, further, that "the Court reconsider the TRO and . . . expand it to allow Plaintiff to preserve evidence by allowing it to duplicate and make copies of any evidence possessed by the Defendants." (*Id.* at ¶¶ 7, 9). Included in Plaintiff's Proposed Order, was a request to "be given immediate access, with the assistance of the United States Marshal . . . to [four different office and residential addresses] to make a copy of any data and information contained on any computers, servers or hard drives located [therein]."  (Plaintiff's Proposed Order on Emergency Mot., attached as **Exhibit B**).

At 10:20 p.m., the Court entered an Order ("March 9 Order") [ECF No. 61], on Plaintiff's Emergency Motion directing Federal Express to withhold shipment of the package containing the Server until further order of the Court, directing Plaintiff to serve the order on Federal Express, and scheduling a hearing on the Emergency Motion, (*see id.*).  The order did not permit Plaintiff to copy the Server or any other computers or documents belonging to Defendants.  Approximately three days later, on March 12, 2018, Federal Express delivered the package containing the Server to the Swiss prosecutor.  (*See* Federal Express Tracking, attached as **Exhibit C**). The following day, on March 13, 2018, Mr. Ryan was released from custody, but not permitted to leave Switzerland.  (*See* First Dolon Decl. ¶ 11).

### III.   MEMORANDUM OF LAW

For the following reasons, the relief requested in this motion is warranted:

**A.   Plaintiff orchestrated a scheme to circumvent the TRO; caused the TRO to be violated, by causing the Server to be sent to the Swiss Prosecutor; and caused Defendant Helsinge, Inc. to be deprived of its server.**

After the Court entered the TRO denying Plaintiff's request to seize and copy defendants' electronic and hard copy records, Plaintiff orchestrated a scheme to circumvent the TRO and obtain a copy of Helsinge, Inc.'s server, which was located at the residence of Mr. Ryan. As part of its scheme, Plaintiff did and/or intentionally failed to do the following:

*First*, Plaintiff's U.S. and/or Swiss counsel informed the Swiss prosecutor *on the morning of March 9, 2018* about the existence of the server at Mr. Ryan's residence. Specifically, a letter from the Swiss prosecutor states:

> I confirm that I was told, on the afternoon [Geneva Time] of Friday, March 9, 2018, that a server which may contain information useful to my investigation may possibly be located at the private domicile of John RYAN in Miami. I received this information from the Counsel for PDVSA, the plaintiff in the criminal proceeding I am conducting.

(*See* Swiss Prosecutor Letter 3). Given the time difference between Geneva and Miami, and the fact that the server left Mr. Ryan's residence around 10:05 a.m., it appears that, at most, a few hours passed from the time PDVSA's counsel spoke to the Swiss prosecutor about the server and the time it left Mr. Ryan's residence. Indeed, Defendants' counsel is aware that soon after the conversation with PDVSA's counsel regarding the server, the Swiss prosecutor reached out to Mr. Ryan's Swiss counsel—Eve Dolon. According to Ms. Dolon's declaration:

> The Swiss prosecutor, Mr. Johan Droz, demanded that Mr. Ryan provide a copy of HELSINGE's server in his home in connection with his investigation. At my request, Mr. Ryan's husband, Wilmer Maldonado, sent directly to the Swiss prosecutor, Mr. Johan Droz

5

> via Federal Express the server that at the time was in Mssrs. Ryan's
> and Maldonado's home.

(First Dolon Decl. ¶¶ 5–6).

*Second*, Plaintiff, it appears intentionally, chose not to serve the TRO at Mr. Ryan's residence on March 8, 2018—the day the Court unsealed the case—or on the morning of March 9, 2018, prior to the Server being removed from Mr. Ryan's residence. It chose not serve the TRO despite that:

- Plaintiff began serving the TRO on other Defendants on March 8, 2018, the day the Court unsealed the docket. For example, Plaintiff served the TRO on Defendant Daniel Lutz by email at approximately 1:48 p.m. EST on March 8, 2018.  (*See* Carpinello email to Lutz, attached as **Exhibit D**).

- Plaintiff listed Mr. Ryan's residence in its March 3, 2018 TRO Motion as one of four residences where it asked the Court to permit the US Marshall's to seize items including, specifically, servers. (*See generally* TRO Mot.; Proposed Order on TRO Mot. [ECF No. 5-1] ¶ 6).

- Plaintiff had Mr. Ryan's house under surveillance and on the morning of March 9, had multiple investigators stationed outside Mr. Ryan's residence including its lead investigator, Mr. Brennan. (*See* Emergency Mot. ¶ 8).  Mr. Brennan states in his declaration, submitted in support of Plaintiff's Emergency Motion:

> I and my associates have been surveilling the residences and the offices of Defendants Helsinge Holdings, LLC and Helsinge, Inc. and the residence of John Ryan who is currently in custody in Geneva, Switzerland. Today, at approximately 10:05 a.m., while we were surveilling the Ryan residence at 11241 NE 9th, Avenue Biscayne Park, FL 33161, I saw a man whom I recognized from Geneva the week before come out of the residence towards a silver SUV carrying a silver box that appeared heavy.

(*See* Second Brennan Decl. [ECF No. 60-1] ¶ 3).  It appears the investigators did not attempt to advise Mr. Maldonado of the TRO as he was leaving.

- Plaintiff served the TRO on Mr. Ryan's residence only *after* Mr. Maldonado had dropped the server off at Federal Express, according to Mr. Maldonado's Motion for Protective Order, To Quash or Modify Subpoena [ECF No. 79].

***Third***, Plaintiff, it appears intentionally, chose not to serve the TRO on Mr. Ryan's Swiss counsel, Ms. Dolon, on March 8 or 9, despite the fact that Plaintiff's Swiss and U.S. counsel were in communication with Ms. Dolon, including on March 9, regarding the Server.

***Fourth***, in addition to not providing Ms. Dolon, Mr. Ryan's Swiss counsel, with a copy of the TRO, Plaintiff contacted Ms. Dolon in an attempt to help Plaintiff obtain a copy of the server. Indeed, Plaintiff's Swiss lawyer, Guerric Canonica, copying U.S. counsel, Messrs. Carpinello and Barrett, sent Ms. Dolon the following email (which has been translated from the original French to English) at approximately 3:25 p.m. EST on March 9, 2018:

edolon@dolon-avocats.ch

| | |
|---|---|
| **From:** | Guerric Canonica <GCanonica@cvpartners.ch> |
| **Sent:** | Friday, March 9, 2018 at 10:25 PM |
| **To:** | 'edolon@dolon-avocats.ch' |
| **Cc:** | George Carpinello (gcarpinello@BSFLLP.com); David Barrett (dbarrett@BSFLLP.com) |
| **Subject:** | PDVSA |

Dear Colleague,

I am acting on behalf of PDVSA.

I'm sorry to bother you at this late hour.

I have just spoken with the American attorneys who have, once again, summarized the content of the injunction issued by a civil judge during the course of the week (a TRO, temporary restraining order).

They aren't opposed to the server being immediately returned to the Public Prosecutor, even though they could contest this on the basis of the above-mentioned decision. However, they formally request, with your agreement, that a copy of this server is made prior to it being sent to Geneva. In particular, they are concerned, likely with good reason, that content stored on the server could be damaged during transportation.

Copying the server would only take a few hours, meaning that the Public Prosecutor would likely receive the server in question on Monday evening or Tuesday morning.

Would your client agree to a copy of the server in question being made prior to it being definitively transported? Please let me know if your client is not amenable to this request.

Should they be willing to do so, can the person possessing or holding the server be put in touch with the following person immediately:

George F. Carpinello
Partner

7

**BOIES SCHILLER FLEXNER** LLP
30 South Pearl St. 11th Floor
Albany, NY 12207
(t) +1 518-434-0600
gcarpinello@bsfllp.com
www.bsfllp.com

It goes without saying that a copy of the server shall be immediately returned to both your client and the Public Prosecutor.

Thank you for your consideration.

Have a pleasant evening.

GUERRIC CANONICA
ATTORNEY – Diploma from the Institute for Real Estate Studies (IEI)

(Canonica email to Dolon #1, attached as **Exhibit E**).  The email clearly evidences an attempt by Plaintiff to obtain a copy of the Server in circumvention of the TRO (apparently feigning concern the server might be damaged in transit) while at the same time exhibiting a total disregard for the TRO's requirement that documents not be removed or alienated.  Indeed, as addressed below, Plaintiff proceeded to file its Emergency Motion, arguing that the act of sending the Server to the Swiss prosecutor violated the TRO. Also on March 9th, Plaintiff's Swiss counsel sent another email to Ms. Dolon stating: "Hi, I'm still speaking with the US attorneys. Does your client have an attorney located in Miami? I would be able to inform the US attorneys of the Miami attorney's name. Thanks. Have a pleasant evening." (Canonica email to Dolon #2, attached as **Exhibit F**). And as the Court is aware, and as explained in greater detail below, Plaintiff did not file its approximately 2-page Emergency Motion until 8:07 p.m. the evening of March 9th.

*Fifth*, Plaintiff chose to wait until 8:07 p.m. to file its Emergency Motion, despite its investigator's observation of the server being removed from Mr. Ryan's residence at 10:05 a.m. Not only does it appear Plaintiff delayed in filing the Emergency Motion because it was primarily interested in obtaining a copy of the Server (which request had already been denied by the Court) but, moreover, it appears Plaintiff may have timed its filing so that the Emergency Motion would be filed after the Federal Express package had departed Miami.  At the very least, Plaintiff appears to have delayed its filing without regard to when the Server would leave the jurisdiction.  One

8

could easily draw that conclusion given that Plaintiff was in possession of the tracking number for the Federal Express shipment and therefore could readily determine its status, including that the Server left Miami, bound for Memphis, at 8:05 p.m. EST, and its location throughout this transit. (*See* Federal Express Tracking).

It is clear Plaintiff was in possession of the tracking number because it included the number in the proposed order it submitted to the Court.[3]  Indeed, Mr. Ryan's Swiss counsel sent the Federal Express tracking number to Plaintiff's Swiss counsel at approximately 11:19 a.m. EST (*See* Supplemental Dolon Decl. ¶ 7, attached as **Exhibit G**; Text Message, attached as **Exhibit H**). Mr. Ryan's Swiss attorney also provided the tracking number to the Swiss prosecutor at 12:52 p.m. EST (7:52 p.m. in Geneva). (*See* Supplemental Dolon Decl. ¶ 8).

*Sixth*, it appears Plaintiff either: (i) failed to serve the March 9 Order on Federal Express; or (ii) delayed in serving the order and/or somehow acted in a manner that caused Federal Express not to withhold shipment as required by the March 9 Order.  We have requested Plaintiff's counsel to inform us if and when it served the March 9 Order on Federal Express and to provide us with their communications with Federal Express regarding the Server, but Plaintiff has thus far refused to provide the information.  At the very least, it is apparent that Plaintiff did not file anything with the Court: (i) indicating it complied with the Court's order by timely serving it on Federal Express; or (ii) accusing Federal Express of not abiding by the order's requirement that it withhold shipment. Indeed, as Plaintiff would have known from the shipment's tracking information, it was

---

[3] Plaintiff also violated Local Rule 7.1(a)(2) by failing to attach its proposed order to its filing.  *See* S.D. Fla. L.R. 7.1(a)(2) ("[A]ny motion seeking emergency or ex parte relief or a temporary restraining order, shall be accompanied by a proposed order that is filed and submitted via e-mail to the Court."). Plaintiff has recently provided to Defendants the email it sent to the Court attaching the proposed order. Accordingly, Defendants have been able to confirm that Plaintiff indeed included the tracking number for the Federal Express shipment in its proposed order, further confirming it was in possession of the tracking number. (*See* Plaintiff's Proposed Order on Emergency Mot. ¶ 1).

not until March 12, three days after the Court entered its order, that Federal Express completed shipment of the package. (*See* Federal Express Tracking).  Accordingly, it appears that Federal Express could have abided by the Court's order and withheld shipment as late as March 12th.

**Seventh**, Plaintiff appears to have waited until just about an hour before Federal Express delivered the Server to the Swiss prosecutor's office in Geneva, on March 12th, to request a copy of the Server from the Swiss prosecutor; and, it appears for the first time, to either advise the Swiss prosecutor about the TRO or at least suggest to the prosecutor that he may have caused the TRO to be violated by requesting the Server.  It appears this too was calculated to convince the Swiss prosecutor to let Plaintiff copy the Server.  The email, which was sent by Plaintiff's Swiss counsel, Guerric Canonica, to the Swiss prosecutor, Johan Droz, copying Mr. Ryan's Swiss counsel, Ms. Dolon, at 8:51 a.m. [Geneva time] says, in its entirety (translated from the original French):

| | |
|---|---|
| **From:** | Guerric Canonica <GCanonica@cvpartners.ch> |
| **Sent:** | Monday, March 12, 2018 at 08:51 AM |
| **To:** | 'Droz Johan (PJ)' |
| **Cc:** | Bünzli Boris (PJ); Eve Dolon (edolon@dolon-avocats.ch) |
| **Subject:** | RE: P/3072/2018 |
| **Importance** | High |

Dear Sir, Madam, the Public Prosecutor,

I am acting on behalf of PDVSA.

I'm writing subsequent to my earlier correspondence with Ms. Eve Dolon.

Please be informed of the following:

1) PDVSA is naturally, quite pleased with Mr. Ryan's willingness to collaborate;

2) On March 5 last, a temporary restraining order (TRO) was issued by a civil judge in Miami against several defendants, including Mr. Ryan;

3) Despite my involvement, notably following a telephone conversation with Ms. Eve Dolon on March 9 last, the American attorneys handling the proceedings (the law firm, Boies Schiller Flexner LLP) were reluctant to inform the presiding judge, who ordered that the package (containing the server used by Mr. Ryan) which was to be sent to you, be detained;

4) However, at the time this injunction was issued and notice thereof was provided to the transportation company, the package in question was already aboard an aircraft headed to Europe;

5) Thus, it should reach you shortly, despite the above-mentioned decision (point 3);

6) Proceedings that were commenced by attorneys in the United States shouldn't in any way be interpreted as a sign of mistrust towards you; they simply decided it was necessary to submit the facts to the judge handling the matter.

In light of the hearing tomorrow, I wanted to summarize the above.

I also point out that my client wishes to be provided with a full copy of the server. According to my client, this is justified notably due to the fact that the injunction referred to above was issued on American soil (point 2).

Finally, one of the American attorneys acting for PDVSA wishes to attend the hearing with me tomorrow. Do you have any objection in this regard?

Ms. Eve Dolon is copied in on this email.

Yours sincerely,

GUERRIC CANONICA

(Email from Canonica to Johan Droz, attached as **Exhibit I**). It appears based on the time stamp, and the Federal Express tracking information, that the email was sent approximately one hour after the Server was loaded onto the final Federal Express truck for delivery to the Swiss prosecutor's office and approximately 90 minutes before the Server was actually delivered to the Swiss prosecutor. Of note, the email appears to advise the Swiss prosecutor of the TRO for the first time, at point number 2. Then, says that Plaintiff's U.S. counsel "were reluctant to inform the presiding judge, who ordered that the package (containing the server used by Mr. Ryan) which was sent to you, be detained," at point number 3. (*Id.*). This seems not only to clearly suggest that Plaintiff's U.S. counsel delayed in filing the Emergency Motion in the hopes of being able to obtain a copy of it, but further suggests, when read in context of the entire email, that Plaintiff led the Swiss prosecutor to believe he may have had a role in violating the Court's TRO and March 9 Order. For example, point number 6 says, in part: "[the filing of the Emergency Motion] shouldn't in any way be interpreted as a sign of mistrust towards you; [Plaintiff's U.S. counsel] simply decided it was necessary to submit the facts to the judge handling the matter." (*Id.*).

And, perhaps most egregious of all, the email says: "I also point out that my client wishes to be provided with a *full copy of the server*. According to my client, *this is justified* notably due to the fact that the *injunction referred to above was issued on American soil* (point 2)."  (*Id.* (emphases added).   Of course, the TRO actually says the opposite—it unequivocally denies

Plaintiff's request to copy the Server—and, in no way, can be interpreted to "justify" Plaintiff being provided with a copy of the Server.  (*See generally* TRO).

Also worth noting is that, at point number 4, the email says: "at the time the injunction was issued and notice thereof was provided to the transportation company, the package in question was already aboard an aircraft headed to Europe." (*See id.*).  This statement is suspicious because the Court entered its order at 10:20 p.m. on March 9th and, based on the Federal Express shipping information, the package did not board a plane to Europe until the morning of March 10th.  (*See* Federal Express Tracking). And, furthermore, regardless of when the package was placed on a plane bound for Europe, the package remained in Federal Express' custody for approximately three days and thus it appears Federal Express could have stopped the shipment before it reached the Swiss prosecutor's office on March 12.

**B.**    **Plaintiff filed a sham "Emergency" Motion in which it omitted material facts and made affirmative statements in what appears to have been a calculated effort to: (i) conceal information from the Court regarding its apparent efforts to circumvent and violate the TRO; and (2) mislead the Court in order to convince the Court to reconsider its TRO denying Plaintiff's request to seize and copy documents.**

After failing in its attempts to obtain a copy of the Server before it left Miami, Plaintiff filed its Emergency Motion. In the motion, Plaintiff both omitted material facts and made affirmative statements in what appears to have been a calculated effort to: (i) hide from the Court the fact that Plaintiff caused the server to be shipped to Switzerland in violation of the TRO; (ii) hide from the Court the fact that Plaintiff took several affirmative steps to try circumvent the TRO and obtain a copy of the Server; and (iii) mislead the Court into believing defendants had caused the TRO to be violated—for the purpose of convincing the Court to reconsider its denial of Plaintiff's request to seize and copy all of defendants' documents.

*First*, Plaintiff failed to inform the Court in its Emergency Motion that the *very same morning* of March 9, 2018 it contacted the Swiss prosecutor and advised him that the server was located at the Ryan residence. (*See* Swiss Prosecutor Letter 3). And it appears Plaintiff further attempted to mislead the Court by merely mentioning in its Emergency Motion instead that:

> Plaintiff's counsel has been informed by Mr. Ryan's counsel in Switzerland, where he is currently in custody, that the purpose of removing the Ryan server is to deliver it to the legal authorities in Switzerland who are conducting a criminal investigation with respect to events alleged in the Complaint.

(Emergency Mot. ¶ 4).

It is apparent that Plaintiff sought to mislead the Court in order to make it seem that defendants had violated the TRO, to convince the Court to reconsider its decision to deny Plaintiff's request to seize and copy defendants' documents. For example, in the Emergency Motion, after reminding the Court of the TRO and that it prohibits certain defendants from destroying and removing and/or alienating documents, Plaintiff states: "[e]arlier today, an individual removed a server (the "Ryan Server") at Mr. Ryan's residence. Further details of this unusual activity are contained in the Second Declaration of John Brennan attached hereto." (Emergency Mot. ¶ 3). Plaintiff then goes on to explain, after mentioning the conversations with Mr. Ryan's Swiss counsel described above, that: "Regardless of the motive these actions violate the Court's TRO as to preserving the evidence in this case and must be enforced." (*Id.* ¶ 6). Plaintiff then goes on to request that it be allowed to copy the server removed from the Ryan residence and further states:

> Additionally, in light of this event Plaintiff asks the Court to reconsider the TRO and to expand it to allow Plaintiff to preserve evidence by allowing it to duplicate and make copies of any evidence possessed by the Defendants, in accordance with Plaintiff's proposed Temporary Restraining Order, filed with the Court on March 2, 2018.

(*Id.* ¶ 9).  ***Second***, Plaintiff omitted to inform the Court in its Emergency Motion of the substance of the emails and other communications with Mr. Ryan's Swiss counsel, described above.  Those communications show that Plaintiff's counsel attempted to convince Mr. Ryan's Swiss counsel to permit Plaintiff to copy the server before it was shipped to Switzerland, mentioning to Mr. Ryan's Swiss counsel only that it was concerned the server would be damaged in transit and not explaining to her that the TRO would be violated if the server was shipped to the Swiss prosecutor. Omitting this material information seems to have been calculated to: (i) mislead the Court into believing that the situation presented a true emergency that warranted the Court reconsidering its TRO; and (ii) conceal Plaintiff's attempts to copy the server in contravention of the TRO, and the fact that Plaintiff had not been diligent nor forthright in presenting its so-called Emergency Motion.

***Third***, Plaintiff omitted to inform the Court that it had not served the TRO on the Ryan residence prior to the time the Server was removed. Worse, in what appears to be a further affirmative attempt to mislead the Court, at the end of its Emergency Motion Plaintiff states:

> Plaintiff attempted to learn the name of Mr. Ryan's United States counsel, if he has counsel, but has been unable to obtain that information. Accordingly, we are unable to provide notice to Mr. Ryan's counsel. Mr. Ryan was served today with the Complaint, TRO and related papers through substitute service by personal delivery to his sister at his residence.

(Emergency Mot. ¶ 10). Importantly, Plaintiff did not say in its Emergency Motion that (i) although its chief investigator and his team sat outside the Ryan residence apparently for days, it only served the TRO on the Ryan residence after the server had left the residence; and (ii) it also made no attempt to provide Mr. Ryan's Swiss counsel with a copy of the TRO before or after the time the server was removed from the Ryan residence, despite Plaintiff's Swiss counsel knowing Ms. Dolon was representing Mr. Ryan, and Plaintiff's U.S. Counsel were communicating with Ms. Dolon on March 9 in an attempt to copy the Server. (*See* Supplemental Dolon Decl. at ¶¶ 7–8).

14

**C.     Plaintiff's Certification of Emergency, contains false and/or misleading statements that appear to have been calculated to (i) lead the Court to believe there was an emergency; and (ii) hide from the Court the fact that Plaintiff delayed filing of its motion because it was attempting to obtain a copy of the server, in circumvention of the Court's TRO.**

As required by Local Rule 7.1(d), Plaintiff filed together with its Emergency Motion a "Certification of Emergency." *See* S.D. FLA. L.R. 7.1(d) (requiring emergency motions to "be accompanied by the Certification of Emergency"). Plaintiff's certification, however, contains false and/or misleading statements that appear calculated to (i) lead the Court to believe there was an emergency; and (ii) hide from the Court the fact that Plaintiff delayed the filing of its motion because it was attempting to obtain a copy of the server, in circumvention of the Court's TRO.

*First*, Plaintiff's Certification of Emergency states, in part: "I further certify that the necessity for this emergency hearing has not been caused by a lack of diligence on my part, but has been brought about only by the circumstances of this case." This statement is false and/or misleading in several respects including because (i) the purported emergency, i.e., that the Server was in the process of being shipped to Switzerland, was caused by Plaintiff (as explained above); and (ii) Plaintiff delayed the filing of its Emergency Motion because it spent several hours communicating with Mr. Ryan's Swiss counsel trying to get her to agree to let Plaintiff copy the server before it was shipped (in contravention of the TRO).

*Second*, Plaintiff's Certification of Emergency states, in part: "I further certify that I have not made an effort to resolve this matter without the necessity of emergency action for the reasons set forth in the Motions filed today." The statement is false and/or misleading because Plaintiff *had* undertaken efforts to resolve the matter (putting aside that such efforts were also designed to circumvent the TRO denying Plaintiff's request to seize and copy the Server) which it did not disclose in its motion, nor at the subsequent hearing. Among the steps it took, were multiple

communications with Mr. Ryan's Swiss counsel whereby Plaintiff attempted to obtain a copy of the server. Indeed, in Plaintiff's Swiss counsel's email to the Swiss prosecutor (to try to convince him to let Plaintiff copy the server) Plaintiff describes its efforts to avoid having to file its Emergency Motion:

> Despite my involvement, notably following a telephone conversation with Ms. Eve Dolon on March 9 last, the American attorneys handling the proceeding (the law firm, Boies Schiller Flexner LLP) were reluctant to inform the presiding judge, who ordered that the package (containing the server used by Mr. Ryan) which was to be sent to you, be detained.

(Email from Canonica to Johan Droz, point 3).

### D. Plaintiff appears to have made false and/or misleading statements at the March 14, 2018 hearing.

The Court held a hearing on Plaintiff's Emergency Motion on March 14th. At that hearing, Plaintiff's counsel, made several statements that appear to be false and/or misleading and also failed to inform the Court of material facts, including in response to questions posed by the Court.

*First*, Plaintiff continued to insist that defendants, not Plaintiff, caused the Server to be shipped to Switzerland and thereby violated the TRO. It also omitted material facts concerning Plaintiff's role in causing the Server to be shipped. For example, Plaintiff's counsel said:

> And as the Court is also aware, a server that was the subject of the Court's order was removed and shipped to Switzerland. . . . . Now they claim that nothing was done to it and it was simply sent to Switzerland. We don't have any way of knowing that. What we know is that it was taken out of the Court's jurisdiction in violation of the TRO.

(Mar. 14 Hr'g Tr. 6:8–10, 14–17, attached as **Exhibit J**).

*Second*, in response to the Court's inquiry regarding why it had taken so long for Plaintiff to file its Emergency Motion, Plaintiff's counsel responded:

> Your Honor, we were trying to track it down. We were trying to get
> the papers prepared. My understanding was that there was an effort
> to contact the Court and see a time when people could come. And if
> we got there late, I apologize.

(*Id.* 24:4–8). Importantly, Plaintiff's counsel did not inform the Court about the several hours delay occasioned by Plaintiff's attempts to reach an agreement with Mr. Ryan's counsel to copy the server before it was shipped. Nor, of course, did Plaintiff's counsel inform the Court that as part of those communications, Plaintiff expressed to Mr. Ryan's Swiss counsel that it was not "opposed to the server being immediately returned to the Public Prosecutor" (Canonica email to Dolon #1, 3), despite that Plaintiff argued in its Emergency Motion, and at the very hearing, that removing the server from the jurisdiction was a violation of the TRO.

**Third**, Plaintiff's counsel appears to have failed to disclose material facts to the Court to correct what appears to be the Court's false impression that the server was shipped because the Court's order did not get to Federal Express on time.  Specifically, at the hearing, the Court said:

> And, I, of course, ordered that FedEx retain that server that was
> delivered to it, but apparently it was too late because by the time I
> issued the order – well, I issued it pretty quickly after I received it
> Friday night on March 9th, the server had been, in fact – yeah, at
> 10:20 p.m., shortly after receiving the motion, I issued that order.
> But the server, as I learned this morning, had been delivered that
> morning to FedEx and had already been shipped.

(Mar. 14 Hr'g Tr. 34:19–35:2).  Plaintiff failed to inform the Court that it knew, because it had access to the Federal Express tracking information, that Federal Express was in possession of the server for three days after the Court entered its order requiring Federal Express to withhold shipment of the package. Nor did Plaintiff's counsel volunteer any details regarding any steps it took to get Federal Express to withhold shipment. (*See generally id.*). Of course, as explained above, it appears based on Plaintiff's Swiss counsel's March 12 email to the Swiss Prosecutor that

Plaintiff either took (or avoided taking) action to cause the Server to by shipped to the Swiss prosecutor in the hopes that the Swiss prosecutor would permit Plaintiff to copy the Server.

      **E.**    **As a result of Plaintiff's improper conduct, Defendant Helsinge, Inc. has been deprived of the rightful possession and use of its server, and Mr. Ryan and his family have been unfairly miscast as intentionally violating the TRO by removing the server from the Court's jurisdiction, at the request of the Swiss Prosecutor in exchange for his release from incarceration.**

In addition to violating the Court's rules and orders and violating its duty of candor to the Court, Plaintiff's actions resulted in Defendant Helsinge, Inc. being deprived of its rightful possession and use of its server. Plaintiff caused the server to be sent outside of the jurisdiction (to Switzerland), in coordination with the Swiss prosecutor (though it appears Plaintiff misled the Swiss prosecutor as well) including, by causing Mr. Ryan to be detained in Switzerland and causing the Swiss prosecutor to demand that Mr. Ryan turn Helsinge, Inc.'s server over to him and disregarding the Hague Convention and the Mutual Legal Assistance Treaty. As a result, Helsinge, Inc. is unable to access its own documents, as it has no access to the Server, and is also unable to adequately prepare for the April 4 hearing.

Mr. Ryan found himself incarcerated by the Swiss authorities on March 9, 2018, while on a business trip relating to criminal charges on behalf of PDVSA. On instruction from Mr. Ryan's Swiss counsel that morning, Mr. Ryan's husband, Mr. Maldanado, immediately shipped the server to the Swiss prosecutor, which he understood would result in Mr. Ryan's release by Swiss authorities. At that time, neither Mr. Ryan, his Swiss counsel, nor his family knew of the U.S proceedings or the Court's TRO although Plaintiff's investigators had been surveilling the Ryan home for several days. Mr. Ryan and his family were unfairly maligned and grossly mischaracterized in open court and in the press as willfully violating this Court's order when all the while Plaintiff's counsel knew that the shipment of the Server was of its own doing, and that

Mr. Ryan, his Swiss counsel, and his family knew nothing of the TRO until it was served, after the Server had left the house.

### F.      Plaintiff's conduct warrants the Court issuing an Order to Show Cause.

 "District courts have inherent and statutory power to enforce their Orders and to punish violators for contempt." *Consumer Elecs. Ass'n v. Compras & Buys Magazine, Inc.*, No. 08-21085-CIV, 2009 WL 10667730, at *7 (S.D. Fla. June 10, 2009); *see also Shillitani v. United States*, 384 U.S. 364, 370 (1966) ("[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt."). Not only is *violating* a court order sanctionable, but "hampering enforcement of a court order" is as well. *Arugu v. City of Plantation*, No. 09-61618-CIV, 2010 WL 11518556, at *6–7 (S.D. Fla. Oct. 29, 2010). In addition to sanctioning a party for violating an order or hampering its enforcement, a court may also hold a party or attorney in contempt for breaching his or her duty of candor to the court. *See Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994) ("Every lawyer is an officer of the court. And . . . always has a duty of candor to the tribunal."); *Nat'l Parks Conservation Ass'n, Inc. v. U.S. Army Corps of Engineers*, 574 F. Supp. 2d 1314, 1319 (S.D. Fla. 2008) (Counsel has the duty to "bring to a court's attention, without delay, facts that may raise a question of mootness.").

When a party or attorney has violated a court's order or breached its duty of candor, a court may hold the party in civil contempt. *See, e.g.*, *U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, No. 14-22739-CIV, 2017 WL 2875427, at *3 (S.D. Fla. May 15, 2017) ("Civil contempt is remedial because it serves to enforce compliance with a court order or to compensate an injured party."). Specifically, "[a] civil contempt sanction may serve to either (1) coerce the contemnor to comply with a court order, or (2) compensate a party for losses suffered as a result of the contemnor's act." *Consumer Elecs. Ass'n v. Compras & Buys Magazine, Inc.*, No. 08-

21085-CIV, 2009 WL 10667730, at *7 (S.D. Fla. June 10, 2009).  Here, Defendants have presented sufficient evidence and support for the Court to issue an Order to Show Cause.

## IV.    REQUESTED RELIEF AND CONCLUSION

In light of Plaintiff's conduct described above, Defendants request that the Court (i) issue an Order to Show Cause requesting Plaintiff explain why it should not be held in contempt in light of its actions and omissions explained above; (ii) order Plaintiff to produce all communications between it and the Swiss prosecutor regarding the server; (iii) order Plaintiff to produce all communications between Plaintiff and Federal Express regarding the Court's March 9 order; (iv) enjoin Plaintiff from attempting to obtain any information located on the Helsinge Server that Plaintiff caused to be removed from Helsinge's possession and shipped to Switzerland, either by having the server copied or otherwise; (v) enjoin Plaintiff from undertaking any further attempts to circumvent the Court's prior rulings and otherwise attempt to accomplish the seizure and/or copying of Defendants' documents, electronic or otherwise; (vi) deny Plaintiff's request, as part of its preliminary injunction motion, to seize and copy Defendants' documents without further hearing; (vii) award Defendants' their attorney's fees and costs relating to preparing for and attending the March 14, 2018 hearing on Plaintiff's "Emergency" Motion for Enforcement of Court's Temporary Restraining Order and their attorney's fees and costs relating to this filing and any additional briefing and/or oral argument thereon; (viii) postpone the preliminary injunction hearing and otherwise stay the matter until such time as Helsinge, Inc. regains possession of its Server and has sufficient time for its counsel to examine the contents of the Server, including in preparation for a preliminary injunction hearing, and so that Mr. Ryan can attend the hearing and assist his U.S. counsel to prepare for the hearing; and (ix) grant such other relief as the Court deems just and proper.

Dated:  March 29, 2018                        Respectfully submitted,

                                             **HOLLAND & KNIGHT LLP**
                                             *Attorneys for Defendants Helsinge Inc., Helsinge*
                                             *Ltd., Helsinge Holdings, LLC, Daniel Lutz, and*
                                             *Luis Liendo*
                                             701 Brickell Avenue, Suite 3300
                                             Miami, Florida 33131
                                             Tel: (305) 374-8500
                                             Fax: (305) 789-7799

                                             By: *s/ Alex M. Gonzalez*
                                                     Alex M. Gonzalez
                                                     Florida Bar No. 991200
                                                     alex.gonzalez@hklaw.com
                                                     Israel J. Encinosa
                                                     Florida Bar No. 0046083
                                                     israel.encinosa@hklaw.com
                                                     David Kully (admitted *pro hac vice*)
                                                     david.kully@hklaw.com

                                             and

                                             **MARK MIGDAL & HAYDEN**
                                             *Attorneys for John Ryan*
                                             80 SW 8th Street
                                             Suite 1999
                                             Miami, FL 33130
                                             Telephone: 305-374-0440

                                             By: *s/ Donald J. Hayden*
                                                     Etan Mark, Esq.
                                                     Florida Bar No. 720852
                                                     etan@markmigdal.com
                                                     Donald J. Hayden, Esq.
                                                     Florida Bar No. 097136
                                                     don@markmigdal.com
                                                     Lara O'Donnell Grillo, Esq.
                                                     Florida Bar No. 37735
                                                     lara@markmigdal.com
                                                     eservice@markmigdal.com

**CERTIFICATE OF GOOD FAITH CONFERENCE**

In accordance with Local Rule 7.1(a)(3)(A), the undersigned certifies that Defendants' counsel has conferred with Plaintiff's counsel and all other interested party defendants regarding relief sought in this motion in a good-faith effort to resolve the issues but has been unable to resolve the issues.

*s/Alex M. Gonzalez*

**CERTIFICATE OF SERVICE**

I certify that on March 29, 2018, I filed this document with the Clerk of Court using CM/ECF, which will serve this document on all counsel of record.

*s/Alex M. Gonzalez*