## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
**Miami Division**

| | |
|---|---|
| PDVSA US LITIGATION TRUST<br><br>               Plaintiff,<br><br>      v.<br><br>LUKOIL PAN AMERICAS LLC; LUKOIL PETROLEUM LTD.; COLONIAL OIL INDUSTRIES, INC.; COLONIAL GROUP, INC.; GLENCORE LTD.; GLENCORE INTERNATIONAL A.G.; GLENCORE ENERGY UK LTD.; MASEFIELD A.G.; TRAFIGURA A.G.; TRAFIGURA TRADING LLC; TRAFIGURA BEHEER B.V.; VITOL ENERGY (BERMUDA) LTD.; VITOL S.A.; VITOL, INC.; FRANCISCO MORILLO; LEONARDO BAQUERO; DANIEL LUTZ; LUIS LIENDO; JOHN RYAN; MARIA FERNANDA RODRIGUEZ; HELSINGE HOLDINGS, LLC; HELSINGE, INC.; HELSINGE LTD., SAINT-HÉLIER; WALTROP CONSULTANTS, C.A.; GODELHEIM, INC.; HORNBERG INC.; SOCIETE DOBERAN, S.A.; SOCIETE HEDISSON, S.A.; SOCIETE HELLIN, S.A.; GLENCORE DE VENEZUELA, C.A.; JEHU HOLDING INC.; ANDREW SUMMERS; MAXIMILIANO POVEDA; JOSE LAROCCA; LUIS ALVAREZ; GUSTAVO GABALDON; SERGIO DE LA VEGA; ANTONIO MAARRAOUI; CAMPO ELIAS PAEZ; PAUL ROSADO; BAC FLORIDA BANK; EFG INTERNATIONAL A.G.; BLUE BANK INTERNATIONAL N.V.<br><br>          Defendants | **Case No. 1:18-CV-20818 (DPG)** |

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION
## <u>FOR A PRELIMINARY INJUNCTION</u>

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................iii-viii

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ...................................................................................................2

ARGUMENT ......................................................................................................................3

I.    AN ORDER REQUIRING DEFENDANTS TO PRESERVE EVIDENCE IS
      WARRANTED ..........................................................................................................3

      A.    Given the Defendants' History of Evidence Destruction and Corporate
            Malfeasance, There Is a Significant Risk That Relevant Evidence Will
            Be Lost Without a Preservation Order ...............................................................5

            1.    The Morillo Group Defendants................................................................6

            2.    The Oil Company Conspirators and Individual Trader Conspirators .........8

      B.    The Destruction of Evidence Would Result in Irreparable Harm.........................10

      C.    The Burden of Preserving Evidence Is Minimal.................................................11

      D.    A Preservation Order Would Provide Critical Added Protections .......................11

II.   AN ORDER FREEZING THE MORILLO GROUP DEFENDANTS' ASSETS IS
      WARRANTED ..........................................................................................................12

III.  PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ............13

      A.    Defendants Do Not Contend that Plaintiff Will Not Succeed on its Antitrust,
            Federal Wire Tap Act, Florida Deceptive and Unfair Trade Practices Act, and
            State Common Law Claims ..............................................................................13

      B.    Plaintiff is Likely to Succeed on the Merits of Its CFAA Claim..........................14

            1.    Defendants Accessed PDVSA's Computer System Without
                  Authorization or Exceeded Authorized Access .........................................14

            2.    Defendants Conspired to Access PDVSA's Computer System.................15

            3.    Defendants' Illegal Access Caused Plaintiff Damage or Loss Under
                  the CFAA ..............................................................................................16

      C.    Plaintiff is Likely to Succeed on Its SCA Claim ................................................17

D.     Plaintiff is Likely to Succeed on its RICO Claims ...............................................18

     1.     Plaintiff Suffered a Domestic Injury in its Business or Property...............18

     2.     Defendants Were Associated with a RICO Enterprise .............................20

     3.     Defendants Engage in a Pattern of Racketeering Activity.......................21

     4.     Defendants Engaged in a RICO Conspiracy..............................................23

E.     Plaintiff Is Likely to Succeed on Its Florida RICO Claim....................................23

F.     Plaintiff Is Likely to Succeed on Its Florida Uniform Trade Secrets Act Claim...23

IV.     THE PDVSA US LITIGATION TRUST HAS STANDING...........................................24

A.     Plaintiff Has Article III Standing ..........................................................................24

B.     The Litigation Trust Has Prudential Standing .......................................................27

CONCLUSION...............................................................................................................................30

## TABLE OF AUTHORITIES

Cases

*Aguent LLC v. Stapleton*,
    65 F. Supp. 3d 1339 (M.D. Fla. 2014) .............................................................................. 15, 16

*Akishev v, Kapustin*,
    2016 WL 7165714 (D.N.J. Dec. 8, 2016) .............................................................................. 19

*All Care Nursing Service, Inc. v. High Tech Staffing Services, Inc.*,
    135 F.3d 740 (11th Cir. 1998) .............................................................................................. 23

*Ambrosia Coal & Constr. Co. v. Pages Morales*,
    482 F. 3d 1309 (11th Cir. 2007) ........................................................................................... 21

*Am. Dental Ass'n v. Cigna Corp.*,
    605 F.3d 1283 (11th Cir. 2010) ............................................................................................ 23

*Am. Family Mut. Ins., Co. v. Roth*,
    2009 WL 982788 (N.D. Ill. Feb. 20, 2009) .......................................................................... 11

*Am. Iron & Steel Inst. v. Occupational Safety & Health Admin.*,
    182 F.3d 1261 (11th Cir. 1999) ............................................................................................ 26

*Angrignon v. KLI, Inc.*,
    2009 WL 10666946 (S.D. Fla. Apr. 13, 2009) ....................................................................... 4

*Arkin v. Gracey-Danna, Inc.*,
    2016 WL 3959611 (M.D. Fla. July 22, 2016) ......................................................................... 4

*Bardfield v. Chisholm Properties Circuit Events, LLC*,
    2009 WL 1659641 (N.D. Fla. June 12, 2009) ................................................................. 12-13

*Bascuňan v. Elsaca*,
    874 F.3d 806 (2d Cir 2017) ............................................................................................ 19, 20

*Bashir v. Amtrak*,
    119 F.3d 929 (11th Cir. 1997) .............................................................................................. 12

*Baxley v. Rutland*,
    409 F. Supp. 1249 (M.D. Ala. 1976) .................................................................................... 26

*Boyle v. United States*,
    556 U.S. 938 (2009) .............................................................................................................. 20

*Brown Jordan Int'l, Inc. v. Carmicle*,
    846 F.3d 1167 (11th Cir. 2017) ............................................................................................ 16

iii

*Capricorn Power Co. v. Siemens Westinghouse Power Corp.*,
   220 F.R.D. 429 (W.D. Pa. 2004) ................................................................................. passim

*CBS Broad., Inc. v. Am. Broad. Companies, Inc.*,
   2012 WL 13013027 (C.D. Cal. June 21, 2012) ......................................................... 5

*Church v. City of Huntsville*,
   30 F.3d 1332 (11th Cir. 1994) ................................................................................. 25

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ................................................................................................. 24

*Continental Casualty Co. v. Cura Group, Inc.*,
   2005 WL 8155321 (S.D. Fla. Apr. 6, 2005) ............................................................. 22

*Council on American-Islamic Relations Action Network, Inc. v. Gaubatz*,
   793 F. Supp. 2d 311 (D.D.C. 2011) ......................................................................... 18

*Del Monte Fresh Produce Co. v. Dole Food Co.*,
   136 F. Supp. 2d 1271 (S.D. Fla. 2001) ..................................................................... 23

*Dell Inc. v. BelgiumDomains, LLC*,
   2007 WL 6862341 (S.D. Fla. Nov. 21, 2007) ........................................................... 10

*DynCorp Int'l v. AAR Airlift Grp., Inc.*,
   664 F. App'x. 844 (11th Cir. 2016) .......................................................................... 24

*Estate of Prince v. Aetna Life Ins. Co.*,
   2008 WL 4327049 (M.D. Fla. Sept. 18, 2008) ......................................................... 25

*First Merchants Collection Corp. v. Republic of Argentina*,
   190 F. Supp. 2d 1336 (S.D. Fla. 2002) ..................................................................... 28

*Global Physics Solutions, Inc. v. Benjamin*,
   2017 WL 6948721 (S.D. Fla. June 26, 2017) ..................................................... 15, 16

*GolTV, Inc. v. Fox Sports Latin America Ltd.*,
   2018 WL 1393790 (S.D. Fla. Jan 26, 2018) ............................................................. 19

*Gov't of Bermuda v. Lahey Clinic, Inc.*,
   2018 WL 1243954 (D. Mass. Mar. 8, 2018) ............................................................. 20

*Gracey-Danna, Inc.*,
   2016 WL 3959611 (M.D. Fla. July 22, 2016) ........................................................... 4

*Grubbs v. Bailes*,
   445 F.3d 1275 (10th Cir.2006) ........................................................................... 26, 27

*Haraburda v. Arcelor Mittal USA, Inc.*,
   2011 WL 2600756 (N.D. Ind. June 28, 2011) ........................................................ 5

*Hazell v. Bd. of Elections of State of N.Y.*,
   224 A.D.2d 806, 637 N.Y.S.2d 530 (1996) ........................................................ 29

*Hypro, LLC v. Reser*,
   2004 WL 2905321 (D. Minn. Dec. 10, 2004) ................................................... 5, 6

*In Matter of Complaint of Boston Boat III, L.L.C.*,
   310 F.R.D. 510 (S.D. Fla. 2015) ........................................................................ 12

*In re Canellas*,
   No. 6:11-CV-1247-ORL-28, 2012 WL 868772 (M.D. Fla. Mar. 14, 2012) .......... 26

*In re Fontanella's Estate*,
   33 A.D.2d 29, 304 N.Y.S.2d 829 (1969) ........................................................... 30

*In re Griffin's Will*,
   45 A.D. 102 (App. Div. 1899) ........................................................................... 29

*In re Klosinski*,
   192 Misc. 2d 714 (Sur. 2002) ............................................................................ 29

*In re Morgan Guar. Tr. Co.*,
   28 N.Y.2d 155 (1971) ........................................................................................ 30

*Jove Eng'g, Inc. v. I.R.S.*,
   92 F.3d 1539 (11th Cir. 1996) ........................................................................... 12

*Kaufman v. Nest Seekers, LLC*,
   2006 WL 2807177 (S.D.N.Y. Sept. 26, 2006) ................................................... 18

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*,
   51 F.3d 982 (11th Cir. 1995) ....................................................................... 12, 13

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   134 S.Ct. 1377 (2014) ....................................................................................... 26

*Lighthouse List Co., LLC v. Cross Hatch Ventures Corp.*,
   2013 WL 11977916 (S.D. Fla. Aug. 13, 2013) ............................................. 15, 16

*Linda R.S. v. Richard D.*,
   410 U.S. 614 (1973) .......................................................................................... 24

*Londin v. Londin*,
   100 Misc. 2d 965 (Sup. Ct. 1979) ..................................................................... 29

*Luis Medina & Evatech, Inc. v. Wright*,
No. 8:10-CV-2134-MSS-AEP, 2014 WL 12618175 (M.D. Fla. Dec. 4, 2014) ...................... 27

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ................................................................................................ 25

*Managed Care Sols., Inc. v. Essent Healthcare, Inc.*,
736 F. Supp. 2d 1317 (S.D. Fla. 2010) ................................................................. 12

*Marine Turbo Engineering, Ltd. v. Turbocharger Services Worldwide, LLC*,
2012 WL 13005711 (S.D. Fla. July 23, 2012) ...................................................... 16

*Matter of Estate of O'Brien*,
165 Misc. 2d 459 (Sur. 1995) ............................................................................... 28

*Mcfarland v. BAC Home Loans Servicing, LP*,
No. 1:11-CV-04061-RWS, 2012 WL 2205566 (N.D. Ga. June 14, 2012)............... 27

*Metro. Transp. Auth. v. Bruken Realty Corp.*,
67 N.Y.2d 156 (1986) ........................................................................................... 29

*Mezerhane v. República Bolivariana de Venezuela*,
2013 WL 11322604 (S.D.Fla. Dec. 30, 2013) ....................................................... 28

*Mulhall v. UNITE HERE Local 355*,
618 F.3d 1279 (11th Cir. 2010) ........................................................................... 26

*Nisselson v. Lernout*,
469 F.3d 143 (1st Cir. 2006)....................................................................... 25, 26, 27

*Nkemakolam v. St. John's Military Sch.*,
2012 WL 12873754 (D. Kan. May 24, 2012)....................................................... 5, 6

*Oswalt v. Sedgwick Claims Mgmt. Servs., Inc.*,
No. 3:14-CV-956-WKW, 2015 WL 1565033 (M.D. Ala. Apr. 8, 2015) ................. 26

*Owen v. Cigna*,
188 F. Supp. 3d 790 (E.D. Ill. 2016)..................................................................... 18

*Pascal Pour Elle, Ltd. v. Jin*,
75 F. Supp. 3d 782 (N.D. Ill. 2014) ...................................................................... 18

*People ex rel. Sayville Steamboat Co. v. Kempner*,
49 A.D. 121 (App. Div. 1900) ............................................................................. 29

*Philips Elecs. N. Am. Corp. v. BC Tech.*,
773 F. Supp. 2d 1149 (D. Utah 2011)................................................................. 11

*Procter & Gamble Co. v. Amway Corp.*,
    242 F.3d 539 (5th Cir. 2001) ............................................................ 25

*Pueblo of Laguna v. United States*,
    60 Fed. Cl. 133 (2004) ................................................................ 3, 4, 5

*Ramírez v. Sánchez Ramos*,
    438 F.3d 92 (1st Cir.2006) .............................................................. 25

*Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*,
    119 F.3d 935 (11th Cir. 1997) ......................................................... 23

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ........................................................................ 22

*RJR Nabisco, Inc. v. European Cmty*,
    136 S. Ct. 2090 (2016) .............................................................. 18, 19

*Rosen v. Cascade Int'l, Inc.*,
    21 F.3d 1520 (11th Cir. 1994) ......................................................... 13

*Se. Mech. Servs., Inc. v. Brody*,
    657 F. Supp. 2d 1293 (M.D. Fla. 2009) ........................................... 11

*Sánchez Ramos*,
    438 F.3d 92 (1st Cir.2006) .............................................................. 24

*Tatung Co., Ltd. v. Shu Tze Hsu*,
    217 F. Supp. 3d 1138 (C.D. Cal. 2016) ........................................... 19

*TEC Ser, LLC v. Crabb*,
    2013 WL 12177342 (S.D. Fla. Jan. 14, 2013) ................................. 16

*Tracfone Wireless, Inc. v. King Trading, Inc.*,
    2008 WL 918243 (N.D. Tex. Mar. 13, 2008) .................................... 5

*Treppel v. Biovail Corp.*,
    233 F.R.D. 363 (S.D.N.Y. 2006) ........................................................ 4

*U.S. Bank, N.A. v. Ramos*,
    No. 11 C 2899, 2013 WL 1498996 (N.D. Ill. Apr. 11, 2013) ............ 27

*U.S. v. John*,
    597 F.3d 263 (5th Cir. 2010) ........................................................... 14

*U.S. v. Rodriguez*,
    628 F.3d 1258 (11th Cir. 2010) .................................................. 14, 15

*United States v. Goldin Indus., Inc.*,
   219 F. 3d 1271 (11th Cir. 2000) ......................................................................... 20, 21

*United States v. Turkette*,
   452 U.S. 576 (1981) ............................................................................................ 20

*United States v. Ward*,
   486 F. 3d 1212 (11th Cir. 2007) ......................................................................... 22

*United States v. Watchmaker*,
   761 F. 2d 1459 (11th Cir. 1985) ......................................................................... 22

*United States v. Welch*,
   656 F. 2d 1039 (5th Cir. 1981) ........................................................................... 22

*Vas Aero Servs. LLC v. Arroyo*,
   860 F. Supp. 2d 1349 (S.D. Fla. 2012) ............................................................. 24

*Vista Marketing, LLC v. Burkett*,
   39 F. Supp. 3d 1367 (M.D. Fla. 2014) ............................................................... 17

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*,
   493 U.S. 400, 110 S. Ct. 701, 107 L. Ed. 2d 816 (1990) .................................. 28

*Wildenstein & Co. v. Wallis*,
   79 N.Y.2d 641 (1992) ......................................................................................... 30

*Williams v. Mohawk Indus., Inc.*,
   465 F.3d 1277 (11th Cir. 2006) .......................................................................... 21

*Yocum v. Nationstar Mortg., LLC*,
   No. 2:14-CV-00970-SGC, 2017 WL 3668178 (N.D. Ala. Aug. 24, 2017) ............. 27

*Zaccone v. Ford Motor Co.*,
   2016 WL 2744837 (M.D. Fla. May 11, 2016) ..................................................... 3, 4

Statutes

18 U.S.C. §1030 ....................................................................................................... 14

18 U.S.C. §2510 ....................................................................................................... 17

18 U.S.C. §2701 ....................................................................................................... 17

18 U.S.C. §2707 ....................................................................................................... 17

Fla. Stat. § 688.002 .................................................................................................. 24

Fla. Stat. § 838.16 .................................................................................................... 23

Fla. Stat. § 895.05(6)....................................................................................................................... 13

Plaintiff files this Reply Brief in further support of its Motion for a Preliminary Injunction to preserve documents; freeze the bank accounts of the Morillo Group Defendants; and enjoin the Morillo Group Defendants from transferring or dissipating any assets.  The Court scheduled the April 4 hearing to hear evidence and argument on this Motion.

## **PRELIMINARY STATEMENT**

In an attempt to distract the Court from the simple question at issue in the April 4 hearing, Defendants have filed a literal blizzard of papers.  Those papers address virtually everything except the Motion.  Defendants challenge the merits of five of Plaintiff's claims – but by saying nothing about the other 14 claims, they effectively concede Plaintiff's likelihood of success.  Certain Defendants also attack the validity of the Trust Agreement.

None of Defendants' arguments have merit.  More important at this stage, none of Defendants' arguments affect the jurisdiction of this Court to enter the relief sought to preserve the status quo while litigation proceeds; none address the serious danger of spoliation and asset disposition absent this relief; and none reveal any defect in Plaintiff's well-pleaded complaint.

At best, Defendants' arguments are a premature preview of arguments Defendants might make in due course on motions to dismiss or for summary judgment.

What is really going on is illustrated by what Plaintiff has offered to resolve its preliminary injunction motion, and what Defendants have refused.

Plaintiff offered to dispense with the subpoenas to the Oil Company Defendants and Bank Defendants if the Defendants would simply provide a Declaration that no documents covered by the Court's TRO have been destroyed. (*See* Exhibit A hereto.)  None of the Defendants would provide such a Declaration.

Plaintiff also offered to agree to the Morillo Group Defendants' request to adjourn the April 4, 2018 hearing if those Defendants would simply provide a Declaration stating there has been no

actual or attempted movement, alteration, or destruction of documents covered by the Court's TRO; stating they have implemented a procedure to ensure there would be no spoliation going forward; and setting forth any payments or movements of assets since January 1, 2018. (*See* Exhibit B hereto.) The Morillo Group Defendants have refused to provide such a Declaration.

Finally, on March 31 Plaintiff proposed a stipulated order to all Defendants that would simply have required them to preserve key documents relating to the merits of Plaintiff's claims, to possible violations of the TROs, and to the movement of funds and assets by the Morillo Defendants. Plaintiff offered to postpone the April 4 hearing if Defendants would simply agree to this limited, conventional order. (*See* Exhibit C hereto.) While the Morillo Group Defendants were willing to negotiate a mutually agreeable stipulation, the Oil Company Defendants refused.

## STATEMENT OF FACTS

This case involves a world-wide conspiracy centered in Miami, Florida involving price fixing, the rigging of bids, and the elimination of competition in the purchase and sale of crude oil and hydrocarbon products by PDVSA. At the heart of the conspiracy are Defendants Francisco Morillo and Leonardo Baquero who hacked into the PDVSA computers to obtain sensitive, internal information concerning PDVSA's business and upcoming bid solicitations for purchase or sale of oil and hydrocarbon products. Through this hacking and the payment of massive bribes to corrupt PDVSA employees, Defendants uncovered the bids of competitors thereby guaranteeing that they would win any bid they made. Using this information, Morillo and Baquero also facilitated a conspiracy among the Oil Company Conspirators to rig bids among themselves to the disadvantage of PDVSA. In addition, Morillo and Baquero were able to direct the Bribed PDVSA Employees to change the terms of the upcoming tenders to ensure that one of the Oil Company Conspirators would be the winning bidder.

This conspiracy was a well-oiled machine; the Oil Company Conspirators paid lucrative bribes to Morillo and Baquero who, in turn, funneled the money, through their shell companies, to the Bribed PDVSA Employees.  Illegal payments were also made by Morillo and Baquero to favored traders who handled the corrupt deals at the Oil Company Conspirators.

The Declaration of John Brennan (Dkt No. 12-1) contains numerous examples of communications which support the allegations contained in the Amended Complaint.  These communications establish, for example, the actions of Defendant Liendo who, at Morillo's direction, hacked into the PDVSA computer system to obtain PDVSA confidential information.  The documents also show evidence of payments to corrupt PDVSA officials, particularly Rene Hecker ("Hecker"), (whose former father-in-law also received bribes in his judicial position from Defendants).  These documents also show substantial illegal payments to traders at the Oil Company Conspirators, who engineered the bid-rigging with Morillo and Baquero.  These documents also demonstrate that Defendants routinely used aliases so as to conceal their identity and routinely destroyed communications.  *None* of these facts are challenged by any of the Defendants in their opposition to the Preliminary Injunction motion.

<u>**ARGUMENT**</u>

I.      **AN ORDER REQUIRING DEFENDANTS TO PRESERVE EVIDENCE IS WARRANTED.**

It is well-settled that "Federal courts have the implied or inherent power to issue preservation orders as part of their general authority 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"  *Zaccone v. Ford Motor Co.*, 2016 WL 2744837, at *1 (M.D. Fla. May 11, 2016) (quoting *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 135 (2004)).  Such orders are "common in complex litigations" and "routine in cases involving electronic evidence, such as e-mails and other forms of electronic communication."  *Pueblo*, 60

Fed. Cl. at 136 (citations omitted); *see also Capricorn Power Co. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429, 431 (W.D. Pa. 2004) ("orders directing parties to preserve materials or documents are common" when "evidence is subject to being destroyed or lost").

To determine whether a preservation order is warranted, courts typically employ one of two tests.[1]  *Arkin v. Gracey-Danna, Inc.*, 2016 WL 3959611, at *1 (M.D. Fla. July 22, 2016). Some courts employ a two-prong test, which requires a movant to show:  (1) "that absent a court order, there is significant risk that relevant evidence will be lost or destroyed;" and (2) "that the particular steps to be adopted will be effective, but not overbroad."  *Pueblo*, 60 Fed. Cl. at 138. Other courts employ a three-factor balancing test, which considers:

> (1) the level of concern the court has for the continuing existence and maintenance of the integrity of the evidence in question in the absence of an order directing preservation of the evidence; (2) any irreparable harm likely to result to the party seeking the preservation of evidence absent an order directing preservation; and (3) the capability of an individual, entity, or party to maintain the evidence sought to be preserved, not only as to the evidence's original form, condition or contents, but also the physical, spatial and financial burdens created by ordering evidence preservation.

*Angrignon v. KLI, Inc.*, 2009 WL 10666946, at *1 (S.D. Fla. Apr. 13, 2009) (quoting *Capricorn Power*, 220 F.R.D. at 433-34).

---

[1] While "orders to preserve documents . . . have their origin within the equity power of the courts to grant injunctions," many courts have concluded that "the four prong test typically applied to matters concerning injunctive relief is not a completely appropriate test to utilize when examining the need for a preservation order."  *Capricorn Power*, 220 F.R.D. at 432-33; *see also Pueblo*, 60 Fed. Cl. at 138 n.8; *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 370 (S.D.N.Y. 2006).  As one court has observed, "a document preservation order is no more an injunction than an order requiring a party to identify witnesses or to produce documents in discovery."  *Pueblo*, 60 Fed. Cl. at 138 n.8. Accordingly, many courts, including courts within the Eleventh Circuit, depart from the usual preliminary injunction analysis—jettisoning an inquiry into the movant's likelihood of success on the merits and public interest—and instead focus on issues specifically germane to discovery. *See, e.g.*, *Zaccone*, 2016 WL 2744837, at *1; *Angrignon v. KLI, Inc.*, 2009 WL 10666946, at *2 (S.D. Fla. Apr. 13, 2009); *Capricorn Power*, 220 F.R.D. at 432-33.

Regardless of the test employed, when evidence demonstrates that a party has repeatedly destroyed or concealed relevant information in the past, and where there is no assurance that adequate retention policies are in place, courts routinely issue preservation orders. *See, e.g.*, *CBS Broad., Inc. v. Am. Broad. Companies, Inc.*, 2012 WL 13013027, at *10 (C.D. Cal. June 21, 2012) (granting a preservation order where evidence demonstrated defendant previously destroyed potentially relevant emails); *Nkemakolam v. St. John's Military Sch.*, 2012 WL 12873754, at *1 (D. Kan. May 24, 2012) (granting a preservation order where plaintiff alleged defendants deleted relevant data from cell phones); *Haraburda v. Arcelor Mittal USA, Inc.*, 2011 WL 2600756, at *3 (N.D. Ind. June 28, 2011) (granting a preservation order where defendant deleted emails during a prior investigation and failed to show that it had implemented any steps to preserve potential evidence); *Tracfone Wireless, Inc. v. King Trading, Inc.*, 2008 WL 918243, at *1 (N.D. Tex. Mar. 13, 2008) (granting a preservation order where "destruction of potentially relevant evidence has been confirmed by investigators hired by plaintiff"); *Hypro, LLC v. Reser*, 2004 WL 2905321, at *6 (D. Minn. Dec. 10, 2004) (granting a preservation order where plaintiff alleged that one defendant "previously attempted to destroy computer files regarding his involvement with the other Defendants").  The evidence outlined below, along with the evidence Plaintiff will present at the hearing on April 4, 2018, strongly supports the issuance of a preservation order against all Defendants.

### A.   Given the Defendants' History of Evidence Destruction and Corporate Malfeasance, There Is a Significant Risk That Relevant Evidence Will Be Lost Without a Preservation Order.

To assess the risk of whether evidence may be destroyed in the future, courts often look to evidence of whether a party "has lost or destroyed evidence in the past." *Pueblo*, 60 Fed. Cl. at 138.  If a prior pattern of behavior creates a concern that the continued existence and integrity of

relevant evidence is threatened, a preservation order is warranted.  *See Capricorn Power*, 220 F.R.D. at 434-35; *Nkemakolam*, 2012 WL 12873754, at *1; *Hypro*, 2004 WL 2905321, at *6.

## 1.    The Morillo Group Defendants

The record demonstrates that the Morillo Group Defendants have habitually destroyed evidence related to the conspiracy at the heart of this case.  Plaintiff has introduced numerous communications between Morillo and various Bribed PDVSA Employees discussing the destruction of emails, electronic archives, and financial records.  (Dkt No. 12-16.)   In one exchange, Hecker, a Bribed PDVSA Employee and a central figure in the conspiracy, emailed documents to Morillo and instructed him to "please delete author… and other details…. Delete everything…." (Dkt. No. 12-16, at 2.).  In another, Hecker implored Morillo to "confirm that you received the information and you deleted the origin data," to which Morillo responded, "Deleted tomorrow morning!!!!" (Dkt. No. 12-16 at 4.)  In yet another exchange, Hecker sent wire transfer information to Morillo to facilitate an illicit bribe payment, placing a note in the subject line to "delete these files after please." (Dkt. No. 12-16, at 6.)

Morillo and Hecker were keenly aware that the information they were deleting was incriminating.  In one email exchange discussing "insurance certificates," Hecker told Morillo "Dude delete the file and/or transfer it *so that there is no evidence*." (Dkt. No. 12-16, at 8.) (emphasis added.)  In another exchange, Antonio Vicentelli, another Bribed PDVSA Employee, provided Morillo and Baquero insider information concerning upcoming PDVSA tenders, and he instructed Morillo to "please delete" his messages, and to find out whether his messages are being permanently saved on their computers.  (Dkt. No. 12-13, at 2.)

In addition to their own words, the *actions* of the Morillo Group Defendants confirm their ongoing intent to prevent their scheme from being uncovered.  Morillo, Baquero, and various bribed PDVSA employees communicated with one another using a litany of aliases to conceal

their identities.  (Dkt. No. 12, at para. 83.)  They used private email accounts and encrypted instant messaging services to keep their communications off official channels and to decrease the likelihood that they could be traced or recorded.  (Dkt. Nos. 12-10, 12-11.)  On March 9, 2018, the Morillo Group Defendants caused the removal of a server from the Miami residence of John Ryan ("Ryan"), an accountant for Defendant Helsinge, sending it to Geneva, Switzerland in violation of the Temporary Restraining Order the Court entered on March 5, 2018.  (Dkt. No. 9, relating to the "removing" or "transferring" of records.)  Although the server was sent at the request of Ryan's Swiss attorney to present it to Swiss prosecutors, Ryan and those acting in concert with him made no effort to seek prior approval from this Court or to insure that a copy of the contents of the server was retained in the Court's jurisdiction before the server was sent to Switzerland.[2]

Moreover, the witnesses Plaintiff will call at the April 4, 2018 hearing have first-hand knowledge of the Morillo Group Defendants' propensity to destroy and conceal evidence.  Vanessa Acosta Friedman will testify that on multiple occasions she personally observed Morillo destroy documents and physical evidence to thwart investigations by Venezuelan authorities.   Ms. Friedman will testify that she has observed Morillo destroy cell phones with a hammer, and that in several instances, he bribed a Venezuelan judicial officer to give him advance notice before authorities searched his office, giving him time to shred documents and destroy electronic evidence so that nothing was found.

Taken together, this evidence establishes that the Morillo Group Defendants engaged in a pattern of behavior designed to ensure that evidence of their illicit scheme would not be

---

[2] The rendition of this episode by the Morillo Group Defendants in their motion for contempt (Dkt. No. 191) is a fabrication, as Plaintiff sets forth in its response their motion. See Declaration of Steven Davis dated April 2, 2018 and the Declaration of Guerric Canonica dated April 2, 2018.

discoverable.  Such past behavior creates a significant concern that, without the threat of added consequences arising from a court order, the Morillo Group Defendants will not be deterred from continuing to destroy relevant documentary and physical evidence.

### 2.    The Oil Company Conspirators and Individual Trader Conspirators

The prior conduct of the Oil Company Conspirators and Individual Trader Conspirators also creates a significant risk of spoliation.  Employees of the Oil Company Conspirators participated in the bid rigging scheme orchestrated by the Morillo Group Defendants and took measures to keep their communications concealed.  For example, when communicating with the Morillo Group Defendants about non-public, insider information, senior traders for Trafigura, Glencore, Vitol and other Oil Company Defendants used the aliases like "Tobo," "Tony," "Che," and "Mateo."  (Dkt. No. 12-1 ¶ 30; 12-11.)  Like their co-conspirators they also used encrypted instant messaging programs rather than communicating via official channels.  (Dkt. No. 12-10.)

In addition, each of the Oil Company Conspirators has a history of engaging in fraudulent efforts to cover up corporate malfeasance.  In 2010, for example, the Commodities Futures Trading Commission ("CFTC") sanctioned Vitol with a $6 million civil penalty for "willfully failing to disclose material information" related to a particular transaction.  *In re Vitol Inc. and Vitol Capital Mgmt.*, No. 10-17 (CFTC Sept. 14, 2010).  In 2005, it was revealed that Glencore, Lukoil, Trafigura, and Vitol were implicated in a multi-billion-dollar scheme involving the payment of illegal kickbacks to win lucrative oil contracts in Iraq, and were accused of using cut-out entities to conceal their involvement in what they knew were illicit transactions.  *See* Paul A. Volcker et al., *Manipulation of the Oil-for-Food Programme by the Iraqi Regime*, Indep. Inquiry Comm. into the U.N. Oil-for-Food Programme 3-4, 116, 441-42 (2005).

Several other incidents fit this pattern as well.  In 2005, Glencore was "accused of illegal dealings with rogue states: apartheid South Africa, Communist Russia, Iran, and Iraq under

Saddam Hussein", and of having a "history of busting UN embargoes to profit from corrupt or despotic regimes." (*See* Exhibit D.)  A 2004 CIA Report cited detailed records held by Iraq's state run oil monopoly, State Oil Marketing Organization ("SOMO"), of Glencore's long history of breaking the rules showing that Glencore paid more than $3.2 million in illegal kickbacks to obtain oil in violation of United Nations sanctions.  (*See* Exhibits D and E.)  In 2006, Trafigura pled guilty and paid approximately $20 million in fines and penalties for selling Iraqi oil that it falsely represented to have obtained through the U.N. Oil-for-Food Programme.  (*See* Exhibit F.)

Other activities of Oil Company Conspriators fit this continued pattern of wrongdoing.  In 2008, a branch of Russia's competition watchdog, the Federal Antimonopoly Service ("FAS"), ruled that subsidiaries of Lukoil violated antitrust laws by fixing the price of diesel fuel.  (*See* Exhibit G.)  In 2013, according to a report by the Swiss non-governmental Berne Declaration group, Trafigura and Vitol were profiting from "opaque joint ventures" with the Nigerian national oil company, Nigerian National Petroleum Corporation ("NNPC"), while the nation of Nigeria lost billions of dollars because large volumes of oil were exported for well below market price and the subsidy scheme for imported oil products was "systematically defrauded."  (*See* Exhibit H.)  In 2015, prosecutors in Romania seized some of Lukoil's assets as part of an investigation into money laundering and tax evasion involving an estimated 230 million euros.  (*See* Exhibit I.)  In 2015, Chinese police froze two Trafigura bank accounts as part of an investigation into an alleged $32 million fraud involving illegal deals with a Trafigura employee. (*See* Exhibit J.)  In 2016, the Office of the Attorney General of Switzerland opened criminal proceedings against a former Trafigura senior executive and board member, Mariano Marcondes Ferraz, linked to corruption involving the Brazilian state-run oil company Petrobras.  Ferraz allegedly paid bribes of more than $800,000 to a former Petrobras director via an off shore account.  (*See* Exhibit K.)  In 2017, Lukoil

Romania was investigated by The Directorate for Investigating Organized Crime and Terrorism ("DIICOT") in a case involving allegations of setting up a criminal group, tax evasion and complicity to tax evasion, where Lukoil Romania allegedly backed four criminal groups that operated a fake circuit for the acquisition and delivery of bitumen.  (*See* Exhibit L.)

 With this multitude of examples, there is ample evidence here to raise significant concerns about the continued integrity of evidence that remains in Defendants' possession.

### B.     The Destruction of Evidence Would Result in Irreparable Harm.

 When evidence is at risk of permanent, irreversible destruction, "it becomes a judicial duty to protect a party from likely harm by acting to prevent the loss or destruction of evidence, thereby ensuring that the party may prosecute . . . its case in a court of law."  *Capricorn Power*, 220 F.R.D. at 435.  If a plaintiff can show a high likelihood that electronic business records and data are in danger of being moved beyond the jurisdictional reach of the court and/or permanently erased, the threat of irreparable harm warrants court intervention.  *See Dell Inc. v. BelgiumDomains, LLC*, 2007 WL 6862341, at *5 (S.D. Fla. Nov. 21, 2007) ("Defendants are highly likely to destroy the evidence or move it out of the country" and such "destruction or moving of the evidence will . . . cause further irreparable harm to Plaintiffs").

 The evidence in this case is fragile and irreplaceable.  As noted above, Defendants have gone to great lengths to cover their electronic tracks, and to keep incriminating information out of official channels where it would be more likely to be stored and archived.  Consequently, a large portion of the evidence relevant to this case resides on computers and servers that Defendants control.  If the data on these computers and servers is destroyed or removed, the information will be lost—permanently.   Given Defendants' clear motive to destroy evidence, and their demonstrated history of doing so, a preservation order is necessary to prevent irreparable harm.

### C.     The Burden of Preserving Evidence Is Minimal.

Plaintiff seeks a preservation order requiring all Defendants to retain any records, documents, communications, or notes in their possession that relate in any way to PDVSA.  (Dkt. No. 5-1.)  Multi-billion-dollar transnational energy companies are perfectly capable of retaining and preserving business records without being exposed to prohibitive costs or burdens.  The proposed preservation order would merely require the Oil Company Defendants to refrain from removing, destroying, altering, or alienating potentially relevant evidence—nothing more.  Indeed, Defendants universally acknowledge that they are already subject to such obligations under applicable federal law and ethical rules.  It is thus puzzling how those same Defendants can argue simultaneously that the requested preservation order is overbroad or unduly burdensome.

### D.     A Preservation Order Would Provide Critical Added Protections.

The entry of a preservation order here would not be "redundant" and "unnecessary" as Defendants contend.  (*See, e.g.*, Dkt. No. 161, at 34; Dkt. No. 159, at 4.)  There are at least two practical reasons why the entry of a preservation order is appropriate when, as here, the circumstances warrant it.

*First*, while all parties face the threat of sanctions for destroying evidence, a party that destroys evidence in violation of a court order faces the additional threat of civil contempt.  *See, e.g.*, *Philips Elecs. N. Am. Corp. v. BC Tech.*, 773 F. Supp. 2d 1149, 1194 (D. Utah 2011) (defendant held in contempt for "wiping" its employees' hard drives in violation of a court order); *Am. Family Mut. Ins., Co. v. Roth*, 2009 WL 982788, at *4 (N.D. Ill. Feb. 20, 2009) ("While a court order is a prerequisite to a finding of contempt, it is not a necessary antecedent to a finding of spoliation or to a duty to preserve evidence.").  Importantly, "[t]he standards for contempt and spoliation are different."  *Se. Mech. Servs., Inc. v. Brody*, 657 F. Supp. 2d 1293, 1296 (M.D. Fla. 2009).  A civil contempt inquiry focuses "not on the subjective beliefs or intent of the alleged

contemnors in complying with the order, but whether in fact their conduct complied with the order at issue." *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1545 (11th Cir. 1996). The standard for spoliation, by contrast, requires a showing of bad faith. *In Matter of Complaint of Boston Boat III, L.L.C.*, 310 F.R.D. 510, 515 (S.D. Fla. 2015), citing *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997). Absent a preservation order, a defendant who destroys evidence has a significantly greater chance to escape sanctions because making an adequate showing subjective intent— especially when evidence has been concealed or destroyed—can be exceedingly difficult. *See, e.g.*, *Bashir*, 119 F.3d at 932; *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1328-34 (S.D. Fla. 2010).

*Second*, a preservation order puts the parties on heightened notice of their preservation obligations and eliminates doubt as to what must be preserved. Without a preservation order in place, Defendants would be free to interpret their individual preservation obligations for themselves, and given their demonstrated history of attempted cover-ups, it is likely they would use that liberty to narrow their obligations to the utmost degree. The preservation order that Plaintiff requests here would make it unequivocally clear to all Defendants that they may not, under any circumstance, destroy or alienate any evidence related to PDVSA.

## II.     AN ORDER FREEZING THE MORILLO GROUP DEFENDANTS' ASSETS IS WARRANTED.

"A request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995). Additionally, "[t]he Florida RICO statute . . . specifically authorizes preliminary injunctions . . . and Florida state and federal courts have used this statutory basis to place prejudgment restrictions on a defendant's right to dispose of assets." *Bardfield v. Chisholm Properties Circuit Events, LLC*,

12

2009 WL 1659641, at *2 (N.D. Fla. June 12, 2009) (*citing* Fla. Stat. § 895.05(6)).  Where a plaintiff

meets the traditional four-prong standard for injunctive relief, courts in this Circuit routinely grant

asset freezes.  (Dkt. No. 5, at 17 (collecting cases).)

The Morillo Group Defendants cite *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520 (11th Cir.

1994) for the proposition that, in some circumstances, applicable law "does not allow" a court "to

freeze assets to satisfy a potential money judgment."  (Dkt. No. 161, at 33.)  However, in *Levi

Strauss & Co.*, a case affirming the grant of an asset freeze, the Eleventh Circuit explicitly

distinguished *Rosen*, noting that the ultimate relief at issue there was exclusively "legal, not

equitable."  51 F.3d at 987.  Here, as in *Levi Strauss & Co.* and unlike in *Rosen*, Plaintiff seeks

several equitable remedies in addition to money damages—specifically, a permanent injunction

enjoining access to and use of PDVSA's confidential information, restitution, and disgorgement

of profits.  (Dkt. No. 12, at para. 302.)

Moreover, while *Levi Strauss & Co.* was a Lanham Act case, the circumstances here are

quite similar.  The assets Plaintiff seeks to freeze here, like the assets frozen in *Levi Strauss & Co.*,

include the ill-gotten profits from an unlawful scheme.  The fact that the scheme involves

commercial bribery and anti-competitive bid rigging as opposed to trademark infringement does

not change the fact that asset dissipation would thwart the equitable relief sought in this action.

And here, as evidenced by their elaborate international network of shell companies and history of

moving bribe payments through sham cut-out intermediaries, the Morillo Group Defendants have

proven themselves particularly adept at secreting assets for fraudulent purposes. In such

circumstances, an asset freeze is not only appropriate; it is necessary.

## III.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

### A.    Defendants Do Not Contend that Plaintiff Will Not Succeed on its Antitrust, Federal Wire Tap Act, Florida Deceptive and Unfair Trade Practices Act, and State Common Law Claims.

Defendants effectively concede Plaintiff's likelihood of success on the merits of its Antitrust, Federal Wire Tap Act, Florida Deceptive and Unfair Practices Act, and State common law claims (Counts I-III, IX-XV, and XVIII) because they completely fail to address them.  In any event, based on the factual allegations set forth on the claims addressed throughout this Reply, it is clear that Plaintiff will ultimately succeed on these claims.

Indeed, because Plaintiff's preliminary injunction request needs to be supported by only one viable cause of action (though there are in fact many), Defendants' discussion of the merits is a red herring.  Defendants' concession as to the 14 counts means that the Court need not address the merits arguments in order to grant the motion

**B.      Plaintiff is Likely to Succeed on the Merits of Its CFAA Claim.**

  **1.      <u>Defendants Accessed PDVSA's Computer System Without Authorization or Exceeded Authorized Access.</u>**

Defendants cannot seriously argue that they did not access PDVSA's computer system without authorization or in excess of any purported authority.  Indeed, their argument is frivolous. Defendants clearly violated the Computer Fraud and Abuse Act which imposes civil liability on anyone who:

> (2) intentionally accesses a computer without authorization or exceeds authorized access and thereby obtains
>
>     \*\*\*
>
> (c) information from any protected computer
>
>     \*\*\*
>
> or
>
> (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct further the intended fraud.

18 U.S.C. §1030(a).

An employee exceeds his authorized access and violates the CFAA when he obtains private information for a nonbusiness reason.  *U.S. v. Rodriguez,* 628 F.3d 1258, 1264 (11th Cir. 2010).

This is especially true when the access is used, as here, to commit a crime.  *Id.,* citing *U.S. v. John*, 597 F.3d 263, 271 (5th Cir. 2010).  "An authorized computer user 'has reason to know' that he or she is not authorized to access data or information in furtherance of a criminally fraudulent scheme."  *John*, 597 F.3d at 273.

Obviously, any access by the Bribed PDVSA Employees in furtherance of the scheme to defraud PDVSA violated company policy.  *See Global Physics Solutions, Inc. v. Benjamin*, 2017 WL 6948721, *2 (S.D. Fla. June 26, 2017) ("when an employee is authorized … but accesses that information in a way that violates company policy, the employee has exceeded his or her authorized access," citing *Rodriguez)*; *Aguent LLC v. Stapleton*, 65 F. Supp. 3d 1339, 1346 (M.D. Fla. 2014) ("when the employer had a policy limiting an employee's computer access to that done for business purposes, an employee who accesses a database for an improper purpose exceeded authorized access," citing *Rodriguez)*; *Lighthouse List Co., LLC v. Cross Hatch Ventures Corp.,* 2013 WL 11977916, *6 (S.D. Fla. Aug. 13, 2013) (employee's "accessing, copying or otherwise removing data from [employer's] computer for their own uses," exceeds their authorized access).

Moreover, as to the majority of Defendants, who are <u>not</u> employees of PDVSA, there is no doubt that their access of PDVSA's computer system is not authorized.  *See e.g.* Amended Complaint (Dkt. 12) paras. 111-115 (describing the access Defendants Morillo and Baquero had, as well as the Oil Company Conspirators); Brennan Decl.[3] paras. 21-22 (detailing such access).

### 2.      Defendants Conspired to Access PDVSA's Computer System.

Since Plaintiff has alleged both direct unauthorized access by Defendants and access exceeding the authority of any PDVSA employees, Plaintiff need not plead a conspiracy claim under the CFAA.  Nevertheless, the allegations of the Amended Complaint more than suffice to

---

[3] The March 1, 2018 Declaration of John Brennan is specifically incorporated by reference to the Amended Company at para. 55 and attached to the Complaint as Exhibit A.

state a conspiracy claim under the CFAA. *See e.g.* Amended Complaint (Dkt. 12) paras. 61-63, 86-91, 110-118.  Brennan Declaration paras. 8, 23-33, 35-49.

> **3.    Defendants' Illegal Access Caused Plaintiff Damage or Loss Under the CFAA.**

Under the Eleventh Circuit's decision in *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017), it is indisputable that the detailed investigations in Caracas by Thackray and the Brennan Group in September and October 2017 are exactly the sort of "reasonable costs incurred in connection with such activities as responding to a violation, assessing the damage done, and restoring the affected data, program system, or information to its condition prior to the violation" (*id.*) that constitute a compensable "loss" under the CFAA.  *See* Thackray Decl. paras. 7-14; Brennan Decl. para. 34; Amended Complaint para. 301 (alleging loss exceeded $5000).  Multiple decisions in the District Courts of Florida confirm this. *See Global Physics Solutions, Inc. v. Benjamin,* 2017 WL 6948721, * 3 (S.D. Fla. June 26, 2017) ("'loss' includes the direct costs of responding to the violation"); *Aquent LLC v. Stapleton*, 65 F. Supp. 3d 1339, 1346 (M.D. Fla. 2014) (costs of engaging a computer forensics firm to respond to, analyze, and assess the wrongful taking of information from computers is a loss under the CFAA); *Lighthouse List,* 2013 WL 11977916, *7 (allegations of conducting an investigation are sufficient for CFAA damages); *TEC Ser, LLC v. Crabb,* 2013 WL 12177342, *3 (S.D. Fla. Jan. 14, 2013) (reasonable cost of damage assessment is a loss under the CFAA).

The Eleventh Circuit has specifically held that "engaging in an extensive forensic and physical review of [Plaintiff's] systems to determine the extent of [Defendant's] hacking activity" is a loss, and therefore compensable damages under the CFAA. *Carmicle*, 846 F. 3d at 1174-75; *see Marine Turbo Engineering, Ltd. v. Turbocharger Services Worldwide, LLC,* 2012 WL

13005711, *9 (S.D. Fla. July 23, 2012) (using Plaintiff's computers or directing their use to obtain and transmit information for the unauthorized purpose of conducting the international or interstate business of Defendants caused substantial damages under the CFAA).

###### C.      Plaintiff is Likely to Succeed on Its SCA Claim.

Plaintiff has clearly alleged that Defendants accessed: (1) a facility without authority or exceeded their authority; (2) a facility providing an electronic communication service; and (3) an electronic communication in electronic storage; and will be able to prove these allegations at trial. Under the SCA, a civil action may be brought against anyone who "intentionally accesses without authorization a facility through which an electronic communication service is provided; or intentionally exceeds an authorization to access that facility; and thereby obtains … access to a wire or electronic communication while it is in the electronic storage in such system." 18 U.S.C. §2701(a) & 2707(a).  Section 2510(15) defines "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications."

Here, Plaintiff has alleged that the electronic communications of PDVSA's tender offers and real time bids on PDVSA's computer system were accessed by Defendants without authorization.  Am. Cmplt. paras. 87-88; Brennan Decl. para. 34 (tenders, acceptance of bids, and awards for contracts are made through PDVSA's computer system).  Plaintiff also alleges that Defendants accessed "PDVSA internal communications" on PDVSA's system utilizing Defendants' unauthorized and illegal access.  Am. Cmplt. paras. 111-115.  Other "communications" were actually made by Defendants on PDVSA's system using bogus and fraudulent domain names.  Brennan Decl. para. 34.

Moreover, PDVSA's emails through its system were made and stored on its servers. Thackray Decl. para. 10.  A company's email system falls within the SCA's definition of an "electronic communication service." *Vista Marketing, LLC v. Burkett,* 39 F. Supp. 3d 1367, 1370

(M.D. Fla. 2014); *see Pascal Pour Elle, Ltd. v. Jin,* 75 F. Supp. 3d 782, 788 (N.D. Ill. 2014) (servers connected to the internet which provide the ability to send or receive electronic communications, including email, is a facility under the SCA); *Council on American-Islamic Relations Action Network, Inc. v. Gaubatz,* 793 F. Supp. 2d 311, 322-36 (D.D.C. 2011) (allegation of unauthorized accessing of "emails, computer-generated spreadsheets, and other electronic documents electronically stored on Plaintiff's computers and computer servers, networks and systems" constitutes an SCA violation).

And, contrary to Defendants' argument, Plaintiff need not specify that an electronic communication was in "temporary, intermediate storage" or was stored "for purposes of backup protection" to state an SCA claim. *Owen v. Cigna,* 188 F. Supp. 3d 790, 795 (E.D. Ill. 2016) (*citing Kaufman v. Nest Seekers, LLC*, 2006 WL 2807177 (S.D.N.Y. Sept. 26, 2006). Rather, "simple allegations that electronic communications were stored on a particular server 'were sufficient to make out the element of "electronic storage." *Id.,* citing *Kaufman*. Here Plaintiff has made even more than such "simple allegations." Complaint paras. 94-96, 222; Thackray Decl. paras. 7-8, 10-12; Brennan Decl. para. 23.

### D.     Plaintiff is Likely to Succeed on its RICO Claims.

#### 1.     Plaintiff Suffered a Domestic Injury in its Business or Property.

Defendants claims that Plaintiff has not alleged a "domestic injury" in the United States pursuant to *RJR Nabisco, Inc. v. European Cmty,* 136 S. Ct. 2090, 2106 (2016). Defendants are simply wrong.

In determining whether an injury is domestic or foreign, "[t]he application of this rule in any given case will not always be self-evident, as disputes may arise as to whether a particular injury is 'foreign' or 'domestic.'" *Id.* at 2111. Indeed,

> [e]vidence of a foreign nationality or primary place of business alone is insufficient to categorize an injury as foreign under RICO.  Consideration of factors such as where the injury to a property interest took place, and whether Plaintiffs were working, traveling or doing business in the United States at the time, are relevant.

*GolTV, Inc. v. Fox Sports Latin America Ltd.*, 2018 WL 1393790, *20 (S.D. Fla. Jan 26, 2018)(internal citations omitted).

In *GolTV*, the injury to the Uruguayan plaintiff, Global Sports, was the loss of bids, through bribery and wire fraud, to purchase U.S. and Americas broadcasting rights of major South American soccer tournaments.  The court found that "each of the bids was also an attempt by Global Sports to do business in the United States," and as a result, the complaint alleged domestic injury to Global Sports, despite its location in Uruguay.

Here, PDVSA has suffered, and alleged, a domestic injury to its ability to do business in the United States as a result of comparable acts of bribery, wire fraud, and money laundering.  *See also Akishev v, Kapustin,* 2016 WL 7165714, *8 *(D.N.J. Dec. 8, 2016) (after *RJR Nabisco* "[a] person responsible for a United States-based fraudulent scheme to defraud people overseas should not escape liability [under RICO] simply because the scheme targets foreign citizens over the internet"— those victims are transacting business in the U.S.); *Tatung Co., Ltd. v. Shu Tze Hsu,* 217 F. Supp. 3d 1138, 1156-57 (C.D. Cal. 2016) (U.S. defendant, acting in the U.S., violates civil RICO when those illegal acts cause injury to a foreign plaintiff doing business in the U.S.).  Because PDVSA's business in the United States – both its buying and selling hydrocarbon products out of and into the United States – was harmed by Defendants' illegal acts, Plaintiff has alleged injury to its business in the United States.

Moreover, PDVSA's property in the United States – its U.S. bank accounts – suffered damage due to those same acts.  *See Bascuñan v. Elsaca*, 874 F.3d 806 (2d Cir 2017).  Defendants incorrectly cite *Bascuñan* for the proposition that "the 'direct damages and losses *from PDVSA's*

*U.S. bank accounts*' … is insufficient to satisfy the domestic injury requirement." Def. Br. at 24 (citation omitted). But they are wrong. Indeed, the *Bascuñan* court makes clear that an injury to Plaintiff's property physically located in the United States *is* a domestic injury. *Bascuñan*, 874 F.3d at 812. ("Where the injury is to tangible property, we conclude that, absent some extraordinary circumstances, the injury is domestic if the Plaintiff's property was in the United States when it was stolen or harmed, *even if the plaintiff himself resides abroad*.") (emphasis added), and *Id.* at 820 (theft of foreign plaintiff's bearer shares and money in a N.Y bank account constituted "domestic injury"); *Gov't of Bermuda v. Lahey Clinic, Inc.,* 2018 WL 1243954, *6 (D. Mass. Mar. 8, 2018)(foreign plaintiff's payments made from and/or through its bank accounts in the United States satisfy the "domestic injury" requirement under RICO). In *Bascuñan,* it was *the defendant's* use of U.S. bank accounts to conceal and facilitate its scheme that could not form the basis of a domestic injury. Plaintiff's property in *Bascuñan* "always remained abroad." *Id.*, 874 F.3d at 819. That is not the case here, where, *Plaintiff's* funds were in bank accounts in the United States and were damaged in the United States. Amended Complaint para. 134-35.

## 2.    Defendants Were Associated with a RICO Enterprise.

Defendants contend that they did not engage in a RICO association-in-fact enterprise. However, this case is a classic example of just such a corrupt association. Defendants' association-in-fact enterprise possesses the three "structural features" set forth by the Supreme Court: (1) a "purpose," (2) "relationships among those associated with the enterprise,' and (3) "longevity sufficient to permit these associates to permit these associates to pursue the enterprises purpose." *Boyle v. United States,* 556 U.S. 938, 944, 946 (2009). And such an associated-in-fact enterprise can be either "formal or informal," as long the enterprise's "various associates function as a continuing unit," as the Defendants have in this case. *United States v. Turkette,* 452 U.S. 576, 583 (1981); *see United States v. Goldin Indus., Inc.,* 219 F. 3d 1271, 1275 (11th Cir. 2000) (how "loose

or informal" an enterprise is makes no difference, as long as the enterprise "furnishes a vehicle" for the racketeering activity).   Thus, Defendants' "RICO enterprise need not possess an 'ascertainable structure' distinct from the associations necessary to conduct the matter of racketeering activity." *Goldin Indus.,* 219 F.3d at 1274-75.

The RICO associated-in-fact enterprise described in the Amended Complaint consists of a group of individuals and entities that associated together for the common purpose of engaging in a course of fraudulent conduct that included defrauding PDVSA into entering detrimental contracts to sell and purchase hydrocarbon products.   The Amended Complaint describes the interrelationships between each set of Defendants and their respective roles in the scheme; it shows how the enterprise has functioned as a continuing unit since 2004, with a longevity sufficient to permit its members to pursue the illicit purpose of the enterprise.   These allegations are sufficient to describe the structure of an associated-in-fact enterprise under *Boyle.*   Am. Cmplt. paras. 57-69, 72-91, 94-105, 120-130; Brennan Decl. paras. 8, 23-33, 35-49.

### 3.   <u>Defendants Engage in a Pattern of Racketeering Activity.</u>

Defendants contend that there is no pattern of racketeering activity because Plaintiff failed to allege "<u>as to each defendant</u>, '(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement (3) the content and manner in which these statements misled the [p]laintiffs; and (4) what the defendants gained by the alleged fraud.   Defs'. Br., at 28 (emphasis added) (quoting *Ambrosia Coal & Constr. Co. v. Pages Morales,* 482 F. 3d 1309, 1316-17 (11th Cir. 2007)).

Defendants are simply wrong in arguing that Plaintiff has to particularize a fraud by "each defendant."   As the Eleventh Circuit has made clear:  "This is not required for pleading a civil RICO claim. Plaintiffs must sufficiently plead that *the RICO enterprise* engaged in a pattern of racketeering activity," *not* each individual defendant.   *Williams v. Mohawk Indus., Inc.,* 465 F.3d

21

1277, 1282 (11th Cir. 2006).  For an individual defendant to be held liable for the acts of the enterprise, that defendant must simply "participate in the operation or management of the enterprise itself."  *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993); *see Continental Casualty Co. v. Cura Group, Inc*., 2005 WL 8155321, at *27-28 (S.D. Fla. Apr. 6, 2005).

Here, the enterprise has engaged in a "pattern of racketeering activity."  According to the statute, a "pattern of racketeering activity" consists of "at least two acts of racketeering activity" that occur within ten years of each other.  Wire fraud is an "act of racketeering activity" and Plaintiff has alleged that Defendants committed wire fraud hundreds, if not, thousands of times over the course of their 14-year scheme.  Thirteen of these acts are specifically described in paras. 36-48 of the Brennan Decl. Moreover, it is immaterial whether any particular Defendant physically committed an act of wire fraud, so long as that Defendant knows that the use of wires "w[ould] follow in the ordinary course of business, of where such use c[ould] reasonably be foreseen, even though not actually intended" *United States v. Ward,* 486 F. 3d 1212, 1222 (11th Cir. 2007).  That Defendants reasonably foresaw that their scheme would require use of the wires is obvious based on the allegations of the Amended Complaint.

Defendants also claim that Plaintiff's alleged RICO claim is meritless because it is based on commercial bribery under Florida law, which does not extend extraterritorially.   But the Amended Complaint alleges Defendants violated Florida commercial bribery law *in Florida*.  All of the bribes were orchestrated by Defendants *in Florida*, and *through Florida*.  *See* Amended Complaint paras. 76-77, 119-23, 127-29; Brennan Decl. paras. 20, 26, 38-40, 46-47.  Moreover, Defendants ignore the fact that "'references to state law serve a definitional purpose, to identify generally the kind of activity made illegal by the federal statute' … the state law citation merely serves to indicate 'the type of serious conduct contemplated by the RICO statute as actionable as

22

racketeering activity.'" *United States v. Watchmaker,* 761 F. 2d 1459, 1469 (11th Cir. 1985) (*quoting United States v. Welch,* 656 F. 2d 1039, 1058 (5th Cir. 1981). Thus, Plaintiff's citation to Fla. Stat. § 838.16 (commercial bribery) is entirely proper and justified.

### 4.  **Defendants Engaged in a RICO Conspiracy.**

Defendants' arguments that Plaintiff does not allege a RICO conspiracy claim is belied by the law and allegations recited above. Plaintiff has sufficiently alleged: (1) substantive RICO claims; (2) a conspiracy among all Defendants; and (3) specific commission of at least two of predicate acts by some of the Defendants. That is all that is necessary. "A plaintiff can establish a RICO conspiracy claim in one of the two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997). Indeed, "[a] plaintiff need not offer direct evidence of a RICO agreement; the existence of conspiracy 'may be inferred from the conduct of the participants.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir. 2010) (*quoting BCCI Holdings,* 119 F.3d at 950). Plaintiff already has such evidence.

### E.  **Plaintiff Is Likely to Succeed on Its Florida RICO Claim.**

"Florida's RICO statutes have consistently been interpreted using federal RICO claims cases." *All Care Nursing Service, Inc. v. High Tech Staffing Services, Inc.*, 135 F.3d 740, 745 (11th Cir. 1998). Accordingly, for the reasons supporting Plaintiff's federal RICO claims set forth above, Plaintiff is likely to succeed on its claims under Civil Remedies for Criminal Practices Act ("Florida RICO Act"), and has clear evidence to support such claims.

### F.  **Plaintiff Is Likely to Succeed on Its Florida Uniform Trade Secrets Act Claim.**

Contrary to Defendants' arguments, the elements of a claim for misappropriation of trade secrets under the FUTSA are: "(1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy and (2) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it." *Del Monte Fresh Produce Co. v. Dole Food Co.,* 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001) (citing Fla. Stat. § 688.002). "To qualify as a trade secret, the information that the plaintiff seeks to protect must derive economic value from not being readily ascertainable by others and must be the subject of reasonable efforts to protect its secrecy." *Id.* "[T]he plaintiff need only allege sufficient facts to plausibly show a trade secret was involved and to give the defendant notice of the material it claims constituted a trade secret." *DynCorp Int'l v. AAR Airlift Grp., Inc.,* 664 F. App'x. 844, 848 (11th Cir. 2016) (citations omitted). And databases and "[d]ocuments containing strategic marketing plans and pricing information," such as PDVSA's purchase and sale bidding on its computer system, "have been held to constitute trade secrets under Florida Law. *Vas Aero Servs. LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1359 (S.D. Fla. 2012). Plaintiff sufficiently alleges all of those elements and has clear evidence of such misappropriation.

## IV.     THE PDVSA US LITIGATION TRUST HAS STANDING.

### A.     Plaintiff Has Article III Standing.

Defendants cite a series of cases dealing with Article III standing and argue that the PDVSA US Litigation Trust ("the Trust") lacks such standing and, therefore, that this lack of standing deprives the Court of subject matter jurisdiction. Defendants are wrong. The Amended Complaint clearly alleges Article III standing. Article III standing is established by an allegation of "threatened *or* actual injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 128 (1983), quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 (1973)(emphasis in original). The constitutional prerequisites for Article III standing are satisfied so long as a plaintiff colorably

alleges an actual injury that is both traceable to the defendant's conduct and redressable by a favorable decision. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–62 (1992); *Ramírez v. Sánchez Ramos*, 438 F.3d 92, 97 (1st Cir.2006).

The Amended Complaint[4] is replete with allegations that demonstrate that the Litigation Trust on behalf of PDVSA has constitutional standing under Article III. *See, e.g.* Am. Cmplt., at para. 9 (the PDVSA US Litigation Trust was formed for the specific purpose, among other things, of pursuing recovery for Defendants' misconduct on behalf of PDVSA); para. 139 ("PDVSA was injured because it was forced to sell oil products to the Oil Company Conspirators and Helsinge, and to do so at artificially depressed, below-market prices"); *Id*. at para. 154 ("PDVSA was injured because it was forced to purchase light crude products at artificially raised, above-market, prices from the Oil Company Conspirators and Helsinge"); para. 194 ("PDVSA was directly injured because it was forced to buy light crude products for artificially increased, above-market prices").[5]

At most Defendants' claims concerning alleged infirmities in the Trust amount to challenges to the Trust's prudential standing,[6] and, in fact, many of Defendants' claims are more

---

[4] A complaint setting forth cognizable allegations of standing must be viewed in the light most favorable to the plaintiff. *Estate of Prince v. Aetna Life Ins. Co.*, No. 8:08CV468-T-24TGW, 2008 WL 4327049, at *3–4 (M.D. Fla. Sept. 18, 2008). And it is enough for a complaint to set out derivative standing by a trust or trustee, even where a complaint "fails to allege the existence of a trust document creating the Trust [or] naming [plaintiff] as Trustee, or [alleging] that the Trust has any legal interest in the benefits at issue" as long as the complaint alleges facts showing derivative standing. *Id*.

[5] Plaintiff here meets the Eleventh Circuit standard for how much evidence a plaintiff must present when the defendant has challenged Article III standing on a preliminary injunction. *See Church v. City of Huntsville*, 30 F.3d 1332, 1336 (11th Cir. 1994). "[T]he plaintiffs' standing should be judged on the sufficiency of the allegations of the complaint, with any preliminary hearing evidence favorable to the plaintiffs on standing treated as additional allegations of the complaint." *Id.*

[6] *Nisselson v. Lernout*, 469 F.3d 143, 151 (1st Cir. 2006)( the "determination of ***who may maintain an otherwise cognizable claim*** turns on a question of prudential standing, not one of Article III

accurately analyzed as challenges to the Trust's capacity to litigate this action. *See e.g. Baxley v. Rutland*, 409 F. Supp. 1249, 1256–57 (M.D. Ala. 1976)(The parties have failed to distinguish the concepts of real party in interest, capacity to sue and be sued, and standing to sue), citing Wright-Miller, Federal Practice & Procedure Civil, Vol. 6, s 1542, Vol. 13, s 3531 (3d ed.)(" . . . courts and attorneys frequently have confused the requirements for standing with those used in connection with real-party-in-interest or capacity principles").

Prudential standing is not jurisdictional. *Am. Iron & Steel Inst.*, 182 F.3d at 1274 (prudential standing is flexible and not jurisdictional in nature); *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1290 (11th Cir. 2010) (prudential standing raises "non-constitutional, non-jurisdictional, policy-based limitations on the availability of judicial review"); *Nisselson*, 469 F.3d at 151 ("[The] ban on hypothetical jurisdiction extends only to issues involving Article III jurisdiction and, hence, Article III standing. There is no counterpart rule that demands the resolution of objections based on prudential concerns before other issues can be adjudicated").

The issue raised by Defendants, *i.e.* whether a trust or trustee has the authority or has been properly authorized to bring a claim, is a classic issue of prudential standing. *See, e.g., In re Canellas*, No. 6:11-CV-1247-ORL-28, 2012 WL 868772, at *3 (M.D. Fla. Mar. 14, 2012) (authority of bankruptcy trustee to challenge assignment of debtor's mortgage to a trust is a matter of prudential standing rather than constitutional standing); *Oswalt v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 3:14-CV-956-WKW, 2015 WL 1565033, at *5 (M.D. Ala. Apr. 8, 2015), *aff'd*,

---

standing)(emphasis added); *Am. Iron & Steel Inst. v. Occupational Safety & Health Admin.*, 182 F.3d 1261, 1274 (11th Cir. 1999); *Grubbs v. Bailes,* 445 F.3d 1275, 1281 (10th Cir.2006); *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 (5th Cir. 2001)(the question of prudential standing is "whether the plaintiff 'is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers"), abrogated on other grounds *by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377 (2014).

624 F. App'x 740 (11th Cir. 2015)(analyzing as a prudential standing issue whether the debtor had authority to pursue his claims directly or whether a bankruptcy trustee has that authority); *Yocum v. Nationstar Mortg., LLC*, No. 2:14-CV-00970-SGC, 2017 WL 3668178, at *9 (N.D. Ala. Aug. 24, 2017), report and recommendation adopted, No. 2:14-CV-00970-MHH, 2017 WL 4918162 (N.D. Ala. Oct. 31, 2017) (examining whether trustee had prudential standing to bring claims); *U.S. Bank, N.A. v. Ramos,* No. 11 C 2899, 2013 WL 1498996, at *4 (N.D. Ill. Apr. 11, 2013) (where assignment of mortgage was allegedly not validly executed and was therefore defective, there was an issue of the plaintiff's prudential standing); but *see Mcfarland v. BAC Home Loans Servicing, LP*, No. 1:11-CV-04061-RWS, 2012 WL 2205566, at *2 (N.D. Ga. June 14, 2012) (defective assignment raised an issue regarding the real party in interest).

Issues of prudential standing are no bar to proceeding with the merits of the case. *Nisselson v. Lernout*, 469 F.3d 143, 151 (1st Cir. 2006) ("[The] ban on hypothetical jurisdiction extends only to issues involving Article III jurisdiction and, hence, Article III standing. There is no counterpart rule that demands the resolution of objections based on prudential concerns before other issues can be adjudicated."); *Grubbs v. Bailes,* 445 F.3d 1275, 1281 (10th Cir.2006) (holding that Article III standing issues must be resolved but "[q]uestions relating to *prudential* standing ... may be pretermitted in favor of a straightforward disposition on the merits"). Furthermore, prudential standing issues may be cured after the litigation has commenced. *Luis Medina & Evatech, Inc. v. Wright*, No. 8:10-CV-2134-MSS-AEP, 2014 WL 12618175, at *2 (M.D. Fla. Dec. 4, 2014) (plaintiff cured prudential standing issue prior to judgment by executing a valid assignment).

### B.    The Litigation Trust Has Prudential Standing.

The Morillo Group Defendants' challenges to the validity of the Trust under Venezuelan law are barred by the Act of State doctrine.   Defendants challenge the very power of Venezuelan officials, including the Prosecutor General, the highest ranking legal official in the Venezuelan

government, to enter into the Trust.   Defendants claim, for instance, that the Trust is void because the Venezuelan officials who approved it did not, in turn, obtain approval of Venezuela's National Assembly, and that Venezuela's Constitution requires such approvals.   But these acts fall under the Act of State doctrine.

Under that doctrine courts in the United States must deem valid all acts of foreign sovereigns taken within their own jurisdictions.   *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990).   And U.S. courts are barred from interfering with the sovereign acts of foreign states commenced within their own borders.   *Mezerhane v. República Bolivariana de Venezuela*, 2013 WL 11322604, *7 (S.D.Fla. Dec. 30, 2013)(declining under the Act of State Doctrine to interfere with Venezuela's seizure of property from a citizen); *First Merchants Collection Corp. v. Republic of Argentina*, 190 F. Supp. 2d 1336, 1339 (S.D. Fla. 2002).

There is no dispute that all of the acts by Venezuelan officials in creating the Trust occurred within the borders of Venezuela and that the acts were public acts of Venezuelan officials. Therefore, Defendants have no power to challenge these acts in this Court and this Court must deem the acts valid.   In any event, the Morillo Defendants' rendition of Venezuelan law is incorrect.   Due to the Holy Week Holiday in Venezuela, Plaintiff has been unable to obtain an expert declaration for filing today. However, Plaintiff will soon show the lack of merit in Defendants' arguments.

The Morillo Defendants' contention that the Trust is invalid due to a lack of notarized acknowledgments ignores that New York courts routinely uphold the validity of legal instruments, including trusts, that have no acknowledgments where there are other indicia of reliability.   *Matter of Estate of O'Brien*, 165 Misc. 2d 459, 460, (Sur. 1995), *decree aff'd*, 233 A.D.2d 561, (1996)(lack of acknowledgement was not fatal to creation of valid trust); *Estate of O'Brien*, 165 Misc.2d 459,

(Surr, Ct., Rensselaer County 1995) (same); *In re Klosinski*, 192 Misc. 2d 714, 727 (Sur. 2002); *Hazell v. Bd. of Elections of State of N.Y.*, 224 A.D.2d 806, 806, 637 N.Y.S.2d 530, 530 (1996). Furthermore, any defects in an acknowledgement can be cured or ignored if there is sufficient evidence of compliance with the statute. *See Klosinski*, 192 Misc. 2d at 727; *Londin v. Londin*, 100 Misc. 2d 965, 966 (Sup. Ct. 1979); *People ex rel. Sayville Steamboat Co. v. Kempner*, 49 A.D. 121, 122 (App. Div. 1900).

In this case, the Trust document contains the official stamp of "visaciones" or "visto bueno" (approval) of the Procurator General of Venezuela on each page and next to each of the Venezuelan signatories. With this filing, Plaintiff is also providing the sworn acknowledgments of two of the trustees. New York's EPTL § 7-1.17(a) requires an acknowledgement from only one trustee.

Similarly, the Morillo Group Defendants contend that the Rule against Perpetuities ("RAP") has been violated because the trust beneficiary is PDVSA, which is defined in the trust document as PDVSA "with all affiliates, subsidiaries, *successors* and assigns." (emphasis added.) The Morillo Defendants cite cases in which future beneficial interests are invalidated when they include "heirs and successors", which is not this case.

Where the parties to an agreement are corporations and when no measuring life or lives are stated in the instruments, the permissible period is 21 years. *Metro. Transp. Auth. v. Bruken Realty Corp.*, 67 N.Y.2d 156, 161 (1986), citing Rohan, Practice Commentary, McKinney's Cons.Laws of N.Y., Book 17B, EPTL 9–1.1, 1986 Cum.Ann.Pocket Part, p. 213; *see also*, *In re Griffin's Will*, 45 A.D. 102, 102 (App. Div. 1899), *rev'd on other grounds,* 167 N.Y. 71 (1901).

But the fact that an instrument does not have built into it a 21-year limitation does not render a trust invalid. Under the savings clause of EPTL 9-1.3(d) and New York's "salvage doctrine" the language of the trust can be construed as vesting within the time period allowed by

the Rule or a court would invalidate only the interest in the trust that violates the Rule. E.g. *In re Morgan Guar. Tr. Co.*, 28 N.Y.2d 155, 160 (1971)  to preserve the intent of the settlor, the court construed the language of the trust to terminate 21 years after the death of the last beneficiary in being at the time of the trust's creation); *Wildenstein & Co. v. Wallis*, 79 N.Y.2d 641, 654 (1992) (Assuming the applicability of the rule . . . the provision would be saved from invalidity by the presumption of validity in EPTL 9–1.3(d)).

In addition, when commercial interests and commercial parties are involved in the creation and as beneficiaries of trusts, as they are here, New York courts find that the Rule is inapplicable when there are significant commercial interests at stake.  *E.g. Wildenstein & Co. v. Wallis*, 79 N.Y.2d 641, 651 (1992).

Defendants assert that the Litigation Trust is void for the additional reason that the property used to fund the trust is "too broad and speculative to be accurately identified."  First, the rule identified by Defendants concerns "personal property" trusts, not litigation trusts of claims belonging to a foreign sovereign.  *See e.g. In re Fontanella's Estate*, 33 A.D.2d 29, 30, 304 N.Y.S.2d 829, 831 (1969).  Second, Defendants fail to cite a single case that requires that claims be brought in court by an entity before the entity can assign those claims to a litigation trust.  There are no such cases.  Finally, Defendants' objection is purely theoretical.  Defendants do not dispute, nor could they, that the claims that have been brought in this litigation fall well within the scope of the Litigation Trust.  Thus the trust corpus is sufficiently defined to encompass the claims that are actually before the Court.

## **CONCLUSION**

For all the foregoing reasons, Plaintiff respectfully requests that its motion for Preliminary Injunction be granted.

Dated:  April 2, 2018

**BOIES SCHILLER FLEXNER LLP**

By:   */s/ Steven W. Davis*_____
     Steven W. Davis (Bar No.: 347442)
     Stephen N. Zack (Bar No.: 145215)
     Bank of America Tower
     100 Southeast 2nd St., Suite 2800
     Miami, FL 33131
     Tel:  (305) 539-8400
     Fax:  (305) 539-1307

     David Boies
     Helen M. Maher
     333 Main Street
     Armonk, New York 10504
     Tel: (914) 749-8200
     Fax: (914) 749-8300

     Nicholas A. Gravante, Jr.
     David A. Barrett
     575 Lexington Avenue
     New York, New York 10022
     Tel: (212) 446-2300
     Fax: (212) 446-2350

     George F. Carpinello
     30 S. Pearl Street, 11th Floor
     Albany, New York 12207
     Tel:  (518) 434-0600
     Fax:  (518) 434-0665

     *Attorneys for Plaintiff*