Exhibit G

# EXHIBIT A

**JPMorgan's Notice of Filing Exhibits to Notice of Removal**

***Leonardo Baquero & Ysbeth Baquero v. J.P.Morgan Chase Bank, N.A.***

**U.S. District Court for the Southern District of Florida**
**Case No.  10-cv-23212 - Seitz**

FILED

AUG - 4 2010

HARVEY RUVIN
CLERK

IN THE CIRCUIT COURT OF THE 11th JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 1 0 - 4 2 5 0 1 CA 0 6

LEONARDO BAQUERO AND YSBETH
BAQUERO,

     Plaintiffs,

vs.

J.P.MORGAN CHASE BANK, N.A.,

     Defendant.

_____/

## COMPLAINT

Plaintiffs, Leonardo Baquero ("Leonardo") and Ysbeth Baquero ("Ysbeth")(collectively, the "Baqueros" or "Plaintiffs"), through counsel, files this complaint for a money judgment against Defendant J.P. Morgan Chase Bank, N.A. ("J.P. Morgan Chase" or "Defendant"). In support hereof, the Baquero's, by their undersigned counsel, respectfully state as follows:

### Background

1.     This is an action by the Baquero's against J.P. Morgan Chase based upon its failure to properly protect the Baquero's checking account balance maintained in a checking account that the Baquero's maintained with J.P. Morgan Chase from 2002 through to the date of the filing of this Complaint. During this time period, J.P. Morgan Chase failed to notify the Baquero's of unusual and unlawful activity pertaining to their

1

checking account and J.P. Morgan Chase, and the theft of the entire account balance thereto affected by an unknown third party.

2.     The amount in controversy exceeds $15,000.

3.     Plaintiffs, the Baqueros, are citizens of the Bolivarian Republic of Venezuela ("Venezuela"). The Baqueros reside in the City of Caracas, Venezuela. The Baqueros also maintain certain property interests in the State of Florida including, among other things, US banking accounts and an office address located at 1221 Brickell Avenue, Suite 935, Miami, Florida 33131-3224.

4.     For purposes of this litigation, the Baqueros submit themselves to the jurisdiction of this Court due to, among other things, their ownership of property in the State of Florida, and the breach of contract and tortuous conduct committed by Chase against them in the State of Florida.

5.     Defendant, Chase, is a Delaware corporation and global banking conglomerate. Chase maintains business operations in the State of Florida including, among other things, retail banking operations in which the Baqueros maintained a retail checking account.

## The Retail Checking Account

6.     Commencing in May 2002, the Baqueros opened a joint, non-interest bearing, retail checking account (the "Chemical Account") with Chemical Bank New Jersey, N.A. ("Chemical Bank"). The Chemical Account was opened while Mr. Baquero was at Exxon headquarter at Deer Park, New Jersey, assigned by Corpoven S.A. an affiliate of Petroleos of Venezuela.

2

7.     After completing his work assignment at Exxon, Mr. Baquero repatriated to Caracas, Venezuela, and asked Chemical Bank to change the Baquero's address (for the Chemical Account) to their Caracas address, where they wanted their banking statements to be sent.

8.     The Baqueros thereupon commenced receiving their Chemical Account banking statements from Chemical Bank at their Caracas address.

9.     In 1996, Chemical Bank merged with the Chase Manhattan Corporation ("Chase"). In 2000, the combined Chemical Bank/Chase entity merged with J.P. Morgan & Co ("J.P. Morgan"), becoming J.P. Morgan Chase, the Defendant herein.

10.    As the result of these mergers, the Baquero's checking account at Chase (i.e., defined above as the Chemical Account), was transferred from Chemical to Chase, and thereafter to J.P. Morgan Chase, the successor in interest.

11.    During the Summer of 2007, Mr. Baquero learned that J.P. Morgan Chase maintained a retail banking branch in Boca Raton, Florida (the "Boca Branch"). Accordingly, during a trip to Florida in September 2007, Mr. Baquero visited the Boca Branch and met with Mr. Jeremy Steinlauf, a J.P. Morgan Chase banking associate ("Steinlauf") on either September 20 or 21, 2007. At this meeting, Mr. Baquero requested that Mr. Steinlauf transfer the Chase Account from New Jersey (where it was opened) to the Boca Branch.

12.    Mr. Steinlauf obliged, and the Chase Account was thereafter transferred to the Boca Branch in September 2007. While meeting with Mr. Steinlauf on September 20 or 21, 2007, Mr. Baquero also notified J.P. Morgan Chase of the Baquero's address

3

change, requesting that all future communications from J.P. Morgan Chase be sent to the Baquero's office address at 1221 Brickell Avenue, Suite 935, Miami, Florida 33131(the "Brickell Address").

13.    At this meeting, Mr. Steinlauf issued the Baqueros a debit card for the Chase Account, which was to be mailed to the Baqueros.  Notwithstanding, the Baqueros never received and/or used the aforesaid debit card.

14.    Lastly, at this meeting, Mr. Steinlauf confirmed for Mr. Baquero that the cash balance in the Chase Account exceeded $35,000 (US).

15.    Following the meeting, the Baqueros did not regularly receive statements for the Chase Account at the Brickell Address or elsewhere. Indeed, the last statement (for the Chase Account) that the Baqueros recall having received was in 2003, which showed an account balance of approximately $30,000 (US).

16.    In February 2008, the Baqueros traveled to Florida for business and social purposes.  As they had not received any account statements for the Chase Account following Mr. Baquero's meeting with Mr. Steinlauf in September 2007, Mr. Baquero again visited the Boca Branch on Friday, February 22, 2008.  On this date, he met with Ms. Lori L. Austin, an Assistant Vice President.

17.    Ms. Austin informed Mr. Baquero that the Chase Account had been closed. She could not explain why or the whereabouts of the monies that the account once held. Instead, Ms. Austin promised to investigate the matter and report her findings to Mr. Baquero.  At this meeting, Mr. Baquero told Ms. Austin that neither he nor Ms. Baquero had withdrawn any funds from the Chase Account following their September 2007 meeting

4

with Mr. Steinlauf . What's more, Mr. Baquero explained to Ms. Austin that, during his meeting with Mr. Steinlauf, the latter confirmed that the Chase Account maintained a balance exceeding $35,000 (US). Mr. Baquero also informed Ms. Austin that neither he nor Mrs. Baquero had authorized anyone else to access the account on their behalf.

18.    Upon their return to Venezuela, on Tuesday, February 26, 2008, Mr. Baquero emailed Ms. Austin to confirm the substance of their February 22 meeting.    In his email, Mr. Baquero requested an explanation (from Ms. Austin) regarding closure of the Chase Account and the unauthorized withdrawal of all funds there from.    A copy of Mr. Baquero's email is annexed as Exhibit 1.

19.    On Friday, February 29, 2008, Mr. Baquero sent Ms. Austin a second email requesting an explanation regarding depletion and closure of the Chase Account.    A copy of this second email is annexed as Exhibit 2.

20.    Ms. Austin did not respond to either of Mr. Baquero's emails.

21.    Consequently, in April 2010, the Baqueros met with and hired the undersigned to assist them to investigate the depletion and closure of the Chase Account.

22.    Commencing in April 2010, the undersigned began the first of numerous communications (orally and in writing) with Mr. Brendan Surmik, the Financial Center Manager for the Boca Branch.    During this dialogue, Mr. Surmik requested that Mr. Baquero issue a power of attorney, so that Mr. Surmik could provide the undersigned with information regarding the Chase Account.

23.    In compliance, the undersigned drafted a standard Florida power of attorney, which Mr. Baquero signed (in Venezuela) and forwarded to the undersigned.    The

5

aforesaid power of attorney was presented to and rejected by J.P. Morgan Chase, because the power of attorney was not an approved J.P. Morgan Chase form.

24.     Consequently, in May 2010, the undersigned obtained from J.P. Morgan Chase an approved (form) power of attorney, which Mr. Baquero executed in Venezuela. This new form power of attorney was then presented to and rejected by Chase, because Mr. Baquero did not execute it at either (a) the US Consulate in Venezuela; or (b) before a licensed, notary public in the State of Florida.

25.     On yet another visit to Florida in June 2010, Mr. Baquero again executed the Chase (form) power of attorney (i.e., this time in Florida and before a licensed Florida notary public). This new power of attorney was, at first, rejected by J.P. Morgan Chase, but later accepted. At last, the undersigned was permitted to speak to Mr. Surmik about the unauthorized depletion and closure of the Chase Account.

26.     Indeed, on June 4, 2010, Mr. Surmik explained to the undersigned what had happened. He explained that, between the dates of September 7, 2007 and September 20, 2007, all of the funds in the Chase Account (i.e., $35,507.96) were withdrawn through a series of approximately 50 debit card purchases and/or ATM withdrawals made on an unauthorized basis by an unknown person in Curacao.   These purchases and/or withdrawals were made without the knowledge or consent of the Baqueros.

27.     What's more, these purchases and/or withdrawals were made while the Baqueros were visiting the United States, and some were even made on the exact day that the Baqueros were meeting with Mr. Steinlauf in the Boca Branch.

6

28.     Notwithstanding, J.P. Morgan Chase (through Mr. Steinlauf, Ms. Austin and others), never once notified the Baqueros of any unusual and/or fraudulent activity concerning the Chase Account and of the illegal withdrawal of funds there from.

29.     Shockingly, Mr. Steinlauf never mentioned these unauthorized purchases/withdrawals to the Baqueros, even though many of them occurred in the days immediately preceding, and even on the day of, the Baqueros' meeting with him in the Boca Branch in September 2007.[1]  Furthermore, Ms. Austin failed to inform the Baqueros of such activity when they met with her to discuss the Chase Account (at the Boca Branch) in February 2008 (i.e., approximately 5 months later).

30.     Indeed, based upon the foregoing, this much is known – none of the aforesaid unauthorized, illicit and illegal activities were detected by J.P. Morgan Chase and its anti-fraud department/mechanisms.     Alternatively, if detection had occurred, the existence of the foregoing was never timely communicated or brought to the attention of the Baqueros.

---

1. The Baqueros met with Mr. Steinlauf on either September 20 or 21, 2007.  Notwithstanding, on September 18, 2007, ten (10) debit card purchases in Curacao totaling approximately $5,631 were made from Chase Account on September 18, 2007; four ATM withdrawals of $500 each in Curacao were made on September 19, 2007; and three (3) debit card purchases in Curacao totaling approximately $2,400 were made on September 20, 2007).

31.    The Baqueros did not learn of such activity until June 4, 2010, when the undersigned (based on the aforesaid dialogue with Mr. Surmik), was first informed of same. Evidence of the unauthorized, illicit and illegal withdrawals is contained in an account statement (of the Chase Account) covering the period September 7, 2007 through October 3, 2007, which the undersigned obtained from Mr. Surmik on June 4, 2010 (the "September 07 Account Statement"). A copy of the September 07 Account Statement is annexed as Exhibit 3.

32.    The September 07 Account Statement shows ATM purchases and/or withdrawals made in Curacao from the Chase Account totaled $32,340.32, and service fees and charges relating thereto totaled $3,171.13. None of these debit withdrawals, debit purchases or corresponding service fees and charges were made by or incurred under the supervision, authorization or direction of the Baqueros.

33.    The foregoing debit withdrawals, debit purchases or corresponding service fees and charges were made fraudulently and illegally, and went undetected by J.P. Morgan Chase, or if detected, were not timely made known to the Baqueros.

### Count I – Negligence

34.    The Baqueros repeat and reallege the allegations contained in Paragraphs 1 through 33 of this Complaint.

8

35.  At all times material to the Complaint, the Baqueros maintained the Chase Account and understood there to be a balance of at least $35,000 (US) therein.

36.  Despite the Baqueros' numerous requests that J.P. Morgan Chase change the Baqueros' address for the receipt (by them) of account statements for the Chase Account, upon information and belief, J.P. Morgan Chase did not change the Baqueros' address in J.P. Morgan Chase's records.

37.  As a consequence, the Baqueros did not receive any account statements for the Chase Account from and after 2003.

38.  Furthermore, J.P. Morgan Chase failed to notify the Baqueros of the unusual account activity occurring in Curacao with regards to their account in September 2007, in which all funds maintained in the Chase Account were stolen by an unauthorized user of a debit card linked to the Chase Account.

39.  Furthermore, without notifying the Baqueros of the aforesaid fraudulent and illegal activity, J.P. Morgan Chase failed to question and/or cease such activity, which should have been easily detected by J.P. Morgan Chase officials and its antifraud unit through the use of J.P. Morgan Chase's advanced anti-fraud software, technology and procedures. Furthermore, J.P. Morgan Chase failed to question whether such activity was known to or permitted by the Baqueros.

40.  Separately, when the Baqueros met with J.P. Morgan Chase officials in 2007 and 2008 – after the Chase Account had been looted, J.P. Morgan Chase failed to inform

the Baqueros of what had happened, and refused to offer the Baqueros any information regarding the status, depletion and closing of the Chase Account.

41.    Indeed, it was not until May 2010 that the Baqueros learned that the monies in the Chase Account had been stolen, and this information thereto was not made available to the Baqueros until they hired an attorney. What's more, the undersigned (i.e., the Baquero's attorney), only learned of the illegal and illicit activity surrounding the Chase Account after tens of separate inquiries, and despite a complete "run-around" regarding execution of the power of attorney.2

42.    J.P. Morgan Chase owed the Baqueros a duty to act with due care and in a commercially reasonable manner to safeguard the monies maintained by the Baqueros in the Chase Account.

43.    Furthermore, J.P. Morgan Chase owed the Baqueros a standard of care to safeguard the monies in the Chase Account as practiced by prudent banks using commercially reasonable methods, practices and procedures.

44.    J.P. Morgan Chase breached these duties and responsibilities by, among other things, failing to safeguard the monies held in the Chase Account, and using commercially reasonable and appropriate standards of care to safeguard the monies maintained in the Chase Account.

---

2   The undersigned also learned from extensive research that Suntrust Bank is also investigating fraudulent activity regarding the Chase Account, as it now appears that several unauthorized deposits and withdrawals were made into and from the Chase Account by parties unrelated to the Baqueros. The Baqueros know nothing about these deposits/withdrawals, but have learned that

45. J.P. Morgan Chase was negligent in carrying out its duties and responsibilities to the Baqueros by, among other things, failing to inquire whether the Baqueros authorized the Curacao Withdrawals, and failing to notify the Baqueros of the Curacao Withdrawals, and failing to stop the Curacao Withdrawals pending confirmation of the Baqueros regarding their consent to same.

46. Due to the negligence of J.P. Morgan Chase, the entire balance of the Chase Account was misappropriated.

47. J.P. Morgan Chase failed to properly explain the events giving rise to the theft after the fact as described above, further compounding its negligence.

48. J.P. Morgan Chase's failure to notify the Baqueros of the foregoing fraudulent and its failure to use commercially reasonable and appropriate standards of care to safeguard the Baqueros' deposits in the Chase Account were the direct and proximate cause of the Baqueros' losses.

49. As the result of J.P. Morgan Chase's negligence, the Baqueros have suffered losses in excess of $35,000 (US), for which recovery is sought herein as well as reasonable attorneys' fees, costs and expenses.

50. The Baqueros are entitled to the return of the balance of the Chase Account, plus interest and costs, including reasonable attorneys' fees, incurred by their having to investigate the theft of their monies, and having to commence and prosecute this lawsuit.

51. All conditions precedent, if any, to commencement of this action have been performed or have occurred.

11

WHEREFORE, Plaintiff, the Baqueros, respectfully requests that this Court (i) enter judgment on their behalf and against Defendant, J.P. Morgan Chase, in the amount of at least $35,000 as of September 2007, plus interest, and costs including reasonable attorneys' fees; and (ii) grant the Baqueros such other and further relief as this Court seems deems just and proper.

## Count II – The Electronic Funds Transfer Act

52.     The Baqueros repeat and reallege the allegations contained in Paragraphs 1 through 33 and 35 through 51 of this Complaint.

53.     The Electronic Funds Transfer Act is codified at Electronic Fund Transfer Act (15 U.S.C. 1693 et seq.)(the "EFTA").

54.     The EFTA protects consumers from, among other things, loss or theft of funds transferred though debit cards and/or automated teller machines. The intent of the EFTA is, among other things, to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems. The primary objective of this title, however, is the protection of individual consumer rights.

55.     In Section 205.6, the EFTA provides, among other things, limits on the liability of a consumer (such as the Baqueros) for the loss or theft of funds from their bank account resulting from unauthorized electronic fund transfers or a series of related unauthorized transfers provided if a depository bank fails to promptly notify the consumer of the theft of funds from the consumer's account through use of debit cards or ATMs.

56.     Indeed, under Section 205.6(b)(1), if the consumer notifies the financial institution within two (2) business days after learning of the loss or theft of the access

12

device, the consumer's liability shall not exceed the lesser of $50 or the amount of unauthorized transfers that occur before notice to the financial institution.

57.      Under Section 205.6(b)(2), if the consumer fails to notify the financial institution within 2 business days after learning of the loss or theft of the access device, the consumer's liability shall not exceed the lesser of $500 or the sum of: (i) $50 or the amount of unauthorized transfers that occur within the two business days, whichever is less; and (ii) the amount of unauthorized transfers that occur after the close of two business days and before notice to the institution, provided the institution establishes that these transfers would not have occurred had the consumer notified the institution within that two-day period.

58.      What's more, under Section 205.6(b)(3), a consumer must report an unauthorized electronic fund transfer that appears on a periodic statement within 60 days of the financial institution's transmittal of the statement to avoid liability for subsequent transfers. If the consumer fails to do so, the consumer's liability shall not exceed the amount of the unauthorized transfers that occur after the close of the 60 days and before notice to the institution, and that the institution establishes would not have occurred had the consumer notified the institution within the 60-day period.

59.      Under Section 205.6(b)(4), if the consumer's delay in notifying the financial institution was due to extenuating circumstances, the institution shall extend the times specified above to a reasonable period.

60.      Furthermore, under Section 205.6(b)(5), notice to a financial institution is given when a consumer takes steps reasonably necessary to provide the institution with

13

the pertinent information, whether or not a particular employee or agent of the institution actually receives the information. Under the EFTA, the consumer may notify the institution in person, by telephone, or in writing. Written notice is considered given at the time the consumer mails the notice or delivers it for transmission to the institution by any other usual means. Notice may be considered constructively given when the institution becomes aware of circumstances leading to the reasonable belief that an unauthorized transfer to or from the consumer's account has been or may be made.

61.     Under Section 205.11(c), a financial institution shall investigate promptly and, except as otherwise provided in this paragraph (c), shall determine whether an error occurred within 10 business days of receiving a notice of error. The financial institution shall report the results to the consumer within 3 business days after completing its investigation. The financial institution is likewise obligated to correct an error within 1 business day after determining that an error occurred.

62.     Under Section 205.11(c), if the financial institution is unable to complete its investigation within 10 business days, the institution may take up to 45 days from receipt of a notice of error to investigate and determine whether an error occurred, provided the institution does the following: (i) Provisionally credits the consumer's account in the amount of the alleged error (including interest where applicable) within 10 business days of receiving the error notice. If the financial institution has a reasonable basis for believing that an unauthorized electronic fund transfer has occurred and the institution has satisfied the requirements of § 205.6(a), the institution may withhold a maximum of $50 from the amount credited; (ii)  the financial institution must inform the consumer, within two business

14

days after the provisional crediting, of the amount and date of the provisional crediting and give the consumer full use of the funds during the investigation; (iii) the financial institution must correct the error, if any, within one business day after determining that an error occurred; and (iv) the financial institution must report the results to the consumer within 3 business days after completing its investigation (including, if applicable, notice that a provisional credit has been made final).

63.    Under the terms of the EFTA, the Baqueros learned of the unauthorized transfers from the Chase Account on June 4, 2010, when the undersigned (based on the aforesaid dialogue with Mr. Surmik), was first informed of same. Evidence of the unauthorized, illicit and illegal withdrawals is contained in an account statement (of the Chase Account) covering the period September 7, 2007 through October 3, 2007, which the undersigned obtained from Mr. Surmik on June 4, 2010 (see Exhibit 3, the September 07 Account Statement).

64.    Upon learning of the aforesaid unauthorized withdrawals, the undersigned (on behalf of the Baqueros), provided prompt written and oral notice to J.P. Morgan Chase that such withdrawals were fraudulent, illegal and unauthorized.

65.    Notwithstanding, J.P. Morgan Chase failed to timely and properly investigate the unauthorized withdrawals as required by the EFTA. Likewise, J.P. Morgan Chase has failed to provide a report of the findings of its investigation to the Baqueros regarding same in violation of the EFTA.

66.    J.P. Morgan Chase is in violation of the EFTA for failure to investigate and report its findings to the Baqueros of the theft of funds from the Chase Account.

67.     Furthermore, J.P. Morgan Chase is in violation of the EFTA for failing to limit the Baqueros losses there from, and failing to credit the full amount of the unauthorized withdrawals from the Chase Account, net of any de minimus deductibles for which the Baqueros are liable under the Act.

68.     All conditions precedent, if any, to commencement of this action have been performed or have occurred.

WHEREFORE, Plaintiff, the Baqueros, respectfully requests that this Court (i) enter judgment on their behalf and against Defendant, J.P. Morgan Chase, in the amount of at least $35,000 as of September 2007, plus interest, and costs including reasonable attorneys' fees; and (ii) grant the Baqueros such other and further relief as this Court seems deems just and proper.

### Count III – The Florida Uniform Commercial Code

69.     The Baqueros repeat and reallege the allegations contained in Paragraphs 1 through 33, 35 through 51 and 53 through 68 of this Complaint.

70.     Under Florida Statute 674.102(2), the liability of a bank for action or nonaction with respect to an item handled by it for purposes of presentment, payment, or collection is governed by the law of the place where the bank is located. In the case of action or nonaction by or at a branch or separate office of a bank, its liability is governed by the law of the place where the branch or separate office is located.

71.     In this case, the Boca Branch is located in Florida, so Florida law governs the subject matter complained of herein.

16

72.     Florida's legislature has adopted the Uniform Commercial Code (Florida Statutes 674.101. et seq.).

73.     Under Florida Statute 674.103 (1), the effect of the provisions of such chapter may be varied by agreement, but the parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith, failure to exercise ordinary care or limit the measure of damages for such lack or failure.

74.     Under Florida Statute 674.103(5), the measure of damages for failure to exercise ordinary care in handling an item is the amount of the item, reduced by an amount that could not have been realized by the exercise of ordinary care. If there is bad faith, it includes any other damages the party suffered as a proximate consequence.

75.     In the matter at hand, J.P. Morgan Chase failed to exercise ordinary care in protecting and safeguarding the monies maintained by the Baqueros in the Chase Account. Among other things, J.P. Morgan Chase failed to change the Baqueros address for the mailing of Chase Account statements, which the Baqueros never timely and regularly received from and after 2003.   Furthermore, J.P. Morgan Chase failed to use reasonable steps and ordinary care to detect the illegal, unauthorized and fraudulent purchases and/or withdrawals from the Chase Account in September 2007, despite the fact that the Baqueros had never even withdrawn a dime from the Chase Account from inception, and all funds were misappropriated there from in September 2007, while the Baqueros were in the United Sates and meeting with Chase officials.

76.     Furthermore, J.P. Morgan Chase never once questioned such purchases and/or withdrawals, failed to investigate same, failed to report the results of its investigation

17

to the Baqueros regarding same, and have engaged in a massive cover-up of the fraud affected against the Baqueros.

77. J.P Morgan Chase's personnel, as well as it anti-fraud software, technology, processes and procedures, failed to detect the illegal and unauthorized withdrawals from the Chase Account. Furthermore, J.P. Morgan Chase employees failed to adequately protect the Baquero's deposit in the Chase Account. Once the Baqueros were finally notified of the theft of funds from the Chase Account, J.P. Morgan Chase has failed to report to the Baqueros the whereabouts of their missing funds and how the theft occurred.

78. What's more, J.P. Morgan Chase failed to credit the stolen funds to the Chase Account, to make the Baqueros whole from the losses that they had suffered due to depletion of funds from their account.

79. J.P. Morgan Chase is liable to the Baqueros for the sum of at least $35,000 plus interest from September 2007 for the loss of the entire Chase Account balance, plus reasonable attorneys' fees. The actions of J.P. Morgan Chase and its employees were the direct and proximate cause of such losses and are in violation of the Florida Uniform Commercial Code for failure to exercise ordinary care in regards to honoring illegal and unauthorized purchases and/or withdrawals from the Chase Account and failing to timely and properly notify the Baqueros of same.

80. All conditions precedent, if any, to commencement of this action have been performed or have occurred.

18

WHEREFORE, Plaintiff, the Baqueros, respectfully requests that this Court (i) enter judgment on their behalf and against Defendant, J.P. Morgan Chase, in the amount of at least $35,000 as of [date] 2007, plus interest, and costs including a reasonable attorneys' fees; and (ii) grant the Baqueros such other and further relief as this Court seems deems just and proper.

Dated: Miami, Florida
      August 4, 2010

                    Respectfully submitted,

                    *Brenta. Fri*

                    Brent A. Friedman
                    Fla. Bar No. 968838
                    BRENT A. FRIEDMAN, P.A.
                    Attorneys for Leonardo and Ysbeth Baquero
                    One Biscayne Tower, 21st Floor
                    2 South Biscayne Boulevard
                    Miami, Florida 33131
                    T:  305.579.5111
                    C:  305.562.6800
                    F:  305.579.5112
                    E: brent@brentafriedman.com

**Exhibit "1"**

recomendó acudir a instancias legales ya que el observa que la oficina de Boca Raton no va a atender por vías simples el problema.

Te adjunto dos e-mails que le he enviado a Lori y a continuación te copio los detalles de mi cuenta, así como los del Sr. Steinlauf y la Srta Austin.

Chase Accounts:
Select checking with interest    600-1224382
Select High Yields Savings       600-1237425

Lori Austin
Assistant Vice President
Lori.l.austin@chase.com
Phone 561 620 2305

Jeremy Steinlauf
Licensed Personal Bank
No mail address on the presentation card.
Phone 561 620 2302.

Office Location
IL1-4120
225 NE Mizner Blvd, Suite 150
Boca Raton, Fl 33432.

---

**From:** Leonardo Baquero <leonardo.baquero@mac.com>
**Date:** Tue, 26 Feb 2008 18:12:09 -0430
**To:** <Lori.L.Austin@Chase.com>
**Cc:** Yanira Marcano <yanira.marcano@wtrpc.com>, Jack Ryan <Jack.Ryan@wtrpc.com>
**Conversation:** Accounts status.
**Subject:** Accounts status.

Dear Lori,

Thanks for the courtesy and interest you showed in our meeting the last Friday, Feb. 22nd, regarding the status of my checking and saving accounts I hold in the Chase Bank.

Just for reminder, I stopped in on August 7, 2007, and had an interview with Mr. Jeremy Steinlauf, on that occasion we checked on the balance of the account, I applied for a new Chase Select bank card, we defined the address where to send the cards as shown below and finally Mr. Jeremy kindly offered to me a Platinum Master Card, which copy of the form I still have with me.

Address: 1221 Brickell Av Suite 921 Mi Fl 33131

As per our meeting the last Friday, my accounts are closed without my knowledge or any authorization, and I left your office with the promise of an investigation to determine what happened between those events.

As I am now, out of the United States, I appreciate if you could answer me trough this way.

Thanks again for your attention, best regards

**Exhibit "2"**

Leonardo Baquero
Account Numbers:
Checking 600-1224382
Savings   600-1237425.

**From:** Leonardo Baquero <leonardo.baquero@mac.com>
**Date:** Fri, 29 Feb 2008 13:32:14 -0430
**To:** "Lori.L.Austin@Chase.com" <Lori.L.Austin@Chase.com>
**Conversation:** Chase accounts Status
**Subject:** Chase accounts Status

Dear Lori,

I am writing to follow up on our conversation on Friday Feb, 22nd. 2008
and my e-mail on Tuesday Feb. 26, 2008. Just for reminder, my accounts in
the Chase has been closed without explanation and you were on the way to
conduct a research of the reason to do it, and where is the balance of the
accounts.

I do appreciate if you could maintained me informed regarding this issue.

Best regards,
Leonardo Baquero
Acc. 600-1224382 and 600 1237425.

**Exhibit "3"**



**CHASE** ◉

JPMorgan Chase Bank, N.A.
Northeast Market
P O Box 260180
Baton Rouge, LA 70826-0180

September 07, 2007 through October 03, 2007

Primary Account: 000006001224382

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| WebSite: | www.Chase.com |
| Service Center: | **1-800-935-9935** |
| Hearing Impaired: | 1-800-242-7383 |
| Para Espanol: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |

ılıfılıılllıılıllılllıllılılıllı.lıllıllılllılllıllıılllıl
00154545 DDA 602 LA 27707 - YNN T 1 000000000 03 0000
LEONARDO BAQUERO
OR YSBETH BAQUERO
1221 BRICKELL AVE STE 935
MIAMI FL 33131-3224



AS A RESULT OF FEDERAL RESERVE BANK CHANGES, YOUR DEPOSIT ACCOUNT
AGREEMENT IS BEING AMENDED. THE FOLLOWING ROUTING TRANSIT NUMBERS
WILL NOW BE CONSIDERED LOCAL. IN LOUISIANA: 0640, 0641, 0642,
2640, 2641, 2642. IN ARIZONA: 1210, 1211, 1212, 1213, 3210,
3211, 3212, 3213.
AS A RESULT OF FEDERAL RESERVE BANK CHANGES, YOUR DEPOSIT ACCOUNT
AGREEMENT IS BEING AMENDED. THE FOLLOWING ROUTING TRANSIT NUMBERS
WILL BE CONSIDERED LOCAL ON 10/19/2007:
IN COLORADO AND UTAH: 0920, 0921, 0929, 2920, 2921, 2929.

## CONSOLIDATED BALANCE SUMMARY

ASSETS

| | ENDING BALANCE PRIOR PERIOD | ENDING BALANCE THIS PERIOD |
|---|---|---|
| Checking | | |
| Chase Premier Checking 000006001224382 | $35,507.96 | $0.00 |
| Total | $35,507.96 | $0.00 |
| Savings | | |
| Chase Premier Savings 000006001237425 | 66.73 | 0.00 |
| Total | $66.73 | $0.00 |
| | | |
| TOTAL ASSETS | $35,574.69 | $0.00 |

All Summary Balances shown are as of October 3, 2007 unless otherwise stated. For details of your retirement
accounts, credit accounts or securities accounts, you will receive separate statements. Balance summary information
for annuities is provided by the issuing insurance companies and believed to be reliable without guarantee of its
completeness or accuracy.



September 07, 2007 through October 03, 2007
Primary Account: 000006001224382

# BALANCING YOUR CHECKBOOK

Use the following worksheet to reconcile your checking account.

Mark in your checkbook all additions and subtractions reported on your statement.

1. **Write in the ending balance shown on this statement**  $_____

2. **List all deposits and other additions**
   (such as transfers) not shown on this statement and add the total to the ending balance.

Total all deposits and additions  + $_____

3. **List all withdrawals and other subtractions**
   (such as outstanding checks and banking card transactions) not shown on this statement. Then subtract this total from the ending balance.

| Check Number | Date | Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Total all withdrawals and subtractions  - $_____

4. **This total should match the current balance in your checkbook**  = $_____

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Telephone or write the bank (Consumer phone # and address on front of statement) and non-consumers contact Customer Service if you think your statement is wrong, or if you need more information about a transaction listed on the statement or receipt. We must hear from you no later than 60 days after we sent you the first statement on which the problem or error appeared. Be prepared to give us the following information:

* Your name and account number
* The dollar amount of the suspected error
* A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, we must hear from you no later than 30 days after the statement was made available to you. For more complete details, see the account rules and regulations that govern your account.

## BILLING RIGHTS SUMMARY

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR BILL:** If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet of paper at the address listed on the front of your statement as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:
* Your name and account number
* The dollar amount of the suspected error
* Describe the error and explain, if you can, why you believe there is an error; if you need more information, describe the item you are unsure of
* Your signature and the date

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question.

**SPECIAL RULE FOR CREDIT CARD PURCHASES:** If you have a problem with the quality of goods or services that you purchased with a credit card and you have tried in good faith to correct the problem with the merchant, you may not have to pay the remaining amount due on the goods or services. You have this protection only when the purchase price was more than $50 and the purchase was made in your home state or within 100 miles of your mailing address. (If we own or operate the merchant, or if we mailed you the advertisement for the property or services, all purchases are covered regardless of amount or location of purchase.)

  Member FDIC



**CHASE** ◆

September 07, 2007 through October 03, 2007
Primary Account: **000006001224382**



---

## CHASE PREMIER CHECKING

LEONARDO BAQUERO                                          Account Number: 000006001224382
OR YSBETH BAQUERO

---

## CHECKING SUMMARY

|  | AMOUNT |
| --- | --- |
| Beginning Balance | $35,507.96 |
| Deposits and Additions | 3.49 |
| ATM & Debit Card Withdrawals | - 32,340.32 |
| Other Withdrawals, Fees & Charges | - 3,171.13 |
| Ending Balance | $0.00 |
| Annual Percentage Yield Earned This Period | 0.40% |
| Interest Paid This Period | $3.49 |
| Interest Paid Year-to-Date | $19.40 |

---

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
| --- | --- | --- |
| 10/01 | Interest Payment | $3.49 |
| | Total Deposits and Additions | $3.49 |

---

## ATM & DEBIT CARD WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
| --- | --- | --- |
| 09/07 | Non-Chase ATM Withdraw 09/07 Cur Hilton Hotel & Casi Curacao Card 7322 | $500.00 |
| 09/07 | Non-Chase ATM Withdraw 09/07 Cur Hilton Hotel & Casi Curacao Card 7322 | 500.00 |
| 09/10 | Card Purchase          09/07 Mi Popchi Suku NV Willemstad Card 7322 | 543.60 |
| 09/10 | Non-Chase ATM Withdraw 09/08 Cur Holiday Hotel & Cas Curacao Card 7322 | 500.00 |
| 09/10 | Non-Chase ATM Withdraw 09/08 Cur Holiday Hotel & Cas Curacao Card 7322 | 500.00 |
| 09/10 | Non-Chase ATM Withdraw 09/09 Cur Breedestraat/Klipst Curacao Card 7322 | 500.00 |
| 09/10 | Non-Chase ATM Withdraw 09/09 Cur Breedestraat/Klipst Curacao Card 7322 | 500.00 |
| 09/10 | Non-Chase ATM Withdraw 09/10 Cur Breedestraat/Klipst Curacao Card 7322 | 500.00 |
| 09/10 | Non-Chase ATM Withdraw 09/10 Cur Breedestraat/Klipst Curacao Card 7322 | 500.00 |
| 09/11 | Card Purchase          09/08 New Amsterdam Store Curacao Card 7322 | 825.00 |
| 09/11 | Card Purchase          09/07 Tommy Hilfiger Curacao Card 7322 | 537.08 |
| 09/11 | Non-Chase ATM Withdraw 09/11 Cur Vanddis Marie Pampo Curacao Card 7322 | 500.00 |
| 09/11 | Non-Chase ATM Withdraw 09/11 Cur Vanddis Marie Pampo Curacao Card 7322 | 500.00 |
| 09/11 | Card Purchase          09/07 Tommy Hilfiger Curacao Card 7322 | 463.58 |
| 09/11 | Card Purchase          09/07 Casa Janina Curacao Card 7322 | 252.51 |
| 09/12 | Non-Chase ATM Withdraw 09/12 Cur Vanddis Marie Pampo Curacao Card 7322 | 500.00 |
| 09/12 | Non-Chase ATM Withdraw 09/12 Cur Vanddis Marie Pampo Curacao Card 7322 | 500.00 |
| 09/13 | Card Purchase          09/11 Changes Curacao Card 7322 | 592.63 |

CHASE ○

September 07, 2007 through October 03, 2007
Primary Account: 000005001224382

## ATM & DEBIT CARD WITHDRAWALS (continued)

| DATE | DESCRIPTION | | AMOUNT |
|------|-------------|---|--------|
| 09/13 | Card Purchase | 09/11 Curacao Dolphin Academy Curacao Card 7322 | 589.50 |
| 09/13 | Non-Chase ATM Withdraw 09/13 Cur Breedestraat/Klipst Curacao Card 7322 | | 500.00 |
| 09/13 | Non-Chase ATM Withdraw 09/13 Cur Breedestraat/Klipst Curacao Card 7322 | | 500.00 |
| 09/13 | Card Purchase | 09/11 Botica Brion Curacao Card 7322 | 92.15 |
| 09/14 | Card Purchase | 09/13 Jewels Curacao Card 7322 | 3,270.00 |
| 09/14 | Card Purchase | 09/13 Score Willemstad Card 7322 | 1,273.00 |
| 09/14 | Non-Chase ATM Withdraw 09/14 Cur Breedestraat 27 Pu Curacao Card 7322 | | 500.00 |
| 09/14 | Non-Chase ATM Withdraw 09/14 Cur Breedestraat 27 Pu Curacao Card 7322 | | 500.00 |
| 09/17 | Card Purchase | 09/14 The Tiger Group N.V. Willemstad Card 7322 | 3,800.00 |
| 09/17 | Non-Chase ATM Withdraw 09/15 Cur Breedestraat/Klipst Curacao Card 7322 | | 500.00 |
| 09/17 | Non-Chase ATM Withdraw 09/15 Cur Breedestraat/Klipst Curacao Card 7322 | | 500.00 |
| 09/17 | Non-Chase ATM Withdraw 09/16 Cur Breedestraat/Klipst Curacao Card 7322 | | 500.00 |
| 09/17 | Non-Chase ATM Withdraw 09/16 Cur Breedestraat/Klipst Curacao Card 7322 | | 500.00 |
| 09/17 | Card Purchase | 09/13 Denny's Curacao Card 7322 | 53.48 |
| 09/17 | Card Purchase | 09/14 Italcambio N.V. Willemstad Card 7322 | 48.25 |
| 09/18 | Card Purchase | 09/16 Scooby's Rentals Scoote Curacao Card 7322 | 3,800.00 |
| 09/18 | Card Purchase | 09/16 Thrifty Car Rental Curacao Card 7322 | 786.21 |
| 09/18 | Card Purchase | 09/18 Cafe Britt Curacao Curacao Card 7322 | 389.18 |
| 09/18 | Card Purchase | 09/14 Cafe Britt Curacao Curacao Card 7322 | 207.30 |
| 09/18 | Card Purchase | 09/14 Howard Johnson Curacao Card 7322 | 170.00 |
| 09/18 | Card Purchase | 09/15 Cafe Britt Curacao Curacao Card 7322 | 142.56 |
| 09/18 | Card Purchase | 09/17 Howard Johnson Plaza Ho Curacao Card 7322 | 85.00 |
| 09/18 | Card Purchase | 09/14 Denny's Curacao Card 7322 | 26.48 |
| 09/18 | Card Purchase | 09/15 Pizza Hut Salinja Curacao Card 7322 | 24.45 |
| 09/18 | Card Purchase | 09/18 Coffee Factory NV Curacao Card 7322 | 22.00 |
| 09/19 | Non-Chase ATM Withdraw 09/18 Cur Airport Branch Curacao Card 7322 | | 500.00 |
| 09/19 | Non-Chase ATM Withdraw 09/18 Cur Airport Branch Curacao Card 7322 | | 500.00 |
| 09/19 | Non-Chase ATM Withdraw 09/19 Cur Breedestraat/Klipst Curacao Card 7322 | | 500.00 |
| 09/19 | Non-Chase ATM Withdraw 09/19 Cur Breedestraat/Klipst Curacao Card 7322 | | 500.00 |
| 09/20 | Card Purchase | 09/18 Sea Aquarium Hotel Mmgm Curacao Card 7322 | 1,116.34 |
| 09/20 | Card Purchase | 09/18 Sea Aquarium Hotel Mmgm Curacao Card 7322 | 1,000.04 |
| 09/20 | Card Purchase | 09/19 Howard Johnson Plaza Ho Curacao Card 7322 | 270.00 |
| | **Total ATM & Debit Card Withdrawals** | | **$32,340.32** |

## OTHER WITHDRAWALS, FEES & CHARGES

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 09/10 | Non-Chase ATM Fee-With | $3.00 |
| 09/10 | Non-Chase ATM Fee-With | 3.00 |
| 09/10 | Non-Chase ATM Fee-With | 3.00 |
| 09/10 | Non-Chase ATM Fee-With | 3.00 |
| 09/11 | Non-Chase ATM Fee-With | 3.00 |
| 09/11 | Non-Chase ATM Fee-With | 3.00 |
| 09/12 | Non-Chase ATM Fee-With | 3.00 |
| 09/12 | Non-Chase ATM Fee-With | 3.00 |
| 09/13 | Non-Chase ATM Fee-With | 3.00 |
| 09/13 | Non-Chase ATM Fee-With | 3.00 |

Case 1:10-cv-20218-PAS   Document 47B-1 Entered on FLSD Docket 06/05/2010 Page 30 of 31



**CHASE ○**

September 07, 2007 through October 03, 2007
Primary Account: 000006001224382

## OTHER WITHDRAWALS, FEES & CHARGES  *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|-------:|
| 09/14 | Non-Chase ATM Fee-With | 3.00 |
| 09/14 | Non-Chase ATM Fee-With | 3.00 |
| 09/17 | Non-Chase ATM Fee-With | 3.00 |
| 09/17 | Non-Chase ATM Fee-With | 3.00 |
| 09/17 | Non-Chase ATM Fee-With | 3.00 |
| 09/17 | Non-Chase ATM Fee-With | 3.00 |
| 09/19 | Non-Chase ATM Fee-With | 3.00 |
| 09/19 | Non-Chase ATM Fee-With | 3.00 |
| 09/19 | Non-Chase ATM Fee-With | 3.00 |
| 09/19 | Non-Chase ATM Fee-With | 3.00 |
| 09/28 | Check / Withdrawal | 3,107.64 |
| 10/03 | Check / Withdrawal | 3.49 |
| | Total Other Withdrawals, Fees & Charges | $3,171.13 |



 **CHASE ○**

September 07, 2007 through October 03, 2007
Primary Account: **000006001224382**

## CHASE PREMIER SAVINGS

LEONARDO BAQUERO                                              Account Number: 000006001237425
OR YSBETH BAQUERO

## SAVINGS SUMMARY

|                                           | AMOUNT   |
|-------------------------------------------|----------|
| Beginning Balance                         | $86.73   |
| Deposits and Additions                    | 0.06     |
| Other Withdrawals, Fees & Charges         | - 86.79  |
| Ending Balance                            | $0.00    |
| Annual Percentage Yield Earned This Period | 1.57%    |
| Interest Paid This Period                 | $0.06    |
| Interest Paid Year-to-Date                | $393.63  |

## TRANSACTION DETAIL

| DATE  | DESCRIPTION         | AMOUNT  | BALANCE |
|-------|---------------------|---------|---------|
|       | Beginning Balance   |         | $86.73  |
| 09/28 | Check / Withdrawal  | - 86.73 | 0.00    |
| 10/01 | Interest Payment    | 0.06    | 0.06    |
| 10/03 | Check / Withdrawal  | - 0.06  | 0.00    |
|       | Ending Balance      |         | $0.00   |