UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

PDVSA U.S. LITIGATION TRUST,

        Plaintiff,

v.

LUKOIL PAN AMERICAS LLC; LUKOIL PETROLEUM LTD.; COLONIAL OIL INDUSTRIES, INC.; COLONIAL GROUP, INC.; GLENCORE LTD.; GLENCORE INTERNATIONAL A.G.; GLENCORE ENERGY UK LTD.; MASEFIELD A.G.; TRAFIGURA A.G.; TRAFIGURA TRADING LLC; TRAFIGURA BEHEER B.V.; VITOL ENERGY (BERMUDA) LTD.; VITOL S.A.; VITOL, INC.; FRANCISCO MORILLO; LEONARDO BAQUERO; DANIEL LUTZ; LUIS LIENDO; JOHN RYAN; MARIA FERNANDA RODRIGUEZ; HELSINGE HOLDINGS, LLC; HELSINGE, INC.; HELSINGE LTD., SAINT-HÉLIER; WALTROP CONSULTANTS, C.A.; GODELHEIM, INC.; HORNBERG INC.; SOCIETE DOBERAN, S.A.; SOCIETE HEDISSON, S.A.; SOCIETE HELLIN, S.A.; GLENCORE DE VENEZUELA, C.A.; JEHU HOLDING INC.; ANDREW SUMMERS; MAXIMILIANO POVEDA; JOSE LAROCCA; LUIS ALVAREZ; GUSTAVO GABALDON; SERGIO DE LA VEGA; ANTONIO MAARRAOUI; CAMPO ELIAS PAEZ; PAUL ROSADO; BAC FLORIDA BANK; EFG INTERNATIONAL A.G.; BLUE BANK INTERNATIONAL N.V.,

        Defendants.

Case No. 1:18-CV-20818 (DPG)

**PLAINTIFF'S MEMORANDUM ADDRESSING (1) THE DESIGNATION OF PDVSA AS SUBJECT TO SANCTIONS, AND (2) DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY**

Plaintiff PDVSA US Litigation Trust submits this Memorandum pursuant to the Court's Order of January 29, 2019 (Dkt. 666).

We begin with three facts, three legal principles, and one necessary conclusion. The three facts are

1) As of no later than August 2017, PDVSA conveyed certain legal claims to the Litigation Trust. That conveyance was valid independent of the act of state doctrine. PDVSA has repeatedly ratified both the Trust and its conveyance of claims to it.

2) In August 2017 the Administration of President Maduro validated and approved PDVSA's conveyance. At the time, that Administration was the recognized Government of Venezuela by the U.S. and by the international community generally.

3) While the conveyance by PDVSA occurred in Venezuela, and the approval and validation occurred in Venezuela by officials of the recognized Government of Venezuela, the claims are now held by a U.S. trust in the U.S., and are being enforced in U.S. courts.

The three legal principles are

1) As a New York trust, the Litigation Trust is entitled to all of the rights provided by the U.S. Constitution and applicable laws, including Due Process and Equal Protection.

2) U.S. laws, including sanctions, do not (and could not) preclude the litigation in U.S. courts of the rights of the Litigation Trust (or even of a sanctioned individual or entity).

3) Official (as opposed to private) acts of officials of a recognized government administration are not, at least in the absence of fraud or violation international law, of which there is here no claim, invalidated by the later withdrawal of recognition.

The necessary conclusion is that once PDVSA's claims were transferred to the N.Y. Trust, no subsequent action by the U.S. government, or by a new Venezuelan government, has (or could) reverse such transfer.

**I.     The Recent Recognition of Juan Guaidó as Interim President of Venezuela and the Subsequent Designation of PDVSA as Subject to Sanctions Adds No Support to – and If Anything Undermines – Defendants' Motion to Dismiss.**

   **A.     Prior to January 23, 2019, the U.S. Recognized Nicolás Maduro as the Head of Government of Venezuela. Thereafter the U.S. Recognized Juan Guaidó as the Head of Government of Venezuela.**

Within the last three weeks, the official position of the United States Government with respect to who is the Head of the Government of Venezuela has changed. On January 10, 2019, Venezuelan President Nicolás Maduro was inaugurated for a second term, following his reelection in a disputed election that occurred in May 2018. On January 23, 2019, the National Assembly of Venezuela declared Maduro's re-inauguration illegitimate and the office of the presidency vacant. (Exh. A). To fill the vacancy, the National Assembly that same day appointed its president, Juan Guaidó, as Interim President of Venezuela. The same day, President Donald J. Trump stated, by tweet, "Today, I have officially recognized the President of the Venezuelan National Assembly, Juan Guaidó, as the Interim President of Venezuela." (Exh. B) (emphasis added).

As these official statements and actions demonstrate, it was only as of January 23, 2019, that the Executive Branch of the United States Government first recognized a new Interim President of Venezuela as head of government to replace Nicolás Maduro. Up until January 23, 2019, the United States recognized President Maduro as head of government. Indeed, until January 23, there was no alternative President or Head of Government of Venezuela. Other than the recognition of Mr. Guaidó as Interim President, there has been no official change in the position of the United States Government concerning recognition of the Government of Venezuela itself. And there is no basis to suggest that any of the acts of the recognized Government of Venezuela prior to January 23 are in any way retroactively invalidated.

### B. The Sanctions and OFAC Regulations Expressly Exclude Litigation and Do Not Affect the Status of This Litigation.

The designation of PDVSA as subject to U.S. sanctions followed shortly after the U.S. recognition of Mr. Guaidó as Interim President and head of government of Venezuela. By Executive Order on January 25, 2019, President Trump amended, *inter alia*, the definition of the term "Government of Venezuela" as contained in Section 6 of Executive Order 13850, which governs sanctions, to include for the first time, PDVSA. (Exh. C). On January 28, 2019, the Department of the Treasury's Office of Foreign Asset Control ("OFAC") sanctioned PDVSA as a Specially Designated National and Blocked Person ("SDN") pursuant to Executive Order 13850. According to Secretary of the Treasury Steven T. Mnuchin, the purposes of the designation included helping to restore democracy and preserving assets for the people of Venezuela. (Exh. D). The Treasury Department's January 28, 2019 press release stated that as a result of OFAC's action, "all property and interests in property of PDVSA subject to U.S. jurisdiction are blocked, and U.S. persons are generally prohibited from engaging in transactions with them." *Id.*

However, the recent designation of PDVSA as an SDN subject to sanctions has no impact on this litigation. The General Licenses codified at 31 C.F.R. § 591.506 continue to *authorize* certain activities that would otherwise be prohibited with regard to Venezuelan SDNs, including "Initiation and conduct of legal, arbitration, or administrative proceedings before any U.S. federal, state, or local court or agency." 31 C.F.R. § 591.506(a)(3). The General Licenses thus expressly allow the provision of legal services to an SDN entity in a U.S. court proceeding. Even if the Litigation Trust were subject to sanctions because of its relationship to PDVSA, nothing would preclude the continued representation of the Litigation Trust in this litigation.[1]

---

[1] Payments for legal services would be governed by 31 C.F.R. § 591.507, and do not affect the provision of legal services to an SDN.

3

### C. The Sanctions in Existence at the Time the Litigation Trust Was Formed Did Not Render the Trust or the Assignment of Claims Illegal.

Moreover, at the time it was formed on July 27, 2017, none of the Venezuela-related sanctions by the United States Government in place at that time affected the Litigation Trust's legality in any way. *See* Dkt. 518 at 26-27 (citing Venezuela Defense of Human Rights and Civil Society Act; Executive Order 13692, issued on March 8, 2015 (the "March 2015 E.O.")[2]; OFAC regulations, codified at 31 C.F.R. pt. 591; and OFAC's designation of additional sanctioned individuals.) These sanctions only barred economic relations with 28 specifically identified Venezuelan SDNs—none of whom had any involvement with the formation of the Litigation Trust or the assignment of claims to it. *See* Dkt. 518 at 26-27 & n.22. The creation of the Litigation Trust, and the assignment of claims to it, did not violate any sanctions in existence at the time of the Litigation Trust's formation. Thus, any argument that the Litigation Trust was void due to such sanctions is meritless. Moreover, as noted, the OFAC General Licenses that became effective July 10, 2015 authorized the "[i]nitiation and conduct of legal, arbitration, or administrative proceedings before any U.S. federal, state, or local court or agency," as they do today. 31 C.F.R. § 591.506(a)(3).

### D. The Sanctions Imposed After the Litigation Trust Was Formed Do Not Affect the Legality of the Litigation Trust or the Assignment of Claims to It.

Nothing in any of the relevant Executive Orders prevents the Litigation Trust from pursuing this litigation. The Litigation Trust was created, *inter alia*, (i) to hold Defendants accountable for the massive, multi-billion-dollar fraud they perpetrated against PDVSA and the people of Venezuela, (ii) to obtain compensation for PDVSA and the people of Venezuela, and

---

[2] Neither PDVSA nor any member of its leadership was included among the list of seven SDNs sanctioned under the March 2015 E.O.

(iii) to authorize the engagement of law firms and investigators to prosecute one or more civil actions to their conclusion.  *See* Dkt. 583-1, PX 1, PDVSA U.S. Litigation Trust Agreement (the "Trust Agreement") at 1.  The subsequent designation of PDVSA, the beneficiary of the Litigation Trust, as an SDN subject to sanctions does not in any way invalidate the Litigation Trust.

Even if the Venezuela sanctions regime blocked implementation of the Litigation Trust's provisions for the *distribution* of proceeds to PDVSA, the Litigation Trust itself would not be invalid, and its ability to pursue corrupt public officials and their co-conspirators would not be affected.  The Litigation Trust would still be able to prosecute its legal claims and hold any litigation proceeds in trust pending a determination of how they should be distributed.  In fact, the Trust Agreement explicitly contemplates this possibility.  Under Section 3.6(b) of the Trust Agreement:  "The Litigation Trust may withhold from amounts distributable to any Person any and all amounts, determined in the Litigation Trustees' reasonable sole discretion, required by any law, regulation, rule, ruling, directive, or other governmental requirement . . . ."[3]  Thus, the Trust Agreement provides that the litigation proceeds would be retained by the Litigation Trust, and would only be distributed when any law or regulation blocking distribution permits.

This is fully in accord with the U.S. Treasury's intent to "preserve these assets for the people of Venezuela." (Exh. D).  Holding funds in trust, as the Litigation Trust is designed to do, is consistent with the aims of the U.S. Government.  Indeed, Defendants' attempt to use the sanctions to invalidate the Litigation Trust and dismiss this action would actually *destroy* assets (the litigation claims) that are being pursued expressly to benefit the people of Venezuela.  In any

---

[3] Additionally, under Section 3.12:  "Any and all distributions of Litigation Trust Assets and Proceeds of borrowings, if any, shall be in compliance with applicable laws, including, but not limited to, applicable federal and state laws."  *See* Dkt. 583-1, PX-1, Trust Agreement § 3.12.

5

event, by the time the Litigation Trust obtains recovery, it is possible a new government will be in place and economic sanctions against Venezuela will have ended.

**II.   The Act of State Doctrine Bars Defendants' Challenge to the Litigation Trust's Validity Under Venezuelan Law Notwithstanding the United States' Recent Recognition of Interim President Guaidó.**

The assignment of claims to the Litigation Trust was approved and validated by, and as such comprised, an official act of the Venezuelan government completed in August 2017, by Venezuelan officials, within Venezuela. (Dkt. 646 at 28-31). The act of state doctrine therefore bars any inquiry by the courts of the United States into the validity of that assignment under Venezuelan law. *Id. See, e.g.*, *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*, 809 F.3d 737, 742–43 (2d Cir. 2016). The United States' recent recognition of a new head of the Venezuelan government does nothing to alter this conclusion. Indeed, as Defendants implicitly acknowledge, the United States' "***withdrawal***" of recognition from the Maduro government on January 23, 2019 (Dkt. 665 at 1) confirms the Litigation Trust's position: that prior to January 23, 2019 (including during 2017 when the assignment of claims took place), the United States recognized Nicolás Maduro as the head of government of Venezuela. (Dkt. 464 at 28-29 n.17) (citing, *e.g.*, *Guaranty Trust Co. of N.Y. v. United States*, 304 U.S. 126, 138 (1938)).

The long-standing, fundamental principle applicable here is that the transfer of power in a foreign state from one head of government to another does not invalidate the acts of the former government. *See The Sapphire*, 78 U.S. 164, 168 (1870); *Guaranty Trust Co.*, 304 U.S. at 138 ("the rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it"). Even when the government representing a state changes, the state itself "remains, with rights and obligations unimpaired." *U.S. ex rel. Kessler v. Watkins*, 163 F.2d 140, 143 (2d Cir. 1947) (quoting *Lehigh Valley R. Co. v. State of Russia*, 21 F.2d 396, 401 (2d Cir. 1927)); *see also United States v. Yao*, 989 F. Supp. 2d 937, 944 (N.D. Cal. 2013), *aff'd*

*sub nom. United States v. Shor*, 635 F. App'x 358 (9th Cir. 2015) ("The current government is bound by the actions of officials from a previous government unless those actions are not attributable to the . . . sovereign."); *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 731 F. Supp. 619, 622 (S.D.N.Y.), *aff'd*, 925 F.2d 566 (2d Cir. 1991) ("the rights and liabilities of a state are unaffected by a change either in the form or personnel of its government, however accomplished, whether by revolution or otherwise").

Consequently, the act of state doctrine bars inquiry into the validity of an act of a foreign government, even when that government is no longer recognized by the United States. *See Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 147-48 (2d Cir. 2012) (applying the act of state doctrine to bar inquiry into the validity of a Soviet decree, despite the fact that the Soviet government no longer exists).[4]

Here, the National Assembly effectively acknowledged that Maduro remained the head of government of Venezuela until his first term expired on January 10, 2019. The National Assembly waited until Maduro completed his term before formally declaring the presidency vacant, and appointing Mr. Guaidó as Interim President. The United States Executive Branch also waited until President Maduro's first term expired before withdrawing its recognition of Maduro and recognizing Mr. Guaidó as Interim President.

Moreover, the purpose behind the act of state doctrine is best served if the Court declines Defendants' invitation to circumvent the policy determinations of the Executive Branch and wade

---

[4] *Accord: Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 954 (D.C. Cir. 2008) (vacating in part and remanding for further consideration the district court's application of the act of state doctrine to a Soviet act; "while no one doubts that the collapse of the Soviet Union has entailed radical political and economic changes in the territory of what is now the Russian Federation, application of *Sabbatino*'s invitation to flexibility would here embroil the court in a seemingly rather political evaluation of the character of the regime change itself"). The court remanded the act of state issue to consider a "proposed exception" to the act of state doctrine based on the assertion that the act of state represented "selective persecution" of a religion and a violation of international law (*id*. at 955).

7

into complicated questions of Venezuelan law. The Litigation Trust affords the government of Venezuela, whoever remains as President, an opportunity to hold scores of corrupt individuals and entities accountable for the multi-billion dollar fraud they perpetrated on PDVSA—and to recoup those funds to be held for the people of Venezuela, which is consistent with U.S. policy. Defendants are seeking to escape that accountability by asking the Court to endorse their dubious interpretation of Venezuelan law. The invalidation of the Litigation Trust could prevent the recovery and return of Defendants' stolen billions to the beleaguered Venezuelan economy. The U.S. Executive Branch has articulated a clear policy of preserving assets for the people of Venezuela, which invalidating the Litigation Trust would hinder.

Defendants are wrong in their Notice of Supplemental Authority to suggest that by recognizing Mr. Guaidó as Interim President, the United States has thereby recognized the legislative branch, the National Assembly, as the "government" of Venezuela because Guaidó also serves as president of the Assembly. (Dkt. 665 at 1). Defendants assert that the National Assembly's prior resolution(s) concerning the Litigation Trust must now be given retroactive and "conclusive legal effect" and the prior acts of Maduro's government invalidated. (Dkt. 665 at 2). That is patently wrong for multiple reasons.

First, while Interim President Guaidó's government may indeed be entitled to recognition "from the commencement of its existence" on January 23, 2019 (*see United States v. Pink*, 315 U.S. 203, 233 (1942)), the National Assembly remains what it has always been: the legislative "branch" of government. (Dkt. 665, Ex. A). Recognition of Mr. Guaidó as Interim President does not mean that prior acts of the Venezuelan government are retroactively invalidated, or that the validity or effect of prior acts of the National Assembly during the time that President Maduro was the recognized head of state are retroactively changed. The fact that Mr. Guaidó is president of

the National Assembly as well as the now-recognized Interim President makes no difference; the two roles are separate and distinct, and only the latter is relevant for act of state purposes.

Second, as discussed further below, there has been no repudiation by the new Guaidó administration of acts taken by the government while it was headed by President Maduro. Indeed, if the newly-recognized Guaidó government is able to consolidate control over PDVSA and the Venezuelan economy, it will benefit tremendously from the prosecution of the claims in this case, thereby furthering the policy goals stated by the United States Executive Branch.

Third, this is not a case where one recognized administration confiscates property and a subsequently recognized administration seeks to undo the confiscation. In the present case, the claims were validly conveyed to a New York trust. They are now subject to U.S. jurisdiction. In the absence of fraud or duress (and there is no claim of that here) no Venezuelan administration, old or new, can undo that conveyance any more than it could recover oil previously sold and shipped to companies in the U.S.

For these reasons, Defendants' cases *Bigio v. Coca-Cola Co.*, 239 F.3d 440 (2d Cir. 2000) and *Republic of Philippines v. Marcos*, 806 F.2d 344 (2d Cir. 1986) are inapposite. Both cases involved acts wrongful at the time (confiscation of property based on religion in *Bigio* and theft and embezzlement in *Marcos*). Both cases also involved acts that were repudiated by subsequent governments. By contrast, the present case involves a conventional transaction (the conveyance of claims) and there has been no attempted repudiation. (In addition, *Marcos* involved private, not official, acts.)[5]

---

[5] *Oetjen v. Central Leather Co.*, 246 U.S. 297, 301, 303 (1918), also has no bearing on this case. In *Oetjen*, one side in a civil war in Mexico had *de facto* control of territory in which it issued a decree. Following its recognition by the United States as the government of the entire country, the revolutionary government validated the earlier action.
    Defendants argue in this case that an action taken by one head of state at a time when that head of state was recognized as such can be retroactively invalidated by a subsequent head of state. (This, of course, is a question that is reached if and only if—contrary to the current record—the

9

Further, any argument that the political question doctrine requires dismissal here is entirely meritless. The parties have no disagreement regarding the relevant law: the Executive Branch of the United States has the exclusive power to recognize a foreign government. (Dkt. 646 at 28-29 n.17; Dkt. 665 at 1). There has never been an open political question relevant to this case because the position of the United States Executive Branch has consistently provided an answer: Prior to January 23, 2019, Nicolás Maduro was recognized by the United States as the President of Venezuela; since that date, Juan Guaidó has assumed that role on an interim basis. Accordingly, there is no nonjusticiable political question here. *See Baker v. Carr*, 369 U.S. 186, 210-17 (1962); *Republic of Panama v. Citizens & So. Int'l Bank*, 682 F. Supp. 1544, 1545 (S.D. Fla. 1988).

## **CONCLUSION**

For all the foregoing reasons, and the reasons stated in Plaintiff's Objection (Dkt. 646) and prior submissions to this Court, the recent changes in the United States Government's pronouncements concerning Venezuela do not alter the conclusion that Defendants' Motion to Dismiss for Lack of Standing should be denied.

As the Court is aware, Plaintiff believes a plenary hearing before the Court on Defendants' motion to dismiss is appropriate, including because of the Court's obligation to make a de novo determination and because of what has occurred subsequent to the Magistrate's hearing. Such a hearing could also provide an opportunity to further explore the issues discussed herein and to take such evidence, if any, as the Court determines is relevant to them.

---

subsequent head of state purports to repudiate the prior action.)
   In *Oetjen*, however, the foreign state action was affirmed by the new government, not invalidated. The Court simply held that the single government action at issue there was insulated from U.S. judicial review by the act of state doctrine.

10

Dated: February 8, 2019                **BOIES SCHILLER FLEXNER LLP**

By: */s/ Steven W. Davis*
Steven W. Davis (Bar No. 347442)
Stephen N. Zack (Bar No. 145215)
Bank of America Tower
100 Southeast 2nd St., Suite 2800
Miami, FL 33131
Tel: (305) 539-8400
Fax: (305) 539-1307

David Boies
Helen M. Maher
333 Main Street
Armonk, New York 10504
Tel: (914) 749-8200
Fax: (914) 749-8300

Nicholas A. Gravante, Jr.
David A. Barrett
Marilyn Kunstler
Ellen Brockman
Alexander Boies
55 Hudson Yards
New York, New York 10001
Tel: (212) 446-2300
Fax: (212) 446-2350

George F. Carpinello
Teresa A. Monroe
30 S. Pearl Street, 11th Floor
Albany, New York 12207
Tel: (518) 434-0600
Fax: (518) 434-0665

Stacey Grigsby
1401 New York Ave NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131

*Attorneys for Plaintiff*

11

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing document was filed on February 8, 2019 with the Clerk of the Court via CM/ECF. I further certify that the foregoing document is being served this date on all counsel of record to all parties via transmission of Notices of Electronic Filing.

By: */s/ George F. Carpinello*