Case 1:18-cv-20818-DPG   Document 731   Entered on FLSD Docket 05/17/2021   Page 1 of 20
USCA11 Case: 19-10950   Date Filed: 05/17/2021   (1 of 2) Page: 1 of 2

FILED BY HH D.C.

May 17, 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

May 17, 2021

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number: 19-10950-AA
Case Style: PDVSA US Litigation Trust v. Lukoil Pan Americas, LLC, et al
District Court Docket No: 1:18-cv-20818-DPG

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Lois Tunstall
Phone #: (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

UNITED STATES COURT OF APPEALS
For the Eleventh Circuit

_____

No. 19-10950

_____

District Court Docket No.
1:18-cv-20818-DPG

PDVSA US LITIGATION TRUST,

                                Plaintiff - Appellant,

versus

LUKOIL PAN AMERICAS, LLC,
LUKOIL PETROLEUM, LTD.,
COLONIAL OIL INDUSTRIES, INC.,
COLONIAL GROUP, INC.,
GLENCORE, LTD., et al.,

                                Defendants - Appellees.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is entered as the judgment of this Court.

Entered: March 18, 2021
For the Court: DAVID J. SMITH, Clerk of Court
By: Djuanna H. Clark

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10950
_____

D.C. Docket No. 1:18-cv-20818-DPG

PDVSA US LITIGATION TRUST,

                                                     Plaintiff - Appellant,

versus

LUKOIL PAN AMERICAS, LLC,
LUKOIL PETROLEUM, LTD.,
COLONIAL OIL INDUSTRIES, INC.,
COLONIAL GROUP, INC.,
GLENCORE, LTD., et al.,

                                                       Defendants - Appellees.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(March 18, 2021)

Before JORDAN, TJOFLAT, and ANDERSON, Circuit Judges.

JORDAN, Circuit Judge:

This lawsuit involves an alleged multi-billion-dollar conspiracy to defraud Petróleos de Venezuela, S.A., the Venezuelan state-owned oil company known as PDVSA. The scheme purportedly involved computer hacking and payment of bribes by numerous corporations and individuals to obtain PDVSA's proprietary oil trading information, and the use of that information to manipulate the pricing of crude oil and hydrocarbon products.

But PDVSA, the purported victim of the fraudulent scheme, did not sue the alleged perpetrators. Instead, an entity called the PDVSA U.S. Litigation Trust filed suit, alleging that it had authority to do so as an assignee of PDVSA pursuant to a trust agreement which, through a choice-of-law clause, is governed by New York law.

Following some discovery, the district court adopted in part the report and recommendation of the magistrate judge and dismissed the action without prejudice under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of Article III standing. *See PDVSA U.S. Litigation Trust v. Lukoil Pan Americas LLC*, 372 F. Supp. 3d 1353, 1359–61 (S.D. Fla. 2019). The court ruled that the Litigation Trust did not properly authenticate the trust agreement—it failed to authenticate three of the five signatures in the agreement—and without an admissible agreement it lacked standing. The court also concluded that, even if the trust agreement were authenticated and admissible, it was void as champertous under New York law,

2

specifically N.Y. Judiciary Law § 489. As a result, the Litigation Trust did not have standing. *See generally MSPA Claims 1, LLC v. Tenet Florida, Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019) (an assignee has standing "if (1) its . . . assignor . . . suffered an injury-in-fact, and (2) [its] claim arising from that injury was validly assigned"); *Kenrich Corp. v. Miller*, 377 F.2d 312, 314 (3d Cir. 1967) (if an assignment is champertous under state law, and therefore "legally ineffective," the assignee lacks standing to sue).

The Litigation Trust appealed. With the benefit of oral argument, we now affirm.

**I**

Rule 901 of the Federal Rules of Evidence entails a two-step process for determining authenticity. A "district court must first make a preliminary assessment of authenticity . . . , which requires a proponent to make out a prima facie case that the proffered evidence is what it purports to be." *United States v. Maritime Life Caribbean Ltd.*, 913 F.3d 1027, 1033 (11th Cir. 2019) (involving the authenticity of an assignment) (citation and internal quotation marks omitted). "If the proponent satisfies this 'prima facie burden,' the inquiry proceeds to a second step, in which the evidence may be admitted, and the ultimate question of authenticity is then decided by the [factfinder]." *Id.* (citation and internal quotation marks omitted). At the first step of the process, it is inappropriate for the district court to place on the

proponent of the evidence the burden of showing authenticity by a preponderance of the evidence. *See id.* ("By requiring Maritime to prove authenticity by 'the greater weight of the evidence,' the district court compressed the two steps of the inquiry under Rule 901 into one and conflated the issue of authenticity with [the merits].").

The magistrate judge stated that the Litigation Trust had the "burden of proving" the authenticity of the trust agreement and concluded that it had not carried that burden because it failed to authenticate the signatures on the agreement. *See* D.E. 636 at 11, 18. The district court noted the burden of proof used by the magistrate judge and agreed that the trust agreement was inadmissible: "The [c]ourt finds that [the Litigation Trust] has failed to establish the admissibility of the [t]rust [a]greement." *PDVSA*, 372 F. Supp. 3d at 1360.

We have not addressed whether or how the two-step authenticity process described in cases like *Maritime Life* should be applied in a Rule 12(b)(1) context where the defendant's attack on subject-matter jurisdiction is factual, and where the district court is permitted to act as the ultimate decision-maker on jurisdictional facts. Some district courts have ruled that on a motion to dismiss for lack of subject-matter jurisdiction they "may only consider evidence which would be of testimonial value at trial." *Dr. Beck & Co. G.M.B.H v. General Electric Co.*, 210 F. Supp. 86, 92 (S.D.N.Y. 1962), *aff'd*, 317 F. 2d 338 (2d Cir. 1963). Others have said that, at the Rule 12(b)(1) stage, a court cannot consider evidence which has "not been

authenticated in some proper manner." *Research Inst. for Medicine and Chemistry, Inc. v. Wis. Alumni Research Found., Inc.*, 647 F. Supp. 761, 773 n.8 (W.D. Wis. 1986). It is difficult to know from the short discussions in these cases whether the district courts were speaking of authentication in a prima facie sense or in a final admissibility sense. And the few treatises that speak to the matter are not very helpful because they focus on the evidence's ultimate admissibility at trial. *See, e.g.,* 61A Am. Jur. 2d, Pleading § 495 (Feb. 2021 update) ("[I]n some [cases], it has been decided that the court may consider only evidence which would be admissible at trial.").

We need not address the interplay between Rule 901 and Rule 12(b)(1) today, for we assume without deciding that the Litigation Trust made out a prima facie case of authenticity for the trust agreement at the Rule 12(b)(1) proceedings, and that this prima facie showing was sufficient. *Cf. Itel Capital Corp. v. Cups Coal Co. Inc.*, 707 F.2d 1253, 1259 (11th Cir. 1983) ("[U]nder Rule 901, proving the signature of a document is not the only way to authenticate it."). We therefore also assume, again without deciding, that the district court erred by ruling that the trust agreement was inadmissible. That leaves the district court's alternative champerty ruling, to which we now turn.

## II

Our cases hold that claims "should not be dismissed on motion for lack of subject-matter jurisdiction when that determination is intermeshed with the merits of the claims and there is a dispute as to a material fact." *Lawrence v. Dunbar*, 919 F.2d 1525, 1531 (11th Cir. 1990). "When the jurisdictional basis of a claim is intertwined with the merits, the district court should apply a Rule 56 summary judgment standard when ruling on a motion to dismiss which asserts a factual attack on subject-matter jurisdiction." *Id.* at 1530. *Cf. Culverhouse v. Paulson & Co., Inc.* 813 F.3d 991, 994 (11th Cir. 2016) ("[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiff would be successful in their claims.") (citation and internal quotation marks omitted).[1]

Based on our review of the record, the district court may have erred procedurally in definitively resolving the question of champerty at the Rule 12(b)(1) stage because that question likely implicated the merits of the Litigation Trust's claims. As it turns out, however, the Litigation Trust does not make this procedural argument on appeal.

**A**

---

[1] The magistrate judge put the parties on notice of our precedent at one of the hearings in the case. *See* D.E. 423 at 22 (explaining that "very frequently issues related to standing are intertwined with issues related to the merits").

Rule 8(c) of the Federal Rules of Civil Procedure provides that "illegality" is an affirmative defense. And New York law treats champerty as an affirmative defense. *See, e.g., Justinian Capital SPC v. WestLB AG*, 65 N.E.3d 1253, 1255 (N.Y. 2016); *Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*, 731 N.E.2d 581, 582 (N.Y. 2000); *Krusch v. Affordable Housing, LLC*, 698 N.Y.S. 2d 674, 674 (App. Civ. 1st Dept. 1999); *Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, ___ F. Supp. 3d ___, 2020 WL 1285783, at *11 (S.D.N.Y. 2020). Indeed, if an assignment or agreement is champertous under New York law it is null and void and cannot be enforced or sued upon. *See, e.g., Bluebird Partners*, 731 N.E. 2d at 587; *Elliott Assoc., LP v. Republic of Peru*, 948 F. Supp. 1203, 1208 (S.D.N.Y. 1996).

Because champerty likely implicated the merits of the claims brought by the Litigation Trust, there is a strong argument that the district court should have used the Rule 56 standard in addressing whether the trust agreement was champertous under New York law. *See, e.g., Morrison v. Amway Corp.*, 323 F. 3d 920, 927–30 (11th Cir. 2003). But we do not reverse on this ground because the Litigation Trust does not raise any procedural objections to the district court's handling of the champerty question.

The Litigation Trust argued to the magistrate judge that champerty is a fact-intensive issue which must be decided by a jury. *See* D.E. 636 at 23 n.16. Yet on appeal the Litigation Trust does not contend that the district court committed

procedural error by failing to employ the Rule 56 standard in addressing the affirmative defense of champerty. Instead, although it acknowledges that champerty is an affirmative defense, it takes the champerty ruling head on and asks us to hold that the assignment was not champertous under New York law. *See* Appellant's Br. at 32–33 & n. 13 (arguing that the district court committed clear error in finding that the clear purpose of the trust agreement was to bring this lawsuit).

We normally decide cases and issues as framed by the parties, and the Litigation Trust has abandoned any procedural objections to the champerty ruling by not raising them in its brief. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (collecting several Eleventh Circuit cases holding that a party abandons an issue by not briefing it). In a case like this one—involving sophisticated litigants represented by able counsel—there is no reason to depart from the general principle of party presentation, and we decline to take up *sua sponte* the district court's failure to apply the Rule 56 standard. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("In our adversarial system, we follow the principle of party presentation . . . . [W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.") (citation and internal quotation marks omitted). Like the district court, then, we address champerty on the merits.

**B**

8

The Litigation Trust was created in 2017 by PDVSA, as both the grantor and beneficiary under New York law, so that the litigation efforts to hold the defendants "accountable could proceed without interference from the political and economic instability and rampant corruption in Venezuelan government and society." Appellant's Br. at 2–3. The Litigation Trust has two New York trustees (appointed by the Trust's counsel) and one Venezuelan trustee. All costs and expenses of the litigation against the defendants are borne by the Trust's counsel. Any recoveries or proceeds will be divided between PDVSA (which receives 34%) and the Trust's counsel, investigator, and financier (who collectively receive the remaining 66%).

The trust agreement, dated July of 2017, was purportedly executed in August of 2017. Under the terms of the trust agreement, PDVSA assigned its claims against the defendants to the Litigation Trust so that they could be pursued by the Trust in the United States.

PDVSA's president and board of directors did not approve the trust agreement. The signatories of the agreement were two Venezuelan government officials, Nelson Martinez (a former Venezuelan oil minister) and Reynaldo Muñoz Pedrosa (an attorney general for civil matters); Alexis Arellano, a PDVSA-designated trustee; and Edward Swyer and Vincent Andrews, two American trustees. The Venezuelan government officials who signed the trust agreement were members

of the administration of President Nicolas Maduro, which the United States had formally recognized as Venezuela's government at the time.[2]

As relevant here, N.Y. Judiciary Law § 489(1) provides that "no corporation or association . . . shall solicit, buy, or take an assignment of . . . a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon[.]" The New York Court of Appeals recently explained that the "statue prohibits the purchase of notes, securities, or other instruments or claims with the intent and for the purpose of bringing a lawsuit." *Justinian Capital*, 65 N.E.3d at 1254.

Whether an agreement is champertous "is a mixed question of law and fact," 14 C.J.S., Champerty and Maintenance § 26 (Feb. 2021 update), and a number of New York cases have reversed summary judgment rulings on champerty because there were underlying disputes of material fact (usually regarding the transaction's "primary purpose"). Take, for example, the decision of the New York Court of Appeals in *Bluebird Partners*, 731 N.E.2d at 587: "We are satisfied that the record here does not support a finding of champerty as a matter of law for summary disposition. It cannot be determined on this record and in this procedural posture

---

[2] President Trump later recognized Juan Guaidó, the President of the Venezuelan National Assembly, as the Interim President of Venezuela.

10

that champerty was the primary motivation, no less the sole basis, for all this strategic jockeying and financial positioning."

But, as noted, the Litigation Trust does not make any Rule 56-type arguments on appeal. So we treat the champerty ruling as one made by the district court as the ultimate decision-maker, and review any underlying factual findings for clear error (as the Litigation Trust asks us to do). *See generally Cooper v. Harris*, 137 S. Ct. 1455, 1465 (2017) (explaining that, under the clear error standard, "[a] finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern"). On this basis, we affirm the district court's conclusion that the trust agreement was champertous under New York law.

The district court found, on the evidence before it, that the primary purpose of the trust agreement was to "facilitate the prosecution and resolution" of the assigned claims and to liquidate the Litigation Trust's "assets with no objective to continue or engage in the conduct of a trade or business." *PDVSA*, 372 F. Supp. 3d at 1360. This factual finding was not clearly erroneous. First, the trust agreement's own language states in the same words that this was the primary purpose. *See* D.E. 517-4 at § 2.5(a). Second, one of the Litigation Trust's lead attorneys testified at his deposition that the trust agreement was executed by the parties for "purposes of pursuing claims that are the subject matter of this litigation, among others." D.E. 573-1 at 11. Third, the Litigation Trust was not a pre-existing entity with a separate

commercial existence. Fourth, only 34% of any recovery goes to PDVSA, with the remaining amount divided between the Litigation Trust's attorneys, investigator, and financier.

Contrary to the Litigation Trust's argument, the fact that some of the ultimate beneficiaries of the litigation (at least to the tune of 34% of the recovery) may be the Venezuelan people does not detract from the fact that the trust agreement was created to allow a third party—the Trust—to sue on claims that belonged to PDVSA. And even if one accepts that the trust agreement also served the facilitation of cooperation with law enforcement and the engagement of investigators to look further into other improper conduct (as one of the Litigation Trust's lead attorneys testified) that does not make the district court's finding clearly erroneous. The same goes for the Litigation Trust's contention that the 34%-66% fee structure is reasonable. *See Cooper*, 137 S. Ct. at 1465. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

The district court also correctly applied New York law. We come to that conclusion based on *Justinian Capital*, 65 N.E.3d at 1258–59. In that case, the New York Court of Appeals confronted a similar arrangement and concluded on summary judgment that it was champertous under N.Y. Judiciary Law § 489(1).

In *Justinian Capital*, a company called DPAG purchased from two special purposes companies (whom we'll collectively call Blue Heron) notes worth approximately € 180 million. DPAG's portfolio was managed by WestLB, a bank partly owned by the German government. When the notes lost most of their value, DPAG—which was receiving financial support from the German government—did not want to sue WestLB because of a concern that the German government might end its support for DPAG. So DPAG turned to Justinian Capital, a Cayman Islands company with few or no assets. *See Justinian Capital*, 65 N.E.3d at 1254.

Justinian Capital proposed a business plan in which it would purchase the notes from DPAG, commence litigation (by partnering with law firms) to recover the losses on the investment, and remit the recovery from the litigation to DPAG "minus a [20%] cut[.]" *See id.* at 1254–55. DPAG subsequently entered into a sale and purchase agreement by which it assigned the notes to Justinian Capital, which in turn agreed to pay DPAG a base purchase price of $1 million. The assignment of the notes, however, was not contingent on Justinian Capital's payment of the purchase price, and failure to pay did not constitute a breach or default of the agreement. The only consequences of Justinian Capital's failure to pay the $1 million by the due date were that interest would accrue on the purchase price and that Justinian Capital's share of the proceeds of litigation would decrease from 20% to 15%. At the time Justinian Capital instituted suit against WestLB, it had not paid

13

any portion of the $1 million and DPAG had not demanded payment. *See id.* at 1255.

The New York Court of Appeals held that the assignment from DPAG to Justinian Capital was champertous because the impetus was DPAG's desire to sue WestLB for the decline in the value of the shares and not be named as a plaintiff in the action. And Justinian Capital's business plan was to acquire investments that suffered major losses in order to sue on them. There was no evidence, the Court of Appeals concluded, that Justinian Capital's acquisition of the notes from DPAG "was for any purpose other than the lawsuit it initiated almost immediately after acquiring the notes[.]" *Id*. at 1257. Significantly, the Court of Appeals dismissed as speculative the testimony of Justinian Capital's principal that there might be other possible sources of recovery on the notes: "Here, the lawsuit was not merely an incidental or secondary purpose of the assignment, but its very essence. [Justinian Capital's] sole purpose in acquiring the notes was to bring this action and hence, its acquisition was champertous." *Id*.

The same is true here. As the district court found, the Litigation Trust's primary purpose in acquiring PDVSA's claims was to bring this action.

### C

Trying to avoid the force of *Justinian Capital*, the Litigation Trust makes a number of arguments. We find them unpersuasive.

The Litigation Trust says that it is closely related to PDVSA, and therefore not a stranger or "officious intermeddler." *See FragranceNet.com, Inc. v. FragranceX.com*, 679 F. Supp. 2d 312, 319 n.9 (E.D.N.Y. 2010) (explaining, in the context of a parent and subsidiary, that champerty bars the "acquisition of a cause of action by a stranger to the underlying dispute"). It describes itself as a fiduciary of PDVSA which does not stand to profit from the litigation.

On this record, the argument fails. The Litigation Trust was a new entity created for the purpose of obtaining and litigating PDVSA's claims, and as a result was a stranger to the underlying disputes with the defendants. *See BSC Assoc., LLC v. Leidos, Inc.*, 91 F. Supp. 3d 319, 328 (N.D.N.Y. 2015) ("Here, Plaintiff—which did not exist prior to February 2014 and was formed solely to 'retain' this cause of action from BSC Partners—clearly did not have a proprietary interest in the Subcontract underlying this action that predates the transfer of claims to Plaintiff."). And there is no claim that PDVSA—the purported assignor of claims—owns or controls the Litigation Trust or that the Trust is a subsidiary or related entity of PDVSA. Finally, given that the Litigation Trust is a pass-through for 64% of the proceeds to go to its counsel, investigator, and financier, it matters little that the Trust itself is not going to reap an economic benefit from the litigation.

The Litigation Trust also asserts that § 489(1) does not apply because it is not a collection agency or a corporation, and does not qualify as an "association." We

15

reject this argument, as the New York Court of Appeals has explained that "association" is a "broad term which may be used to include a wide assortment of differing organizational structures including trusts, depending on the context." *Mohonk v. Bd. of Assessors of Town of Gardiner*, 392 N.E.2d 876, 879 (N.Y. 1979). Given that § 489(1) lists "trustees" as one of the persons or entities who can violate the statute's general prohibition on champerty, the context here permits the application of the champerty bar to the trust agreement.

Finally, the Litigation Trust argues that it comes within § 489(2), the champerty statute's "safe harbor" provision. This provision states that the champerty bar in § 489(1) is inapplicable if the "aggregate purchase price" of a claim is at least $500,000. The Litigation Trust says that it was prevented from presenting evidence that its counsel had spent over $500,000 in fees and costs, for the benefit of PDVSA, even before the assignment of claims.

The magistrate judge and the district court rejected the Litigation Trust's "safe harbor" argument because there was no evidence of any payment from the Litigation Trust to PDVSA. *See PDVSA*, 372 F. Supp. 3d at 1361; D.E. 636 at 22–23. We come to the same conclusion.

In *Justinian Capital*, the New York Court of Appeals held that the "phrase 'purchase price' in [§] 489(2) is better understood as requiring a binding and bona fide obligation to pay $500,000 or more of notes or securities, which is satisfied by

16

actual payment of at least $500,000 or the transfer of financial value worth at least $500,000 in exchange for the notes or other securities." 65 N.E.3d at 1258. The expenditure by the Litigation Trust or its counsel of fees and costs for the litigation, even if they exceeded $500,000, did not constitute a contractual "purchase price." There were no underlying instruments or claims valued at or transferred for more than $500,000, and there was no obligation on the Litigation Trust or its counsel to spend $500,000 or more for the costs of litigation.

Moreover, none of the Litigation Trust's expenditures for litigation costs flowed to PDVSA. As an entity, PDVSA was no better off financially due to the footing of litigation costs by the Litigation Trust or its counsel, and it still had to wait until the Trust succeeded on the assigned claims to reap any contingent monetary benefit. *Cf. id.* at 1259 ("[B]ecause Justinian [Capital] did not pay the purchase price or have a binding and bona fide obligation to pay the purchase price of the notes independent of the successful outcome of the lawsuit, [it] is not entitled to the protections of the safe harbor.").

We also think the defendants may be correct in asserting that the Litigation Trust's interpretation of § 489(2) could threaten to swallow much of § 489(1). An otherwise-champertous transaction, no matter the value of the assigned instruments or the lack of a binding obligation to pay a purchase price of $500,000 or more,

17

would be immunized under New York law if the assignee simply spent over $500,000 in litigation expenses.

### III

This appeal might have come out differently had it been argued differently. But on the issues presented to us, we affirm the district court's dismissal of the Litigation Trust's complaint without prejudice for lack of standing.

**AFFIRMED.**