## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
**Miami Division**

| | |
|---|---|
| PETRÓLEOS DE VENEZUELA, S.A.<br><br>Plaintiff,<br><br>v.<br><br>LUKOIL PAN AMERICAS LLC; LUKOIL PETROLEUM LTD.; COLONIAL OIL INDUSTRIES, INC.; COLONIAL GROUP, INC.; GLENCORE LTD.; GLENCORE INTERNATIONAL, A.G.; GLENCORE ENERGY UK LTD.; MASEFIELD A.G.; TRAFIGURA A.G.; TRAFIGURA TRADING LLC; TRAFIGURA BEHEER B.V.; VITOL ENERGY (BERMUDA) LTD.; VITOL S.A.; VITOL, INC.; FRANCISCO MORILLO; LEONARDO BAQUERO; DANIEL LUTZ; LUIS LIENDO; JOHN RYAN; MARIA FERNANDA RODRIGUEZ; HELSINGE HOLDINGS, LLC; HELSINGE, INC.; HELSINGE LTD.,SAINT-HELIER;WALTROP CONSULTANTS, C.A.; GODELHEIM, INC.; HORNBERG INC.; SOCIETE DOBERAN, S.A.; SOCIETE HEDISSON, S.A.; SOCIETE HELLIN, S.A.; GLENCORE DE VENEZUELA, C.A.; JEHU HOLDING INC.; ANDREW SUMMERS; MAXIMILIANO POVEDA; JOSE LAROCCA; LUIS ALVAREZ; GUSTAVO GABALDON; SERGIO DE LA VEGA; ANTONIO MAARRAOUI; CAMPO ELIAS PAEZ; PAUL ROSADO; BAC FLORIDA BANK; EFG INTERNATIONAL A.G.; BLUE BANK INTERNATIONAL N.V.<br><br>Defendants. | **JURY TRIAL DEMANDED**<br><br>**Case No. 1:18-cv-20818-DPG** |

## PROPOSED SECOND AMENDED COMPLAINT

Plaintiff Petróleos de Venezuela, S.A. ("Plaintiff or PDVSA"), for its Second Amended Complaint against Defendants (each, a "Defendant, and, collectively, the "Defendants").[1] Lukoil Pan Americas LLC; Lukoil.  Each capitalized term defined in this Complaint shall have the meaning ascribed to it herein when being so defined, unless the context clearly requires otherwise Petroleum Ltd.; Colonial Oil Industries, Inc.; Colonial Group, Inc.; Glencore Ltd.; Glencore International A.G.; Glencore Energy UK Ltd.; Masefield A.G.; Trafigura A.G.; Trafigura Trading LLC; Trafigura Beheer B.V.; Vitol Energy (Bermuda) Ltd.; Vitol S.A.; Vitol, Inc.; Francisco Morillo; Leonardo Baquero; Daniel Lutz; Luis Liendo; John Ryan; Helsinge Holdings, LLC; Helsinge, Inc.; Helsinge Ltd., Saint-Helier (Helsinge Holdings LLC, Helsinge, Inc. and Helsinge Ltd., Saint-Helier, collectively "Helsinge"); Waltrop Consultants, C.A.; Godelheim, Inc.; Hornberg Inc.; Societe Doberan, S.A.; Societe Hedisson, S.A.; Societe Hellin, S.A.; Glencore de Venezuela, C.A.; Jehu Holding Inc.; Andrew Summers; Maximiliano Poveda; Jose Larocca; Luis Alvarez; Gustavo Gabaldon; Sergio De La Vega; Antonio Maarraoui; Campo Elias Paez; Paul Rosado; BAC Florida Bank; EFG International A.G.; and Blue Bank International N.V. (BAC Florida Bank, EFG International A.G.; and Blue Bank International N.V., collectively the "Bank Defendants"), alleges, upon personal knowledge as to its own actions and states upon information and belief as to all other matters as follows:

## NATURE OF THE ACTION

1.      This action arises from an on-going conspiracy (the "Helsinge Enterprise") among international oil companies and traders, their banks, and co-conspirators, including corrupt agents and officials of the Venezuelan state-owned energy company PDVSA:

(a)      to fix prices, rig bids, and eliminate competition in the purchase and sale of crude oil and hydrocarbon products by PDVSA;

(b)      to misappropriate PDVSA proprietary data and intellectual property; and

(c)      to systematically loot PDVSA by causing corrupt PDVSA officials not to collect monies due PDVSA, to pay inflated prices for products and services acquired by PDVSA., to accept artificially low prices for products sold by PDVSA, to overlook the failure to deliver products and services paid for by PDVSA, and to fraudulently conceal what was owed to PDVSA.

2.      By fixing prices, rigging bids, and eliminating competition in PDVSA's purchase and sale of crude oil and hydrocarbon products, the Helsinge Enterprise was able to:

(a)      prevent companies, including many legitimate American companies, from competing for PDVSA's business, and thereby secure that business for the Oil Company Conspirators (as defined below) members of the Helsinge Enterprise;

(b)      purchase PDVSA products at artificially low prices; and

(c)      sell products and services to PDVSA at artificially high prices.

3.      By bribing and corrupting PDVSA agents and officials, the Helsinge Enterprise was able to favor the Oil Company Conspirators and disadvantage, or exclude, many legitimate American and other competitors, including by:

(a)      structuring tenders for PDVSA contracts to favor the Oil Company Conspirators and Helsinge and disadvantage, or exclude, competitors;

(b)      securing inside, proprietary information concerning PDVSA' s requirements and plans before such information was publicly available, again with the purpose and effect of advantaging the Oil Company Conspirators and disadvantaging, or excluding, competitors; and

(c)       securing inside, proprietary information concerning competing bids so that the Oil Company Conspirators could beat them.

4.       By bribing and corrupting PDVSA agents and officials, the Helsinge Enterprise also induced such agents and officials not to collect the full amounts due to PDVSA for the sale of PDVSA products to the Oil Company Conspirators and to overlook the failure of the Oil Company Conspirators to deliver the full amount of products bought and paid for by PDVSA.

5.       Initially, the Helsinge Enterprise acquired the proprietary inside PDVSA information used to implement its schemes by bribing and corrupting PDVSA agents and officials to provide such information on a case-by-case basis.

6.       However, as the conspiracy progressed, the Helsinge Enterprise was able to obtain direct access to PDVSA's proprietary servers, including by installing an interconnected, "clone server," and otherwise obtaining direct access to PDVSA's servers, that enabled the Helsinge Enterprise to misappropriate PDVSA inside and proprietary information on a real-time basis.

7.       The losses to PDVSA and the gains to Defendants as a result of the misdeeds by the Helsinge Enterprise amount to many billions of dollars.

## PARTIES

8.       Plaintiff PDVSA is the Venezuelan state-owned energy company.

9.       Through bribes and intimidation, Defendants succeeded in concealing their schemes for many years. However, as a result of an intensive investigation by lawyers and investigators in the United States, Venezuela, and Europe, the nature of Defendants' wrongful conduct was uncovered, and the PDVSA US Litigation Trust was formed on July 27, 2017 for the specific purpose, among other things, of pursuing recovery for Defendants' misconduct. Because this Court found that PDVSA's assignment to the Trust was invalid, PDVSA now brings the action in its own name.

10.     Defendant Lukoil Pan Americas, LLC is a limited liability company organized under the laws of Delaware with its principal office located at 1095 Avenue of the Americas, New York, New York 10036.

11.     Defendant Lukoil Petroleum Ltd. is a company organized under the laws of Switzerland with its principal place of business located at Rue Du Conseil-General 9, 1204 Geneva, Switzerland.

12.     Defendant Colonial Oil Industries, Inc. is a corporation organized under the laws of Georgia with its principal place of business at 101 North Lathrop Avenue, Savannah, Georgia 31415.

13.     Defendant Colonial Group, Inc. is a corporation organized under the laws of Georgia with its principal office located at 101 North Lathrop Avenue, Savannah, Georgia 31415.

14.     Defendant Glencore Ltd. is a company organized under the laws of England and Wales with its principal office located at 50 Berkeley Street, London, England W1J 8HD.

15.     Defendant Glencore International A.G. is a corporation organized under the laws of Switzerland with its principal office located at 301 Tresser Boulevard, Stamford, Connecticut 06901.

16.     Defendant Glencore Energy UK Ltd. is a company organized under the laws of England and Wales with its principal office located at 50 Berkeley Street, London, England W1J 8HD.

17.     Defendant Masefield A.G. is a corporation organized under the laws of Switzerland with its principal office located at Baarerstrasse 69, Zug 6300, Switzerland.

18.     Defendant Trafigura AG is a corporation organized under the laws of Switzerland with its principal office located at 1 rue de Jargonnant, CH1207 Geneva, Switzerland.

19.     Defendant Trafigura Trading LLC, formerly known as "Trafigura, Inc.," is a limited liability company organized under the laws of Delaware with its principal office located at 1401 McKinney Street, Suite 1500, Houston, Texas 77010.

20.     Defendant Trafigura Beheer BV is a corporation organized under the laws of the Netherlands with its principal office located at Evert van de Beekstraat 1-82, The Base, Tower B, 5th floor, 1118 CL Schiphol, The Netherlands.

21.     Defendant Vitol Energy (Bermuda) Ltd., is a company organized under the laws of Bermuda with its principal office located at Magnolia Towers, Hamilton HM 12, Bermuda.

22.     Defendant Vitol SA, is a corporation organized under the laws of Switzerland with its principal office located at Boulevard du Pont d'Arve 28, CH1205 Geneva, Switzerland.

23.     Defendant Vitol, Inc., formerly known as "Vitol SA, Inc.," is a corporation organized under the laws of Delaware with its principal office located at 2925 Richmond Avenue, 11th Floor, Houston, Texas 77098.

24.     Defendant Francisco Morillo is a Venezuelan national residing in Boca Raton, Florida, Miami, Florida and Geneva, Switzerland.

25.     Defendant Leonardo Baquero is a Venezuelan national residing in Miami, Florida.

26.     Defendant Daniel Lutz is a Venezuelan national residing in Miami, Florida.

27.     Defendant Luis Liendo is a Venezuelan national residing in Orlando, Florida.

28.     Defendant John Ryan is a U.S. national residing in Biscayne Park, Florida.

29.     Defendant Maria Fernanda Rodriguez is a Venezuelan national residing in Miami, Florida and a confidante of Ryan, Morillo and Baquero, upon information and belief.

30.     Defendant Helsinge Holdings, LLC, is a limited liability company organized under the laws of Florida with its principal office located at 1221 Brickell Avenue, Suite 948, Miami, Florida 33131.

31.     Defendant Helsinge, Inc. is a corporation organized under the laws a Panama with its principal place of business at 1221 Brickell Avenue, Suite 948, Miami, Florida :33131.

32.     Defendant Helsinge Ltd., Saint-Helier is a company organized under the laws of Jersey (U.K.) with its principal place of business in Geneva, Switzerland.

33.     Defendant Waltrop Consultants, C.A. is a corporation organized under the laws of Venezuela with its principal office located at 1221 Brickell Avenue, Suite 948, Miami, Florida 33131.

34.     Defendant Godelheim, Inc. is a corporation organized under the laws of Panama with its principal office located at 1221 Brickell Avenue, Suite 948, Miami, Florida 33131.

35.     Defendant Hornberg Inc. is a corporation organized under the laws of Panama with its principal office located at 1221 Brickell Avenue, Suite 948, Miami, Florida 33131.

36.     Defendant Societe Doberan, S.A. is a corporation organized under the laws of Panama with its principal office located at 1221 Brickell Avenue, Suite 948, Miami, Florida 33131.

37.     Defendant Societe Hedisson, S.A. is a corporation organized under the laws of Panama with its principal office located at 1221 Brickell Avenue, Suite 948, Miami, Florida 33131.

38.     Defendant Societe Hellin, S.A. is a corporation organized under the laws of Panama with its principal office located at 1221 Brickell Avenue, Suite 948, Miami, Florida 33131.

39.     Defendant Glencore de Venezuela, C.A. is a corporation organized under the laws of Panama with its principal office located at 1221 Brickell Avenue, Suite 948, Miami, Florida 33131.

40.     Defendant Jehu Holding Inc. is a corporation organized under the laws of Barbados with its principal place of business in Barbados.

41.     Defendant Andrew Summers is an individual residing in Geneva, Switzerland.

42.     Defendant Maximiliano Poveda is an individual residing in Houston, Texas.

43.     Defendant Jose Larocca is an individual residing in Geneva, Switzerland.

44.     Defendant Luis Alvarez is an individual residing in London, United Kingdom.

45.     Defendant Gustavo Gabaldon is an individual residing in Cos Cob, Connecticut.

46.     Defendant Sergio De La Vega is an individual residing in Mexico City, Mexico.

47.     Defendant Antonio Maarraoui is an individual residing in Houston, Texas.

48.     Defendant Campo Elias Paez is an individual residing in Caracas, Venezuela.

49.     Defendant Paul Rosado is an individual residing in Savannah, Georgia.

50.     Defendant BAC Florida Bank is a Florida banking corporation with its principal office located at 169 Miracle Mile, R-10, Coral Gables, Florida 33134.

51.     Defendant EFG International A.G., formerly known as "BSI," is a banking company organized under the laws of Switzerland with its principal office located at Bleicherweg 8, CH-9022 Zurich, Switzerland.

52.     Defendant Blue Bank International N.V., formerly known as "Premier Bank International N.V." is a banking company organized under the laws of Curacao with its principal office located at Abraham de Veerstraat 9, Willemstad, Curacao.

## JURISDICTION AND VENUE

53.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises out of violations of the federal laws and has supplemental jurisdiction over the related state claims pursuant to 28 U.S.0 §1367.

54.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and several of the Defendants reside and have offices in this district.

## BACKGROUND

**I.      THE ORIGIN OF THE CONSPIRACY AND THE RELEVANT PARTICIPANTS.**

55.     One of the principal participants in the investigations that uncovered the illegal conduct described herein is John Brennan, Chief Executive Officer of The Brennan Group LLC and a former Senior Detective at New Scotland Yard. His Declaration is attached hereto as Exhibit A, and the statements therein are incorporated by reference herein.

56.     Beginning on March 30, 2001, two Venezuelan nationals, Francisco Morillo ("Morillo") and Leonardo Baquero ("Baquero"), formed an energy consultancy firm called Waltrop Consultants, C.A. ("WTRPC") in Venezuela. WTRPC's ostensible purpose was to provide market intelligence to energy traders doing business in Venezuela and with PDVSA specifically.

57.     On January 30, 2004, Morillo and Baquero formed an energy advisory and trading firm called Helsinge, Inc., which they incorporated in Panama. Helsinge, Inc. was originally located in Caracas, Venezuela, but Helsinge and WTRPC thereafter relocated their

principal place of business to Miami, Florida.[2] Helsinge and WTRPC describe themselves as energy advisory firms.

58.     On behalf of the Helsinge Enterprise, Morillo and Baquero also formed many additional entities incorporated in Panama or Barbados (the "Panamanian Companies") to facilitate the various illicit schemes described herein. Among the Panamanian Companies formed by Morillo and Baquero are: (1) Societe Doberan, S.A.; (2) Societe Hedisson, S.A.; (3) Societe Hellin, S.A.; (4) Hornberg Inc.; (5) Godelheim, Inc.; (6) Glencore de Venezuela, C.A.; and (7) Jehu Holding, Inc.

59.     As is the case with WTRPC and Helsinge, the Helsinge Enterprise through Morillo and Baquero exerts total control over the Panamanian Companies. However, Morillo and Baquero do not appear as directors for any of the Panamanian Companies. Instead, the Panamanian Companies share the same five directors who reside in Panama and Miami, Florida.

60.     The Panamanian Companies are shell companies that serve as conduit entities for illegal payments and money laundering schemes (a) used to provide Morillo and Baquero and their co-conspirators with inside information on PDVSA's tenders for the sales of its hydrocarbon products as well as PDVSA's tenders for the purchase of its light crude oil products necessary for PDVSA's refinery operations so that it can lighten its domestic heavy crude oil products for export to countries outside of Venezuela, including the United States, and (b) used to distribute a portion of the Helsinge Enterprise's ill-gotten gains to participants.

61.     Beginning in 2004, Helsinge (through Morillo and Baquero) received PDVSA's confidential inside information for itself and its select multi-national energy trading corporation clients by bribing PDVSA business managers in PDVSA's Commercial and Supply Department and its Transport Department.

62.     These PDVSA departments collectively control the PDVSA tenders for contracts concerning PDVSA's purchases and sales of hydrocarbon products. The bribes were facilitated and paid out of the Panamanian Companies at the direction of Morillo and Baquero and with the knowledge and approval of their multi-national energy trading corporation co-conspirators.

63.     The international energy trading companies that have been provided access to this proprietary PDVSA information and that participated in the bribery payments and bid-rigging and other schemes include: (1) Lukoil Pan Americas LLC; (2) Lukoil Petroleum Ltd.; (3) Colonial Oil Industries, Inc.; (4) Colonial Group, Inc.; (5) Glencore Ltd.; (6) Glencore International, A.G.; (7) Glencore Energy UK Ltd.; (8) Masefield A.G.; (9) Trafigura A.G.; (10) Trafigura Trading LLC; (11) Trafigura Beheer B.V.; (12) Vitol Energy (Bermuda) Ltd.; (13) Vitol S.A.; and (14) Vitol, Inc. (each, an "Oil Company Conspirator" and, collectively, the "Oil Company Conspirators").

64.     The Oil Company Conspirators have offices throughout the United States.

65.     The Oil Company Conspirators' senior traders participating in this illicit activity include:

(a)     Trafigura senior traders, including Maximiliano Poveda, Jose Larocca and former Trafigura senior trader, Andrew Summers. Poveda is the Head Trader for Trafigura's LPG business worldwide. Larocca is a Director of Trafigura and the Head of Oil Trading and Member of Management Board of Trafigura Beheer B.V. Summers is the former Head of Fuel Oil & Bitumen for Trafigura;

(b)     Glencore senior traders, including Luis Alvarez (the former global head of crude-oil trading) and Gustavo Gabaldon (an oil products trader) and former Glencore Business Development Executive, Sergio De La Vega;

(c)     Vitol's Director of Latin American and Caribbean Trading, Antonio Maarraoui; and

(d)     Colonial Group's senior trader, Paul Rosado.

66.     Poveda, Larocca, Summers, Alvarez, Gabaldon, De La Vega, lvIaarraoui and Rosado are sometimes collectively referred to herein as "Individual Trader Conspirators".

67.     From 2004 to the present time, the Individual Trader Conspirators have served as among the most senior energy traders for each of the Oil Company Conspirators. In the case of Trafigura and Glencore, Jose Larocca and Luis Alvarez served as his company's director and head of global trading.

68.     Among the banks used to facilitate the bribe payments made by the Helsinge Enterprise, including by Morillo and Baquero, Helsinge, and the Oil Company Conspirators are: (1) BAC Florida Bank; (2) Blue Bank International N.V., (formerly "Premier Bank International N.V."); (3) EFG International A.G. (formerly "BSI"); and (4) Credit Suisse, through accounts located in Florida, Switzerland, and Curacao.

69.     This illegal activity is ongoing and the conspirators continue to use the same Panamanian Companies and banks to launder the payments to the bribed PDVSA agents and officials.

## II.     THE BID-RIGGING AND PRICE-FIXING SCHEMES CONCERNING PDVSA'S TENDERS FOR ITS HYDROCARBON SALES AND PURCHASES.

70.     PDVSA's policy is to buy and sell products only from traders whom it has pre-approved for doing business with PDVSA.

71.     From 2004 to 2011, neither Helsinge, WTRPC, nor any of the Panamanian Companies were approved as authorized oil and gas traders with PDVSA.

72.     Notwithstanding this fact, in 2004, Morillo and Baquero leveraged their contacts within PDVSA's Commercial and Supply Department and entered into an illicit agreement with several business managers at PDVSA whereby Morillo and Baquero would pay the PDVSA employees bribes in exchange for advance and confidential information concerning PDVSA's future tenders for its purchases and sales of hydrocarbon products and the bids made by competing oil traders.

73.     Among the key business managers coordinating this illicit scheme from within PDVSA were Rene Hecker (the business manager of the Commercial and Supply Department until 2013), Marco Malave (Head of the PDVSA Commercial and Supply Department from 2012 to 2017), Edgar Garcia (a business manager in PDVSA's Freight and Transport Department until 2008), and Ysmel Serrano (the current Head of PDVSA's Commercial and Supp Ly Department) (each, a "Bribed PDVSA Employee" and, collectively, the "Bribed PDVSA Employees").

74.     The Oil Company Conspirators were already existing traders approved to do business with PDVSA in 2004. However, Morillo and Baquero promised and delivered to the Oil Company Conspirators full details of competing bids as well as PDVSA's confidential inside information concerning PDVSA's future tenders months before the marketplace received the same information from PDVSA.

75.     As explained in greater detail below, the advance receipt of this confidential PDVSA information provided the Oil Company Conspirators with an acute advantage over their marketplace competitors in "winning" the tenders offered by PDVSA. Many of these disadvantaged competitors are oil trading companies in the United States.

76.     Morillo and Baquero, acting through Helsinge and the Panamanian Companies, provided inside proprietary PDVSA information as well as access to the Bribed PDVSA

Employees to the Oil Company Conspirators. In return, the Oil Company Conspirators paid Helsinge and the Panamanian Companies' fees or "commissions" for the receipt of the inside information and rigged tenders. These payments compensated Morillo and Baquero for serving as the "middle man" for the sale of PDVSA's confidential proprietary information and were also the funds ultimately used in part for the bribe payments to the Bribed PDVSA Employees.

77.     As explained below, Morillo and Baquero attempted to disguise the bribes and launder these illicit payments. The payments to the Bribed PDVSA Employees were paid by the Oil Company Conspirators to the Panamanian Companies' bank accounts. Morillo and Baquero would then pay the bribes to the Bribed PDVSA Employees from the Panamanian Companies' bank accounts. Shortly before or after the payment of these bribes, the Oil Company Conspirators would receive the advance PDVSA tender information and their competitors' competing bids so that the Oil Company Conspirators were assured to win their choice of PDVSA contracts.

78.     As explained below, the Oil Company Conspirators knowingly participated in this scheme. Indeed, the fraudulent and anti-competitive schemes were so lucrative for the Oil Company Conspirators, that as part of the conspiracy Individual Trader Conspirators personally received payments to reward their involvement in the conspiracy and assure their silence.

79.     The conspirators expended substantial time and resources to conceal their illicit conduct, including by fraudulently generating fictitious "agency" or "advisory" agreements between the Panamanian Companies and the Oil Company Conspirators whereby the Oil Company Conspirators purportedly "retained" the Panamanian Companies as "market research" or "business intelligence" firms to assist the Oil Company Conspirators' "liaison" with PDVSA.

80.     These fictitious agency and advisory agreements were generated between Morillo and Baquero and the Oil Company Conspirators to provide the facade of legitimacy to the millions

of dollars in annual bribe payments being funneled by the Oil Company Conspirators, through the Panamanian Companies, to the corrupt PDVSA agents and officials, and other co-conspirators, in furtherance of their bid-rigging, price-fixing and other schemes. Indeed, each of the Oil Company Conspirators entered into an agency or advisory agreement with one or more Panamanian Companies that served as the conduit for the payments to the Bribed PDVSA Employees and Individual Trader Conspirators.

81.     Given that the Panamanian Companies have never been approved to do business of any kind with PDVSA and that the Oil Company Conspirators were all approved traders with PDVSA, there was not even a colorable business justification for these advisory or agency agreements, which purported to pay the Panamanian Companies excessively high compensation for their "services," including non-refundable monthly retainers between $15,000 and $150,000, plus added compensation of $0.05 to $0.22 per barrel of oil product bought from or sold to PDVSA by the Oil Company Conspirators as a result of the Panamanian Companies' "services."

82.     The manner in which Morillo and Baquero communicated PDVSA's proprietary tender information and the third-parties' competing bids to the Oil Company Conspirators took several forms, as described more fully below.

83.     Morillo and Baquero and the Bribed PDVSA Employees communicated via numerous private email accounts using a litany of aliases to conceal their identities. For example, Rene Hecker (one of the Bribed PDVSA Employees) used a private email account at sclupsgmail.com to communicate with Morillo at either Morillo's WTRPC email account or his many private email accounts, including franciscomorillo@cantv.net, whereby Hecker or one of his complicit subordinates would provide Morillo and Baquero with the details concerning upcoming PDVSA tenders.

84.     Morillo and Baquero would then relay PDVSA's proprietary information concerning future tenders to the Oil Company Conspirators at their corporate email accounts or, at other times, to the Individual Trader Conspirators' private email accounts. As explained in greater detail below, the Oil Company Conspirators would then instruct Morillo and Baquero on how to rig selected future tenders in such a manner so as to either ensure (1) that they would win those tenders by being the only bidders able to fulfill the quantitative and qualitative terms of the rigged tenders or (2) that their bids would beat the bids of competing oil traders.

85.     Morillo and Baquero would then relay the Oil Company Conspirators' directives to the Bribed PDVSA Employees over private email to ensure the targeted future tenders were modified accordingly.

86.     As explained below, separate and apart from the use of private emails to disseminate PDVSA's proprietary and confidential information, Morillo and Baquero, with the assistance of certain Bribed PDVSA Employees, particularly Luis Liendo, set up a "clone server," and related interconnected electronic means to gain immediate access to PDVSA's confidential information.

87.     Thus, Morillo and Baquero had direct "real time" access into PDVSA's computer system in the Commercial and Supply Department. This enabled Morillo and Baquero to access PDVSA's confidential information, including with respect to its future tender contracts and the real time competing bids submitted by the Oil Company Conspirators' market competitors for tenders already released by PDVSA for competitive bidding.

88.     Morillo and Baquero would then either share with the Oil Company Conspirators their real-time access to PDVSA's computer system or communicate the competing bid information to the Oil Company Conspirators via private email or through Instant Message

Boards in which Morillo and Baquero and the Individual Trader Conspirators, using aliases to conceal their identities, would discuss the competing third-party bids. Each of the Individual Trader Conspirators have operated, and continue to operate, with aliases of their own and the conspirators continue to use the clone server and other means to obtain PDVSA's confidential information to their economic advantage. *See* the Declaration of John Thackray, dated February 12, 2018, attached hereto as Exhibit B, whose statements are incorporated by reference herein.

89.     The conspirators have concealed their actions from the marketplace and from PDVSA (apart from the Bribed PDVSA Employees whose misconduct was unauthorized and outside the scope of their employment). In addition to the actions described above, Morillo and Baquero instructed the Bribed PDVSA Employees to destroy evidence maintained at PDVSA concerning the modification of the tenders targeted by the conspirators so as to avoid detection by PDVSA through its internal controls. The Bribed PDVSA Employees were also instructed to destroy any evidence of their communications with the conspirators.

90.     As a result of the improper influence of the Helsinge Enterprise, in 2011 PDVSA's accreditation department approved Helsinge as an authorized PDVSA trader.

91.     The aforementioned bid-rigging and price-fixing schemes continued after Helsinge became an approved PDVSA trader and continue to the present day. In addition, Helsinge now trades on its own account as well as continuing to serve as the "advisor" or "agent" for the Oil Company Conspirators, whereby Morillo and Baquero continue being compensated by the Oil Company Conspirators for providing the inside information and rigging the tenders on the Oil Company Conspirators' behalf

III.     III.     **CONTROL AND RIGGING OF PDVSA'S TENDER PROCESS FOR OIL PRODUCTS THAT IT SELLS AND PURCHASES.**

92.      Morillo and Baquero have control over the PDVSA tender process through the Bribed PDVSA Employees in the Commercial and Supply Department. Morillo and Baquero control the details of the launch of a tender by PDVSA and the tender's terms.

93.      This gives Helsinge and the Oil Company Conspirators an illegal and grossly disproportionate advantage because it provides them with the ability to dictate the procedure and substance of the tenders in a manner that makes it logistically impossible for a market competitor to even submit a valid competing bid.

94.      For example, PDVSA's Planning Department notifies the Commercial and Supply Department of PDVSA's supply of heavy crude available for sale or conversely its light crude requirements approximately 45 to 60 days in advance of when a tender should be "officially" launched into the marketplace for bids.

95.      Instead of promptly issuing the tender for the particular hydrocarbon product to the approved PDVSA traders, however, the Bribed PDVSA Employees only communicate this information to Morillo and Baquero and withhold releasing the tender until such time as the Bribed PDVSA Employees receive feedback from Morillo and Baquero as to whether the tender is of interest to Helsinge or the Oil Company Conspirators.

96.      Morillo and Baquero use the "first look" and advance lead time to coordinate with the Oil Company Conspirators (including through the Individual Trader Conspirators) and determine if any of the conspirators have an interest in closing on the specific tender.

97.      If so, Morillo and Baquero directed the Bribed PDVSA Employees as to how to change the quantitative and qualitative terms of the tender to ensure that one of the Oil Company Conspirators is the winning bidder (per the instructions received by Morillo and Baquero from the

18

Oil Company Conspirators). The adjustments made by the Bribed PDVSA Employees in the Commercial and Supply Department include: (a) lowering the minimum pricing formula for a particular tender; (b) requiring the use of a particular shipping company as the oil tanker transport; (c) altering the loading dates and times; (d) amending the terms of payment for the tender; and (e) demanding that a particular inspection company be available as the quality control agent.

98.     The Bribed PDVSA Employees hold back the tender issuance date to the marketplace in order to compress the bid window and the time period from "best and final" tender offers to the closing date when the buyer must take delivery of the product on its tanker and leave the loading port.

99.     By compressing the time period on those tenders of interest to the Oil Company Conspirators, the market competitors are placed at a further severe disadvantage in submitting competing bids because they cannot arrange for financing, transport vessels or inspection teams in such a short period of time.

100.    By contrast, Helsinge and the Oil Company Conspirators have ample time to establish the lines of credit and transport services required to close on a contract because they receive the tender information at least thirty (30) days before the competitors do. As a result, Helsinge and the Oil Company Conspirators are able to acquire PDVSA's crude oil at a price artificially lower than the price that would result from competitive bidding.

101.    Helsinge and the Oil Company Conspirators are engaging in the same fraudulent scheme for supplying PDVSA with light crude products that PDVSA needs for blending with its heavy crude oil in order to sell its oil products into the marketplace, including the United States.

102.    Just as with PDVSA's oil products that it sells through tenders designed to facilitate competitive bidding, Morillo and Baquero and the Oil Company Conspirators pay bribes to the

Bribed PDVSA Employees in exchange for receipt of confidential PDVSA information and control over the tender process for PDVSA's light-crude oil purchases.

103.     Among the light crude products that PDVSA needs to purchase with regularity are naphtha, MTBE, and Blend Stock. Without these light crude products, PDVSA cannot refine its heavy crude and export its own hydrocarbon products.

104.     Helsinge and the Oil Company Conspirators use their advance knowledge of PDVSA's demand requirements for the light crude products (*e.g.,* naphtha) to buy as much of these light crude products and petrochemical solvents from energy suppliers in advance of PDVSA's official issuance of the tenders so as to prevent competitors from being able to source these products during the compressed timeframes demanded in the rigged tenders. In addition, Helsinge and the Oil Company Conspirators can dictate the price of these light crude products sold to PDVSA because of their total control over the tender process.

105.     Morillo and Baquero's provision of inside proprietary PDVSA tender information to the Oil Company Conspirators has occurred from 2004 until the present date.

106.     The Helsinge Enterprise's illicit schemes and control over the Bribed PDVSA Employees, as orchestrated by Morillo and 13aquero, have enabled Helsinge and the Oil Company Conspirators to earn billions in unlawful profits at the expense of PDVSA.

107.     Helsinge and the Oil Company Conspirators are now the dominant suppliers of light crude products to PDVSA. Between 2004 and 2017, Helsinge, Glencore, Lukoil, Trafigura, and Vitol constituted five out of the top ten suppliers of light crude products to PDVSA as measured by volume and total contract price.

108. This is remarkable for Helsinge given its small size (under 10 employees, temporary office space, and no significant infrastructure) and the fact that it was not an approved bidder or seller to PDVSA until 2011.

109. Indeed, on December 7, 2016, Helsinge was awarded one of the largest contracts for the supply of naphtha in PDVSA's history — the supply of 18 million barrels of heavy naphtha which was scheduled for delivery in the first six months of 2017.

## IV. BID-RIGGING AND PRICE-FIXING THROUGH DIRECT REAL-TIME ACCESS TO PDVSA'S COMPUTER SYSTEM.

110. Morillo and Baquero and their co-conspirators have implemented a second layer of competitive advantage (also illicit) to ensure that competitors that try to bid on rigged PDVSA tenders are edged out on the "best and final" offers because they have real time access to competing third-party bids through Morillo and Baquero's use of a "clone server," and other electronic interconnections, which provides them direct, real-time access to the confidential information of the PDVSA Commercial and Supply Department.

111. A clone server was originally installed at Morillo and Baquero's Miami offices by a former PDVSA IT Administrator named Luis Liendo. Liendo was an associate of Bribed PDVSA Employee Rene Hecker. Liendo is himself a Bribed PDVSA Employee who received direct payments from Morillo and Baquero (through the Panamanian Companies) in exchange for his services.

112. Morillo and Baquero have referred to Liendo by his alias, "The Nerd," and his bribe payments have been recorded in the Panamanian Companies' books and records.

113. Liendo successfully set up a clone server to operate automatically and provide Morillo and Baquero and their co-conspirators with instantaneous real time "live access" to the PDVSA Commercial and Supply server.

114.    Morillo and Baquero and the co-conspirators continue to utilize the clone server, including to provide Morillo and Baquero and, through them, the Helsinge Enterprise, with direct access to PDVSA internal communications at their Miami office, which serves as the principal place of business for Helsinge, WTRPC, and the Panamanian Companies.

115.    Initially, Morillo and Baquero utilized the clone server and conveyed the data so obtained to the Oil Company Conspirators. However, since at least as early as 2013, and up to the present, Morillo and Baquero have been able to provide the Oil Company Conspirators with direct access to the clone server and the PDVSA Commercial and Supply Department. This access is controlled by Morillo and Baquero who are paid by the Oil Company Conspirators for this illicit advantage.

116.    In order to prolong the illicit scheme, Morillo and Baquero took active measures to fraudulently conceal the scheme from PDVSA's management. The scheme continued for over a decade because Morillo and Baquero and their co-conspirators intentionally and knowingly concealed material facts, including that the PDVSA tenders were rigged and that Morillo and Baquero and their co-conspirators had access to PDVSA's confidential, inside information.

117.    To conceal their scheme, the co-conspirators bribed corrupt high-level PDVSA managers to monitor and sabotage any potential discovery of the scheme and to rig the tenders and bid awards to create a false appearance of regular market transactions. In addition, Morillo and Baquero ensured that their scheme was not discovered by monitoring PDVSA's internal computer system using the clone server that was created for them by the Bribed PDVSA Employees.

118.    Absent the co-conspirators' active measures to covertly prevent any discovery of the illicit scheme, PDVSA would have ceased doing business with the Oil Company Conspirators and Helsinge.

V.     **THE PAYMENTS FLOWING FROM THE OIL COMPANY CONSPIRATORS TO THE BRIBED PDVSA EMPLOYEES VIA THE PANAMANIAN COMPANIES.**

119.    Payments from the Oil Company Conspirators to the Bribed PDVSA Employees flowed and continue to flow, among other means, through the Panamanian Companies.

120.    The Oil Company Conspirators wire payments into the Panamanian Companies' bank accounts (many of which are located in Florida and elsewhere in the United States). Typically, within one week of receiving these payments from the Oil Company Conspirators, Morillo and Baquero wire transfer the payments to the Bribed PDVSA Employees from the same Panamanian Companies' bank accounts.

121.    Morillo and Baquero and their co-conspirators have undertaken elaborate efforts to facilitate the bribe payments to the Bribed PDVSA Employees. For example, payments to these employees have been made to "straw men" recipients ranging from shell companies to relatives. Moreover, in an effort to conceal these payments, the records of these payments routinely refer to the recipients through aliases.

122.    Morillo and Baquero have coordinated the payments running to the 13ribed PDVSA Employees and the Individual Trader Conspirators from 2004 until the present time by using the Panamanian Companies as the conduit entities to facilitate and launder the payments.

123.    The Oil Company Conspirators were fully apprised of all bribe payments made by Morillo and Baquero which were disguised as "representation fees" or *"honorarios"* in the books and records of the Oil Company Conspirators.

124.    The Oil Company Conspirators have also reconciled the bribes against the contracts steered toward each Oil Company Conspirator. These schedules include payments made to the Oil Company Conspirators' own traders (and sometimes their spouses).

125.     Morillo and Baquero have maintained similar records with the Oil Company Conspirators and the scheme remains in place today.

## VI.      BANKS FACILITATED THE FRAUDULENT SCHEME.

126.     Morillo and Baquero could not have perpetuated the multibillion-dollar fraudulent scheme without the active facilitation of the Bank Defendants.

127.     The Bank Defendants failed to follow the due diligence requirements commonly referred to as "know your customer" rules imposed by banking regulations, industry standards and internal rules. The "know your customer" rules are designed to detect and prevent the type of money laundering scheme Morillo and Baquero executed. These rules require a reasonable inquiry to determine the intended purpose of a customer's transactions and whether a customer's business operations, and the proceeds of those operations, constitute an illegal scheme. To the contrary, the Bank Defendants had actual and/or constructive knowledge of the fraud run by Morillo, Baquero, and the Helsinge Enterprise. The evidence of the Bank Defendants' actual and/or constructive knowledge include:

(a)     Morillo and Baquero frequently opened and closed accounts on their own behalf, and on behalf of the Panamanian Companies, including closing and opening accounts within the same day;

(b)     Morillo and Baquero and the Panamanian Companies made frequent intercompany wire transfers that were obviously not related to the operation of any regular business;

(c)     Morillo and Baquero provided identical pretextual and suspicious reasons for closing and opening accounts;

24

      (d)      Morillo and Baquero provided evasive and obscure answers to questions regarding the Panamanian Companies' business operations and the identity of their owners; and

      (e)      Morillo and Baquero and the Bribed PDVSA Employees shared the same private bankers at the Bank Defendants and opened and closed accounts in tandem and wired substantial sums of monies between their accounts at the Bank Defendants.

128.    For example, Morillo and Baquero paid Rene Hecker hundreds of thousands of dollars in bribes in four transactions over a three-month period. Those payments were paid out of a Premier Bank International N.V. (now Blue Bank International N.V.) account held in the name of one of the Panamanian Companies and into a Premier Bank International N.V. account held in the name of Rene Hecker's shell entity. All of these transactions were facilitated by a single banker at Premier Bank International N.V., Randolph Arvelo. Two weeks after the last payment, Morillo and Baquero urgently requested Arvelo to close the bank accounts on the same day as they requested to open new accounts. Morillo and Baquero provided Arvelo with identical pretextual reasons for the request to close the accounts and open new accounts.

129.    Similarly, Premier Bank International N.V. failed to perform the requisite "know your customer" due diligence when Morillo and Baquero attempted to open new accounts under the names of different Panamanian Companies. Even when Premier Bank International N.V. made rudimentary requests for background information regarding the Panamanian Companies, including the identity of directors, Morillo and Baquero refused to provide responsive information. Notwithstanding the evasiveness, Premier Bank International N.V. permitted Morillo and Baquero to open the accounts without any further investigation.

130.     Industry standards, bank regulations, and the Bank Defendants' own policies required that suspicious activities be reported to the appropriate authorities. Morillo and Baquero's activities clearly raised red flags that were, at best, willfully ignored by the Bank Defendants and were never reported to the authorities. Thus, as a result of the Bank Defendants' failure to comply with their own legal and regulatory obligations, the fraudulent activity continued unabated for over a decade and provided substantial aid to Morillo and Baquero's scheme, realizing millions of dollars in fees for the Bank Defendants as a result.

## VII.     HELSINGE AND THE OIL COMPANY CONSPIRATORS HAVE FAILED TO REMIT FULL PAYMENT ON THE CONTRACTS IN WHICH PDVSA HAS SOLD TO THEM AND THEY HAVE FAILED TO DELIVER THE QUANTITIES OF LIGHT CRUDE OIL PRODUCTS FOR WHICH PDVSA HAS ALREADY PRE-PAID.

131.     As a result of the conspirators' control over the Bribed PDVSA Employees, the Bribed PDVSA Employees caused PDVSA to overlook the fact that Helsinge and the Oil Company Conspirators have failed to remit full payment to PDVSA on sales contracts for hydrocarbon products on which Helsinge or the Oil Company Conspirators closed.

132.     In addition, Helsinge and the Oil Company Conspirators require PDVSA to pre-pay 100% of the contract price for the light crude products that Helsinge and the Oil Company Conspirators sell to PDVSA. However, the Oil Company Conspirators and Helsinge have consistently failed to deliver the full amount of the light crude oil products for which PDVSA has fully paid.

133.     The total amounts of monies owed by Helsinge and the Oil Company Conspirators, for their respective underpayments on PDVSA's sales contracts and PDVSA's overpayment with recent products purchased by PDVSA that have already been identified alone total in the billions of dollars.

26

VIII.    **PAYMENTS WERE MADE BY PDVSA AND PAYMENTS WERE RECEIVED BY PDVSA FROM AND TO PDVSA'S ACCOUNTS IN BANKS IN THE UNITED STATES.**

134.    PDVSA received payments for the sale of crude oil and made payments for the purchase of light hydrocarbon products through its accounts in American banks or in foreign banks with branches in the United States.

135.    Thus, to the extent that the misdeeds perpetrated by the Helsinge Enterprise resulted in underpayments to PDVSA for the sale of crude oil products and overpayments by PDVSA for the purchase of light hydrocarbon products, PDVSA suffered injury in the United States.

## CLAIMS FOR RELIEF

### COUNT I

**(PDVSA Sales of Hydrocarbon Products — Violations of Section I of the Sherman Act) (Against All Defendants)**

136.    Plaintiff incorporates by reference and realleges paragraph 1-13 5 as though fully set forth herein.

137.    PDVSA sells hydrocarbon products for foreign export. The United States is the largest market for PDVSA's products.

138.    The Oil Company Conspirators, Helsinge, and their co-conspirators contracted, combined, and conspired to unreasonably restrain trade by fixing the prices of, rigging the bids for, and excluding competition (including the competition of legitimate American oil companies) in, the purchase of hydrocarbon products from PDVSA, as described in more detail above.

139.    As a result of the suppressed competition described above, PDVSA was injured because it was forced to sell oil products to the Oil Company Conspirators and Helsinge, and to do so at artificially depressed, below-market prices.

140.     The Oil Company Conspirators and Helsinge acted with the specific intent and effect of preventing their competitors, including U.S. importers, from competing with them in the purchase and sale of products to and from PDVSA. That direct domestic effect of limiting competition with U.S. importers caused the injury suffered by PDVSA. That injury is quantifiable and not speculative.

141.     As a result of this unlawful conduct, PDVSA suffered billions of dollars in losses by selling its products to the Oil Company Conspirators and Helsinge at artificially depressed prices.

142.     The actions of the Oil Company Conspirators, Helsinge, and their co-conspirators constitute a continuing, horizontal agreement and conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition.

143.     The Oil Company Conspirators and Helsinge (a) directly entered into the illegal conspiracy and agreement with each other; and (b) entered into individual agreements with their common agents, Morillo and Baquero and their co-conspirators, for the express purpose of illegally restraining competition, which themselves constitute illegal horizontal agreements to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act.

144.     The Oil Company Conspirators and Helsinge, by direct agreement and through their common agents, conspired to rig the bidding on the purchase of PDVSA's products. The Oil Company Conspirators and Helsinge's agreement to submit collusive, non-competitive, rigged bids constitutes *a per se* violation of the Section 1 of the Sherman Act (15 U.S.C. § 1).

145.     The Oil Company Conspirators and Helsinge, by direct agreement and through their common agents, conspired to artificially depress the price of PDVSA's products. The Oil Company

Conspirators and Helsinge's agreement to artificially depress the price of PDVSA's products constitutes a *per se* violation of the Section 1 of the Sherman Act (15 U.S.C. § 1).

146.    The Oil Company Conspirators and Helsinge, by direct agreement and through their common agents, conspired to obtain and exchange material, non-public information to reduce competition for the purchase of PDVSA's products in order to artificially depress the price of those products and to eliminate competitors. The information exchange among the Oil Company Conspirators and Helsinge facilitated their price-fixing agreement, *a per se* violation of the Section 1 of the Sherman Act (15 U.S.C. § 1).

147.    The Oil Company Conspirators and Helsinge engaged in the above-described conduct with the participation of Morillo and Baquero and their co-conspirators.

148.    As a result of this unlawful conduct and suppressed competition, PDVSA has suffered billions of dollars in losses. Pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), Defendants are liable for treble damages and the costs of suit, including reasonable attorney's fees, as a consequence of Defendants' violations of Section 1 of the Sherman Act.

149.    In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from continuing to engage in the anticompetitive conduct described herein.

## COUNT II

**(PDVSA Purchases of Light Crude Products — Violations of Section I of the Sherman Act)**
**(Against All Defendants)**

150.    Plaintiff incorporates by reference and realleges paragraphs 1-1 3 5, 13 71 4 1 and 14 3 - 1 4 7 as though fully set forth herein.

151.    PDVSA exports oil products including heavy crude oil to the United States and other countries. In order to transport the heavy crude oil, PDVSA refines the heavy crude oil to

lighten the load. In order to refine the oil, PDVSA uses imported petroleum solvents and light crude oil products, including naphtha.

152.    PDVSA issues tenders to market participants to provide them with an opportunity to bid on spot contracts for the sale of light crude products to PDVSA.

153.    The Oil Company Conspirators and Helsinge have also sold light crude products to PDVSA, many of these products come from the United States.

154.    The Oil Company Conspirators and Helsinge, through Morillo and Baquero, reached an agreement on how they would rig PDVSA tenders for the purchase of its petroleum solvents and light crude oil products, including naphtha, in their favor and at the exclusion of competitors (including legitimate American companies) that are not members of the scheme.

155.    In addition their direct agreement to limit competition, the Oil Company Conspirators and Helsinge also used Morillo and Baquero and their co-conspirators as their common agents to participate in the scheme to rig PDVSA's tenders and artificially raise the price of the hydrocarbon products acquired by PDVSA, all as described herein, including, for example, bribing the Bribed PDVSA Employees to customize PDVSA tenders such that only the Oil Company Conspirators and Helsinge could meet the demands of the tenders and otherwise suppressing competition.

156.    In addition to customizing the tenders such that only the Oil Company Conspirators and Helsinge could succeed, Morillo and Baquero also bribed the Bribed PDVSA. Employees to provide access to material non-public inside information regarding PDVSA's prospective tender pricing and specifications, to further facilitate the bid-rigging scheme, which Moril Lo and Baquero and their co-conspirators provided to the Individual Trader Conspirators, the Oil Company Conspirators, and Helsinge.

157.     The Oil Company Conspirators and Helsinge's advance access to PDVSA's tenders allowed them to acquire a substantial amount of the supply of the light crude products required by PDVSA and store them in warehouses in the United States until the public release of PDVSA's tenders. With regard to the tenders that the co-conspirators manipulated, the scheme prevented other competitors from acquiring the light crude products to sell to PDVSA within the compressed timeframes demanded by the rigged tenders.

158.     As a result of the suppressed competition, PDVSA was injured because it was forced to purchase light crude products at artificially raised, above-market, prices from the Oil Company Conspirators and Helsinge. The Oil Company Conspirators' and Helsinge's competitors would have bid to sell the light crude products to PDVSA at lower, competitive, prices if they were privy to the same PDVSA inside information. The Oil Company Conspirators and Helsinge were able to suppress competition because they conspired with corrupt PDVSA employees to customize and manipulate bids in their favor.

159.     The Oil Company Conspirators and Helsinge acted with the specific intent and effect of eliminating their competitors, including U.S. light crude product exporters, from competing with them by rigging the tenders to exclude these competitors.

160.     As a result of the co-conspirators' unlawful conduct, PDVSA unknowingly entered into thousands of rigged purchase contracts with the Oil Company Conspirators and Helsinge.

161.     The Oil Company Conspirators and Helsinge entered into a continuing, horizontal agreement to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition, including competition from legitimate American companies. That direct domestic effect caused the injury suffered by PDVSA and such injury is in quantifiable and not speculative.

162.    The Oil Company Conspirators and Helsinge directly entered into the illegal agreement with each other.

163.    The Oil Company Conspirators and Helsinge also entered into separate, individual agreements with their common agents, Morillo and Baquero and their co-conspirators, for the express purpose of illegally restraining competition. The use of Morillo and Baquero and their coconspirators as the Oil Company Conspirators' and Helsinge's common agents constitutes an illegal horizontal agreement to unreasonably restrain trade and commerce.

164.    The Oil Company Conspirators and Helsinge, by direct agreement and through their common agents, conspired to rig the bidding on the tenders for the sale of light crude products to PDVSA. The Oil Company Conspirators and Helsinge's agreement to submit collusive, non-competitive, rigged bids constitutes a *per se* violation of the Section 1 of the Sherman Act (15 U.S.C. § 1).

165.    The Oil Company Conspirators and Helsinge, by direct agreement and through their common agents, conspired to artificially raise the price of the light crude products PDVSA was seeking to acquire. The Oil Company Conspirators and Helsinge's agreement to artificially raise the price of these products constitutes a *per se* violation of the Section 1 of the Sherman Act (15 U.S.C. § 1).

166.    The Oil Company Conspirators and Helsinge, by direct agreement and through their common agents, conspired to obtain and exchange material, non-public information to reduce competition for the sale of light crude products to PDVSA in order to artificially raise the price of those products. The information exchange among the Oil Company Conspirators and Helsinge facilitated their price-fixing agreement, a *per se* violation of the Section 1 of the Sherman Act (15 U.S.C. § 1).

167.     Because of this price-fixing, PDVSA paid inflated, anti-competitive prices for light crude products which directly affected the price and the amount of such products that were exported from the United States.

168.     The Oil Company Conspirators engaged in the above-described conduct with the participation of their co-conspirators, including Morillo, Baquero, Helsinge, and WTRPC.

169.     As a result of this unlawful conduct and suppressed competition, PDVSA has suffered billions of dollars in losses. Pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), Defendants are liable for treble damages, the costs of suit, including reasonable attorney's fees, as a consequence of Defendants' violations of Section 1 of the Sherman Act.

170.     In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from engaging in the anticompetitive conduct set forth herein.

<u>**COUNT III**</u>

**(PDVSA Sales of Hydrocarbon Products - Violations of Section 2(c) of the
Robinson-Patman Act)
(Against All Defendants)**

171.     Plaintiff incorporates by reference and realleges paragraphs 1 - 1 3 5 as though fully set forth herein.

172.     In concert with Morillo and Baquero and the Panamanian Companies, the Oil Company Conspirators, Helsinge and the Individual Trader Conspirators paid bribes to the Bribed PDVSA Employees in order to: (a) rig tenders for the sale of PDVSA's oil products; and (b) gain inside information, which allowed the Oil Company Conspirators and Helsinge to eliminate and unreasonably restrain their competition and purchase oil products from PDVSA at artificially depressed prices. For example, as described below:

(a)    The Oil Company Conspirators and Helsinge, as the potential purchasers of PDVSA's products, made illicit payments to the Bribed PDVSA Employees in order to obtain a competitive advantage over other potential purchasers;

(b)    In exchange for payments, the Bribed PDVSA Employees modified PDVSA tenders such that only the Oil Company Conspirators and Helsinge could meet the tenders' requirements;

(c)    In exchange for payments, the Bribed PDVSA Employees rejected competitive bids from market competitors for pretextual reasons in order to award those tenders to the Oil Company Conspirators and Helsinge;

(d)    In exchange for payments, the Bribed PDVSA Employees provided the Oil Company Conspirators, Helsinge, the Individual Trader Conspirators and Morillo and Baquero with access to non-public inside information that was unavailable to other potential purchasers of PDVSA products; and

(e)    The inside information provided by the bribed PDVSA employees allowed the Oil Company Conspirators, Helsinge and the Individual Trader Conspirators to rig bids for PDVSA products and to fix the pricing for those products.

173.    The Oil Company Conspirators and Helsinge colluded in the bribery scheme to gain an advantage over other competitors for the purchase of PDVSA products. The bribery scheme suppressed competition and artificially depressed the price the Oil Company Conspirators and Helsinge paid PDVSA for the oil products. Absent the Oil Company Conspirators and Helsinge's bribery scheme, more competitors would have bid for PDVSA tenders and increased the price that PDVSA would have received for its products.

174.   As a result of the anti-competitive conduct, PDVSA was directly injured because it was forced to sell its products for artificially depressed, below-market prices. PDVSA is the party most directly affected by the anti-competitive conduct.

175.   The Oil Company Conspirators and Helsinge, through Morillo and Baquero, continue to bribe the Bribed PDVSA Employees to conceal their illegal scheme from PDVSA management and to sabotage any attempts at discovering the scheme.

176.   The bribery scheme has adversely affected the flow of commerce between the United States and Venezuela, including by excluding legitimate American companies from fairly competing to do business with PDVSA.

177.   The Oil Company Conspirators and Helsinge have made the illicit payments in order to induce the Bribed PDVSA Employees to rig tenders in their favor and to allow the Oil Company Conspirators and Helsinge to acquire PDVSA products at artificially depressed, below-market prices. The Oil Company Conspirators and Helsinge have purchased PDVSA products in Venezuela and most of the products were ultimately delivered to the United States market.

178.   The Individual Trader Conspirators have used the U.S. bank accounts of the Oil Company Conspirators and Helsinge to transfer payments to Morillo and Baquero, with the intent and effect that the payments would be sent on to the Venezuela-based Bribed PDVSA Employees as bribes.

179.   The Helsinge Enterprise through Morillo and Baquero, has managed the bribery scheme from their U.S. offices.

180.   In addition, the Individual Trader Conspirators and Morillo and Baquero directly accessed PDVSA's inside information, which was gained by paying bribes to the Bribed PDVSA

Employees, at the Individual Trader Conspirators' and Morillo and Baquero's respective U.S. offices.

181.     In furtherance of the Oil Company Conspirators' and Helsinge's scheme to corrupt the Bribed PDVSA Employees, the Individual Trader Conspirators met with Morillo and Baquero in the United States.

182.     The payments of bribes by the Oil Company Conspirators and Helsinge, as purchasers, to the Bribed PDVSA Employees, as agents of the seller, violated Section 2(c) of the Robinson-Patman Act (15 U.S.C. § 13).

183.     As a result of Defendants' unlawful conduct and suppressed competition, PDVSA has suffered billions of dollars in losses. Pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), the Defendants are liable for treble damages and the costs of suit, including reasonable attorney's fees.

184.     In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from engaging in the anticompetitive conduct described above.

## COUNT IV

**(PDVSA Purchases of Light Crude Products - Violations of
Section 2(c) of the Robinson-Patman Act)
(Against All Defendants)**

185.     Plaintiff incorporates by reference and realleges paragraphs 1-13 5and 1 221 8 1 as though fully set forth herein.

186.     In concert with Morillo and Baquero and the Panamanian Companies, the Oil Company Conspirators, Helsinge and the Individual Trader Conspirators paid bribes to the Bribed PDVSA Employees in order to (a) rig tenders for the sale of light crude products to PDVSA and (b) gain advance inside information about the timing and specifications of these tenders, which allowed the Oil Company Conspirators and Helsinge to squeeze out their competition by acquiring

a significant supply of petroleum solvent products, stockpiling them and ultimately manipulating the pricing of these products.

187.    The Oil Company Conspirators and Helsinge, as sellers of products to PDVSA, made illicit payments to the Bribed PDVSA Employees, as agents of the purchaser, in order to obtain a competitive advantage over other potential sellers.

188.    In exchange for payments, the Bribed PDVSA Employees modified PDVSA tenders such that only the Oil Company Conspirators and Helsinge could meet the tenders' requirements.

189.    In exchange for payments, the Bribed PDVSA Employees rejected competitive bids from market competitors for pretextual reasons in order to award those tenders to the Oil Company Conspirators and Helsinge.

190.    In exchange for payments, the Bribed PDVSA Employees provided the Oil Company Conspirators, Helsinge, the Individual Trader Conspirators and Morillo and Baquero with access to non-public inside information that was unavailable to other potential sellers of light crude products to PDVSA.

191.    The inside information provided by the bribed PDVSA employees allowed the Oil Company Conspirators, Helsinge and the Individual Trader Conspirators to rig bids for products sold to PDVSA and to fix the pricing for those products.

192.    The payments of bribes by the Oil Company Conspirators and Helsinge, as sellers, to the Bribed PDVSA Employees, as agents of the purchaser, violated Section 2(c) of the Robinson-Patman Act (15 U.S.C. § 13).

193.    The Oil Company Conspirators and Helsinge colluded in the bribery scheme to gain an advantage over other competitors for the sale of products to PDVSA. The bribery scheme

provided the Oil Company Conspirators, Helsinge and the Individual Trader Conspirators with access to advance notice of upcoming PDVSA tenders to purchase light crude products. The Oil Company Conspirators, Helsinge and the Individual Trader Conspirators used the advance knowledge to acquire substantial amounts of the market supply of the light crude products. The resulting lack of supply of the products impeded other competitors from bidding for PDVSA tenders and artificially raised the prices for these products. Absent the Oil Company Conspirators and Helsinge's bribery scheme, more competitors would have bid for PDVSA tenders and decreased the price that PDVSA would have paid for the products PDVSA was seeking to acquire.

194.    As a result of the anti-competitive conduct, PDVSA was directly injured because it was forced to buy light crude products for artificially increased, above-market prices. PDVSA is the party most directly affected by the anti-competitive conduct.

195.    The Oil Company Conspirators and Helsinge, through Morillo and Baquero, continue to bribe the Bribed PDVSA Employees to conceal their illegal scheme from PDVSA management and to sabotage any attempts at discovering the scheme.

196.    The bribery scheme has adversely affected the flow of commerce between the United States and Venezuela.

197.    PDVSA required the light crude products to lighten the heavy crude oil sold to purchasers in order to transport the crude oil from Venezuelan ports to purchasers primarily located in the United States, including the Oil Company Conspirators and Helsinge's customers.

198.    Once the Oil Company Conspirators, Helsinge and the Individual Trader Conspirators obtained advance knowledge of PDVSA's tenders for the purchase of petroleum solvents, the Individual Trader Conspirators acquired those solvents and stockpiled them in the United States until PDVSA published its tenders.

199.    Once PDVSA awarded the tenders for light crude products to the Oil Company Conspirators and Helsinge, the solvents were shipped from the United States to Venezuela.

200.    The Individual Trader Conspirators have used the U.S. bank accounts of the Oil Company Conspirators and Helsinge to transfer payments to Morillo and Baquero, which were destined to the Venezuela-based Bribed PDVSA Employees as bribes.

201.    Morillo and Baquero managed the bribery scheme from their U.S. offices.

202.    In addition, the Individual Trader Conspirators and Morillo and Baquero directly accessed PDVSA's inside information, at the Individual Trader Conspirators' offices, many of which are in the United States, and at Morillo and Baquero's offices in the United States.

203.    In furtherance of the Oil Company Conspirators and Helsinge's scheme to corrupt the Bribed PDVSA Employees, many of the Individual Trader Conspirators met with Morillo and Baquero in the United States.

204.    As a result of Defendants' unlawful conduct and suppressed competition, PDVSA has suffered billions of dollars in losses. Pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15), Defendants are liable for treble damages and the costs of suit, including reasonable attorney's fees.

205.    In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from engaging in the unlawful conduct described above.

## COUNT V

**(Violations of the Florida Deceptive and Unfair Trade Practices Act)**
**(Against All Defendants)**

206.    Plaintiff incorporates by reference and realleges paragraphs 1-13 4 as though fully set forth herein.

207.    Morillo and Baquero were the principal coordinators and facilitators of the illegal anti-competitive schemes. Morillo's and Baquero's companies, Helsinge and WTRPC, have their principal place of business in Florida. They hold their board of directors meetings in Florida, maintained their books and records in Florida and primarily used Florida bank accounts to pursue their illegal scheme. Morillo and Baquero coordinated their illegal schemes out of their Florida office, including with their co-conspirators, the Oil Company Conspirators and the Bribed PDVSA Employees. Morillo and Baquero transferred illicit payments to the Bribed PDVSA Employees through Florida bank accounts. Morillo and Baquero and their agents, Lutz and Ryan, also accessed PDVSA's confidential information in Florida in furtherance of rigging the PDVSA tenders.

208.    The Oil Company Conspirators and Helsinge have conspired in a bid-rigging and price-fixing scheme, both constituting *per se* violations of the Sherman Act. By violating the Sherman Act, a statute that proscribes unfair methods of competition, the Defendants have violated the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201).

209.    The Oil Company Conspirators and Helsinge have engaged in a scheme to corrupt PDVSA's employees through commercial bribery in violation of the Robinson-Patman Act. By violating the Robinson-Patman Act, a statute that proscribes unfair methods of competition, Defendants have violated the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201).

210.    Defendants engaged in a conspiracy to bribe the Bribed PDVSA Employees, defraud PDVSA and misappropriate PDVSA's confidential information, which independently constitute violations of the Florida Deceptive and Unfair Trade Practices Act (Fla. S tat. § 501.201).

211.    The Oil Company Conspirators and Helsinge, through Morillo and Baquero, continue to bribe the Bribed PDVSA Employees to conceal their illegal scheme from PDVSA management and to sabotage any attempts at discovering the scheme.

212.    As a result of Defendants' fraudulent scheme, PDVSA has suffered billions of dollars in losses. Pursuant to Section 501.211 of the Florida Deceptive and Unfair Trade Practices Act, the Defendants are liable for actual damages and the costs of suit, including reasonable attorney's fees.

213.    In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from engaging in the unlawful conduct described above.

## COUNT VI

### (Violations of the U.S. Racketeer Influenced and Corrupt Organizations Act under 18 U.S.C. § 1962(c)) (Against All Defendants)

214.    Plaintiff incorporates by reference and realleges paragraphs 1-135 as though fully set forth herein.

215.    Morillo and Baquero and their co-conspirators formed the Helsinge Enterprise, an association-in-fact "enterprise," as that term is defined in 18 US.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. Morillo and Baquero, their named co-conspirators and the Bribed PDVSA Employees are members of the Helsinge Enterprise.

216.    The members of the Helsinge Enterprise are and have been joined in a common purpose, have relationships with and among each other, and have associated through time sufficient to permit those associated to pursue the Helsinge Enterprise's purpose. The members forged symbiotic relationships and each member needed and depended on the participation of the other members to accomplish their common purpose of defrauding PDVSA through fraudulent bids submitted to PDVSA tenders, including (a) Morillo and Baquero entered into an illicit

agreement with several business managers at PDVSA, whereby Morillo and Baquero would pay the PDVSA employees bribes in exchange for advance and confidential information concerning PDVSA's future tenders, and other assistance to rig the tenders; (b) Morillo and Baquero formed Helsinge and the Panamanian Companies to facilitate and conceal the bribery scheme; (c) Morillo and Baquero recruited the Individual Trader Conspirators to participate in the bid-rigging bribery scheme; (d) the Oil Company Conspirators knowingly and actively participated in the fraudulent scheme; (e) Morillo and Baquero coordinated and controlled the activities and relationships between the members to defraud PDVSA; and (0 the Bank Defendants facilitated the illegal payments from the Oil Company Conspirators to the Panamanian Companies and then the Panamanian Companies to the Bribed PDVSA Employees.

217.    Each Defendant has been employed by and/or associated with the Helsinge Enterprise.

218.    Each Defendant has knowingly and directly participated in the conduct of the Helsinge Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of predicate acts, defined as "racketeering activity" under 18 U.S.C. § 1961(1). These include acts involving bribery which are chargeable under the laws of the State of Florida (Fla. Stat. § 838.16), the federal mail fraud statute (18 U.S.C. § 1341), the federal wire fraud statute (18 U.S.C. § 1343), the federal money laundering statute (18 U.S.C. § 1956) and the Computer Fraud and Abuse Act (18 U.S.C. § 1030).

219.    Pursuant to 18 U.S.C. § 1961(1)(A), any act involving bribery chargeable under State law as a felony constitutes a racketeering activity. Under Fla. Stat. § 838.16, the Helsinge Enterprise has committed the crime of commercial bribery by paying the Bribed PDVSA Employees with the intent to influence those employees to violate their duties to PDVSA.

220.    The Helsinge Enterprise has committed mail and wire fraud involving the use of the United States mails and telephone and electronic communication systems to submit fraudulent bids and contracts from the respective United States offices of Morillo and Baquero, the Individual Trader Conspirators, the Oil Company Conspirators and Helsinge, to PDVSA The bids are submitted in response to PDVSA's tenders without disclosure of material information to PDVSA, including the fact that the tenders were rigged by the Oil Company Conspirators and Helsinge to suppress competition and artificially set the price of the products that were the subject of the bids. The Individual Trader Conspirators, the Oil. Company Conspirators and Helsinge knew that they materially misrepresented the true nature of their bids.

221.    The Helsinge Enterprise and its members have committed money laundering by intentionally disguising the nature and source of their illegal proceeds by transferring the ill-gotten gains and bribes to bank accounts in the United States, Switzerland and Curacao, in violation of 18 U.S.C. §§ 1956 and 1957. The Helsinge Enterprise opened and closed bank accounts for the purpose of laundering the illegal proceeds. Each of the laundering transactions exceeded $10,000 and were never disclosed to the applicable reporting authorities and were made with the specific intent to avoid reporting income and gains to the applicable authorities. The laundering transactions were made by the members with the intent of concealing the scheme, and of placing the stolen proceeds beyond the jurisdictional reach of courts in the United States and Venezuela. The laundering transactions affected interstate and foreign commerce as they involved the transfer of money between accounts in the United States or between accounts located in the United States, Switzerland and Curacao.

222.    The Helsinge Enterprise and its members violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 by intentionally accessing PDVSA's protected computer system

43

and stealing PDVSA's confidential information concerning PDVSA's upcoming tenders for the sale of crude oil products; PDVSA's upcoming need for the purchase of various additives to add to its crude oil products; and the competing bids of other oil companies. The Helsinge Enterprise and its members accessed this information to further their conspiracy to fix prices, rig bids and eliminate competition in the purchase and sale of crude oil and hydrocarbon products and to structure tenders for PDVSA contracts to favor the Oil Company Conspirators and Helsinge and disadvantage or exclude competitors, including many American oil trading companies.

223.    Defendants' fraudulent scheme took place over an extended period of time, commencing in 2004 and continuing today, and involves distinct and independent criminal acts of mail fraud, wire fraud, bribery, computer tampering, theft of trade secrets, and money laundering. These acts were neither isolated nor sporadic events, but, rather, involved regular and repeated violations of law to accomplish the Helsinge Enterprise's desired objective of defrauding PDVSA. These acts were related to each other by virtue of the common participants, a common victim, common methods of commission, and the common purpose of stealing PDVSA's funds.

224.    In addition, the Oil Company Conspirators and Helsinge, through Morillo and Baquero, continue to bribe the Bribed PDVSA Employees to conceal their illegal scheme from PDVSA management and to sabotage any attempts at discovering the scheme.

225.    Defendants' violations of 18 U.S.C. §§ 1962(c) proximately caused PDVSA to suffer direct damages and losses from PDVSA's U.S. bank accounts. The Helsinge Enterprise targeted PDVSA's assets located in the United States and misappropriated those assets. The violators have caused U.S. oil-trading competitors to lose contracts for the purchase and sale of oil products from and to PDVSA by means of Defendants' rigging of the bidding process.

226.     As a result of Defendants' unlawful conduct, PDVSA has suffered billions of dollars in losses. Pursuant to 18 U.S.C. § 1964(c), Defendants are liable for treble damages and the costs of suit, including reasonable attorney's fees.

227.     In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from engaging in the illegal conduct described above.

## COUNT VII

**(Violations of the U.S. Racketeer Influenced and Corrupt Practices Act Under 18 U.S.C. § 1962(d))**
**(Against All Defendants)**

228.     Plaintiff incorporates by reference and realleges paragraphs 1-13 5 and 2 1 5 -2 2 5 as though fully set forth herein.

229.     Each of the Defendants conspired with each other to violate 18 U.S.0 § 1962(c), in violation of 18 U.S.0 § 1962(d).

230.     As a result of Defendants' unlawful conduct, PDVSA has suffered billions of dollars in losses. Pursuant to 18 U.S.C. § 1964(c), Defendants are liable for treble damages and the costs of suit including reasonable attorney's fees.

231.     In addition to damages, Plaintiff is entitled to injunctive relief enjoining Defendants from engaging in the illegal conduct described above.

## COUNT VIII

**(Violations of the Civil Remedies for Criminal Practices Act)**
**(Against All Defendants)**

232.     Plaintiff incorporates by reference and realleges paragraphs 1-13 5 and 2 1 5 -2 2 5 as though fully set forth herein.

233.     Morillo and Baquero and their co-conspirators formed the Helsinge Enterprise, an association-in-fact "enterprise" as that term is defined in Fla. Stat. § 772.102(3), that engages in, and the activities of which affect, Florida commerce.

234.     The members of the Helsinge Enterprise are and have been joined in a common purpose, have relationships with and among each other, and have associated through time sufficient to permit those associated to pursue the Helsinge Enterprise's purpose. The conspirators forged symbiotic relationships and each member needed and depended on the participation of the other members to accomplish their common purpose of defrauding PDVSA through fraudulent bids submitted to PDVSA tenders, including (a) Morillo and Baquero entered into an illicit agreement with several business managers at PDVSA, whereby Morillo and Baquero would pay the PDVSA employees bribes in exchange for advance and confidential informal ion concerning PDVSA's future tenders, and other assistance to rig the tenders; (b) Morillo and Baquero formed Helsinge and various the Panamanian Companies to facilitate and conceal the bribery scheme; (c) Morillo and Baquero recruited the Individual Trader Conspirators to participate in the bid-rigging bribery scheme; (d) the Individual Trader Conspirators caused their employers, the Oil Company Conspirators, to knowingly and actively participate in the fraudulent scheme; (e) Morillo and Baquero coordinated and controlled the activities and relationships between all of the members to defraud PDVSA; and (0 the Bank Defendants facilitated the illegal payments from the Oil Company Conspirators to the Panamanian Companies and then from the Panamanian Companies to the Bribed PDVSA Employees.

235.     Each Defendant has been employed by and/or associated with the Helsinge Enterprise.

236.     Each Defendant has knowingly and directly participated in the conduct of the Helsinge Enterprise's affairs through a pattern of criminal activity consisting of repeated violations of predicate acts, defined as "criminal activity" under Fla. Stat. § 772.102(1), including violations of the Florida commercial bribery statute (Fla. Stat. § 838.16); the Florida Communications Fraud Act (Fla. Stat. § 817.034); and conduct that constitutes "racketeering activity" under 18 U.S.C. § 1961(1), including violations of the federal mail fraud statute (18 U.S.C. § 1341), the wire fraud statute (18 U.S.C. § 1343), the federal money laundering statute (18 U.S.C. § 1956) and the Computer Fraud and Abuse Act (18 U.S.C. § 1030).

237.     Pursuant to Fla. Stat. § 838.116, the Helsinge Enterprise has committed the crime of commercial bribery by paying the Bribed; PDVSA Employees with the intent to influence those employees to violate their duties to PDVSA.

238.     The Helsinge Enterprise has committed communications fraud under Fla. Stat. § 817.034 involving the use of the mails and telephone and electronic communication systems to submit fraudulent bids and contracts from the respective United States offices of Morillo and Baquero, the Individual Trader Conspirators, the Oil Company Conspirators and Helsinge, to PDVSA. The bids are submitted in response to PDVSA's tenders without disclosure of material information to PDVSA, including the fact that the tenders were rigged by the Oil Company Conspirators and Helsinge to suppress competition and artificially set the price of the products that were the subject of the bids. The Individual Trader Conspirators, the Oil Company Conspirators and Helsinge knew that they materially misrepresented the true nature of their bids.

239.     Defendants' fraudulent scheme took place over an extended period of time, commencing in 2004 and continuing today, and involves distinct and independent criminal acts of

mail fraud, wire fraud, bribery, computer tampering, theft of trade secrets and money laundering. These acts were neither isolated nor sporadic events, but, rather, involved regular and repeated violations of law to accomplish the Helsinge Enterprise's desired objective of defrauding PDVSA. These acts were related to each other by virtue of the common participants, a common victim, common methods of commission, and the common purpose of stealing PDVSA's funds.

240.    Defendants' fraudulent scheme was orchestrated and coordinated by Morillo and Baquero in their Florida offices and utilizing Florida bank accounts.

241.    Defendants unlawfully, knowingly and willfully conspired with each other to violate Fla. Stat. § 772.103(3), in violation of Fla. Stat. § 772.103(4).

242.    The Oil Company Conspirators and Helsinge, through Morillo and Baquero, continue to bribe the Bribed PDVSA Employees to conceal their illegal scheme from PDVSA management and to sabotage any attempts at discovering the scheme.

243.    Defendants' violations of Fla. Stat. §§ 772.103 (3) and (4) proximately caused PDVSA to suffer direct damages and billions of dollars in losses from PDVSA's U.S. bank accounts. The Helsinge Enterprise targeted. PDVSA's assets held in the United States banks and misappropriated those assets.

244.    As a result of Defendants' unlawful conduct, PDVSA has suffered billions of dollars in losses. Pursuant to Fla. Stat. § 772.104(1), Defendants are liable for treble damages and the costs of suit, including reasonable attorney's fees.

245.    In addition to damages, Plaintiff is entitled to injunctive relief pursuant Fla. Stat. § 895.05(6), enjoining Defendants from engaging in the conduct described above.

## COUNT IX

**(Fraud)**
**(Against All Defendants)**

246.     Plaintiff incorporates by reference and realleges paragraphs 1-13 5 as though fully set forth herein.

247.     Defendants represented their sale and purchase bids to PDVSA as arm's length transactions in an open and free market that was unaffected by bribery or theft of secret business information. Defendants made those representations in order to induce PDVSA to accept Defendants' bids.

248.     Defendants knew that such representations were false and that they had, in fact, secretly rigged the market in their favor. Defendants knew that PDVSA was ignorant of Defendants' rigging of the market and that their bids were based upon secret information that they had stolen by bribing PDVSA employees.

249.     PDVSA was, in fact, ignorant of Defendants' rigging of the market, their bribery and theft of PDVSA's secret business information.

250.     PDVSA materially relied upon the existence of an open and free market when it awarded the bids to Defendants.

251.     As a result of PDVSA's reliance upon an open and free market for its sale and purchase bids, and its ignorance of Defendants' secret rigging of that market, PDVSA awarded contracts to Defendants that injured PDVSA by fraudulently increasing its costs and diminishing its profits.

252.     Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty which entitles Plaintiff to recover punitive damages.

253.     Accordingly, by virtue of the foregoing, Plaintiff is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

254.     In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from the unlawful acts described above, along with an accounting, restitution and the imposition of a constructive trust against Defendants.

## COUNT X

**(Civil Conspiracy)**
**(Against All Defendants)**

255.     Plaintiff incorporates by reference and realleges paragraphs 1-13 5 as though fully set forth herein.

256.     Defendants knowingly and willfully entered into an agreement for the purpose of defrauding PDVSA and violating U.S. antitrust and money laundering laws.

257.     Defendants' fraudulent scheme took place over an extended period of time, commencing in 2004 and continuing to the present, and involved distinct and independent unlawful acts of fraud, bribery and money laundering. These acts were neither isolated nor sporadic events, but, rather, involved regular and repeated violations of law to accomplish the Helsinge Enterprise's desired objective of defrauding PDVSA. These acts were related to each other by virtue of the common participants, a common victim, common methods of commission, and the common purpose of stealing PDVSA's funds and to disguise and conceal the source of the funds.

258.     Absent Defendants' agreement to act jointly against PDVSA, the fraudulent scheme may not have taken place.

259.     Accordingly, PDVSA was damaged by the Defendants' conspiracy to defraud it. By virtue of the foregoing, Plaintiff is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

260.     In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from engaging in the unlawful conduct described above.

## COUNT XI

### (Aiding and Abetting Breach of Fiduciary Duty)
### (Against All Defendants)

261.     Plaintiff incorporates by reference and realleges paragraphs 1-1 3 5 as though fully set forth herein.

262.     PDVSA's employees owed a fiduciary duty to PDVSA barring them from self-dealing and assisting the Defendants in a scheme to defraud PDVSA.

263.     The Bribed PDVSA Employees violated their fiduciary duty by accepting bribes from Defendants to participate in a bid-rigging and price-fixing scheme thereby intentionally causing PDVSA to lose billions of dollars.

264.     Defendants knew that PDVSA employees owed a fiduciary duty to PDVSA and that the Defendants' payments would influence PDVSA's employees to breach such duty.

265.     By bribing PDVSA employees, Defendants rendered knowing and substantial assistance to the Bribed PDVSA Employees in breaching their fiduciary duty.

266.     As a result of the Defendants aiding and abetting the breach of PDVSA's employees' fiduciary duties, PDVSA suffered damages in the billions of dollars, and Plaintiff is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

267. In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from engaging in the unlawful conduct described above.

## COUNT XII

### (Aiding and Abetting Fraud)
### (Against the Bank Defendants)

268. Plaintiff incorporates by reference and realleges paragraphs 1-13 5 as though fully set forth herein.

269. In order to prolong the illicit scheme, Morillo and Baquero took active measures to fraudulently conceal the scheme from PDVSA's management. The scheme continued for over a decade because Morillo and Baquero intentionally and knowingly concealed material facts, including that they were paying bribes to the Bribed PDVSA Employees.

270. To conceal their scheme, Morillo and Baquero bribed corrupt high-level PDVSA managers to monitor and sabotage any potential discovery of the scheme and to rig the tenders and bid awards to create a false appearance of a regular market transaction. In addition, Morillo and Baquero ensured that their scheme was not discovered by monitoring PDVSA's 'Internal system through the clone server that was created for them by the Bribed PDVSA Employees.

271. Morillo and Baquero concealed the scheme by intentionally disguising the nature and source of their illegal transactions by transferring the ill-gotten gains and bribes between various bank accounts in the United States, Switzerland and Curacao held at the Bank Defendants.

272. Absent Morillo's and Baquero's active measures to covertly sabotage any discovery of the illicit scheme, PDVSA would have terminated the Bribed PDV SA Employees and ceased doing business with the Oil Company Conspirators and Helsinge.

273. The Bank Defendants knew that Morillo and Baquero were seeking to disguise and conceal illicit transactions by using the accounts at the Bank Defendants.

274.     By failing to comply with their "know your customer" due diligence obligations, the Bank Defendants provided substantial aid and assistance to the conspirators' fraudulent concealment of the bribery scheme.

275.     As a result of the Bank Defendants' aiding and abetting the fraud, PDVSA suffered damages in the billions of dollars. Accordingly, by virtue of the foregoing, Plaintiff is entitled to compensatory and punitive damages, together with interest and costs.

276.     In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from engaging in the unlawful conduct described above.

## **COUNT XIII**

### **(PDVSA Purchases of Light Crude Products - Breach of Contract) (Against the Oil Company Conspirators and Helsinge)**

277.     Plaintiff incorporates by reference and realleges paragraphs 1-13 5 as though fully set forth herein.

278.     The Oil Company Conspirators and Helsinge entered into agreements with PDVSA which required PDVSA to pre-pay 100% of the supply contract price for petroleum solvents and other light crude products.

279.     Despite PDVSA pre-paying in full for the products, the Oil Company Conspirators and Helsinge failed to deliver the contractually agreed amounts of the products. Indeed, PDVSA overpaid on approximately 80% of the contracts because the quantity received by PDVSA was less than the contract's volume specifications.

280.     As part of the Oil Company Conspirators and Helsinge's scheme, they bribed the Bribed PDVSA Employees to fraudulently conceal short deliveries.

281.     By failing to deliver the contracted volume, Helsinge breached these contracts causing PDVSA damages.

282.    By virtue of the foregoing, Plaintiff is entitled to compensatory and punitive damages, together with interest and costs.

283.    In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from the behavior described above, together with an accounting, restitution and the imposition of a constructive trust.

## COUNT XIV

**(PDVSA Sales of Hydrocarbon Products - Breach of Contract)**
**(Against the Oil Company Conspirators and Helsinge)**

284.    Plaintiff incorporates by reference and realleges paragraphs 1-13 5 as though fully set forth herein.

285.    The Oil Company Conspirators and Helsinge entered into agreements with PDVSA which required the Oil Company Conspirators and Helsinge to make full payment to PDVSA based on the contract price for hydrocarbon products sold by PDVSA.

286.    Despite PDVSA supplying the full amount of the products that it sold, the Oil Company Conspirators and Helsinge failed to remit the entire contract price for thousands of contracts, comprising billions of dollars in underpayments.

287.    As part of the Oil Company Conspirators and Helsinge's scheme, they bribed the Bribed PDVSA Employees to fraudulently conceal the underpayment.

288.    By failing to remit the entire contract price, Helsinge and the Oil Company Conspirators breached these contracts causing PDVSA damages.

289.    Accordingly, by virtue of the foregoing, Plaintiff is entitled to compensatory and punitive damages, together with interest and costs.

290.     In addition to damages, Plaintiff is also entitled to injunctive relief, enjoining Defendants from the behavior described above, together with an accounting, restitution and the imposition of a constructive trust.

## COUNT XV

### (Unjust Enrichment)
### (Against All Defendants)

291.     Plaintiff incorporates by reference and realleges paragraphs 1-13 5 as though fully set forth herein.

292.     Defendants unjustly enriched themselves at PDVSA's expense by engaging in fraudulent bid-rigging and price-fixing reaping billions of dollars of gains.

293.     It is against equity and good conscience to permit Defendants to retain the benefits of their fraudulent scheme to misappropriate billions of dollars from PDVSA.

294.     Therefore, equity requires that the benefit of Defendants' fraud be returned to Plaintiff.

295.     By virtue of the foregoing, Plaintiff is entitled to recover the amount by which Defendants were unjustly enriched and punitive damages, together with interest and costs.

296.     In addition to damages, Plaintiff is entitled to an accounting, restitution and the imposition of a constructive trust for the billions of dollars unjustly siphoned from PDVSA.

## COUNT XVI

### (Violation of the Computer Fraud and Abuse Act 18 U.S.C. § 1030)
### (Against All Defendants)

297.     Plaintiff incorporates by reference and realleges paragraphs 1-13 5 as though fully set forth herein.

298.     Defendants intentionally accessed PDVSA's protected computer system by setting up an unauthorized clone server at WTRPC's offices in Miami, Florida or elsewhere and by

otherwise accessing PDVSA's computer system in order to obtain direct "real time" access to PDVSA's confidential information in excess of any authorization otherwise granted to them.

299.    Defendants either actively participated in intentionally accessing PDVSA's protected computer system or rendered knowing and substantial assistance in committing the unauthorized access to PDVSA's protected computer system.

300.    Defendants obtained PDVSA's confidential information from the protected PDVSA computer system in excess of their authorization.

301.    As a result, there was a loss to PDVSA in excess of $5,000 in value each year Defendants accessed PDVSA's computer system.

302.    Accordingly, Plaintiff is entitled to compensatory and punitive damages and a preliminary and permanent injunction enjoining access to and use of the internal confidential information described above, restitution and disgorgement of profits, together with interest, costs and attorney's fees.

## COUNT XVII

### (Violation of the Stored Communications Act, 18 U.S.C. § 2701)
### (Against All Defendants)

303.    Plaintiff incorporates by reference and realleges paragraphs 1-13 5 and 2 9 8 -3 0 0 as though fully set forth herein.

304.    Defendants intentionally accessed PDVSA's protected computer system and the stored communications therein and set up an unauthorized clone server at WTRPC's offices in Miami, Florida or elsewhere in order to obtain "real time" access to PDVSA's information in excess of any authorization otherwise granted to them.

305.    Defendants either actively participated in intentionally accessing PDVSA's protected computer system and stored communications or rendered knowing and substantial assistance in committing the unauthorized access to PDVSA's protected computer system.

306.    Defendants willfully, intentionally and in excess of their authorization obtained PDVSA's electronic communications and confidential information stored on the PDVSA computer system.

307.    As a result of these violations, PDVSA suffered actual damages. including lost profits, and Plaintiff is entitled to recover such damages and attorney's fees, interest and costs.

308.    Because Defendants' actions were willful and intentional, Plaintiff is entitled to punitive damages.

309.    In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from their unlawful behavior described above.

## COUNT XVIII

**(Violation of the Wire and Electronic Communications Interception and Interception of Oral Communications Act (Federal Wiretap Act), 18 U.S.C. § 2510)**
**(Against All Defendants)**

310.    Plaintiff incorporates by reference and realleges paragraphs 1-13 5 and 2 9 8 - 3 0 0 as though fully set forth herein.

311.    Defendants intentionally accessed PDVSA's protected computer system and set up an unauthorized clone server at Waltrop's offices in Miami, Florida or elsewhere in order to obtain direct "real time" access to PDVSA's information in excess of any authorization otherwise granted to them.

312.    Defendants either actively participated in intentionally intercepting and procuring PDVSA's protected electronic communications, or intentionally disclosed or endeavored to disclose to others the contents of those electronic communications, or intentionally used or

endeavored to use the contents of those electronic communications, knowing the information had been obtained through the interception of electronic communications, all in violation of the Federal Wiretap Act.

313.     As a result of these violations, PDVSA suffered actual damages, including lost profits, and Plaintiff is entitled to recover actual damages and the disgorgement of all profits made by Defendants as a result of their violations of the Federal Wiretap Act.

314.     Plaintiff is also entitled to recover interest and costs.

315.     In addition to damages, Plaintiff is entitled to injunctive relief, enjoining Defendants from their unlawful behavior described above.

<u>**COUNT XIX**</u>

**(Violation of the Florida Uniform Trade Secrets Act, CH. 688)**
**(Against All Defendants)**

316.     Plaintiff incorporates by reference and realleges paragraphs 1-1 3 5 and 2 9 8 - 3 0 0 as though fully set forth herein.

317.     Defendants used unauthorized means, including bribing PDVSA employees and setting up unauthorized electronic access systems, in order to gain access to PDVSA's confidential trade secrets.

318.     These trade secrets include PDVSA's confidential information about upcoming tenders for the sale of crude oil and expected amounts of crude oil available for sale; PDVSA's requirements for the purchase of light crude oil products; and the terms of bids received from competing oil companies for the purchase and sale of products.

319.     At the time Defendants gained access to PDVSA's trade secrets, they knew that these trade secrets were acquired by unauthorized means and were obtained from individuals who owed a fiduciary duty to PDVSA to maintain the secrecy of these trade secrets.

320.  Defendants' actions were willful and malicious.

321.  As a result of these actions, Plaintiff is entitled to single and double damages, injunctive relief, attorney's fees, interest and costs.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against Defendants, jointly and severally, as follows:

I.  As to Count I, compensatory damages, treble damages, injunctive relief, interest and the costs of suit, including reasonable attorney's fees, pursuant to 15 U.S.C. § 15;

II.  As to Count II, compensatory damages, treble damages, injunctive relief, interest and the costs of suit, including reasonable attorney's fees, pursuant to 15 U.S.C. § 15;

III.  As to Count III, compensatory damages, treble damages, injunctive relief, interest and the costs of suit, including reasonable attorney's fees, pursuant to 15 U.S.C. § 15;

IV.  As to Count IV, compensatory damages, treble damages, injunctive relief, interest and the costs of suit, including reasonable attorney's fees, pursuant to 15 U.S.C. § 15;

V.  As to Count V, actual damages, injunctive relief, interest and the costs of suit, including reasonable attorney's fees pursuant to Fla. Stat. § 501.211'

VI.  As to Count VI, compensatory damages, treble damages, interest and the costs of suit, including reasonable attorney's fees, pursuant to 18 U.S.C. § 1964(c);

VII.  As to Count VII, compensatory damages, treble damages, interest and the costs of suit, including reasonable attorney's fees, pursuant to 18 U.S.0 § 1964(c);

VIII.  As to Count VIII, compensatory damages, treble damages, interest and the costs of suit, including reasonable attorney's fees, pursuant to Fla. Stat. § 772.104(1);

IX.  As to Count IX, compensatory and punitive damages, injunctive relief together with interest and cost, an accounting, restitution and the imposition of a constructive trust;

X.  As to Count X, compensatory and punitive damages, injunctive relief, together with interest and costs;

XI.    As to Count XI, compensatory and punitive damages, injunctive relief, restitution, disgorgement of profits, and an accounting together with interest and costs;

XII.   As to Count XII, compensatory and punitive damages, restitution, injunctive relief, disgorgement of profits, and an accounting together with interest and costs;

XIII.  As to Count XIII, compensatory and punitive damages, injunctive relief, together with an accounting, restitution, the imposition of a constructive trust, interest and costs;

XIV.   As to Count XIV, compensatory and punitive damages, injunctive relief, together with an accounting, restitution, the imposition of a constructive trust, interest and costs;

XV.    As to Count XV, compensatory and punitive damages, together with an accounting, restitution, the imposition of a constructive trust, interest and costs;

XVI.   As to Count XVI, a preliminary and permanent injunction enjoining access and use of the internal confidential information, described in such Count XVI, compensatory and punitive damages, restitution and disgorgement of profits, interest, costs and attorney's fees;

XVII.  As to Count XVII, actual damages, including lost profits, punitive damages, injunctive relief, attorney's fees, interest and costs;

XVIII. As to Count XVIII, actual damages, disgorgement of profits made by Defendants, injunctive relief, with interest and costs;

XIX.   As to Count XIX, single and double damages, injunctive relief, interest, costs and attorney's fees.

and, granting Plaintiff such other and further relief as the Court deems just, equitable and

appropriate, relating to this litigation.

Dated: May 18, 2021                          Respectfully submitted,

                                             **BOIES SCHILLER FLEXNER LLP**

                                             By: */s/ Steven W. Davis*
                                             Steven W. Davis (Bar No. 347442)
                                             Bank of America Tower
                                             100 SE Second Street, Suite 2800 Miami,
                                             Florida 33131
                                             Tel: (305) 539-8400

Fax: (305) 539-1307

David Boies
333 Main Street
Armonk, New York, NY 10504
Tel: (914) 749-8200
Fax: (914) 7498300

George F. Carpinello
30 S. Pearl Street, 11th Floor
Albany, New York 12207
Tel: (518) 434-0600
Fax: (518) 434-0665

*Attorneys for Movant PDVSA*